IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

──────────────────────────────

DELVILLE BENNETT,

                            Plaintiff,          Civil Action No.
              v.                                9:09-CV-0515 (GLS/DEP)


TED NESMITH, Physicians Assistant,
LESTER WRIGHT, M.D., Deputy Commissioner
and Chief Medical Officer, and TIMOTHY
WHALEN, M.D., Medical Provider,

                            Defendants.

──────────────────────────────

APPEARANCES:

FOR PLAINTIFF:

DELVILLE BENNETT, *Pro Se*
98-A-1110
Woodbourne Correctional Facility
99 Prison Road
P.O. Box 1000
Woodbourne, NY 12788

FOR DEFENDANTS:

HON. ERIC T. SCHNIEDERMAN          MICHAEL G. McCARTIN, ESQ.
Attorney General of               Assistant Attorney General
the State of New York
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

Plaintiff Delville Bennett, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis*, has commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights. Plaintiff's complaint originally named three medical employees of the New York State Department of Correctional Services ("DOCS") as defendants, and alleges that they were deliberately indifferent to his complaints of persistent pain.[1]   As relief, plaintiff seeks recovery of compensatory and punitive damages as well as a permanent injunction directing prison officials to examine him and provide appropriate medical treatment.

Defendants now seek summary judgment dismissing Bennett's claims against them, asserting they are entitled to judgment because he failed to exhaust his administrative remedies, and additionally arguing that

---

[1]    On April 6, 2010, I issued a report recommending dismissal of plaintiff's claims against defendant Lester Wright, with leave to replead.  Dkt. No. 30.  District Judge Gary L. Sharpe adopted that recommendation in full, on May 11, 2010, granting defendant Wright's motion and dismissing plaintiff's claims against him, except as to those against him in his official capacity seeking injunctive relief, with leave to replead. Dkt. No. 35.  Plaintiff has apparently filed an appeal from that determination, *see* Dkt. No. 41, which has been dismissed; plaintiff also has requested reconsideration of that dismissal, and it appears that that motion remains pending.  Plaintiff has not, however, filed an amended complaint against defendant Wright.  As a result, defendant Wright is no longer a party to this lawsuit, other than in his official capacity, should plaintiff's claims survive.  For these reasons, those arguments relating to Wright's personal involvement in the deprivations alleged included within the parties' motion papers will not be addressed herein.

plaintiff's claims fail as a matter of law.  For the reasons set forth below, I recommend that defendants' motion be granted and that plaintiff's complaint be dismissed in its entirety.

I.    BACKGROUND[2]

Plaintiff, a prison inmate entrusted to the care and custody of the DOCS, at the times relevant to his claims was designated to the Great Meadow Correctional Facility ("Great Meadow"), located in Comstock, New York.  Complaint (Dkt. No. 1) ¶ 2.

The facts surrounding plaintiff's claims, which are relatively uncomplicated and largely undisputed, involve an incident occurring on June 19, 2007, when he fell down stairs at one of the buildings at Great Meadow.  Complaint (Dkt. No. 1) ¶ 7.  Plaintiff apparently sought medical treatment for the resulting injuries he sustained from defendant Ted Nesmith, a physicians assistant ("PA") who, he maintains, was indifferent to his medical condition.  *Id.* at ¶ 8.  PA Nesmith and a facility nurse saw Bennett when he arrived at the facility hospital, reporting that his right

---

[2]    In light of the procedural posture of the case following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).  It should be noted, however, that many if not most of plaintiff's allegations are sharply contested by the defendants.

knee had given out and that he had fallen down six stairs; as a result of plaintiff's complaints of pain in his right knee, PA Nesmith ordered an x-ray.  Nesmith Decl. (Dkt. No. 31-5) ¶ 4.  PA Nesmith's review of that x-ray revealed no broken bone, and he consequently ordered that plaintiff be provided with Tylenol PM to treat his pain, and provided Bennett with permission to take three days of rest in his cell to recover while elevating his leg.  *Id*.

The other defendant whose actions remain at issue in this lawsuit is Timothy Whalen, a physician employed by the DOCS.  Whalen Decl. (Dkt. No. 31-6) ¶ 3.  The basis for plaintiff's claims against defendant Whalen is less than clear, especially since plaintiff concedes that Whalen had no involvement in the care and treatment provided for the injuries that he sustained during his fall.  Prior to his accident on June 19, 2007, Bennett saw defendant Whalen on one occasion, on October 23, 2006, for a follow-up medical visit relating to complaints of pain in his left hand.  Transcript of Bennett Deposition ("Bennett Tr.") (Dkt. No. 31-3) pp. 62-63, 65, 67.  That visit lasted fifteen seconds, and after that Bennett refused to see Dr. Whalen again.  *Id*. at pp. 62, 68-69, 75.  Plaintiff's claim against Dr. Whalen appears to be premised upon his theory that Whalen was

4

ultimately responsible for the treatment that Bennett received in the facility

hospital on June 19, 2007.  Bennett Tr. (Dkt. No. 31-3) pp. 71-72.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on May 1, 2009.  Dkt. No. 1.

Plaintiff's complaint names PA Nesmith, Dr. Whalen, and Dr. Wright as

defendants and asserts a claim of deliberate medical indifference in

violation of the Eighth Amendment's prohibition against cruel and unusual

punishment, as well as a claim that could be construed as one for

retaliation, asserting that he was refused medical treatment as a result of

a grievance previously filed against Dr. Whalen.  *Id.*

Following service of an answer and completion of pretrial discovery,

defendants moved pursuant to Federal Rule of Civil Procedure 56(b) for

summary judgment dismissing the complaint, arguing in support of their

motion that 1) plaintiff failed to exhaust his administrative remedies before

commencing suit; 2) the record fails to supply a basis sufficient to find

defendant Whalen personally involved in the constitutional deprivations

alleged; 3) plaintiff's claim of medical indifference against defendant

Whalen fails as a matter of law; 4) the evidence in the record shows that

plaintiff's Eighth Amendment rights were not violated; and 5) in any event,

defendants are protected from liability on plaintiff's claims under the doctrine of qualified immunity.  Plaintiff has since responded in opposition to defendants' motion, Dkt. No. 37, which is now fully briefed and ripe for determination, and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

    A.    Summary Judgment Standard

    Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure.  Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at

248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83. In the event this initial burden is met the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court

7

to consider whether *pro se* plaintiff understood nature of summary

judgment process).

When deciding a summary judgment motion, a court must resolve

any ambiguities, and draw all inferences from the facts, in a light most

favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v.*

*Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  The entry of summary

judgment is warranted only in the event of a finding that no reasonable

trier of fact could rule in favor of the non-moving party.  *See Building*

*Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d

Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.

Ct. at 2511 (summary judgment is appropriate only when "there can be

but one reasonable conclusion as to the verdict").

B.    Failure to Exhaust

In support of their motion, defendants first contend that the

complaint is subject to summary dismissal since the record reveals that

plaintiff failed to exhaust his administrative remedies by filing a grievance

addressed to the claims alleged in the complaint before commencing this

lawsuit.  The record presently before the court appears to support

defendants' assertion.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S. Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007).[3]  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983, 992 (2002) (citation omitted).

In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal.  *See Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y.

---

[3]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 94-95, 126 S. Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies).  "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules."  *Woodford*, 548 U.S. at 95, 126 S. Ct. at 2388; *see also Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007) (citing *Woodford*).[4]

In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement.[5]  *Macias*, 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir. 2004).  Under the prescribed algorithm, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times.  *Macias,* 495

---

[4]     While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA.  *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted).

[5]     As will be seen, whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford*, has been a matter of some speculation.  *See, e.g.*, *Newman v. Duncan,* NO. 04-CV-395, 2007 WL 2847304, at * 2 n.4 (N.D.N.Y. Sept. 26, 2007) (McAvoy, S.J. and Homer, M.J.) .

F.3d at 41; *Hemphill,* 380 F.3d at 686.  If such a remedy existed and was available, the court must next examine whether the defendants have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it or whether, through their own actions preventing the exhaustion of plaintiff's remedies, they should be estopped from asserting failure to exhaust as a defense.  *Macias*, 495 F.3d at 41; *Hemphill*, 380 F.3d at 686.  In the event the proffered defense survives these first two levels of scrutiny, the court lastly must examine whether special circumstances nonetheless exist and "have been plausibly alleged" to justify the plaintiff's failure to comply with the applicable administrative procedural requirements.[6]  *Macias*, 495 F.3d at 41; *Hemphill*, 380 F.3d at 686.

    a)    <u>Availability of Remedy</u>

New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCS and recognized as an "available" remedy for purposes of the PLRA.  *See Mingues v. Nelson*, No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing

---

[6]    In practicality these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap.  *See Hargrove*, 2007 WL 389003, at *8 n.14; *see also Giano v. Goord*, 380 F.3d 670, 677 n.6 (2d Cir. 2004).

*Mojias v. Johnson*, 351 F.3d 606 (2d Cir. 2003) and *Snider v. Melindez*, 199 F.3d 108, 112-13 (2d Cir.1999)).  The IGP consists of a three-step review process.  First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident.[7]  7 N.Y.C.R.R. § 701.5(a).  The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance.  *Id.* §§ 701.4(b), 701.5(b).  If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision.  *Id.* § 701.5(c).  The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision.  *Id.* § 701.5(d).  Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court.  *Reyes v. Punzal*, 206 F. Supp. 2d 431, 432 (W.D.N.Y. 2002) (citing, *inter alia*, *Sulton v. Greiner*, No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

---

[7]     The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances."  7 N.Y.C.R.R. § 701.6(g)(1)(i)(a)-(b).

Despite an inmate's entitlement in most instances to file and pursue a grievance in accordance with the IGP, there are circumstances under which the grievance procedure nonetheless is deemed not to have been available to an inmate plaintiff.  *See Hemphill*, 380 F.3d at 687-88.  Thus, for example, "[e]xhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, . . . or where defendants' behavior prevents plaintiff from seeking administrative remedies."  *Hargrove,* 2007 WL 389003, at *8 (citations omitted) (noting, for example, that a defendant's failure to advance plaintiff's grievances or the issuance of threats against an inmate to deter the filing of a grievance may effectively render the administrative process unavailable).  When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process, courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would] have deemed them available."  *Id.* at 688 (quotations and citations omitted); *see Hargrove,* 2007 WL 389003, at *8.

<div align="center">

b)      <u>Presentation of Defense/Estoppel</u>

</div>

<div align="center">13</div>

The second prong of the *Hemphill* analysis focuses upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (citations omitted).

<div align="center">c)   <u>Special Circumstances</u></div>

The third, catchall factor to be considered under the Second Circuit's prescribed exhaustion rubric focuses upon whether special circumstances have been plausibly alleged which, if demonstrated, would justify excusing a plaintiff's failure to exhaust administrative remedies. *Hemphill,* 380 F.3d at 689; *see also Giano,* 380 F.3d at 676-77; *Hargrove,* 2007 WL 389003, at *10.  Among the circumstances potentially qualifying as "special" under this prong of the test include where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable.  *Giano*, 380 F.3d at 676-77; *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Giano*).

<div align="center">14</div>

In this case, there is no dispute regarding the availability of the remedy, or defendants' preservation of the defense by raising it in their answer. *See* Defendants' Answer (Dkt. No. ) ¶ 9. And, defendants have produced unrefuted evidence that plaintiff did not pursue a grievance regarding the allegedly unconstitutional medical care he received at Great Meadow through the final level of appeal to the CORC. Bellamy Decl. (Dkt. No. 31-7) ¶ 5. The question presented is whether plaintiff has produced sufficient evidence to suggest that defendants should be estopped from asserting this defense, or special circumstances otherwise exist which warrant excusing Bennett's failure to exhaust his administrative remedies regarding the claims at issue in this lawsuit. On the record before the court, he has not.

To the contrary, at his deposition plaintiff confirmed that the only grievance he filed against defendant Whelan was filed more than six months before the incident alleged in the complaint, on December 7, 2006, complaining that his medical needs were not being met. Bennett Tr. (Dkt. No. 31-3) pp. 87, 93, 100-01. Plaintiff also essentially admitted that he did not file a grievance relating to the medical care that was provided to him in relation to the June 19, 2007 incident. Although he claimed that

15

five bags of his property, which included his grievance files, were stolen

from him, when asked whether he ever filed a grievance regarding the

claims alleged in the complaint, Bennett stated that he could not recall,

and made no claim that he ever was prevented from doing so.  *Id.* at pp.

118, 124.

In opposition to defendants' motion, plaintiff generally asserts that

the IGP is unreliable and that the prison administration will delete and

expunge grievances in order to prevent plaintiff from pursuing his claims.

Plf's Opposition Memorandum (Dkt. No. 37-3) ¶ 3.  For the first time,

contradicting his own deposition testimony, plaintiff seems to claim that he

did file and pursue through appeal to the CORC a grievance regarding the

claims asserted in this action.  *See* Plaintiff's Response to Defendants'

Local Rule 7.1(a)(3) Stmt. (Dkt. No. 37) p. 21 (unnumbered).[8]

---

[8]    In response to defendants' statement that plaintiff did not exhaust his
administrative remedies because he did not pursue a grievance through the third step
in the DOCS grievance procedure by filing an appeal to the CORC, *see* Defendants'
Local Rule 7.1(a)(3) Statement (Dkt. No. 31-8) ¶ 5, plaintiff states, "[p]laintiff denied
NO. 5 he did appeal and pursue his grievance to the central office Review Commette
[sic] (CORC)."  Plaintiff's Response to Defendants' Local Rule 7.1(a)(3) Statement
(Dkt. No. 37) p. 21 (unnumbered).  Additionally, attached to plaintiff's opposition
papers is a grievance dated February 11, 2009, nearly two years after the incident
alleged in this lawsuit, which was apparently filed when plaintiff was housed at Clinton
Correctional Facility and is stamped received on February 24, 2009.  See Plf's Exh. 2
(Dkt. No. 37-1) p. 20 (unnumbered).  Plaintiff does not provide any further information
with respect to this grievance, and has not shown that he pursued it through appeal to
the CORC.  Even more, that grievance only generally claims that the medical

Additionally, plaintiff now claims that at the time of his deposition on December 15, 2009 he "was afflicted with atrocities cruel and unusual punishment for the period of time that he was there", including being deprived of a shower and receiving only three meals, assertions that he never made during the course of his deposition testimony.  *See* Plaintiff's Opposition Memorandum (Dkt. No. 37-3) ¶ 6.

Plaintiff's new and uncorroborated contention that he pursued a grievance, however, fails to create a genuine issue of material fact as to whether he completed the exhaustion process.  *Shaheen v. McIntyre*, No. 9:05-CV-0173, 2007 WL 3274835, at * 16 (N.D.N.Y.  Nov. 5, 2007) (McAvoy, S.J. and Lowe, M.J.).  Though Bennett claims that his personal property was stolen at some point, and also implies that his grievance was included therein, in opposition to defendants' motion he has produced no evidence that he ever attempted to file a grievance involving the claims at issue in this lawsuit.  Plaintiff does not state the date on which such grievance was allegedly filed, or where he was located at the time, nor does he does specifically identify the particulars of the complaint he

_____

department has ignored his requests for medical attention, which he believes indicates he is terminally ill, and makes no reference whatsoever to any of the claims made in this lawsuit.

17

allegedly made.  In sum, despite plaintiff's eleventh-hour, unsupported assertion, the record remains barren of any evidence that plaintiff satisfied, or was somehow prevented from satisfying, his obligation to exhaust administrative remedies.  Plaintiff's complaint should therefore be dismissed on this procedural basis.

     C.    Medical Indifference

Defendants further contend that even if plaintiff's claims were properly exhausted, they would fail on the merits because the medical care he received met the minimum standards imposed by the Eighth Amendment.

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment.  *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976).  The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain" and is incompatible with "the evolving standards of decency that mark the progress of a maturing society."  *Id.; see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084 (1986) (citing, *inter alia, Estelle).*  While

the Eighth Amendment does not mandate comfortable prisons, neither
does it tolerate inhumane treatment of those in confinement. *Farmer v.
Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes
v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)). To satisfy
their obligations under the Eighth Amendment, prison officials must
"ensure that inmates receive adequate food, shelter, and medical care,
and must take reasonable measures to guarantee the safety of inmates."
*Farmer*, 511 U.S. at 832, 114 S.Ct. at 1976 (quoting *Hudson v. Palmer*,
468 U.S. 517, 526-27, 104 S.Ct. 3194, 3200 (1984)) (internal quotations
omitted).

A claim alleging that prison officials have violated the Eighth
Amendment by inflicting cruel and unusual punishment must satisfy both
objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255,
268 (2d Cir. 2009); *Price v. Reilly*, No. 07-CV-2634 (JFB/ARL), 2010 WL
889787, at *7-8 (E.D.N.Y. Mar. 8, 2010). Addressing the objective
element, to prevail a plaintiff must demonstrate a violation sufficiently
serious by objective terms, "in the sense that a condition of urgency, one
that may produce death, degeneration, or extreme pain exists." *Hathaway
v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). With respect to the

19

subjective element, a plaintiff must also demonstrate that the defendant

had "the necessary level of culpability, shown by actions characterized by

'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).

Claims of medical indifference are subject to analysis utilizing this Eighth

Amendment paradigm. *See Salahuddin v. Goord,* 467 F.3d 263, 279-81

(2d Cir. 2006).

### 1.    Objective Requirement

Analysis of the objective, "sufficiently serious," requirement of an

Eighth Amendment medical indifference claim begins with an inquiry into

"whether the prisoner was actually deprived of adequate medical care . .

.", and centers upon whether prison officials acted reasonably in treating

the plaintiff. *Salahuddin*, 467 F.3d at 279.  A second prong of the

objective test addresses whether the inadequacy in medical treatment

was sufficiently serious.  *Id*. at 280.  If there is a complete failure to

provide treatment, the court must look to the seriousness of the inmate's

medical condition.  *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir.

2003).  If, on the other hand, the complaint alleges that treatment was

provided but was inadequate, the seriousness inquiry is more narrowly

confined to that alleged inadequacy, rather than focusing upon the

seriousness of the prisoner's medical condition.  *Salahuddin*, 467 F.3d at

280.  "For example, if the prisoner is receiving on-going treatment and the

offending conduct is an unreasonable delay or interruption in treatment. . .

[the focus of] the inquiry is on the challenged delay or interruption, rather

that the prisoner's underlying medical condition alone."  *Id.* (quoting *Smith*,

316 F.3d at 185) (internal quotations omitted).  In other words, at the heart

of the relevant inquiry is the seriousness of the medical need, and whether

from an objective viewpoint the temporary deprivation was sufficiently

harmful to establish a constitutional violation.  *Smith*, 316 F.3d at 186.  Of

course, "when medical treatment is denied for a prolonged period of time,

or when a degenerative medical condition is neglected over sufficient

time, the alleged deprivation of care can no longer be characterized as

'delayed treatment', but may properly be viewed as a 'refusal' to provide

medical treatment."  *Id.* at 186, n.10 (quoting *Harrison v. Barkley*, 219

F.3d 132, 137 (2d Cir. 2000)).

Since medical conditions vary in severity, a decision to leave a

condition untreated may or may not raise constitutional concerns,

depending on the circumstances.  *Harrison,* 219 F.3d at 136-37 (quoting,

*inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998)).

Relevant factors informing this determination include whether the plaintiff suffers from an injury or condition that a "'reasonable doctor or patient would find important and worthy of comment or treatment'", a condition that "'significantly affects'" a prisoner's daily activities, or "'the existence of chronic and substantial pain.'" *Chance,* 143 F.3d at 702 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

### 2.    Subjective Element

The second, subjective, requirement for establishing an Eighth Amendment medical indifference claim mandates a showing of a sufficiently culpable state of mind, or deliberate indifference, on the part of one or more of the defendants.  *Salahuddin*, 467 F.3d at 280 (citing *Wilson v. Seiter*, 501 U.S. 294, 300, 111 S.Ct. 2321, 2325 (1991)). Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference."  *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach v. Dufrain,* 103 F. Supp.2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.)

22

(citing *Farmer*); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (same).  Deliberate indifference is a mental state equivalent to subjective recklessness as the term is used in criminal law.  *Salahuddin*, 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-40, 114 S. Ct. 1970).

Plaintiff's complaint, which is lacking in detail, alleges that defendants refused and failed to properly treat and examine him for the injuries he sustained on June 19, 2007, and that as a result he continues to experience excruciating pains in his knees, ankle joints, left side of his body, his chest, and lower back.  Notwithstanding the completion of discovery and defendants' motion seeking summary dismissal of his complaint, plaintiff's claim of medical indifference remains conclusory.

Though plaintiff continues to claim that he presented to the facility hospital on June 19, 2007 complaining of numerous injuries, he fails to identify with specificity any injury or condition that he had at the time or that has since worsened, stating only that his injuries "called for x-ray of his shank right knee chest and ankle[,]" whereas only his knee was x-rayed.  Plaintiff's Reply to Decl. of Ted Nesmith, P.A. (Dkt. No. 37-1) ¶ 4. In contrast to plaintiff's vague and unsupported allegations, plaintiff's

ambulatory health record ("AHR") provides objective evidence demonstrating that his injuries were minimal.  In fact, Bennett's only complaint on June 19, 2007 was pain in his right knee, for which an x-ray was ordered, revealing no abnormality.[9]  Moreover, plaintiff does not dispute that he did receive treatment for his complaints; he was given Tylenol PM for the pain and a pass for three days of rest by defendant Nesmith.

Significantly, plaintiff's AHR reveals that less than a week later plaintiff had returned to jogging.  Although plaintiff continued to complain of pain in his right knee and ankle when presenting to the Great Meadow medical facility on June 28, 2007, an examination by a facility health care provider on that occasion revealed no swelling or bruising, no acute distress, that plaintiff ambulated well, and that he reported increased pain with jogging.[10]  Bennett Tr., Exh. 1 (Dkt. No. 31-4) .  On that date, Bennett was provided with a ten-day supply of ibuprofen for his pain.  The next

---

[9]     A subsequent review of the June 19, 2007 x-ray by a physician, Dr. William Hendrick, at Albany Medical Center revealed a finding of "mild osteoarthritis", a common type of arthritis that is caused by the breakdown and eventual loss of cartilage of one or more joints.  Nesmith Decl. (Dkt. No. 31-5) ¶ 5.

[10]     Plaintiff, who was sixty-six years old at the time of his deposition, testified that he has continued to try to jog and play soccer since his fall on June 19, 2007. Bennett Tr. (Dkt. No. 31-3) pp. 43, 46, 47-48, 58-60.

notation in plaintiff's AHR occurred on July 16, 2007, at the time of

plaintiff's transfer to another DOCS facility.  *Id.* at Exh. 7.  On the date of

his transfer, no physical complaints, medications, or restrictions were

noted.  *See id.*

It is well established that minor injuries do not normally rise to the

level of seriousness required to make a viable claim medical indifference

under the Eighth Amendment.  *See, e.g., Harris v. Morton*, No. 9:05-CV-

1049, 2008 WL 596891, at  *3 n.2 (N.D.N.Y. Feb. 29, 2008) (Kahn, J. and

Treece, M.J.) ("We note that although Plaintiff states he suffered from a

'snapped' neck, he does not indicate he suffered from anything other than

a generic neck injury.") (citing *Bennett v. Hunter*, No. 9:02-CV-1365, 2006

WL 1174309) (Scullin, S.J. and Lowe, M.J.) (pinched nerve not a serious

medical need)); *Ford v. Phillips*, No. 05 Civ. 6646, 2007 WL 946703, at *

12 (S.D.N.Y. Mar. 27, 2007) (abrasions, minor bruise, slight bleeding and

scratches are not sufficiently serious); *Dzwonczyk v. Syracuse Police

Dep't*, No. 5:08-CV-00557, 2008 WL 5459147, at * 13 (N.D.N.Y. Dec. 22,

2008) (McCurn, S.J.) (allegation of a bruised rib does not satisfy the

requirement of a sufficiently serious deprivation); *Tapp v. Tougas*, No.

9:05-CV-0149, 2008 WL 4371766, at * 9 (N.D.N.Y. Aug. 11, 2008)

(Peebles, M.J.) (citing *Peterson v. Miller*, No. 9:04-CV-797, 2007 WL

2071743, at *7 (N.D.N.Y. July 13, 2007) (noting that a "dull pain" in

plaintiff's back and persistent rash on plaintiff's foot did not raise a

constitutional issue) (citation omitted)), *Report and Recommendation*

*Adopted in Part, Rejected in Part,* 2008 WL 4371762 (N.D.N.Y. Sep 18,

2008) (Mordue, C.J.); and, *Bonner v. N.Y. City Police Dep't*, No. 99 Civ.

3207, 2000 WL 1171150, at *4 (S.D.N.Y. Aug. 17, 2000) (inability to close

hand due to swelling insufficiently serious to constitute Eighth Amendment

violation).[11]

Here, the record demonstrates that plaintiff suffered no more than a

minor injury as a result of his fall on June 19, 2007 and that he was

promptly provided with adequate treatment. "[T] hat [a prisoner] feels

something more should have been done to treat his injuries is not a

sufficient basis for a deliberate indifference claim." *Dawkins v. Jones*, No.

03Civ.0068, 2005 WL196537, at * 16 (S.D.N.Y. Jan. 31, 2005) (citing

---

[11]     Plaintiff's AHR shows that plaintiff has a history of generalized
complaints of pain in the areas of his lumbar back region, cervical spine, right and left
shoulders, right knee joint, and right ankle, and studies showed degenerative changes
in all of all of these areas, except the right ankle, years before his fall on June 19,
2007.  It should be noted that to the extent that plaintiff's complaint encompasses a
claim for failure to treat these conditions, his general complaints of pain are patently
insufficient to sustain an Eighth Amendment claim.  *Mortimer Excell v. Fischer*, Civ.
No. 9:08-CV-945, 2009 WL 3111711, at *5 (N.D.N.Y. Sept. 24, 2009) (Hurd, J. and
Treece, M.J.).

*Espinal v. Coughlin*, No. 98 Civ. 2579(RPP), 1999 WL 387435, at *4

(S.D.N.Y. June 14, 1999) (Doctor who diagnosed and treated prisoner's

knee pain as asserted in complaint did not act with deliberate indifference

to his medical needs.); *Keyes v. Strack*, 95 Civ. 2367, 1997 WL 187368,

at *4 (S.D.N.Y. Apr.16, 1997)).  Because the record shows both that

plaintiff did not suffer from a serious medical condition and that defendant

Nesmith did not act with deliberate indifference to Bennett's medical

needs, plaintiff's medical indifference claims should be dismissed on the

merits.

     D.    Retaliation

     In support of their motion, defendants next argue that to the extent

plaintiff alleges that defendants retaliated against him for a grievance he

filed against Whalen, this claim fails as well.

     In order to state a *prima facie* claim under section 1983 for

retaliatory conduct, a plaintiff must advance non-conclusory allegations

establishing that 1) the conduct at issue was protected; 2) the defendants

took adverse action against the plaintiff; and 3) there was a causal

connection between the protected activity and the adverse action – in

other words, that the protected conduct was a "substantial or motivating

27

factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S. Ct. 568, 576 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds*, *Phelps v. Kapnolas*, 308 F.3d 180 (2d Cir. 2002). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy*, 429 U.S. at 287, 97 S. Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citations omitted).

As can be seen, evaluation of claims of retaliation is a particularly fact-laden exercise, since such claims revolve around both the engaging in protected conduct, as well as establishment of a nexus between that conduct and the adverse action ultimately taken. Because plaintiff's retaliation claims have been alleged in only conclusory form, and are not supported by evidence now in the record establishing a nexus between any protected activity and the adverse actions complained of, I

recommend that defendants' motion for summary judgment dismissing plaintiff's retaliation claims be granted.  *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983).

Plaintiff's complaint alleges that defendants refused and failed to treat his medical needs because he filed a grievance concerning their malfeasance.  It is well established that the filing of a grievance is protected under the First Amendment.  *Graham*, 89 F.3d at 80.  Moreover, the denial of medical care may establish adverse action.  *Benitez v Ham*, No. 9:04-CV-1159, 2009 WL 3486379, at *12 n.33 (N.D.N.Y. Oct. 21, 2009) (Mordue, C.J. and Lowe, M.J.) (citing *Odom v. Poirier*, No. 99 Civ. 4933, 2004 2884409, at *4 (S.D.N.Y. Dec. 10, 2004)).  Plaintiff's claim, however, fails in light of my determination that plaintiff was not denied necessary medical treatment.

It is also worth noting that plaintiff offers nothing but rank speculation regarding defendant Nesmith's knowledge of the grievance filed against defendant Whalen, in the face of defendant Nesmith's unequivocal denial of knowing as well as Whalen's denial of having told PA Nesmith.  Plaintiff's mere speculation as to the causal connection between his filing of a grievance and the purported failure to provide him

with constitutionally adequate medical care, especially given the lack of record evidence that any such connection existed, cannot sustain a retaliation claim.  *Shaheen*, 2007 WL 3274835, at * 11.  For these reasons, defendants' motion should be granted as to any claim of retaliation.

     E.    Personal Involvement

In their motion, defendants also assert that the record evidence does not suffice to establish defendant Whalen's personal involvement in the acts complained of.  Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under 42 U.S.C. § 1983.  *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct. 1282 (1978)).  In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant.  *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

On December 7, 2006, Bennett signed a refusal sheet stating that he refused to see Dr. Whalen for medical treatment.  Bennett Tr. (Dkt .No. 31-3) pp. 68-69.  Plaintiff did not see defendant Whalen for medical care after that date.  Bennett Tr. (Dkt .No. 31-3) at p. 75.  In fact, the last date of treatment by defendant Whalen was on October 23, 2006.  *Id.* at pp. 62, 67.

According to plaintiff, he has sued Whalen because, as Bennett's medical provider, Whalen is responsible for his medical treatment, including the care PA Nesmith provided on June 19, 2007.  *Id.* at p. 71. As a supervisor, however, Dr. Whalen cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. Culpability on the part of such a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing

31

the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring.[12]  *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds sub nom.*, *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937 (2009); *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.

Vague and conclusory allegations that a supervisor has failed to properly monitor the actions of subordinate employees do not suffice to establish the requisite personal involvement and support a finding of liability.  *Pettus v. Morgenthau*, 554 F.3d 293, 300 (2d Cir. 2009) ("To the

---

[12]      The issue of supervisory liability for civil rights violation was addressed by the Supreme Court recently in its decision in *Ashcroft v. Iqbal*, ____ U.S. ___, 129 S. Ct. 1937 (2009).  The Second Circuit has yet to address the impact of *Iqbal* upon the categories of supervisory liability under *Colon*.  Lower courts have struggled with this issue, and specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability.  *See Sash*, 674 F. Supp. 2d at 542-544; *see also Stewart v. Howard*, No. 9:09-CV-0069 (GLS/GHL), 2010 WL 3907227, at *12 n.10 (N.D.N.Y. Apr. 26, 2010) ("The Supreme Court's decision in [*Iqbal*] arguably casts in doubt the continued vitality of some of the categories set forth in *Colon*.") (citations omitted), *report and recommendation adopted*, 2010 WL 3907137 (Sept. 30, 2010) . While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.*, No.07 CIV. 1801, 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd*, 387 Fed. App'x 55 (2d Cir. 2010), others disagree and conclude that whether any of the five categories apply in any particular case depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi*, Nos. 09 Civ. 7283 (JSR), 09 Civ. 9952 (JSR), 2010 WL 2428128, at *5 (S.D.N.Y. Jun. 15, 2010); *Qasem v. Toro*, No. 09 Civ. 8361 (SHS), 2010 WL 3156031, at *4 (S.D.N.Y. Aug. 10, 2010).

extent that [a] complaint attempts to assert a failure-to-supervise claim . . .

[that claim is insufficient where] it lacks any hint that [the supervisor] acted

with deliberate indifference to the possibility that his subordinates would

violate [plaintiff's] constitutional rights.").  Under the circumstances

presented, there is no basis in the record before the court to conclude that

Bennett has a viable section 1983 damage claim against Dr. Whalen, and

defendants' motion should therefore be granted on this basis.

> F.    Leave to Amend

Plaintiff suggests in his papers submitted in opposition to

defendants' motion that in addition to opposing defendants' motion, he

seeks leave to amend his complaint.  When assessing the sufficiency of a

complaint, particular deference should be afforded to a *pro se* litigant

whose complaint merits a generous construction by the court when

determining whether it states a cognizable cause of action.  *Erickson v.*

*Pardus,* 551 U.S. 89, 94*,* 127 S. Ct. 2197, 2200 (2007) ("'[A] *pro se*

complaint, however inartfully pleaded, must be held to less stringent

standards than formal pleadings drafted by lawyers'") (quoting *Estelle*, 429

U.S. at 106, 97 S. Ct. at 292 (internal quotations omitted)); *Davis v.*

*Goord*, 320 F.3d 346, 350 (2d Cir. 2003) (citation omitted); *Donhauser v.*

33

*Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (Hurd, J.).  In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated.  *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir.1991); *see also* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires").

On the other hand, if a claim contained in a proposed amended complaint would be vulnerable in the face of a Rule 12(b)(6) motion then permitting amendment would be an act of futility which should not be sanctioned.  *See, e.g., Saxholm AS v. Dynal, Inc.,* 938 F. Supp. 120, 124 (E.D.N.Y. 1996); *In re Boesky Sec. Litig.,* 882 F.Supp. 1371, 1379 (S.D.N.Y. 1995).  Accordingly, "[i]n considering whether to grant a motion for leave to amend, the court may properly take into account the futility associated with the newly added claims or defenses."  *Clarke v. Max Advisors, LLC,* 235 F. Supp.2d 130, 151 (N.D.N.Y. 2002) (citing *Foman,* 371 U.S. at 182, 83 S. Ct. at 230).

Plaintiff's request for leave to amend in this action was made long after the completion of discovery and only after the defendants moved for summary judgment.  In general, the special solicitude that permits a *pro*

*se* plaintiff to effectively amend his or her complaint when responding to a motion to dismiss, does not similarly allow such a litigant to do so in responding to a summary judgment motion.  *Abdul-Matiyn v. Allen*, No. 9:06-cv-1503, 2010 WL 388 0510, at * 4 n.9 (citing cases) (N.D.N.Y. Sept. 28, 2010) (Suddaby, J.).  This is particularly true where, as here, discovery has already been completed based upon the allegations in plaintiff's complaint.  *Id.*

In this instance, at various times plaintiff's papers in opposition to defendants' motion make vague reference to leave to amend.[13]   Bennett has not, however, attached a proposed amended pleading to his moving papers, as required by the court's rules, N.D.N.Y.L.R. 7.1(a)(4), nor has he identified the particulars of any such proposed amendment, leaving the court to speculate as to what the parameters of any new proposed claim might be and whether it may state a plausible cause of action.

After careful review of the record before the court, I have concluded that there is no evidence suggesting that if granted another opportunity to amend his complaint, plaintiff can state a viable section 1983 claim against the defendants in this action.  Defendant Whalen only saw plaintiff

---

[13]      Upon dismissal of plaintiff's claims against Dr. Wright, he was granted leave to amend but failed to avail himself of that opportunity.

on one occasion for a follow-up visit relating to medical testing that

occurred outside of the Great Meadow medical facility, and there is no

evidence that plaintiff was suffering from a condition of urgency at that

time, or that his condition thereafter significantly deteriorated to one

causing a threat to his health a result of defendant Whalen's failure to

treat plaintiff during that visit[14]

     Similarly, with regard to defendant Nesmith, the evidence in the

record shows that he saw plaintiff on only two occasions, other than the

date of his fall.  On both occasions, February 22, 2007 and April 5, 2007,

---

[14]    For the first time, in his opposition papers plaintiff makes reference to
section 1981 and claims that defendant Whalen discriminated against him based upon
his race.  Notwithstanding the unfairness that would result to defendants in allowing
plaintiff to amend his complaint to assert a section 1981 claim at this late date, any
such claim would fail on the merits.  To state a claim under section 1981, the plaintiff
must allege that he is a member of a racial minority, an intent to discriminate on the
basis of race by the defendant, and the discrimination concerned one or more of the
activities enumerated in the statute (*i.e.*, make and enforce contracts, sue and be
sued, give evidence, etc.).  *Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*, 7
F.3d 1085, 1087 (2d Cir.1993).  "Essential to an action under Section 1981 are
allegations that the defendants' acts were purposefully discriminatory."  *Jenkins v.
Arcade Bldg. Maint.*, 44 F.Supp. 2d 524, 528 (S.D.N.Y. 1999).  "Mere 'intent as volition
or intent as awareness of consequences' does not establish a discriminatory purpose;
the actor must have 'selected or reaffirmed a particular course of action at least
because of, not merely in spite of, its adverse effects upon an identifiable group."  *Hill
v. Philip Morris USA*, No. 03 Civ. 6922, 2004 WL 1065548 *4 (S.D.N.Y. May 11,
2004)(quoting *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).
Moreover, a claim seeking personal liability under section 1981 must be predicated on
the actor's personal involvement.  *Whidbee v. Garzarelli Food Specialities, Inc.*, 223
F.3d 62, 75 (2d Cir. 2000).  Once again, on this record, there is no evidence of any
personal involvement of defendant Whalen in the unconstitutional conduct alleged.

plaintiff was seen at sick call.  Bennett Tr., Exhs. 8 and 9 (Dkt. No. 31-4).

On the first sick call visit, plaintiff provided ambiguous and non-responsive

answers to defendant Nesmith's inquiries as to what was bothering him,

including, "your guess is as good as mine", and "I can't say."; ultimately,

he made a vague complaint of a "crawling" sensation in both ears, and

was referred by PA Nesmith for a mental health evaluation.  *Id*. at Exh. 9.

On April 5, 2007, plaintiff complained of low back pain, right knee

pain, numbness of his thighs, and a foot rash, and requested a diet for

high blood pressure, lotion for his foot, and a stool to sit on to help his

back pain.  Defendant Nesmith's physical examination of plaintiff revealed

that he was not in acute distress, plaintiff looked well, no evidence of a

rash, and that plaintiff walked with some difficulty.  *Id*.  Additionally, PA

Nesmith noted that x-rays of plaintiff's back and right knee, as well as a

CT scan of his cervical spine, were previously conducted, revealing

nothing but mild degenerative changes, and that a 2006 neurology consult

resulted in no objective findings of abnormality.  Nonetheless, PA Nesmith

did not disregard plaintiff's complaints, but ordered x-rays of Bennett's

lumbar spine and right knee as well as further observation of plaintiff.  As

previously noted, however, none of these general ailments occurring

before plaintiff's fall on June 19, 2007, is sufficient to raise the specter of

an Eighth Amendment claim. *Mortimer Excell*, 2009 WL 3111711, at *5.

For all of the foregoing reasons, I recommend a finding that any

proposed amendment of plaintiff's complaint would be futile and that the

complaint be dismissed on the merits.

IV.    SUMMARY AND RECOMMENDATION

In the first instance, the record before the court demonstrates that

plaintiff failed to exhaust available administrative remedies with regard to

the claims alleged in his complaint before filing this lawsuit, thus

warranting dismissal of the action on this procedural basis.  Turning to the

merits of plaintiff's claim, contrary to the allegations in plaintiff's complaint,

the record before the court reveals that despite the nonspecific and

relatively minor nature of plaintiff's physical complaints, at all times

relevant defendant Nesmith was attentive to his medical needs and

rendered appropriate care and treatment to Bennett, and in any event,

plaintiff's various medical conditions never rose to a level of seriousness

implicating Eighth Amendment protection.  Moreover, with regard to

defendant Whalen, plaintiff has failed to demonstrate his personal

involvement in any alleged constitutional violation, and there is no evidence in the record that would support a claim for retaliation.[15]

It is therefore hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 31) be GRANTED, and plaintiff's complaint be dismissed in its entirety with prejudice.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

---

[15]     In light of my determination on the merits, I have declined to address the issue of qualified immunity.

David E. Peebles
U.S. Magistrate Judge

Dated:        February 25, 2011
              Syracuse, NY



Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

C  Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that
Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff[FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants filed separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27,
2004. The *pro se* clerk's office received and
filed the complaint on September 20, 2004. Under the
prison mail-box rule, a *pro se* prisoner's
complaint is deemed filed when it is delivered to
prison authorities. *See, e.g., Walker v.
Jastremski, 430 F.3d 560, 562 (2d
Cir.2005)*(deeming *pro* se prisoner's
§ 1983
action filed on date complaint was handed to
prison officials). There is no evidence in the
record as to when Hargrove handed the
complaint to prison officials. However, it is clear
the operative date is between August 27, 2004
and September 20, 2004. As discussed, *infra,*
both of these dates occur before Hargrove
properly exhausted the administrative remedies
available to him at NCCF.

FN2. The Nassau County University Medical
Staff are employed by the Nassau Health Care
Corporation ("NHCC"). Pursuant to the
Correctional Center Health Services Agreement
between the County of Nassau and NHCC, dated
September 24, 1999, NHCC provides medical
services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented
separately from NHCC. Accordingly, when a
distinction is necessary, Reilly and NCCF will
be referred to as "County Defendants" and Nassau
County University Medical Staff and NHCC will
be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through
medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶
3. This standard process usually takes seventy-two hours.
Edwards Aff. ¶ 4. During medical intake, NCCF tests
inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.")
¶ 3. NCCF generally uses a PPD test to detect latent TB.
Feleke Aff. ¶ 3. However, if an inmate has previously
tested positive for TB, it is NCCF's policy to test for TB
using an x-ray instead.FN4 Feleke Aff. ¶ 3. As part of its
Infectious Disease Program, NCCF re-tests inmates for TB
each year, beginning after they have been housed in that
facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin
test should not be done for people who have a(1)
Known TB infection [or a] (2) Positive
tuberculin skin test in the past. A second test may
cause a more severe reaction to the TB antigens."
Jan Nissl, RN, BS, *Tuberculin Skin Tests,*
W E B M D , h t t p : / /
www.webmd.com/hw/lab_tests/hw203560.asp
(last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF.

NHCC Defs.' 56.1 Statement ¶ 1. Before entering the
general population, Hargrove was processed through
medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The
NCCF Medical Intake Chart for Hargrove, dated March
15, 2002 ("3/15/02 Chart"), shows that Hargrove informed
medical staff that he had previously been exposed to
tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1;
NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also
shows that Hargrove reported testing positive to a prior
PPD test and that he had been treated for TB in 2000.
NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges
that he was exposed to and treated for TB in 1997.
Hargrove's Aff. in Opp. to Mot. for Summary Judgment,
("Aff. in Opp."), Ex. A at 1-2. Defendants contend that
Hargrove was given an x-ray during the medical intake
process because of his reported positive PPD test, and that
the x-ray was negative, showing no active TB infection.
NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3.
Without specifying a date, Hargrove generally states that
his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after
being incarcerated in NCCF for a year, Hargrove was
scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC
Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove
was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.'
56.1 Statement ¶ 4. This test was negative. Edwards Aff.
¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to
Hargrove, he requested an x-ray instead of a PPD test
because of his previous exposure to TB, but was forced to
submit to the PPD test. He also alleges that defendants
threatened to put him in "keep lock" or "lock up" unless
he submitted to the PPD test.FN5 Complaint, Ex. C; Aff. in
Opp. at 1-4, Ex. A.

FN5. Hargrove has made contradictory
statements about being placed in "keep lock" or
"lock up". It is unclear whether he is alleging that
defendants threatened to place him in "lock up"
unless he submitted to the PPD test or whether he
was actually placed in "lock up" until such time
that he agreed to submit to the PPD tests. For
example, in his complaint, Hargrove states that
when he "refused to submit to another [PPD]
test, the Correctional Authorities were brought in
and placed [him] in lock up." Complaint ¶ 4. In
a hearing before Magistrate Judge Bloom on

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD

test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

(3)

**NCCF's Inmate Grievance Procedure**

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. [FN6] The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8] *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

FN8. Hargrove has not argued that he was unaware of this five-day deadline.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

(4)

**Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom it may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶ ¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

**\*4** A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated

documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

**\*5** Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest arguments, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,*

--- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525).*See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth,* 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford,* 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock,* 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero,* 467 F.3d at 176 (quoting *Woodford,* 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2382).

**(3)**

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams,* 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca,* No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

*7 Hargrove has submitted both forged FN11 and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero,* 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford,* 126 S.Ct. at 2382).

FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

> **FN12.** Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams,* 418 F.Supp.2d at 101, 102 (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at \*4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams,* 418 F.Supp.2d at 101 (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at \*8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a) unless Hargrove can establish excuse for his failure to exhaust.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

### (4)

### No Grounds to Excuse Plaintiff's Failure to Exhaust

\*8 Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at \* 8-11;*Sloane,* 2006 WL 3096031, at \*4;*Williams,* 418 F.Supp.2d at 101. Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175;*Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

> **FN13.** Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law"). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at \*9, n. 4 (S.D.N.Y. Dec. 6,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2006) (applying the current law of the Second
Circuit to exhaustion claims); *Sloane,* 2006 WL
3096031, at *5 ("Until such time as the Court of
Appeals considers the impact of *Woodford,* if
any, on its prior rulings, this Court must follow
the law of the Second Circuit. The Court will
therefore apply the current law of this circuit to
the exhaustion claims."); *Collins v. Goord,* 438
F.Supp.2d at 411 n. 13 (acknowledging that
*Woodford* and *Hemphill* may be in tension, but
deciding exhaustion claims under *Hemphill*
inquiry); *Hernandez v. Coffey,* No. 99-CV11615,
2006 WL 2109465, at *3 (S.D.N.Y. July 26,
2006) (same). Here, Hargrove does not prevail
under *Hemphill;* therefore, there is no occasion
to address the potential effect *Woodford* may
have had in his case.

**a. Whether administrative remedies were "available"
to Hargrove**

The first step in the *Hemphill* inquiry requires a court to
determine whether administrative remedies were available
to the prisoner. *Hemphill,* 380 F.3d at 686. The test for
assessing availability is an "objective one: that is, would
a similarly situated individual of ordinary firmness have
deemed them available." *Id.* at 688 (internal quotation
marks omitted). In making this determination, "courts
should be careful to look at the applicable set of grievance
procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d
Cir.2004). Exhaustion may be considered unavailable in
situations where plaintiff is unaware of the grievance
procedures or did not understand it, *Ruggiero,* 467 F.3d at
179, or where defendants' behavior prevents plaintiff from
seeking administrative remedies,[FN14] *Hemphill v. State of
New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish
between situations in which defendants' behavior
renders administrative remedies "unavailable" to
the plaintiff and cases in which defendants are
estopped from asserting non-exhaustion as an
affirmative defense because of their behavior. As
such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's
administrative grievance procedure was unavailable to
him. In fact, Hargrove demonstrated his access to and
knowledge of NCCF's IGP by filing proper grievances
on November 19, 2004 and on May 10, 2005. Hargrove did
not dispute any part of Investigator Williams's affidavit
detailing the IGP and its availability to inmates since
2001. Specifically, Hargrove did not dispute, upon
entering the facility, that he received a copy of the inmate
handbook outlining the IGP. He has not claimed that he is
unfamiliar with or unaware of NCCF's IGP. Hargrove has
not alleged that prison officials failed to advance his
grievances [FN15] or that they threatened him or took any
other action which effectively rendered the administrative
process unavailable.

FN15. Although not specifically alleged,
interpreting the evidence to "raise the strongest
argument," Hargrove may be arguing that
NCCF's IGP was not available to him because
the Grievance Coordinator failed to respond to
his grievances. In the single grievance regarding
PPD tests that defendants concede is authentic,
Hargrove writes, "[n]ow for the third time your
office refused to answer my grievances so please
look into this matter because the T.B. shot is
[sic] effecting my health." 11/19/04 Grievance.
This language implies that Hargrove filed
grievances in the past and received no response
from the Inmate Grievance Coordinator.
Furthermore, Hargrove wrote on one of the
submitted copies of the November 19, 2004
grievance that "[t]his is the only accepte[sic] that
Plaintiff got back from all grievances and letters
that the Plaintiff sent to Sheriff Riley and his
medical staffs about his staff making [sic] take
T.B. test for 3 year[s]." County Defs'. Not. of
Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the
initial grievances was untimely. However,
even assuming *arguendo* that the original
grievances had been timely filed, district
courts in the Second Circuit have held that the
"lack of a response from the [Inmate
Grievance Review Committee] does not
excuse an inmate's obligation to exhaust his

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

c. Special circumstances

*10 Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " Hemphill, 380 F.3d at 688 (quoting Giano, 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." Giano, 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. See Sloane, 2006 WL 3096031, at *8;Freeman v. Goord, No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

(5)

Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct

its own mistakes with respect to the programs it administers." Woodford, 126 S.Ct. at 2385. See also Ruggiero, 467 F.3d at 178 (citing Porter, 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. Berry v. Kerik, 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." Berry, 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests are given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. Berry, 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

*11 Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. Shangold v. The Walt Disney Co., No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." Gleason v. Jandrucko, 860 F.2d 556, 559 (2d Cir.1988); McMunn v. Mem'l Sloan-Kettering Cancer Center, 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the presentation of the opposing party's claim or defense."
*McMunn*, 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold*, 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn*, 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer,* 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn,* 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn

affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold,* 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic,* 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn,* 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

## Conclusion

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan,
Defendants.
No. 9:04-CV-0471.

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney General, The Capitol Albany, NY, for Defendants.

### DECISION and ORDER

THOMAS J. McAVOY, Senior District Judge.

*1 Plaintiff commenced the instant action asserting various violations of his constitutional rights arising out of his placement at the Southport Correctional Facility. In his Complaint, Plaintiff alleges that he was improperly sent to the Special Housing Unit ("SHU") at a maximum security facility and that being in SHU has put his life in jeopardy. Currently before the Court is Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 seeking dismissal of the Complaint in its entirety for failure to exhaust administrative remedies.

**I. FACTS**[FN1]

> FN1. The following facts are taken from Defendants' statement of material facts submitted

pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts are deemed admitted because they are supported by the record evidence and Plaintiff failed to submit an opposing statement of material facts as required by Rule 7.1(a)(3). Plaintiff was specifically advised by Defendants of his obligation to file an opposing statement of material facts and to otherwise properly respond to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State Department of Correctional Services. Plaintiff signed the instant Complaint on April 7, 2004. On his Complaint form, Plaintiff indicated that there is a grievance procedure available to him and that he availed himself of the grievance procedure by filing a complaint with the IGRC [FN2], followed by an appeal to the superintendent of the facility, and then to the Central Office Review Committee in Albany. The Complaint indicates that Plaintiff is "waiting for response from Albany." The Complaint was filed on April 27, 2004.

> FN2. Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant Complaint, Plaintiff filed a grievance relating to the issues presented in this case. On April 19, 2004, the IGRC recommended that Plaintiff's grievance be denied. Plaintiff then appealed that decision to the facility Superintendent. In the meantime, on April 27, Plaintiff commenced the instant litigation. On May 3, 2004, after Plaintiff filed the Complaint in this case, the Superintendent denied Plaintiff's grievance. On May 5, 2004, Plaintiff appealed the decision to the Central Office Review Committee in Albany. On June 23, 2004, the Central Office Review Committee denied Plaintiff's appeal. Plaintiff did not file any other grievances in connection with the matters raised in this lawsuit.

Defendants now move to dismiss on the ground that Plaintiff commenced the instant action before fully exhausting his available administrative remedies.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

## II. DISCUSSION

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." *Id.* at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1, *et seq.* Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. *Neal,* 267 F.3d 116.

## III. CONCLUSION

**\*2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
William MINGUES, Plaintiff,
v.
C.O NELSON and C.O. Berlingame, Defendants.
**No. 96 CV 5396(GBD).**

Feb. 20, 2004.

**Background:** Inmate brought a § 1983 action asserting, inter alia, claims of excessive force during his wife's visit with him at the correctional facility.

**Holding:** On a defense motion to dismiss, the District Court, Daniels, J., held that the record established that the action was filed after the effective date of the Prison Litigation Reform Act (PLRA).
Motion granted.

West Headnotes

Civil Rights 78 🔑 1395(7)

78 Civil Rights
  78III Federal Remedies in General
    78k1392 Pleading
    78k1395 Particular Causes of Action
      78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases
Record established that inmate's § 1983 action was filed after the effective date of the Prison Litigation Reform Act of 1996 (PLRA), such that the inmate's failure to exhaust his administrative remedies precluded relief; examination of the initial complaint itself, on its face, unequivocally demonstrated that the inmate's subsequent allegation in his amended complaint that he filed the complaint in April of

1996 was patently false; there was no explanation offered that could reasonably support and account for the existence of May dates on the complaint. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), 42 U.S.C.A. § 1997e(a).

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1** This § 1983 action was originally commenced by the plaintiff, [FN1] a prisoner in New York State custody, and his wife claiming their civil rights were violated during the wife's visit with plaintiff at the correctional facility. Discovery in this matter has concluded. Previously, all claims asserted by plaintiff's wife were dismissed for failure to prosecute. Additionally, defendants' summary judgment motion was denied with respect to plaintiff's claims of excessive force,[FN2] and summary judgment was granted dismissing all of plaintiff's other claims. Defendants now seek to dismiss the remaining excessive force claims on the grounds they are barred by the Prisoner Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a), as plaintiff failed to exhaust his administrative remedies.

> FN1. Plaintiff and his wife were proceeding *pro se* when they filed the complaint and amended complaint. Thereafter, plaintiff obtained legal representation.

> FN2. In the amended complaint, plaintiff alleges he was beaten, kicked and punched. (Am.Compl. § 6). In his original complaint, he had also claimed that he was whipped." (Compl. at 7, 8). Plaintiff testified at his deposition that he was slapped once in the face, punched about four or five times in the lower back, and a correctional officer then laid on top of him. (Mingues Dep. at 78-81). The incident, which took approximately thirty to forty seconds, caused plaintiff to suffer from back pain for an unspecified period of time. (*Id.* at 81, 86).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

Subdivision (a) of § 1997e provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This provision became effective on April 26, 1996. *Blisset v. Casey,* 147 F.3d 218, 219 (2d Cir.1998). The PLRA's exhaustion requirement does not apply retroactively to actions pending when the Act was signed into law. *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

There is no dispute that plaintiff did not avail himself of the existing and available prison grievance procedure. Plaintiff, however, argues he was not required to exhaust his administrative remedies because, as alleged in his amended complaint, "petitioners (sic) had already filed in April 10-12 of 1996," prior to the PLRA's April 26, 1996 enactment date.[FN3] (Am.Compl. § 2). In order to determine the date that the instant action was commenced, the date of the filing of the amended complaint relates back to the filing date of the original complaint. Fed.R.Civ.P. 15(c). The original complaint was signed and dated by plaintiff's wife on May 8, 1996; it was stamped received by the Pro Se Office on May 10, 1996; and plaintiff's signature is dated May 13, 1996.[FN4]

> FN3. The amended complaint reads as follows:
>
> That the original complaint filed under and pursuant to Title 42 section 1983 and 1985 was made and submitted before this court in April of 1996, before the application of the Prisoner Litigation Reform Act of 1996 was signed into law. The Act was signed into law April 26, 1996 and petitioners had already filed in April 10-12 of 1996. (Am.Compl. § 2).
>
> FN4. Plaintiff's wife application for *in forma pauperis* relief was signed and dated May 8, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Plaintiff's signature, on his initial application for appointment of counsel, is dated May 13, 1996, and it is stamped as

received by the Pro Se Office on May 10, 1996. Attached to plaintiff's application, is his signed Affirmation of Service, dated May 13, 1996, wherein plaintiff declared under penalty of perjury that he served his application upon the Pro Se Office. Plaintiff alleges that "between April 17, 1996 until October 7, 1996," all visitation was suspended between him and his wife and that their "only form of communications was correspondence ." (Am.Compl. § 7).

The matter was referred to Magistrate Judge Pitman for a Report and Recommendation ("Report"). Although the magistrate judge found that the three earliest possible dates that the evidence demonstrates the complaint could have been filed, *i.e.,* May 8th, 10th, and 13th of 1996, were all beyond the PLRA enactment date, he nevertheless recommended that the motion to dismiss be denied based on plaintiff's allegation in the amended complaint that he filed the original complaint April 10-12 of 1996, prior to the April 26, 1996 enactment date. The magistrate judge found that, "[i]n light of the express allegation in the Amended Complaint that plaintiff commenced the action before April 26, 1996 and the absence of a clear record to the contrary, the requirement that disputed factual issues be resolved in plaintiff's favor for purposes of this motion requires that the motion be denied." (Report at 12-13).

**\*2** Defendants object to the Report's conclusion that there is a material issue of fact regarding the date the action was filed. Plaintiff's attorney did not file any objections.[FN5] The Court must make a *de novo* determination as to those portions of the Report to which there are objections. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). It is not required that the Court conduct a *de novo* hearing on the matter. *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Rather, it is sufficient that the Court "arrive at its own, independent conclusion" regarding those portions to which the objections were made. *Nelson v. Smith,* 618 F.Supp. 1186, 1189-90 (S.D.N.Y.1985) (quoting *Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983)). Accordingly, the Court, in the exercise of sound judicial discretion, must determine the extent, if any, it should rely upon the magistrate judge's proposed findings and recommendations. *Raddatz,* 447 U.S. at 676. The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within the Report. Fed.R.Civ.P. 72(b); 28 U.S.C. §

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

636(b)(1)(C). Where there are no objections, the Court may accept the Report provided there is no clear error on the face of the record. *Nelson v. Smith,* 618 F.Supp. at 1189; *see also Heisler v. Kralik,* 981 F.Supp. 830, 840 (S.D.N.Y.1997), *aff'd sub nom. Heisler v. Rockland County,* 164 F.3d 618 (2d Cir.1998).

FN5. Plaintiff himself filed objections which was not adopted by his counsel. Plaintiff objects to the magistrate judge's finding that an issue exists as to when plaintiff filed the complaint because plaintiff asserts he gave it to prison officials to be mailed in April. Additionally, plaintiff objects to the magistrate judge's suggestion that the defendants convert their motion to one for summary judgment asserting the same theory as set forth in the present motion. Since this Court finds that the instant motion is meritorious, the propriety of plaintiff personally submitting his own objections need not be address as those objections are moot.

Upon a *de novo* review, the Report's recommendation that the motion be denied is rejected by the Court. Section 1997e (a) requires that inmates exhaust all available administrative remedies prior to the commencement of a § 1983 action concerning prison conditions, and failure to do so warrants dismissal of the action. *Porter v. Nussel,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Scott,* 344 F.3d at 290. The exhaustion of one's administrative remedies, however, is not a jurisdictional requirement under the PLRA. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003). A defendant may assert a non-exhaustion claim as an affirmative defense. *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). Since it is an affirmative defense, defendants bear the burden of proof in this regard. *See, McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y.2003); *Arnold v. Goetz,* 245 F.Supp.2d 527, 534-35 (S.D.N.Y.2003); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002). A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), is an appropriate vehicle to be used by a defendant where the failure to exhaust is clear from the face of the complaint as well as any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *See, Scott v. Gardner,* 287 F.Supp.2d 477, 485 (S.D.N.Y.2003) (citation omitted); *McCoy,* 255 F.Supp.2d at 249.

In the amended complaint, plaintiff alleges, in a conclusory manner, that he filed the original complaint before the effective date of the PLRA, sometime between April 10th and April 12th of 1996.FN6 On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inference in plaintiff's favor. *Resnick v. Swartz,* 303 F.3d 147, 150-51 (2d Cir.2002) (citation omitted); *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal is only warranted where it appears without doubt that plaintiff can prove no set of facts supporting his claims that would entitle him to relief. *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The court's consideration is not limiting solely to the factual allegations set forth in the amended complaint. Rather, the court may also consider documents attached to the complaint as exhibits or incorporated in it by reference, matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which he has knowledge of and relied on in bringing the action. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citation omitted). The court is not bound to accept as true a conclusory allegation where the pleadings are devoid of any specific facts or circumstances supporting such an assertion. *DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996). Nor must the court "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1416 (7th Cir.1992) (citation omitted).

FN6. In response to then Chief Judge Thomas P. Griesa's 1996 order dismissing this action, plaintiff filed an Application for Reconsideration, dated October 28, 1996, wherein he claims that "on April 12, 1996 this petitioner filed a 1983 civil suit ..." (Pl.'s Mot. for Recons. at 1).

*3 Plaintiff fails to allege any factual basis in support of his claim that he filed the initial complaint between April 10-12, 1996. The Court is not required to accept this statement as a well-pleaded factual allegation in light of the existing record which clearly demonstrates that such an allegation is not only factually unsupported by the clear evidence, but is factually impossible. Generally, an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

amended complaint supersedes the original complaint, and renders it of no legal effect. *In re. Crysen/Montenay Energy Co.,* 226 F.3d 160, 162 (2d Cir.2000). In plaintiff's amended complaint, he states that he is submitting the amended complaint in support of his original complaint. Hence, the original complaint is incorporated by reference in the amended complaint, and may be considered by the Court. Even if the initial complaint was not so incorporated, given the circumstances of this case, the Court would nevertheless consider it as it relates to the original date of filing. An examination of the initial complaint itself, on its face, unequivocally demonstrates that plaintiff's subsequent allegation in his amended complaint that he filed the complaint between April 10th and 12th of 1996 is patently false.

The original complaint refers to plaintiff's prison disciplinary hearing arising out of the same incident forming the basis of the present lawsuit. Generally, the disciplinary charges against plaintiff were in connection with an alleged conspiracy by him and his wife to commit grand larceny against inmate Robert Cornell. That hearing began on April 16, 1996, and concluded on April 19, 1996. (Defs.' Notice of Mot. for Summ. J. Ex. N, Transcript of Disciplinary Hr'g, conducted on April 16, 18-19, 1996). Specifically, in the original complaint, plaintiff refers to the testimony given by this fellow inmate.[FN7] (Compl. at 8). That inmate testified on April 19th. (Hr'g. Tr. at 53-54, 57). Thus, plaintiff's claim that he filed the complaint between April 10-12, 1996, is absolutely impossible as the initial complaint refers to events occurring after that time period. Merely because plaintiff boldly alleges in his amended complaint that he filed the original complaint between April 10th and 12th does not require this Court to turn a blind eye to plaintiff's prior pleadings demonstrating the absurdity of his claim.[FN8] *See Silva Run Worlwide Ltd. v. Gaming Lottery Corp.,* 2001 WL 396521, *1 (S.D.N.Y. April 19, 2001) (citations omitted) (A court should not "accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court.").

FN7. In the complaint, plaintiff alleges "that at his S.H.U. hearing petitioner called as a witness Robert Cornell who stated that this petitioner Mingues nor his wife (co-petitioner) Narvaez ever took any money from him. (Compl. at 8).

FN8. At his deposition, plaintiff testified that he filed the initial complaint "[a]pproximately around June of 1996." (Mingues Dep. at 37-38).

Lawsuits by inmates represented by counsel are commenced when the complaint is filed with the court. *See,* Fed.R.Civ.P. 3, 5(e). For *pro se* litigants, who are not imprisoned and have been granted *in forum pauperis* relief, their complaints are deemed filed when received by the Pro Se Office. *See,* *Toliver v. County of Sullivan,* 841 F.2d 41 (2d Cir.1998). The complaint of a *pro se* prisoner, however, is deemed filed when he or she gives the complaint to prison officials to be mailed. *Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993), *modified on other grounds,* 25 F.3d 81 (2d Cir.1994). The "prison mailbox" rule is designed to combat inmate litigants' dependence on the prison facility's mail system and their lack of counsel so as to assure the timely filing of their legal papers with the court. *Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir.2001) (citations omitted). Given the difficulty in determining when a prisoner relinquishes control of the complaint to prison personnel, the date the plaintiff signed the original complaint is presumed to be the date plaintiff gave the complaint to prison officials to be mailed. *See e.g., Forster v. Bigger,* 2003 WL 22299326, *2 (S.D.N.Y. Oct.7, 2003); *Hosendove v. Myers,* 2003 WL 22216809, *2 (D.Conn. Sept.19, 2003); *Hayes v. N .Y.S. D.O.C. Officers,* 1998 WL 901730, *3 (S.D.N.Y. Dec.28, 1998); *Torres v. Irvin,* 33 F.Supp.2d 257, 270 (S.D.N.Y.1998) (cases cited therein).

**\*4** In response to the Report and Recommendation, plaintiff asserts that, in April, the original complaint "was placed in the facility mail box." (Pl.'s Objection to Report at 1). However, it is uncontested that plaintiff's wife signed the complaint on May 8th; it was received by the Pro Se Office on May 10 th; and plaintiff's signature is dated May 13th. There is no explanation offered that could reasonably support and account for the existence of these May dates on a complaint which plaintiff falsely claims to have deposited to be mailed during the period of April 10th and April 12th. Had plaintiff mailed the complaint directly to the court prior to April 26th, it would have been impossible for the plaintiff's wife to have signed the document two

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

days prior to the date that the Pro Se Office stamped it received on May 10th.[FN9] Moreover, absent evidence to the contrary, applying the mailbox rule would presume that plaintiff gave his complaint to prison officials on May 13, 1996, the date he signed it. *See, Johnson v. Coombe,* 156 F.Supp.2d 273, 277 (S.D.N.Y.2001) (quoting *Torres,* 33 F.Supp.2d at 270). Even if the Court gave plaintiff the benefit of the date plaintiff's wife signed the complaint, *i.e.,* the earliest date reflected on the filed complaint, it was still after the effective date of the PLRA. Hence, plaintiff is legally obligated to have pursued his prison grievance procedures prior to filing the instant action. The plaintiff has offered no explanation for the initial complaint's reference to events that occurred after the date he claims he filed it, the two May dates on which he and his former co-plaintiff wife signed the complaint, or the May date stamped received by the Pro Se Office. As the magistrate Judge observed:

> FN9. The benefit of the mailbox rule does not apply where the plaintiff delivers the complaint to someone outside the prison system to forward to the court. *Knickerbocker v. Artuz,* 271 F.3d 35, 37 (2d Cir.2001).

Apart from the allegation that certain events giving rise to the claims occurred on April 9, 1996, the Original Complaint contains no mention of dates in April, 1996. Mingues no where explains the contradiction between the signature dates on the Original Complaint and the allegations contained in Amended Complaint. (Report at 12).

New York state law provides a three tier grievance procedure applicable to plaintiff's claims of excessive force. *See,* N.Y. Correct. Law § 139 (McKinnney's 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2003); *Mendoz v. Goord,* 2002 WL 31654855 (S.D.N.Y. Nov.21, 2002); *Rodriguez v. Hahn,* 209 F.Supp.2d 344 (S.D.N.Y.2002). Plaintiff has not denied knowledge of the grievance procedure at his institution, nor claimed that anything or anyone caused him not to file a grievance and completely pursue it through the administrative process.[FN10] The magistrate judge's determination that the defendants' Rule 12(b) motion should be denied because of an "absence of a clear record" contrary to plaintiff's express allegation in the amended complaint that he

commenced the action before April 26, 1996 is erroneous. The Court could have *sua sponte* dismiss this action as the record is unmistakably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA. *See, Mojias v. Johnson,* 351 F.3d 606 (2003); *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999). In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear.

> FN10. In the original complaint, plaintiff stated he did not file a grievance, pursuant to the state's prisoner grievance procedure, "because this matter can not be dealt with by interdepartmental grievances." (Compl. at 2-3). In plaintiff's attorney's memorandum in opposition to the motion to dismiss, counsel contends that plaintiff is not required to file a grievance because the state's prison system provides extremely limited administrative remedies and money damages, which plaintiff seeks, are not available.

**5 Accordingly, it is hereby

ORDERED that the Report and Recommendation is not adopted; and it is further

ORDERED that the defendants' motion to dismiss the complaint is granted.

S.D.N.Y.,2004.
Mingues v. Nelson
Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Roger SULTON, Plaintiff,
v.
Charles GREINER, Superintendent of Sing Sing Corr.
Fac., Doctor Halko & P.A. Williams of Sing Sing Corr.
Fac. Medical Department, Doctor Lofton, Defendants.
**No. 00 Civ. 0727(RWS).**

Dec. 11, 2000.

Roger Sulton, Wende Correctional Facility, Alden, NY,
Plaintiff, pro se.

Honorable Eliot Spitzer, Attorney General of the State of
New York, New York, NY, By: S. Kenneth Jones,
Assistant Attorney General, for Defendants, of counsel.

OPINION

SWEET, J.

**\*1** Defendants Charles Greiner ("Greiner"), past
Superintendent of Sing Sing Correctional Facility ("Sing
Sing") and Dr. Nikulas Halko, ("Halko"), P.A. Williams
("Williams"), and Dr. Lofton ("Lofton"), all of the Sing
Sing Medical Department, (collectively, the
"Defendants"), have moved to dismiss the amended
complaint of *pro se* inmate Roger Sulton ("Sulton"),
pursuant to Fed.R.Civ.P. 12(b)(6) and 12(h)(2) for failure
to exhaust administrative remedies. For the reasons set
forth below, the motion will be granted.

*Prior Proceedings*

Sulton filed the complaint in this action on February 2,
2000, asserting a claim against the Defendants under
Section 1983 for alleged violation of his constitutional
rights under the Eighth Amendment for acting with
deliberate indifference to his serious medical needs.
Sulton filed an amended complaint on May 3, 2000, to
identify additional defendants to his suit. Additionally,
Sulton alleges negligent malpractice by the Sing Sing
medical staff. Sulton seeks monetary damages. The instant
motion was filed on August 9, 2000, and was marked fully
submitted on September 6, 2000.

*Facts*

The Defendants' motion comes in the posture of a motion
to dismiss for failure to state a claim, pursuant to Federal
Rule of Civil Procedure 12(b)(6). However, both the
Defendants and Sulton have submitted materials outside
the pleadings. Where a District Court is provided with
materials outside the pleadings in the context of a 12(b)(6)
motion to dismiss, it has two options: the court may
exclude the additional materials and decide the motion on
the complaint alone or convert the motion to one for
summary judgment. *See* Fed.R.Civ.P. 12(b); *Kopec v.
Coughlin,* 922 F.2d 152, 154 (2d Cir.1991); *Fonte v.
Board of Managers of Continental Towers Condominium,*
848 F.2d 24, 25 (2d Cir.1988). The Court has determined
to treat the instant motion as a motion for summary
judgment. Therefore, the following facts are gleaned from
the parties' submissions, with all inferences drawn in favor
of the non-movant as required on a motion for summary
judgment. They are not findings of fact by the Court.

Sulton is a prison inmate who was incarcerated in Sing
Sing at the time of the incidents in question. Greiner was
Superintendent of Sing Sing at that time. Halko was and is
a doctor on medical staff at Sing Sing. Williams and
Lofton are alleged to be affiliated with the Sing Sing
Medical Department.

According to Sulton, on October 8, 1998, he slipped on a
flight of wet stairs, where there was no "wet floor" sign
posted, and injured his left knee. The next day his knee
was swollen and the pain "was real bad." That same day

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

Sulton went to sick call and saw P.A. Williams. Williams ordered x-rays and also ordered "no-work, feed-in cell, pain killers and a cane" for Sulton. The swelling went down, but the pain got stronger.

For four months Sulton complained to the Sing Sing medical staff about his pain. During this time his left knee would give out "at any time." Yet, "nothing was done." However, the Sing Sing Medical Department did send Sulton to the Green Haven Correctional Facility for an M.R.I. and, subsequently, knee surgery was recommended by an attending physician on April 23, 1999. A hinged knee brace was recommended for post-surgery recovery.

**\*2** At some point thereafter, Sulton wrote to Greiner concerning his medical problem and he was placed on "a call-out" to see Halko. Halko then informed Sulton that he would not be going for surgery because Correctional Physician Services [FN1] ("CPS") would not allow it. CPS wanted the inmate to undergo physical therapy before they would approve surgery. Sulton continued to be in pain and requested outside medical care from Williams. However, Williams could not do anything about Sulton's surgery until it was approved by CPS.

> FN1. CPS is the health maintenance organization which must pre-approve any outside medical service to be provided to inmates outside of the correctional facility.

In September 1999, Sulton was transferred to Wende Correctional Facility ("Wende"). The medical department there provided him with physical therapy for his left knee, which was "still in constant pain" and was prone to giving out beneath his body weight.

Sulton filed grievance # 14106-99 on November 3, 1999, and on November 24, 1999, he received a response from the Inmate Grievance Resolution Committee (the "IGRC"). Sulton contends that on that same date he indicated his desire to appeal their decision to the Superintendent. Sulton did not appeal his grievance to the highest level of administrative review, the Central Office Review Committee (the "CORC"). In a letter to Wende Superintendent Donnelly ("Donnelly") dated December

17, 2000, Sulton complained that he never received a response to his appeal of the IGRC decision. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly stated that he concurred with the IGRC's decision.

In January 2000, "plaintiff['s] legs gave out and the right leg took the weight of the body ... causing the plaintiff to suffer ... torn joints in the ankle area." Surgery was performed on the ankle and he was placed on "medical confinement status."

*Discussion*

I. *This Action Will Be Dismissed For Plaintiff's Failure To Comply With The Prison Litigation Reform Act Of 1996*

In his amended complaint, Sulton alleges that he filed a grievance and, although initially the Defendants were unable to identify the grievance, by his opposition to the instant motion Sulton has identified the process he undertook to pursue his grievance.

Section 1997e(a) of the Prison Litigation Reform Act (the "PLRA") provides that:

No action shall be brought with respect to prison conditions under ... 42 U.S.C. § 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

In enacting Section 1997e(a), Congress made exhaustion mandatory. *Salahuddin v. Mead,* 174 F.3d 271, 274-75 (2d Cir.1999). As a result, where an inmate fails to satisfy the PLRA's exhaustion requirement, the complaint must be dismissed. *See, e.g., Santiago v. Meinsen,* 89 F.Supp.2d 435, 439-40 (S.D.N.Y.2000) (citations omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

In New York, the relevant administrative vehicle is the Inmate Grievance Program ("IGP"). *See* N.Y. Correct. Law § 139 (directing Commissioner of the Department of Correctional Services to establish a grievance mechanism in each correctional facility under the jurisdiction of the Department); N.Y. Comp.Codes R. & Regs., tit. 7, § 701.1 (instituting IGP). New York inmates can file internal grievances with the inmate grievance committee on practically any issue affecting their confinement. *See In re Patterson,* 53 N.Y.2d 98, 440 N.Y.S.2d 600 (N.Y.1981) (interpreting N.Y. Correct. Law § 139 broadly); N.Y. Comp.Codes R. & Regs., tit. 7, §§ 701.2(a) (inmates may file grievances about the "substance or application of any written or unwritten policy, regulation, procedure or rule of the Department of Correctional Services ...") and 701.7 (procedures for filing, time limits, hearings and appeals).

**\*3** The New York State Department of Correctional Services ("DOCS") has established a grievance program with specific procedures which must be followed in order for a prisoner to exhaust his administrative remedies. *See Petit v. Bender,* No. 99 Civ. 0969. 2000 WL 303280, at *2- *3 (S.D.N.Y. March 22, 2000) (holding that prisoner failed to exhaust his administrative remedies where prisoner only partially complied with the grievance procedures established by Section 701 *et seq.*). These procedures include a requirement that an inmate appeal a Superintendent's decision to the CORC by filing an appeal with the Grievance Clerk. *See* N.Y. Comp.Codes R. & Regs., tit. 7, § 701.7(c)(1).

There is, however, an additional issue to be addressed in this case, which is that the administrative remedies available to Sulton do not afford monetary relief. The Second Circuit has not yet ruled on whether the PLRA's exhaustion requirement applies where the available administrative remedies available do not provide the type of relief the prisoner seeks. *Snider v. Dylag,* 188 F.3d 51, 55 (2d Cir.1999) ("We note that it is far from certain that the exhaustion requirement of 42 U.S.C. § 1997e(a) applies to deliberate indifference claims ... under Section 1983, where the relief requested is monetary and where the administrative appeal, even if decided for the complainant, could not result in a monetary award.").

There is disagreement among the district courts within this circuit as to this issue, although there is "clear trend ... to find exhaustion applicable even where the requested relief, money damages, cannot be awarded by the administrative body hearing the complaint." *Santiago v. Meinsen,* 89 F.Supp.2d at 440; *see Snider v. Melindez,* 199 F.3d 108, 114 n. 2 (2d Cir.1999) (noting disagreement among courts as to applicability of exhaustion requirement where administrative remedies are unable to provide the relief that a prisoner seeks in his federal action); *but cf. Nussle v. Willette,* 224 F.3d 95, (2d Cir.2000) (holding that exhaustion not required for excessive force claim because such claim is not "prison conditions" suit and overruling district court decisions applying exhaustion requirement to excessive force claims seeking monetary relief).

Moreover, this Court has previously held that a prisoner must exhaust his administrative remedies before seeking relief in federal court in connection with a prison conditions claim even where a prisoner seeks damages not recoverable under an established grievance procedure. *Coronado v. Goord,* No. 99 Civ. 1674, 2000 WL 52488, at *2 (S.D.N.Y. Jan. 24, 2000); *Edney v. Karrigan,* No. 99 Civ. 1675, 1999 WL 958921, at *4 (S.D.N.Y. Oct. 14, 1999). This is the rule that will be applied here.

In his response to the motion to dismiss, Sulton indicates that he filed grievance # 14106-99 on November 3, 1999 and on November 24, 1999 he received a response IGRC and that on the same date Sulton indicated his desire to appeal their decision to the Superintendent. Sulton does not contend that he appealed his grievance to the highest level of administrative review, namely, the CORC. Instead, Sulton has asserted that Superintendent Donnelly never replied to the appeal of the IGRC decision and submits a letter dated December 17, 2000 in which Sulton complains that he never received a response from Donnelly. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly concurred with the decision of the IGRC denying Sulton relief. There is no evidence in the record that Sulton appealed the grievance to CORC.

**\*4** Accordingly, because Sulton failed to exhaust his administrative remedies by appealing the grievance to the CORC, his claims of medical indifference will be dismissed pursuant to 42 U.S.C. § 1997e. *See Petit,* 2000 WL 303280, at *3.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

*Conclusion*

Therefore, for the reasons set forth above, the Defendants'
motion will be granted and the amended complaint will be
dismissed without prejudice to the action being renewed
once Sulton has exhausted all administrative remedies.

It is so ordered.

S.D.N.Y.,2000.
Sulton v. Greiner
Not Reported in F.Supp.2d, 2000 WL 1809284
(S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)

(Cite as: 2007 WL 3274835 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Marvin Smith SHAHEEN, Plaintiff,
v.
P. McINTYRE, Correction Officer; J. Frazier,
Correction Officer; and J. Hoessle; Correction
Officer, Defendants.
No. 9:05-CV-0173 (TJM/GHL).

Nov. 5, 2007.
Marvin Smith Shaheen, New York, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Steven H. Schwartz, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior United States District
Judge.

*1 This *pro se* action brought pursuant to 42 U.S.C.
§ 1983 was referred to the Hon. George H. Lowe, United
States Magistrate Judge, for a Report and
Recommendation pursuant to 28 U.S.C. § 636(b) and
Local Rule 72.3(c). No objections to the
Report-Recommendation dated September 28, 2007 have
been filed. Furthermore, after examining the record, this
Court has determined that the Report-Recommendation is
not subject to attack for plain error or manifest injustice.
Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

It is therefore,

**ORDERED** that Defendants' motion for summary
judgment (Docket No. 28) is **GRANTED** and the
complaint is **DISMISSED** as to all defendants.

**IT IS SO ORDERED.**

**REPORT-RECOMMENDATION**

GEORGE H. LOWE, United States Magistrate Judge.

This action has been referred to me for Report and
Recommendation by the Honorable Thomas J. McAvoy,
Senior United States District Judge, pursuant to Title 28,
United States Code, Section 28 U.S.C. § 636(b) and Local
Rule 72.3(c) of the Local Rules of Practice for this Court.
Plaintiff Marvin Smith Shaheen ("Plaintiff") commenced
this *pro se* prisoner civil rights action pursuant to 42
U.S.C. § 1983. Generally, Plaintiff alleges that three
employees of the New York State Department of
Correctional Services ("DOCS")-Coxsackie Correctional
Facility Corrections Officers P. McIntyre, J. Frazier, and
J. Hoessle ("Defendants")-violated his rights under the
First and Fourteenth Amendments when, between
September 28, 2004 and October 2, 2004, they filed false
misbehavior reports against him in retaliation for his
having exercised his right to make complaints and file
state and federal civil rights actions against state prison
officials. (*See generally* Dkt. No. 1, Part 1, ¶ ¶ 6-7 &
Attachments [Plf.'s Compl.].) Currently pending before the
Court is Defendants' motion for summary judgment
pursuant to Rule 56 of the Federal Rules of Civil
Procedure. (Dkt. No. 28.) For the reasons that follow, I
recommend that Defendants' motion be granted.

**I. BACKGROUND**

**A. Allegations of Plaintiff's Complaint**

Liberally construed, Plaintiff's Complaint alleges the
following facts.

1. Before September 28, 2004, Plaintiff filed various
complaints against prison officials in state and federal
courts, including (1) *Smith v. New York,* Claim No.
103499 (N.Y.Ct.Cl.) on September 29, 2000, (2) *Shaheen
v. New York,* Claim No. 10628 (N.Y.Ct.Cl.) on December
3, 2001, (3) *Shaheen v. Hollins,* 03-CV-0017 (N.D.N.Y.)
in January of 2003, (4) *Smith v. New York,* Claim No.
103499 (N.Y.Ct.Cl.) on October 10, 2003, (5) *Shaheen v.
Notabartolo,* 03-CV-1366 (N.D.N.Y.) on November 12,
2003, (6) *Smith v. New York,* Claim No. 109017
(N.Y.Ct.Cl.) on February 13, 2004, (7) *Shaheen v.
Herbert,* 04-CV-0648 (W.D.N.Y.) on March 4, 2004, and
(8) *Shaheen v. Filion,* 04-CV-0625 (N.D.N.Y.) on March
7, 2004.[FN1]

FN1. (Dkt. No. 1, Part 1, ¶ 5.b. & Attachment
Thereto [Plf.'s Compl.].)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)

(Cite as: 2007 WL 3274835 (N.D.N.Y.))

**\*2** 2. On September 28, 2004, while Plaintiff was an inmate at Coxsackie Correctional Facility ("Coxsackie C.F."), Defendant McIntyre issued a misbehavior report falsely charging Plaintiff with refusing to obey a direct order, being out of place, and violating other (unspecified) facility regulations, in retaliation against Plaintiff for having exercised his right, under the First Amendment, to file various of the aforementioned federal and state court actions.[FN2] As a result of the false misbehavior report, Plaintiff was later (at an unspecified time) subjected to keeplock confinement for fifteen (15) days with an accompanying loss of telephone, commissary, packages and recreation privileges.[FN3]

FN2. (*Id.* at ¶¶ 6, 6.A.)

FN3. (*Id.* at ¶ 6.A.)

3. On October 2, 2004, Defendant McIntyre issued a *second* misbehavior report falsely charging Plaintiff with refusing to obey a direct order and creating a disturbance, in retaliation against Plaintiff for having exercised his First Amendment right to file various of the aforementioned federal and state court actions.[FN4] As a result of the false misbehavior report, Plaintiff was later (at an unspecified time) subjected to keeplock confinement for fifteen (15) days with an accompanying loss of telephone, commissary, and packages privileges.[FN5]

FN4. (*Id.* at ¶ 6.B.)

FN5. (*Id.* at ¶ 6.B.)

4. Also on October 2, 2004, Defendant McIntyre, in a conspiratorial manner, told Defendant Hoessle, in the Coxsackie C.F. mess hall, that he wanted Plaintiff "packed-up [sic] for beating his previous misbehavior report."[FN6] That same day, after Plaintiff returned from the mess hall, Defendant Hoessle related Defendant McIntyre's instruction to an unknown corrections officer assigned to A Block of Coxsackie C.F.[FN7] As a result of Defendant McIntyre's instruction, Defendant Hoessle issued a misbehavior report falsely charging Plaintiff with smoking a cigarette in his cell.[FN8] As a result of the false misbehavior report, Plaintiff was later (at an unspecified

time) subjected (by Hearing Officer Lt. McDermot) to keeplock confinement for thirty (30) days.[FN9]

FN6. (*Id.* at ¶ 6.C.)

FN7. (*Id.*)

FN8. (*Id.*)

FN9. (*Id.*)

5. Yet again on October 2, 2004, Defendants Frazier and McIntyre conspired (in an unspecified manner) to subject Plaintiff to unjustified disciplinary penalties in retaliation for having exercised his First Amendment right to file various of the aforementioned federal and state court actions.[FN10]

FN10. (*Id.* at ¶ 6.D. & Attached Grievance dated 10/2/04.)

6. Finally, at approximately 3:30 p.m. on October 2, 2004, after Plaintiff had returned to his cell in A Block of Coxsackie C.F., Defendant McIntyre told Defendant Frazier to "fuck [Plaintiff]." [FN11] As a result, after Defendant Frazier had released the inmates on the cell block for dinner, Defendant Frazier refused Plaintiff his dinner, a shower, recreation and any telephone calls.[FN12] Defendant Frazier then issued a misbehavior report falsely charging Plaintiff with smoking a cigarette in his cell, refusing to obey a direct order, harassment, and obstructing the visibility into his cell, in retaliation for having exercised his First Amendment right to file various of the aforementioned federal and state court actions.[FN13] As a result, Plaintiff was later (at an unspecified time) subjected to keeplock confinement for thirty (30) days.[FN14]

FN11. (*Id.* at ¶ 6.E.)

FN12. (*Id.*)

FN13. (*Id.*)

FN14. (*Id.*)

**B. Parties' Arguments on Defendants' Motion for Summary Judgment**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)

(Cite as: 2007 WL 3274835 (N.D.N.Y.))

*3 In their motion for summary judgment, Defendants argue that Plaintiff's Complaint should be dismissed on three grounds: (1) Plaintiff failed to exhaust his administrative remedies before filing this action; (2) Plaintiff's conclusory allegations of retaliation fail to state a claim upon which relief might be granted; and (3) Plaintiff has failed to provide the Court or opposing counsel with his present address. (Dkt. No. 28, Part 7, at 2-8 [Defs.' Mem. of Law].)

In response to Defendants' exhaustion argument, Plaintiff argues that (1) he was frustrated from pursuing his administrative remedies in that, after he submitted by mail a grievance (a copy of which is attached to his Complaint) to the "F-Block tier officer," that grievance was "never processed" by "the guard staff or grievance officials" at Coxsackie C.F., (2) "it is impossible for Plaintiff to file or make an appeal [with respect] to something that was never processed," (3) in any event, Plaintiff wrote timely "follow-up" letters to grievance officials, who simply failed to respond to those "follow-up" letters. (Dkt. No. 34, at 9-12 [Plf.'s Mem. of Law, pages "2" through "5"].)

In response to Defendants' argument that Plaintiff's conclusory allegations of retaliation fail to state a claim, Plaintiff argues that (1) he has, in fact, alleged sufficiently specific facts plausibly suggesting the times, dates, and persons involved in the alleged constitutional violations in order to state an actionable claim, and (2) moreover, the documentary evidence contained in the summary judgment record before the Court shows that Defendants conspired thirteen (13) times to retaliate against Plaintiff for having exercised his First Amendment right to file various of the aforementioned federal and state court actions. (Dkt. No. 34, at 6, 12 [Plf.'s Mem. of Law, pages "5" and "6"].)

Finally, in response to Defendants' argument that Plaintiff has failed to provide the Court or opposing counsel with his present address, Plaintiff argues that (1) the only mistake that Plaintiff has made, since the filing of District Judge McAvoy's Order of September 6, 2006 (denying Defendants' motion to dismiss for failure to prosecute), is the listing of his address as being Post Office Box "215" in Portchester, NY, rather than Post Office Box "1215" in Portchester, NY, and (2) in any

event, Plaintiff rectified the error, and no prejudice has resulted to Defendants. (Dkt. No. 34, at 6, 7 [Plf.'s Mem. of Law, pages "6" and "7"].)

In reply, Defendants assert several arguments with regard to Plaintiff's failure to exhaust his available administrative remedies, including an argument that Plaintiff's original grievance was too vague and conclusory to place its reader on notice of any constitutional violations whatsoever, and an argument that Plaintiff's two "follow-up" letters (while more detailed) were not submitted to grievance officials and were thus not treated as grievances (although they were duly investigated). (Dkt. No. 35, Part 1, ¶¶ 3-14 [Schwartz Affirm.)

## II. APPLICABLE LEGAL STANDARDS

### A. Motion for Summary Judgment Under Rule 56

*4 Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [FN15] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[FN16]

FN15. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

FN16. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." [FN17] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)

(Cite as: 2007 WL 3274835 (N.D.N.Y.))

doubt as to the material facts." [FN18] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN19]

> **FN17.** Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

> **FN18.** Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> **FN19.** *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

What this somewhat complex burden-shifting standard means is that, where a plaintiff has failed to respond to a defendant's statements of material fact contained in its Statement of Material Facts (a/k/a its "Rule 7.1 Statement"), the facts as set forth in that Statement will be accepted as true [FN20] to the extent that (1) those facts are supported by the evidence in the record, [FN21] and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. [FN22] (Here, I note that Plaintiffs were so advised by Defendants.) [FN23]

> **FN20.** *See* N.D.N.Y. L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* ).

> **FN21.** *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[W]here the non-movant party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.... If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted]; *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added]; *Adirondack Cycle & Marine, Inc. v. Am. Honda Motor Co., Inc.,* 00-CV-1619, 2002 U.S. Dist. LEXIS 4386, at *2-3, 2002 WL 449757 (N.D.N.Y. Mar. 18, 2002) (McAvoy, J.) ("Local Rule 7.1 requires a party opposing summary judgment to respond to the statement of undisputed material facts submitted by the movant. To the extent such facts are not controverted, *the properly supported facts* will be taken as true.") [emphasis added; citation omitted]; *cf.* Fed.R.Civ.P. 83(a)(1) ("A local rule shall be consistent with ... Acts of Congress and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)

(Cite as: 2007 WL 3274835 (N.D.N.Y.))

rules adopted under 28 U.S.C. §§ 2072 and 2075 [which include the Federal Rules of Civil Procedure] ...."); Fed.R.Civ.P. 56(e) (requiring that, "if the non-movant does not ... respond [to a summary judgment motion], summary judgment, *if appropriate,* shall be entered against the non-movant," and requiring that, as a threshold matter, the motion for summary judgment must be "made *and supported* as provided in this rule") [emphasis added].

FN22. *See* Champion v. Artuz, 76 F.3d 483, 486 (2d Cir.1996); *cf.* N.D.N.Y. L.R. 56.2 (imposing on movant duty to provide such notice to *pro se* opponent).

FN23. (Dkt. No. 46, Part 1.) Furthermore, clearly Plaintiff understood these consequences since he subsequently requested (and was granted) an extension of time in which to respond to Defendants' motion. (Dkt. No. 47.)

Implied in the above-stated standard is the fact that, where a non-movant fails to respond to a movant's Rule 7.1 Statement, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that non-movant is proceeding *pro se.*[FN24] In the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit.[FN25] (Here, I note that Plaintiffs' Complaint contains a verification pursuant to 28 U.S.C. § 1746.[FN26]) In any event, to be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit must, among other things, not be conclusory.[FN27] An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.[FN28] Finally, even where an affidavit (or verified complaint) is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[FN29]

FN24. *See* Amnesty Am. v. Town of W. Hartford,

288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord,* Lee v. Alfonso, No. 04-1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13, 2004 WL 5477530 (N.D.N.Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); Fox v. Amtrak, 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4, 2006 WL 395269 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); Govan v. Campbell, 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); Prestopnik v. Whelan, 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.)

FN25. *See* Patterson v. County of Oneida, 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); Fitzgerald v. Henderson, 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922, 122 S.Ct. 2586, 153 L.Ed.2d 776 (2002); Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted].

FN26. (Dkt. No. 1.)

FN27. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); Patterson, 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; Applegate v. Top Assoc., 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)

(Cite as: 2007 WL 3274835 (N.D.N.Y.))

FN28. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN29. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect

in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb.15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

**B. Motion to Dismiss for Failure to State a Claim Under Rule 12(b)(6)**

**\*5** To the extent that a defendant's motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure is based entirely on the plaintiff's complaint,[FN30] such a motion is functionally the same as a motion to dismiss for failure to state a claim under Rule 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted], *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is

Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)

(Cite as: 2007 WL 3274835 (N.D.N.Y.))

proper with or without notice to the parties.").

FN30. (*See, e.g.,* Dkt. No. 28, Part 7, at 7-8 [Defs.' Mem. of Law, arguing, *inter alia,* that Plaintiff's conclusory allegations of retaliation, in his Complaint, fail to state a claim upon which relief may be granted].)

Moreover, even where a defendant has not advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim upon which relief may be granted.FN31

FN31. The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss [the prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

For these reasons, it is appropriate to briefly summarize the newly revised legal standard governing Rule 12(b)(6) motions to dismiss. Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Rule 8(a)(2); FN32 or (2) a challenge to the legal cognizability of the claim. FN33

FN32. *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations

omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

FN33. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12(b)[6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5, 2004 WL 2613993 (E.D.N.Y. Nov. 18, 2004) (distinguishing

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)

(Cite as: 2007 WL 3274835 (N.D.N.Y.))

between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-02 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b] [6] motion-one aimed at the sufficiency of the pleadings under Rule 8 [a], and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Such a statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." FN34 The purpose of this rule is to "facilitate a proper decision on the merits." FN35 A complaint that fails to comply with this rule "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." FN36

FN34. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ); *see also Swierkiewicz,* 534 U.S. at 512 (quoting *Conley,* 355 U.S. at 47); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (quoting *Conley,* 355 U.S. at 47).

FN35. *See Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48).

FN36. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential

authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Tech., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

The Supreme Court has long characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. FN37 However, it is well established that even this liberal notice pleading standard "has its limits." FN38 As a result, several Supreme Court and Second Circuit decisions exist, holding that a pleading has failed to meet this liberal notice pleading standard. FN39

FN37. *See, e.g., Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

FN38. 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

FN39. *See, e.g., Bell Atl. Corp. v. Twombly,* ---U.S. ----, ---- - ----, 127 S.Ct. 1955, 1964-74, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement), *accord, Dura Pharm.,* 125 S.Ct. at 1634-35, *Christopher v. Harbury,* 536 U.S. 403, 416-22, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-35 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-09 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see Rules of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)

(Cite as: 2007 WL 3274835 (N.D.N.Y.))

the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

Most notably, in the recent decision of *Bell Atl. Corp. v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated a claim upon which relief could be granted, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." --- U.S. ----, ---- - ----, 127 S.Ct. 1955, 1968-69, 167 L.Ed.2d 929 (2007). FN40 Rather than turning on the conceivability of an actionable claim, the Court clarified, the Rule 8 standard turns on the "plausibility" of an actionable claim. *Id.* at 1965-74. More specifically, the Court held that, for a plaintiff's complaint to state a claim, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]" assuming, of course, that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id.*

FN40. The Court in *Twombly* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint

claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Twombly,* 127 S.Ct. at 1969.

**\*6** Having said that, it should be emphasized that, "[i]n reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." FN41 Moreover, it should be noted that "[t]his standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" FN42 In other words, while all pleadings are to be construed liberally, *pro se* civil rights pleadings are generally to be construed with an *extra* degree of liberality. Indeed, generally "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." FN43 In addition, when addressing a *pro se* complaint, generally a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." FN44

FN41. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

FN42. *Hernandez,* 18 F.3d at 136 [citation omitted]; *see also Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

FN43. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

FN44. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)

(Cite as: 2007 WL 3274835 (N.D.N.Y.))

However, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [FN45] For example, an opportunity to amend should be denied where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [FN46] In addition, "[t]here are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special solicitude" or status that is normally afforded *pro se* litigants. [FN47]

FN45. *Stinson v. Sheriff's Dep't of Sullivan County,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M. J.); *Muniz,* 2007 WL 2027912, at *2 (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins,* 2007 WL 37404, at *4 (Kahn, J., adopting report-recommendation of Lowe, M.J.).

FN46. *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted].

FN47. *Smith v. Burge,* 03-CV-0955, 2006 WL 2805242, at *3 & n. 3 (N.D.N.Y. Sept.28, 2006) (Kahn, J., adopting report-recommendation of Lowe, M.J.) [citations omitted]; *see also Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, at *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994).

**C. Revocation of Special Status of Overly Litigious *Pro Se* Civil Rights Litigants**

Generally, the rationale for revoking the special status of overly litigious *pro se* civil rights litigants (at least in the Second Circuit) is not that the *pro se* litigant should be punished but that his excessive litigiousness demonstrates his *experience,* the lack of which is the reason for conferring the special status upon *pro se* litigants in the first place. [FN48] Moreover, permitting experienced *pro se* litigants to retain their special status would tilt the scales of justice unfairly in favor of the *pro se* litigant and against his opponents. [FN49] As observed by Judge Irving R. Kaufman, of the Second Circuit, regarding an active *pro se* litigant nearly 45 years ago:

FN48. **Second Circuit Cases:** *See, e.g., Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, at *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)

(Cite as: 2007 WL 3274835 (N.D.N.Y.))

**N.D.N.Y. Cases:** *See, e.g., Carlisle v. Goord,* 03-CV-0296, 2007 WL 2769566, at *9 (N.D.N.Y. Sept.21, 2007) (Scullin, J., adopting Report-Recommendation of Lowe, M.J.); *Shomo v. N.Y. D.O.C.S.,* 04-CV-0910, 2007 WL 2580509, at *3-4 (N.D.N.Y. Sept.4, 2007) (Kahn, J., adopting Report-Recommendation of Lowe, M.J.); *Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *7-8 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting Report-Recommendation of Lowe, M.J.); *Tracy v. Freshwater,* 01-CV-0500, 2007 WL 2230068, at *2-4 (N.D.N.Y. July 31, 2007) (Munson, J., adopting Report-Recommendation of Lowe, M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *6 (N.D.N.Y. July 11, 2007) (McAvoy, J., adopting Report-Recommendation of Lowe, M.J.); *Eady v. Lappin,* 05-CV-0824, 2007 WL 1531879, at *4-6 (N.D.N.Y. May 22, 2007) (Mordue, C.J., adopting Report-Recommendation of Lowe, M.J.); *Edwards v. Selsky,* 04-CV-1054, 2007 WL 748442, at *2-3 (N.D.N.Y. March 6, 2007) (Mordue, C.J., adopting Report-Recommendation of Lowe, M.J.); *Rolle v. Garcia,* 04-CV-0312, 2007 WL 672679, at *4 (N.D.N.Y. Feb.28, 2007) (Kahn, J., adopting Report-Recommendation of Lowe, M.J.); *Mora v. Bockelmann,* 03-CV-1217, 2007 WL 603410, at *4 (N.D.N.Y. Feb.22, 2007) (Mordue, C.J., adopting Report-Recommendation of Homer, M.J.); *Brown v. Goord,* 04-CV-0785, 2007 WL 607396, at *2-3 (N.D.N.Y. Feb.20, 2007) (McAvoy, J., adopting Report-Recommendation of Lowe, M.J.); *Mitchell v. Harriman,* 04-CV-0937, 2007 WL 499619, at *3 (N.D.N.Y. Feb.13, 2007) (Sharpe, J., adopting Report-Recommendation of Homer, M.J.); *Sledge v. Kooi,* 04-CV-1311, 2007 WL 951447, at *3-4 (N.D.N.Y. Feb.12, 2007) (Lowe, M.J.), *adopted by* 2007 WL 969576 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Gill v. Pidylpchak,* 02-CV-1460, 2006 WL 3751340, at *2 (N.D.N.Y. Dec.19, 2006) (Scullin, J., adopting Report-Recommendation of Treece, M.J.); *Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *2 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.); *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *3 (N.D.N.Y. June 22, 2006) (McAvoy, J., adopting Report-Recommendation of Lowe, M.J.); *Davidson v. Talbot,* 01-CV-0473, 2005 U.S. Dist. LEXIS 39576, at *20, 2005 WL 928620 (N.D.N.Y. March 31, 2005) (Treece, M.J.), *adopted by* 2006 U.S. Dist. LEXIS 47554, 2006 WL 1877144 (N.D.N.Y. July 5, 2006) (Scullin, J.); *Gill v. Riddick,* 03-CV-1456, 2005 U.S. Dist. LEXIS 5394, at *7, 2005 WL 755745 (N.D.N.Y. March 31, 2005) (Treece, M.J.).

**S.D.N.Y. Cases:** *See, e.g., Davidson v. Dean,* 204 F.R.D. 251, 257 & n. 5 (S.D.N.Y.2001); *Santiago v. C.O. Campisi,* 91 F.Supp.2d 665, 670 (S.D.N.Y.2000); *McGann v. U.S.,* 98-CV-2192, 1999 WL 173596, at *2 (S.D.N.Y. March 29, 1999); *Hussein v. Pitta,* 88-CV-2549, 1991 WL 221033, at *4 (S.D.N.Y. Oct.11, 1991).

**W.D.N.Y. Cases:** *See, e.g., Yip v. Bd. of Tr. of SUNY,* 03-CV-0959, 2004 WL 2202594, at *3 (W.D.N.Y. Sept.29, 2004).

**E.D.N.Y. Cases:** *Cf. Wechsler v. R D Mgmt. Corp.,* 861 F.Supp. 1153, 1157 (E.D.N.Y.1994) (explaining that special solicitude is extended to *pro se* litigants because of their lack of legal training, and questioning whether such solicitude should be extended to *pro se* litigants who are in fact sophisticated in the law); *Horton v. Trans World Airlines Corp.,* 169 F.R.D. 11, 16 (E.D.N.Y.1996) ("[*P* ]*ro se* litigants are held to a more lenient standard than professional counsel, with Rule 11's application determined on a sliding scale according to the litigant's level of sophistication.") [citing cases].

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)

(Cite as: 2007 WL 3274835 (N.D.N.Y.))

FN49. *Standley,* 2007 WL 2406909, at *7 & n. 34; *Edwards,* 2007 WL 748442, at *2; *Sledge,* 2007 WL 951447, at *3; *see also Hussein,* 1991 WL 221033, at *4 (concluding that experienced *pro se* litigant should no longer be afforded special leniency because continuing to afford him such leniency would be unfair to "numerous attorneys," whose time and energy had already been consumed by plaintiff); Jessica Case, "Pro se Litigants at the Summary Judgment Stage: Is Ignorance of the Law an Excuse?" 90 *Ky. L.J.* 701, 735-740 (Spring 2001) (discussing how extending special leniency to *pro se* litigants in some circumstances "distorts the adversarial system and the role of trial judges") [citing cases]; Julie M. Bradlow, "Procedural Due Process Rights of *Pro se* Civil Litigants," 55 *U. Chi. L.Rev.* 659, 672 (Spring 1988) (discussing how "extending too much procedural leniency to a *pro se* litigant risks undermining the impartial role of the judge in the adversary system") [citations omitted].

He comes before this Court wearing the cloak of a *pro se* applicant, and seeks to extract from us the solicitude ordinarily afforded one appearing without counsel. But this should not shield him from rebuke when merited. He is an intelligent, able and sophisticated litigant, who is no stranger to this Court, having appeared frequently in his own behalf both in the District Court and the Court of Appeals. We would expect that one possessed of his background would be conscious of the outer limits of forceful advocacy and fully aware when his acts transgress those limits. Moreover, we are not to be manipulated by resourceful but meritless moves .... [which] serve only to distract us from important judicial business.[FN50]

FN50. *Raitport v. Chem. Bank,* 74 F.R.D. 128, 133 (S.D.N.Y.1977) [citing *Ackert v. Bryan,* No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring) ].

**\*7** Courts relying on the "experience" rationale for revoking a *pro se* litigant's special status look at a variety

of factors in assessing whether or not the *pro se* litigant is experienced. Most often, these factors include (1) the number of previous federal court actions filed, (2) the number of previous federal court appeals filed, (3) the number of previous state court actions filed, (4) the number of previous state court appeals filed, and (5) the recency or simultaneity of the actions and/or appeals.[FN51]

FN51. *See, e.g., Eggersdorf,* 8 F. App'x at 143; *Gummerson,* 201 F.3d at *2; *Flynn,* 32 F.3d at 31; *Standley,* 2007 WL 2406909, at *7 & n. 35; *Frawley,* 2006 WL 1742738, at *3 & n. 2; *Talbot,* 2005 U.S. Dist. LEXIS 39576, at *18-20 & n. 10, 2005 WL 928620; *Riddick,* 2005 U.S. Dist. LEXIS 5394, at *7 & n. 3, 2005 WL 755745; *Dean,* 204 F.R.D. at 257; *Santiago,* 91 F.Supp.2d at 670; *McGann,* 1999 WL 173596, at *2, 8-10; *McClellan,* 1996 U.S. Dist. LEXIS 8164, at *3-4 & n. 3; *Brown,* 1995 U.S. Dist. LEXIS 213, at *2 n. 1.

There is, of course, no formula for determining "How many is too many?" However, *generally,* if a *pro se* litigant has filed a dozen or more actions and/or appeals before the date of the decision in question, it is quite possible that he will be deemed to be "experienced."[FN52] Granted, there are some cases revoking the special status of a *pro se* litigant who has filed *fewer* than a dozen cases.[FN53] However, there appear to be *more* cases refusing to revoke the special status of a *pro se* litigant who has filed fewer than a dozen cases.[FN54]

FN52. *See, e.g., Eggersdorf,* 8 F. App'x at 143 (denying leniency to *pro se* civil rights inmate based on fact that at one point plaintiff had *twelve* simultaneously pending lawsuits in Northern District alone); *Gummerson,* 201 F.3d at *2 (denying leniency to *pro se* civil rights inmate based on fact that plaintiff had *twelve* simultaneously pending lawsuits in Northern District alone); *Standley,* 2007 WL 2406909, at *8 (denying leniency to *pro se* civil rights inmate based on fact that plaintiff had previously filed *sixteen* federal or state court actions or appeals); *Talbot,* 2005 U.S. Dist. LEXIS 39576, at *18-20 & n. 10, 2005 WL 928620 (denying leniency to

Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)

(Cite as: 2007 WL 3274835 (N.D.N.Y.))

*pro se* civil rights inmate based on fact that plaintiff had filed *twenty* lawsuits in Northern District alone); *Riddick,* 2005 U.S. Dist. LEXIS 5394, at *7 & n. 3, 2005 WL 755745 (denying leniency to *pro se* civil rights inmate based on fact that plaintiff had filed *twenty* lawsuits in Northern District alone). Interestingly, this *de facto* "rule of twelve" is consistent with the California Code of Civil Procedure, which declines to extend a reduction in small-claims-court filing fees to those litigants who have filed more than 12 small-claims lawsuits in the state within the previous 12 months. *See* Cal. Civ. Proc. § 116.230 (2006).

FN53. *See, e.g., Santiago,* 91 F.Supp.2d at 670 (denying leniency to *pro se* civil rights inmate based on fact that at one point plaintiff had *ten* lawsuits pending in Southern District); *Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *2 & n. 11 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (denying leniency to *pro se* civil rights inmate who had previously filed *eight* federal court actions or appeals); *McClellan,* 1996 U.S. Dist. LEXIS 8164, at *3-4 & n. 3 (denying leniency to *pro se* civil rights inmate based on fact that inmate had filed *seven* previous lawsuits against prison officials); *Brown,* 1995 U.S. Dist. LEXIS 213, at *2 n. 1 (denying leniency to *pro se* civil rights inmate based on fact that plaintiff had *seven* lawsuits pending in Western District).

FN54. *See, e.g., McEachin v. Faruki,* 03-CV-1442, 2006 WL 721570, at *2 n. 3 (N.D.N.Y. March 20, 2006) (refusing to deny leniency to *pro se* civil rights inmate who had filed *eleven* other federal lawsuits since 2000); *Pritchett v. Portoundo,* 03-CV-0378, 2005 WL 2179398, at *2 n. 3 (N.D.N.Y. Sept.9, 2005) (refusing to deny leniency to *pro se* civil rights inmate who had filed *eight* other federal lawsuits since 1996); *Burke v. Seitz,* 01-CV-1396, 2006 WL 383 513, at *2 n. 5 (N.D.N.Y. Feb. 13, 2006) (refusing to deny leniency to *pro se* civil rights inmate who had filed *six* other federal

lawsuits in previous nine years); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *3 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (refusing to deny leniency to *pro se* civil rights inmate who had previously filed *five* actions or appeals in federal or state court); *Smith,* 2006 WL 2805242, at *3 & n. 4 (refusing to deny leniency to *pro se* civil rights inmate based on his filing of *five* other lawsuits); *Abbas v. Senkowski,* 03-CV-0476, 2005 WL 2179426, at *2 n. 4 (N.D.N.Y. Sept.9, 2005) (continuing to afford special status to *pro se* litigant despite his litigation experience due to his having filed *three* other federal actions since 1997); *Loren v. Feerick,* 97-CV-3975, 1997 WL 441939, at *1 & n. 9 (S.D.N.Y. Aug.6, 1997) (continuing to afford special status to *pro se* litigant despite his litigation experience due to his having filed *three* previous actions in state court regarding current matter, and two previous actions in district court regarding current matter).

One reason for this array of cases is that, in determining whether or not a *pro se* litigant is "experienced," courts sometimes consider additional factors, such as (1) the quality of the *pro se* litigant's submissions to the Court (e.g., whether they are typed, cogent, supported by applicable affidavits, exhibits, and/or memoranda of law, etc),[FN55] (2) whether or not the *pro se* litigant has been victorious (or partially victorious) in any of his previous actions or appeals,[FN56] and (3) whether or not the *pro se* litigant has received sufficient formal legal training to familiarize him with legal procedure and terminology.[FN57]

FN55. *See, e.g., Saunders,* 2006 WL 3051792, at *2 (in deciding whether *pro se* plaintiff should be denied special solicitude, considering the fact that, among other things, "with regard to the current action, ... the motion papers that [p]laintiff has submitted over the past several years have often been fairly good-being typed, being accompanied by affidavits, and containing legal memoranda, exhibits, etc."), *accord, Standley,* 2007 WL 2406909, at *8.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)

(Cite as: 2007 WL 3274835 (N.D.N.Y.))

FN56. *See, e.g., Standley,* 2007 WL 2406909, at *8 & n. 45 (in deciding whether *pro se* plaintiff should be denied special solicitude, considering the fact that plaintiff had been victorious or partially victorious in at least four of his previous actions or appeals); *Saunders,* 2006 WL 3051792, at *2 (in deciding whether *pro se* plaintiff should be denied special solicitude, considering the fact that plaintiff had settled two of his previous six federal court actions, receiving $25,000 in exchange for his agreement to voluntarily dismiss the actions, and the fact that some of plaintiff's motions in his many actions have been granted); *Ab v. Sekendur,* 03-CV-4723, 2004 WL 2434220, at *5 (N.D.Ill. Oct.28, 2004) (considering, during decision of whether *pro se* plaintiff should be denied leniency normally afforded inexperienced *pro se* litigants, fact that "[plaintiff] has successfully applied for and received ... [a] patent, and as the record in this case indicates, he engaged in lengthy business negotiations with Anoto and various other corporations").

FN57. *See, e.g., Walker v. Suburban Hosp. Ass'n,* No. 90-1506, 1991 U.S.App. LEXIS 4049, at *3, n. 2, 1991 WL 32283 (4th Cir. March 13, 1991) ("Walker is not due the lenient treatment accorded pro se litigants. Walker has ... a law degree.... Certainly, the policies underlying the Court's admonitions to accord pro se litigants an understanding view of their pleadings and conduct do not have force in this context."); *Heimbaugh v. San Francisco,* 591 F.Supp. 1573, 1577 (N.D.Cal.1984) ("While plaintiff appears [pro se], he is schooled in the law, having recently completed law school .... There is every reason to hold him to the certification he made by signing the pleadings he has filed in this action."); *Pham v. U.S.,* 317 F.3d 178, 186-188 (2d Cir.2003) (relying on fact that *pro se* prisoner was "not trained in the law," and that he was "untutored," when explaining reason for extending him special solicitude under the circumstances); *Iwachiw v. N.Y. City Bd. of*

*Educ.,* 2007 U.S. Dist. LEXIS 8040, at * 12, 2007 WL 433401 (E.D.N.Y. Feb. 5, 2007) ("This policy of liberally construing pro se submissions is driven by the understanding that implicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training.") [internal quotation marks and citations omitted]; *cf.* John C. Rothermich, "Ethical and Procedural Implications of "Ghostwriting" for *Pro Se* Litigants: Toward Increased Access to Civil Justice," 67 *Fordham L.Rev.* 2687, 2697 (Apr.1999) (arguing that, when the papers of a *pro se* litigant are "ghostwritten" by a legal assistant, the "special leniency" normally afforded to *pro se* litigants is "unwarranted") [citations omitted], *accord, Saunders,* 2006 WL 3051792, at *2, n .15.

Here, over the past nineteen years, Plaintiff has filed at least *twenty* other federal court actions (eighteen of which were in the Northern District), [FN58] and at least *four* state court actions. [FN59] Furthermore, a review of the dockets in the aforementioned actions-most or all of which challenged the conditions of his confinement-reveals that Plaintiff is well aware of the pleading requirements to state a valid claim with regard to prison conditions, [FN60] and the requirements for opposing a motion for summary judgment on a retaliation claim in particular. [FN61] Under the circumstances, I find that Plaintiff's special status as a *pro se* litigant should be revoked for the remainder of this action. Again, continuing to afford him such special status would be unnecessary (and unfairly prejudicial to Defendants). [FN62]

FN58. *See Shaheen v. Leonardo,* 88-CV-1128 (N.D.N.Y.) (prisoner civil rights action filed on 10/31/88); *Shaheen v. Enmy,* 89-CV-0035 (N.D.N.Y.) (prisoner civil rights action filed on 1/12/89); *Shaheen v. Bump,* 89-CV-0124 (N.D.N.Y.) (prisoner civil rights action filed on 2/6/89); *Shaheen v. Higgins,* 89-CV-0125 (N.D.N.Y.) (prisoner civil rights action filed on 2/6/89); *Shaheen v. Atkinson,* 89-CV-0294

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)

(Cite as: 2007 WL 3274835 (N.D.N.Y.))

(N.D.N.Y.) (prisoner civil rights action filed on 3/17/89); *Shaheen v. Crossman,* 89-CV-0499 (N.D.N.Y.) (prisoner civil rights action filed on 4/18/89); *Shaheen v. King,* 89-CV-0536 (N.D.N.Y.) (prisoner civil rights action filed on 4/27/89); *Shaheen v. King,* 89-CV-0964 (N.D.N.Y.) (prisoner civil rights action filed on 8/7/89); *Shaheen v. King,* 89-CV-1005 (N.D .N.Y.) (prisoner civil rights action filed on 8/18/89); *Shaheen v. Johnson,* 89-CV-1264 (N.D.N.Y.) (prisoner civil rights action filed on 10/23/89); *Shaheen v. Cronin,* 90-CV-0101 (N.D.N.Y.) (prisoner civil rights action filed on 1/26/90); *Shaheen v. Bocchi,* 90-CV-0228 (N.D.N.Y.) (prisoner civil rights action filed on 3/1/90); *Shaheen v. Wills,* 90-CV-0291 (N.D.N.Y.) McAvoy, C.J.) (prisoner civil rights action filed on 3/14/90; dismissed pursuant to Rule 12[b][6] on 7/30/93); *Shaheen v. Leonardo,* 90-CV-0328 (N.D.N.Y.) (prisoner civil rights action filed on 3/23/90); *Shaheen v. Cuomo,* 90-CV-0637 (N.D.N.Y.) (prisoner civil rights action filed on 6/8/90); *Shaheen v. Hollins,* 03-CV-0017 (N.D.N.Y .) (prisoner civil rights action filed on 1/3/03); *Shaheen v. Notabartolo,* 04-CV-1366 (N.D.N.Y.) (prisoner civil rights action filed on 11/12/03); *Shaheen v. Filion,* 04-CV-0465 (N.D.N.Y.) (prisoner civil rights action filed on 6/1/04); *Shaheen v. Beaver,* 04-CV-0546 (W.D.N.Y.) (prisoner civil rights action filed on 7/23/04); *Shaheen v. Herbert,* 04-CV-0648 (W.D.N.Y.) (prisoner civil rights action filed on 8/9/04).

FN59. *See Smith v. New York,* Index No.2003-032-117, Claim No. 103499 (N.Y.Ct.Cl.) (filed circa 3/28/01); *Smith v. New York,* Index No.2002-031-017, Motion No. M-64589 (N.Y.Ct.Cl.) (filed circa 1/18/02); *Smith v. New York,* Index No.2004-034-545, Claim No. 106268 (N.Y.Ct.Cl.) (filed on 6/24/02); *Smith v. Filion,* Index No. 000524/2004 (N.Y.S. Sup.Ct., Greene County) (Article 78 proceeding filed 6/23/04); *see also Smith v. New York,* Claim No. 109017 (N.Y.Ct.Cl.) (allegedly filed on 2/13/04, *see* Dkt.

No. 1, Part 1, ¶ 5.b. & Attachment Thereto [Plf.'s Compl.] ).

FN60. *See, e.g., Shaheen v. Wills,* 90-CV-0291, Order of Dismissal (N.D.N.Y. filed 7/30/93) (McAvoy, C.J.) (granting defendants' motion to dismiss Plaintiff's complaint for failure to state a claim pursuant to Rule 12[b][6] ); *Shaheen v. Filion,* 04-CV-0625, 2006 WL 2792739, at *2-3 (N.D.N.Y. Sept.17, 2006) (Scullin, J., adopting Report-Recommendation of Homer, M.J.) (reciting elements of valid claim of retaliation under First Amendment).

FN61. *See, e.g., Shaheen v. Filion,* 2006 WL 2792739, at *2-3 (granting defendants' motion for summary judgment with respect to, *inter alia,* Plaintiff's claim of retaliation because "Shaheen fails to show a causal connection between his criticism of prison officials and the alleged filing of a false misbehavior report because he offers only conclusory evidence to support his claim that defendants were aware of his criticism of the prison."); *see also* Dkt. No. 28, Part 1 (reminding Plaintiff of the potential consequences of failing to respond to a motion for summary judgment).

FN62. In the alternative, I recommend that his special status be revoked due to his lack of candor with the Court. (*See* Dkt. No. 1, Part 1, ¶ 5.b. & Attachment Thereto [Plf.'s Compl., falsely asserting, under oath, that as of the date of signing of his Complaint, 12/7/04, the only other actions that Plaintiff had filed in any state or federal court relating to his imprisonment were those listed in his Complaint, while, in fact, he had filed numerous other such actions.)

## III. ANALYSIS

## A. Whether Plaintiff Has Failed to Allege Facts Plausibly Suggesting, or Adduce Evidence Establishing, a Retaliation Claim Under the First Amendment

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment.[FN63] Central to such

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)

(Cite as: 2007 WL 3274835 (N.D.N.Y.))

claims is the notion that, in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights.[FN64] Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care.[FN65] As the Second Circuit has noted,

FN63. *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004).

FN64. *See Gill,* 389 F.3d at 381-383.

FN65. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

**\*8** This is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.[FN66]

FN66. *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) [citations omitted], *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To prevail on a First Amendment claim of retaliation under 42 U.S .C. § 1983, a plaintiff must prove by a preponderance of the evidence the following: (1) that the speech or conduct at issue was "protected"; (2) that the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) that there was a *causal connection* between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff.[FN67] Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone.[FN68]

FN67. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d Cir.2001] ).

FN68. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) [citations omitted].

Generally, evidence that might lead to an inference of a causal connection includes (1) the temporal proximity between the protected conduct and the alleged retaliatory act, (2) the inmate's prior good disciplinary record, (3) vindication at a hearing on the matter, and (4) statements by the defendant regarding his motives.[FN69] However, as explained above, prisoner retaliation claims are generally viewed "with skepticism and particular care" because "virtually any adverse action taken against a prisoner by a prison official-even those not otherwise rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act."[FN70] Indeed, the Second Circuit has established a "presumption that a prison official's acts to maintain order are done for a proper purpose," explaining that "the conclusion that the state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage."[FN71] Because of this presumption, a "[p]laintiff has the initial burden of showing that an improper motive played a substantial part in the defendant's action. The burden then shifts to the defendant to show it would have taken exactly the same action absent the improper motive."[FN72] If the defendant meets this burden, or if the plaintiff fails to meet his or her initial burden, summary judgment is appropriate.[FN73]

FN69. *See Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995).

FN70. *Dawes,* 239 F.3d at 492.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)

(Cite as: 2007 WL 3274835 (N.D.N.Y.))

FN71. *Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998).

FN72. *Scott v. Coughlin,* 344 F.3d 282, 288 (2d Cir.2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274 [1977] ).

FN73. *See Davidson v. Chestnut,* 193 F.3d 144, 149 (2d Cir.1999).

**1. Rule 12(b)(6) Analysis**

**\*9** The problem with the bulk of Plaintiff's retaliation claim lies not with the first and second elements discussed above but with the third element. Clearly, Plaintiff has alleged facts plausibly suggesting that he had engaged in "protected" speech or conduct under the First Amendment, namely, the filing of the federal and state court actions against prison officials challenging the conditions of his confinement.[FN74] Moreover, I find that Plaintiff has alleged facts plausibly suggesting that Defendants took "adverse action" against him, by alleging that Defendants wrongfully caused him to be subjected to "keeplock" confinement for two fifteen-day periods and two thirty-day periods.[FN75] (Having said that, I find that Plaintiff's somewhat related allegations of lost privileges, standing alone, would be too *de minimis* to constitute "adverse action," [FN76] and his allegations of repetitive searches of his prison cell in which he possesses no reasonable expectation of privacy, standing alone, would appear not be "adverse action.") (Scullin, J., sitting by designation); *Gill v. Hoadley,* 261 F.Supp.2d 113, 123-24 (N.D.N.Y.2003) (Peebles, M.J.) (recommending, *inter alia,* that district judge deny defendants' motion to dismiss for failure to state a claim because, *inter alia,* prisoner's allegation of keeplock confinement for periods of four days, twenty-one days and twenty-one days constituted allegation of "adverse action" for purposes of First Amendment retaliation claim), *adopted,* 2007 U.S. Dist. LEXIS 33122 (N.D.N.Y. May 4, 2004) (Scullin, J.); *Auleta v. LaFrance,* 233 F.Supp.2d 396, 402 (N.D.N.Y.2002) (Kahn, J.) (denying defendants' motion to dismiss for failure to state a claim because, *inter alia,* prisoner's allegation of seven and one-half days in keeplock confinement constituted allegation of "adverse action" for purposes of First Amendment retaliation claim) [collecting cases].

FN74. (Dkt. No. 1, Part 1, ¶ 5.b. & Attachment Thereto [Plf.'s Compl.].) *See Lewis v. Casey,* 518 U.S. 343, 355, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (" *Bounds [v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) ] does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.") [emphasis in original].

FN75. (Dkt. No. 1, Part 1, ¶¶ 6.A. 6.B., 6.C., 6.E. [Plf.'s Compl.].) *See Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir.2004) ("Gill has sufficiently alleged ... adverse action on the part of the defendants-the filing of false misbehavior reports against Gill and his sentence of three weeks in keeplock-that would deter a prisoner of ordinary firmness from vindicating his or her constitutional rights through the grievance process and the courts ....")

In any event, Plaintiff has not alleged facts plausibly suggesting a *causal connection* between that "protected" speech or conduct and the "adverse action."

FN76. *Bartley v. Collins,* 95-CV-10161, 2006 U.S. Dist. LEXIS 28285, at \*22, 2006 WL 1289256 (S.D.N.Y. May 10, 2006) ("Bates' misbehavior report against plaintiff and Collins's first report, which both resulted in plaintiff's temporary loss of various privileges such as permission to visit the commissary, likewise do not constitute adverse action because they were *de minimis:* they do not constitute penalties that would deter a similarly situated prisoner of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)

(Cite as: 2007 WL 3274835 (N.D.N.Y.))

ordinary firmness from exercising his constitutional rights.") [citations omitted].

FN77. *See Battice v. Phillip,* 04-CV-0669, 2006 WL 2190565, at *7 (E.D.N.Y. Aug.2, 2006) ("The Second Circuit has not addressed whether a cell search can constitute an adverse action for purposes of a First Amendment retaliation claim; however, many district courts in this circuit have concluded that it does not.") [collecting cases].

Specifically, in his Complaint, Plaintiff alleges no facts plausibly suggesting that any of the three Defendants in this action even *knew* that he had filed a previous federal or state court action against a prison official challenging the conditions of his confinement.[FN78] For example, Plaintiff does not allege facts plausibly suggesting that any of the federal or state court actions he had previously filed against prison officials asserted a claim against any of the three Defendants in this action.[FN79] Nor does Plaintiff allege facts plausibly suggesting that any of the three Defendants came across, and read, any of Plaintiff's legal papers during one of their searches of his prison cell.[FN80] Nor does Plaintiff allege facts plausibly suggesting that any of the three Defendants *told* Plaintiff that they were searching his cell or filing an (allegedly) false misbehavior report against him *because* he had previously filed one or more federal or state court actions against prison officials challenging the conditions of his confinement.[FN81]

FN78. (*See generally* Dkt. No. 1, Part 1, ¶ 6 & Attachment Thereto [Plf.'s Compl.].)

FN79. (*Id.* at ¶¶ 5, 6 & Attachments Thereto.)

FN80. (*Id.* at ¶ 6 & Attachment Thereto.)

FN81. (*Id.* at ¶ 6 & Attachment Thereto.)

Granted, Plaintiff asserts, in his purported Rule 7.1 Response (which neither contains citations to the record, nor is organized into paragraphs matching those of Defendants' Rule 7.1 Statement), that "Defendant (McIntyre) while searching Plaintiff's cell did read [some of Plaintiff's legal files] and complain to Plaintiff [about]

his bitterness towards prisoners and [Plaintiff for] suing the State prison system ...."[FN82] However, I find that such an assertion may not, under the circumstances, successfully amend the allegations of Plaintiff's Complaint for two independent reasons: (1) the assertion in question is not consistent (as it must be) with the allegations of that Complaint, which are conspicuously silent with regard to such a highly material admission by Defendant McIntyre;[FN83] and (2) because Plaintiff's special status as a *pro se* litigant has been revoked, his Complaint may not be construed with the sort of extraordinarily solicitude that would be necessary to permit it to be effectively amended through such an unsworn assertion made not in response to a motion to dismiss (which comes relatively early in an action) but a summary judgment motion (which typically comes relatively late in an action, for example, after discovery has occurred).[FN84]

FN82. (Dkt. No. 34, at 2-3, ¶ 6 [Plf.'s Rule 7.1 Response].)

FN83. *See Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (Hurd, J.) ("[I]n cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' ") [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004) (Hurd, J.).

FN84. *Cf. Gadson v. Goord,* 96 Civ. 7544, 1997 WL 714878, *1, n. 2 (S.D.N.Y. Nov.17, 1997) ("Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum.") (citing, *inter alia, Gill v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ).

**\*10** Moreover, even if the Court were to use the assertion in question to amend the allegations of Plaintiff's Complaint, the assertion would not do much to save the

Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)

(Cite as: 2007 WL 3274835 (N.D.N.Y.))

bulk of Plaintiff's retaliation claim: by acknowledging that the comment in question was made only by Defendant McIntyre during a search of Plaintiff's cell, Plaintiff (1) in no way alleges facts plausibly suggesting any knowledge of Plaintiff's litigiousness by Defendants Frazier and Hoessle, and (2) acknowledges that at least one of the searches would have occurred even without Defendant McIntyre's (alleged) discovery of Plaintiff's litigiousness.

Simply stated, given the absence of factual allegations plausibly suggesting that any of the three Defendants in this action even *knew* that Plaintiff had filed a previous federal or state court action against prison officials, and given the six-month delay between the filing of Plaintiff's last (alleged) federal or state court action against prison officials (occurring on March 7, 2004) [FN85] and the occurrence of the first instance of adverse action in question (on September 28, 2004), I find that Plaintiff has failed to state a claim of retaliation against all three Defendants *arising from Plaintiff's protected activity of filing federal and state court actions against prison officials challenging the conditions of his confinement.*

> [FN85.](#) (Dkt. No. 1, Part 1, ¶ 5.b. & Attachment Thereto [Plf.'s Compl.].)

However, I reach a different conclusion with respect to Plaintiff's more discrete claim of retaliation against *Defendants McIntyre and Hoessle arising from Plaintiff's (alleged) protected activity of challenging one or more disciplinary charges at a disciplinary hearing.* As described above in Part I.A. of this Report-Recommendation, Plaintiff alleges that, on October 2, 2004, Defendant McIntyre, in a conspiratorial manner, told Defendant Hoessle, in the Coxsackie C.F. mess hall, that he wanted Plaintiff "packed-up [sic] for beating his previous misbehavior report." [FN86] (While it is not entirely clear from Plaintiff's Complaint, it appears that the referenced "previous misbehavior report" had allegedly been issued by Defendant McIntyre on September 28, 2004, and had allegedly charged Plaintiff with refusing to obey a direct order, being out of place, and violating other, unspecified facility regulations. [FN87]) Moreover, Plaintiff alleges that, later that day (on October 2, 2004), Defendant Hoessle related Defendant McIntyre's instruction to an unknown corrections officer assigned to

A Block of Coxsackie C.F.,[FN88] and then, as a result of Defendant McIntyre's instruction, Defendant Hoessle issued a misbehavior report falsely charging Plaintiff with smoking a cigarette in his cell,[FN89] which further resulted in Plaintiff being subjected to keeplock confinement for thirty (30) days.[FN90]

> [FN86.](#) (Dkt. No. 1, Part 1, ¶ 6.C. [Plf.'s Compl.].)
>
> [FN87.](#) (*Id.* at ¶¶ 6, 6.A.)
>
> [FN88.](#) (Dkt. No. 1, Part 1, ¶ 6.C. [Plf.'s Compl.].)
>
> [FN89.](#) (*Id.*)
>
> [FN90.](#) (*Id.*)

While I have not found many cases addressing the issue, I will assume for the sake of argument that *actively* and *successfully* challenging a charge contained in a misbehavior report, during a prison disciplinary hearing, is "protected" conduct or speech under the First Amendment. The requirement that the challenge be *active* (e.g., through the introduction of witness testimony and documentary evidence at the disciplinary hearing, or the filing of an appeal thereafter) results from the rule, announced by the Supreme Court in *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), that the only types of prisoner litigation activity protected by the First Amendment are (1) an "attack [on] their sentences, directly or collaterally" (e.g., through the filing of state court appeals or a federal habeas corpus action), and (2) a "challenge [to] the conditions of their confinement" (e.g., through the filing of a federal court civil rights action pursuant to 42 U.S.C. § 1983). [FN91] The requirement that the challenge be *successful* results from the fact that, if a prisoner was not successful in his challenge to a disciplinary charge, then his so called "protected conduct" would appear to be inextricably intertwined with his (properly determined) violation of a prison regulation; and it is rather well settled that "[t]he violation of a prison regulation ... is not protected conduct." [FN92]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)

(Cite as: 2007 WL 3274835 (N.D.N.Y.))

FN91. *Lewis v. Casey,* 518 U.S. 343, 355, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (" *Bounds* [*v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) ] does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.") [emphasis in original]; *see, e.g., Brookins v. Kolb,* 990 F.2d 308, 313 (7th Cir.1993) ("[E]ven though [the plaintiff] contends that [his] letter [sent to prison officials who were about to conduct a disciplinary hearing on charges against another inmate] represented an exercise of his right to petition the government for the redress of grievances on behalf of [that other inmate], the content of the letter fails to demonstrate that [the plaintiff] was exercising such a right.... He was merely suggesting that lie detector tests be given to help determine whether the allegations [against the other inmate] were true before [the other inmate] had his disciplinary hearing ...."); *Ford v. Rodda,* 99-CV-10090, 2001 U.S. Dist. LEXIS 24956, at *21-22 (E.D.Mich. Jan. 4, 2001) ("Clearly, *presenting a defense* is a right protected by the First Amendment, even in a prison hearing setting ....") [emphasis added; citing no cases].

FN92. *Hall v. Beavin,* No. 98-3803, 1999 U.S.App. LEXIS 29700, at *5, 1999 WL 1045694 (6th Cir. Nov. 8, 1999) ("The violation of a prison regulation ... is not protected conduct.... [Plaintiff] has not stated a retaliation or First Amendment claim as he produced no evidence that he engaged in protected conduct. The disciplinary charges and actions followed an investigation involving [Plaintiff] which showed that [he] engaged in illegal conduct."); *see, e.g.,*

*Floyd v. Dugal,* 2003 U.S. Dist. LEXIS 24025, at *16, 2003 WL 23101802 (E.D.Pa. Dec. 16, 2003) ("If [the defendant] requested a [prison administrative] support team hearing regarding [the prisoner's] employment [at the prison] with the intent to punish [the prisoner] for defending himself at the [prison] misconduct hearing and in retaliation for the *dismissal* of [the prisoner's] misconduct charges, [the defendant] is liable for unconstitutional retaliation.") [emphasis added]; *Lindell v. O'Donnell,* 05-CV-0004, 2005 U.S. Dist. LEXIS 24767, at *78, 2005 WL 2740999 (W.D.Wisc. Oct. 21, 2005) (appearing to acknowledge legal sufficiency of retaliation claim alleging that protected conduct consisted of "*successfully* challeng[ing] a conduct report" but rejecting that claim because prisoner had failed to exhaust his available administrative remedies with respect to that claim before filing suit) [emphasis added]; *cf. Hatch v. Ragland,* No. 95-2525, 1997 U.S.App. LEXIS 2374, at *6-7 (7th Cir. Jan. 29, 1997) (not treating prisoner's challenges to procedures followed at disciplinary hearing as protected conduct for purposes of a claim of retaliation under First Amendment).

*11 Granted, there are several facts missing from Plaintiff's allegations, such as (1) which of the charges, which had been filed against Plaintiff on September 28, 2004, Plaintiff subsequently "beat," (2) whether Plaintiff actively challenged the charge or charges ultimately dismissed, (3) when his disciplinary hearing dismissing one or more of those charges occurred, and who conducted that hearing, (4) how he knew that Defendant McIntyre had issued this instruction to Defendant Hoessle in the Coxsackie C.F. mess hall on October 2, 2004, and (5) how he knew that Defendant Hoessle was motivated by the instruction when he issued Plaintiff a misbehavior report on or after October 2, 2004. However, for the sake of argument, I will assume that, under Rule 8's liberal notice pleading standard, Plaintiff has (barely) alleged facts plausibly suggesting retaliation by Defendants McIntyre and Hoessle in response to Plaintiff's protected activity of challenging his disciplinary charges at a disciplinary hearing. (Whether or not that claim survives

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)

(Cite as: 2007 WL 3274835 (N.D.N.Y.))

Defendants' motion for summary judgment, however, is another matter.)

As a result, I recommend that the Court dismiss, on Rule 12(b)(6) grounds, Plaintiff's First Amendment claim of retaliation against all three Defendants arising from Plaintiff's protected activity of filing federal and state court actions against prison officials challenging the conditions of his confinement, but that the Court *not* dismiss, on Rule 12(b)(6) grounds, Plaintiff's First Amendment claim of retaliation against Defendants McIntyre and Hoessle arising from Plaintiff's protected activity of challenging his disciplinary charges at a disciplinary hearing.

**2. Rule 56 Analysis**

Because I have already found that adequate grounds exist upon which to base a recommendation that the Court dismiss Plaintiff's First Amendment claim of retaliation against all three Defendants arising from Plaintiff's protected activity of filing federal and state court actions against prison officials challenging the conditions of his confinement, I need not address in detail Defendants' argument that insufficient record evidence exists to create a question of fact for purposes of a summary judgment motion, with respect to that claim. For the sake of brevity, I will simply report that I have reviewed the record evidence and I have found no evidence establishing a *causal connection* between (1) Plaintiff's filing of any of the aforementioned federal or state court actions and (2) Defendants' searches of Plaintiff's prison cell and/or Defendants' filing of misbehavior reports against Plaintiff. Indeed, several pieces of record evidence affirmatively establish the *lack* of a causal connection.[FN93] Moreover, other portions of the record reveal the *speculative* nature of Plaintiff's theory of a causal connection between his previous court actions and his cell searches and/or misbehavior reports.[FN94]

FN93. (*See, e.g.,* Dkt. No. 35, Part 3, at 4 [Ex. B to Schwartz Decl., attaching Coxsackie C.F. Intradepartmental Communication dated 10/2/04 from Defendant McIntyre to Sgt. Hofaker, stating, *inter alia,* "I have searched [Plaintiff's] cell in the past but did not read his litigation [materials] as he claims."].)

FN94. (Dkt. No. 35, Part 3, at 7 [Ex. B to Schwartz Affirm., attaching grievance dated 9/28/04 from Plaintiff, alleging, "[T]he only thing I can conclude [is] that ... [Defendant McIntyre] through official revenge and retaliation is angry at me because of my activities as a prison litigant wherein [sic] I filed a lot of civil litigation against the state prison system including staff here at Coxsackie .... [Defendant McIntyre] has searched and read a lot of the litigation [materials] in my cell ... since I've been ... [housed in this cell block]."].)

With respect to Plaintiff's First Amendment claim of retaliation against Defendants McIntyre and Hoessle arising from Plaintiff's (alleged) protected activity of challenging his disciplinary charges at a disciplinary hearing, a more detailed analysis is appropriate. As an initial matter, the sole record evidence adduced by Plaintiff that he "beat" any disciplinary charge is contained in Paragraph 6 .C. of Plaintiff's Complaint, which, because it is verified, has the effect of an affidavit for purposes of a motion for summary judgment.[FN95] Specifically, that paragraph contains a sworn assertion that, on October 2, 2004, Defendant McIntyre, in a conspiratorial manner, told Defendant Hoessle, in the Coxsackie C.F. mess hall that he wanted Plaintiff "packed-up [sic] for beating his previous misbehavior report."[FN96] As stated above, while it is not entirely clear from Plaintiff's Complaint, it appears that the referenced "previous misbehavior report" had (allegedly) been issued by Defendant McIntyre on September 28, 2004, and had (allegedly) charged Plaintiff with refusing to obey a direct order, being out of place, and violating other (unspecified) facility regulations.[FN97] This interpretation of Paragraph 6.C. of Plaintiff's Complaint is consistent with the record evidence adduced by Defendants, specifically the DOCS Disciplinary Hearing Disposition they provide, which indicates that, on September 30, 2004, Plaintiff was found not guilty of Defendant McIntyre's charge of refusing a direct order, but found guilty of the charges of being out of place and moving in violation of prison regulations.[FN98]

FN95. *See, supra,* Part II.A. of this Report-Recommendation.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)

(Cite as: 2007 WL 3274835 (N.D.N.Y.))

FN96. (Dkt. No. 1, Part 1, ¶ 6.C. [Plf.'s Verified Compl.].)

FN97. (*Id.* at ¶¶ 6, 6.A.)

FN98. (Dkt. No. 35, Part 4, at 10, 11 [Ex. C to Schwartz Affirm., attaching Inmate Misbehavior Report dated 9/28/04 filed by Defendant McIntyre against Plaintiff, and DOCS Disciplinary Hearing Disposition of 9/30/04].)

*12 However, neither Plaintiff's Verified Complaint nor any other portion of the record contains evidence that is critical to Plaintiff's claim: evidence that, at the disciplinary hearing in question, Plaintiff *actively* challenged the charge or charges that were dismissed (e.g., through the introduction of witness testimony and documentary evidence at the hearing, or the filing of an appeal after the hearing).[FN99] This detail is critical because the sole materiality of Plaintiff's sworn assertion that he "beat" the referenced misbehavior report depends on the extent that, when he did so, he was engaging in conduct or speech that is "protected" by the First Amendment. And the only type of conduct or speech that is "protected" by the First Amendment at a prison disciplinary hearing is conduct or speech that is *active* (and that is *successful* in the sense that it results in dismissal of the disciplinary charge in question). *See, supra,* notes 91-92 of this Report-Recommendation. Merely being the beneficiary of the dismissal of a charge at a prison disciplinary hearing is not any sort of "conduct" or "speech" at all, much less the more limited type of "conduct" or "speech" that is protected by the First Amendment. *Id.*

FN99. (*See generally* Dkt. No. 1, Part 1, ¶ 6.C. [Plf.'s Verified Compl.]; Dkt. No. 35, Part 4, at 11 [Ex. C to Schwartz Affirm., attaching DOCS Disciplinary Hearing Disposition of 9/30/04] .)

The closest Plaintiff comes to adducing the aforementioned evidence is when, in Paragraph 11 of a declaration offered in response to Defendants' motion, Plaintiff appears to assert that defense counsel is in possession of a transcript of the referenced disciplinary hearing, at which Plaintiff was present and testified. Specifically, Plaintiff asserts:

Copies of the ... transcripts ... [from] all four (4) [disciplinary] hearings regarding the written reports written by defendants McIntyre, Frazier, and Hoessle ... [against] Plaintiff were ... [obtained] by defendants ['] attorneys ... [,] which [copies] the Attorney General is [maintaining], and has always maintained[,] since [defendants' attorneys] ordered [transcripts] setting forth any and all particulars regarding Plaintiff's keeplocked [sic] status as to dates, time, and people, and the subject matter testimony of Plaintiff and the defendants.[FN100]

FN100. (Dkt. No. 34, at 18, ¶ 11 [Plf.'s Decl. in Response to Defs .' Motion].)

However, Plaintiff does not attach copies of those transcripts to his declaration (or to any document submitted in response to Defendants' motion).[FN101] Nor do Defendants attach those transcripts to any of their submissions.[FN102] As a result, those transcripts are not part of the record before the Court on Defendants' motion for summary judgment. Moreover, Plaintiff's implied assertion that he provided testimony at one or more of his disciplinary hearings is not evidence that he actively challenged the dismissed charge or charges in question.

FN101. (*See generally* Dkt. No. 34 [Plf.'s Papers in Response to Defs.' Motion].)

FN102. (*See generally* Dkt. No. 28 [Defs.' Motion for Summ. Judgment]; Dkt. No. 35 [Defs.' Reply Papers].)

In any event, even if Plaintiff had adduced record evidence that he had engaged in "protected" conduct or speech by challenging one or more disciplinary charges that was or were dismissed, I would find that he has adduced no record evidence from which a rational fact-finder could conclude that there was a *causal connection* between such "protected" conduct or speech and the adverse action that Plaintiff (allegedly) experienced when Defendant Hoessle issued a misbehavior report falsely charging Plaintiff with smoking a cigarette in his cell.[FN103] The only such "evidence" that Plaintiff has adduced is his sworn assertion that, on October 2, 2004, at some point before he was issued the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)

(Cite as: 2007 WL 3274835 (N.D.N.Y.))

aforementioned false misbehavior report by Defendant Hoessle, Defendant McIntyre told Defendant Hoessle, in the Coxsackie C.F. mess hall that he wanted Plaintiff "packed-up [sic] for beating his previous misbehavior report." FN104

> FN103. (Dkt. No. 1, Part 1, ¶ 6.C. [Plf.'s Compl.].)

> FN104. (*Id.*)

*13 This self-serving assertion by Plaintiff does not contain any specific details indicating *personal knowledge* by Plaintiff of the fact asserted, namely, that Defendant McIntyre had issued this instruction to Defendant Hoessle in the Coxsackie C.F. mess hall on October 2, 2004. FN105 Moreover, the fact asserted is largely, if not totally, unsubstantiated by any other direct evidence in the record. For example, Plaintiff adduces no evidence that *Defendant Hoessle* made any sort of statement to Plaintiff indicating a retaliatory motive during the issuance of the referenced misbehavior report (or at any time). FN106 Indeed, the record evidence is to the contrary. FN107

> FN105. I note that Plaintiff's allegation, in his unsworn grievance of October 3, 2004, that he "overheard" this instruction (or a related remark) is not *admissible evidence.* (Dkt. No. 35, Part 4, at 14 [Ex. C to Schwartz Affirm., attaching grievance dated 10/3/04 from Plaintiff].) As an initial matter, such unsworn claims are not *evidence* of the events giving rise to the claims at all but mere *allegations,* which are always insufficient to create a question of fact for purposes of summary judgment. *See* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings"); *see, e.g., Mays v. Rhodes,* 255 F.3d 644, 648 (8th

Cir.2001) ("unsworn accounts [of events] found in grievance forms filed by [prison] inmates" did not constitute evidence for purposes of motion for summary judgment) [citations omitted]; *Boyd v. Pork,* 01-CV-7957, 2003 U.S. Dist. LEXIS 7485, at *19, 2003 WL 21011805 (N.D.Ill. Apr. 30, 2003) ("[The prisoner's] statement in the grievance is unsworn and of no evidentiary value [for purposes of the defendant's motion for summary judgment]."); *cf. David v. Lester,* 156 F.Supp.2d 588, 592, n. 6 ("These unsworn grievance responses cannot be considered evidence from either party as to what actually happened or why. At the most, they are evidence as to the answers that [the prisoner] received to his grievances."). In any event, even if such unsworn claims did somehow constitute evidence, they could not be used for purposes of summary judgment because they are *inadmissible* at trial as hearsay. *See* Fed.R.Civ.P. 56(e) (requiring summary judgment decisions to be based on matters that would be "admissible in evidence"); Fed.R.Evid. 801(c) (" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."); Fed.R.Evid. 802 ("Hearsay is not admissible except as provided by these rules or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress."); *see, e.g., Jordan v. Van Winkle,* 04-CV-0647, 2006 U.S. Dist. LEXIS 76733, at *7-8, 2006 WL 2925657 (N.D.Ind. Oct. 6, 2006) (prisoner's "unsworn grievances" were not able to create question of fact for purposes of summary judgment since they were not admissible to prove truth of statements contained in those grievances).

> FN106. Again, Plaintiff's allegation, in his grievance of October 3, 2004, that, in response to the referenced instruction by Defendant McIntyre, Defendant Hoessle said, "Consider it done" is not *evidence* for the reason stated above in note 105 of this Report-Recommendation. (Dkt. No. 35, Part 4, at 13 [Ex. C to Schwartz

Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)

(Cite as: 2007 WL 3274835 (N.D.N.Y.))

Affirm., attaching grievance dated 10/3/04 from Plaintiff.)

FN107. (*See* Dkt. No. 35, Part 4, at 4 [Ex. C to Schwartz Affirm., attaching Coxsackie C.F. Memorandum dated 10/21/04, from Defendant Hoessle to Sgt. Mugs, reporting that, at 7:02 a.m. on 10/2/04, while he was "taking the chow list on [Plaintiff's] cell block," Defendant Hoessle witnessed Plaintiff smoking in his cell, and that, as a result, later that day, he issued Plaintiff a misbehavior report]; *accord*, Dkt. No. 35, Part 4, at 6 [Ex. C to Schwartz Affirm., attaching Inmate Misbehavior Report dated 10/2/04, filed by Defendant Hoessle against Plaintiff for smoking in his cell at 7:02 a.m.].)

Nor does the record contain any of the other types of evidence that the Second Circuit has stated might lead to an inference of a causal connection between "protected" activity and adverse action. For example, Plaintiff has adduced no evidence that he was ever vindicated of the charge of smoking a cigarette in his cell. Rather, the record evidence indicates he was convicted of that charge.[FN108] Nor has Plaintiff even adduced any evidence that, before Defendant Hoessle issued the referenced misbehavior report on October 2, 2004, Plaintiff had a good disciplinary record. Again, the record evidence is to the contrary.[FN109]

FN108. (Dkt. No. 1, Part 1, ¶ 6.C. [Plf.'s Compl., offering sworn assertion that, upon conviction of Defendant Hoessle's charge of smoking, Plaintiff "was subjected to 30 days keeplocked [sic]" confinement].)

FN109. (*See* Dkt. No. 35, Parts 6, 7 [Exs. 1, 2 to Carroll Decl., attaching grievance filed by Plaintiff on 11/23/03 alleging staff misconduct resulting in filing of disciplinary charges against Plaintiff, and grievance filed by Plaintiff on 3/23/04 alleging wrongful removal of Plaintiff from his former position as Inmate Liaison Committee Chairman resulting in conviction on aforementioned disciplinary charges and sentence of 60 days keeplock confinement]; Dkt.

No. 35, Part 4, at 11 [Ex. C to Schwartz Affirm., attaching DOCS Disciplinary Hearing Disposition indicating that, on 9/30/04, Plaintiff had been convicted of two disciplinary charges].)

As a result, I recommend that the Court dismiss, on Rule 56 grounds, Plaintiff's First Amendment claim of retaliation against Defendants McIntyre and Hoessle arising from Plaintiff's (alleged) protected activity of challenging his disciplinary charges at a disciplinary hearing. I also recommend that, should the Court decline to dismiss Plaintiff's other First Amendment claim (i.e., his claim of retaliation against all three Defendants arising from Plaintiff's alleged protected activity of filing federal and state court actions against prison officials challenging the conditions of his confinement) on Rule 12(b)(6) grounds, the Court dismiss that claim, in the alternative, on Rule 56 grounds.

**B. Whether Plaintiff Has Failed to Allege Facts Plausibly Suggesting, or Adduce Evidence Establishing, that He Exhausted His Available Administrative Remedies Before Filing this Action in Federal Court**

Because I have already found that adequate grounds exist upon which to base a recommendation that the Court dismiss Plaintiff's First Amendment claims of retaliation against Defendants, I need not address in detail Defendants' alternative exhaustion argument. In the interest of thoroughness, I will address that argument.

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." [FN110] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN111] The Department of Correctional Services ("DOCS") has available a well-established three-step inmate grievance program.[FN112]

FN110. 42 U.S.C. § 1997e.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)

(Cite as: 2007 WL 3274835 (N.D.N.Y.))

FN111. *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

FN112. 7 N.Y.C.R.R. § 701.7.

**\*14** Generally, the DOCS Inmate Grievance Program ("IGP") involves the following procedure.[FN113] *First,* an inmate must file a complaint with the facility's IGP clerk within fourteen (14) calendar days of the alleged occurrence. A representative of the facility's inmate grievance resolution committee ("IGRC") has seven working days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within seven (7) working days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within four (4) working days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within ten (10) working days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within four (4) working days of receipt of the superintendent's written decision. CORC is to render a written decision within twenty (20) working days of receipt of the appeal. It is important to emphasize that *any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process.*[FN114]

FN113. 7 N.Y.C.R.R. § 701.7; *see also White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at \*6, 2002 WL 31235713 (S.D.N.Y. Oct 3, 2002).

FN114. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g ., Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at \*4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails

to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.).

Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. [FN115] However, the Second Circuit recently held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA.[FN116] *First,* "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." [FN117] *Second,* if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." [FN118] *Third,* if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." [FN119]

FN115. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)

(Cite as: 2007 WL 3274835 (N.D.N.Y.))

FN116. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).

FN117. *Hemphill,* 380 F.3d at 686 (citation omitted).

FN118. *Id.* [citations omitted].

FN119. *Id.* [citations and internal quotations omitted].

**1. Rule 12(b)(6) Analysis**

To the extent that Defendants' argue that Plaintiff has failed to allege facts plausibly suggesting that he exhausted his available administrative remedies before filing this action in federal court,[FN120] I reject that argument.

FN120. (*See, e.g.,* Dkt. No. 28, Part 7, at 2, 6 [Defs.' Mem. of Law, arguing that the Court should dismiss Plaintiff's Complaint because of, in part, his "inconsistent" allegations regarding exhaustion of administrative remedies, and his failure to allege special circumstances justifying Plaintiff's failure to exhaust his administrative remedies].)

**\*15** For some years now, it has been the majority rule (followed by the Second Circuit) that a prisoner's fulfillment of his duty to exhaust his administrative remedies under the PLRA is not a fact that the prisoner has to plead in order to state a claim under 42 U.S.C. § 1983 but a fact that may be challenged by a defendant through an affirmative defense (such as on a motion for summary judgment) established by the PLRA. *See, e.g., Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). Recently, the Supreme Court upheld this interpretation of the exhaustion requirement, prohibiting circuits (such as the Sixth, Tenth and Eleventh Circuits) from using exhaustion as a heightened pleading requirement in prisoner civil rights case. *See Jones v. Block,* 549 U.S. 199, ---- - ----, ---- - 127, 127 S.Ct. 910, 914-915, 918-923, 166 L.Ed.2d 798 (2007). "[T]his is not to say that failure to exhaust cannot be a basis for dismissal for failure to state a claim." *Block,* 127 S.Ct. at 921. Rather, it means that a prisoner has no duty to plead facts

plausibly suggesting that he exhausted his administrative remedies. If he chooses to plead facts regarding exhaustion, however, his Complaint may be dismissed for failure to state a claim if "the allegations in the complaint [taken as true] suffice to establish that [the prisoner failed to exhaust his administrative remedies]." *Id.*

Here, the allegations in Plaintiff's Complaint, taken as true, simply do not suffice to establish that he failed to exhaust his administrative remedies. Defendants are certainly correct that, in Plaintiff's Complaint, in response to the question "Is there a prisoner grievance procedure at this facility," Plaintiff answered "Yes." (Dkt. No. 1, ¶ 4[a] [Plf.'s Compl.].) However, in response to the question "If your answer to 4(a) is YES, did you present the facts relating to your complaint in this grievance program," Plaintiff answered "Yes." (*Id.* at ¶ 4[b].) In response to the next question "What steps did you take?" Plaintiff answered, "I filed a grievance at Coxsackie [Correctional] [F]acility." (*Id.* at ¶ 4[b][i].) In response to the next question "What was the **final** result of your grievance?" Plaintiff answered, "None. They failed to [r]espond." (*Id.* at ¶ 4[b][ii] [emphasis in original; internal quotation marks omitted].)[FN121] In response to a later question, "If there is no grievance procedure in your institution, did you complain to prison authorities about the facts alleged in your complaint?" Plaintiff answered, "Yes." (*Id.* at ¶ 4[c].) In response to the next question, "What steps did you take?" Plaintiff answered, "I filed complaints to ... Deputy Superintendent ... of Security [Graham]." (*Id.* at ¶ 4[c][i].) Finally, in response to the next question, "What was the **final** result regarding your complaint?" Plaintiff answered, "No results." (*Id.* at ¶ 4[c][ii] [emphasis in original].)

FN121. I note that Plaintiff attached to his Complaint a copy of this grievance. (Dkt. No. 1, Part 1, ¶ 4 & Attachment Thereto [Plf.'s Compl.].)

It is true that Plaintiff has not alleged facts plausibly suggesting that he filed an appeal (or complaint) with the Coxsackie C.F. Superintendent, complaining of a failure by the IGRC to timely respond to the grievance. Nor has he alleged facts plausibly suggesting that he filed an appeal (or complaint) with CORC, complaining of a failure by Deputy Superintendent of Security Graham to

Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)

(Cite as: 2007 WL 3274835 (N.D.N.Y.))

timely respond to his informal complaint. However, he has no duty to do so because, as explained above, a prisoner has no duty to plead facts plausibly suggesting that he exhausted his administrative remedies. Moreover, he has pled facts plausibly suggesting that "special circumstances" might have existed justifying his failure to comply with the administrative procedural requirements, namely, (1) his previously mentioned informal efforts to file complaints with Deputy Superintendent of Security Graham coupled with (2) his confused understanding that the PLRA did not require him to further pursue his remedies through the prison grievance program. (Dkt. No. 1, ¶ 4 [b] [Plf.'s Compl., answering "Because of the Prison Litigation Reform Act" in response to question "Why did you choose to not present the facts relating to your complaint in the prison's grievance program?"].)

   *16 As a result, I recommend that the Court reject Defendants' exhaustion argument to the extant that argument is premised on Rule 12(b)(6) grounds. However, I reach a different conclusion with regard to Defendants' exhaustion argument to the extent that argument is premised on Rule 56 grounds.

## 2. Rule 56 Analysis

   Simply stated, the record contains insufficient evidence to create a triable issue of fact regarding each of the inquiries contained in the above-described three-part inquiry established by the Second Circuit for exhaustion cases.

   With regard to the first inquiry (regarding whether the administrative remedies not pursued by Plaintiff were in fact "available" to Plaintiff), Plaintiff essentially alleges that his administrative remedies were not "available" to him because (1) on October 2, 2004, he filed a grievance to which the Coxsackie C.F. Inmate Grievance Review Committee provided no response, and (2) he then filed multiple complaints with Coxsackie C.F. Deputy Superintendent of Security Graham, who provided no response to those complaints. (Dkt. No. 1, ¶ 4 & Attachment Thereto [Plf.'s Compl.] .) The problem is that, pursuant to DOCS well-established three-step Inmate Grievance Program, an inmate in a New York State correctional facility has an administrative remedy even when the correctional facility has failed to file, or respond

to, a grievance that has been submitted by the inmate; specifically, here, Plaintiff could have filed with CORC an appeal complaining of the aforementioned failures, and had to do so to complete the grievance process. [FN122] Moreover, Plaintiff has effectively admitted that he never did so. [FN123]

   **FN122.** As explained above in this Report-Recommendation, any failure by a facility's IGRC or superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process. *See supra,* note 114 of this Report-Recommendation (citing authorities).

   **FN123.** (*Compare* Dkt. No. 28, Part 2, ¶ 6 [Defs.'Rule 7.1 Statement, asserting that Plaintiff never filed appeal with CORC and providing accurate record citation supporting that factual assertion] *with* Dkt. No. 34, at 2, ¶ 6 [Plf.'s Rule 7.1 Response, not specifically controverting the referenced factual assertion, nor providing any record citation in support of any factual assertion, nor even addressing Defendants' referenced factual assertion in a matching numbered paragraph, as required by Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court]; *see also* Dkt. No. 34, at 2, ¶¶ 7-9 [Plf.'s Rule 7.1 Response, asserting several facts regarding the alleged exhaustion of his administrative remedies in general, but asserting no facts regarding whether he filed any appeal with CORC, and, in any event, providing no record citations in support of any factual assertions].)

   Although the Court has no duty to independently scour the record for evidence that Plaintiff filed any appeal to CORC,[FN124] I note that Plaintiff has, in response to Defendants' motion, adduced a sworn assertion that, at some point in time, he sent one or more "follow-up letters" to "Director Eagen" at "Albany's (IGRC) Central Office," and that Director Eagen never responded to that letter or those letters.[FN125] Setting aside the totally uncorroborated nature of this new assertion by Plaintiff, such an assertion

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)

(Cite as: 2007 WL 3274835 (N.D.N.Y.))

would not create a genuine issue of material fact with respect to whether Plaintiff completed the exhaustion process since (1) Plaintiff has not provided any evidence that the referenced "follow-up letters" constituted *appeals* from decisions by relevant officials at Coxsackie C.F. regarding one or more of his grievances, nor has he even identified the subject matter (or dates) of the referenced "follow-up letters," and (2) in any event, the record contains no evidence that Plaintiff satisfied a prerequisite to an appeal to CORC regarding the decision (or lack of response) from the IGRC, namely, an appeal from the IGRC's decision (or lack of response) to the Coxsackie C.F. *Superintendent.*

> FN124. *See, supra,* note 24 of this Report-Recommendation.

> FN125. (Dkt. No. 34, at 17, ¶ 7 [Plf.'s Decl. in Opp. to Defs.' Motion].)

With regard to the second inquiry (regarding whether some or all of the Defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, and whether Defendants' own actions inhibiting Plaintiff's exhaustion of remedies may estop one or more of the Defendants from raising Plaintiff's failure to exhaust as a defense), Defendants have not forfeited the affirmative defense of non-exhaustion because they did indeed raise it in their Answer. (Dkt. No. 12, Part 1, ¶ 13 [Defs.' Answer].) Moreover, I can find no record evidence that any Defendants are estopped from raising Plaintiff's exhaustion as a defense by taking actions that inhibited Plaintiff's exhaustion of administrative remedies. Indeed, rather than alleging that *Defendants* inhibited Plaintiff's exhaustion of administrative remedies, Plaintiff's Complaint alleges that Plaintiff was inhibited (through non-responsiveness) by (1) unnamed officials at Coxsackie C.F.'s Inmate Grievance Program (or perhaps the Grievance Review Committee),[FN126] and Coxsackie C.F. Deputy Superintendent of Security Graham.[FN127] His opposition papers similarly fail to contain any evidence placing blame on Defendants for the (alleged) failure to address his grievances and complaint letters.[FN128]

> FN126. (Dkt. No. 1, Part 1, ¶ 4[b] & Attachment Thereto [Plf.'s Compl.].)

> FN127. (*Id.* at ¶ 4[c].)

> FN128. (*See, e.g.,* Dkt. No. 34, at 16-17, ¶¶ 5-8 [Plf.'s Decl. in Opp. to Defs.' Motion].)

**\*17** Finally, with regard to the third inquiry (regarding whether evidence of "special circumstances" justifying Plaintiff's failure to exhaust has been adduced sufficient to create an issue of fact to survive a motion for summary judgment), I find no such evidence in the record. Granted, there are some pieces of record evidence indicating two efforts by Plaintiff to informally complain about various of the issues raised in his Complaint in this action.[FN129] However, because Plaintiff chose to raise those concerns by letter to Deputy Superintendent of Security Graham rather than by a grievance to the Coxsackie C.F. IGRC, Coxsackie C.F Superintendent, and CORC pursuant to DOCS' well-established exhaustion procedure, his letters were interpreted as alleging "staff harassment,"[FN130] and they never reached Coxsackie C.F. Superintendent Gary H. Filion.[FN131] Furthermore, Plaintiff never explains the source of his confused understanding, expressed in his Complaint, that the PLRA did not require him to further pursue his remedies through the prison grievance program.[FN132] Based on the record before me, I have no choice but to conclude that his confusion was not reasonable. For these reasons, I find that Plaintiff's efforts (to complain about various of the issues raised in his Complaint in this action) are not evidence of "special circumstances" justifying his failure to exhaust, but evidence merely of his decision to unnecessarily circumvent DOCS' well-established exhaustion procedure, which was available at Coxsackie C.F.

> FN129. (Dkt. No. 35, Part 3, at 5-9 [Ex. B to Schwartz Affirm., attaching copy of Plaintiff's letter of 9/28/04 to Coxsackie C.F. Deputy Superintendent Graham, alleging misconduct by Defendant McIntyre]; Dkt. No. 35, Part 3, at 2 [Ex. B to Schwartz Affirm., attaching copy of Coxsackie C.F. Memorandum dated 10/12/04 from Coxsackie C.F. Superintendent Filion to Plaintiff responding to Plaintiff's letter of 9/28/04 to Coxsackie C.F. Deputy Superintendent Graham, interpreting Plaintiff's letter as alleging

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)

(Cite as: 2007 WL 3274835 (N.D.N.Y.))

"staff harassment"]; Dkt. No. 35, Part 4, at 13-18 [Ex. C to Schwartz Affirm., attaching copy of Plaintiff's letter of 10/3/04 to Coxsackie C.F. Captain A.W. Dirie, alleging misconduct by Defendants McIntyre, Hoessle and Frazier]; Dkt. No. 35, Part 3, at 2 [Ex. C to Schwartz Affirm., attaching copy of Coxsackie C.F. Memorandum dated 11/4/04 from Coxsackie C.F. Captain A.W. Dirie to Plaintiff responding to Plaintiff's letter of 10/3/04 to Coxsackie C.F. Deputy Superintendent Graham, again interpreting Plaintiff's letter as alleging "staff harassment"].)

FN130. (Id.)

FN131. (Id.)

FN132. (Dkt. No. 1, ¶ 4[b] [Plf.'s Compl., answering "Because of the Prison Litigation Reform Act" in response to question "Why did you choose to not present the facts relating to your complaint in the prison's grievance program?"].)

As a result, I recommend that, should the Court decline to dismiss Plaintiff's First Amendment claims on Rule 12(b)(6) grounds, the Court dismiss that claim, in the alternative, on Rule 56 grounds for failure to adduce record evidence that he exhausted his available administrative remedies before filing suit in federal court.

**C. Whether Plaintiff's Complaint Should Be Dismissed Because of His Failure to Promptly Notify the Court and Opposing Counsel of His Change of Address**

Because I have already found that multiple independent grounds exist upon which to base a recommendation that the Court dismiss Plaintiff's Complaint, I need not, and do not, address the merits of this alternative argument, other than to note that, although it is true that, on September 6, 2006, District Judge McAvoy stated that **"[a]ny future failures to keep Defendants and the Court apprised of address changes will result in the dismissal of this action,"** (Dkt. No. 26, at 2 [emphasis in original] ), Plaintiff has provided a plausible explanation for his referenced failure (Dkt. No. 34, at 7 [Plf.'s Opp. Mem. of Law] ), and Defendants do

not appear to have experienced any prejudice as a result of that failure.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 28) be **GRANTED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2007.

Shaheen v. McIntyre
Not Reported in F.Supp.2d, 2007 WL 3274835 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

C

United States District Court,
E.D. New York.
Anthony PRICE, Plaintiff,
v.
Sheriff Edward REILLY, Kim Edwards, RN III, Perry
Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, MD,
and Nassau University Medical Center, Defendants.
**No. 07-CV-2634 (JFB)(ARL).**

March 8, 2010.

**Background:** Pro se inmate, who suffered from end stage renal disease requiring dialysis, filed § 1983 action against sheriff, nurse practitioner, physician, and medical center, alleging violations of the Eighth Amendment for defendants' failure to provide adequate medical care. Defendants moved for summary judgment.

**Holdings:** The District Court, Joseph F. Bianco, J., held that:

(1) there was no evidence that administrative remedy was available to inmate;

(2) prison medical staff's modification of inmate's medication dosage did not constitute deliberate indifference to his medical needs;

(3) prison's failure to provide food with inmate's medication was not sufficiently serious to satisfy objective prong of test for deliberate indifference to serious medical needs;

(4) medical staff did not act with culpable intent to consciously disregard inmate's serious medical needs;

(5) genuine issue of material fact as to whether prison medical staff was aware of, and consciously disregarded inmate's request for a kidney transplant test precluded summary judgment;

(6) genuine issue of material fact as to whether inmate's shoulder pain was a serious medical condition precluded summary judgment;

(7) sheriff was not liable under § 1983; but

(8) genuine issues of material fact precluded summary

judgment on § 1983 liability of registered nurse and doctor.

Motion granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A**  2547.1

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2547 Hearing and Determination
                    170Ak2547.1 k. In general. Most Cited Cases
Generally, plaintiffs' failure to respond or contest facts set forth by defendants in their statement of facts, submitted in support of summary judgment, constitutes admission of those facts, and facts are accepted as undisputed under local rule. U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

**[2] Federal Civil Procedure 170A**  25

170A Federal Civil Procedure
    170AI In General
        170AI(B) Rules of Court in General
            170AI(B)1 In General
                170Ak25 k. Local rules of District Courts. Most Cited Cases
District court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.

**[3] Federal Civil Procedure 170A**  2547.1

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2547 Hearing and Determination
                    170Ak2547.1 k. In general. Most Cited

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Cases
District court, when analyzing motion for summary judgment by sheriff and medical personnel in inmate's pro se action alleging cruel and unusual punishment, would treat as admitted only those facts in defendants' statement of facts that were supported by admissible evidence and not controverted by other admissible evidence in the record, given that inmate was acting pro se, he failed to file and serve a response to defendant's statement, but he had identified arguments and factual assertions in statement with which he disagreed. U.S.C.A. Const.Amend. 8; U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

**[4] Federal Civil Procedure 170A ⚷ 657.5(1)**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(1) k. In general. Most Cited Cases
Court must construe pro se complaint broadly, and interpret it to raise the strongest arguments that it suggests.

**[5] Attorney and Client 45 ⚷ 62**

45 Attorney and Client
    45II Retainer and Authority
        45k62 k. Rights of litigants to act in person or by attorney. Most Cited Cases

**Federal Civil Procedure 170A ⚷ 657.5(1)**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(1) k. In general. Most Cited Cases

**Federal Civil Procedure 170A ⚷ 2546**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2542 Evidence
                    170Ak2546 k. Weight and sufficiency.
Most Cited Cases
Though pro se litigant's pleadings and other submissions are afforded wide latitude, pro se party's conclusory assertions, completely unsupported by evidence, are not sufficient to defeat motion for summary judgment.

**[6] Civil Rights 78 ⚷ 1304**

78 Civil Rights
    78III Federal Remedies in General
        78k1304 k. Nature and elements of civil actions.
Most Cited Cases
To prevail on a claim under § 1983, a plaintiff must show: (1) deprivation of any rights, privileges, or immunities secured by the Constitution and its laws, (2) by a person acting under the color of state law. 42 U.S.C.A. § 1983.

**[7] Prisons 310 ⚷ 317**

310 Prisons
    310II Prisoners and Inmates
        310II(H) Proceedings
            310k316 Exhaustion of Other Remedies
                310k317 k. In general. Most Cited Cases
In order to determine if prisoner exhausted his administrative remedies prior to commencement of lawsuit, as required by PLRA, court must first establish from a legally sufficient source that an administrative remedy is applicable, and that the particular complaint does not fall within an exception. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

**[8] Prisons 310 ⚷ 313**

310 Prisons

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

310II Prisoners and Inmates
    310II(H) Proceedings
        310k307 Actions and Litigation
            310k313 k. Trial. Most Cited Cases
Whether administrative remedy was available to prisoner in a particular prison or prison system, and whether such remedy was applicable to grievance underlying prisoner's suit, for purpose of PLRA's exhaustion requirement, are not questions of fact; rather, such issues either are, or inevitably contain, questions of law. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

[9] Civil Rights 78 ☞ 1319

78 Civil Rights
    78III Federal Remedies in General
        78k1314 Adequacy, Availability, and Exhaustion of State or Local Remedies
            78k1319 k. Criminal law enforcement; prisons. Most Cited Cases
Sheriff and prison medical staff provided no evidence that an administrative remedy was available to inmate who suffered from end state renal disease, and who sought, but did not receive, medical testing to determine if he was a candidate for kidney transplant, and thus inmate's § 1983 action alleging violations of Eighth Amendment would not be dismissed for his failure to exhaust administrative remedies under PLRA; defendants failed to establish procedural framework for grievance resolution at the prison or the availability of any administrative remedies for prisoner's situation. U.S.C.A. Const.Amend. 8; Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

[10] Sentencing and Punishment 350H ☞ 1533

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1533 k. Deliberate indifference in general. Most Cited Cases
Test for determining whether prison official's actions or omissions rise to level of "deliberate indifference" in violation of the Eighth Amendment, as will allow recovery by prisoner in federal civil rights action, is twofold: first, prisoner must demonstrate that he is incarcerated under

conditions posing substantial risk of serious harm, and second, prisoner must demonstrate that defendant prison officials possessed sufficient culpable intent. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

[11] Sentencing and Punishment 350H ☞ 1533

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1533 k. Deliberate indifference in general. Most Cited Cases
Second prong of test for determining whether prison officials acted with deliberate indifference to rights of prisoners in violation of the Eighth Amendment, that of "culpable intent," in turn involves two-tier inquiry; specifically, prison official has sufficient culpable intent if he has knowledge that inmate faces substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate harm. U.S.C.A. Const.Amend. 8.

[12] Sentencing and Punishment 350H ☞ 1546

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases
Mere fact that an inmate's underlying disease is a "serious medical condition" does not mean that prison staff's allegedly incorrect treatment of that condition automatically poses an "objectively serious health risk," in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8.

[13] Prisons 310 ☞ 192

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k192 k. In general. Most Cited Cases

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**Sentencing and Punishment 350H** 🔑   1546

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
       350HVII(H) Conditions of Confinement
          350Hk1546 k. Medical care and treatment. Most Cited Cases
Even though inmate's end stage renal disease requiring dialysis was serious medical condition, prison medical staff did not act with deliberate indifference to inmate's medical needs in violation of his Eighth Amendment rights by modifying his medication dosage, since reduction in medication levels posed no objectively serious health risk to inmate; only injury inmate suffered was an increase in phosphorous levels, which was correctable, and a slight rash. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[14] Prisons 310** 🔑   192

310 Prisons
    310II Prisoners and Inmates
       310II(D) Health and Medical Care
          310k191 Particular Conditions and Treatments
             310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** 🔑   1546

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
       350HVII(H) Conditions of Confinement
          350Hk1546 k. Medical care and treatment. Most Cited Cases
Even though inmate's prescriptions indicated that his medications for renal disease were to be taken with meals, prison officials' failure to provide food with the medication was not sufficiently serious to satisfy objective prong of test for deliberate indifference to inmate's serious medical needs, in violation of Eighth Amendment; inmate did not suffer any harm from taking medicine without food. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[15] Sentencing and Punishment 350H** 🔑   1546

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
       350HVII(H) Conditions of Confinement
          350Hk1546 k. Medical care and treatment. Most Cited Cases
An inmate's mere disagreement with prison officials' prescribed medication dosage is insufficient as a matter of law to establish officials' "deliberate indifference" to his medical needs, in violation of the Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[16] Prisons 310** 🔑   192

310 Prisons
    310II Prisoners and Inmates
       310II(D) Health and Medical Care
          310k191 Particular Conditions and Treatments
             310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** 🔑   1546

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
       350HVII(H) Conditions of Confinement
          350Hk1546 k. Medical care and treatment. Most Cited Cases
Even though inmate disagreed with medical treatment he received at prison, medical staff did not act with culpable intent to consciously disregard inmate's serious medical needs, in violation of his Eighth Amendment rights, by adjusting the dosage levels of his prescription medication for renal disease; dosage inmate received adequately treated his condition, he suffered no injury from modification of dosage other than increased phosphorous levels, and officials changed dosage to correct those levels. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[17] Federal Civil Procedure 170A** 🔑   2491.5

170A Federal Civil Procedure
    170AXVII Judgment
       170AXVII(C) Summary Judgment
          170AXVII(C)2 Particular Cases
             170Ak2491.5 k. Civil rights cases in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

general. Most Cited Cases
Genuine issue of material fact as to whether prison
medical staff was aware of, and consciously disregarded
inmate's request for a kidney transplant test, precluded
summary judgment in inmate's § 1983 action alleging
officials' deliberate indifference to his medical needs, in
violation of Eighth Amendment. U.S.C.A. Const.Amend.
8; 42 U.S.C.A. § 1983.

[18] Sentencing and Punishment 350H ⟲   1546

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most
Cited Cases
An inmate's chronic pain can constitute a "serious medical
condition" for purposes of claim of deliberate indifference
to a serious medical need under the Eighth Amendment.
U.S.C.A. Const.Amend. 8;.

[19] Federal Civil Procedure 170A ⟲   2491.5

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in
general. Most Cited Cases
Genuine issue of material fact as to whether inmate's
shoulder pain was a serious medical condition, and
whether prison medical staff acted with deliberate
indifference by failing to prescribe pain medication or take
x-rays, despite inmate's ongoing complaints, precluded
summary judgment, in inmate's § 1983 Eighth Amendment
claims against medical staff. U.S.C.A. Const.Amend. 8; 42
U.S.C.A. § 1983.

[20] Civil Rights 78 ⟲   1355

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1355 k. Vicarious liability and respondeat

superior in general; supervisory liability in general. Most
Cited Cases
Supervisor liability in § 1983 action can be shown in one
or more of the following ways: (1) actual direct
participation in the constitutional violation, (2) failure to
remedy a wrong after being informed through a report or
appeal, (3) creation of a policy or custom that sanctioned
conduct amounting to a constitutional violation, or
allowing such a policy or custom to continue, (4) grossly
negligent supervision of subordinates who committed a
violation, or (5) failure to act on information indicating
that unconstitutional acts were occurring. 42 U.S.C.A. §
1983.

[21] Civil Rights 78 ⟲   1358

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases
Sheriff was not liable under § 1983 for alleged deliberate
indifference to medical needs of inmate related to inmate's
end stage renal disease or chronic shoulder pain; there was
no showing that sheriff was personally involved in denying
medical treatment to inmate, or that there was a custom or
policy at prison of allowing alleged constitutional
violations. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. §
1983.

[22] Federal Civil Procedure 170A ⟲   2491.5

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in
general. Most Cited Cases
Genuine issue of material fact as to whether registered
nurse on prison medical staff was personally involved in
prison's alleged failure to arrange for inmate's kidney
transplant test precluded summary judgment in inmate's §
1983 action alleging officials' deliberate indifference to his
medical needs, in violation of Eighth Amendment.
U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**[23]** Civil Rights 78 ☞ 1358

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases
If prison doctor denies medical treatment to an inmate, that doctor is "personally involved" in alleged constitutional violation for purposes of § 1983 liability. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[24]** Federal Civil Procedure 170A ☞ 2491.5

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether doctor denied medical treatment to inmate suffering from end stage renal disease, precluded summary judgment in inmate's § 1983 action alleging prison officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.
*347 Anthony Price, pro se.

Edward J. Troy, Law Office of Edward J. Troy, Greenlawn, NY, for the Defendants.

**\*348 MEMORANDUM AND ORDER**

JOSEPH F. BIANCO, District Judge:

*Pro se* plaintiff Anthony Price (hereinafter "Price" or "plaintiff") alleges, pursuant to 42 U.S.C. § 1983, that Sheriff Edward Reilly, Kim Edwards, RN, Perry Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, and Nassau University Medical Center (hereinafter "defendants") violated his Eighth Amendment rights by acting with deliberate indifference to his serious medical needs while plaintiff was incarcerated at the Nassau County Correctional Center (hereinafter "NCCC"). Specifically, plaintiff alleges that defendants: (1) prescribed an incorrect dosage of medication for his renal disease; (2) failed to get him tested for a kidney transplant list; and (3) failed to adequately treat him for shoulder pain. Defendants have moved for summary judgment on all of plaintiffs' claims. For the reasons set forth below, defendants' motion is granted in part and denied in part. Specifically, defendants' motion is granted with respect to plaintiff's claim regarding the dosage of his prescription medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

### I. FACTS

**[1][2][3]** The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the defendants' Rule 56.1 statement of facts.[FN1] They are not findings of fact by the Court, but rather are assumed to be true for the purposes of deciding this motion. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party-here, the plaintiff. *See Capobianco v. City of New York,* 422 F.3d 47, 50 n. 1 (2d Cir.2005). Unless otherwise noted, where a party's 56.1 statement or deposition is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.

FN1. The Court notes that plaintiff failed to file and serve a response to defendants' Local Rule 56.1 Statement of Facts in violation of Local Civil Rule 56.1. Generally, a "plaintiff['s] failure to respond or contest the facts set forth by the defendants in their Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." *Jessamy v. City of New Rochelle,* 292 F.Supp.2d 498, 504 (S.D.N.Y.2003) (quoting *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.,* 262 F.Supp.2d 134, 139 (S.D.N.Y.2003)). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted); *see*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

*also Giliani v. GNOC Corp.,* No. 04 Civ.
2935(ILG), 2006 WL 1120602, at *2 (E.D.N.Y.
Apr. 26, 2006)* (exercising court's discretion to
overlook the parties' failure to submit statements
pursuant to Local Civil Rule 56.1). In his
opposition papers, plaintiff identifies defendants'
arguments and factual assertions with which he
disagrees. In the exercise of its broad discretion,
and given plaintiff's *pro se* status, the Court will
deem admitted only those facts in defendants'
Rule 56.1 statement that are supported by
admissible evidence and not controverted by
other admissible evidence in the record. *See
Jessamy,* 292 F.Supp.2d at 504-05. Furthermore,
the Court has carefully reviewed all of the
parties' submissions, including plaintiff's
deposition, to determine if plaintiff has any
evidence to support his claims.

A. Arrival at NCCC and Medication

Plaintiff was incarcerated in the Nassau County
Correctional Center from January 7, 2007 to December
11, 2007. (Price Dep. at 6, 35.) Plaintiff has end stage
renal disease and has been on dialysis since 2004 related
to kidney failure. (*Id.* at 10; Defs.' 56.1 ¶ 2.) Plaintiff takes
two daily medications, Renagel and PhosLo, for this
condition. (Price Dep. at 10.) Before arriving **349** at the
NCCC,[FN2] plaintiff was taking two 800 milligram pills of
Renagel three times a day and two 667 milligram pills of
PhosLo three times a day. (*Id.* at 12-13.)

> FN2. Plaintiff was incarcerated at the Elmira
> correctional facility in 2005 and 2006. (Price
> Dep. at 7-8.)

When plaintiff arrived at the NCCC, he was interviewed
by Perry Intal, a nurse practitioner in the medical intake
department. (*Id.* at 21-22.) Plaintiff told Intal about his
medical history, including that he was a dialysis patient
and that he took medications. (*Id.* at 22.) Plaintiff was
given a prescription for one 800 milligram pill of Renagel
two times a day and one 667 milligram pill of PhosLo two
times a day. (*Id.* at 23-24.) Two or three weeks later,
plaintiff went to dialysis treatment and a blood test
revealed high phosphorous levels. (*Id.* at 25-26.) As a

result, plaintiff was given an increased dosage of
medication. (*Id.* at 25-27.) Thereafter, plaintiff's
phosphorous levels decreased and about one month later
(*id.* at 30-31), his dosage was decreased to one 800
milligram pill of Renagel three times a day and two 667
milligram pills of PhosLo three times a day. (*Id.* at 31-33.)
This was the dosage plaintiff received for the rest of his
incarceration at the NCCC.[FN3] (*Id.* at 32-33.) Plaintiff
believed that the dosage he was receiving was "wrong"
and that it was "hurting" him. (*Id.* at 59-60.) However, the
more plaintiff complained about the dosage hurting him,
"the more it seemed like the people got aggravated." (*Id.*
at 60.) In addition, plaintiff's prescriptions for Renagel and
PhosLo indicate that the medications were to be taken with
meals. (*See* Defs.' Ex. E.) Plaintiff alleges, however, that
the medications were sometimes given to him without
food or at times that interfered with his meals. (Price Dep.
at 23, 60.)

> FN3. Plaintiff testified that, at the time of his
> deposition, he was receiving two 800 milligram
> pills of Renagel three times a day and two 667
> milligram pills of PhosLo three times a day at the
> Fishkill correctional facility. (Price Dep. at
> 11-12.)

Besides receiving medication, plaintiff also received
dialysis treatment three times a week at the Nassau
University Medical Center. (*Id.* at 30.) On some
occasions, plaintiff refused dialysis treatment because he
"was feeling good" and "wanted to take a break" from
treatment. (*Id.* at 56.) Plaintiff's regular medical treatment
at the hospital also included a blood test every 30 days.
(*Id.* at 27-28, 30.)

B. Kidney Transplant Request

In February or March 2007, plaintiff spoke with a social
worker named "Susan" about getting tested for a kidney
transplant. (*Id.* at 76.) A test was required before an
inmate could be placed on a waiting list for kidney
transplants. (*Id.* at 80-81.) Only two hospitals in the area
dealt with such matters: Stony Brook and a hospital in
Westchester County. (*Id.* at 75-76.) Susan tried to contact
Dr. Benjamin Okonta (hereinafter "Okonta") at Nassau
University Medical Center in or about February or March

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

2007 (*id.* at 76-77), but Susan told plaintiff that Okonta did not get back to her.[FN4] (*Id.* at 65-66, 74-78.) Susan also submitted a letter to Okonta in July 2007, stating: "As per our conversation on 7/27/07, I am re-submitting for your review my request [for] your medical services on behalf of our renal dialysis pt., Anthony Price." (*Id.* at 77-78; Defs.' Ex. K.) Plaintiff never received a response from Okonta. (Price Dep. at 82.)

> FN4. Plaintiff never interacted with Okonta except through Susan, the social worker. (Price Dep. at 73-74.)

Susan also submitted a letter to Nurse Mary Sullivan (hereinafter "Sullivan"), the **\*350** day supervisor at the NCCC medical center, stating: "As per our telephone conversation, I am submitting in writing Anthony Price's request for referral and evaluation to a kidney transplant center ... Stonybrook Univ. Medical Ctr." (Def.'s Ex. K.) At some point in time, plaintiff was called down to the NCCC medical center and was told by Sullivan that defendants knew about plaintiff's request to get on the kidney transplant list but that they had "other priorities right now." (Price Dep. at 70.) Plaintiff believed Sullivan was referring to his other health issues. (*Id.* at 70.) Plaintiff did not ask when he would be tested for the kidney transplant list. (*Id.* at 71.)

On September 25, 2007, plaintiff filed a formal grievance regarding his request to be tested for the kidney transplant list.[FN5] (*Id.* at 85.) Plaintiff stated on his grievance form that he had "been waiting to take the test I need to take to get on the kidney transplant list" and that his social worker had told him that she had forwarded the paperwork to the jail, but could not get a response. (Defs.' Ex. F.) Plaintiff requested that he be "given the test to see if I'm a candidate for possibly a kidney transplant." (*Id.*) By interdepartmental memorandum dated September 27, 2007, the Inmate Grievance Coordinator informed plaintiff that the medical grievance "is being discussed with and turned over to the Health Services Administrator. The medical unit will evaluate you. A Grievance Unit Investigator will contact you at a later date to conduct an evaluation of your status and to closeout the paperwork." (*Id.*) In another memo dated October 5, 2007, defendant Kim Edwards,[FN6] informed plaintiff:

> FN5. This was the only formal medical grievance filed by plaintiff. (Price Dep. at 85.)

> FN6. Edwards never wrote medical orders for plaintiff or examined plaintiff. (Price Dep. at 61.) Plaintiff had no interaction with Edwards except her written response to plaintiff's grievance. (*Id.* at 67.)

The social worker can only inform you of treatment options that are available for your medical problem. If you are in need of a "test", documentation must be provided by the attending physician that is responsible for your renal treatment.

(*Id.*) Plaintiff interpreted this response from Edwards to mean that the matter was now in the hands of the medical department, and so he did not further proceed with the grievance and "did not feel it was necessary." (Pl.'s Opp. at 3.)[FN7] Therefore, plaintiff "signed off on the grievance," saying that he had "read it and accepted it." (Price Dep. at 88.)

> FN7. Although plaintiff does not offer this explanation in his deposition, the Court construes the *pro se* plaintiff's sworn "verified rebuttal" to defendants' motion for summary judgment as an evidentiary submission. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) ("[A] verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment."); *see also Hailey v. N.Y. City Transit Auth.,* 136 Fed.Appx. 406, 407-08 (2d Cir.2005) ("The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims.").

Plaintiff did not get the requested test during the remainder of his incarceration at the NCCC. (*Id.* at 90.) Defendants have submitted evidence that they made efforts to get plaintiff tested and, in fact, scheduled plaintiff for a test at Stony Brook University Hospital on November 29, 2007, but that the test had to be cancelled due to "unforeseen circumstances"; the test was

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

re-scheduled for January 10, 2008. (Defs.' Ex. G, Reschke Aff. ¶¶ 6-7.) Plaintiff was not informed about any scheduled test (Pl.'s Opp. at 2), and he was **351 transferred to a different facility in December 2007. (Price Dep. at 35; Reschke Aff. ¶ 7.)

### C. Shoulder Pain

Plaintiff began complaining about shoulder pain to the medical department at the NCCC on January 17, 2007, stating that his right shoulder was "extremely hurting." (Price Dep. at 36; Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Plaintiff had received treatment for shoulder pain in the past, including a shot of Cortisone while at the Elmira facility (Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.) After the January 17 complaint, plaintiff was seen a couple of days later and given medication to rub on his shoulder. (Price Dep. at 41.) The medication did not help with the discomfort, and so plaintiff complained again later in January. (*Id.* at 42-43.) Although defendants gave plaintiff Motrin and Naprosyn for the pain, no x-rays were taken for several months. (*Id.* at 44, 55; Defs.' Ex. H, Edwards Aff. ¶ 4.) The pain medication continued to be ineffective, and plaintiff continued to complain. (*See, e.g., id.* at 45, 51.) For instance, in June 2007, plaintiff complained that his right shoulder "hurts really bad." (Def.'s Ex. E, Sick Call Request, June 12, 2007.) Plaintiff never refused medication for his shoulder. (Price Dep. at 56.) When plaintiff eventually was given x-rays, in April and November 2007 (Edwards Aff. ¶ 4), plaintiff was told that nothing was wrong with his shoulder.[FN8] (Price Dep. at 44; *see also* Defs.' Ex. J, Discharge Summary, November 2007 ("Although no definite evidence of venous thrombosis is seen with Rt. upper extremity, short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information....").) Plaintiff states that, with respect to his right shoulder, he currently wears a brace for carpal tunnel syndrome, has a separated shoulder, and takes shots for the pain. (Pl.'s Opp. at 4.)

> FN8. Plaintiff testified that he stopped complaining about his shoulder at some point because he was frustrated that defendants were not helping. (Price Dep. at 54-55.) There is evidence that plaintiff complained about his shoulder at least as late as June 2007, and again

complained in November 2007, which resulted in the taking of additional x-rays. (*See* Def.'s Ex. E, Sick Call Request, June 21, 2007; Defs.' Ex. J.)

### II. PROCEDURAL HISTORY

On June 28, 2007, plaintiff filed the initial complaint in this action. Plaintiff filed an amended complaint on August 20, 2007 alleging, pursuant to Section 1983, that defendants Sheriff Edward Reilly, Kim Edwards, Perry Intal, and Nassau University Medical Center violated his Eighth Amendment rights with respect to his medication dosage, kidney transplant request, and shoulder pain. On November 14, 2007, plaintiff filed another complaint in a separate action (No. 07-CV-4841) making substantially the same allegations and expanding on his allegations regarding the kidney transplant request. This complaint named Mary Sullivan and Dr. Benjamin Okonta, as well as the Nassau University Medical Center, as defendants. By Order dated July 11, 2008, the Court consolidated both actions (Nos. 07-CV2634 and 07-CV-4841) because the allegations in the two actions were "factually intertwined."

Defendants moved for summary judgment on May 29, 2009.[FN9] Plaintiff submitted **352 an opposition to the motion on August 3 and August 11, 2009.[FN10] Defendants replied on August 20, 2009. Plaintiff submitted a surreply on October 6, 2009. This matter is fully submitted.

> FN9. Pursuant to Local Rule 56.1, defendants also served plaintiff with the requisite notice for *pro se* litigants opposing summary judgment motions. *See Irby v. N.Y. City Transit Auth.*, 262 F.3d 412, 414 (2d Cir.2001) ("And we remind the district courts of this circuit, as well as summary judgment movants, of the necessity that pro se litigants have actual notice, provided in an accessible manner, of the consequences of the pro se litigant's failure to comply with the requirements of Rule 56.").

> FN10. Plaintiff submitted his two identical oppositions and a sur-reply to the instant motion not only in this action, but also in the now-consolidated action (No. 07-CV-4841). The

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Court has considered all of plaintiff's submissions in both actions in deciding the instant motion.

## III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Reiseck v. Universal Commc'ns of Miami, Inc.,* 591 F.3d 101, 104 (2d Cir.2010). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir.2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party " 'must do more than simply show that there is some metaphysical doubt as to the material facts .... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*' " *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original)). As the Supreme Court stated in Anderson, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50, 106 S.Ct. 2505 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48, 106 S.Ct. 2505 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth " 'concrete particulars' " showing that a trial is needed.

*R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984) (quoting *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978)). Accordingly, it is insufficient for a party opposing summary judgment " 'merely to assert a conclusion without supplying supporting arguments or facts.' " *BellSouth Telecomms., Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir.1996) (quoting *Research Automation Corp.,* 585 F.2d at 33).

[4][5] Where the plaintiff is proceeding *pro se,* the Court must "construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel v. Bd. of Educ. of the City of N.Y.,* 287 F.3d 138, 145-46 (2d Cir.2002) (alterations in original) (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000)). Though a *pro se* litigant's pleadings and other submissions are afforded wide latitude, a *pro se* party's conclusory assertions, completely unsupported **353 by evidence, are not sufficient to defeat a motion for summary judgment. *Shah v. Kuwait Airways Corp.,* 653 F.Supp.2d 499, 502 (S.D.N.Y.2009) ("Even a *pro se* party, however, 'may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful.' " (quoting *Auguste v. N.Y. Presbyterian Med. Ctr.,* 593 F.Supp.2d 659, 663 (S.D.N.Y.2009))).

## IV. DISCUSSION

[6] To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993).

There is no dispute for purposes of this motion that defendants were acting under color of state law. The question presented, therefore, is whether defendants' alleged conduct deprived plaintiff of his Eighth Amendment rights. Plaintiff alleges that his Eighth Amendment rights were violated when defendants: (1) prescribed him an incorrect dosage of medication for his renal disease; (2) failed to get him tested for the kidney

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

transplant list; and (3) failed to adequately treat him for his shoulder pain. For the reasons set forth below, after drawing all reasonable inferences from the facts in favor of plaintiff, the Court concludes that defendants are entitled to summary judgment on plaintiff's claim regarding the dosage of his medication and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion for summary judgment is denied in all other respects.

### A. Exhaustion

As a threshold matter, defendants argue that plaintiff is barred from raising any Eighth Amendment claim with respect to his kidney transplant request because plaintiff has not exhausted his administrative remedies.[FN11] For the reasons set forth below, the Court disagrees and cannot conclude from this record that plaintiff failed to exhaust his administrative remedies.

> FN11. Defendants raise exhaustion only with respect to plaintiff's kidney transplant request, and so the Court does not consider exhaustion with respect to plaintiff's other claims.

### 1. Legal Standard

The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under 42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures." Espinal v. Goord, 558 F.3d 119, 124 (2d Cir.2009) (quoting Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." Woodford v. Ngo, 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368

(2006). Therefore, the exhaustion inquiry requires a court to "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *354 Espinal, 558 F.3d at 124 (citing Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) and Woodford, 548 U.S. at 88-90, 126 S.Ct. 2378).

Prior to Woodford, 548 U.S. 81, 126 S.Ct. 2378 (2006), the Second Circuit "recognized some nuances in the exhaustion requirement: (1) administrative remedies that are ostensibly 'available' may be unavailable as a practical matter, for instance, if the inmate has already obtained a favorable result in administrative proceedings but has no means of enforcing that result; (2) similarly, if prison officials inhibit the inmate's ability to seek administrative review, that behavior may equitably estop them from raising an exhaustion defense; (3) imperfect exhaustion may be justified in special circumstances, for instance if the inmate complied with his reasonable interpretation of unclear administrative regulations, or if the inmate reasonably believed he could raise a grievance in disciplinary proceedings and gave prison officials sufficient information to investigate the grievance." Reynoso v. Swezey, 238 Fed.Appx. 660, 662 (2d Cir.2007) (internal citations omitted); see also Davis v. New York, 311 Fed.Appx. 397, 399 (2d Cir.2009) (citing Hemphill v. New York, 380 F.3d 680, 686, 691 (2d Cir.2004)). However, the Second Circuit has not decided whether the above-discussed considerations apply post- Woodford. See, e.g., Reynoso, 238 Fed.Appx. at 662 ("Because we agree with the district court that [plaintiff] cannot prevail on any of these grounds, we have no occasion to decide whether Woodford has a bearing on them."); Ruggiero v. County of Orange, 467 F.3d 170, 176 (2d Cir.2006) ("We need not determine what effect Woodford has on our case law in this area, however, because [plaintiff] could not have prevailed even under our pre- Woodford case law.").

As the Supreme Court has held, exhaustion is an affirmative defense: "We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints." Jones v. Bock, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); see also Key v. Toussaint, 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) ("Failure to exhaust remedies under the PLRA is an affirmative defense, and thus the defendants have the

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

burden of proving that [plaintiff's] retaliation claim has not been exhausted." (citations omitted)).

### 2. Application

Defendants argue that plaintiff did not appeal the resolution of his grievance request, i.e., the memo from Edwards dated October 5, 2007, stating that: "If you are in need of a 'test', documentation must be provided by the attending physician that is responsible for your renal treatment." (Defs.' Ex. F.) Therefore, defendants argue, plaintiff has failed to exhaust his administrative remedies under the PLRA. (Defs.' Br. at 25.) Plaintiff argues in response that he did not believe any further action on his grievance was "necessary" because the matter was put into the hands of the medical department. (Pl.'s Opp. at 3.) For the reasons discussed below, the Court concludes that, on this record, defendants have not met their burden of proving that plaintiff failed to exhaust his administrative remedies.

[7][8][9] As discussed above, the PLRA requires exhaustion only with respect to "such administrative remedies as are available." See 42 U.S.C. § 1997e(a). Therefore, in order to determine whether plaintiff exhausted his administrative remedies, the Court "must first establish from a legally sufficient source that an administrative remedy is applicable and that the particular complaint does not fall within an exception. Courts should be careful to look at the applicable set of grievance procedures,*355 whether city, state or federal." Mojias v. Johnson, 351 F.3d 606, 610 (2d Cir.2003); see also Espinal, 558 F.3d at 124 (holding that, when considering exhaustion, courts must "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures" (citations omitted)). "Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They are, or inevitably contain, questions of law." See Snider v. Melindez, 199 F.3d 108, 113-14 (2d Cir.1999). However, "the existence of the procedure may be a matter of fact." Id. at 114.

On the record before the Court on this motion, the Court

is unable to establish from any legally sufficient source that an administrative remedy was available to plaintiff. Defendants have made no submissions to the Court regarding the applicable grievance procedures at the NCCC. See, e.g., Abney v. County of Nassau, 237 F.Supp.2d 278, 281 (E.D.N.Y.2002) (noting that the "Inmate Handbook" for the Nassau County Correctional Facility procedure was "annexed to Defendants' moving papers"). Specifically, defendants have not submitted any evidence, by affidavit or otherwise, that NCCC procedures offer a remedy to address the particular situation in this case.FN12 Therefore, the Court cannot conclude from this record that plaintiff had an available administrative remedy that he failed to exhaust.

FN12. The Court notes that the October 5, 2007 memo from Edwards is unclear as to which party bore the responsibility of obtaining plaintiff's medical records. (Defs.' Ex. F.) Edwards explains in an affidavit that she advised plaintiff that "it would be necessary for his doctors to provide the selected facility with his records before a request for testing would be considered." (Edwards Aff. ¶ 2.) It is unclear whether plaintiff had access to these records or whether the prison would need to obtain them. Thus, there appears to be a factual question as to the implementation of this grievance resolution. A similar situation arose in Abney v. McGinnis, 380 F.3d 663 (2d Cir.2004), in which the Second Circuit held that where a prisoner achieved favorable results in several grievance proceedings but alleged that prison officials failed to implement those decisions, that prisoner was without an administrative remedy and therefore had exhausted his claim for purposes of the PLRA. See id. at 667-68, 669 ("Where, as here, prison regulations do not provide a viable mechanism for appealing implementation failures, prisoners in [plaintiff's] situation have fully exhausted their available remedies."). The Court recognizes that Abney, 380 F.3d 663, was decided before Woodford v. Ngo, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), and that, as discussed above, the Second Circuit has not decided whether the various nuances to the exhaustion requirement apply post- Woodford. However, the Court need not decide the applicability of any such nuances to the

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

exhaustion requirement because, as discussed above, defendants have failed to establish the procedural framework for grievance resolution at the NCCC and the availability of *any* administrative remedies.

Although there may be administrative remedies for such a situation under the New York Department of Corrections regulations, *see* 7 N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(c)(4) ("If a decision is not implemented within 45 days, the grievant may appeal to CORC citing lack of implementation as a mitigating circumstance."), it does not follow that the same procedure applies at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d at 283 ("The flaw in Defendants' argument, however, is that the cases relied upon were all decided under the New York State administrative procedure-none were decided in the context of the procedure relied upon-the Nassau County Inmate Handbook procedure.").

B. Plaintiff's Claims of Deliberate Indifference

1. Legal Standard

"[D]eliberate indifference to serious medical needs of prisoners constitutes the *356 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment" and therefore "states a cause of action under § 1983." *Estelle v. Gamble,* 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). As the Second Circuit has explained,

[t]he Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. Moreover, under 42 U.S.C. § 1983, prison officials are liable for harm incurred by an inmate if the officials acted with "deliberate indifference" to the safety of the inmate. However, to state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice.

*Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (citations omitted). Within this framework, "[d]eliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment." *Bellotto v. County of Orange,* 248 Fed.Appx. 232, 236 (2d Cir.2007). Thus, according to the Second Circuit,

[d]efendants may be held liable under § 1983 if they ... exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution. Deliberate indifference is found in the Eighth Amendment context when a prison supervisor knows of and disregards an excessive risk to inmate health or safety .... Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.

*Ortiz v. Goord,* 276 Fed.Appx. 97, 98 (2d Cir.2008) (citations and quotation marks omitted); *see also Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) ("Deliberate indifference will exist when an official 'knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.' ") (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *Curry v. Kerik,* 163 F.Supp.2d 232, 237 (S.D.N.Y.2001) (" '[A]n official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' ") (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks omitted)).

[10][11] In particular, the Second Circuit has set forth a two-part test for determining whether a prison official's actions or omissions rise to the level of deliberate indifference:

The test for deliberate indifference is twofold. First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent. The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry. Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.

**\*357** *Hayes,* 84 F.3d at 620 (internal citation omitted); *see also Phelps v. Kapnolas,* 308 F.3d 180, 185-86 (2d Cir.2002) (setting forth two-part deliberate indifference test).

In *Salahuddin v. Goord,* the Second Circuit set forth in detail the objective and subjective elements of a medical indifference claim. 467 F.3d 263 (2d Cir.2006). In particular, with respect to the first, objective element, the Second Circuit explained:

The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious. Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable under the Cruel and Unusual Punishments Clause, and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability.

Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is

sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an inmate's daily activities, and whether it causes chronic and substantial pain. In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone. Thus, although we sometimes speak of a serious medical condition as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

467 F.3d at 279-80 (citations and quotation marks omitted); *see also Jones v. Westchester County Dep't of Corr. Medical Dep't,* 557 F.Supp.2d 408, 413-14 (S.D.N.Y.2008).

With respect to the second, subjective component, the Second Circuit further explained:

The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind. In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health. Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware **\*358** of a substantial risk that serious inmate harm will result. Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable. The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices. But recklessness

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent.

*Salahuddin,* 467 F.3d at 280 (citations and quotation marks omitted); *see also Jones,* 557 F.Supp.2d at 414. The Supreme Court has stressed that

in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle v. Gamble,* 429 U.S. 97, 105-06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (internal citations omitted); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("A showing of medical malpractice is therefore insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." (internal quotations omitted)); *Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir.2000) (a medical practitioner who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not evince the culpability necessary for deliberate indifference).

### 2. Application

Plaintiff alleges that defendants violated his Eighth Amendment rights by: (1) prescribing an incorrect dosage of his renal disease medication; (2) failing to have him tested for the kidney transplant list; and (3) failing to properly treat his shoulder pain. The Court considers each claim in turn and, for the reasons discussed below, concludes that defendants are entitled to summary

judgment on plaintiff's claim regarding his medication dosage and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

#### a. Medication Dosage

Defendants concede that plaintiff's kidney condition is serious (Defs.' Br. at 21), but argue that the dosage of Renagel and PhosLo prescribed for plaintiff did not result in any injury. Defendants also argue that, even if the dosage was incorrect, it was at most "an error in medical judgment." Finally, defendants argue that plaintiff cannot show deliberate indifference because defendants continually tested plaintiff and twice changed the dosage of his medication depending on his phosphorous levels. (Defs.' Br. at 22.) For the reasons set forth below, the Court agrees and concludes that no rational jury could find that defendants acted with deliberate indifference with respect to the prescription **\*359** of medication for plaintiff's renal disease.

#### i. Objective Prong

[12][13][14] Plaintiff has failed to present any evidence that the allegedly incorrect medication dosage posed an objectively serious risk to plaintiff's health. As a threshold matter, the mere fact that plaintiff's underlying renal disease is a serious medical condition does not mean that the allegedly incorrect treatment for that condition poses an objectively serious health risk. *See Smith v. Carpenter,* 316 F.3d 178, 186-87 (2d Cir.2003) ("As we noted in *Chance* [*v. Armstrong,* 143 F.3d 698 (2d Cir.1998) ], it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes."). Furthermore, plaintiff has failed to produce any evidence that his medication dosage at the NCCC caused him any objectively serious harm. Instead, plaintiff testified merely that the prescribed dosage was "wrong" and was "hurting" him.[FN13] (Price Dep. at 60.) Plaintiff's belief that the medication dosage was incorrect is insufficient to establish the objective prong of the deliberate indifference test.[FN14] *See Fox v. Fischer,* 242 Fed.Appx. 759, 760 (2d Cir.2007) ("[T]he fact that [plaintiff] was provided Claritin as a substitute for Allegra

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

fails to establish deliberate indifference to a serious medical need, because there is no allegation that the change in medication caused harm, if any, sufficiently serious to establish the objective prong of a deliberate indifference claim...."); *Reyes v. Gardener,* 93 Fed.Appx. 283, 285 (2d Cir.2004) ( "[Plaintiff] has offered no evidence ... showing that the prescribed medication regimen deviated from reasonable medical practice for the treatment of his condition."). Although there is evidence that plaintiff's phosphorous levels increased when he was prescribed a lesser dosage of medication upon arriving at the NCCC (*see* Price Dep. *360 at 23-26), that is not by itself enough to support a finding of an objectively serious condition.[FN15] *See Smith,* 316 F.3d at 188-89 ("Although [plaintiff] suffered from an admittedly serious underlying condition, he presented no evidence that the two alleged episodes of missed medication resulted in permanent or on-going harm to his health, nor did he present any evidence explaining why the absence of actual physical injury was not a relevant factor in assessing the severity of his medical need.") (affirming denial of motion for new trial). Thus, plaintiff's medication dosage claim must fail because he cannot show that the complained-of dosage posed an objectively serious health risk.[FN16]

FN13. Plaintiff does not distinguish between the initial dosage he received at the NCCC and the later dosages he received, instead arguing generally that all of the dosages he received at the NCCC were incorrect.

FN14. Plaintiff's conclusory testimony that the dosage was "hurting" him also is insufficient to establish the objective prong of the deliberate indifference test. To the extent plaintiff claims that the medication caused him pain, there is no evidence in the record that plaintiff suffered from chronic pain or, indeed, any other objectively serious symptoms in connection with the medication dosage. Although not mentioned in plaintiff's deposition or in his opposition to the instant motion, plaintiff alleges in his amended complaint that the lesser dosage put him at risk of "itching" and "breaking of bones." (Amended Complaint, No. 07-CV-2634, at 4.) There is evidence that plaintiff suffered from a rash and/or itching while at the NCCC and that plaintiff was told at one point that he had

eczema. (*See* Price Dep. at 45-51.) However, there is no evidence to connect those symptoms with the medication dosage for his renal disease. (*See, e.g., id.* at 46 ("Q. Did anyone ever tell you what was causing a rash? A. I kept going to the-I had went to the dermatologist at Bellevue. To me, the doctor had an attitude like it ain't nothing wrong; like it was acne or something.").) Furthermore, there is no evidence that the rash and/or itching was an objectively serious condition. *See Lewal v. Wiley,* 29 Fed.Appx. 26, 29 (2d Cir.2002) (affirming summary judgment and holding that plaintiff's alleged "persistent rash" was not a "serious medical condition"); *see also Benitez v. Ham,* No. 04-CV-1159, 2009 WL 3486379, at *11 (N.D.N.Y. Oct. 21, 2009) ("[T]he evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation."). In any event, even if plaintiff did suffer from an objectively serious condition because of the medication dosage, he cannot prove that defendants acted with a subjectively culpable state of mind, as discussed *infra.*

FN15. In any event, as discussed *infra,* defendants adjusted plaintiff's dosage in response to the increase in phosphorous levels, and there is no evidence from which a rational jury could conclude that defendants acted with deliberate indifference in prescribing plaintiff's medication.

FN16. Although he does not raise it in any of his pleadings or in his opposition to the instant motion, plaintiff testified at his deposition that he had to take the medication with meals but that sometimes he was given the medication without food or at times that interfered with his meals. (Price Dep. at 23, 60; Defs.' Ex. E.) The record is unclear as to how often this occurred. The Court assumes, as it must on this motion for summary judgment, that on some occasions plaintiff was given his medications not at meal times or at times that interfered with meals. However, plaintiff points to no evidence whatsoever of any harm caused by defendants' alleged conduct in this regard, and, therefore, no

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

rational jury could find that the provision of medication without food on some occasions was objectively serious. *See Gillard v. Kuykendall, 295 Fed.Appx. 102, 103 (8th Cir.2008)* (affirming summary judgment for defendants where defendants, on some occasions, "were late in giving [plaintiff] his medications and did not always administer them with meals as [plaintiff] apparently desired" where there was no evidence of any adverse consequences). Thus, any deliberate indifference claim based on these allegations would fail as well.

ii. Subjective Prong

[15][16] Plaintiff's claim with respect to his medication dosage also fails because plaintiff cannot show that defendants acted with subjectively culpable intent, i.e., that they were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff's claim is based on his assertion that the prescribed dosage was "wrong." However, mere disagreement with a prescribed medication dosage is insufficient as a matter of law to establish the subjective prong of deliberate indifference. *See Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir.1998)* ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); *Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F.Supp.2d 303, 312 (S.D.N.Y.2001)* ("[D]isagreements over medications ... are not adequate grounds for a Section 1983 claim. Those issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment." (citing *Estelle,* 429 U.S. at 107, 97 S.Ct. 285)); *see also, e.g., Fuller v. Ranney,* No. 06-CV-0033, 2010 WL 597952, at *11 (W.D.N.Y. Feb. 17, 2010)* ("Plaintiff's claim amounts to nothing more than a disagreement with the prescribed treatment he received and his insistence that he be prescribed certain medications. Without more, plaintiff's disagreement with the treatment he received does not rise to the level of a constitutional violation of his Eighth Amendment rights."); *Covington v. Westchester County Dep't of Corr., No. 06 Civ. 5369, 2010 WL 572125, at *6 (S.D.N.Y. Jan. 25, 2010)* ("[Plaintiff's] claims that Defendants failed *361 to change or increase his medication and counseling

sessions amount to negligence claims at most, which is insufficient."); *Hamm v. Hatcher,* No. 05-CV-503, 2009 WL 1322357, at *8 (S.D.N.Y. May 5, 2009)* ("Plaintiff's unfulfilled demand for a larger dosage of [the medication] represents a mere disagreement over the course of Plaintiff's treatment and is inconsistent with deliberate indifference ....").

The fact that defendants adjusted the dosage of plaintiff's medication in response to plaintiff's phosphorous levels (*see* Price Dep. at 25-27) is also inconsistent with deliberate indifference. *See Bellotto v. County of Orange, 248 Fed.Appx. 232, 237 (2d Cir.2007)* ("The record also shows that mental health professionals responded to [plaintiff's] concerns about his medications and adjusted his prescription as they believed necessary.") (affirming summary judgment for defendants); *see also Jolly v. Knudsen, 205 F.3d 1094, 1097 (8th Cir.2000)* ("[Defendant's] actions in this case cannot reasonably be said to reflect deliberate indifference. The only relevant evidence in the record indicates that [defendant's] actions were aimed at correcting perceived difficulties in [plaintiff's] dosage levels [in response to blood tests]."); *Fuller,* 2010 WL 597952, at *11* ("Moreover, a subsequent decision to prescribe plaintiff a certain medication does not indicate that the medication should have been prescribed earlier.").[FN17] Thus, there is no evidence in the record sufficient for a rational jury to find that defendants acted with deliberate indifference regarding the prescription dosage of plaintiff's renal disease medication.

FN17. To the extent plaintiff also argues that that defendants acted with deliberate indifference because he has received different prescriptions at different facilities, the Court rejects that argument as well. *See, e.g., Cole v. Goord,* No. 04 Civ. 8906, 2009 WL 1181295, at *8 n. 9 (S.D.N.Y. Apr. 30, 2009)* ("[Plaintiff's] reliance upon the fact that subsequent medical providers have provided him with a different course of medication or treatment ... does nothing to establish that [defendant] violated [plaintiff's] Eighth Amendment rights. Physicians can and do differ as to their determination of the appropriate treatment for a particular patient; that difference in opinion does not satisfy the requirements for a constitutional claim of deliberate indifference."

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

(citing *Estelle,* 429 U.S. at 97, 97 S.Ct. 285)).

In sum, based on the undisputed facts and drawing all reasonable inferences in plaintiff's favor, no rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's objectively serious health needs regarding his medication dosage. Accordingly, defendants' motion for summary judgment is granted with respect to this claim.

### b. Kidney Transplant

[17] Defendants also argue that plaintiff cannot proceed with his deliberate indifference claim regarding his request to be tested for a kidney transplant. Defendants do not dispute the objective seriousness of plaintiff's underlying condition or the requested transplant, and instead argue only that defendants lacked subjective culpability. Specifically, defendants argue that they made reasonable efforts to get plaintiff tested. (Defs.' Br. at 23.) However, construing the facts in the light most favorable to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs.

Plaintiff began requesting a kidney transplant test as early as February or March 2007 and still had not received one by the time he left the NCCC in December 2007. (*See* Price Dep. at 76-77, 90.) Requests were sent on plaintiff's behalf to Dr. Okonta at the Nassau University Medical Center and to Nurse Mary Sullivan at the NCCC medical department. (*See* Defs.' Ex. K.) The record indicates that plaintiff received no response from Okonta. (*See* Price Dep. at 82.) When plaintiff asked Sullivan about the test, Sullivan told him that defendants had "other priorities right now." (Price Dep. at 70.) Even after plaintiff filed a formal grievance in September 2007, he still did not receive the requested test. (*See* Defs.' Ex. F.) On these facts, where there was a delay of at least nine months in arranging a kidney transplant test for plaintiff despite plaintiff's repeated requests, and where defendants do not dispute the necessity of the test, a rational jury could find that defendants acted with deliberate indifference to plaintiff's serious medical needs. *See Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (holding summary judgment inappropriate where there

was evidence that, *inter alia,* plaintiff was delayed dental treatment for a cavity for one year); *Hathaway v. Coughlin,* 841 F.2d 48, 50-51 (2d Cir.1988) ("[Plaintiff's] affidavit in opposition to [defendants'] motion for summary judgment alleged that a delay of over two years in arranging surgery ... amounted to deliberate indifference to his serious medical needs. We believe this is a sufficient allegation to survive a motion for summary judgment under *Archer* [*v. Dutcher,* 733 F.2d 14 (2d Cir.1984) ] because it raises a factual dispute ...."); *see also Lloyd v. Lee,* 570 F.Supp.2d 556, 569 (S.D.N.Y.2008) ("A reasonable jury could infer deliberate indifference from the failure of the doctors to take further steps to see that [plaintiff] was given an MRI. The argument that the doctors here did not take [plaintiff's] condition seriously is plausible, given the length of the delays. Nine months went by after the MRI was first requested before the MRI was actually taken.").

Defendants point to evidence in the record that they were, in fact, attempting to get plaintiff tested throughout the time in question, but were unsuccessful in their efforts. (*See* Defs.' Br. at 23; Reschke Aff. ¶ 3.) However, defendants' proffered explanation for the delay, i.e., the difficulty of finding a hospital because of transportation and security concerns, raises questions of fact and does not, as a matter of law, absolve them of liability. *See Johnson v. Bowers,* 884 F.2d 1053, 1056 (8th Cir.1989) ("It is no excuse for [defendants] to urge that the responsibility for delay in surgery rests with [the hospital]."); *Williams v. Scully,* 552 F.Supp. 431, 432 (S.D.N.Y.1982) (denying summary judgment where plaintiff "was unable to obtain treatment ... for five and one half months, during which time he suffered considerable pain" despite defendants' "explanations for the inadequacy of [the prison's] dental program"), *cited approvingly in Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000). Thus, whether defendants' efforts were reasonable over the nine month period at issue is a question of fact for the jury.

In sum, on this record, drawing all reasonable inferences in plaintiff's favor, the Court concludes that a rational jury could find that defendants acted with deliberate indifference regarding plaintiff's request for a kidney transplant test. Accordingly, defendants' motion for summary judgment on this claim is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

c. Shoulder

Defendants argue that summary judgment is warranted on the claim relating to the alleged shoulder injury because plaintiff's complained-of shoulder pain was not objectively serious and plaintiff has failed to show subjectively culpable intent by defendants. For the reasons set forth below, the Court disagrees and concludes that a rational jury could find that defendants acted with deliberate indifference *363 regarding plaintiff's shoulder pain. Thus, summary judgment on this claim is denied.

i. Objective Prong

[18][19] Defendants argue that plaintiff cannot satisfy the objective element of the deliberate indifference test regarding his shoulder because plaintiff alleges only that he had pain in his shoulder and not that he had "a condition of urgency, one that might produce death, deterioration or extreme pain." (Defs.' Br. at 22.) However, plaintiff did complain to the medical department that his right shoulder was "extremely hurting." (Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Furthermore, plaintiff states that he now has a separated shoulder and wears a brace for carpal tunnel syndrome. (Pl.'s Opp. at 4.) In any event, chronic pain can be a serious medical condition. See Brock v. Wright, 315 F.3d 158, 163 (2d Cir.2003) ("We will no more tolerate prison officials' deliberate indifference to the chronic pain of an inmate than we would a sentence that required the inmate to submit to such pain. We do not, therefore, require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one."); Hathaway v. Coughlin, 37 F.3d 63, 67 (2d Cir.1994); see also Sereika v. Patel, 411 F.Supp.2d 397, 406 (S.D.N.Y.2006) ( "[Plaintiff's] allegation that he experienced severe pain as a result of the alleged delay in treatment, together with his allegation that the alleged delay in treatment resulted in reduced mobility in his arm and shoulder, raise issues of fact as to whether his shoulder injury constitutes a sufficiently serious medical condition to satisfy the objective prong of the deliberate indifference standard.") (denying summary judgment). Thus, the Court cannot conclude at the summary judgment stage that plaintiff did not suffer from a serious medical condition.

ii. Subjective Prong

Defendants also argue that plaintiff cannot meet the subjective prong of the deliberate indifference test because plaintiff was seen repeatedly by the medical department and was given pain medication. (Defs.' Br. at 22.) Defendants also point to the fact that when x-rays were ultimately taken, they were negative.[FN18] However, construing the facts most favorably to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff repeatedly complained to defendants over a period of several months, beginning in January 2007, about the pain in his shoulder (see Defs.' Ex. E), and further complained that the pain medication he was being given was ineffective.[FN19] (See, e.g., Price Dep. at 45, 51.) In June 2007, for instance, plaintiff was still complaining that his right shoulder "hurts really bad," and that he had been "complaining of that for months." (Def.'s Ex. E, Sick Call Requests, June 12 and June 17, 2007.) Thus, it is uncontroverted that defendants were aware of plaintiff's alleged chronic shoulder pain.

FN18. The November 2007 x-ray records indicate that "short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information ...." (See Defs.' Ex. J, Discharge Summary, November 2007.) Defendants point to no evidence in the record that they followed up on that x-ray report.

FN19. Plaintiff also informed defendants that he had been given a Cortisone shot for his shoulder at his previous place of incarceration. (See Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.)

Despite plaintiff's complaints, however, plaintiff was not given an x-ray exam for several months (Price Dep. at 44; Def.'s *364 Ex. J), and was not given any pain medication besides Motrin and Naprosyn. (Price Dep. at 55.) Although defendants argue that the treatment for plaintiff's shoulder pain was reasonable under the circumstances, there are factual questions in this case that preclude

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

summary judgment. *See Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.") (reversing grant of motion to dismiss). Drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference by not changing plaintiff's pain medication despite his continued complaints that it was ineffective, by failing to take x-rays for several months, and by failing to follow-up on a November 2007 x-ray report indicating that further tests might be needed (*see* Defs.' Ex. J, Discharge Summary, November 2007). *See Brock,* 315 F.3d at 167 ("It is not controverted that [defendant] was aware that [plaintiff] was suffering some pain from his scar. The defendants sought to cast doubt on the truthfulness of [plaintiff's] claims about the extent of the pain he was suffering and, also, to put into question DOCS' awareness of [plaintiff's] condition. But at most, defendants' arguments and evidence to these effects raise issues for a jury and do not justify summary judgment for them."); *Hathaway,* 37 F.3d at 68-69 (holding that, *inter alia,* two-year delay in surgery despite plaintiff's repeated complaints of pain could support finding of deliberate indifference). The fact that defendants offered some treatment in response to plaintiff's complaints does not as a matter of law establish that they had no subjectively culpable intent. *See Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) ("[Plaintiff] received extensive medical attention, and the records maintained by the prison officials and hospital do substantiate the conclusion that [defendants] provided [plaintiff] with comprehensive, if not doting, health care. Nonetheless, [plaintiff's] affidavit in opposition to the motion for summary judgment does raise material factual disputes, irrespective of their likely resolution.... [Plaintiff's] assertions] do raise material factual issues. After all, if defendants did decide to delay emergency medical-aid-even for 'only' a few hours-in order to make [plaintiff] suffer, surely a claim would be stated under *Estelle.*"). Specifically, given the factual disputes in this case, the Court cannot conclude as a matter of law that defendants did not act with deliberate indifference when they allegedly declined to change their treatment for plaintiff's shoulder pain despite repeated complaints over several months that the pain persisted. *See, e.g., Lloyd,* 570 F.Supp.2d at 569 ("[T]he amended complaint plausibly alleges that doctors knew that [plaintiff] was experiencing extreme pain and loss of mobility, knew that the course of treatment they prescribed was ineffective, and declined to do anything to attempt to improve

[plaintiff's] situation besides re-submitting MRI request forms.... Had the doctors followed up on numerous requests for an MRI, the injury would have been discovered earlier, and some of the serious pain and discomfort that [plaintiff] experienced for more than a year could have been averted."). Thus, there are factual disputes that prevent summary judgment on defendants' subjective intent.

In sum, on this record, drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference to plaintiff's shoulder pain. Accordingly, defendants' motion for summary judgment on this claim is denied.

**\*365** C. Individual Defendants

Defendants also move for summary judgment specifically with respect to plaintiff's claims against three of the individual defendants: Sheriff Edward Reilly (hereinafter "Reilly"), Edwards, and Okonta. For the reasons set forth below, the Court grants defendants' motion with respect to Reilly, and denies it with respect to Edwards and Okonta.

1. Legal Standard

[20] "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citation and quotation marks omitted). In other words, "supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior." *Id.* Supervisor liability can be shown in one or more of the following ways: "(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." *Id.* at 145 (citation omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

2. Application

[21] Although plaintiff alleges in the complaint that Reilly was aware of plaintiff's condition and failed to assist,[FN20] there is no mention whatsoever of Reilly in plaintiff's deposition or in any of the parties' evidentiary submissions. Because there is no evidence in the record that Reilly was personally involved in any of the alleged constitutional violations or that there was a custom or policy of allowing such constitutional violations (and that Reilly allowed such custom or policy to continue), no rational jury could find Reilly liable for any of plaintiff's deliberate indifference claims. *See Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) ("[M]ere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim."); *see also Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438-39 (E.D.N.Y.2009) ("[T]he plaintiff cannot establish that Sheriff Reilly was grossly negligent in failing to supervise subordinates because the medical care of inmates at the NCCC was delegated to the Nassau Health Care Corporation and plaintiff provides no evidence that Reilly was otherwise personally involved in his treatment."). Therefore, defendants' motion for summary judgment with respect to plaintiff's claims against Sheriff Reilly is granted.

> FN20. Plaintiff actually refers in the complaint to "Sheriff Edwards," but the Court determines, liberally construing the complaint, that this allegation refers to Sheriff Reilly.

[22] With respect to plaintiff's claims against Edwards and Okonta, however, there are disputed issues of fact that preclude summary judgment. Defendants argue that Edwards was not personally involved in the alleged constitutional violations because she did not treat plaintiff and merely responded to his grievance request. (Defs.' Br. at 24-25.) However, plaintiff testified that, although Edwards never physically treated him, she "takes care of appointments and makes sure you get to certain specialists" and that "she was in a position to make sure that I get the adequate care that I needed." (Price Dep. at 61-62.) Plaintiff also testified that he submitted a grievance request to *366 Edwards in order to be tested for the kidney transplant list, but that Edwards failed to get him on the list. (Price Dep. at 62-63.) Drawing all

reasonable inferences in favor of plaintiff, a rational jury could find that Edwards was personally involved in the alleged constitutional violations because she was in a position to get plaintiff tested for the kidney transplant list and failed to do so. *See McKenna v. Wright,* 386 F.3d 432, 437-38 (2d Cir.2004) ("Although it is questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of, [defendant] was properly retained in the lawsuit at this stage, not simply because he rejected the grievance, but because he is alleged, as Deputy Superintendent for Administration at [the prison], to have been responsible for the prison's medical program." (citation omitted)). Thus, plaintiff has presented sufficient evidence of Edwards's personal involvement in the alleged constitutional violations to raise a genuine issue of material fact as to whether Edwards is liable for the alleged Eighth Amendment violations.

[23][24] Defendants also argue that Okonta was not personally involved in the alleged constitutional violations because he did not actually treat plaintiff. (Defs.' Br. at 24-25.) This argument misses the mark. It is plaintiff's allegation that Okonta violated plaintiff's constitutional rights precisely by not treating him. Plaintiff has presented evidence that he received no response from Okonta regarding his requests to be tested for the kidney transplant list. Where a prison doctor denies medical treatment to an inmate, that doctor is personally involved in the alleged constitutional violation. *See McKenna,* 386 F.3d at 437 (finding "personal involvement" where medical defendants were alleged to have participated in the denial of treatment); *see also Chambers v. Wright,* No. 05 Civ. 9915, 2007 WL 4462181, at *3 (S.D.N.Y. Dec. 19, 2007) ("Prison doctors who have denied medical treatment to an inmate are 'personally involved' for the purposes of jurisdiction under § 1983." (citing *McKenna,* 386 F.3d at 437)). Although defendants argue that they were in fact making efforts to get plaintiff tested (Defs.' Br. at 25), the reasonableness of those efforts, as discussed above, is a factual question inappropriate for resolution on summary judgment.

In sum, defendants' motion for summary judgment on plaintiff's claims against Reilly is granted. Defendants' motion with respect to Edwards and Okonta is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)


### V. CONCLUSION


For the foregoing reasons, the Court grants in part and denies in part defendants' motion for summary judgment. Specifically, the Court grants defendants' motion with respect to plaintiff's claim regarding the dosage of his renal disease medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects. The parties to this action shall participate in a telephone conference on Monday, April 5, 2010 at 3:30 p.m. At that time, counsel for defendants shall initiate the call and, with all parties on the line, contact Chambers at (631) 712-5670.


SO ORDERED.


E.D.N.Y.,2010.
Price v. Reilly
697 F.Supp.2d 344


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Karus LAFAVE, Plaintiff,
v.
CLINTON COUNTY, Defendants.
No. CIV.9:00CV0744DNHGLS.

April 3, 2002.

Karus Lafave, Plaintiff, Pro Se, Plattsburgh, for the
Plaintiff.

Maynard, O'Connor Law Firm, Albany, Edwin J. Tobin,
Jr., Esq., for the Defendants.

REPORT-RECOMMENDATION [FN1]

> FN1. This matter was referred to the undersigned
> for Report-Recommendation by the Hon. David
> N. Hurd, United States District Judge, pursuant
> to 28 U.S.C. § 636(b)(1)(B) and L.R. 72.3(c).

SHARPE, Magistrate J.

I. INTRODUCTION

*1 Plaintiff, pro se, Karus LaFave ("LaFave") originally
filed this action in Clinton County Supreme Court. The
defendant filed a Notice of Removal because the
complaint presented a federal question concerning a
violation of LaFave's Eighth Amendment rights (Dkt. No.
1). Currently before the court is the defendant's motion to
dismiss made pursuant to Rule 12(b)(6) and in the
alternative, pursuant to Rule 56(b) of the Federal Rules of
Civil Procedure (Dkt. No. 5). LaFave, in response, is
requesting that the court deny the motion, excuse his
inability to timely file several motions, and to permit the

matter to be bought before a jury [FN2]. After reviewing
LaFave's claims and for the reasons set forth below, the
defendant's converted motion for summary judgment
should be granted.

> FN2. It should be noted that the date for
> dispositive motions was February 16, 2001. The
> defendant's motion to dismiss was filed on
> September 29, 2000. On January 9, 2001, this
> court converted the defendant's motion to dismiss
> to a motion for summary judgment, and gave
> LaFave a month to respond. On April 16, 2001,
> after three months and four extensions, LaFave
> finally responded.

II. BACKGROUND

LaFave brings this action under 42 U.S.C. § 1983
claiming that the defendant violated his civil rights under
the Eighth Amendment [FN3]. He alleges that the defendant
failed to provide adequate medical and dental care causing
three different teeth to be extracted.

> FN3. LaFave does not specifically state that the
> defendant violated his Eighth Amendment rights
> but this conclusion is appropriate after reviewing
> the complaint.

III. FACTS [FN4]

> FN4. While the defendant provided the court
> with a "statement of material facts not in issue"
> and LaFave provided the court with "statement
> of material facts genuine in issue," neither
> provided the court with the exact nature of the
> facts.

Between January and July of 1999, LaFave, on several
occasions, requested dental treatment because he was
experiencing severe pain with three of his teeth. After
being seen on several occasions by a Clinton County

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

Correctional Facility ("Clinton") doctor, he was referred to a dentist. Initially, LaFave's mother had made an appointment for him to see a dentist, but he alleges that Nurse LaBarge ("LaBarge") did not permit him to be released to the dentist's office [FN5]. Subsequently, he was seen by Dr. Boule, D.D.S ., on two occasions for dental examinations and tooth extractions.

> FN5. This appears to be in dispute because the medical records show that LaFave at first stated that his mother was going to make arrangements, but later requested that the facility provide a dentist.

### IV. DISCUSSION

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc .,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once this burden is met, it shifts to the opposing party who, through affidavits or otherwise, must show that there is a material factual issue for trial. Fed.R.Civ.P. 56(e); *see Smythe v. American Red Cross Blood Services Northeastern New York Region,* 797 F.Supp. 147, 151 (N.D.N.Y.1992).

Finally, when considering summary judgment motions, *pro se* parties are held to a less stringent standard than attorneys. *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). With this standard in mind, the court

now turns to the sufficiency of LaFave's claims.

B. *Eighth Amendment Claims*

**\*2** LaFave alleges that his Eighth Amendment rights were violated when the defendant failed to provide adequate medical care for his dental condition. The Eighth Amendment does not mandate comfortable prisons, yet it does not tolerate inhumane prisons either, and the conditions of an inmate's confinement are subject to examination under the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1975, 128 L.Ed.2d 811 (1994). Nevertheless, deprivations suffered by inmates as a result of their incarceration only become reprehensible to the Eighth Amendment when they deny the minimal civilized measure of life's necessities. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (*quoting Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)).

Moreover, the Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ..." against which penal measures must be evaluated. See *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). Repugnant to the Amendment are punishments hostile to the standards of decency that " 'mark the progress of a maturing society." ' *Id.* (*quoting Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion)). Also repugnant to the Amendment, are punishments that involve " 'unnecessary and wanton inflictions of pain." ' *Id. at 103,97 S.Ct. at 290 (quoting Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)).

In light of these elementary principles, a state has a constitutional obligation to provide inmates adequate medical care. See *West v. Atkins,* 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988). By virtue of their incarceration, inmates are utterly dependant upon prison authorities to treat their medical ills and are wholly powerless to help themselves if the state languishes in its obligation. *See Estelle,* 429 U.S. at 103, 97 S.Ct. at 290. The essence of an improper medical treatment claim lies in proof of "deliberate indifference to serious medical

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

needs." *Id.* at 104, 97 S.Ct. at 291. Deliberate indifference may be manifested by a prison doctor's response to an inmate's needs. *Id.* It may also be shown by a corrections officer denying or delaying an inmate's access to medical care or by intentionally interfering with an inmate's treatment. *Id.* at 104-105, 97 S.Ct. at 291.

The standard of deliberate indifference includes both subjective and objective components. The objective component requires the alleged deprivation to be sufficiently serious, while the subjective component requires the defendant to act with a sufficiently culpable state of mind. *See Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A prison official acts with deliberate indifference when he " 'knows of and disregards an excessive risk to inmate health or safety.' " *Id.* (*quoting Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979). However, " 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.*

**\*3** However, an Eighth Amendment claim may be dismissed if there is no evidence that a defendant acted with deliberate indifference to a serious medical need. An inmate does not have a right to the treatment of his choice. *See Murphy v. Grabo,* 1998 WL 166840, at \*4 (N.D.N.Y. April 9, 1998) (*citation omitted*). Also, mere disagreement with the prescribed course of treatment does not always rise to the level of a constitutional claim. *See Chance,* 143 F.3d at 703. Moreover, prison officials have broad discretion to determine the nature and character of medical treatment which is provided to inmates. *See Murphy,* 1998 WL 166840, at \*4 (*citation omitted*).

While there is no exact definition of a "serious medical condition" in this circuit, the Second Circuit has indicated what injuries and medical conditions are serious enough to implicate the Eighth Amendment. *See Chance,* 143 F.3d at 702-703. In *Chance,* the Second Circuit held that an inmate complaining of a dental condition stated a serious medical need by showing that he suffered from great pain for six months. The inmate was also unable to chew food and lost several teeth. The Circuit also recognized that dental conditions, along with medical conditions, can vary in severity and may not all be severe. *Id.* at 702. The court acknowledged that while some injuries are not serious enough to violate a constitutional right, other very similar

injuries can violate a constitutional right under different factual circumstances. *Id.*

The Second Circuit provided some of the factors to be considered when determining if a serious medical condition exists. *Id.* at 702-703. The court stated that " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain' " are highly relevant. *Id.* at 702-703 (*citation omitted* ). Moreover, when seeking to impose liability on a municipality, as LaFave does in this case, he must show that a municipal "policy" or "custom caused the deprivation." *Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 137 (2d Cir.1999).

In this case, the defendant maintains that the medical staff was not deliberately indifferent to his serious medical needs. As a basis for their assertion, they provide LaFave's medical records and an affidavit from Dr. Viqar Qudsi [FN6], M.D, who treated LaFave while he was incarcerated at Clinton. The medical records show that he was repeatedly seen, and prescribed medication for his pain. In addition, the record shows that on various occasions, LaFave refused medication because "he was too lazy" to get out of bed when the nurse with the medication came to his cell (*Def. ['s] Ex. A, P. 4*) .

FN6. Dr. Qudsi is not a party to this action.

According to the documents provided, Dr. Qudsi, examined LaFave on January 13, 1999, after LaFave reported to LaBarge that he had a headache and discomfort in his bottom left molar (*Qudsi Aff., P. 2*). Dr. Qudsi noted that a cavity was present in his left lower molar. *Id.* He prescribed Tylenol as needed for the pain and 500 milligrams ("mg") of erythromycin twice daily to prevent bacteria and infection. *Id.* On January 18, 19, and 20, 1999, the medical records show that LaFave refused his erythromycin medication (*Def. ['s] Ex. B, P. 1).*

**\*4** Between January 20, and April 12, 1999, LaFave made no complaints concerning his alleged mouth pain. On

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

April 12, 1999, LaFave was examined by LaBarge due to a complaint of pain in his lower left molar (*Def. ['s] Ex. A, P. 4* ). Dr. Qudsi examined him again on April 14, 1999. *Id.* He noted a cavity with pulp decay and slight swelling with no discharge. *Id.* He noted an abscess in his left lower molar and again prescribed 500 mg of erythromycin tablets twice daily and 600 mg of Motrin three times daily for ten days with instructions to see the dentist. *Id.* On the same day, LaBarge made an appointment for LaFave to see an outside dentist that provides dental service to facility inmates, Dr. Boule *(Qudsi Aff., P. 3).*

On May 3, 1999, LaBarge was informed by LaFave that his mother would be making a dental appointment with their own dentist and that the family would pay for the treatment (*Def. ['s] Ex. A, P. 4* ). On that same day, Superintendent Major Smith authorized an outside dental visit. *Id.* On May 12, 1999, he was seen by LaBarge for an unrelated injury and he complained about his lower left molar (*Def .['s] Ex. A, P. 5* ). At that time, LaFave requested that LaBarge schedule a new appointment with Dr. Boule because the family had changed their mind about paying an outside dentist. *Id.* LaBarge noted that he was eating candy and informed him of the deleterious effects of candy on his dental condition. *Id.* Thereafter, LaBarge scheduled him for the next available date which was June 24, 1999, at noon. *Id.*

On June 2, 1999, LaFave again requested sick call complaining for the first time about tooth pain in his upper right molar and his other lower left molar (*Def. ['s] Ex. A, P. 6* ). He claimed that both molars caused him discomfort and bothered him most at night. *Id.* LaFave confirmed that he had received treatment from Dr. Boule for his first lower left molar one week before. *Id.* The area of his prior extraction was clean and dry. *Id.* There was no abscess, infection, swelling, drainage or foul odor noted. *Id.* LaBarge recommended Tylenol as needed for any further tooth discomfort. *Id.*

On June 21, 1999, LaFave again requested a sick call and was seen by LaBarge (*Def. ['s] Ex. A, P. 6* ). No swelling, drainage or infection was observed. *Id.* However, LaBarge noted cavities in LaFave's lower left molar and right lower molars. *Id.* LaBarge made arrangements for Dr. Qudsi to further assess LaFave. *Id.* On June 23, 1999, Dr. Qudsi examined his right lower molar and noted cavitation with

decay in that area (*Def. ['s] Ex. A, P. 7* ). In addition, he noted that LaFave had a cavity in his second left lower molar. *Id.* He prescribed 500 mg of erythromycin twice daily for 10 days and 600 mg of Motrin three times daily for 10 days, with instructions to see a dentist. *Id.*

On June 30, 1999, Officer Carroll reported that LaFave was again non-compliant with his medication regimen as he refused to get up to receive his medication (*Def. ['s] Ex. A, P. 8* ). On July 7, 1999, he again requested sick call complaining of a toothache in his lower right molar (*Def. ['s] Ex. A, P. 9* ). Again, LaFave was non-compliant as he had only taken his erythromycin for five days instead of the ten days prescribed. *Id.* During the examination, Dr. Qudsi informed LaFave that extraction of these teeth could be necessary if he did not respond to conservative treatment. *Id.* At that time, LaFave informed Dr. Qudsi that he was going to be transferred to another facility. *Id.* Dr. Qudsi advised LaFave to follow-up with a dentist when he arrived at the new facility. *Id.* Dr. Qudsi prescribed 500 mg Naproxin twice daily for thirty days with instructions to follow-up with him in two weeks if the pain increased. *Id.* The following day, LaFave requested sick call complaining to LaBarge that he had taken one dose of Naproxin and it was not relieving the pain. *Id.* He was advised that he needed to take more than one dose to allow the Naproxin to take effect. *Id.*

**\*5** On July 17, 1999, LaFave was again seen by Dr. Qudsi and he indicated that he did not believe he was benefitting from the prescribed course of conservative treatment with medication (*Def. ['s] Ex. A, P. 10* ). Subsequently, LaBarge made a dental appointment for him on July 23 [FN7], 1999, at 3:15 p.m. *Id.* On July 23, 1999, a second extraction was conducted. *Id.* On July 28, 1999, he was again seen by Dr. Qudsi, for an ulceration at the left angle of his mouth for which he prescribed bacitracin ointment. *Id.* At this time, LaFave continued to complain of tooth pain so he was prescribed 600 mg of Motrin three times daily. *Id.*

FN7. The medical records contain an error on the July 17, 1999, note which indicted that an appointment was set for June 23, 1999, however, it should have been recorded as July 23, 1999.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

On August 4, 1999, he was seen for feeling a sharp piece of bone residing in the area of his lower left molar (*Def. ['s] Ex. A, P. 11* ). Dr. Qudsi recommended observation and to follow-up with dental care if his condition continued. *Id.* The defendant maintains that given all of the documentation that he was seen when he requested to be seen and prescribed numerous medications, the medical staff was not deliberately indifferent to his serious medical needs. The defendant contends that at all times, professional and contentious dental and medical treatment were provided in regards to his various complaints.

In his response, LaFave disagrees alleging that the county had a custom or policy not to provide medical treatment to prisoners. However, LaFave does not allege in his complaint that the county had a "custom or policy" which deprived him of a right to adequate medical or dental care. In his response to the motion for summary judgment, for the first time, LaFave alleges that the county had a policy which deprived him of his rights. He maintains that his continued complaints of pain were ignored and although he was prescribed medication, it simply did not relieve his severe pain.

This court finds that the defendant was not deliberately indifferent to his serious dental and medical needs. Moreover, even if this court construed his complaint to state a viable claim against the county, LaFave has failed to show that the county provided inadequate medical and dental treatment. As previously stated, an inmate does not have the right to the treatment of his choice. The record shows that he was seen numerous times, and referred to a dentist on two occasions over a six month period. While LaFave argues that the dental appointments were untimely, the record shows that the initial delay occurred because he claimed that his mother was going to make the appointment but later changed her mind. In addition, the record demonstrates that he did not adhere to the prescribed medication regime. On various occasions, LaFave failed to get out of bed to obtain his medication in order to prevent infection in his mouth. Although it is apparent that LaFave disagreed with the treatment provided by Clinton, the record does not show that the defendant was deliberately indifferent to his serious medical needs. Accordingly, this court recommends that the defendant's motion for summary judgment should be granted.

**\*6** WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that the defendant's motion for summary judgment (Dkt. No. 5) be GRANTED in favor of the defendant in all respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2002.
Lafave v. Clinton County
Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C**  Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

> FN1. This matter was referred to the undersigned
> pursuant to 28 U.S.C. § 636(b) and
> N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.[FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

### I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. Id. at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. Id. at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. Id. at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. Id. at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. Id. at ¶¶ 22, 27-28.

### II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Staron v. McDonald's Corp., 51 F.3d 353, 355 (2d Cir.1995) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.), cert. denied, 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

### III. Discussion

### A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); Rhodes v. Chapman, 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. Farmer, 511 U.S. at 837.

### 1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes*, 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver*, 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord*, 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn*, 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio*, 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie*, 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray*, 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer*, 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer*, 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,* 524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at \*3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at \*3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

#### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

#### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 596891 (N.D.N.Y.)

(Cite as: 2008 WL 596891 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
George HARRIS, Plaintiff,
v.
G. MORTON, et al, Defendants.
No. 9:05-CV-1049 (LEK/RFT).

Feb. 29, 2008.

George Harris, Marcy, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Risa L. Viglucci, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

### DECISION AND ORDER

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a Report-Recommendation filed on January 24, 2008 by the Honorable Randolph F. Treece, United States Magistrate Judge, pursuant to 28 U .S.C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report-Rec. (Dkt. No. 36). After ten days from the service thereof, the Clerk has sent the entire file to the undersigned, including the objections by Plaintiff George Harris, which were filed on February 26, 2008. Objections (Dkt. No. 38).

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* This Court has considered the objections and has undertaken a de novo review of the record and has determined that the Report-Recommendation should be approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 36) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion for summary judgment (Dkt. No 28) is **GRANTED;** and it is further

**ORDERED,** that the Complaint (Dkt. No. 1) is **DISMISSED;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

### REPORT-RECOMMENDATION and ORDER

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff George Harris brings this civil rights action pursuant to 42 U.S.C. § 1983 claiming that his constitutional rights under the Eighth Amendment were violated when he was not properly treated for an injury he suffered as a passenger in a car accident. Dkt. No. 1, Compl. Defendants have filed a Motion for Summary Judgment (Dkt. No. 28) under Rule 56 of the Federal Rules of Civil Procedure, to which Plaintiff has responded in opposition (Dkt. No. 29). For the reasons that follow, it is recommended that Defendants' Motion for Summary Judgment be **granted,** and Plaintiff's Complaint be **dismissed.**

### I. FACTS

The following facts were derived mainly from the Defendants' Statement of Material Facts, submitted in accordance with N.D.N.Y.L.R. 7. 1, which were not specifically countered nor opposed by Plaintiff. *See* N.D.N.Y.L.R. 7.1(a)(3) ( *"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* (emphasis in original)). In any event, most, if not all, of the material facts are not in dispute, but rather, the issue is whether those facts give rise to constitutional violations.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2008 WL 596891 (N.D.N.Y.)

(Cite as: 2008 WL 596891 (N.D.N.Y.))

On October 24, 2003, Plaintiff was a passenger in a van driven by Defendant Corrections Officer (C.O.) Morton headed from Mid-State Correctional Facility to the SUNY Health Care Center in Syracuse, New York. Dkt. No. 28-4, Defs.' 7.1 Statement at ¶ 1. While attempting to back out of a parking space, Morton hit the rear driver side panel of another vehicle. *Id.* at ¶ 3. Both Morton and Defendant C.O. Irving, who was also present in the car, inspected the vehicles and noted minimal damages. *Id.* at ¶ 4. Plaintiff was wearing a seatbelt when the accident occurred. *Id.* at ¶ 5. Plaintiff arrived at Mid-State at approximately 11:20 a.m. and was seen in the infirmary at approximately 12:40 p.m., at which point he completed an inmate injury report. *Id.* at ¶ 6; Compl. at p. 5. Plaintiff complained of a "bumped" left knee and a "snapped" neck, but Defendant Nurse Hanley found that Plaintiff was not suffering from any injuries requiring medical treatment, and noted that Plaintiff had full range of motion and was alert and oriented. Defs' 7.1 Statement at ¶¶ 8-9. Plaintiff did not seek any further medical attention until October 31, 2003, when he complained of pain and discomfort in his neck and knee to Nurse Myers [FN1] at the flu shot clinic, which is provided for the purpose of administering flu shots only. *Id.* at ¶ 9; Compl. at p. 6. Nurse Myers instructed Plaintiff to sign up for sick call if he needed medical attention, to which Plaintiff responded that he intended to file a grievance. Defs' 7.1 Statement at ¶ 9; Compl. at p. 7.

> **FN1.** Nurse Myers is not a named Defendant in this action.

**\*2** Plaintiff filed a grievance on November 6, 2003, which Superintendent James A. Nichols denied on November 11, 2003, after an investigation. Dkt. No. 28, Defs.' Mot. for Summ. J., Risa Viglucci, Esq., Affirm., dated Apr. 2, 2007, Ex. B at p. 3. Plaintiff's appeal to the Central Office Review Committee (CORC) was unanimously denied. *Id.* at p. 2; Defs' 7.1 Statement at ¶ 10. Plaintiff now brings this action claiming violation of his constitutional rights.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir.1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 596891 (N.D.N.Y.)

(Cite as: 2008 WL 596891 (N.D.N.Y.))

*Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

**B. Eighth Amendment Claim**

**\*3** Plaintiff claims that the Defendants failed to adequately care for injuries he sustained to his neck and knee during a minor car accident. "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to [his] serious medical needs." *Smith v. Carpenter,* 316 F.3d 178, 183 (2d Cir.2003) (internal quotation marks and citations omitted) (alteration in original). This standard contains both objective and subjective elements. *Id.* "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberative indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Id.* at 183-84 (citing *Chance v. Armstrong,* 143 F.3d at 702 & *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). The subjective element "entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Hathaway v. Coughlin,* 99 F.3d at 553 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835 (1994)).

The record in this case shows that on the day of the accident, October 24, 2003, Plaintiff was attended to by Defendant Nurse Hanley, who found Plaintiff free of injury. Viglucci Affirm., Ex. A ., Rep. of Inmate Injury, dated Oct. 24, 2003. Plaintiff did not seek any further medical attention until October 31, 2003, when he complained of pain and discomfort in his neck and knee to Nurse Myers, who instructed him to utilize the sick call procedure in order to receive medical attention. Compl. at p. 6. Plaintiff's Ambulatory Health Record (AHR) shows that Plaintiff continued to complain of neck pain in the months that followed. *See* Viglucci Affirm., Ex. A, AHR.

The medical staff questioned whether Plaintiff had possibly suffered from whiplash, and it was recommended that Plaintiff take Tylenol and apply heat to the afflicted area. *Id.* at entries dated Jan. 15 & Feb. 17, 2004.[FN2] An x-ray exam of Plaintiff's cervical spine revealed an "old apparent injury to [the] C6 spinous process." Dkt. No. 29, Pl.'s Resp. to Defs.' Mot. to Dismiss, Ex. 9, Cervical Spine Exam Rep., dated Jan. 16, 2004. Plaintiff's regular physician received the x-ray report and recommended no changes to his prescriptions. AHR, entry, dated Jan. 22, 2004. This injury was later diagnosed as a pinched nerve in his neck. *Id.* at entry dated Mar. 5, 2004. Such a minor injury does not normally rise to the level of seriousness required to make a viable claim of medical indifference under the Eighth Amendment. *See Bennett v. Hunter,* 2006 WL 1174309, at *3 (N.D.N.Y.2006) (stating that a pinched nerve is not a serious medical need).

> FN2. We note that although Plaintiff states he suffered from a "snapped" neck, he does not indicate he suffered from anything other than a generic neck injury. *See* Compl. at p. 9.

The record also reflects that Plaintiff has suffered from Degenerative Disc Disease [FN3] since 2002. Pl.'s Opp. to Defs.' Mot. to Dismiss, Ex. 9, Bone Scan Rep. dated Mar. 29, 2002 & Radiologic Consultation, dated Jan. 16, 2004. The January 16, 2004 report notes a "straightening and mild degenerative disc disease at C5-6 and C6-7." Degenerative Disk Disease itself might be considered a constitutionally significant injury, *see Moolenaar v. Champagne,* 2006 WL 2795339, at *6 n. 6 (N.D.N.Y. Sept. 26, 2006) (citation omitted), however, Plaintiff does not claim that he received inadequate treatment for this ongoing condition, but rather for the neck injury he allegedly suffered as a result of the car accident. *See generally* Compl.; *see also Smith v. Carpenter,* 316 F.3d at 186 (citations omitted) (stating Eighth Amendment claims concern "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract"). In addition, the Plaintiff has not asserted, nor does the record reflect, that his disease was somehow worsened as a result of the alleged injury he sustained in the car. Therefore, the Plaintiff's claim must fail under the objective prong of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 596891 (N.D.N.Y.)

(Cite as: 2008 WL 596891 (N.D.N.Y.))

Eighth Amendment deliberate indifference standard.

> FN3. Degenerative Disc Disease (DDD) is "not really a disease but a term used to describe the normal changes in your spinal discs as you age ... [it] can take place throughout the spine, but it most often occurs in the discs in the lower back (lumbar region) and the neck (cervical region)." Information *available at* www.webmd.com. DDD involves the break down or degeneration of the spinal disks caused by the loss of fluid in the discs or tiny cracks or tears in the outer layer of a disc. *Id.* DDD can result in back or neck pain, depending on the location of the affected disc. *Id.*

**\*4** Even assuming, *arguendo,* that Plaintiff sustained a serious medical injury, his claim would fail under the subjective prong as well. Defendants Irving, Morton, and Hanley are the only named Defendants who were directly involved in the care Plaintiff received after the accident. *See generally* Compl. C.O.'s Irving and Morton were present in the van during the accident, and upon their return to Mid-State, Defendant Morton sent Plaintiff to the infirmary to be checked out for any injury. *Id.* at p. 5. Thus, far from exhibiting a deliberate indifference to Plaintiff's medical needs or otherwise preventing Plaintiff from receiving medical attention, these officers ensured that Plaintiff received medical attention in a timely fashion. *Id.*

Nurse Hanley examined Plaintiff on the day of the accident and found no injuries, noting that Plaintiff was alert and had a full range of motion. Rep. of Inmate Injury, dated Oct. 24, 2003. Plaintiff states in his Complaint that he requested to see a doctor, but that Hanley denied his request stating he would have to go to sick call to see a doctor. Compl. at p. 6. Plaintiff also states later that night he again complained of neck pain to C.O. Jordan [FN4] who informed Hanley of his complaints, but that Hanley refused to see Plaintiff. *Id.* Even accepting these statements as true, there is no evidence on the record to suggest that Hanley acted with deliberate indifference towards Plaintiff's alleged injuries. Prison officials act with deliberate indifference "when [they] 'know[ ] of and disregard[ ] an excessive risk to inmate health or safety;

the official[s] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference.' " *Chance v. Armstrong,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1970). Hanley did a "head to toe assessment" and found nothing wrong with Plaintiff, and then advised Plaintiff to utilize the sick call procedure if he wanted to see a doctor. Rep. of Inmate Injury, dated Oct. 24, 2003. Plaintiff admits that despite the severe pain he allegedly felt, he did not inform any medical staffer until October 31, 2003, seven days after the car accident. Compl. at p. 6. At worse then, Hanley failed to identify an injury that Plaintiff himself had not felt the effects of at the time of Hanley's assessment. *Id.* (stating that only after Hanley's examination did Plaintiff "really feel the effects of the accident upon his neck."). There is no accusation nor evidence on the record that Defendant Hanley consciously disregarded Plaintiff's medical needs. *See Farmer v. Brennan,* 511 U.S. at 836 (stating a plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm).

> FN4. C.O. Jordan is not a named Defendant in this action.

For the foregoing reasons, it is recommended that Summary Judgment be **granted** as to Defendants Hanley, Irving, and Morton.

### C. Personal Involvement

**\*5** The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement. Therefore, a prison official may not be found liable for a constitutional violation merely because of the acts of those under his control." *Kinch v. Artuz,* 1997 WL 576038, at \*2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted).

If a plaintiff seeks to bring a § 1983 action for supervisory liability, liability on the part of the supervisor

Not Reported in F.Supp.2d, 2008 WL 596891 (N.D.N.Y.)

(Cite as: 2008 WL 596891 (N.D.N.Y.))

may exist

in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir.2003) (citing Colon v. Coughlin, 58 F.3d at 873) (further citations omitted).

In the case at bar, Plaintiff has failed to identify how the remaining Defendants, Baxter, Stine, Nichols, Berry, and Mohrman, were personally involved in his alleged Eighth Amendment claim. Plaintiff's statements about these Defendants concern the investigation of the Grievance he filed and the subsequent decisions rendered against him. Plaintiff takes issue with several alleged failures to follow correct procedure in reporting the car accident, and accuses these Defendants of failing to follow what Plaintiff asserts is correct protocol in the aftermath of a car accident.[FN5] See Compl. at pp. 5-9. However, aside from his Eighth Amendment claim, Plaintiff fails to explain, and the Court cannot itself fathom, how any of these accusations amount to a violation of his constitutional rights.

> FN5. For example, Plaintiff states that Defendants Morton and Irvin failed to "speak with their superiors and get instructions as to what procedure was to be followed" in the wake of the car accident. Compl. at p. 5. Similarly, Plaintiff accuses Defendant Stine of failing to contact Plaintiff in order to make a written report of the accident. Id. at p. 7.

For these reasons it is recommended that the Motion for Summary Judgment be **granted** as to the remaining Defendants.

**D. Qualified Immunity**

Defendants raise the affirmative defense of qualified immunity. However, because we find that Plaintiff has suffered no constitutional violation, we need not address the merits of that defense. See Saucier v. Katz, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for fruther inquiries regarding qualified immunity.").

**III. CONCLUSION**

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 28) be **granted;** and it if further

**\*6 RECOMMENDED,** that Plaintiff's Complaint (Dkt. No. 1) be **dismissed;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15 (2d Cir.1989)); see also 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2008.

Harris v. Morton
Not Reported in F.Supp.2d, 2008 WL 596891 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 1174309 (N.D.N.Y.)

(Cite as: 2006 WL 1174309 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Donald Mack BENNETT, Plaintiff,
v.
T. HUNTER, Administrative Director of Medical,
Riverview Correctional Facility, Defendant.
No. 9:02-CV-1365 (FJS/GHL).

March 31, 2006.
May 1, 2006.
Donald Mack Bennett, White Plains, NY, for Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General for the State of New York, Nelson Sheingold, Assistant Attorney General, of counsel, Albany, NY, for Respondent Department of Law.

*ORDER*

FREDERICK J. SCULLIN, JR., S.D.J.

**\*1** The above-captioned matter having been presented to me by the Report-Recommendation of Magistrate Judge George H. Lowe filed March 31, 2006, and the Court having reviewed the Report-Recommendation and the entire file in this matter; and Judge Lowe's Report-Recommendation which was mailed to plaintiff's last known address, but was returned to the Clerk's office marked "Return to Sender". Under Local Rule 41.2(b), failure to notify the Court of a change of address as required by Local Rule 10.1(b) may result in dismissal of the action. Therefore, in light of Plaintiff's failure to notify the Court of his change of address, it is hereby

**ORDERED,** that the Report-Recommendation filed by Magistrate Judge George H. Lowe filed on March 31, 2006, is, for the reasons stated therein, **ACCEPTED** in its entirety; and it is further

**ORDERED,** that Defendant's motion for summary judgment is **GRANTED,** and it is further

**ORDERED,** that the Clerk of the Court is to enter judgment in favor of Defendant and **CLOSE** this case.

**IT IS SO ORDERED.**

GEORGE H. LOWE, United States Magistrate Judge.

*REPORT-RECOMMENDATION*

This matter has been referred to me for Report and Recommendation by the Honorable Frederick J. Scullin, Senior U.S. District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). Generally, in this *pro se* civil rights complaint brought under 42 U.S.C. § 1983, Donald Mack Bennett ("Plaintiff"), formerly an inmate at the Riverview Correctional Facility ("Riverview C.F."), alleges that the Administrative Director of the Medical Department at Riverview C.F., Thomas B. Hunter ("Defendant"), violated Plaintiff's rights under the First, Eighth and Fourteenth Amendments to the United States Constitution when, between July and December of 2000, he was deliberately indifferent to Plaintiff's serious medical needs (which included a heart condition known as "atrial fibrillation," a seizure disorder, a disc problem in his back known as "spondylolisthesis," and a pinched nerve in his right wrist). (Dkt. No. 29 [Plf.'s Second Am. Compl.].)

Currently before the Court is Defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 59.) Generally, Defendant's motion raises three issues: (1) whether Plaintiff has failed to establish the elements for a claim of deliberate indifference to a serious medical need; (2) whether Plaintiff has failed to establish any personal involvement by Defendant in the alleged constitutional deprivations, and (3) whether Defendant is protected by qualified immunity. (Dkt. No. 59 [Def.'s Mem. of Law].) For the reasons discussed below, I answer each of these questions in the affirmative. As a result, I recommend that Defendant's motion be granted.

**I. SUMMARY JUDGMENT STANDARD**

Under Fed.R.Civ.P. 56(c), summary judgment is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1174309 (N.D.N.Y.)

(Cite as: 2006 WL 1174309 (N.D.N.Y.))

warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [FN1] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir.1990) (citation omitted). However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986).

    FN1. A fact is "material" only if it would have some effect on the outcome of the suit. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

*2 To "specifically controvert[ ]" each of the statements of material fact in a defendant's Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a response to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" and that "set[s] forth a specific citation to the record where the factual issue arises." [FN2]

    FN2. N.D.N.Y. L.R. 7.1(a)(3); see, e.g., Jones v. Smithkline Beecham Corp., 309 F.Supp.2d 343, 346 (N.D.N.Y.2004) (McAvoy, J.) ("[W]here Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's assertions of fact, those assertions will be taken as true."); Lee v. Alfonso, 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *15 (N.D.N.Y. Feb. 10, 2004) (Scullin, C.J.) ("Plaintiff does not offer any facts to support his claims that would raise an issue of fact. Nor has he overcome his failure to respond to Defendants' Rule 7.1(a)(3) Statement. Therefore, Defendants' version of the facts remains uncontroverted."); Morgan v.

Niles, 250 F.Supp.2d 63, 67 (N.D.N.Y.2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record. Because plaintiff's response Rule 7.1(a)(3) statement does not comply with the local rules, it has not been considered."); Mehlenbacher v. Slafrad, 99-CV-2127, 2003 U.S. Dist. LEXIS 9248, at *4 (N.D.N.Y. June 4, 2003) (Sharpe, M.J.) ("Since [the plaintiff] has failed to respond to the defendant's statements of material fact, the facts as set forth in the defendants' Rule 7.1 Statement ... are accepted as true."); Adams v. N.Y. State Thruway Auth., 97-CV-1909, 2001 U.S. Dist. LEXIS 3206, at *2, n. 1 (N.D.N.Y. March 22, 2001) (Mordue, J.) ("[T]o the extent plaintiff's responses violate Local Rule 7. 1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff."); see also Holtz v. Rockefeller, 258 F.3d 62, 74 (2d Cir.2001) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").

"If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e) (emphasis added). "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." Champion v.. Artuz, 76 F.3d 483, 486 (2d Cir.1996). "Such a motion may properly be granted only if the facts as to which there is no genuine dispute 'show that ... the moving party is entitled to a judgment as a matter of law.' " Champion, 76 F.3d at 486 (quoting Fed.R.Civ.P. 56[c]).[FN3] Therefore, the Court must review the merits of the motion. Allen v. Comprehensive Analytical Group, Inc., 140 F.Supp.2d 229, 232 (N.D.N.Y.2001).

    FN3. Local Rule 7.1(b)(3) recognizes this requirement (that the motion have merit) when it provides that "the non-moving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown," only

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1174309 (N.D.N.Y.)

(Cite as: 2006 WL 1174309 (N.D.N.Y.))

where the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein." N.D.N.Y. L.R. 7.1(b)(3).

Where a plaintiff has failed to respond to a defendant's Rule 7.1 Statement of Material Fact, the facts as set forth in that Rule 7.1 Statement are accepted as true to the extent those facts are supported by the record.[FN4] A district court has no duty to perform an independent review of the record to find proof of a factual dispute.[FN5] In the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit.[FN6] I note that, here, while Plaintiff's Second Amended Complaint ("Complaint") is *not* verified, he has submitted what purports to be an "affidavit" in opposition to Defendant's motion. (Dkt.Nos.29, 72.)

FN4. *See* N.D.N.Y. L.R. 7.1(a)(3) ("*Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*") [emphasis in original]; *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243-245 (2d Cir.2004) ("If the evidence submitted in support of the motion for summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden ..., the district court may not rely solely on the statement of undisputed material facts contained in the moving party's Rule 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [citation omitted]; *see, e.g.,* *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added].

FN5. *See* *Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (citations omitted); *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN6. *See* Patterson v. County of Oneida, 375 F.2d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted]; Fed.R.Civ.P. 56(c) ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact....").

However, to be sufficient to create a factual issue, an affidavit (or verified complaint) must, among other things, be based "on personal knowledge."[FN7] An affidavit (or verified complaint) is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay.[FN8] In addition, such an affidavit (or verified complaint) must not be conclusory.[FN9] An affidavit (or verified complaint) is conclusory if, for example, its

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1174309 (N.D.N.Y.)

(Cite as: 2006 WL 1174309 (N.D.N.Y.))

assertions lack any supporting evidence or are too general.[FN10] Moreover, "[a]n affidavit must not present legal arguments." [FN11]

> FN7. Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc., 44 F.3d 1082, 1084 (2d Cir.1995)* [citations omitted], *cert. denied sub nom, Ferrante v. U.S., 516 U.S. 806 (1995)*.

> FN8. *See Patterson*, 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M .C. Floor Crafters, Inc., 842 F.2d 639, 643 (2d Cir.1988)* ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc., 425 F.2d 92, 97 (2d Cir.1970)* (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co., 803 F.Supp. 649, 664 (W.D.N.Y.1992)* (rejecting affidavit made on "secondhand information and hearsay"), *aff'd, 995 F.2d 1147 (2d Cir.1993)*.

> FN9. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine

issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

> FN10. *See, e.g., Bickerstaff v. Vassar Oil, 196 F.3d 435, 452 (2d Cir.1998)* (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur., 78 F.3d 61, 63 (2d Cir.1996)* (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon, 759 F.2d 989, 997 (2d Cir.1985)* (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

> FN11. N.D.N.Y. L.R. 7.1(a)(2).

Finally, even where an affidavit (or verified complaint) is based on personal knowledge and is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [FN12]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1174309 (N.D.N.Y.)

(Cite as: 2006 WL 1174309 (N.D.N.Y.))

FN12. *See, e.g.,* Jeffreys v. City of New York, 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; Argus, Inc. v. Eastman Kodak Co., 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); Allah v. Greiner, 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); Olle v. Columbia Univ., 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), aff'd, 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

## II. ANALYSIS

*3 Before I analyze each of the three issues presented by Defendant in his motion, I would like to make a general observation. In support of each of his arguments, Defendant relies on certain record citations and legal citations. I find that these citations indeed support Defendant's arguments. My resulting conclusion that Defendant's motion has merit is not rebutted by Plaintiff's opposition papers. His papers are woefully deficient, despite the fact that he was twice warned of the potential consequences of failing to properly respond to Defendant's motion, and was granted numerous extensions of time in which to do so.[FN13]

FN13. (Dkt.Nos.59, 63, 67, 70.)

Specifically, because Plaintiff fails to include in his opposition papers a Rule 7.1 Response which specifically controverts Defendant's factual assertions in matching numbered paragraphs with specific citations to the record, Defendant's factual assertions in his Rule 7.1 Statement are deemed admitted by Plaintiff.[FN14] In addition, because in his opposition papers Plaintiff fails to address the legal arguments advanced by Defendant, Plaintiff is deemed to have consented to the granting of Defendant's motion based on those legal arguments.[FN15]

FN14. N.D.N.Y. L.R. 7.1(a)(3).

FN15. N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."); N .D.N.Y. L.R. 7.1(a) (requiring opposition to motion for summary judgment to contain, *inter alia,* a memorandum of law); Beers v.. GMC, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ); *cf.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1174309 (N.D.N.Y.)

(Cite as: 2006 WL 1174309 (N.D.N.Y.))

Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's *response ...* must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so *respond,* summary judgment, if appropriate, shall be entered against the adverse party.") [emphasis added].

**A. Whether Plaintiff Has Failed to Establish the Elements for a Claim of Deliberate Indifference to a Serious Medical Need**

Defendant recites the correct legal standard that governs Plaintiff's claim of inadequate medical care under the Eighth Amendment. (Dkt. No. 59, Mem. of Law at 9-12.) Generally, to prevail on such a claim, Plaintiff must show two things: (1) that Plaintiff had a sufficiently serious medical need; and (2) that Defendant was deliberately indifferent to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

**1. Serious Medical Need**

Defendant acknowledges, and the record establishes, that, during some or all of the time in question, Plaintiff had a heart condition (atrial fibrillation),[FN16] a seizure disorder,[FN17] a disc problem in his lower back (spondylolysis),[FN18] a pinched nerve in his right wrist,[FN19] and calluses on his feet.[FN20] However, Defendant argues that, while some of these health conditions may have constituted "serious medical needs" (e.g., Plaintiff's heart condition, his seizure disorder, etc.), other of these health conditions did not constitute "serious medical needs" (e.g., any calluses on his foot, etc.).[FN21]

FN16. (*See, e.g.,* Dkt. No. 59, Def.'s Rule 7.1 Statement, ¶ 4; Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement, Ex. D-2 at 589, 590-594, 639-642, 653, 678-679, 683.)

FN17. (*See, e.g.,* Dkt. No. 59, Def.'s Rule 7.1 Statement, ¶ 4; Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement, Ex. D-2 at 591, 594, 639.)

FN18. (*See, e.g.,* Dkt. No. 59, Def.'s Rule 7.1

Statement, ¶ 5; Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement, Ex. D-2 at 95, 536.)

FN19. (*See, e.g.,* Dkt. No. 59, Def.'s Rule 7.1 Statement, ¶ 6; Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement, Ex. D-2 at Dkt. 536.)

FN20. (*See, e.g.,* Dkt. No. 59, Def.'s Rule 7.1 Statement, ¶ 12; Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement, Ex. D-2 at 6 .)

FN21. (Dkt. No. 59, Mem. of Law at 9-10.)

Setting aside the fact that I can find no reference to any foot calluses in Plaintiff's Amended Complaint,[FN22] I am persuaded by Defendant's argument. Depending on the precise nature of the disease, generally a heart condition, a seizure disorder, and a disc problem in one's back are "serious medical needs,"[FN23] while a pinched nerve in one's wrist, and calluses on one's feet are not "serious medical needs."[FN24]

FN22. Rather, Plaintiff's claim that he had foot calluses that constituted a "serious medical condition" appears to have been asserted in an administrative grievance filed by Plaintiff on January 2, 2001. (*Compare* Dkt. No. 29 *with* Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement, Ex. D-2.)

FN23. *See Mejia v. Goord,* 03-CV-0124, 2005 WL 2179422, at *7 (N.D.N.Y. Aug. 16, 2005) (Peebles, M.J.) ("The record in this case is strongly suggestive of a coronary condition which, though medically unspecified, could qualify as a serious medical need."); *Boomer v. Lanigan,* 00-CV-5540, 2001 WL 1646725, at *3 (S.D.N.Y. March 31, 1999) ("Epilepsy, or an epileptic seizure, is a serious medical injury."); *Williams v. M.C.C. Institution,* 97-CV-5352, 1999 WL 179604, at *10 (S.D.N.Y. March 31, 1999) ("There can be no question that epilepsy, and in particular an epileptic fit that runs unchecked, is a serious medical condition, even if for a half-hour.") [citation omitted]; *Veloz v. State of New York,* 339 F.Supp.2d 505, 522-524

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1174309 (N.D.N.Y.)

(Cite as: 2006 WL 1174309 (N.D.N.Y.))

(S.D.N.Y.2004) (spinal condition that included spondylosis was a serious medical need); *Faraday v. Lantz,* 03-CV-1520, 2005 WL 3465846, at *5 (D.Conn. Dec. 12, 2005) ("persistent [ ] ... back pain caused by herniated, migrating discs [and] sciatica" was a serious medical need).

FN24. *See Dixon v. Nusholtz,* No. 98-1637, 1999 U.S.App. LEXIS 13318, at *1, 5 (6th Cir.1999) (foot callouses that required orthopedic shoes were not a "grave medical need"); *Jackson v. O'Leary,* 89-CV-7139, 1990 U.S. Dist. LEXIS 17249, at *2, 4 (1990) (N.D.Ill.Dec. 17, 1990) ("[Plaintiff's] medical problem [of having callouses on his feet which allegedly required him to be able to wear gym shoes] is not one of especially grave concern."); *Green v. Senkowski,* 99-CV-1523, Decision & Order at 6-7 (N.D.N.Y. Aug. 5, 2003) (Hood, J.) (granting defendants' motion for summary judgment because, in part, plaintiff's wrist pain was not a "serious medical need"), *aff'd,* No. 03-250, 2004 U.S.App. LEXIS 11454 (2d Cir. June 10, 2004) (unpublished opinion); *Warren v. Purcell,* 03-CV-8736, 2004 U.S. Dist. LEXIS 17792, at *26 (S.D.N .Y. Sept. 3, 2004) ("[I]t appears highly unlikely that the injuries plaintiff alleges to have suffered ... namely pain in his wrists and pain, numbness and swelling in his foot and ankle, would be considered sufficiently serious to rise to the level of an Eighth Amendment violation.").

As a result, for purposes of summary judgment, I find that Plaintiff has established a serious medical need only with regard to his heart condition, seizure disorder, and back problem (but not with regard to his wrist pain and calloused feet). However, I note that, even if I were to consider all of Plaintiff's health problems *together* as constituting one "serious medical need" over the entire relevant time period, it would not change my ultimate recommendation in this report, for the reasons stated below

**2. Deliberate Indifference**

**\*4** Defendant asserts, and the record establishes, that Riverview C.F. provided a considerable amount of medical care to Plaintiff during his incarceration there.FN25 Generally, Riverview C.F. (1) responded to Plaintiff's medical requests by examining and treating him (e.g., through the prescription of more than six medications, and the administration of "foot soaks," etc.), (2) investigated his complaints, and (3) kept comprehensive and detailed records regarding Plaintiff's various health problems and complaints.

FN25. (Dkt. No. 59, Def.'s Rule 7.1 Statement, ¶¶ 4, 5, 6, 12, 13, 14, 15, 16, 17, 20, 21, 23, 24, 25, 26, 27, 28, 29, 30; *see generally* Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement.)

Based on this evidence, Defendant argues that (1) Plaintiff was receiving more than adequate care for his various health problems at Riverview C.F., and (2) even if he was not receiving adequate care for some of those health problems, absolutely no evidence exists suggesting that Defendant was deliberately indifferent to those health problems (whether they constituted "serious medical needs" or not).FN26

FN26. (Dkt. No. 59, Mem. of Law, at 10-12.)

I agree with Defendant, for the reasons stated in his Memorandum of Law. Simply stated, there is no evidence that Defendant's state of mind was equivalent to the sort of *criminal recklessness* necessary for liability under the Eighth Amendment.FN27 At most, the evidence indicates there may have been a difference of opinion between the medical staff at Riverview C.F. and Plaintiff, or *conceivably* a hint of negligence on the part of someone on the medical staff at Riverview C.F. However, even if true, neither of those facts implicate Defendant or (if they did implicate Defendant) would be enough to make Defendant liable to Plaintiff under the Eighth Amendment.FN28

FN27. *See Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ( "The required state of mind [under the Eighth Amendment is] equivalent to criminal recklessness....").

FN28. *See Estelle v. Gamble,* 429 U.S. 97, 106

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1174309 (N.D.N.Y.)

(Cite as: 2006 WL 1174309 (N.D.N.Y.))

(1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); *see, e.g., Veloz v. New York,* 339 F.Supp.2d 505, 522-24 (S.D.N.Y.2004) (granting defendants' motion for summary judgment on plaintiff's claim for deliberate indifference because defendants denied plaintiff's request for a stronger pain medication to treat his back condition based on a mere disagreement as to treatment, and medical malpractice is not actionable under the Eighth Amendment); *Connors v. Heywright,* 02-CV-9988, 2003 WL 21087886, at *3 (S.D.N.Y. May 12, 2002) (granting defendants' motion to dismiss because plaintiff's allegations that defendants forgot to give him his medications, altered his medications, and did not give him his monthly examinations, despite his epileptic seizures, failed to state a claim for deliberate indifference but stated a claim only for negligence).

As a result, I find that Plaintiff has not established that Defendant acted with deliberate indifference to any of Plaintiff's various health conditions, including his heart condition, seizure disorder, and back problem.

**B. Whether Plaintiff Has Failed to Establish any Personal Involvement by Defendant in the Alleged Constitutional Deprivation**

A defendant's personal involvement in the alleged unlawful conduct is a prerequisite for a finding of liability in an action under 42 U.S.C. § 1983. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977),

*cert. denied,* 434 U.S. 1087 (1978). To prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior*) is insufficient to show his or her personal involvement in that unlawful conduct. *Richardson v. Goord,* 347 F .3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

Rather, for a supervisory official to be personally involved in unlawful conduct, he or she must have (1) directly participated in that violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Richardson,* 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

**\*5** Here, even after conducting an independent review of the record, I can find no evidence of any such personal involvement by Defendant in the alleged unlawful conduct (which primarily consisted of Nurse Holden's dispensing the wrong medication to Plaintiff). Plaintiff has not established (or even alleged) that Defendant directly participated in Nurse Holden's (alleged) misconduct.[FN29] Nor has Plaintiff established (or even alleged) the existence of a policy or custom under which Nurse Holden's (alleged) misconduct occurred.

> FN29. For example, in his opposition papers, Plaintiff acknowledges that "Defendant Hunter was not present for the pill incident." (Dkt. No. 72, ¶ 6.)

Rather, liberally construed, Plaintiff's sole theories of personal involvement appear to be that (1) Defendant knew of various of Plaintiff's complaints about Nurse Holden before and during the misconduct, but negligently

Not Reported in F.Supp.2d, 2006 WL 1174309 (N.D.N.Y.)

(Cite as: 2006 WL 1174309 (N.D.N.Y.))

failed to act on those complaints, and (2) Defendant failed to remedy Nurse Holden's misconduct (and indeed sought to cover it up) after learning of it through Plaintiff's complaints. (Dkt. No. 29, ¶¶ VII, VIII, IX.) The problem with these theories of personal involvement is that they are completely devoid of any evidentiary support in the record.

At most, the record shows that Defendant supervised Nurse Holden (a part-time employee), and dutifully investigated Plaintiff's *sole* complaint about Nurse Holden, which was contained in Grievance No. RV-5422-01 (filed on January 2, 2001). In pertinent part, Plaintiff's grievance alleged that (1) on December 25, 2000, Nurse Holden gave Plaintiff the wrong liquid in which to soak his feet, making his calloused feet uncomfortable, and (2) on August 27, 2000, Nurse Holden failed to give Plaintiff a new pill after dropping that pill on the floor, and improperly took his pulse.

I can find no evidence in the record that Plaintiff made any complaints to Defendant about Nurse Holden before August 27, 2000, or even before December 25, 2000 (such that Defendant could possibly be said to have been "grossly negligent" or "deliberately indifferent" for failing to act on those complaints before the dates of the alleged misconduct in question). Indeed, he had arrived at Riverview C.F. only in July of 2000. Nor do I have any reason to believe that, if there existed any such complaints, they would have been sufficient to put Defendant on notice of the potential for misconduct by Nurse Holden, given Plaintiff's prolix and confusing use of language.[FN30]

> [FN30]. (*See, e.g.,* Dkt. No. 29; Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement, Ex. D-2 [attaching Plaintiff's Grievance No. RV-5422-01.)

The crux of Plaintiff's theory of personal involvement appears to be that Defendant failed to *remedy* Nurse Holden's misconduct during the "foot soak," dropped pill, and pulse reading. Setting aside the issue of whether any discipline of Nurse Holden would even be warranted for such "misconduct," the fact remains that Plaintiff wanted a remedy other than discipline of Nurse Holden.[FN31]

Rather, Plaintiff wanted Defendant to somehow undo the (alleged) results of Nurse Holden's misconduct, namely the worsening of Plaintiff's medical conditions, which (allegedly) included having his heart condition, seizure disorder and back problem "upgraded." I do not understand this extraordinary feat of medicine (bordering on a supernatural act) to be the sort of "remedy" referred to in the above-described personal involvement test for supervisors.

> [FN31]. (*See* Dkt. No. 29, ¶ IX [complaining that Defendant merely informed Plaintiff that Nurse Holden "will either be suspended or fired"].)

*6 All that was required of Defendant, under the circumstances, was what he did. He investigated Plaintiff's grievance (reviewing his medical records, and talking to both Plaintiff and Nurse Holden), and determined Plaintiff's complaints about Nurse Holden to be without merit. Even if Defendant's determination had been incorrect, there is no evidence that Nurse Holden's misconduct (if it indeed occurred) constituted a violation of Plaintiff's constitutional rights (i.e., that it occurred during the treatment of a serious medical need, and that it resulted from anything more than negligence by Nurse Holden). This absence of evidence is especially noteworthy, considering that Plaintiff was provided the opportunity to obtain such evidence during this action's discovery period, which closed long ago.[FN32] Under analogous circumstances, other district courts within the Second Circuit have refused to find personal involvement by a nurse supervisor.[FN33]

> [FN32]. (*See* Dkt. No. 39 at 1 [Scheduled Order of 6/22/04, setting discovery deadline as 10/30/04].)

> [FN33]. *See, e.g., Gates v. Goord,* 99-CV-1378, 2004 U.S. Dist. LEXIS 12299, at *32-35 (S.D.N.Y. July 1, 2004) (granting summary judgment to nurse supervisor, because-despite inmate's conclusory allegations that nurse supervisor was "repeatedly notified" of inmate's allegedly inadequate medical care but refused to take appropriate action-inmate had offered no facts showing personal involvement by nurse

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1174309 (N.D.N.Y.)

(Cite as: 2006 WL 1174309 (N.D.N.Y.))

supervisor in any constitutional violation, and
discovery was closed); *Patterson v. Lilley,*
02-CV-6056, 2003 U.S. Dist. LEXIS 11097, at
*19-22 (S.D.N.Y. June 30, 2003) (granting
motion to dismiss filed by nurse administrator,
because fact that inmate sent complaint letter to
nurse administrator about subordinate nurse's
allegedly inadequate medical care was not
sufficient to personally involve nurse
administrator in alleged misconduct, especially
where no facts indicated any constitutional
deprivation); *Gadson v. Goord,* 96-CV-7544,
2000 U.S. Dist. LEXIS 3944, at *20-21
(S.D.N.Y. March 28, 2000) (granting summary
judgment to nurse supervisor, because no
evidence existed showing he was personally
involved in physical therapist's alleged denial of
adequate wheel chair, even though he attended
meetings at which issue of wheel chair was
discussed, and because no evidence existed that
alleged misconduct constituted a constitutional
deprivation); *Rosales v. Coughlin,* 10 F.Supp.2d
261, 267 (W.D.N.Y.1998) (granting summary
judgment to nurse supervisor because of lack of
personal involvement, where record did not
include any evidence that nurse supervisor failed
to take appropriate action in response to inmate's
complaints of inadequate medical care);
*Muhammad v. Francis,* 94-CV-2244, 1996 U.S.
Dist. LEXIS 16785, at *25 (S.D.N.Y. Nov. 13,
1996) (granting summary judgment to nurse
supervisor because of lack of personal
involvement, where evidence showed merely that
nurse supervisor had been contacted during
investigation of inmate's grievance complaint
regarding his medical care); *Holmes v. Fell,* 856
F.Supp. 181, 183-184 (S.D.N.Y.1994) (granting
summary judgment to nurse supervisor because
of lack of personal involvement in subordinate
nurse's allegedly inadequate medical care of
inmate, and because of lack of any evidence that
the allegedly inadequate medical care constituted
a constitutional violation).

As a result, I find that, even if Plaintiff had
established the elements of a claim for deliberate

indifference to a serious medical need, Plaintiff has not
established that Defendant was personally involved in any
constitutional deprivation.

**C. Whether Defendant Is Protected by Qualified
Immunity**

Finally, Defendant argues that he is entitled to
dismissal because he is protected by qualified immunity.
Regardless of the merits of this defense, I have already
concluded that Plaintiff's Amended Complaint should be
dismissed on two alternative grounds (failure to establish
the elements of an Eighth Amendment claim, and failure
to establish the personal involvement of Defendant in any
constitutional deprivation). As I result, I need not address
this issue. However, in the interest of thoroughness, I will
do so briefly.

Defendant recites the correct legal standard with
regard to the qualified immunity defense. (Dkt. No. 59,
Mem. of Law at 14-16.) Generally, Defendant has
established facts showing that (1) his investigation of
Plaintiff's January 2, 2001, grievance was reasonably
conducted, and (2) as a result of that investigation, he
found no evidence that Nurse Holden had been
deliberately indifferent to any of Plaintiff's medical needs
(whether those needs were serious or not). Under the
circumstances, I can find no violation of a "clearly
established" right, much less a right of which a reasonable
person would have known.

As a result, I find that Defendant is entitled to
qualified immunity.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendant's motion for
summary judgment (Dkt. No. 59) be *GRANTED.*

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule
72.1(c), the parties have ten days within which to file
written objections to the foregoing report. Such objections
shall be filed with the Clerk of the Court. **FAILURE TO
OBJECT TO THIS REPORT WITHIN TEN DAYS
WILL PRECLUDE APPELLATE REVIEW.** *Roldan
v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v.
Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1174309 (N.D.N.Y.)

(Cite as: 2006 WL 1174309 (N.D.N.Y.))


Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2006.

Bennett v. Hunter
Not Reported in F.Supp.2d, 2006 WL 1174309
(N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)

(Cite as: 2007 WL 946703 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Corey FORD, Plaintiff,
v.
William E. PHILLIPS, Superintendent of Green Haven Correctional Facility; Guiney, Deputy Superintendent; Matthew Miller, Corrections Officer; Franklin W. Middleton, Corrections Officer; S. Phillip, Corrections Officer; D. McClenning, Corrections Officer, J. Erns, Corrections Officer; D. Huttel, Corrections Officer; C. Austin, Corrections Officer; L. Czyzewski, Corrections Officer; R. Myers, Sergeant; D. Carey, Sergeant; John Doe # 1, Corrections Officer; John Doe # 2, Corrections Officer; Joseph T. Smith, Superintendent of Shawangunk Correctional Facility; John Maly, Deputy Superintendent; Bipin Bhavsar, Medical Doctor; Kimbler, Sergeant; Jewett, Sergeant; Alfred Vacca, Inspector General, individually and in their official capacities, Defendants.[FN1]

> FN1. This caption reflects the caption in plaintiff's Complaint. Defendants did not provide the Court with a full, corrected caption.

No. 05 Civ. 6646(NRB).

March 27, 2007.
Corey Ford, Walkill, NY, Plaintiff, pro se.

Efthimios Parasidis, Assistant Attorney General, Office of the Attorney General, State of New York, New York, NY, for Defendants.

MEMORANDUM AND ORDER

BUCHWALD, J.

**\*1** *Pro se* plaintiff Corey Ford ("Ford"), who is currently incarcerated, brings this action against employees of the Department of Correctional Services ("DOCS"), pursuant to 42 U.S.C. § 1983, alleging: (1)

excessive force; (2) denial of recreation, showers, special meals and property; (3) deliberate indifference to a serious medical need; and (4) mail interference, all in violation of his constitutional rights. Ford moved for summary judgment on July 24, 2006 and defendants cross-moved for summary judgment on December 22, 2006.[FN2] For the reasons stated below, we deny Ford's motion for summary judgment and grant defendants' motion for summary judgment in part.

> FN2. Although the title of Ford's motion is "Motion for Partial Summary Judgment", his papers clearly argue for judgment on all of the claims raised in his Complaint. Defendants' motion for summary judgment expressly applies to Ford's entire Complaint.

*BACKGROUND* [FN3]

> FN3. Unless otherwise noted, the following facts are not in controversy.

A. Ford's Attack on Officer Miller

Plaintiff's Complaint arises from events at the Green Haven and Shawangunk correctional facilities in April and May of 2004.[FN4] In the early afternoon of April 14, 2004, at approximately 12:30 p.m., Ford exited his cell without permission when a corrections officer unlocked the door for Ford's cellmate.[FN5] After leaving his cell, Ford headed directly for Officer Miller, who was writing passes for inmates.[FN6] As Ford later admitted,[FN7] Ford then threw hot oil on Officer Miller, burning his face, head, eye, neck, shoulders and chest, and repeatedly stabbed Officer Miller with a homemade shank measuring approximately nine inches in length. As he was attacked by Ford, Officer Miller repeatedly screamed, "Get him off me!"[FN8]

> FN4. Plaintiff is currently incarcerated and serving a sentence of twelve and one-half to twenty-five years, having plead guilty to attempted murder, kidnapping and a weapons violation. *See* Declaration of Efthimios Parasidis ("Parasidis Decl."), dated December 22, 2006.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)

(Cite as: 2007 WL 946703 (S.D.N.Y.))

FN5. *See* Parasidis Decl., Ex. B, FORD 42. Earlier that day, Officer McClenning observed Ford yelling from his cell gate and generally being disrespectful. *Id.* at FORD 39.

FN6. *See id.* at FORD 1, 15, 17-18, 27, 34, 40, 42, 44, 66.

FN7. *Id.,* Ex. E., FORD IG 26-29, 290-295.

FN8. *Id.,* Ex B., April 14, 2004 Statement of Officer J. Erns ("I heard officer Miller begin to scream.... I saw Officer Miller being attacked by an inmate and Officer Miller screaming 'Get him off me Get him off me' ").

Officers Phillips, Middleton and Todriff responded to Officer Miller's call, attempting to restrain Ford.[FN9] After slipping in the oil and falling with Ford to the ground, the officers pried the shank out of Ford's hand, placed him in mechanical restraints, stood him up, and faced him against a wall.[FN10] Once the officers had Ford under control, an ambulance rushed Officer Miller to St. Francis Hospital in Poughkeepsie, New York, where he remained over night.[FN11] Officers Todriff and Middleton were also treated at the St. Francis emergency room for injuries sustained while restraining Ford.[FN12] Ford was later convicted by a jury for his assault on Officer Miller and is currently awaiting sentencing.[FN13]

FN9. *Id.*

FN10. *Id.* at FORD 1, 10-12, 16, 27, 29, 42, 77, 80.

FN11. *Id.* at FORD 45-46.

FN12. *Id.* at FORD 1-2, 21-22, 43.

FN13. *See id.,* Ex. F, FORD 130-131. *See also* Supreme & County Courts of the State of New York, Dutchess County, Certificate of Disposition Indictment (certifying that Ford was convicted of one count of first degree attempted assault, two counts of second degree assault, two counts of third degree criminal possession of a

weapon, and one count of promoting prison contraband in the first degree).

In his Complaint, Ford provides a somewhat different version of the events of April 14, 2004. Specifically, Ford asserts that Officer Miller denied him recreation, an alternative meal, and showers on April 5, 12, 13 and 14 of 2004[FN14] and that, on the morning of April 14, 2004, prior to his attack on Officer Miller, Officers Miller, Erns, and McClenning kicked and punched Ford in the face, head, chest and back without provocation.[FN15] Ford further asserts that later, at 12:30 p.m., approximately the time of Ford's assault on Officer Miller, Officers Miller, Erns, Middleton and Phillips used excessive force against him.[FN16]

FN14. Ford Complaint, received June 20, 2005 at the S.D.N.Y. Pro Se Office, at 6. Ford contends that he is entitled to non-meat meals.

FN15. *Id.* (alleging cruel and unusual punishment, harassment, excessive force, deprivation of outside exercise, threats of bodily harm, and other grievances). As discussed *infra,* these claims are contradicted by statements made and signed by Ford shortly after the putative attack.

FN16. *Id.* at 7.

Thus, Ford does not directly challenge the facts provided above, but adds that Officer Miller deprived him of certain entitlements over four days, that Officers Miller, Erns and McClenning used excessive force against him on the morning of April 14, 2004, and that Officers Miller, Erns, Middleton and Phillips used excessive force against him again when he attacked Officer Miller.

B. Ford's Escort to Special Housing

**\*2** After Ford attacked Officer Miller, Officers Huttel, Czyzewski, Myers and Austin escorted Ford to Special Housing (also known as "SHU"). During the escort, defendants contend that plaintiff was combative and uncooperative, kicking Officer Huttel and attempting to kick the other officers.[FN17] As is evident from a videotape

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)

(Cite as: 2007 WL 946703 (S.D.N.Y.))

showing parts of Ford's transfer to Special Housing, Ford fell twice during his escort and was picked up by the officers each time.[FN18] Ford claims that he was again the victim of excessive force during this transfer, calling the officers' conduct "unwarrantly malicious sadistic and unprovoked" and alleging that his head was repeatedly rammed into a wall and steel bars, and that he was punched and kicked in the face and back.[FN19]

FN17. Parasidis Decl., Ex. B, FORD 2, 42, 48, 52, 60-63; Ex. H (videotape of officers escorting Ford to Special Housing).

FN18. *Id.*

FN19. Compl. at 6-10. Apparently quoting the report from his medical examination, Ford asserts that he sustained "extreme and numerous abriasions (sic), with bleeding Lt temple (sic), redenes abriasion (sic) on both right and left sides of plaintiff face. 2 redden abriasions areas (sic) RT upper chest, superficial scratches on RT upper back" from the April 14 attacks.

C. Ford's Post-Incident Medical Treatment

Upon his arrival at Special Housing, Ford was examined by medical staff, which found him to have a minor bruise on his forehead; reddened abrasions with a slight amount of bleeding on his left temple; reddened abrasions on his right upper chest, abdomen, and right underarm; and superficial scratches on his right upper back.[FN20] The staff found no other injuries and the medical records indicate that Ford did not suggest that he had any other injuries at that time.[FN21]

FN20. Parasidis Decl., Ex. B, FORD 2, 8-9 (April 14, 2004 Physical Examination of Corey Ford), 51-53.

FN21. *See id.,* Ex. C, FORD GRIEVANCE 43-46 (SHU Entrance Exam, stating "Use of force exam done.").

During the next few weeks, Ford received additional medical attention. On the morning of April 16, for instance, Ford was examined by a triage nurse and complained the he was urinating and spitting up blood.[FN22]

The nurse scheduled an appointment for Ford to meet with a doctor and he was examined by Dr. Bipin Bhavsar that afternoon.[FN23] After examining Ford, Dr. Bhavsar ordered a urine analysis[FN24] and prescribed Tylenol.[FN25] Dr. Bhavsar also treated Ford on April 21, 2004, as Ford again complained of blood in his urine, and ordered a second urine analysis.[FN26] Both urine analyses found evidence of blood.[FN27]

FN22. *Id.,* Ex. B, 47; Ex. D, FORD MEDICAL 26.

FN23. *Id.*

FN24. *Id.;* Ex. G (Bhavsar Decl.) at 1.

FN25. *Id.*

FN26. *Id.* at FORD MEDICAL 25; Ex. G at 2.

FN27. *Id.*

On April 29, 2004, medical staff examined Ford because Ford complained of pain in his wrists.[FN28] The staff determined that Ford had "no obvious loss of dexterity."[FN29] The next day, on April 30, 2004, Dr. Bhavsar reexamined Ford, observing that Ford's ribs and abdomen had no tenderness, that his glands were not enlarged, that his abrasions were healed, and that his wrist was not swollen or restricted in movement.[FN30] As Ford still complained of blood in his urine, Dr. Bhavsar ordered a third urine analysis and ordered that x-rays be taken of Ford's hands as a precaution.[FN31] The x-rays were taken on May 3, 2004 and revealed no "fracture, dislocation or arthritic change."[FN32]

FN28. *Id.*

FN29. *Id.*

FN30. *Id.* at FORD MEDICAL 24; Ex. G at 9.

FN31. *Id.* at FORD MEDICAL 37.

FN32. *Id.* at FORD MEDICAL 41.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)

(Cite as: 2007 WL 946703 (S.D.N.Y.))

Finally, since Ford continued to complain of pain and other problems, and since the urine tests persisted in revealing blood at level "3+", Dr. Bhavsar ordered that Ford undergo a CAT-scan of his abdomen and kidneys on May 7, 2004.[FN33] The CAT-scan results were negative.[FN34] In addition to this and the other treatments he received, Ford had daily opportunities for medical assistance from the Special Housing nurse who, in accordance with DOCS policy, made regular rounds of the entire Special Housing unit.[FN35]

FN33. Id. at FORD MEDICAL 22-3, 69; Ex. G at 2.

FN34. Id. (Ford's "renal parenchyma and collecting system [were] normal on all series" and there was "no evidence of renal stone, filling defect, or mass lesion". Ford's liver, adrenals, pancreas, spleen and bowels were also found to be "unremarkable". No free fluid or air was detected and, more generally, there was no evidence of any medical abnormality).

FN35. Id., Ex. C, FORD GRIEVANCE 34.

*3 Notwithstanding the medical attention he received, Ford contends that he was denied necessary medical treatment during April and May of 2004.[FN36] Specifically, he asserts that he "was denied medical treatment on arrival to [Special Housing]" and, despite numerous complaints made to Sgt. Jewett, Sgt. Kimbler and others that he was in excruciating pain, "never received medical attention".[FN37] Ford claims that, to this day, he suffers from a weak bladder and leaks blood from his penis on occasion.[FN38]

FN36. See e.g. Ford' Motion for Partial Summary Judgment, dated July 24, 2006, at 18.

FN37. Id.

FN38. Id.

D. Post-Incident Restrictions on Ford

Ford was placed under certain restrictions upon his admission to Special Housing. According to defendants, Ford was under a restraint order as a result of his assault on the staff at Green Haven and, accordingly, was not permitted out-of-cell activities.[FN39] As well, Ford was initially denied certain property because of the danger he posed to himself and to others.[FN40] The order restraining Ford remained in effect until May 3, 2004, and the order regarding Special Housing property remained in effect until April 25, 2004.[FN41] Ford was permitted to leave his cell on April 20, 2004 to retrieve his personal property and, according to defendants' affidavits, was permitted out of his cell to shower on a regular basis starting on April 23, 2004.[FN42]

FN39. Parasidis Decl., Ex. C, FORD GRIEVANCE 34-35, 50-57.

FN40. Id.

FN41. Id.

FN42. Id.

Ford offers a slightly different, if only more specific, version of these restrictions. Ford repeatedly claims that, in violation of his rights, his cell was covered with plexi-glass and he was denied bed sheets, a pillow case, a towel, a wash cloth, soap, toothpaste, a toothbrush, pens and writing paper.[FN43] He also claims that he was not permitted to shower or to have outside recreation for fourteen days.[FN44] Ford states that he complained of these deprivations to Sgts. Kimbler and Jewett on April 15, 2004, the day after his attack on Officer Miller and before some of the deprivations allegedly occurred, but that the Sargeants ignored his complaints.[FN45]

FN43. See e.g. Complaint at 10.

FN44. Id.

FN45. Id. at 10-11.

E. Ford's Mail Watch

Following his attack on Officer Miller, Shawangunk officials also implemented a mail watch for Ford pursuant to DOCS policy.[FN46] During the mail watch, DOCS

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)

(Cite as: 2007 WL 946703 (S.D.N.Y.))

employees discovered a letter from Ford in which he boasts about his attack on Officer Miller: "I had to let one of those crazy ass pink boys have a balance kit of steel & an hot oil treatment." [FN47] The mail watch also revealed a letter in which Ford apparently tried to convince his girlfriend and others to improperly influence a witness in his trial for that attack: "I'm trying to establish a way to try & beat this case, some way so (sic) how we have to make Mr. Hill do what we want him to do not what he wants to do." [FN48]

> FN46. Parasidis Decl., Ex. B, 126, 128-129, 131-137; Ex. J, FORD MAIL 1-12.

> FN47. *Id.,* Ex. E, FORD IG 316-324.

> FN48. *Id.,* at FORD IG 316, 325-333.

In his Complaint, Ford contends that Superintendent Joseph T. Smith authorized a mail watch on his personal and legal mail, which prevented Ford's girlfriend from receiving Ford's mail and prevented Ford from receiving mail from his girlfriend. [FN49] Ford further claims that DOCS employees and others conspired to deprive him of his privacy and to hamper his access to the courts by confiscating his incoming and outgoing legal mail, stating that incoming legal documents were taken and never returned to him. [FN50]

> FN49. Compl. at 13-14.

> FN50. *Id.* at 15.

## *DISCUSSION*

### A. Legal Standard

**\*4** Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 55(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); *Gallo v. Prudential Residential Srvcs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). The moving party bears the initial burden of "informing the district court of the basis for its motion" and of identifying the matter that "it believes demonstrates the absence of a genuine issue of material fact." *Celotex,*

477 U.S. at 323. In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

When, as here, both parties seek summary judgment, the Court must consider each party's motion on its own merits, "taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Schwabenbauer v. Board of Educ.,* 667 F.2d 305, 314 (2d Cir.1981); *accord Abrams v. United States,* 797 F.2d 100, 103 (2d Cir.1986). However, the submissions of a *pro se* plaintiff are held to a less stringent standard than those drafted by an attorney and must be liberally construed for the benefit of the plaintiff. *Estelle v. Gamble,* 429 U.S. 97 (1976); *Patrick v. LeFevre,* 745 F.2d 153, 160 (2d Cir.1984).

### B. Analysis

### 1. Eleventh Amendment

As a preliminary matter, defendants note that they are sued for damages in their official as well as individual capacities and argue that Ford may only sue defendants for damages in their individual capacities. Defendants are correct. *See Al- Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989) ("[S]ection 1983 claim for damages against a state official can only be asserted against that official in his or her individual capacity"); *accord Davis v. New York,* 316 F.3d 93 (2d Cir.2002); *see also Kentucky v. Graham,* 473 U.S. 159 (1985) (a claim for damages against state officials in their official capacity is considered to be a claim against the state and is therefore barred by the Eleventh Amendment); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89 (1984) (agencies and departments of the state are entitled to assert the state's Eleventh Amendment immunity); *Santiago v. New York State Dep't of Corr. Servs.,* 945 F.2d 25, 28 n. 1 (2d Cir.1991) (department that is an agency of the state is entitled to assert Eleventh Amendment immunity); *cf. Hafer v. Melo,* 502 U.S. 21, 27-31 (1991) (Eleventh Amendment does not bar actions for damages against state

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)

(Cite as: 2007 WL 946703 (S.D.N.Y.))

officials sued in their personal or individual capacities). Accordingly, Ford's claims for damages against defendants in their official capacities are dismissed.

2. Excessive Force

**\*5** Regarding his claims for excessive force, Ford describes three instances of abuse in his Complaint, which he alleges occurred: (1) on the morning of April 14, 2004; (2) after his assault on Officer Miller; and (3) during his transfer to Special Housing. Defendants argue that Ford was not the victim of excessive force and that any force used against him was appropriate given his attack on Officer Miller and his combative behavior following that attack.

To prevail on a claim for excessive force constituting cruel and unusual punishment under the Eighth Amendment, a plaintiff must show the unnecessary and wonton infliction of pain. *Hudson v. McMillian et al.,* 503 U.S. 1 (1992) (citing *Whitley v. Albers,* 475 U.S. 312 (1986)). Whether an infliction of pain is unnecessary and wanton depends on the context in which force is used. *Whitley,* 475 U.S. at 320. Where prison officials use force to quell a prison disturbance, the question is whether force was applied in a good faith effort to maintain or restore discipline or, instead, if it was applied maliciously and sadistically for the purpose of causing harm. *Id.* at 320-21; *Hudson,* 503 U.S. at 7 (prison officials must act quickly when responding to a prison disturbance, balancing the need to "maintain and restore discipline" against "the risk of injury to inmates."). When an individual attacks with a deadly weapon, for instance, corrections officers may respond with commensurate force. *Diggs v. New York Police Dep't et al.,* 2005 U.S. Dist. LEXIS 38244, \*1 (E.D.N.Y.2005) (citing *Tennessee v. Garner,* 471 U.S. 1, 11-12 (1985) and *Estate of Kenneth Jackson v. Rochester,* 705 F.Supp. 779, 783 (W.D.N.Y.1989)).

a. The Morning of April 14, 2004

Ford alleges that Officers Miller, Erns and McClenning, without provocation, kicked and punched him in the face, head, chest and back, while using racial epithets, on the morning of April 14, 2004. Defendants respond that Ford was abusive and disruptive on the morning of April 14, 2004 and that corrections officers

"verbally counseled" Ford without using any force.[FN51]

FN51. *See e.g.* Parasidis Decl., Ex. E., FORD IG 303.

Having reviewed the parties' submissions and the evidence presented to the Court, we hold that no reasonable jury could find in favor of Ford on this claim. First, Ford's evidence is very weak and primarily suggests only a *de minimus* use of force. Ford offers no direct medical evidence supporting his claim[FN52] and his documentary evidence is limited to affidavits from other inmates, which contradict one another and are otherwise problematic.[FN53] The only affidavit submitted by Ford that offers any specific allegations of potentially excessive force is signed by inmate Eric Tolliver. That affidavit states, somewhat ambiguously, that Tolliver saw Officers Miller and McClenning attack Ford with "solid fist and kicks" after 9:40 a.m. on April 14, 2004.[FN54] However, in addition to being ambiguous in its description of the morning's events, Tolliver's affidavit suffers from the following problems: (1) it contradicts statements in the other affidavits submitted by Ford, including inmate Shaun Harris' sworn recollection of what Ford told Harris about that morning; (2) it makes no mention of Officer Erns, in contrast to the version of the events offered in Ford's Complaint; and (3) it was signed and dated by Tolliver on September 12, 2006, more than two years after the incident allegedly took place.

FN52. Ford could have sustained any and all of the medical injuries evidenced in the record during his attack on Officer Miller or during his transfer to Special Housing.

FN53. Specifically: the May 19, 2004 affidavit of Shaun Harris offers no personal knowledge of the alleged attack, stating only that Ford told Harris that Officer Miller had pushed Ford into his cell after yelling at Ford; the July 22, 2004 affidavit of Jermaine Page offers personal knowledge of Ford being "up on the wall" on April 14, 2004, but says nothing about a push or any other violence; the September 14, 2004 affidavit of Jesse Guess states that Mr. Guess saw Officer Miller push Ford into his cell, consistent with what Harris claims Ford told

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)

(Cite as: 2007 WL 946703 (S.D.N.Y.))

Harris, but inconsistent with Jermaine Page's statement; the April 28, 2004 affidavit of Ralph Nieves only alleges general harassment of Ford by Officer Miller; and the August 24, 2004 affidavit of Allen Griffin generally alleges that he saw Officer Miller "verbally, mentally, emotionally, and physically" assault Ford on April 14, 2004, but does not specify whether the assault occurred in the morning or in the afternoon on April 14 and does not specify what kind of physical assault took place. The Court found these affidavits amidst a stack of disorganized papers in the case file kept by the clerk's office.

FN54. Paragraph 8 of the Tolliver affidavit states exactly as follows: "On April 14, 2004 I was out of my cell as usual to clean up after keeplock recreation went out approx. 9:30 AM, I was talking to the dubble (sic) bunk cell above 143, 4 company, for about 10 minutes, The cell on 4-company 143 opened up around 9:40 AM I locked in and called the guy whom I heard his name was "C" which I found out was actually Corey Ford, I told him to watch himself I seen C.O. Miller use the exact tactics that I warned [him] about yesterday, the Guy Corey Ford was called over to the [B] post first and the gate to 4-company was then locked, I seen solid fist and kicks being thrown by officer M. Miller and c.o. McClenning connecting against the inmate Corey ford FACE and body, The inmate was yelling for help, I witness the whole excessive force incident."

*6 Second, defendants offer evidence that Ford faced no excessive force on the morning of April 14, 2004, having submitted a number of sworn affidavits to this effect,[FN55] and Ford's own statements, made shortly after the alleged abuse, confirm this position. In a statement signed on April 14, 2004, and in another statement signed on April 15, 2004 ("Ford's Post-Incident Statements"), Ford does not accuse Officers Miller, McClenning and Erns of punching and kicking him during the morning of April 14, 2004. On the contrary, Ford makes no mention of any force used by Officers McClenning and Erns and

only alleges that Officer Miller used a *de minimus* amount of force against him: "At this point, Miller slapped me on each side of my face ..."[FN56] *Candelaria v. Coughlin,* 787 F .Supp. 368, 374 (S.D.N.Y.1992) (use of force *de minimus* when officer "pushed his fist against [plaintiff's] neck so that [he] couldn't move and was losing [his] breath"), *aff'd* 979 F.2d 845 (2d Cir.1992).

FN55. *See supra* note 51.

FN56. Parasidis Decl., Ex. E, FORD IG 26-28 (quoting Ford's April 14, 2004 statement); *see also id.* at FORD IG 290-93 ("This is where he yells at me and slap me (sic) across my face"), dated April 15, 2004 at 9:00 a.m.

Third, given the different versions of the April 14 events offered by Ford and the inconsistencies between the affidavits submitted by Ford to support his Complaint, no reasonable jury could credit Ford's latest allegations. *See e.g. Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 572 (2d Cir.1991) (plaintiff may not "create a material issue of fact by submitting ... affidavit[s] disputing his own prior sworn testimony" in order to defeat defendants' summary judgment motion) (quoting *Mack v. United States,* 814 F.2d 120, 124 (1987)); *Jeffreys v. City of New York,* 426 F.3d 549, 553 (affirming district court's grant of summary judgment for defendants in section 1983 case brought by *pro se* prisoner-where plaintiff relied almost exclusively on his own testimony, district court could make assessments about whether a reasonable jury could credit plaintiff's testimony); *Shabazz v. Pico,* 994 F.Supp. 460, 470 (S .D.N.Y.1998) (Sotomayor, J.) (granting summary judgment for defendants where "plaintiffs allegations of the events at issue [were] replete with inconsistent and contradictory statements" and "plaintiff's version of the events ... [had] undergone at least one significant revision"). Ford has offered no fewer than four versions of what happened on the morning of April 14, 2004 through his submissions to the Court, at least three of which allege only a *de minimus* use of force and many of which, as discussed, are inconsistent with one another.[FN57] Moreover, Ford's signed and personal version of the events, without any explanation from Ford, has undergone at least one significant and self-serving revision, changing from a story

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)

(Cite as: 2007 WL 946703 (S.D.N.Y.))

about a *de minimus* use of force to one about a brutal, unprovoked beating.

> FN57. *See supra* note 53. Versions of the events offered in Ford's submissions include: (1) Ford was pushed into his cell; (2) Ford was held up on a wall; (3) Ford was slapped in the face by Officer Miller; (4) Ford was punched and kicked by Officers Miller, McClenning and Erns; and (5) Ford was punched and kicked by Officers Miller and McClenning.

In sum, given the sheer lack of evidence to support Ford's new version of the April 14 morning events, the substantial evidence against that version, and the fact that Ford's initial, signed statements contradict the allegations in his Complaint and confirm defendants' position, no reasonable jury could find in favor of Ford on this claim. Accordingly, we deny Ford's motion for summary judgment and grant summary judgment in favor of defendants.

b. Attack on Officer Miller

**\*7** Regarding the afternoon of April 14, 2004, Ford alleges that Officers Miller, Erns, Middleton and Phillips kicked and punched him, and that Sgt. Carey watched this happen without taking action. Having reviewed the parties' submissions, we hold that, even accepting Ford's allegations as true, no reasonable jury could find that defendants responded with excessive force when attempting to save Officer Miller.

The genesis of Ford's claim is his own brutal attack on Officer Miller. As Ford admits, he rushed Officer Miller, threw hot oil on his face and then stabbed him repeatedly with a nine inch shank. Given this use of potentially lethal force, and given that defendants had to react quickly to save Officer Miller, defendants were legally authorized to respond to Ford with significant force of their own, perhaps including deadly force. *See e.g. Tennessee,* 471 U.S. at 11-12; *see also Diggs v. New York Police Dep't et al.,* 2005 U.S. Dist. LEXIS 38244, \*1 (E.D.N.Y.2005). Most significantly, Ford does not allege that defendants used force even commensurate with the force that he used against Officer Miller. Instead, he only alleges that the officers punched and kicked him as they got him under

control.[FN58] No reasonable jury could deem this force to have been wanton, unnecessary or otherwise excessive under the circumstances. Accordingly, we deny summary judgment for Ford and grant it for defendants.[FN59]

> FN58. *See e.g.* Parasidis Decl., Ex. B, FORD 1-2, 22, 43.

> FN59. Additionally, the officers are protected by the doctrine of qualified immunity for this allegation of excessive force as it would be objectively reasonable to respond to Ford's apparent attempt to seriously injure or kill Officer Miller with force much greater than that alleged by Ford. *See e.g. Cerrone v. Brown,* 246 F.3d 194, 199 (2d Cir.2001) (officers entitled to qualified immunity as it was objectively reasonable for them to believe that their actions were lawful at the time of the challenged act).

c. Transfer to Special Housing

Regarding his transfer to Special Housing, immediately following his attack on Officer Miller, Ford alleges that he was kicked and punched by the officers escorting him, that Sgt. Myers punched him in the right side of his face, that the officers tried to break his wrist while he was on the elevator to Special Housing, that the officers repeatedly rammed his head into the steel bars at the entrance to Special Housing, and that the officers rammed his head into the wall of the strip/frisk room.[FN60] Defendants respond that they did not use excessive force against Ford and that Ford was uncooperative and violent throughout the transfer to Special Housing.

> FN60. Compl. at 9.

We deny Ford's motion for summary judgment on this claim. Ford offers no meaningful evidence, other than his own version of the events, to support the putative attacks during his transfer to Special Housing, and the medical evidence submitted by defendants tends to contradict Ford's claims. For instance, Ford asserts that his face and head were repeatedly rammed into steel bars, that the officers tried to break his wrist, and that Ford was otherwise beaten severely throughout the transfer-beatings that ostensibly followed Ford's alleged beating that

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)

(Cite as: 2007 WL 946703 (S.D.N.Y.))

morning at the hands of Officers Miller, Erns and McClenning as well as Ford's alleged beating during his attack on Officer Miller. Yet, the medical record of Ford's injuries upon his entrance to Special Housing reveals only the minor abrasions and scratches discussed *supra*, and the subsequent CAT-scan and x-rays revealed no injuries to Ford's abdomen or wrist. Moreover, Ford's transfer to Special Housing came immediately after, and because of, his assault on Officer Miller, making it objectively reasonable for the officers to use some amount of force to keep him under control.

**\*8** Despite the apparent weakness of Ford's evidence regarding this claim, we also deny defendants' motion for summary judgment. Defendants offer the medical evidence, which tends to contradict Ford's story, their sworn affidavits that Ford was not beaten during the transfer, their claims that Ford was combative throughout the transfer, and a video tape of the transfer that shows no violence being committed against Ford (but also does not show Ford being noticeably combative). Nevertheless, this evidence is not sufficient to preclude a reasonable jury from finding in Ford's favor. First, Ford offers his own sworn statement of the events in his Complaint, which describes a malicious, unprovoked beating accomplished while using racial epithets and, unlike his version of the morning attack, this version is consistent with Ford's Post-Incident Statements.[FN61]

> **FN61.** Ford makes no mention of abuse during his transfer to Special Housing in his April 14, 2004 statement. However, in his April 15, 2004 statement, Ford notes, "I also want to tell you about how I was assaulted in the elevator on my way to SHU. I was slammed in to the wall and taken to the floor a number of times. I did not resist. They had my hands cuffed behind my back and my pants were falling down. I had a hard time standing up-so I fell to the floor. When this happened they punched me in the balls. I think I got the bump on my head when they threw me into the wall....".

Second, although the Court might find the low level of injuries in Ford's medical reports to strongly contradict Ford's claims, we cannot rely on that evidence alone to

enter summary judgment against him. *See e.g. Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999) (genuine issues of material fact existed concerning what transpired after appellant was handcuffed and whether the guards maliciously used force against him; district court mistakenly concluded that because appellant's injuries were not severe, appellant's claim failed as a matter of law); *Estelle,* 429 U.S. at 102-105 ("inmates have the right to be free from the 'unnecessary and wanton infliction of pain' at the hands of prison officials").[FN62]

> **FN62.** As well, the evidence that Ford had blood in his urine tends to support his allegation that he was punched and kicked in the back. If defendants needlessly punched Ford in the back causing him to suffer internal bleeding, they violated his Eighth Amendment rights.

Finally, although the video tape shows Ford being escorted to and from the elevator to Special Housing and shows him entering the strip/frisk room and being stripped and frisked without apparent incident, the video has periodic breaks and interruptions. Whereas a complete video might dispel all issues of fact regarding Ford's transfer, an incomplete video cannot.[FN63] Accordingly, summary judgment is denied for defendants as well as for Ford on this claim.[FN64]

> **FN63.** Ford insists that defendants intentionally beat him when the cameras were off and during transitions between cameras. *See* Ford's Motion for Partial Summary Judgment at 8.

> **FN64.** Defendants claim that they are entitled to qualified immunity on all claims raised by Ford. However, the doctrine of qualified immunity, which protects officers in the reasonable exercise of their duties, clearly would not cover a malicious beating as alleged by Ford during his transfer to Special Housing. *See supra* note 59.

d. Due Process

Liberally construed, Ford's Complaint also alleges that the aforementioned uses of excessive force violated his due process rights under the Fourteenth Amendment.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)

(Cite as: 2007 WL 946703 (S.D.N.Y.))

For prisoners, however, the Eighth Amendment "serves as the primary source of substantive protection ... in cases ... where the deliberate use of force is challenged as excessive and unjustified." *Whitley v. Albers,* 475 U.S. 312, 327 (1986). "Any protection that 'substantive due process' affords convicted prisoners against excessive force is, [the Supreme Court] has held, at best redundant of that provided by the Eighth Amendment." *Graham v. Connor,* 490 U.S. 386, 395 (1989). Accordingly, Ford is only entitled to pursue his claims for excessive force under the Eighth Amendment. *Cf. Rodriguez v. Phillips,* 66 F.3d 470, 477 (2d Cir.1995) (in the non-prisoner, non-seizure context, the due process right to be free from excessive force is alive and well). Thus, we grant summary judgment for defendants on this claim.

3. Deprivations

**\*9** Ford also alleges that he suffered a number of deprivations upon being transferred to Special Housing and that these deprivations amounted to cruel and unusual punishment under the Eighth Amendment and to a violation of his due process rights under the Fourteenth Amendment. Defendants argue that Ford has failed to offer sufficient support for these claims.

a. Cruel and Unusual Punishment

"The constitutional prohibition against cruel and unusual punishments is intended to protect inmates from serious deprivations of basic human needs such as adequate food, clothing, shelter and medical care." *Malsh v. Garcia,* 971 F.Supp. 131, 138 (S.D.N.Y.1997). An Eighth Amendment claim challenging prison deprivations requires proof of subjective and objective components. Subjectively, the prison officials must have acted with deliberate indifference toward an inmate's health or safety and, objectively, the inmate's deprivation must have been sufficiently serious to have denied that inmate "the minimal civilized measure of life's necessities." *Branham v. Meachum,* 77 F.3d 626 (2d Cir.1996) (citing *Wilson v. Seiter,* 501 U.S. 294, 297-98 (1997) and *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied* 513 U.S. 1154 (1995)). The "minimal civilized measures of life's necessities" is not a low standard. Indeed, "conditions that are restrictive and even harsh are part of the penalty that criminal offenders pay for their offenses against society." *Anderson v. Coughlin,* 757 F.2d 33, 35

(2d Cir.1985) (internal quotations omitted).

To support his Eighth Amendment claim, Ford alleges a number of deprivations. He complains that, on April 5, 12, 13, and 14, he was denied special meals, outside exercise and showers by Officer Miller and that, upon his arrival at Special Housing and until April 28, he was forced to have a plexi-glass shield on his cell, was denied recreation, was denied showers, did not trust the food given to him on one or two occasions, and was denied various personal items.

Defendants respond that Special Housing prisoners are limited in the number of belongings they may possess, that they are further limited in their recreation and shower privileges, and that these limitations may be extended if members of DOCS staff determine that the inmate poses a threat to himself or to others. [FN65] Defendants further state that Ford's vicious attack on Officer Miller precipitated his placement in Special Housing, that DOCS staff placed the restrictions on Ford expressly in response to that attack, and in response to the danger that Ford posed to himself and to others, and that the restrictions, which were temporary in nature and made in accordance with DOCS policy, did not amount to a constitutional violation.

FN65. See Defendants' Mem. of Law at 10-13.

We agree with defendants that Ford's deprivation claims do not begin to demonstrate deliberate indifference toward Ford's need for the minimal necessities of life. Ford does not allege or explain why the temporary placement of a plexi-glass shield threatens his minimum needs and, as a matter of law, minor and temporary deprivations of property, showers and recreation do not violate the Eighth Amendment. *See e.g. Chapple v. Coughlin,* 1996 U.S. Dist. LEXIS 12960, \*1 (S.D.N.Y 1996) (temporary deprivations of shower, recreation and legal papers "in no way involved the severity of treatment which must be shown to make out a case of cruel and unusual punishment") (citing *Majid v. Scully,* No. 83 Civ. 7409, 1985 WL 1408 \*6 (S.D.N.Y. May 21, 1985) (unpublished)); *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (prisoners must receive nutritiously adequate food that does not endanger their health and safety); *Cruz v. Jackson,* 1997 U.S. Dist. LEXIS 1093 (S.D.N.Y. Feb.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)

(Cite as: 2007 WL 946703 (S.D.N.Y.))

5, 1997) (two weeks without showers, cold food for four weeks and unspecified incidents of receiving rusty drinking water did not violate Eighth Amendment rights) (citing *Williams v. Greifinger,* 918 F.Supp. 91, 95 n. 3 (S.D.N.Y.1996)).

**\*10** Moreover, defendants have provided evidence that the deprivations were not a result of malice or of deliberate indifference to Ford's health or safety but, instead, served legitimate security and safety needs following Ford's attack on Officer Miller and were imposed during a period of time when Ford received food and medical care.[FN66] Accordingly, Ford's motion for summary judgment on his Eighth Amendment claim is denied and summary judgment is granted for defendants.

> FN66. *See e.g.* Parasidis Decl., Ex. C, FORD GRIEVANCE 34-35, 50-57; Ex. I, FORD ORDERS 1-8.

b. Due Process

Ford also suggests that his confinement to Special Housing, given the deprivations discussed above, violated his right to due process under the Fourteenth Amendment. We construe Ford's Complaint as asserting his liberty interest to be free from confinement involving atypical and significant hardships without due process of law.

A prisoner's confinement to Special Housing in a New York prison may implicate that prisoner's legally recognized interest in being free from restraints imposing atypical and significant hardships relative to the ordinary incidents of prison life. *Sandin v. Connor,* 515 U.S. 472 (1995) (thirty days in Special Housing does not, by itself, violate prisoner's due process rights); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) (prisoner failed to demonstrate a significant deprivation of a liberty interest where he spent approximately twelve days in Special Housing and was denied "certain privileges that prisoners in the general population enjoy"); *Lee v. Coughlin,* 26 F.Supp.2d 615 (S.D.N.Y.1996) (Sotomayor, J.) (376 days in Special Housing implicated liberty interest recognized by the State of New York). However, to prevail under section 1983, a plaintiff must allege not only that his confinement to Special Housing implicated a recognized liberty interest, but also that the liberty interest was

infringed without due process of law. *See e.g. Cespedes v. Coughlin,* 956 F .Supp. 454, 469 (S.D.N.Y.1997).

Regarding Ford's claim that he was denied recreation, showers, and a special meal on four occasions before and on April 14, 2004, we deny summary judgment for Ford and grant it in favor of defendants. These minor and temporary denials clearly do not constitute significant hardships implicating a constitutionally protected liberty interest. *See e.g. Frazier,* 81 F.3d at 317. We also deny summary judgment for Ford and grant it for defendants on Ford's claim arising from his confinement in Special Housing.

There are three significant problems with Ford's due process claim based on his confinement in Special Housing. First, it is far from clear that the alleged confinement, even if accurately depicted by Ford, implicates a protected liberty interest given the temporary nature of the deprivations. *See e.g. Frazier,* 81 F.3d at 317. Second, Ford has failed to allege that he was denied due process of law in connection with this ostensible liberty interest. Ford does not allege that he was denied a hearing or that his hearing officer was not objective, and he does not allege that defendants did not explain to him why he faced the deprivations he did. *Cf. Sandin,* 515 U.S. at 487-88 (summary judgment granted for defendants where plaintiff claimed violation of due process because defendants "refus[ed] to allow him to present witnesses at his hearing, and [sentenced] him to disciplinary segregation for thirty days.").

**\*11** Third, although Ford does allege that defendants deprived him of privileges and Special Housing property in violation of DOCS directive 4933, this allegation fails to state a violation of due process. For one, the text of Directive 4933 shows that Ford was not necessarily entitled to the claimed property and privileges under the circumstances of his confinement: "An order depriving an inmate of a specific item, privilege or service may be issued when it is determined that a threat to the safety or security of staff, inmates, or State property exists". Moreover, defendants offer a mass of evidence demonstrating that they followed Directive 4933 with respect to Ford and that Ford received full consideration and a hearing in connection with Directive 4933. A

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)

(Cite as: 2007 WL 946703 (S.D.N.Y.))

"Deprivation Order", dated April 14, 2004 and authorized by Sgt. Maly, for example, states:

> In accordance with 7 NYCRR Section 305.2, you are being deprived of the following specific item(s), privilege(s), or service(s): All out of cell activities (including showers) because it is determined that a threat to the safety or security of staff, inmates or State property exists and for the following specific reason(s): You seriously assaulted a corrections officer. [FN67]

> FN67. Parasidis Decl., Ex E., FORD GRIEVANCE 50. *See also id.* at FORD GRIEVANCE 50-58, 109, 118-20, 126, 128, 129, 131, 132, 133, 134, 135-37, 143; Ex. I, FORD ORDERS 1-8.

A lengthy statement reviewing Ford's April 19, 2004 grievance regarding his Special Housing confinement further provides: "Upon full hearing of the facts and circumstances in the instant case, the action requested herein is hereby denied with clarification to the extent that the matter was investigated and the issue of the complaint has been found to be without merit." [FN68]

> FN68. *Id.* at FORD GRIEVANCE 30.

Since Ford has failed to allege any cognizable violation of due process of law relating to his Special Housing confinement, and since defendants have provided the Court with ample, uncontroverted evidence that Ford received such process, summary judgment is denied for Ford and granted for defendants on this claim. [FN69]

> FN69. We note further that the reasons and bases for Ford's confinement and deprivations in Special Housing should have been obvious to Ford immediately upon his transfer to Special Housing given that they arose immediately after his vicious attack on Officer Miller. Not only would such an attack make guards fearful for themselves and other prisoners should Ford be taken out of his Special Housing cell, but guards would also be fearful that Ford would use any property he obtained to hurt himself or others. In fact, this is the explanation provided in the

deprivation orders and related documents submitted by defendants. *See supra* note 67.

4. Deliberate Indifference to a Serious Medical Need

Ford argues that defendants Joseph Smith, John Maly, Sgt. Kimbler and Dr. Bhavsar violated his constitutional rights by failing to provide adequate medical care for the injuries to his face, head, back, kidneys, groin area and penis during April of 2004. Defendants respond that Ford's pleadings are not sufficient to support a claim for constitutionally deficient medical care.

To maintain a claim for deliberate medical indifference, Ford must prove "deliberate indifference to [his] serious medical needs." *Hathaway,* 37 F.3d at 63 (quoting *Estelle,* 429 U.S. at 102 (medical indifference claim brought by prisoner pursuant to section 1983 alleging violation of Eighth Amendment as applied to the states via Fourteenth Amendment)). This standard requires proof of objective and subjective prongs. *Id.*

The objective prong of the deliberate indifference standard requires proof of a medical deprivation "sufficiently serious" to create a condition of urgency that might produce death, degeneration or extreme pain. *Id.; see e.g. Williams v. Vincent,* 508 F.2d 541 (2d Cir.1974) (easier and less efficacious treatment of throwing away prisoner's ear and stitching the stump may be deliberate indifference); *cf. Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (cut finger with "skin ripped off" is insufficiently serious); *Bonner v. N.Y. City Police Dep't,* No. 99 Civ. 3207, 2000 WL 1171150, at *4 (S.D.N.Y. Aug. 17, 2000) (inability to close hand due to swelling insufficiently serious to constitute Eighth Amendment violation); *Gomez v. Zwillinger,* 1998 U.S. Dist. LEXIS 17713 at *16 (S.D.N.Y. November 6, 1998) (back pain and discomfort not sufficiently serious); *Jones v. New York City Health & Hosp. Corp.,* 1984 U.S. Dist. LEXIS 21694 at *3-4 (S.D.N.Y. November 28, 1984) (deliberate indifference claim dismissed where plaintiff challenged treatment for bruises on head and body).

*12 The subjective prong of the deliberate indifference standard requires proof that the accused defendant knew of and disregarded "an excessive risk to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)

(Cite as: 2007 WL 946703 (S.D.N.Y.))

inmate health or safety". *Hathaway,* 37 F .3d at 66 ("The official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and must also draw the inference."). Specifically, the plaintiff must prove that the accused defendant acted, or declined to act, with a state of mind equivalent to criminal recklessness. *See Boomer v. Lanigan,* 2002 WL 31413804, *1 (S.D.N.Y.2002) (Cote, J.) (unreported) (citing *Hathaway,* 99 F.3d at 553); *Cunningham v. City of New York,* 2006 U.S. Dist. LEXIS 35607 at *6 (S.D.N.Y. June 1, 2006) (mere disagreement between treating physician and patient about course of treatment does not give rise to a constitutional claim).

Having reviewed the pleadings and evidence submitted with the motions for summary judgment, we agree with defendants that Ford cannot prevail on his claim for deliberate medical indifference stemming from his treatment during April and May of 2004. First, most of the injuries asserted by Ford were not sufficiently serious to satisfy the objective prong of the deliberate indifference standard. Ford claims, and the prison's medical reports confirm, that Ford suffered from a minor bruise on his forehead; reddened abrasions with a slight amount of bleeding on his left temple; reddened abrasions on his right upper chest, abdomen, and right underarm; and superficial scratches on his right upper back when he was admitted to Special Housing. Abrasions, a minor bruise, slight bleeding and scratches are not injuries that may produce death, degeneration or extreme pain, and no reasonable jury could find to the contrary. *See e.g. Jones,* 1984 U.S. Dist. LEXIS 21694 at *3-4 (allegations of bruises about head and body do not shock the conscience and are inadequate to state claim for deliberate medical indifference in section 1983 suit). [FN70]

FN70. The remaining injuries claimed by Ford, which might have appeared to be serious upon his initial complaints, also proved not to be serious. Ford complained that he found blood in his urine, that he vomited blood, that he suffered from persistent abdominal and groin pain, that his wrists hurt and that he had headaches and dizzy spells. Within a few weeks, however, Ford ceased to have blood in his urine; his bruises and abrasions were healed or healing normally;

x-rays showed no damage to his wrist; and a CAT-scan revealed no injuries to the organs inside his abdomen or to his abdomen generally, confirming Dr. Bhavsar's finding that Ford had no tenderness in his ribs or abdomen. As well, Ford has not alleged that his vomiting, dizzy spells or headaches, for which there is no objective evidence to begin with, persisted or led to more serious problems, and though Ford claims that he now has a weak bladder, he has not alleged that it is degenerative or causes him extreme pain. *See generally* Parasidis Decl., Ex. G, Bhavsar Decl.

Second, in light of the evidence submitted by defendants, Ford also cannot satisfy the subjective prong of the deliberate indifference standard. Various medical forms submitted by defendants reveal that Ford was evaluated on no fewer than eight occasions between April 14, 2004 and early May of 2004, including examinations by a triage nurse and visits with Dr. Bhavsar, and not including the regular opportunities Ford had to speak with a Special Housing nurse. As Ford admits, Dr. Bhavsar, in addition to examining Ford personally, ordered three different urine analyses, a set of x-rays, and a CAT-scan, calling for the latter two procedures even though Ford's wrist and abdomen showed no apparent signs of problems. Dr. Bhavsar's records further reveal that he explained to Ford the proper course of treatment for his various injuries, that he prescribed Tylenol for his minor injuries, and that he continued to monitor Ford's possible internal injuries, such as the blood in his urine, until those symptoms subsided. [FN71]

FN71. *Id.*

**\*13** As such, no reasonable jury could find that the medical staff demonstrated deliberate indifference to Ford's medical condition and certainly Ford has not offered any evidence to suggest that the medical care he received amounted to criminal recklessness. On the contrary, a reasonable jury would readily find that Ford, in receiving x-rays for a non-swollen wrist with full movement, a CAT-scan for an abdomen showing no tenderness, and three urine tests for a problem that shortly resolved itself, obtained more thorough medical attention

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)

(Cite as: 2007 WL 946703 (S.D.N.Y.))

while incarcerated than he would have outside of prison. For these reasons, we deny Ford's motion for summary judgment and grant defendants' motion for summary judgment on Ford's medical indifference claim.[FN72]

> FN72. Even if one or more officers ignored Ford's complaints on one or more specific occasions, which Ford alleges without offering additional support, the fact that Ford actually received extensive and repeated medical attention demonstrates that those instances of indifference did not deny Ford adequate medical attention. Moreover, to prevail on the subjective element against those officers, Ford would have to demonstrate that the officers knew that Ford actually had a serious injury-as opposed to simply hearing Ford complain of such an injury-and nevertheless ignored it. Ford has not offered any evidence to this effect, beyond that he complained more than once that he suffered from severe pain. He does not, for instance, allege that the officers saw him bleeding or otherwise suffering some clearly serious injury.

5. Mail Interference

Ford further complains that the DOCS staff instituted a mail-watch on his personal mail and confiscated some of his mail in violation of his constitutional rights, denying him access to the courts and preventing him from communicating with his girlfriend. Defendants admit that they instituted a mail watch on Ford following his attack on Officer Miller and argue that Ford has not sufficiently alleged any constitutional violation based on mail interference.

a. Denial of Access to the Courts

In order to state a constitutional claim for denial of access to the courts, a plaintiff must show deliberate and malicious action resulting in an actual injury, such as the dismissal of an otherwise meritorious claim. *Cancel v. Goord,* 2001 U.S. Dist. LEXIS 3440, *16 (S.D.N.Y. Mar. 29, 2001) (plaintiff must show frustration of non-frivolous claim as a result of official action) (citing *Washington v. Jones,* 782 F.2d 1134, 1138 (2d Cir.1986)); *see also Lewis v. Casey,* 518 U.S. 343, 351 (1996); *Monsky v. Moraghan,*

127 F.3d 243, 247 (2d Cir.1997). Actions causing mere delay in a prisoner's ability to work on a legal action or to communicate with the courts do not rise to the level of a constitutional violation. *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) (citing *Jones v. Smith,* 784 F.2d 149, 151-52 (2d Cir.1986)).

We agree with defendants that Ford cannot prevail on his denial of access claim. Ford's only allegations that defendants' interference with his mail caused him an actual legal injury are his vague statements that the interference made him lose papers that were "very important" to his motion to set aside the verdict in his criminal trial and that the interference hurt his preparation for sentencing.[FN73] Ford has not alleged that he missed any deadlines or faced any other, specific legal injuries as a result of the alleged interference, and the mere suggestion, without any supporting argument or evidence, that Ford would have succeeded on his motion to set aside the verdict or that he would have received a lighter sentence but-for defendants' mail-watch clearly does not state that Ford lost an otherwise meritorious claim.[FN74] This is especially true in light of Ford's conviction for the offense charged, the substantial evidence supporting that conviction discussed *supra,* the fact that Ford has not yet been sentenced for his attack on Officer Miller, and the fact that Ford, far from proceeding *pro se,* has been represented by counsel throughout his criminal and post-trial proceedings.[FN75] Thus, we deny Ford's motion for summary judgment on this claim and grant summary judgment in favor of defendants.

> FN73. *See* Ford Brief at 22-23; *see also* Complaint at 25.

> FN74. Ford also generally alleges that he was denied the right to appear before a grand jury. However, Ford does not explain how interference with his mail caused this denial and he has also submitted documents to the Court suggesting that he did not intend to appear before the grand jury in his criminal case. *See infra* note 75 at 3-4.

> FN75. *See* March 16, 2006 Order of Judge Hayes at 2-3 (Ford was initially represented by Assistant Public Defender James Hill and was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)

(Cite as: 2007 WL 946703 (S.D.N.Y.))

later represented by Assistant Public Defenders George Hazel and David Martin. Kenneth J. Roden, Esq. represented Ford in connection with his CPL §§ 330.30 and 440.10 motions).

b. First Amendment

   *14 Ford's Complaint does not expressly assert a First Amendment claim based on interference with his non-legal mail, but a liberal reading of that document suggests that Ford intended to do so since he complains that DOCS staff took mail going to and coming from his girlfriend.[FN76] In order to state a First Amendment claim based on mail interference, a prisoner must show that the interference either did not further one or more substantial government interests, such as security, order and rehabilitation, or that the interference was greater than necessary to the protection of that interest. Davis, 2003 U.S.App. LEXIS 13030 at *8-10 (citing Washington v. James, 782 F.2d 1134 (2d Cir.1986)); U.S. v. Felipe et al., 148 F.3d 101 (2d Cir.1998) (interception of prison correspondence does not violate First Amendment if prison officials had "good or reasonable cause" for inspection) (citing U.S. v. Workman, 80 F.3d 688, 699 (2d Cir.1996) ("We think it clear that-at least where prison officials have reasonable cause for suspicion-surveillance of inmate mail is unobjectionable; investigation and prevention of illegal activity among inmates is "a legitimate penological interest, which has a logical connection to the decision to impose a mail watch on a prisoner").

       FN76. At times in Ford's submissions, he also complains of losing mail to his spouse. It is not entirely clear whether the spouse and girlfriend to whom Ford refers are the same person, but the pleadings, taken together, strongly suggest that this is the case.

   We agree with defendants that no reasonable jury could find for Ford on his First Amendment claim. To the extent that Ford complains about a mail watch, it is evident from defense submissions and from the facts discussed supra that defendants had legitimate reasons for monitoring Ford's mail, namely: (1) to investigate Ford's assault on Officer Miller; (2) to prevent Ford from instigating further violence following that assault; and (3) to monitor efforts by Ford to improperly influence his trial

for that assault.[FN77] In fact, the mail watch revealed one letter in which Ford admits to stabbing and throwing hot oil on Officer Miller, which proved to be useful to the prison's investigation of that attack, and at least one letter wherein Ford discusses and recommends efforts to improperly influence a witness in his trial. [FN78]

       FN77. See Parasidis Decl., Ex. C, FORD GRIEVANCE 126, 128-29, 131-37; Ex. J, FORD MAIL 1-12; Ex. E, FORD IG 316-24.

       FN78. Id.

   Moreover, although destroying Ford's incoming and outgoing mail would likely go beyond the measures necessary to protect the prison's interests in security and in investigating Ford's assault, Ford has failed to plead any instance of mail interference wherein defendants improperly confiscated his mail. Ford generally alleges that defendants took mail going to and from his girlfriend, but he does not allege any specific occurrence of confiscation and does not specify whether DOCS staff confiscated just the two letters discussed above or whether they took other letters as well. Clearly, if defendants only confiscated the letters admitting to the assault on Officer Miller and attempting to improperly influence Ford's trial for that assault, the confiscation did not go beyond what was necessary to protect the prison's legitimate penological interests. Without any specific allegation regarding some other confiscation by DOCS staff, without any evidence offered to support such an allegation, and given defendants' affidavits and documents stating that defendants merely implemented an appropriate mail watch in accordance with DOCS policies and procedures,[FN79] no reasonable jury could find that defendants violated Ford's constitutional rights by improperly interfering with his non-legal mail.

       FN79. See e.g. Parasidis Decl., Ex C., FORD GRIEVANCE 128-29, 131-37; Ex. J, FORD MAIL 1-12.

   *15 Accordingly, Ford has not sufficiently alleged any violation of his rights regarding the mail to state a constitutional claim. Ford's summary judgment motion for his mail claims is denied and summary judgment is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)

(Cite as: 2007 WL 946703 (S.D.N.Y.))

granted in favor of defendants.

6. Responsibility of Individual Defendants

Defendants' Memorandum of Law concludes by arguing that Ford fails to allege that certain defendants were personally involved in or responsible for the constitutional violations he alleges, entitling those defendants to judgment as a matter of law. Specifically, defendants argue that Ford fails to allege: (1) that Sgt. Carey, Superintendent Phillips and Sgt. Guiney used any force against him; (2) that Inspector Vacca violated his constitutional rights by ordering a mail watch; and (3) that Sgt. Kimbler and Sgt. Jewett are responsible to him for any deliberate indifference to his medical needs. Defendants are correct that Ford must allege and support personal involvement in the constitutional violations to prevail against these defendants. *See e.g. Woods v. Goord,* 2002 U.S. Dist. LEXIS 7157, *23 (S.D.N.Y.2002) (Section 1983 plaintiff must allege personal involvement of each defendant); *see also Montero v. Travis,* 171 F.3d 757, 761-62 (2d Cir.1999) (requiring allegation of direct personal involvement against supervisory official to state section 1983 claim) (citing *Sealey v.. Giltner,* 116 F.3d 47, 51 (2d Cir.1997)).

Having reviewed Ford's submissions, we agree that Sgt. Carey, Superintendent Phillips and Superintendent Guiney are entitled to summary judgment. Ford does not accuse these defendants of using excessive force against him. We also agree that Inspector Vacca is entitled to summary judgment given that we grant defendants' motion for summary judgment on Ford's mail interference claims, and that Sgts. Kimbler and Jewett are entitled to summary judgment on Ford's claims for medical indifference and for lack of due process.

*CONCLUSION*

For the reasons stated above, we deny all aspects of Ford's motion for summary judgment and grant summary judgment for defendants on all of Ford's claims except for his excessive force claim arising from his transfer to Special Housing on April 14, 2004 .[FN80] Thus, Ford may pursue his claim for excessive force against defendants C.O. Huttel, C.O. Austin, C.O. Czyzewski and Sgt. Myers,[FN81] but his Complaint is dismissed as to the

following defendants: Superintendent Phillips, Deputy Superintendent Guiney, C .O. Miller, C.O. Middleton, C.O. McClenning, C.O. Erns, Sgt. Carey, Superintendent Smith, Deputy Superintendent Maly, Dr. Bhavsar, Sgt. Kimbler, Sgt. Jewett and Inspector General Vacca.

FN80. Ford raises what purports to be an equal protection argument, for the first time, in his Motion for Partial Summary Judgment, dated July 24, 2006, at 26-27. The argument offers only minimal facts and conclusions of law, without providing any reason or argument as to why those facts support a violation of Ford's right to equal protection. To the extent that Ford seeks summary judgment on an equal protection claim, summary judgment is denied.

FN81. Although we do not grant summary judgment for defendants on Ford's one remaining claim, we note that our reluctance to do so should *not* be taken to reflect any view that Ford will prevail on that claim. On the contrary, Ford has only limited evidence to support the claim and defendants have considerable evidence against it. Moreover, for the plaintiff's edification, even if a jury were to find in his favor on that claim, it would be entitled to award Ford only nominal damages-as low as $1-if it found that Ford deserved nothing more.

IT IS SO ORDERED.

S.D.N.Y.,2007.

Ford v. Phillips
Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



710 F.Supp.2d 248

(Cite as: 710 F.Supp.2d 248)

**H**

United States District Court,

N.D. New York.
Wlodzimierz J. DZWONCZYK, Plaintiff,
v.
SYRACUSE CITY POLICE DEPARTMENT; Syracuse
Housing Authority Security; John Doe, Syracuse
Housing Authority Detective; Gary Miguel, Chief of
Police, Syracuse City Police Department; Onondaga
County Sheriff's Office; Onondaga County Justice
Center; John Does, in Their Official and Individual
Capacities, Defendants.
No. 5:08-CV-00557 (NPM/DEP).

Dec. 22, 2008.

**Background:** Arrestee brought action alleging § 1983
claims against, inter alia, county sheriff's office, county
correctional facility, and city police department and chief
of police, asserting violation of Fourth, Fifth, and
Fourteenth Amendments, as well as state common-law tort
claims. County defendants move to dismiss and city
defendants moved for judgment on the pleadings.

**Holdings:** The District Court, Neal P. McCurn, Senior
District Judge, held that:

(1) city and county law enforcement officers' failure to
read arrestee his *Miranda* rights did not violate arrestee's
right against self-incrimination;

(2) use of force by city officers in course of arrest was not
excessive;

(3) no exigent circumstances existed as would permit
warrantless in-home arrest;

(4) arrestee's consent to arresting officer's entry into home
was valid;

(5) city officers had probable cause to make arrest for
second degree aggravated harassment;

(6) alleged strip search of arrestee after admission to
correctional facility was unreasonable;

(7) correctional facility officers did not violate arrestee's
Fourteenth Amendment Due Process rights;

(8) correctional facility officers did not unreasonably
endanger detainee's physical safety; and
(9) unlawful strip search, without more, could be
considered extreme and outrageous conduct giving rise to
liability on claim for intentional infliction of emotional
distress (IIED).

Ordered accordingly.

West Headnotes

**[1] Federal Civil Procedure 170A** 🗝 **1832**

170A Federal Civil Procedure

    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
        170AXI(B)5 Proceedings
            170Ak1827 Determination
                170Ak1832 k. Matters considered in
general. Most Cited Cases
    An arrest report is a matter of public record that may
be considered on motion to dismiss for failure to state a
claim upon which relief can be granted. Fed.Rules
Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[2] Civil Rights 78** 🗝 **1394**

78 Civil Rights

    78III Federal Remedies in General
        78k1392 Pleading
            78k1394 k. Complaint in general. Most Cited
Cases
**Federal Civil Procedure 170A** 🗝 **1772**

170A Federal Civil Procedure

    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
        170AXI(B)3 Pleading, Defects In, in General
            170Ak1772 k. Insufficiency in general. Most
Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

710 F.Supp.2d 248

(Cite as: 710 F.Supp.2d 248)

A motion to dismiss for failure to state a claim upon which relief can be granted may not be granted so long as the complaint includes enough facts to state a claim to relief that is plausible on its face; this requires the court to apply a flexible "plausibility standard" which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible, but does not require a heightened pleading standard for civil rights claims. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[3] Federal Civil Procedure 170A** &#9755; **657.5(2)**

170A Federal Civil Procedure

    170AVII Pleadings and Motions
      170AVII(A) Pleadings in General
        170Ak654 Construction
          170Ak657.5 Pro Se or Lay Pleadings
            170Ak657.5(2) k. Civil rights proceedings in general. Most Cited Cases
A pro se litigant's papers are to be construed liberally when determining a motion to dismiss for failure to state a claim upon which relief can be granted, especially when civil rights violations are alleged. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[4] Federal Civil Procedure 170A** &#9755; **657.5(1)**

170A Federal Civil Procedure

    170AVII Pleadings and Motions
      170AVII(A) Pleadings in General
        170Ak654 Construction
          170Ak657.5 Pro Se or Lay Pleadings
            170Ak657.5(1) k. In general. Most Cited Cases
A pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers when determining a motion to dismiss for failure to state a claim upon which relief can be granted. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[5] Federal Civil Procedure 170A** &#9755; **657.5(1)**

170A Federal Civil Procedure

    170AVII Pleadings and Motions
      170AVII(A) Pleadings in General
         170Ak654 Construction
          170Ak657.5 Pro Se or Lay Pleadings
            170Ak657.5(1) k. In general. Most Cited Cases
When determining a motion to dismiss for failure to state a claim upon which relief can be granted, the court must interpret a pro se plaintiff's submissions to raise the strongest arguments that they suggest. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[6] Federal Civil Procedure 170A** &#9755; **657.5(1)**

170A Federal Civil Procedure

    170AVII Pleadings and Motions
      170AVII(A) Pleadings in General
         170Ak654 Construction
          170Ak657.5 Pro Se or Lay Pleadings
            170Ak657.5(1) k. In general. Most Cited Cases
When reviewing pro se submissions on a motion to dismiss for failure to state a claim upon which relief can be granted, a district court should look at them with a lenient eye, allowing borderline cases to proceed. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[7] Attorney and Client 45** &#9755; **62**

45 Attorney and Client

    45II Retainer and Authority
      45k62 k. Rights of litigants to act in person or by attorney. Most Cited Cases
**Federal Civil Procedure 170A** &#9755; **657.5(1)**

170A Federal Civil Procedure

    170AVII Pleadings and Motions
      170AVII(A) Pleadings in General
         170Ak654 Construction
          170Ak657.5 Pro Se or Lay Pleadings
            170Ak657.5(1) k. In general. Most Cited Cases
A court cannot read into pro se submissions claims that are not consistent with the pro se litigant's allegations,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

710 F.Supp.2d 248

(Cite as: 710 F.Supp.2d 248)

or arguments that the submissions themselves do not suggest, and should not excuse frivolous or vexatious filings by pro se litigants; pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law.

**[8] Federal Civil Procedure 170A ☞     657.5(1)**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(1) k. In general. Most Cited Cases
    A court is not obliged to reconcile a pro se plaintiff's own pleadings that are contradicted by other matter asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint; where such contradiction exists, the pro se plaintiff's allegations are insufficient to defeat a motion to dismiss for failure to state a claim upon which relief can be granted. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[9] Civil Rights 78 ☞     1031**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1030 Acts or Conduct Causing Deprivation
        78k1031 k. In general. Most Cited Cases
    A claim for negligence is not cognizable under § 1983. 42 U.S.C.A. § 1983.

**[10] Criminal Law 110 ☞     412.2(3)**

110 Criminal Law
    110XVII Evidence
        110XVII(M) Declarations
            110k411 Declarations by Accused
                110k412.2 Right to Counsel; Caution
                    110k412.2(3) k. Informing accused as to his rights. Most Cited Cases
    City and county law enforcement officers' failure to

read arrestee his *Miranda* rights did not violate arrestee's Fifth Amendment right against self-incrimination as required for § 1983 claim against city and county; Fifth Amendment, like all the other guaranties in the first eight amendments, applies only to proceedings by the Federal Government. U.S.C.A. Const.Amend. 5; 42 U.S.C.A. § 1983.

**[11] Criminal Law 110 ☞     412.1(4)**

110 Criminal Law
    110XVII Evidence
        110XVII(M) Declarations
            110k411 Declarations by Accused
                110k412.1 Voluntary Character of Statement
                    110k412.1(4) k. Interrogation and investigatory questioning. Most Cited Cases
    City and county law enforcement officers' failure to read arrestee his *Miranda* rights did not violate arrestee's right against self-incrimination as required for § 1983 claim against city and county, where officers did not initiate any questioning of arrestee after he was taken into custody. U.S.C.A. Const.Amends. 5, 14.

**[12] Constitutional Law 92 ☞     3855**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(A) In General
            92k3848 Relationship to Other Constitutional Provisions; Incorporation
                92k3855 k. Fifth Amendment. Most Cited Cases
    The Fifth Amendment's guaranty of the right against self incrimination applies to the states through the Due Process Clause of the Fourteenth Amendment. U.S.C.A. Const.Amends. 5, 14.

**[13] Criminal Law 110 ☞     412.1(4)**

110 Criminal Law
    110XVII Evidence
        110XVII(M) Declarations
            110k411 Declarations by Accused

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

710 F.Supp.2d 248

(Cite as: 710 F.Supp.2d 248)

110k412.1 Voluntary Character of Statement
110k412.1(4) k. Interrogation and investigatory questioning. Most Cited Cases
**Criminal Law 110** ☞ **412.2(2)**

110 Criminal Law

    110XVII Evidence
        110XVII(M) Declarations
           110k411 Declarations by Accused
                110k412.2 Right to Counsel; Caution
                    110k412.2(2) k. Accusatory stage of proceedings; custody. Most Cited Cases
*Miranda*'s warning and waiver requirements apply only in the context of custodial interrogation; a person must have been both in custody and subjected to interrogation for statements made without warnings or waiver to be inadmissible. U.S.C.A. Const.Amend. 5.

**[14] Arrest 35** ☞ **68(2)**

35 Arrest

    35II On Criminal Charges
        35k68 Mode of Making Arrest
           35k68(2) k. Use of force. Most Cited Cases
    When evaluating a claim of excessive force during the course of arrest under the Fourth Amendment, courts must examine whether the use of force is objectively unreasonable in light of the facts and circumstances confronting them, without regard to the police officers' underlying intent or motivation. U.S.C.A. Const.Amend. 4.

**[15] Arrest 35** ☞ **68(2)**

35 Arrest

    35II On Criminal Charges
        35k68 Mode of Making Arrest
           35k68(2) k. Use of force. Most Cited Cases
    When evaluating a claim of excessive force during the course of arrest under the Fourth Amendment, courts must measure the reasonableness of the use of force by considering the facts and circumstances of each particular case, including the crime committed, its severity, the threat of danger to the officer and society, and whether the

suspect is resisting or attempting to evade arrest. U.S.C.A. Const.Amend. 4.

**[16] Arrest 35** ☞ **68(2)**

35 Arrest

    35II On Criminal Charges
        35k68 Mode of Making Arrest
           35k68(2) k. Use of force. Most Cited Cases
    Use of force by city police officers in the course of arrest was not excessive as would constitute Fourth Amendment violation, despite arrestee's allegation that he received wrist injury that took five months to heal when officers handcuffed and "literally dragged" him from his apartment to elevator; arrestee clearly stated that he did not suffer serious injuries as a result of arrest, and arrestee made no allegations regarding the tightness of the handcuffs, whether he was in pain during arrest, and if so, whether he communicated his pain to the officers. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[17] Arrest 35** ☞ **68(2)**

35 Arrest

    35II On Criminal Charges
        35k68 Mode of Making Arrest
           35k68(2) k. Use of force. Most Cited Cases
    A reasonable arrest involves handcuffing the suspect, and to be effective handcuffs must be tight enough to prevent the arrestee's hands from slipping out. U.S.C.A. Const.Amend. 4.

**[18] False Imprisonment 168** ☞ **2**

168 False Imprisonment

    168I Civil Liability
        168I(A) Acts Constituting False Imprisonment and Liability Therefor
           168k1 Nature and Elements of False Imprisonment
           168k2 k. In general. Most Cited Cases
    A claim for false arrest or false imprisonment, which terms are synonymous under New York law, is evaluated pursuant to the Fourth Amendment right to be free from

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

710 F.Supp.2d 248

(Cite as: 710 F.Supp.2d 248)

unreasonable searches and seizures. U.S.C.A. Const.Amend. 4.

**[19] Civil Rights 78 ☞    1037**

78 Civil Rights

   78I Rights Protected and Discrimination Prohibited in General
      78k1030 Acts or Conduct Causing Deprivation
         78k1037 k. Malicious prosecution and false imprisonment; mental health commitments. Most Cited Cases

**Civil Rights 78 ☞    1088(4)**

78 Civil Rights

   78I Rights Protected and Discrimination Prohibited in General
      78k1088 Police, Investigative, or Law Enforcement Activities
         78k1088(4) k. Arrest and detention. Most Cited Cases

**False Imprisonment 168 ☞    2**

168 False Imprisonment

   168I Civil Liability
   168I(A) Acts Constituting False Imprisonment and Liability Therefor
      168k1 Nature and Elements of False Imprisonment
         168k2 k. In general. Most Cited Cases
   The elements of a claim for false arrest or false imprisonment in violation of Fourth Amendment right to be free of unreasonable searches and seizures, whether brought under § 1983 or New York common law, are as follows: (1) the defendant intentionally confined the plaintiff; (2) the plaintiff was aware of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[20] False Imprisonment 168 ☞    13**

168 False Imprisonment

   168I Civil Liability
   168I(A) Acts Constituting False Imprisonment and Liability Therefor
      168k9 Defenses
         168k13 k. Probable cause. Most Cited Cases

**False Imprisonment 168 ☞    22**

168 False Imprisonment

   168I Civil Liability
   168I(B) Actions
      168k21 Evidence
         168k22 k. Presumptions and burden of proof. Most Cited Cases
   The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest; however, under New York law, a warrantless arrest raises a rebuttable presumption that the arrest is unlawful. U.S.C.A. Const.Amend. 4.

**[21] Arrest 35 ☞    68(9)**

35 Arrest

   35II On Criminal Charges
      35k68 Mode of Making Arrest
       35k68(6) Intrusion or Entry
         35k68(9) k. Entry without warrant permissible. Most Cited Cases
   A warrantless arrest in the home is permitted under Fourth Amendment where there is probable cause plus exigent circumstances, or where the entry is consensual. U.S.C.A. Const.Amend. 4.

**[22] Arrest 35 ☞    68(10)**

35 Arrest

   35II On Criminal Charges
      35k68 Mode of Making Arrest
       35k68(6) Intrusion or Entry
         35k68(10) k. Entry without warrant impermissible. Most Cited Cases
   No exigent circumstances existed as would permit warrantless in-home arrest by city police officers, where officers arrested suspect on misdemeanor aggravated

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

710 F.Supp.2d 248

(Cite as: 710 F.Supp.2d 248)

harassment charge based on statement by alleged victim four days prior. U.S.C.A. Const.Amend. 4; N.Y.McKinney's Penal Law § 240.30.

**[23] Arrest 35** ☞ **68(13)**

35 Arrest

 35II On Criminal Charges
  35k68 Mode of Making Arrest
   35k68(6) Intrusion or Entry
    35k68(13) k. Consent. Most Cited Cases
 Regardless whether arrestee was under a false impression regarding the purpose of city police officers' visit to arrestee's home due to misleading statements by the officers, or a simple misunderstanding on arrestee's part, arrestee's consent to officer's entry was nonetheless valid, eliminating the requirement for a warrant for in-home arrest on aggravated harassment charge; consent under false pretenses, absent outright fraud, such as where a police officer falsely claims to have a warrant in order to gain entry to a suspect's home, was still valid. U.S.C.A. Const.Amend. 4; N.Y.McKinney's Penal Law § 240.30.

**[24] Arrest 35** ☞ **63.4(2)**

35 Arrest

 35II On Criminal Charges
  35k63 Officers and Assistants, Arrest Without Warrant
   35k63.4 Probable or Reasonable Cause
    35k63.4(2) k. What constitutes such cause in general. Most Cited Cases
 Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested. U.S.C.A. Const.Amend. 4.

**[25] Arrest 35** ☞ **63.4(7.1)**

35 Arrest

 35II On Criminal Charges

  35k63 Officers and Assistants, Arrest Without Warrant
   35k63.4 Probable or Reasonable Cause
    35k63.4(7) Information from Others
     35k63.4(7.1) k. In general. Most Cited Cases
 City police officers had probable cause to make arrest for second degree aggravated harassment; alleged victim reported receiving repeated unwanted written and verbal communications from arrestee, wherein arrestee told victim that victim "needed to find God" and that victim was a Devil worshiper, victim claimed that communications persisted despite arrestee having been twice contacted by police regarding the matter, and communications caused victim and his wife to be annoyed and alarmed. U.S.C.A. Const.Amend. 4; N.Y.McKinney's Penal Law § 240.30(1).

**[26] Federal Civil Procedure 170A** ☞ **1824**

170A Federal Civil Procedure

 170AXI Dismissal
  170AXI(B) Involuntary Dismissal
   170AXI(B)5 Proceedings
    170Ak1824 k. Dismissal on court's own motion. Most Cited Cases
 Court may sua sponte dismiss claims against a non-moving defendant in the interest of judicial economy for failure to state a claim.

**[27] Civil Rights 78** ☞ **1088(4)**

78 Civil Rights

 78I Rights Protected and Discrimination Prohibited in General
  78k1088 Police, Investigative, or Law Enforcement Activities
   78k1088(4) k. Arrest and detention. Most Cited Cases
 Failure of county sheriff's office to intervene to prevent allegedly false arrest or imprisonment did not violate arrestee's constitutional rights, where arrest by city police officers for second degree aggravated harassment was lawful under the Fourth Amendment. U.S.C.A. Const.Amend. 4.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

710 F.Supp.2d 248

(Cite as: 710 F.Supp.2d 248)

**[28]** Prisons 310 ⚷     359

310 Prisons

   310III Pretrial Detention
      310k351 Care, Custody, Confinement, and Control
         310k359 k. Search, seizure, and confiscation.
Most Cited Cases
   Persons charged with a misdemeanor and remanded to a local correctional facility have a right to be free of a strip search absent reasonable suspicion that they are carrying contraband or weapons. U.S.C.A. Const.Amend. 4.

**[29]** Prisons 310 ⚷     359

310 Prisons

   310III Pretrial Detention
      310k351 Care, Custody, Confinement, and Control
         310k359 k. Search, seizure, and confiscation.
Most Cited Cases
   Alleged strip search of arrestee after his admission to county correctional facility was unreasonable, where none of the circumstances surrounding arrest or underlying charge of second degree aggravated harassment warranted reasonable suspicion that arrestee was carrying contraband or weapons at the time of search. U.S.C.A. Const.Amend. 4; N.Y.McKinney's Penal Law § 240.30(1).

**[30]** Constitutional Law 92 ⚷     4545(3)

92 Constitutional Law

   92XXVII Due Process
      92XXVII(H) Criminal Law
         92XXVII(H)3 Law Enforcement
            92k4543 Custody and Confinement of Suspects; Pretrial Detention
               92k4545 Conditions
                  92k4545(3) k. Safety and security.
Most Cited Cases
Prisons 310 ⚷     356

310 Prisons

   310III Pretrial Detention
      310k351 Care, Custody, Confinement, and Control
         310k356 k. Protection from violence, assault, or abuse. Most Cited Cases
   County correctional facility officers did not fail to protect pre-trial detainee in violation of his due process rights, although officers allegedly watched while assault took place in detainee's presence and assailant allegedly asked detainee "if he had panties" which caused detainee to fear for his safety, where detainee was not assaulted himself and assailant was removed from group cell after assault, thus eliminating whatever risk of harm existed. U.S.C.A. Const.Amend. 14.

**[31]** Constitutional Law 92 ⚷     4545(1)

92 Constitutional Law

   92XXVII Due Process
      92XXVII(H) Criminal Law
         92XXVII(H)3 Law Enforcement
            92k4543 Custody and Confinement of Suspects; Pretrial Detention
               92k4545 Conditions
                  92k4545(1) k. In general. Most Cited Cases
   The Due Process Clause of the Fourteenth Amendment protects pre-trial detainees against intolerable prison conditions. U.S.C.A. Const.Amend. 14.

**[32]** Constitutional Law 92 ⚷     4545(1)

92 Constitutional Law

   92XXVII Due Process
      92XXVII(H) Criminal Law
         92XXVII(H)3 Law Enforcement
            92k4543 Custody and Confinement of Suspects; Pretrial Detention
               92k4545 Conditions
                  92k4545(1) k. In general. Most Cited Cases
   The failure to protect a pre-trial detainee from harm is one type of intolerable prison condition prohibited by Due Process Clause of the Fourteenth Amendment. U.S.C.A. Const.Amend. 14.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

710 F.Supp.2d 248

(Cite as: 710 F.Supp.2d 248)

**[33]** Constitutional Law 92 🗝️      4545(3)

92 Constitutional Law

    92XXVII Due Process
      92XXVII(H) Criminal Law
       92XXVII(H)3 Law Enforcement
        92k4543 Custody and Confinement of Suspects; Pretrial Detention
         92k4545 Conditions
          92k4545(3) k. Safety and security.
Most Cited Cases
    Where pre-trial detainee does not allege that he was assaulted or threatened by other prison inmates, or where detainee only alleges that he was in fear of an assault, a claim for failure to protect in violation of Due Process Clause of Fourteenth Amendment must be dismissed. U.S.C.A. Const.Amend. 14.

**[34]** Constitutional Law 92 🗝️      4545(2)

92 Constitutional Law

    92XXVII Due Process
      92XXVII(H) Criminal Law
       92XXVII(H)3 Law Enforcement
        92k4543 Custody and Confinement of Suspects; Pretrial Detention
         92k4545 Conditions
          92k4545(2) k. Medical treatment.
Most Cited Cases
    Where a pre-trial detainee alleges deliberate indifference to a medical need while incarcerated in a local correctional facility, such a claim is evaluated under the Due Process Clause of the Fourteenth Amendment; the pre-trial detainee's rights are at least as great as those provided to a convicted prisoner under the Eighth Amendment, and something more than negligence on the part of the defendant is required. U.S.C.A. Const.Amends. 8, 14.

**[35]** Constitutional Law 92 🗝️      4545(2)

92 Constitutional Law

    92XXVII Due Process
      92XXVII(H) Criminal Law

       92XXVII(H)3 Law Enforcement
        92k4543 Custody and Confinement of Suspects; Pretrial Detention
         92k4545 Conditions
          92k4545(2) k. Medical treatment.
Most Cited Cases
    In order for a pre-trial detainee incarcerated in a local correctional facility to establish a claim for deliberate indifference to a medical need in violation of Due Process Clause, detainee must allege: (1) a deprivation that is "sufficiently serious," i.e., a deprivation that presents a condition of urgency, one that may produce death, degeneration, or extreme pain, and (2) "reckless indifference," that is, that defendants were aware of detainee's serious medical needs and consciously disregarded a substantial risk of serious harm. U.S.C.A. Const.Amend. 14.

**[36]** Constitutional Law 92 🗝️      4545(2)

92 Constitutional Law

    92XXVII Due Process
      92XXVII(H) Criminal Law
       92XXVII(H)3 Law Enforcement
        92k4543 Custody and Confinement of Suspects; Pretrial Detention
         92k4545 Conditions
          92k4545(2) k. Medical treatment.
Most Cited Cases
**Prisons 310** 🗝️      362

310 Prisons

    310III Pretrial Detention
      310k361 Health and Medical Care
       310k362 k. In general. Most Cited Cases
    Pre-trial detainee's allegedly bruised rib was not serious medical need and thus any failure to address injury by county correctional facility officers was not deliberate indifference to medical need in violation of detainee's due process rights. U.S.C.A. Const.Amend. 14.

**[37]** Constitutional Law 92 🗝️      4545(2)

92 Constitutional Law

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

710 F.Supp.2d 248

(Cite as: 710 F.Supp.2d 248)

92XXVII Due Process
   92XXVII(H) Criminal Law
    92XXVII(H)3 Law Enforcement
     92k4543 Custody and Confinement of
Suspects; Pretrial Detention
      92k4545 Conditions
       92k4545(2) k. Medical treatment.
Most Cited Cases
**Prisons 310   362**

310 Prisons

   310III Pretrial Detention
    310k361 Health and Medical Care
    310k362 k. In general. Most Cited Cases
   Even if pre-trial detainee's allegedly bruised rib was
serious medical need, county correctional facility and
officers were not deliberately indifferent to that need in
violation of detainee's due process rights, where detainee
admitted that his medical concerns were in fact addressed
by someone at facility. U.S.C.A. Const.Amend. 14.

**[38] Constitutional Law 92   4545(4)**

92 Constitutional Law

   92XXVII Due Process
    92XXVII(H) Criminal Law
    92XXVII(H)3 Law Enforcement
     92k4543 Custody and Confinement of
Suspects; Pretrial Detention
      92k4545 Conditions
       92k4545(4) k. Other particular
conditions. Most Cited Cases
**Prisons 310   353**

310 Prisons

   310III Pretrial Detention
    310k351 Care, Custody, Confinement, and Control
    310k353 k. Particular violations, punishments,
deprivations, and conditions. Most Cited Cases
   Pre-trial detainee at county correctional facility was
not deprived of food and water in violation of his rights
under Due Process Clause of Fourteenth Amendment;
detainee was incarcerated after his arrest at 5:35 p.m. and
received food and drink the following morning. U.S.C.A.

Const.Amend. 14.

**[39] Prisons 310   157**

310 Prisons

   310II Prisoners and Inmates
    310II(B) Care, Custody, Confinement, and Control
    310k157 k. Food and drink. Most Cited Cases
   Where a prisoner is deprived of two of three meals
served regularly each day, a constitutional violation may
exist if that one meal is nutritionally inadequate.

**[40] Municipal Corporations 268   1016**

268 Municipal Corporations

   268XVI Actions
    268k1016 k. Capacity to sue or be sued in general.
Most Cited Cases
   An administrative arm of a municipality cannot sue or
be sued because it does not exist separate and apart from
the municipality and does not have its own legal identity.

**[41] Civil Rights 78   1389**

78 Civil Rights

   78III Federal Remedies in General
    78k1385 Parties
    78k1389 k. Criminal law enforcement; prisons.
Most Cited Cases
**Civil Rights 78   1395(6)**

78 Civil Rights

   78III Federal Remedies in General
    78k1392 Pleading
    78k1395 Particular Causes of Action
     78k1395(4) Criminal Law Enforcement;
Police and Prosecutors
      78k1395(6) k. Arrest, search, and
detention. Most Cited Cases
   Court would construe arrestee's pro se complaint
alleging claims under § 1983 against city and county
administrative arms as including claims against city and
county; although administrative arms were not proper

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

710 F.Supp.2d 248

(Cite as: 710 F.Supp.2d 248)

parties because they did not have separate identities apart from municipalities, city and county asserted that city and county were proper parties and court had duty to liberally construe complaint due to arrestee's pro se status. 42 U.S.C.A. § 1983.

**[42] Civil Rights 78** ⬤⟲ **1345**

78 Civil Rights

    78III Federal Remedies in General
      78k1342 Liability of Municipalities and Other Governmental Bodies
        78k1345 k. Acts of officers and employees in general; vicarious liability and respondeat superior in general. Most Cited Cases
**Civil Rights 78** ⬤⟲ **1351(1)**

78 Civil Rights

    78III Federal Remedies in General
      78k1342 Liability of Municipalities and Other Governmental Bodies
        78k1351 Governmental Ordinance, Policy, Practice, or Custom
          78k1351(1) k. In general. Most Cited Cases
A municipal entity is not liable pursuant to § 1983 under the theory of respondeat superior, but may be liable where its employee acted pursuant to an official policy, custom, or practice of said entity. 42 U.S.C.A. § 1983.

**[43] Civil Rights 78** ⬤⟲ **1401**

78 Civil Rights

    78III Federal Remedies in General
      78k1400 Presumptions, Inferences, and Burdens of Proof
        78k1401 k. In general. Most Cited Cases
A policy, custom, or practice giving rise to a municipal entity's liability on a § 1983 claim may be inferred where the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction. 42 U.S.C.A. § 1983.

**[44] Civil Rights 78** ⬤⟲ **1345**

78 Civil Rights

    78III Federal Remedies in General
      78k1342 Liability of Municipalities and Other Governmental Bodies
        78k1345 k. Acts of officers and employees in general; vicarious liability and respondeat superior in general. Most Cited Cases
Where a § 1983 claim against a municipal entity is based solely on the actions of municipality's officers, municipal liability cannot exist if the individual defendants have not violated the plaintiff's constitutional rights. 42 U.S.C.A. § 1983.

**[45] Civil Rights 78** ⬤⟲ **1394**

78 Civil Rights

    78III Federal Remedies in General
      78k1392 Pleading
        78k1394 k. Complaint in general. Most Cited Cases
The notice pleading requirement for a § 1983 claim against a municipality based on constitutional violations by its officers will be met if a plaintiff alleges that a formal policy which is officially endorsed by the municipality caused the plaintiff's injuries; even where allegations in the complaint of the existence of an official policy are not buttressed by supporting facts, dismissal is not warranted as long as the municipality has fair notice of what the plaintiff's claim is and the grounds upon which it rests. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 8(a)(2), 28 U.S.C.A.

**[46] Civil Rights 78** ⬤⟲ **1395(6)**

78 Civil Rights

    78III Federal Remedies in General
      78k1392 Pleading
        78k1395 Particular Causes of Action
          78k1395(4) Criminal Law Enforcement; Police and Prosecutors
            78k1395(6) k. Arrest, search, and detention. Most Cited Cases
Arrestee's allegation that county had policies or

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

710 F.Supp.2d 248

(Cite as: 710 F.Supp.2d 248)

procedures pursuant to which its employees carried out their duties put county on notice of § 1983 claim asserting county's liability for alleged unlawful strip search by county correctional officers after arrestee was admitted to county correctional facility. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 8(a)(2), 28 U.S.C.A.

[47] Municipal Corporations 268 ☞ 741.20

268 Municipal Corporations
    268XII Torts
        268XII(A) Exercise of Governmental and Corporate Powers in General
            268k741 Notice or Presentation of Claims for Injury
                268k741.20 k. Requirement as mandatory or condition precedent. Most Cited Cases
    As a condition precedent to commencing a tort action against New York municipalities, or any of their officers, agents, or employees, a plaintiff must file a notice of claim within ninety days after the claim arises. N.Y.McKinney's General Municipal Law § 50-e.

[48] Negligence 272 ☞ 202

272 Negligence
    272I In General
        272k202 k. Elements in general. Most Cited Cases
    In New York, in order to establish a claim of negligence, plaintiff must prove (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.

[49] Counties 104 ☞ 146

104 Counties
    104VII Torts
        104k146 k. Acts of officers or agents. Most Cited Cases
    Under New York law, county was not liable in negligence to pretrial detainee for the alleged actions of county correctional facility officers, where detainee alleged only emotional, not physical, damage.

[50] Damages 115 ☞ 57.14

115 Damages
    115III Grounds and Subjects of Compensatory Damages
        115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
            115III(A)2 Mental Suffering and Emotional Distress
                115k57.13 Negligent Infliction of Emotional Distress
                    115k57.14 k. In general. Most Cited Cases

Damages 115 ☞ 57.27

115 Damages
    115III Grounds and Subjects of Compensatory Damages
        115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
            115III(A)2 Mental Suffering and Emotional Distress
                115k57.26 Injury or Threat to Another; Bystanders
                    115k57.27 k. In general. Most Cited Cases
    A plaintiff who alleges that he suffered emotional harm due to a defendant's negligence may recover on a claim for negligent infliction of emotional distress (NIED) in New York under either a "bystander theory," meaning the plaintiff was a bystander who was in the zone of danger and suffers emotional trauma as a result of his observations, or a "direct duty theory," meaning the defendant breached a direct duty to the plaintiff which results in emotional injury to the plaintiff.

[51] Damages 115 ☞ 57.27

115 Damages
    115III Grounds and Subjects of Compensatory Damages
        115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

710 F.Supp.2d 248

(Cite as: 710 F.Supp.2d 248)

115III(A)2 Mental Suffering and Emotional Distress

115k57.26 Injury or Threat to Another; Bystanders

115k57.27 k. In general. Most Cited Cases

In order to recover under the bystander theory of negligent infliction of emotional distress (NIED) in New York, a plaintiff must prove that he witnessed the death or serious bodily injury of a member of his immediate family.

**[52]** Damages 115 ☞ 57.14

115 Damages

115III Grounds and Subjects of Compensatory Damages

115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses

115III(A)2 Mental Suffering and Emotional Distress

115k57.13 Negligent Infliction of Emotional Distress

115k57.14 k. In general. Most Cited Cases

Under New York law, the duty allegedly breached on a claim under the direct duty theory of negligent infliction of emotional distress (NIED) must be specific to the plaintiff and not some amorphous, free-floating duty to society.

**[53]** Damages 115 ☞ 57.16(1)

115 Damages

115III Grounds and Subjects of Compensatory Damages

115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses

115III(A)2 Mental Suffering and Emotional Distress

115k57.13 Negligent Infliction of Emotional Distress

115k57.16 Nature of Injury or Threat

115k57.16(1) k. In general. Most Cited Cases

**Damages 115 ☞ 57.27**

115 Damages

115III Grounds and Subjects of Compensatory Damages

115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses

115III(A)2 Mental Suffering and Emotional Distress

115k57.26 Injury or Threat to Another; Bystanders

115k57.27 k. In general. Most Cited Cases

Under New York law, where a plaintiff has not established that his physical safety was ever threatened or endangered by defendants, he cannot recover under either the direct duty theory or bystander theory of negligent infliction of emotional distress (NIED).

**[54]** Damages 115 ☞ 57.29

115 Damages

115III Grounds and Subjects of Compensatory Damages

115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses

115III(A)2 Mental Suffering and Emotional Distress

115k57.26 Injury or Threat to Another; Bystanders

115k57.29 k. Other particular cases. Most Cited Cases

Under New York law, county correctional facility officers who allegedly stood by and watched while two inmates who occupied same cell as pre-trial detainee engaged in physical altercation did not unreasonably endanger detainee's physical safety as would support claim for negligent infliction of emotional distress (NIED), where officers removed assailant from cell following altercation, even if assailant was not removed before asking detainee if detainee was wearing panties.

**[55]** Damages 115 ☞ 57.21

115 Damages

710 F.Supp.2d 248

(Cite as: 710 F.Supp.2d 248)

115III Grounds and Subjects of Compensatory Damages
115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
115III(A)2 Mental Suffering and Emotional Distress
115k57.19 Intentional or Reckless Infliction of Emotional Distress; Outrage
115k57.21 k. Elements in general. Most Cited Cases

To state a claim for intentional infliction of emotional distress (IIED) under New York law, a plaintiff must plead the following four elements: (1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal relationship between the conduct and the resulting injury; and (4) severe emotional distress.

**[56] Damages 115 ☞ 57.22**

115 Damages

115III Grounds and Subjects of Compensatory Damages
115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
115III(A)2 Mental Suffering and Emotional Distress
115k57.19 Intentional or Reckless Infliction of Emotional Distress; Outrage
115k57.22 k. Nature of conduct. Most Cited Cases

Under New York law, the alleged conduct underlying claim for intentional infliction of emotional distress (IIED) must be so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.

**[57] Damages 115 ☞ 57.22**

115 Damages

115III Grounds and Subjects of Compensatory Damages
115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
115III(A)2 Mental Suffering and Emotional Distress
115k57.19 Intentional or Reckless Infliction of Emotional Distress; Outrage
115k57.22 k. Nature of conduct. Most Cited Cases

Under New York law as predicted by district court, an unlawful strip search, without more, may be considered extreme and outrageous conduct giving rise to liability on claim for intentional infliction of emotional distress (IIED).

**\*255** Wlodzimierz J. Dzwonczyk, pro se.

Rory A. McMahon, City of Syracuse Corporation Counsel, Syracuse, NY, for the Defendants, Syracuse City Police Department; Gary Miguel, Chief of Police, Syracuse City Police Department; and John Does, in their official and individual capacities.

Paul F. Murak, Sliwa & Lane, Buffalo, NY, for the Defendants, Syracuse Housing Authority Security; and John Doe, Syracuse Housing Authority Detective.

Karen A. Bleskoski, Gordon J. Cuffy, Onondaga County Attorney, Syracuse, NY, for the Defendants, Onondaga County Sheriff's Office; Onondaga County Justice Center; and John Does.

***Amended Memorandum, Decision and Order***

NEAL P. McCURN, Senior District Judge.
*I. Introduction*

Presently before the court in this civil rights action are two dispositive motions. **\*256** Defendants Onondaga County Sheriff's Office, Onondaga County Justice Center and John Does (collectively, "the County Defendants") move to dismiss the complaint filed by plaintiff, Wlodzimierz J. Dzwonczyk ("Plaintiff") for failure to state claims against them upon which relief may be granted pursuant to Fed.R.Civ.P. 12(b)(6). *See* Dkt. No. 16. Defendants Syracuse City Police Department ("SPD"); Gary Miguel, Chief of Police, Syracuse City Police Department ("Miguel"); and John Does (collectively, "the City Defendants") move for judgment on the pleadings in their favor pursuant to Fed.R.Civ.P. 12(c). *See* Dkt. No. 37. Plaintiff opposes both motions. No reply having been

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

710 F.Supp.2d 248

(Cite as: 710 F.Supp.2d 248)

filed by the County Defendants, and the City Defendants having informed the court of their intent not to reply, both motions are fully briefed. Decision regarding the motions is on the papers submitted, without oral argument.

**II. Procedural Background**

Plaintiff, appearing pro se, filed a complaint against the County Defendants and City Defendants as well as defendants, Syracuse Housing Authority Security and John Doe, Syracuse Housing Authority Detective (collectively, "SHA Defendants"), alleging the violation of his rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution as predicates for civil rights claims pursuant to 42 U.S.C. § 1983, as well as several New York common law tort claims, stemming from events surrounding Plaintiff's arrest and detention for aggravated harassment on or about May 23, 2008. The City Defendants and SHA Defendants thereafter answered the complaint, while the County Defendants filed a pre-answer motion to dismiss. The City Defendants' motion for judgment on the pleadings followed.

**III. Legal Standard**

[1] The standard to be applied when deciding a motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) is identical to that of a motion to dismiss for failure to state claims upon which relief may be granted pursuant to Fed.R.Civ.P. 12(b)(6). *See Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). When deciding a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept the allegations of fact in the complaint as true, drawing all reasonable inferences in the plaintiff's favor. *See World Religious Relief, Inc. v. Sirius Satellite Radio, Inc.,* No. 05-CV-8257, 2007 WL 2261549, at *1 (S.D.N.Y. Aug. 7, 2007) (quoting *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994)). Additionally, when deciding such a motion, the court may only consider "the factual allegations in the complaint, [...] documents attached to the complaint as exhibits or incorporated by reference, [... matters of which judicial notice might be taken, and [...] documents either in plaintiff's] possession or of which [the] plaintiff [ ] had knowledge and relied on in bringing suit." *Muller-Paisner v. TIAA,* 446 F.Supp.2d 221, 226-227 (S.D.N.Y.2006) (citing *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (internal citations omitted)) (*rev'd in part on other*

grounds, 289 Fed.Appx. 461 (2d Cir.2008)). Particularly relevant here, an arrest report is a matter of public record that may be considered on a Rule 12(b)(6) motion to dismiss. *See McCloud v. Cutler,* No. 06-CV-5443, 2008 WL 906701, at *1 n. 2 (E.D.N.Y. Apr. 3, 2008) (*citing Vasquez v. City of New York,* No. 99 Civ.4606(DC), 2000 WL 869492, at *1 n. 3 (S.D.N.Y. June 29, 2000)).

[2] A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007).FN1 The Court of Appeals for the Second Circuit has interpreted the foregoing language to require that lower courts apply "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible [,]" but does not require a heightened pleading standard for civil rights claims. *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (emphasis in original).

> FN1. By its opinion in *Bell Atlantic,* the Supreme Court abrogated the often-cited language of *Conley v. Gibson* "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. 544, 561, 127 S.Ct. 1955, 1968, 167 L.Ed.2d 929 (2007) (quoting *Conley,* 355 U.S. 41, 45-46, 78 S.Ct. 99 (1957)). In doing so, the Court found that *Conley* "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Id.,* at 1969.

[3][4][5][6] Finally, the court is mindful of the well-established principle that a pro se litigant's papers are to be construed liberally, especially when civil rights violations are alleged. *See Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191 (2d Cir.2008) (internal citations omitted). Thus, "a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Boykin v. KeyCorp,* 521 F.3d 202, 214 (2d Cir.2008) (*quoting*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

710 F.Supp.2d 248

(Cite as: 710 F.Supp.2d 248)

*Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007)* (per curiam* ). Accordingly, the court must interpret Plaintiff's "submissions to raise the strongest arguments that they suggest." *Diaz v. United States,* 517 F.3d 608, 613 (2d Cir.2008)* (internal quotation and citation omitted). Further, "when reviewing pro se submissions, a district court should look at them 'with a lenient eye, allowing borderline cases to proceed.' " *Phillips v. Girdich,* 408 F.3d 124, 127-128 (2d Cir.2005)* (quoting *Fleming v. United States,* 146 F.3d 88, 90 (2d Cir.1998)) (per curiam* ). Thus, courts have held it appropriate to consider assertions in a pro se plaintiff's papers in opposition to a motion to dismiss to effectively amend the allegations of the complaint, to the extent such assertions are consistent with the allegations of the complaint. *See Robles v. Bleau,* No 9:07-CV-0464, 2008 WL 4693153, at *6 (N.D.N.Y. Oct. 22, 2008) (citations omitted).

[7][8] At the same time, the court is mindful that, according to Second Circuit precedent, it

> cannot read into pro se submissions claims that are not consistent with the pro se litigant's allegations, or arguments that the submissions themselves do not suggest, ... [and it] should not excuse frivolous or vexatious filings by pro se litigants, and that pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law[.]

*Triestman v. Federal Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006)* (internal citations and quotations omitted). Accordingly, the court notes that it "is not obliged to reconcile [a pro se] plaintiff's own pleadings that are contradicted by other matter asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint." *Koulkina v. City of New York,* 559 F.Supp.2d 300, 314 (S.D.N.Y.2008)* (internal citation omitted). Thus, where such contradiction exists, the pro se **258** plaintiff's allegations "are insufficient to defeat a motion to dismiss." *Id.*

***IV. Factual Background***

The court will, as it must, accept the following allegations of fact in the Plaintiff's complaint ("the

Complaint") as true, drawing all reasonable inferences in Plaintiff's favor. *See supra,* at 256.

On or about May 18, 2008, Plaintiff sent a "Letter of Trespass Notice" to one Daniel Bebber.[FN2] Mr. Bebber is apparently employed as a delivery person at a local pharmacy. At one time Mr. Bebber delivered medications to Plaintiff as well as to Plaintiff's parents, through which association Plaintiff and Mr. Bebber became acquainted.

> FN2. Although Plaintiff refers to Mr. Bebber as "Daniel Beber" throughout the Complaint and opposition papers, the court will adopt the spelling of Mr. Bebber's surname as is reflected in his own statement regarding the circumstances supporting Plaintiff's arrest, to be discussed *infra.*

On May 23, 2008, Plaintiff was arrested at his residence for aggravated harassment. It is unclear from the complaint the exact number of arresting officers, but Plaintiff alleges that an officer or officers from both SPD and Syracuse Housing Authority Security were involved. Specifically, Plaintiff alleges that the "Syracuse Police Department and Syracuse Housing Authority Security came to [his] residence ... with two police officers[;] ... [o]ne was a detective working for the Syracuse Police Department and Syracuse Housing Authority Security, ... [and] the other was in the police uniform ...." Compl. ¶ 13. Plaintiff alleges a "Detective" entered his residence, showed him "the Letter of Trespass Notice" and accused him of aggravated harassment, then arrested Plaintiff by putting handcuffs on his wrists. *See id.* ¶¶ 15, 16. It should also be noted that Plaintiff contends the Syracuse Housing Authority Security arrested him in retaliation for litigation he filed in this court, alleging violations of his rights under the Fair Housing Act. *See* Compl. ¶ 50. [FN3]

> FN3. Ostensibly, Plaintiff refers to *Dzwonczyk v. Syracuse Housing Authority, et al.,* 5:07-cv-01239. The court notes, however, that Plaintiff previously filed another action against the Syracuse Housing Authority, alleging violations of, among other things, the Fair Housing Act, which was dismissed by stipulation of the parties on December 13, 2004. *See Dzwonczyk v. Syracuse Housing Authority, et al.,*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

710 F.Supp.2d 248

(Cite as: 710 F.Supp.2d 248)

5:04-cv-01198.

Plaintiff alleges he was not read his " *Miranda* rights," and that the Detective would not let Plaintiff put on his socks or notify his mother that he was leaving prior to defendants removing him from his residence. *See id.* ¶ 16. Plaintiff further contends the "Detective grabbed [him] and literally dragged him to the elevator" and gave him "little pushes ... here and there" while defendants transported Plaintiff to the police car. *See id.* Finally, Plaintiff claims that at some point he was "thoroughly searched still without *Miranda* rights read." *Id.*

In his papers in opposition to the City Defendants' motion for judgment on the pleadings, Plaintiff expands upon the allegations in the Complaint regarding his arrest. Plaintiff contends that he was arrested without a warrant, and that he "did not really give the consent to enter because [he] was under the impression that the [C]ity [D]efendants ... were coming to update [him on another matter]." Pl.'s Mem. of Law in Opp'n to City Defs.' Mot. for J. on the Pleadings, at 12, Dkt. No. 64. Also in his opposition papers, regarding his allegation that the Detective "literally dragged him to the elevator," Compl. ¶ 16, **259** Plaintiff contends that he "did not sustain any serious injuries as it is about 7 feet ... from [his] apartment to the elevator[ ] except wrists, but it has been 5 months so they healed," Pl.'s Mem. of Law in Opp'n to City Defs.' Mot. for J. on the Pleadings, at 12.

According to the arrest report, Plaintiff was arrested at his residence and was charged with second degree aggravated harassment pursuant to N.Y. Penal Law § 240.30. *See* Ex. A to Mem. of Law in Supp. of Mot. for J. on the Pleadings, Dkt. No. 39. The Syracuse Housing Authority is identified on the arrest report as the victim. *See id.* The arresting officer, who is identified as "Kiefer," noted on the arrest report that Plaintiff was "transported to justice center without incident." *Id.*

Attached to the arrest report is an incident report, signed by "Theodore Kiefer", naming "Daniel Bebber" as the victim, and Plaintiff as the suspect. *Id.* Also attached to the arrest report is a statement by Mr. Bebber, wherein he alleges receiving several telephone calls and mailings from Plaintiff over the previous two months, which continued despite Mr. Bebber's repeated requests, via the Syracuse Police Department, that Plaintiff cease contact with Mr. Bebber, and which caused Mr. Bebber and his wife to be annoyed and alarmed. *See id.* According to Mr. Bebber, on one occasion, about one week after Plaintiff was first asked to stop contacting Mr. Bebber, Plaintiff came to his house uninvited. Finally, Mr. Bebber states that he received a letter from Plaintiff informing him that he "was no longer allowed on Syracuse Housing property, specifically [Plaintiff's] building." *Id.* In light of the fact that a similar letter was sent to Mr. Bebber's employer, coupled with Plaintiff's repeated telephone calls and mailings despite having been asked to stop, Mr. Bebber asked that Plaintiff be prosecuted "to the fullest extent of the law." *Id.*

Kiefer's narrative attached to the arrest report indicates that he received Bebber's complaint of harassment against Plaintiff on May 19, 2008. *See id.* Kiefer notes that prior to that date, Mr. Bebber twice asked him to speak with Plaintiff on Bebber's behalf, which Kiefer did and twice received Plaintiff's assurances that the unwanted communications would stop. *See id.* Thereafter, Plaintiff sent the notice of trespass letter to Mr. Bebber, regarding which Kiefer states that Plaintiff "claim[ed to have] the Syracuse Housing Authority's permission to issue such a letter ...." *Id.* Kiefer states that on May 23, 2008, he, "while working in a part time capacity as an investigator within the [Syracuse] Housing Authority, responded to [Plaintiff's apartment] to locate [Plaintiff]." *Id.* According to Kiefer, he was accompanied by "Officer Chimileski and Det. Rood." *Id.* Kiefer concluded his narrative report as follows:

[Plaintiff] was in fact located at his residence and arrested for Aggravated Harassment in the 2nd degree. Due to the strong likelihood of reoccurrence, [Plaintiff] was lodged at the Justice Center. IT SHOULD BE NOTED THAT THE LETTER OF TRESPASS generated by [Plaintiff] has/holds NO MERIT and should be considered a fraud as he invoked the authority, without permission, of the Syracuse Housing Authority's security division.

*Id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

710 F.Supp.2d 248

(Cite as: 710 F.Supp.2d 248)

Kiefer then drafted a misdemeanor information, which he provided to the City of Syracuse Criminal Court, complaining that [Plaintiff], from March 2008 through May 19, 2008, "with intent to harass, annoy[,] threaten or alarm another did communicate with the victim, by mail in a manner likely to cause annoyance or alarm." *Id.* **\*260** Among other things, the information also alleges that Plaintiff "did purport to be a representative of Syracuse Housing Authority when in fact he is not." *Id.* The letter of trespass notice, which is identical to that attached to the Complaint, also accompanies the arrest report. *See id.*; Ex. A to Compl.

The letter, which is titled, "LETTER OF TRESPASS NOTICE," indicates that Mr. Bebber is "no longer allowed in or around the premises of [Plaintiff's home] for any reason whatsoever." Ex. A to Compl. The letter further indicates that should Mr. Bebber be "seen in or around the premises" he "will hereafter be considered as a 'TRESPASSER' and the Syracuse Police will be called to ARREST [him]." *Id.* Through said letter, Plaintiff also informs Mr. Bebber that a copy of same "is being sent to the Syracuse Police Department, the Security of Syracuse Housing Authority, and to [Mr. Bebber's] employer, for their information." *Id.* The letter is signed by Plaintiff, under which signature appears that the Syracuse Police Department and Security of Syracuse Housing Authority have been copied. Beneath same appears the following language: "Provided Courtesy of Syracuse Police Department Updated on 04/16/2006". *Id.* The letter also appears to be notarized, and is dated May 19, 2008.

Returning to the allegations in the Complaint, it is clear that at some point after his arrest, Plaintiff arrived at the "Onondaga County Jail" where he was booked, searched and "placed in a group cell." Compl. ¶ 17. While in the group cell, Plaintiff witnessed one prisoner assault another, while the "County Jail officers ... watch[ed] without any reaction." *Id.* ¶ 18. Before the assailant was removed from the cell, he "asked Plaintiff if he had panties", which caused Plaintiff to "fear[ ] very much for his safety." *Id.*

Plaintiff also describes being strip-searched prior to receiving "prisoner's clothing". ¶ 20. According to Plaintiff, he was told to "get completely undressed,

including his underwear." *Id.* Plaintiff agreed to undress, but requested the presence of two male officers. When the second officer arrived, the first officer explained that "Plaintiff did not want to fulfill his request to undress, and was uncooperative." *Id.* After Plaintiff undressed, one of the officers used vulgar language, instructing Plaintiff to " 'bring up his balls', and 'spread up his ass' ", which caused Plaintiff to feel "humiliated, hurt, [and] deprived of his dignity as a human being." *Id.* In his papers in opposition to the County Defendants' motion to dismiss, Plaintiff alleges that "defendants searched [him] thoroughly twice without probable cause, and ... subjected [him] to [an] absolutely unwarranted alcohol level check." Pl.'s Mem. of Law in Opp'n to Mot. to Dismiss, at 14, Dkt. No. 20.

Finally, in the Complaint, Plaintiff describes his lack of access to food, drink and medicine while he was incarcerated. Plaintiff alleges that "he had a bruised rib, and was in pain." Compl. ¶ 17. *See also* ¶¶ 19, 21. Plaintiff also alleges he "was supposed to take Tylenol with Codeine, which he was never given[ ]" and that "[h]e was not given his other medication." *Id.* To be sure, Plaintiff does not specify the cause of the bruised rib, nor does he allege that he informed anyone of his injury, or that he asked anyone for any medication. However, later in the Complaint, Plaintiff contends that "his medical concerns were not addressed at all" and that "[e]xcept one person, nobody addressed Plaintiff's medical concerns." ¶ 21. Plaintiff also alleges that "[h]e was held without drink and food[,]" ¶ 19, but later in the Complaint **\*261** claims that he was given breakfast, *see* ¶ 22.

Finally, it appears from the allegations in the Complaint that Plaintiff was held overnight at the Justice Center, and was released without bail the following day. *See* ¶¶ 21, 24.

*V. Discussion*

A fair reading of the Complaint reflects that Plaintiff purports to allege a number of constitutional violations as predicates for civil rights claims pursuant to 42 U.S.C. § 1983, as well as several tort claims under New York common law. Specifically, under Count I of the Complaint, Plaintiff contends that all defendants

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

710 F.Supp.2d 248

(Cite as: 710 F.Supp.2d 248)

(hereinafter "Defendants") violated the following of his rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution: (1) right to be free from unreasonable searches and seizures; (2) right not to be deprived of due process; (3) right to be free from excessive force; (4) right to be free from false arrest, and (5) "negligence." *See* Compl. ¶ 28. Plaintiff further claims that he is due punitive damages regarding the aforementioned violations. *See id.* ¶ 31. Through Count II of the Complaint, Plaintiff contends that the defendant, Detective "John Doe" was deliberately indifferent to Plaintiff's right to be free from excessive force and unreasonable searches and seizures in violation of the Fourth and Fourteenth Amendments. *See id.* ¶ 33. Under Count III, Plaintiff alleges that Defendants violated his rights under the Fourth, Fifth and Fourteenth Amendments by falsely arresting him without a "basis in fact to do so" and "without reading to Plaintiff [his] *Miranda* rights." Compl. ¶ 36. Count IV, labeled False Imprisonment, includes the allegations that Defendants "breached a duty of care owed to Plaintiff" to not deprive him of his personal liberty by restraining or detaining him without just cause, through use of force, and without reading Plaintiff his *Miranda* rights. *See id.* ¶¶ 39-41. Counts V, VI and VII allege claims for negligence, intentional infliction of emotional distress ("IIED"), and negligent infliction of emotional distress ("NIED"), respectively, against all defendants. *See id.* ¶¶ 44-48. Finally, it should be noted that Plaintiff alleges that Chief Miguel "is responsible for the promulgation, and implementation of police procedures and practices among police officers of Syracuse City Police Department, sued herein as John Does, which officers include members of the Onondaga County Sheriff's Office ...." Compl. ¶ 51.

**A. Claims Pursuant to 42 U.S.C § 1983**

It is well settled that in order to state a claim pursuant to 42 U.S.C. § 1983, a plaintiff must allege "(1) that some person has deprived him of a federal right, and (2) that the person who has deprived him of that right acted under color of state ... law." *Velez v. Levy,* 401 F.3d 75, 84 (2d Cir.2005) (*quoting Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980) (internal quotations omitted)). "Section 1983 is not itself a source of substantive rights[,] but merely provides a method for vindicating federal rights elsewhere conferred[.]" *Patterson v. County of Oneida,* 375 F.3d 206, 225 (2d

Cir.2004) (*quoting Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)).

**1. Negligence Under 42 U.S.C. § 1983**

[9] As an initial matter, the court notes that to the extent Plaintiff purports to allege a negligence claim against the Defendants under 42 U.S.C. § 1983, such a claim is dismissed as negligence is not cognizable under § 1983. *See* **\*262** *Resto v. Weissmane,* No. 9:08-CV-340, 2008 WL 5191733, at \*4, n. 3 (N.D.N.Y. Dec. 10, 2008); *Perez v. Crook,* No. 9:08-CV-1153, 2008 WL 4891167, at \*3 (N.D.N.Y. Nov. 10, 2008).

**2. Miranda**

[10][11][12] It is clear Plaintiff intends to allege a claim for the violation of his right against self-incrimination due to Defendants' failure to read Plaintiff his "*Miranda* rights." Compl. ¶¶ 16, 28, 36. In support of same, Plaintiff invokes both the Fifth and Fourteenth Amendments. *See id.* ¶¶ 28, 36. As County Defendants correctly point out, Plaintiff's claims, insofar as he seeks redress under the Fifth Amendment, must be dismissed because Plaintiff has not named as a defendant any agency or employee of the United States. It is true that "[t]he Fifth Amendment, like all the other guaranties in the first eight amendments, applies only to proceedings by the Federal Government[.]" *United States v. Ng,* 699 F.2d 63, 69 (2d Cir.1983). However, the Fifth Amendment's guaranty of the right against self incrimination applies to the states through the Due Process Clause of the Fourteenth Amendment, *see Floyd v. Meachum,* 907 F.2d 347, 354 (2d Cir.1990) (*citing Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)). Regardless, Plaintiff's claim under *Miranda* is unfounded and must be dismissed.

[13] In *Miranda v. Arizona,* the Supreme Court held that the police may not interrogate a suspect in custody unless that person is 'warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'

*Anderson v. Corcoran,* No. 05-Civ.-436, 2007 WL 1288539, at \*4 (S.D.N.Y. May 2, 2007) (*quoting Miranda*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

710 F.Supp.2d 248

(Cite as: 710 F.Supp.2d 248)

*v. Arizona,* 384 U.S. 436, 478-79, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966); *accord Dickerson v. United States,* 530 U.S. 428, 443-44, 120 S.Ct. 2326, 2336, 147 L.Ed.2d 405 (2000) (reaffirming *Miranda* )). Accordingly, it is clear that " *Miranda 's* warning and waiver requirements apply *only* in the context of 'custodial interrogation,' i.e., a person must have been both in custody and subjected to interrogation for statements made without warnings or waiver to be inadmissible ...." *United States v. Rommy,* 506 F.3d 108, 131-132 (2d Cir.2007) (citing *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602; *accord United States v. Newton,* 369 F.3d 659, 669 (2d Cir.2004)) (emphasis added). Plaintiff's complaint is devoid of any allegation that Defendants initiated any questioning of Plaintiff after he was taken into custody. Accordingly, any such cause of action for a violation of Plaintiff's right against self incrimination is dismissed for failure to state a claim upon which relief may be granted.

### 3. Fourth Amendment

The City and County Defendants argue that Plaintiff's claims under the Fourth Amendment must be dismissed. The County Defendants argue that because the Complaint reflects that no member of the Onondaga County Sheriff's Office (1) was present at Plaintiff's arrest, (2) engaged in any act of force against Plaintiff, or (3) detained Plaintiff with any knowledge that such detention was improper, Plaintiff cannot state a Fourth Amendment claim against them. The City Defendants argue that because the officers had probable cause to arrest Plaintiff, the Fourth Amendment claims against them must be dismissed.

**\*263** Plaintiff complains of a myriad of acts or omissions by Defendants, which the court interprets as claims that Plaintiff's rights were violated under the Fourth Amendment in the following ways: excessive force, false arrest and false imprisonment, failure to intervene, and unreasonable search. Each claim will be addressed in turn.

#### a. Excessive Force

[14][15] According to Plaintiff, in the course of his arrest, he was handcuffed and "literally dragged" to the elevator by "the Detective," and "Defendants" escorted Plaintiff through the hallway of his apartment building, giving him "little pushes" ... "here and there." Compl. ¶ 16. When evaluating an excessive force claim under the

Fourth Amendment, "courts should examine whether the use of force is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to [the officers'] underlying intent or motivation.' " *Jones v. Parmley,* 465 F.3d 46, 61 (2d Cir.2006) (quoting *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). Courts are to measure the reasonableness of the use of force by considering "the facts and circumstances of each particular case, including the crime committed, its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest." *Id.* (quoting *Thomas v. Roach,* 165 F.3d 137, 143 (2d Cir.1999)).

[16][17] Here, considering all of the circumstances as alleged by Plaintiff, the use of force by the officers in the course of Plaintiff's arrest does not rise to the level of a Fourth Amendment violation. To begin with, "[r]outine handcuffing at the time of an arrest, absent something more, cannot constitute a cognizable excessive force claim. Frequently, a reasonable arrest involves handcuffing the suspect, and to be effective handcuffs must be tight enough to prevent the arrestee's hands from slipping out." *Gil v. County of Suffolk,* 590 F.Supp.2d 360, 371 (E.D.N.Y.2008) (internal citations an quotations omitted). In deciding whether something beyond a routine handcuffing is at issue in this case, the court finds it instructive that "the reasonableness of a handcuffing is dependent on whether the handcuffs were unreasonably tight, whether the arrestee's pleas to that effect were ignored, and the degree of injury to the arrestee's wrists." *Fifield v. Barrancotta,* 545 F.Supp.2d 307, 311 (W.D.N.Y.2008) (citing *Esmont v. City of New York,* 371 F.Supp.2d 202, 214 (E.D.N.Y.2005)). Here, Plaintiff implies that he received some type of injury to his wrists, noting that "it has been 5 months so they healed." Pl.'s Mem. of Law in Opp'n to City Defs.' Mot. for J. on the Pleadings, at 120. However, Plaintiff very clearly states, regarding his allegation that he was "literally dragged" from his apartment to the elevator, that "he did not sustain any serious injuries ...." This, coupled with the absence of any allegations regarding the tightness of the handcuffs, whether Plaintiff was in pain, and if so, whether he communicated his pain to the officers, leads to the conclusion that Plaintiff fails to state a claim against the City Defendants for excessive force. Accordingly, said claim is dismissed.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

710 F.Supp.2d 248

(Cite as: 710 F.Supp.2d 248)

Moreover, it is clear from a reading of the Complaint that no County employee or official was involved in Plaintiff's arrest, and that no one used force against Plaintiff after the arrest. Therefore, to the extent Plaintiff alleges an excessive force claim against the County Defendants, said claim is also dismissed.

### b. False Arrest and Imprisonment

[18][19][20] A claim for false arrest or false imprisonment, which terms are synonymous under New York law, is evaluated **264 pursuant to the Fourth Amendment right to be free from unreasonable searches and seizures. *See Smith v. City of New York,* 388 F.Supp.2d 179, 184 (S.D.N.Y.2005) (*citing Hygh v. Jacobs,* 961 F.2d 359, 366 (2d Cir.1992)). The elements of such a claim, whether brought under § 1983 or New York common law, are as follows: "(1) the defendant intentionally confined the plaintiff; (2) the plaintiff was aware of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged." *Id.* (*citing Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994)). "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest [.]" *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996) (internal citation and quotation omitted). However, under New York law, a warrantless arrest raises a rebuttable presumption that the arrest is unlawful. *See Curry v. City of Syracuse,* 316 F.3d 324, 335 (2d Cir.2003).

[21] According to the City Defendants, they can rebut such a presumption by proving that Plaintiff's arrest was authorized by section 140.10 of the New York Criminal Procedure Law, "which lays out the requirement of reasonable cause for warrantless arrests." Mem. of Law in Supp. of Mot. for J. on the Pleadings, at 10, Dkt. No. 37, *citing Raysor v. Port Authority of New York and New Jersey,* 768 F.2d 34, 40 (2d Cir.1985). *Raysor,* however, is clearly distinguishable as the plaintiff in that case was arrested at a Port Authority police station in the World Trade Center, while Plaintiff here was arrested in his home. *See Raysor,* 768 F.2d at 36-37. The Supreme Court has held that "warrantless arrests when the arrestee is in the sanctity of his home" violate the Fourth Amendment. *United States v. Spencer,* 684 F.2d 220, 222-223 (2d Cir.1982) (*citing Payton v. New York,* 445 U.S. 573, 602-03, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980)). Exceptions to the *Payton* rule allow a warrantless arrest in the home where there is probable cause plus exigent circumstances, *see Kirk v. Louisiana,* 536 U.S. 635, 638, 122 S.Ct. 2458, 2459, 153 L.Ed.2d 599 (2002), or where the entry is consensual, *see Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148 (1990).

[22] To be sure, the factors surrounding Plaintiff's arrest hardly support a finding of exigent circumstances. The Supreme Court has stated that

the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests. Indeed, the Court has recognized only a few such emergency conditions, *see, e.g., United States v. Santana,* 427 U.S. 38, 42-43, 96 S.Ct. 2406, 2409-2410, 49 L.Ed.2d 300 (1976) (hot pursuit of a fleeing felon); *Warden v. Hayden,* 387 U.S. 294, 298-299, 87 S.Ct. 1642, 1645-1646, 18 L.Ed.2d 782 (1967) (same); *Schmerber v. California,* 384 U.S. 757, 770-771, 86 S.Ct. 1826, 1835-1836, 16 L.Ed.2d 908 (1966) (destruction of evidence); *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486 (1978) (ongoing fire), and has actually applied only the "hot pursuit" doctrine to arrests in the home, *see Santana, supra.*

*Welsh v. Wisconsin,* 466 U.S. 740, 749-750, 104 S.Ct. 2091, 2097-2098, 80 L.Ed.2d 732 (1984). The Court went on to explain their "hesitation in finding exigent circumstances, especially when warrantless arrests in the home are at issue, is particularly appropriate when the underlying offense for which there is probable cause to arrest is relatively minor." *Id.,* at 750, 104 S.Ct. at 2098. Here, defendant officers arrested Plaintiff on a misdemeanor aggravated harassment **265 charge, based upon a statement provided by the alleged victim four days prior. Accordingly, because the requisite exigent circumstances are lacking, the City Defendants cannot establish a legal arrest under that exception to the *Payton* Rule.

[23] Nonetheless, it appears from Plaintiff's allegations that he did consent to the officers' entry.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

710 F.Supp.2d 248

(Cite as: 710 F.Supp.2d 248)

Plaintiff claims that he "did not really give the consent to enter because [he] was under the impression that the [C]ity [D]efendants ... were coming to update [him on another matter]." Pl.'s Mem. of Law in Opp'n to City Defs.' Mot. for J. on the Pleadings, at 12, Dkt. No. 64. Consent under false pretenses, absent outright fraud, such as where a police officer falsely claims to have a warrant in order to gain entry, is still proper. Cf. *Breitbard v. Mitchell,* 390 F.Supp.2d 237, 248 (E.D.N.Y.2005) (*quoting Hadley v. Williams,* 368 F.3d 747, 749 (7th Cir.2004)) ("Though 'the law permits police to pressure and cajole, conceal material facts, and actively mislead, it draws the line at outright fraud.' "). Accordingly, regardless whether Plaintiff was under a false impression regarding the purpose of the officers' visit due to misleading statements by the officers, or a simple misunderstanding on Plaintiff's part, he nonetheless consented to their entry, eliminating the requirement for a warrant.

[24][25] Having overcome the presumption that Plaintiff's warrantless arrest was unlawful, the City Defendants must still establish that probable cause existed for the arrest. "Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Valentine,* 539 F.3d 88, 93 (2d Cir.2008). Pursuant to section 240.30 of the New York Penal Law, in relevant part,

[a] person is guilty of aggravated harassment in the second degree when, with intent to harass, annoy, threaten or alarm another person, he or she:

[ ]Either (a) communicates with a person, anonymously or otherwise, by telephone, by telegraph, or by mail, or by transmitting or delivering any other form of written communication, in a manner likely to cause annoyance or alarm[.]

N.Y. PENAL LAW § 240.30(1) (McKinney 2008). Less severe circumstances than those present in this case have led to a finding of probable cause to arrest on such a charge. The Second Circuit affirmed a lower court

dismissal of a false arrest claim, finding probable cause to arrest for second degree aggravated harassment where, according to admissions in the complaint, after plaintiff's "agitation had grown to anger" he attempted to contact defendant by leaving messages for her "about her evident lack of consideration and disrespect." *Silver v. Kuehbeck,* 217 Fed.Appx. 18, 22 (2d Cir.2007). A district court found probable cause to exist on a claim for second degree aggravated harassment where in an isolated incident, plaintiff sent audio tapes of conversations between his son and a woman with whom his son had a romantic relationship to the woman's subsequent fiancé as well as a member of her family. *See Quinn v. City of New York,* No. 99-CV-7068, 2003 WL 1090205, at *1 (E.D.N.Y. Mar. 12, 2003). The court in *Quinn* determined that it was reasonable for the arresting officer to conclude that the tapes were sent to embarrass and harass plaintiff's son's former girlfriend, and to annoy and alarm the former girlfriend's fiancé and family. *See id., at *4.* The court further noted that the **\*266** requisite communication under § 240.30 does not have to include repetitive or continuous behavior. *See id.*

Here, Mr. Bebber reports receiving repeated unwanted written and verbal communications from Plaintiff, wherein Plaintiff told Bebber that he "needed to find God and that [he] was a Devil worship[ ]er." Ex. A to Mem. of Law in Supp. of Mot. for J. on the Pleadings, Dkt. No. 39. Bebber also claims that these communications persisted, despite Plaintiff having been twice contacted by police regarding the matter, and that the communications caused Bebber and his wife to be "annoyed and alarmed." *Id.* Under these set of facts, it is clear the officers had probable cause to arrest Plaintiff for second degree aggravated harassment.[FN4] Accordingly, Plaintiff's claim for false arrest against Defendants is dismissed.

FN4. The court is constrained to express its curiosity regarding the claim included in the misdemeanor information, signed by the arresting officer, that through the notice of trespass letter which was sent to Mr. Bebber, Plaintiff "purport[ed] to be a representative of Syracuse Housing Authority when in fact he is not." Ex. A to Mem. of Law in Supp. of Mot. for

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

710 F.Supp.2d 248

(Cite as: 710 F.Supp.2d 248)

J. on the Pleadings, Dkt. No. 39. Despite the dubious relevance of said claim to the charge of second degree aggravated harassment, a fair reading of the referenced notice of trespass letter reveals no such representation by Plaintiff.

[26] Further, the only allegations in the Complaint which implicate the City Defendants and the SHA Defendants are those allegations regarding Plaintiff's claims of excessive force and false arrest. Accordingly, those defendants are dismissed from this action. It should be noted that although the SHA Defendants have not made a motion to dismiss this action as against them, the court may sua sponte dismiss claims against a non-moving defendant in the interest of judicial economy. *See Hollander v. Copacabana Nightclub,* 580 F.Supp.2d 335, 342-43 (S.D.N.Y.2008) (*citing Perez v. Ortiz,* 849 F.2d 793, 797 (2d Cir.1988); *Leonhard v. United States,* 633 F.2d 599, 609 n. 11 (2d Cir.1980) ("The district court has the power to dismiss a complaint sua sponte for failure to state a claim.")).

### c. Failure to Intervene

[27] County Defendants address a claim by Plaintiff for failure to intervene to protect against the infringement of Plaintiff's constitutional rights under the Fourth Amendment in the context of his claim for false arrest and imprisonment. However, because the court has deemed the arrest lawful under the Fourth Amendment, and consequently dismissed the false arrest claim, to the extent Plaintiff claims a failure to intervene to prevent his false arrest or imprisonment, such a claim is likewise dismissed.

### d. Unreasonable Search

[28][29] The court interprets the Complaint to allege a claim against the County Defendants for an unreasonable search under the Fourth Amendment. Plaintiff alleges that he was subjected to a strip search after his admission to the Justice Center. According to the law in this circuit, "persons charged with a misdemeanor and remanded to a local correctional facility ... have a right to be free of a strip search absent reasonable suspicion that they are carrying contraband or weapons[.]" *Shain v. Ellison,* 273 F.3d 56, 66 (2d Cir.2001). *See also Iqbal,* 490 F.3d at 172. After explaining that, "[u]nlike persons already in jail who receive contact visits, arrestees do not ordinarily have

notice that they are about to be arrested and thus an opportunity to hide something[,]" the Second Circuit noted that "a person who is allowed to visit the bathroom unescorted**267** before an arrest" would be an exception where "reasonable suspicion may well exist." *Shain,* 273 F.3d at 64. Where a detainee was strip searched after being arrested for a misdemeanor, and where the nature of the charge had nothing to do with drugs or weapons, reasonable suspicion was found to be lacking even though the detainee appeared to be under the influence of alcohol. *See Dodge v. County of Orange,* 282 F.Supp.2d 41, 59-60 (S.D.N.Y.2003). Here, according to the allegations in the Complaint as well as the arrest report, including Mr. Bebber's statement in support of Plaintiff's arrest, none of the circumstances surrounding Plaintiff's arrest or the underlying charge would warrant a reasonable suspicion that Plaintiff was carrying contraband or weapons at the time he was strip searched by the officers at the Justice Center. For this reason, the court is not able to conclude that Plaintiff has failed to state a Fourth Amendment claim against the individually named County Defendants, John Does. Accordingly, the County Defendants' motion to dismiss the Complaint is denied in this regard.

### 4. Deliberate Indifference

### a. Failure to Protect

[30] The court also interprets Plaintiff's papers to allege facts in support of a claim that County Defendants failed to protect him from harm while in custody at the Justice Center. According to the Complaint, Plaintiff was placed in a group cell at the Justice Center, wherein he witnessed one prisoner assault another, while "[t]he County Jail officers [ ] watch[ed] without any reaction." Compl. ¶ 18. After the assault ended, the assailant was removed from the cell, but before the assailant was removed, he "asked Plaintiff if he had panties." *Id.* In his papers in opposition to the County Defendants' motion to dismiss, Plaintiff alleges that he was subjected to "unwanted sexual contact and/or assault" when he was placed in the group cell, and that the "officers from [the] County jail ... did not exercise their affirmative duty to protect the constitutional rights of citizens from infringement ... premised on the official presence and realistic opportunity to intervene to prevent harm from occurring." Pl.'s Mem. of Law in Opp'n to Mot. to Dismiss, at 14-15, Dkt. No. 20.

[31][32][33] The Due Process Clause of the

710 F.Supp.2d 248

(Cite as: 710 F.Supp.2d 248)

Fourteenth Amendment protects pre-trial detainees, such as Plaintiff here, against intolerable prison conditions. *See Patrick v. Amicucci,* No. 05-Civ. 5206, 2007 WL 840124, at *3 (S.D.N.Y. Mar. 19, 2007) (*citing Weyant,* 101 F.3d at 856). The failure to protect a pre-trial detainee from harm is one type of intolerable prison condition. Thus, a prison official's deliberate indifference to a substantial risk of serious harm to an inmate may form the basis of a deliberate indifference claim. *See id.* However, where, as here, the plaintiff does not allege that he was assaulted or threatened by other inmates, or where plaintiff only alleges that he was in fear of an assault, a claim for failure to protect must be dismissed. *See Chalif v. Spitzer,* No. 9:05-CV-1355, 2008 WL 1848650, at *9 (N.D.N.Y. Apr. 23, 2008) (*citing Dawes v. Walker,* 239 F.3d 489, 494 (2d Cir.2001) (*overruled on other grounds* ); *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998)). Here, while Plaintiff alleges that an assault took place in his presence while County Defendant officers watched, and that the assailant asked Plaintiff "if he had panties" which caused Plaintiff to fear for his safety, there is no allegation that Plaintiff was assaulted. Moreover, according to Plaintiff, the assailant was removed from the group cell after the assault, eliminating whatever risk of harm existed. Accordingly,**268** to the extent Plaintiff claims that County Defendants failed to protect him in violation of his Due Process rights, said claim is dismissed.

### *b. Failure to Provide Medical Care*

Also included in the Complaint are allegations that during his incarceration at the Justice Center, Plaintiff had a bruised rib, was in pain, and was not given Tylenol with Codeine or his other medication. *See* Compl. ¶ 17. Plaintiff alleges that "[e]xcept one person, nobody addressed [his] medical concerns." Compl. ¶ 21.

[34][35] Where a pre-trial detainee alleges deliberate indifference to a medical need while incarcerated, such a claim is evaluated under the Due Process Clause of the Fourteenth Amendment. *See Arac v. Bodek,* 213 F.3d 625 (2d Cir.2000) (*citing City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 244-45, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983)). While the exact standard to be applied to such a claim has not been made clear, what is known is that the pre-trial detainee's rights are at least as great as those provided to a convicted prisoner under the Eighth

Amendment, *see City of Revere,* 463 U.S. at 244, 103 S.Ct. 2979, and that something more than negligence on the part of the defendant is required, *see Bryant v. Maffucci,* 923 F.2d 979, 984 (2d Cir.1991). Consequently, courts tend to apply the Eighth Amendment standard when deciding a pre-trial detainee's claim for deliberate indifference to a medical need under the Fourteenth Amendment. *See Lloyd v. Lee,* 570 F.Supp.2d 556, 570 (S.D.N.Y.2008). *See also Lara v. Bloomberg,* No. 04-CV-8690, 2008 WL 123840, at *2 n. 4 (S.D.N.Y. Jan. 8, 2008) (*citing Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000)). Accordingly, in order for a pre-trial detainee to establish a claim for deliberate indifference to a medical need, a plaintiff must allege

(1) a deprivation that is 'sufficiently serious,' i.e., a deprivation that presents a 'condition of urgency, one that may produce death, degeneration, or extreme pain,' *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (*quoting Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting)), and (2) reckless indifference, that is, 'defendants were aware of plaintiff's serious medical needs and consciously disregarded a substantial risk of serious harm[,]' *Singleton v. Perilli,* No. 03 Civ. 2271(DC), 2004 WL 74238, at *3 (S.D.N.Y. Jan. 16, 2004).

*Lloyd,* 570 F.Supp.2d at 566.

[36] Here, to begin with, Plaintiff's allegation of a bruised rib does not satisfy the requirement of a sufficiently serious deprivation. In one case, for example, even where the court assumed as true the plaintiff's allegation that he suffered "soreness, pain in and a lump behind his right ear, lump on the back of his head, small abrasions on his nose and knuckle, and bruising to his back, ribs and legs," it nonetheless found that those injuries do not constitute the requisite "serious medical need" in order to satisfy the first prong of a deliberate indifference claim. *Jones v. Furman,* No. 02-CV-939F, 2007 WL 894218, at *10 (W.D.N.Y. Mar. 21, 2007) (*citing Hemmings v. Gorczyk,* 134 F.3d 104, 109 (2d Cir.1998)).

[37] However, even if Plaintiff were to satisfy the first element of his deliberate indifference claim, he still has

710 F.Supp.2d 248

(Cite as: 710 F.Supp.2d 248)

failed to state such a claim because he admits that his medical concerns were in fact addressed by someone at the Justice Center. While Plaintiff alleges in the first instance that "his medical concerns were not addressed at all," in the very next sentence he claims "[e]xcept one person, nobody addressed [his] medical concerns." **269 Compl. ¶ 21. Accordingly, because Plaintiff's alleged injury is not sufficiently serious, and because he alleges that his medical concerns were addressed by at least one person, he fails to state a claim against Defendants for deliberate indifference to a medical need.

### c. Deprivation of Food

[38][39] Next, while Plaintiff claims "[h]e was held without drink and food," ¶ 19, he also claims he was given breakfast the morning following his initial detention, *see* ¶ 22. Courts have found a constitutional violation where an inmate has suffered "[s]ubstantial deprivation of nutritionally adequate food ... if the food is served in a fashion that presents an immediate danger to the inmate's health or well-being." *Beckford v. Portuondo,* 151 F.Supp.2d 204, 213 (N.D.N.Y.2001) (internal quotation and citation omitted). Where a prisoner is deprived of two of three meals served regularly each day, a constitutional violation may exist if that one meal is nutritionally inadequate. *See id.* Here, Plaintiff was incarcerated after his arrest at 5:35 p.m. *See* Ex. A to Mem. of Law in Supp. of Mot. for J. on the Pleadings, Dkt. No. 39. Thus, the fact that he received no food or drink until the following morning does not establish a constitutional violation. Accordingly, to the extent Plaintiff claims his due process rights were violated by the deprivation of food and water, said claim is dismissed.

### B. Claims Against Onondaga County Sheriff's Office; Onondaga County Justice Center; and Syracuse City Police Department

[40][41] The County Defendants argue that the Onondaga County Sheriff's Office and the Onondaga County Justice Center, which is a facility operated by the Sheriff's Office, are not proper defendants, but that "the real party in interest is the municipality County of Onondaga." Mem. of Law in Supp. of Mot. to Dismiss, at 3, Dkt. No. 16. The City Defendants, while not directly addressing the issue, assume that the City of Syracuse is a defendant. *See* Mem. of Law in Supp. of Mot. for J. on the

Pleadings, at 8, Dkt. No. 37. It is important to note that an administrative arm of a municipality, such as SPD or the Onondaga County Sheriff's Office, "cannot sue or be sued because it does not exist separate and apart from the municipality and does not have its own legal identity." *Leland v. Moran,* 100 F.Supp.2d 140, 145 (N.D.N.Y.2000) (internal quotation omitted). *See also Clayton v. City of Kingston,* 44 F.Supp.2d 177, 183 (N.D.N.Y.1999). Accordingly, all claims against the Onondaga County Sheriff's Office, the Onondaga County Justice Center, which is a facility operated by the Sheriff's Office, and SPD are dismissed. However, because of the City and County Defendants' assertions that the City of Syracuse ("the City") and County of Onondaga ("the County") are the proper parties, and the court's duty to liberally construe Plaintiff's papers due to his pro se status, the court will consider the Complaint to include claims against the City and County.

[42][43] Although Plaintiff insists that the municipal defendants are liable for the actions of their employees under the doctrine of respondeat superior, the law is clear that a municipal entity may not be liable pursuant to § 1983 under the theory of respondeat superior, but may be only liable where its employee acted pursuant to an official policy, custom, or practice of said entity. *See Monell v. Dep't of Soc. Serv. of the City of New York,* 436 U.S. 658, 694-95, 98 S.Ct. 2018, 2037-38, 56 L.Ed.2d 611 (1978); *Rojas v. Alexander's Dep't Store, Inc.,* 924 F.2d 406, 408 (2d Cir.1990). Such a policy, custom or practice **270 may "be inferred where the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction." *Patterson,* 375 F.3d at 226 (*quoting Kern v. City of Rochester,* 93 F.3d 38, 44 (2d Cir.1996)) (internal quotation marks omitted).

[44] To be sure, "where a *Monell* claim is based solely on the actions of a municipality's officers, municipal liability cannot exist if the individual defendants have not violated the plaintiff's constitutional rights." *Matican v. City of New York,* 424 F.Supp.2d 497, 508 (E.D.N.Y.2006) (*citing City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986)). Accordingly, because the claims here against the City employees have been dismissed, it follows that any *Monell* claim against the City is likewise dismissed.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

710 F.Supp.2d 248

(Cite as: 710 F.Supp.2d 248)

For its part, the County Defendants argue that Plaintiff fails to properly plead a *Monell* claim against the County. The County argues that Plaintiff fails to allege the existence of a policy or custom that led to any constitutional deprivation he suffered, and that he fails to allege any facts to support an inference of a such a policy or custom.

[45] The Supreme Court has held that no heightened pleading standard should be applied to § 1983 actions alleging claims for municipal liability under *Monell*. *See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). The Court in *Leatherman* reiterated, in accordance with *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) that under Rule 8, all that is required is "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Leatherman,* 507 U.S. at 168, 113 S.Ct. at 1163 (*quoting Conley,* 355 U.S. at 47, 78 S.Ct. at 103) (internal quotations omitted).[FN5] The Second Circuit has evolved from its requirement that "a complaint must contain specific allegations of fact which indicate a deprivation of constitutional rights[,]" *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987), to the post- *Leatherman* conclusion that "the court may not go beyond FRCP 8(a)(2) to require the plaintiff to supplement his pleadings with additional facts that support his allegation of knowledge either directly or by inference. Whether the plaintiff can produce evidence to create a genuine issue with regard to his allegation is to be resolved through a motion for summary judgment[,]" *Phelps v. Kapnolas,* 308 F.3d 180, 186-87 (2d Cir.2002). In *Phelps,* on an Eighth Amendment claim against prison officials for deliberate indifference, the court found that the mere allegation of an official's knowledge of a substantial risk to the plaintiff's safety was enough to set forth the subjective element of said claim. *See id.* at 186. It is clear from the language of that opinion that a plaintiff need not plead facts to support allegations of constitutional violations beyond what is required by Rule 8. *See id. See also Hernandez v. Goord,* 312 F.Supp.2d 537, 544-45 (S.D.N.Y.2004). Regarding *Monell* claims in particular, "[t]he pleading requirement for a § 1983 claim against a

municipality will be met if a plaintiff alleges that 'a formal policy which is officially endorsed by the municipality' caused the plaintiff's injuries." **271 *Perez v. Westchester County Dep't of Corrs.,* No. 05-Civ.-8120, 2007 WL 1288579, at *5 (S.D.N.Y. Apr. 30, 2007) (*quoting Moray v. City of Yonkers,* 924 F.Supp. 8, 12 (S.D.N.Y.1996) (*citing Monell,* 436 U.S. at 690, 98 S.Ct. 2018)). Even where allegations in the complaint of the existence of an official policy are not buttressed by supporting facts, dismissal is not warranted as long as the defendant has "fair notice of what the plaintiff's claim is and the grounds upon which it rests[,]" *Nesbitt v. County of Nassau,* No. 05-CV-5513, 2006 WL 3511377, at *4 (E.D.N.Y. Dec. 6, 2006) (*quoting Conley,* 355 U.S. at 47, 78 S.Ct. 99). "It is up to the 'liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims.' " *Id.* (*quoting Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) and *citing Leatherman,* 507 U.S. at 168-69, 113 S.Ct. 1160). *See also Conley,* 355 U.S. at 47-48, 78 S.Ct. at 103 ("Such simplified 'notice pleading' is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues.").

> FN5. Abrogated on other grounds by *Bell Atlantic v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). To be sure, the Court in *Bell Atlantic,* while rejecting *Conley* 's "no set of facts" language, nonetheless favorably cited the "fair notice" language cited here. *See* 127 S.Ct. at 1964.

[46] Here, to be sure, Plaintiff alleges that Chief Miguel "has been and still is responsible for the promulgation, and implementation of police procedures and practices among police officer of [SPD], sued herein as John Does, which officers include members of the Onondaga County Sheriff's Office ...." Compl. ¶ 51. Construing such an allegation liberally, as it must, the court determines that Plaintiff contends that both City and County Defendants have policies or procedures pursuant to which their employees carry out their duties. Because this allegation puts the County on notice of Plaintiff's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

710 F.Supp.2d 248

(Cite as: 710 F.Supp.2d 248)

*Monell* claim, the County's motion to dismiss in that regard is denied. However, it should be noted that the *Monell* claim is limited to the sole remaining Fourth Amendment claim regarding the alleged unlawful strip search.

Finally, the court notes that the County Defendants correctly argue that municipalities, and municipal employees sued in their official capacities, are not liable for punitive damages, and accordingly, any claims for punitive damages against the County or any County employee sued in his official capacity, are dismissed. *See Jefferson v. City of Tarrant, Ala.,* 522 U.S. 75, 118 S.Ct. 481, 482, 139 L.Ed.2d 433 (1997) (citing *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981)); *Ivani Contracting Corp. v. City of New York,* 103 F.3d 257, 262 (2d Cir.1997) (citing *Brandon v. Holt,* 469 U.S. 464, 471-73, 105 S.Ct. 873, 877-79, 83 L.Ed.2d 878, (1985)).

**C. State Common Law Claims**

[47] Plaintiff's claims for negligence, negligent infliction of emotional distress and intentional infliction of emotional distress remain for consideration. County Defendants argue that Plaintiff's state law claims must be dismissed because he has failed to file a notice of claim as is required under New York's General Municipal Law. N.Y. GEN. MUN. LAW § 50-e (McKinney). It is true that "[a]s a condition precedent to commencing a tort action against New York municipalities, or any of their officers, agents, or employees, New York General Municipal Law section 50-e requires plaintiffs to file a notice of claim within ninety days after the claim arises." *Olsen v. County of Nassau,* No. CV-05-3623, 2008 WL 4838705, at *1 (E.D.N.Y. Nov. 4, 2008). Further, while Plaintiff may seek permission to file a late notice of claim, he must do so in state court. *See Olsen,* 2008 WL 4838705, at *3 (citing **\*272** New York General Municipal Law § 50-e(5)(7)). Accordingly, Plaintiff's state law claims must be dismissed without prejudice on this basis. Nonetheless, the court is constrained to note that even if Plaintiff had filed a timely notice of claim, his negligence and NIED claims fail, and therefore are dismissed on the merits.

[48][49] In New York, in order to establish a claim of negligence, Plaintiff must prove "(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." *Muller-Paisner v. TIAA,* 289 Fed.Appx. 461, 465 (2d Cir.2008) (internal quotation omitted). Here, Plaintiff fails to allege that he suffered a physical injury as a result of the County Defendants' action or inaction. Plaintiff alleges only emotional damages. Accordingly, the court must evaluate Plaintiff's claim as solely a claim for negligent infliction of emotional distress ("NIED"). *See Stephens v. Shuttle Associates, L.L.C.,* 547 F.Supp.2d 269, 275 (S.D.N.Y.2008).

In his papers in opposition to the County Defendants' motion to dismiss, Plaintiff contends that he claims liability on his NIED cause of action under both the bystander and direct duty theories and that Plaintiff "find himself [at] risk of bodily harm resulting from really possible assault and/or rape." Pl.'s Mem. of Law in Opp'n to Mot. to Dismiss, at 16, Dkt. No. 20.

[50][51][52][53] A plaintiff who alleges that he suffered emotional harm due to a defendant's negligence may recover on a claim for NIED in New York under either a "bystander theory," meaning the plaintiff was "a bystander who was in the zone of danger [and] suffers emotional trauma as a result of [his] observations," or a "direct duty theory," meaning "the defendant breache[d] a direct duty to [the] plaintiff which results in emotional injury to the plaintiff." *Stephens,* 547 F.Supp.2d at 275. In order to recover under the bystander theory, however, a plaintiff must prove that he witnessed "the death or serious bodily injury of a member of [his] immediate family" which clearly has not been alleged by Plaintiff in this case. *Id.* Accordingly, Plaintiff's only chance for recovery here would be under the direct duty theory, wherein "a plaintiff suffers an emotional injury from defendant's breach of a duty which unreasonably endangered [plaintiff's] own physical safety." *Id., at 275-276.* Nonetheless, "[t]he duty in such cases must be specific to the plaintiff and not some amorphous, free-floating duty to society." *Id.* Moreover, where a plaintiff "has not established that his physical safety was ever threatened or endangered by defendants, he cannot recover under either [the direct duty theory or bystander] theory." *Id.* (quoting *Danielak v. City of New York,* No. 02 Civ. 2349, 2005 WL 2347095, at *18 (E.D.N.Y. Sept. 26, 2005)).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

710 F.Supp.2d 248

(Cite as: 710 F.Supp.2d 248)

[54] Plaintiff's allegation regarding the threat to his physical safety is exceptionally dubious. Essentially, Plaintiff claims that the John Doe defendants, officers at the Justice Center, stood by and watched while two other inmates who occupied the same group cell as Plaintiff engaged in a physical altercation. Thereafter, Plaintiff alleges the officers removed the assailant from the group cell, but not before the assailant asked Plaintiff is he was wearing panties. From this sequence of events, Plaintiff concludes that he was at "risk of bodily harm resulting from really possible assault or/and rape." Pl.'s Mem. of Law in Opp'n to Mot. to Dismiss, at 16, Dkt. No. 20. Based the aforementioned allegations, Plaintiff has failed to plead the requisite unreasonable endangerment to his physical safety in order for his NIED claim to go forward. Accordingly, even if Plaintiff had filed a timely notice of claim, the County Defendants' motion to dismiss his negligence **273 and NIED claims must nonetheless be granted on the merits.

[55] Such is not the case for Plaintiff's IIED claim against the John Doe County Defendants.[FN6] "To state a claim for IIED under New York law, [a] plaintiff must plead the following four elements: (1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal relationship between the conduct and the resulting injury; and (4) severe emotional distress." *Davey v. Jones,* 2007 WL 1378428, at *3 (S.D.N.Y.2007) (*citing Bender v. City of New York,* 78 F.3d 787, 790 (2d Cir.1996)).

> FN6. Plaintiff's IIED claim against the County must fail, as it is "well-settled that public policy bars claims sounding in intentional infliction of emotional distress against a government entity." *Rivera v. City of New York,* 392 F.Supp.2d 644, 657 (S.D.N.Y.2005) (*quoting Lauer v. City of New York,* 240 A.D.2d 543, 659 N.Y.S.2d 57, 58 (1997)).

[56] As to the first element, New York courts impose a heavy burden on the plaintiff such that "the alleged conduct must be so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in

a civilized society." *Davey,* 2007 WL 1378428, at *3 (internal citations and quotations omitted). The Second Circuit has noted that New York state courts have sustained IIED claims where there is "some combination of public humiliation, false accusations of criminal or heinous conduct, verbal abuse or harassment, physical threats, permanent loss of employment, or conduct contrary to public policy." *Stuto v. Fleishman,* 164 F.3d 820, 828 (2d Cir.1999). When evaluating IIED claims regarding an unlawful strip search, most district courts in this circuit have followed suit, allowing the claim to go forward where some other circumstance existed in combination with the unlawful search. *See, e.g. Jean-Laurent v. Hennessy,* No. 05-CV-1155, 2008 WL 3049875, at *20 (E.D.N.Y. Aug. 1, 2008) (denying summary judgment on an IIED claim where questions of fact existed regarding whether the plaintiff was slammed against a car and strip searched in public without justification); *Travis v. Village of Dobbs Ferry,* 355 F.Supp.2d 740, 756 (S.D.N.Y.2005) (denying summary judgment on IIED claim where defendants lacked probable cause for the arrest, and accordingly, the strip search incident to the arrest was also unlawful, but where the court also found the facts of the case were outrageous in that the arrest essentially was based on a hunch that plaintiff was in possession of illegal drugs, and the strip search was conducted in order to corroborate said hunch); *Mejia v. City of New York,* 119 F.Supp.2d 232, 286 (E.D.N.Y.2000) (denying summary judgment on IIED claim where questions of fact remained regarding whether strip search was justified and whether ethnic slurs were used by defendant during plaintiff's arrest). However, one district court in this circuit denied a defendant's motion for summary judgment on plaintiff's IIED claim where there was a question of fact regarding whether the plaintiff was subjected to a strip search without probable cause, but where none of the other aforementioned circumstances were present. *See Caceres v. Port Authority of New York and New Jersey,* No. 06-Civ.-1558, 2008 WL 4386851, at *13 (S.D.N.Y. Sept. 24, 2008) (finding that "subjecting [a] plaintiff to a strip search without probable cause for such an intrusive search could be considered extreme and outrageous").

[57] At this stage of the litigation the court is unable to determine whether Plaintiff's strip search was lawful,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

710 F.Supp.2d 248

(Cite as: 710 F.Supp.2d 248)

and it appears that an unlawful strip search, without more, may be considered extreme *274 and outrageous conduct. Accordingly, should Plaintiff be granted leave in state court to file a late notice of claim, the court would, based on the allegations in the Complaint, deny the County Defendants' motion to dismiss insofar as Plaintiff states an IIED claim against the John Doe County Defendants. Accordingly, Plaintiff's claim of IIED against the John Doe County Defendants is dismissed without prejudice to renew upon the filing of a notice of claim pursuant to New York General Municipal Law section 50-e.

Regarding the City Defendants and SHA Defendants, because the federal civil rights claims against them, of which the court had original jurisdiction, have been dismissed in their entirety, the court may dismiss the remaining state law claims against them due to the lack of diversity jurisdiction. See Weinraub v. Glen Rauch Securities, Inc., 399 F.Supp.2d 454, 464 (S.D.N.Y.2005) (citing 28 U.S.C. § 1367(c)(3); Martinez v. Simonetti, 202 F.3d 625, 636 (2d Cir.2000)). Nonetheless, because there are no allegations in the Complaint sufficient to state a claim for negligence, NIED or IIED against the City Defendants or SHA Defendants, those claims are dismissed against said defendants with prejudice.

**VI. Conclusion**

In accordance with the foregoing discussion of the pending motions, it is hereby

ORDERED that the motion for judgment on the pleadings by defendants, City of Syracuse; Syracuse City Police Department; Gary Miguel, Chief of Police, Syracuse City Police Department; and John Does, see Dkt. No. 37, is GRANTED, and it is further

ORDERED that all claims against defendants, City of Syracuse; Syracuse City Police Department; Gary Miguel, Chief of Police, Syracuse City Police Department; and John Does are DISMISSED; and it is further

ORDERED that all claims against defendants Syracuse Housing Authority Security and John Doe, Syracuse Housing Authority Detective, are sua sponte DISMISSED; and it is further

ORDERED that the motion to dismiss for failure to state claims upon which relief may be granted by defendants County of Onondaga, Onondaga County Sheriff's Office, Onondaga County Justice Center and John Does, see Dkt. No. 16, is GRANTED in part and DENIED in part, and it is further

ORDERED that the Clerk of the Court shall change the caption of this case to reflect the substitution of the County of Onondaga as a defendant for the Onondaga County Sheriff's Office and the Onondaga County Justice Center; and it is further

ORDERED that the Clerk of the Court shall close this case as to all defendants except the County of Onondaga and John Does; and it is further

ORDERED that Clerk of the Court shall serve a copy of this memorandum, decision and order upon plaintiff, Wlodzimierz J. Dzwonczyk, by regular mail.

IT IS SO ORDERED.

N.D.N.Y.,2008.

Dzwonczyk v. Syracuse City Police Dept.
710 F.Supp.2d 248
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)

(Cite as: 2008 WL 4371766 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Sean TAPP, Plaintiff,
v.
R. TOUGAS, et al., Defendants.
Civil Action No. 9:05-CV-01479 (NAM/DEP).

Aug. 11, 2008.

Sean Tapp, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Steven H. Schwartz, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Sean Tapp, a former New York prison inmate who is now apparently in the custody of Pennsylvania officials, has commenced this civil rights action pursuant to 42 U.S.C. § 1983 against Donald Selsky, who at the relevant times served as an Assistant Commissioner of the New York State Department of Correctional Services ("DOCS"), and various other employees of the department including four corrections officers, a sergeant, a nurse, a hearing officer, and a guidance counselor, complaining of several constitutional violations alleged to have occurred during the time of his confinement in New York. In his complaint, as amended, plaintiff asserts claims stemming from a series of events precipitated by an altercation between himself and several corrections officers. Plaintiff maintains that he was assaulted by corrections workers without provocation, denied adequate medical care for injuries sustained during the course of the conflict, and subjected to a lengthy period of disciplinary special housing unit ("SHU") confinement as a result of the incident, purportedly without first having been afforded the procedural safeguards guaranteed under the Fourteenth Amendment.

As relief, *inter alia,* plaintiff seeks a mandatory injunction directing the restoration of good time credits forfeited as a result of the incident and directing his release from prison, termination of all defendants' employment with the DOCS, and recovery of $15 million in compensatory and punitive damages.

Now that pretrial discovery has concluded, the defendants have moved for summary judgment requesting dismissal of plaintiff's claims, arguing that they are substantively deficient, and further asserting their entitlement to qualified immunity. In addition to opposing defendants' motion, plaintiff has since cross-moved for summary judgment on the issue of liability, based substantially upon the allegations as set forth in his complaint.

Despite the existence of what at first blush appear to be conflicting accounts of the circumstances surrounding plaintiff's excessive force claim, having surveyed the record I am convinced no reasonable factfinder could credit plaintiff's version and find in his favor with respect to that claim. Additionally, discerning the existence of no genuine issues of material fact surrounding plaintiff's remaining claims, including for deliberate medical indifference, the issuance of a false misbehavior report, and violation of his procedural due process rights, and similarly concluding that no reasonable factfinder could rule in plaintiff's favor on any of those claims, I recommend that defendants' summary judgment motion be granted in its entirety, and plaintiff's cross-motion addressing those claims correspondingly be denied.

I. *BACKGROUND*[FN1]

> FN1. In light of the procedural posture of the case, the following recitation is drawn from the record now before the court, with all inferences drawn, and ambiguities resolved, in favor of the plaintiff. *See Wells-Williams v. Kingsboro Psychiatric Ctr.,* No. 03-CV-134, 2007 WL 1011545, at \*2 (E.D.N.Y. Mar. 30, 2007) (citations omitted). To the extent that the parties' versions of the relevant events differ, those

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)

(Cite as: 2008 WL 4371766 (N.D.N.Y.))

discrepancies will be noted.

At the times relevant to his claims, the plaintiff was entrusted to the custody of the DOCS and designated to the Great Meadow Correctional Facility ("Great Meadow"), a maximum security prison facility located in Comstock, New York. *See generally* Amended Complaint (Dkt. No. 19) ¶ 3; *see also* Brown Aff. (Dkt. No. 50-5) Exh. A at 60:21-22 (hereinafter cited as "Tapp Dep. (Dkt. No. 50-6) at ____."). On June 24, 2005, while waiting in a line in the Great Meadows B-block for a call out slip permitting him to go to the library, and later to a scheduled religious service, plaintiff was involved in a physical conflict with correctional officers at the Great Meadow facility. *See* Amended Complaint (Dkt. No. 19) ¶¶ 4-5, 7-9. It is that incident, together with events which followed, which form the underpinnings for plaintiff's claims in this action.

**\*2** Neither Tapp nor the defendants dispute the fact that a physical altercation, initially involving only the plaintiff and Corrections Officer R. Tougas, but with later intervention by other corrections officers, occurred on the date in question. The parties' respective versions of the controlling events, however, are sharply contradictory, particularly as relates to the issue of who initiated the confrontation. While both sides agree that the plaintiff attempted to go to the front of a relatively lengthy line of inmates awaiting call out passes, accustomed as he was to having his daily library pass already written and awaiting him, and that the plaintiff was ordered by Corrections Officer Tougas to return to the back of the line but ignored that directive, it is at this point that the parties' versions of the relevant events diverge.

Defendants assert that upon moving ahead of the other inmates also awaiting call out slips, Tapp was given a direct order by Corrections Officer Tougas to return to his place in line, and when he refused to obey that directive and instead uttered expletives directed toward that officer, was ordered to return to his cell-an instruction which he also ignored. Tougas Decl. (Dkt. No. 50-24) ¶¶ 6-10. After Tapp refused a further order to place his hands on the cat walk bars, instead assuming an offensive fighting stance, raising his clenched fist and lunging at the officer, a struggle ensued between the two. *Id.* ¶¶ 10-17.

After signaling an alert in an attempt to gain control of the situation, with the assistance of Corrections Officer Sharrow, another defendant in the action, Tougas was ultimately able to force the plaintiff to lie face down on the floor, at which point mechanical restraints were applied by a third corrections officer, defendant Rando, and plaintiff was transported to the facility hospital for examination, strip frisked, and then taken to the facility SHU. *Id.* ¶¶ 16-17; Sharrow Decl. (Dkt. No. 50-22) ¶¶ 4-10 and Exh. A; *see also* Rando Decl. (Dkt. No. 50-18) ¶ 4. While at the prison infirmary plaintiff was examined by defendant Santini-Correa, who did not observe any injuries to the plaintiff, nor did he complain of any during her examination. Santini-Correa Decl. (Dkt. No. 50-8) ¶¶ 5-11 and Exh. A. During that examination, Nurse Santini-Correa wiped dried blood which did not appear to be his from the plaintiff's back. *Id.*

Plaintiff's sworn submissions recite a significantly different version of the relevant events. While acknowledging that he ignored a directive from Corrections Officer Tougas, and at one point instructed the officer to "shut the f__k up[,]" plaintiff maintains that after a verbal exchange between the two defendant Tougas "outright attacked" him, "banging [his] head against cell bars while he pulled on inmate & repeatedly punched [him] in the face, body & head for no apparent reason." Amended Complaint (Dkt. No. 19) ¶ 4; *see also* Tapp Dep. (Dkt. No. 50-6) at 66-72. While acknowledging that he punched defendant Tougas in the mouth during the course of the encounter, Tapp also asserts that it was only after he was punched and his shirt was pulled over his head, adding that he did so in an effort to defend himself. *Id.* Plaintiff also asserts that other corrections employees responded to an alert concerning the incident and continued to assault him and that defendant Michael, a corrections sergeant, stood idly by and refused to intercede on his behalf. Tapp Dep. (Dkt. No. 50-6) at 72-73.

**\*3** According to Tapp, once he was subdued and mechanical restraints were applied, he was escorted to the infirmary by defendant Rando who, along the way, intentionally stepped on his leg chains causing him to experience pain in his Achilles tendon. Tapp Decl. (Dkt. No. 50-6) at 75-76. Upon his arrival at the facility

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)

(Cite as: 2008 WL 4371766 (N.D.N.Y.))

hospital, plaintiff claims to have complained of pain in his wrist, back, right shoulder, and groin and having requested medical attention for his injuries. *Id.* at 88. Plaintiff further maintains that as a result of the incident he experienced blood in his urine, but that at the directive of defendant Michael, Nurse Santini-Correa "refused to note actual injuries of plaintiff such as swollen testicles, blood in urine & stool, lower back pain, bruises to [plaintiff's] wrist & face while she prevented co-workers from seeing [plaintiff] at sick call for" his injuries. Amended Complaint (Dkt. No. 19), at ¶¶ 5-6.

On the date of the incident, plaintiff was issued a misbehavior report charging him with multiple violations of prison disciplinary rules stemming from the altercation, including assault on staff (Rule 100.11), engaging in violent conduct (Rule 104.11), creating a disturbance (Rule 104.13), violating a direct order (Rule 106.10), and failure to comply with frisk and search procedures (Rule 115.10) .[FN2] *See* Amended Complaint (Dkt. No. 19) ¶ 4; Tougas Decl. (Dkt. No. 50-24) ¶ 19 and Exh. A; Harvey Decl. (Dkt. No. 50-10) ¶ 5 and Exh. A, p. 9. A Tier III superintendent's hearing was convened at Great Meadow to address the charges set forth in the misbehavior report, beginning on July 1, 2005 and ending two weeks later on July 15, 2005; presiding at that hearing was Andrew Harvey, a Commissioner's Hearing Officer ("CHO") employed by the DOCS.[FN3] Harvey Aff. (Dkt. No. 50-10) ¶¶ 3-6 and Exh. A. In preparation for that hearing, following the filing of charges, plaintiff was offered a list of DOCS employees available to aid in preparation for the hearing and was assigned defendant Melanie Jones, a DOCS Guidance Specialist at the facility and his designated first choice, as his assistant. Amended Complaint (Dkt. No. 19) ¶ 12; Jones Decl. (Dkt. No. 50-14) ¶¶ 2-3 and Exh. A. In his amended complaint plaintiff asserts that defendant Jones conspired with others at the prison to deprive him of "everything that [he] was entitled too [sic] by due process of law." Amended Complaint (Dkt. No. 19) ¶ 12. Plaintiff's submissions, however, fail to identify any document or information obtained by defendant Jones that was withheld from him.

FN2. Plaintiff maintains that this misbehavior report was falsely written by defendant Tougas and deliberately fashioned to make it appear as if the plaintiff caused the incident by punching Tougas and resisting restraint. *See* Amended Complaint (Dkt. No. 19), at ¶ 4.

FN3. The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

In a declaration filed in support of defendants' summary judgment motion, defendant Jones advises that she met with the plaintiff on a total of three occasions to prepare for the impending disciplinary hearing. Jones Decl. (Dkt. No. 50-14) ¶ 4. According to Jones, during those meetings plaintiff requested numerous documents, and asked that she interview four witnesses identified by him. *Id.* ¶ 5. Upon interviewing those witnesses, defendant Jones ascertained that three of the four would agree to testify and secured a written statement from the fourth inmate declining plaintiff's request to testify on his behalf. *Id.* ¶ 5 and Exh. A. In addition, defendant Jones obtained most of the documents requested by the plaintiff, and advised him that other requested information could not be provided by prison officials. *Id.* ¶ 6. Among the documents withheld by prison officials from defendant Jones, as plaintiff's assistant, were Corrections Officer Tougas' medical records. *Id.* ¶ 7 and Exh. A.

**\*4** Defendant Jones explained her inability to obtain certain records to the plaintiff and informed him that in her role as his assistant she did not control what documents would be made available to the plaintiff, consistent with institutional security concerns and privacy interests. *Id.* ¶¶ 8-9. Defendant Jones also informed the plaintiff of his right to request additional information, either at the hearing or through other avenues. *Id.* ¶ 7.

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)

(Cite as: 2008 WL 4371766 (N.D.N.Y.))

At the conclusion of the hearing defendant Harvey found plaintiff guilty of all charges set forth in the misbehavior report, imposing a penalty which included eighteen months of disciplinary SHU confinement, with a corresponding loss of package, commissary and telephone privileges, and additionally recommending a twelve month loss of good time credits.[FN4] Harvey Aff. (Dkt. No. 50-10) ¶ 18 and Exh. A at pp. 3-4.

> FN4. Despite plaintiff's apparent belief otherwise, a Tier III superintendent's hearing officer is not empowered to make a final determination regarding forfeiture of good time credits; such determinations are left to the appropriate facility time allowance committee ("TAC"). *See Dawes v. Kelly,* No. 01CV6276, 2005 WL 2245688, at *3, 8 (W.D.N.Y. Sep. 14, 2005). Inmate claims regarding improperly withheld good time credits are not appropriately brought under 42 U.S.C. § 1983, the court having no power in such a case to direct that an inmate be released from custody, but instead must be pursued by means of habeas petitions brought pursuant to 28 U.S.C. §§ 2241 and/or 2254. *See generally Peralta v. Vasquez,* 467 F.3d 98, 104-05 (2d Cir.2006); *see also Jenkins v. Duncan,* No. 9:02-CV-0673, 2003 WL 22139796, at *2-3 (N.D.N.Y. Sep. 16, 2003) (Sharpe, D.J.).

CHO Harvey's determination, including the penalty imposed, was upheld following plaintiff's appeal of that decision to defendant Donald Selsky, formerly an Assistant DOCS Commissioner and the Director of Special Housing and Inmate Disciplinary Programs for the agency. Selsky Decl. (Dkt. No. 50-20) ¶¶ 2, 7 and Exh. A. Plaintiff opted not to avail himself of the right to commence a proceeding in New York State Supreme Court under Article 78 of the N .Y. Civil Practice Law and Rules further challenging that disciplinary determination.

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on November 29, 2005, and later filed an amended complaint-the operative pleading now before the court-on April 11, 2006.[FN5] *See*

Dkt. Nos. 1, 19. In his complaint, as amended, plaintiff asserts multiple constitutional violations relating to the events occurring on and after June 24, 2005 at Great Meadow including, *inter alia,* the use of excessive force and the failure to protect him from injury, deliberate indifference to his injuries, the deprivation of procedural due process, and denial of equal protection.[FN6,FN7] Named as defendants in plaintiff's amended complaint, apparently both in their official capacities and as individuals, are various DOCS employees, including Assistant Commissioner Selsky; Sergeant Michael; CHO Harvey; Corrections Officers Tougas, Wilson, Rando, and Sharrow; and Nurse Santini-Correa. Amended Complaint (Dkt. No. 19) at ¶¶ 4-12.

> FN5. From a review of the court's records it appears that the amendment was prompted by a court order dated March 28, 2006 directing the filing of an amended complaint naming Corrections Officer Wilson as an additional defendant before that officer could be served as a defendant. Dkt. No. 10.

> FN6. The introductory portion of plaintiff's complaint makes reference to supplemental jurisdiction over state law tort claims pursuant to 28 U.S.C. § 1367. See Amended Complaint (Dkt. No. 19) ¶ 2. The body of plaintiff's complaint, however, does not assert any such claims, which in any event could well be precluded under N.Y. Corrections Law § 24. *See Ierardi v. Sisco,* 119 F.3d 183, 186-88 (2d Cir.1997).

> FN7. In his motion for summary judgment plaintiff addresses additional claims not included in his complaint, including discrimination, violation of his right to free speech, and lost property. *See generally* Plaintiff's Motion (Dkt. No. 56). Because those matters are raised for the first time on motion for summary judgment, and they are not included within his amended complaint, the court will not address these additional claims. *See, e.g., Caidor v. Potter,* No. 5:02-CV-1486, 2007 WL 2847229, at *8 (N.D.N.Y. Sep. 26, 2007) (Mordue, C.J.) (refusing to hear a claim raised for the first time in a summary judgment motion).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)

(Cite as: 2008 WL 4371766 (N.D.N.Y.))

On February 20, 2008, following the close of discovery, the defendants filed a motion seeking summary judgment dismissing plaintiff's complaint in its entirety. *See generally* Defendants' Motion (Dkt. No. 50). In their motion defendants offer a variety of grounds for dismissal of plaintiff's claims, asserting deficiency of plaintiff's claims for violations of the Eighth Amendment, plaintiff's due process rights, and medical indifference. *Id.* Defendants also argue that plaintiff has not raised a cognizable constitutional question pertaining to the allegedly false misbehavior report issued by defendant Tougas, that this court lacks subject matter jurisdiction to decide plaintiff's due process claim based upon his failure to first invalidate the hearing results, and that they are entitled to qualified immunity. *Id.* In response, plaintiff has opposed defendants' motion and cross-moved for summary judgment, offering substantially the same arguments as those found in his complaint.[FN8] *See generally* Plaintiff's Motion (Dkt. No. 56).

FN8. Although the plaintiff devotes a portion of his motion submission to discussion of his efforts to exhaust administrative remedies, because the defendants have not raised failure to exhaust as an affirmative defense there is no need to address the issue in this report and recommendation. *See* Plaintiff's Brief (Dkt. No. 56) at Argument, Point 2; *see also* Schwartz Decl. (Dkt. No. 61) at ¶¶ 3-4.

**\*5** The parties' motions are now ripe for determination, and have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* FED. R. CIV. P. 72(b).

III. *DISCUSSION*

A. *Summary Judgment Standard*

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material," for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. FED. R. CIV. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)

(Cite as: 2008 WL 4371766 (N.D.N.Y.))

judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Excessive Force*

**\*6** The centerpiece of plaintiff's complaint is his claim of being beaten on June 24, 2005, initially by Corrections Officer Tougas, and later by others including Corrections Officers Wilson, Rando, and Sharrow, and that Sergeant Michael failed to intervene to protect him from injury. This component of plaintiff's civil rights claim implicates potential violations of the right of a sentenced prison inmate to be free from cruel and unusual punishment, as guaranteed under the Eighth Amendment.

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 998 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973) (Friendly, J.), *cert. denied sub nom., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462 (1973)). Analysis of claims of cruel and unusual punishment requires both objective and subjective examinations. *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999; *Wilson v. Seiter,* 501 U.S. 294, 298-99, 111 S.Ct. 2321, 2324 (1991); *Griffen,* 193 F.3d at 91.

The objective prong of the inquiry is contextual, and relies upon "contemporary standards of decency." *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999-1000 (quoting *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290 (1976)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a

prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). Under *Hudson,* even if the injuries suffered by a plaintiff " 'were not permanent or severe,' " a plaintiff may still recover if " 'the force used was unreasonable and excessive.' " *Corselli v. Coughlin,* 842 F.2d 23, 26 (2d Cir.1988) (quoting *Robinson v. Via,* 821 F.2d 913, 924 (2d Cir.1987)).

Turning to the subjective element, to prevail the plaintiff must establish that defendants acted with a sufficiently culpable state of mind. *Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994) (citing *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999). That determination is informed by four factors, including 1) the need for application of force; 2) the relationship between that need and the amount of force used; 3) the threat reasonably perceived by the responsible officials; and 4) any efforts made to temper the severity of a forceful response. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085. The principal focus of this inquiry "turns on 'whether force was applied in a good faith effort to maintain discipline or maliciously and sadistically for the very purpose of causing harm.' " *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson,* 481 F.2d at 1033).

**\*7** The portion of defendants' motion addressing whether plaintiff was subjected to a level of force which a reasonable factfinder could conclude was unlawful, considered against this backdrop, presents a close case. Because the versions of the relevant events offered by the various participants are sharply contradictory, it could be argued that defendants' motion invites the court to make a credibility determination, something which courts are generally loathe to do on motion for summary judgment. See *Snyder v. Goord,* 9:05-cv-01284, 2007 WL 957530, at \*9 (N.D.N.Y.2007) (McAvoy, S.J.).

In this instance, however, the evidence now before the court overwhelmingly establishes that the incident and resulting injuries to the participants was precipitated by the plaintiff and his admitted failure to comply with lawful

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)

(Cite as: 2008 WL 4371766 (N.D.N.Y.))

directives of C.O. Tougas and his admonition to that corrections officer that he should "shut the f__k up".[FN9] Tapp Dep. (Dkt. No. 50-6) at 66. Coupled with these factors is the stark contrast presented by evidence of the injuries suffered by the two primary participants. Corrections Officer Tougas, who the plaintiff admitted punching, received an injury during the conflict which required twelve stitches to repair. Tougas Decl. (Dkt. No. 50-24) ¶ 20; Tapp Dep. (Dkt. No. 50-6) at p. 69. By comparison the plaintiff, who contends that he was beaten, punched, dragged, and stomped on by Corrections Officer Tougas, with the assistance of Corrections Officers Wilson, Sharrow and Rando, suffered little if any injury despite the alleged participation of four corrections officers, as evidenced by both the sworn declaration of Nurse Santini-Correa, who examined him shortly after the incident, a videotape of plaintiff's escort following the incident, and photographs taken of him on that day. *See* Santini-Correa Decl. (Dkt. No. 50-8) ¶¶ 5-10; *see also* Dkt. No. 50-12. This evidence, augmented by a hearing officer's finding, following a disciplinary hearing at which plaintiff was provided due process, that it was the plaintiff who in fact assaulted staff members, including Corrections Officer Tougas, on the date in question, and the fact that at least on two prior occasions plaintiff was subjected to lengthy periods of disciplinary SHU confinement for having assaulted other DOCS staff members, convinces me that no reasonable factfinder could credit plaintiff's version and determine that the force applied by the corrections officers involved in the incident, including Corrections Officer Tougas, to control the situation and restore the safety and security of the institution, was unlawfully excessive.[FN10] *See Jeffreys v. City of New York, 426 F.3d 549, 555 (2d Cir.2005)* (in circumstances where the record is lacking in support of plaintiff's contradictory and incomplete statements, summary judgment may be appropriate upon the basis that no reasonable factfinder could credit plaintiff's version of the relevant events); *Aziz Zarif Shabazz v. Pico, 994 F.Supp. 460, 470 (S.D.N.Y.1998)* (same); *see also Panetta v. Crowley, 460 F.3d 388, 394 (2d Cir.2006)* (noting that "[j]udgment as a matter of law is appropriate if no reasonable factfinder could have viewed the evidence as supporting plaintiff's claim"). Accordingly, I recommend dismissal of plaintiff's Eighth Amendment claim against Corrections Officer Tougas, Wilson, Michael, Rando and Sharrow as a matter of law.

FN9. While the plaintiff apparently believed that Corrections Officer Tougas' directive that he return to the end of the line was somehow unreasonable, that belief did not legitimize Tapp's acknowledged failure to comply with that directive. *See Kalwasinski v. Artuz,* No. 02 CV 2582, 2003 WL 22973420, at *3 (S.D.N.Y.2003). As one court has noted,

Under New York law, "inmates are not free to choose which orders to obey and which to ignore. *Farid v. Coombe,* 236 A.D.2d 660, 653 N.Y.S.2d 715, 716 (App.Div.1997). This is true even where the inmate feels that the order infringes upon his or her rights. "Inmates may not refuse to obey orders issued by correction officers, even if the orders appear to be without authority or to infringe upon the inmate's constitutional rights." *Keith v. Coombe,* 235 A.D.2d 879, 880, 653 N.Y.S.2d 401 (N.Y.App.Div.1997). The penological rationale for this is clear. "The threat to prison security would be manifest were we to allow inmates to decide for themselves which orders to obey and which to ignore as violative of their rights and to act accordingly." *Rivera v. Smith,* 63 N.Y.2d 501, 516, 483 N.Y.S.2d 187, 472 N.E.2d 1015 (1984).

*Kalwasinski v. Artuz,* 2003 WL 22973420, at *3.

FN10. The incident at Great Meadow was not the first involving an altercation between the plaintiff and corrections officers. In 1996, while at the Attica Correctional Facility, plaintiff was found guilty of charges related to an alleged assault upon one or more corrections officers and was sentenced to serve three years of disciplinary confinement in the Attica SHU. *See* Tapp Dep. (Dkt. No. 50-6) at 53:3-55:22. Similarly, in 2000, while incarcerated at the Wende Correctional Facility, plaintiff became involved in a confrontation with a corrections officer,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)

(Cite as: 2008 WL 4371766 (N.D.N.Y.))

again receiving a penalty which included disciplinary confinement of between eighteen months and two years following a hearing to address the matter. *Id.* at 55:24-58:13.

*C. Deliberate Indifference*

**\*8** Liberally construed, plaintiff's amended complaint also appears to assert deliberate indifference on the part of the defendants to his injuries following the June 24, 2005 incident. Amended Complaint (Dkt. No. 19) ¶¶ 6-7. While this aspect of plaintiff's complaint appears to focus principally on the actions of Nurse Santini-Correa, in his motion for summary judgment plaintiff seems to expand that claim, though without disclosing specifics, explaining that it is also being asserted against defendant Jones, his assigned hearing assistant, and Sergeant Michael. *See* Defendants' Motion for Summary Judgment (Dkt. No. 56) at p. 1. In their motion, defendants also seek dismissal of this cause of action.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and

Homer, M .J.); *see also generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious.' " *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance* ). Relevant factors informing this determination include whether the plaintiff suffers from an injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment,' " a condition that " 'significantly affects' " a prisoner's daily activities, or causes " 'chronic and substantial pain.' " *Chance,* 43 F.3d at 701 (citation omitted); *LaFave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *2-3 (N.D .N.Y. Apr. 3, 2002) (Sharpe, M.J.).

**\*9** Deliberate indifference, in a constitutional sense, exists if an official knows of and disregards an excessive risk to inmate health or safety; the official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)

(Cite as: 2008 WL 4371766 (N.D.N.Y.))

); *Waldo,* 1998 WL 713809, at *2 (same).

It is well-established that mere disagreement with a prescribed course of treatment, or even a claim that negligence or medical malpractice has occurred, does not provide a basis to find a violation of the Eighth Amendment. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 201-02; *Chance,* 143 F.3d at 703; *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828 (1992). The question of what diagnostic techniques and treatments should be administered to an inmate is a "classic example of a matter for medical judgment"; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703; *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998).

Plaintiff alleges in his complaint that as a result of the incident, he suffered from "swollen testicles, blood in urine & stool, lower back pain, bruises to [his] wrist & face" which defendant Santini-Correa allegedly refused to note, as well as cuts to his wrists, a shoulder "pop," numbness in his right shoulder, left thumb, and both wrists, as well as a rash on his wrists. [FN11] Amended Complaint (Dkt. No. 19) ¶¶ 6-8. Noticeably absent from plaintiff's complaint is any indication that these conditions gave rise to extreme pain, degeneration, or death. [FN12] Even crediting plaintiff's claims concerning these injuries, it does not appear that plaintiff has set forth a "sufficiently serious" condition to support a claim for either deliberate or medical indifference. *See Peterson v. Miller,* No. 9:04-CV-797, 2007 WL 2071743, at *7 (N.D.N .Y. July 13, 2007) (noting that a "dull pain" in plaintiff's back and persistent rash on plaintiff's foot did not raise a constitutional issue) (Hurd, D.J. and Peebles, M.J.) (citing *Hathaway,* 37 F.3d at 66; *Salaam v. Adams,* No. 03-CV-0517, 2006 WL 2827687, at *10 (N.D.N.Y. Sept. 29, 2006)); *see also Ford v. Phillips,* No. 05 Civ. 6646, 2007 WL 946703, at *12 & n. 70 (S.D .N.Y. Mar. 27, 2007) (finding that plaintiff's allegations of bruises, abrasions, and blood in his urine for a few weeks did not constitute a sufficiently serious condition giving rise to a medical indifference claim).

FN11. In his summary judgment motion plaintiff also raises, for the first time, a claim that he was denied an asthma inhaler. *See* Plaintiff's Statement of Undisputed Facts (Dkt. No. 56) at § 5. Because the first mention of any issue pertaining to plaintiff's asthma medication has occurred at this late stage in the case, I recommend against expansion of his indifference cause of action to encompass this claim. *See, e.g., Caidor,* 2007 WL 2847229, at *8.

FN12. In his motion for summary judgment plaintiff now asserts that his back condition has been "diagnosed as chronic serious pain," and speculates as to his physical ability to have children in the future. *See* Plaintiff's Motion (Dkt. No. 56), at p. 6; Plaintiff's Statement of Undisputed Facts (Dkt. No. 56), at § 9. It is also noted that while plaintiff's ambulatory record entry for "6/24/05" reveals "[n]o injuries noted or voiced" by the plaintiff, an entry made a day later reveals that Nurse Santini-Correa observed "dry abrasion[s]" on plaintiff's wrist and upper extremities, along with numbness of his left thumb and two big toes, all of which appear to be injuries that plaintiff "want[ed] ... noted in [his] chart." *See* Plaintiff's Ambulatory Record (Dkt. No. 56-4), Exhs. 21-22. These matters are far too speculative and attenuated from the incident in question to constitute serious medical needs arising from the June 24, 2005 incident.

Moreover, even assuming the existence of a serious medical need, the record now before the court is also lacking in any evidence from which a reasonable factfinder could conclude that any of those three defendants implicated in this claim, and in particular Nurse Santini-Correa, was deliberately indifferent to his medical needs. At best, plaintiff appears to assert a claim of negligence or malpractice against Nurse Santini-Correa for failure to treat his injuries; such a claim, however, is not cognizable under the Eighth Amendment. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 201-02; *Chance,* 143 F.3d at 703; *Ross,* 784 F.Supp. at 44. As for the other defendants, the record is devoid of any evidence to suggest their awareness of, and deliberate indifference to, plaintiff's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)

(Cite as: 2008 WL 4371766 (N.D.N.Y.))

allegedly serious medical needs.

**\*10** In sum, because plaintiff has established neither the existence of a serious medical need nor defendants' subjective, deliberate indifference to any such need, his medical indifference claim is subject to dismissal as a matter of law.

D. *False Misbehavior Report*

One of the claims in this action is predicated upon plaintiff's contention that the misbehavior report issued by Corrections Officer Tougas, following the June 24, 2005 incident, was fabricated. In their motion, defendants seek dismissal of this claim as lacking in merit.

As defendants correctly note, the mere allegation that a false misbehavior report has been issued against an inmate, standing alone, does not implicate constitutional considerations. *Boddie v.. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997); *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U .S. 982, 108 S.Ct. 1273 (1988)). Proof that a false misbehavior report has been issued in response to an inmate having engaged in activity protected under the First Amendment, however, may suffice to support a claim of unlawful retaliation. *See Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988).

A thorough canvas of the record in this case, including plaintiff's amended complaint, fails to reveal any evidence tending to suggest that the misbehavior report issued in this case was in retaliation for Tapp having engaged in protected activity. Because plaintiff has not raised any further allegations concerning the allegedly false misbehavior report, any constitutional claims associated with it are subject to dismissal as a matter of law.

E. *Procedural Due Process*

A second major theme of plaintiff's amended complaint surrounds the procedures which followed the issuance of the June 24, 2005 misbehavior report. Plaintiff contends that during the course of the ensuing disciplinary proceedings he was denied procedural due process, and that assigned hearing officer was biased. [FN13] Those involved in this cause of action include defendants

Harvey, the hearing officer; Jones the corrections employee assigned to assist the plaintiff; and Selsky, the Assistant DOCS Commissioner who upheld the hearing determination on appeal. Defendants also seek dismissal of this claim as a matter of law.

> FN13. Plaintiff also argues that the hearing did not comply with governing State requirements, in that it was not commenced within seven days of the filing of charges and did not end within the required fourteen days, and additionally because extensions were not properly sought and validly granted. Amended Complaint (Dkt. No. 19) ¶ 10. This portion of plaintiff's due process claim implicates only state procedural requirements which if violated nonetheless would not support a federal constitutional claim under section 1983. *See, e.g., Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.1987). To the extent that federal due process considerations are called into play, it appears that plaintiff's disciplinary hearing did occur within the "reasonable time" required by federal law. *See Green v. Bauvi,* 46 F.3d 189, 195 (2d Cir.1995); *see also* Harvey Declaration (Dkt No. 50-10) at §§ 7-9 (explaining that the hearing could not start until one day after the applicable state requirement of seven days due to a high volume of cases and that a six-day extension was granted due to the unavailability of defendant Tougas and certain of plaintiff's witnesses to testify).

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996). The allegation that as a result of the disciplinary hearing at issue plaintiff was subjected to eighteen months of disciplinary confinement in a facility SHU suffices to establish the deprivation of a liberty interest and trigger the due process protections of the Fourteenth Amendment. *See Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004) (citing *Welch v. Bartlett,* 196

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)

(Cite as: 2008 WL 4371766 (N.D.N.Y.))

F.3d 389, 394 n. 4 (2d Cir.1999)); see also *Alvarez v. Coughlin,* No. 94-CV-985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.)).

**\*11** The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well-established; the contours of the requisite protections were discussed in some detail in the Supreme Court's decision in *Wolff v. McDonnell,* 418 U.S. 539, 564-67, 94 S.Ct. 2963, 2978-80 (1974). Under *Wolff,* the constitutionally mandated due process requirements include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564-67, 94 S.Ct. at 2978-80; *see also Eng v. Coughlin,* 858 F.2d 889, 897-98 (2d Cir.1988). In addition, in order to pass muster under the Fourteenth Amendment a hearing officer's disciplinary determination must garner the support of at least "some evidence." *Superintendent v. Hill,* 472 U.S. 445, 105 S.Ct. 2768 (1985).

The record now before the court convincingly establishes that plaintiff received the requisite due process during the course of the disciplinary proceedings against him. The record discloses, and the plaintiff does not dispute, that he received written notice of the charges against him, as well as a written determination from the hearing officer, following the hearing, outlining his findings.

One of the issues raised in support of his due process argument is plaintiff's contention that he was precluded from presenting witnesses on his behalf. Undeniably, under *Wolff* and its progeny an inmate must be afforded the right to call witnesses and present evidence in his or her defense "when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." 418 U.S. at 566, 94 S.Ct. at 2979. Due process requires that the hearing officer explain why any witnesses requested were not allowed to testify. *Ponte,* 471 U.S. at 497, 105 S.Ct. at 2196; *Fox v. Coughlin,* 893 F.2d 475,

478 (2d Cir.1990) (citing *Ponte* ); *Parris v. Coughlin,* No. 90-CV-414, 1993 WL 328199, at *5 (N.D.N.Y. Aug. 24, 1993) (Hurd, M.J.) (same). These reasons may be provided at the disciplinary hearing itself, or by presenting testimony in the course of a later constitutional challenge. *Ponte,* 471 U.S. at 497, 105 S.Ct. at 2196; *Parris,* 1993 WL 328199, at *6 (citing *Ponte* ). The burden is not upon the inmate to prove the official's conduct was arbitrary and capricious, but rather upon the official to prove the rationality of his or her position. *Fox,* 893 F.2d at 478 (citing *Ponte* ); *Parris,* 1993 WL 328199, at *6 (citing *Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30-31 (2d Cir.1991)).

In this case the record discloses that the plaintiff was permitted to call all of the witnesses necessary to present a meaningful defense to the charges. At the outset of the hearing plaintiff requested the presence of four inmate witnesses, one of whom refused to testify after which plaintiff advised the hearing officer that he did not wish to pursue securing testimony from him in any event. Jones Decl. (Dkt. No. 50-14) Exh. A; Harvey Decl. (Dkt. No. 50-10) Exh. A at pp. 1-2. The remaining three witnesses were permitted to testify on behalf of the plaintiff. Harvey Decl. (Dkt. No. 50-10) Exh. A at pp. 17-27. While the plaintiff later announced his intention to call twelve additional witnesses, and the hearing officer permitted him to select four-all of whom, when contacted, indicated their refusal to testify-plaintiff subsequently advised CHO Harvey that he did not find it necessary to call other witnesses all of whom would have repeated versions of events already given by himself and his other witnesses.[FN14] Harvey Decl. (Dkt. No. 50-10) Exh. C at pp. 41-47.

FN14. In addition to the inmate witnesses CHO Harvey also permitted plaintiff to call to elicit further testimony from Corrections Officers Walcak and Tougas. Harvey Decl. (Dkt. No. 50-10) Exh. C. at pp. 41-47.

**\*12** Under these circumstances it appears that CHO Harvey had a rational basis to conclude that calling the additional requested witnesses would have been cumulative and unnecessary. Similarly, it appears that the hearing officer had a reasonable basis to conclude that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)

(Cite as: 2008 WL 4371766 (N.D.N.Y.))

calling the witnesses who had refused to testify would be futile. *Dumpson v. Rourke,* No. CIVA96CV621, 1997 WL 610652, at *5 (N.D.N.Y. Sept. 26, 1997) (Pooler, D.J.) (citing *Silva v. Casey,* 992 F.2d 20, 21-22 (2d Cir.1993)). "Clearly, if a witness will not testify if called, it cannot be a 'necessity' to call him." *Silva,* 992 F.2d at 22; *see also Wolff,* 418 U.S. at 568-69, 94 S.Ct. at 2981 (recognizing discretion of prison officials to decline to call as witnesses fellow inmates who do not wish to testify). Regarding the two witnesses who refused to testify with an explanation, a hearing officer has no power to force an inmate to testify, and when an inmate refuses, the hearing officer need not call that witness. *Silva,* 992 F.2d at 21-22; *Dumpson,* 1997 WL 610652, at *5 (citing *Greene v. Coughlin,* No. 93 Civ. 2805, 1995 WL 60020, at *14 (S.D.N.Y. Feb. 10, 1995) (hearing officer need not make independent evaluation of the basis for refusal to testify)). Finally, with regard to the plaintiff's eight additional witnesses who would have stated "basically ... the same thing," Harvey clearly had a rational basis to refuse to call these witnesses as their testimony would be unnecessarily repetitive. Thus, neither defendant Harvey or Jones took part in any improper denial of plaintiff's right to call witnesses to testify in his behalf.

It appears that the plaintiff finds fault with the aid rendered by the selected hearing assistant, Melanie Jones. The Fourteenth Amendment requires only that prison officials provide an inmate accused of a disciplinary infraction, in some though not necessarily all circumstances, meaningful assistance in preparing a defense. *Eng v. Coughlin* 858 F.2d 889, 897 (2d Cir.1988) (holding that in some circumstances, "[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges"). The assistant acts as a *"surrogate*-to do what the inmate would have done were he able." *Silva,* 992 F.2d at 22 (emphasis in original). An assistant also may not act in bad faith in aiding a prisoner in mounting a defense. *Id.* The law does not require that the assistant assigned be a trained lawyer or that the assistant be held to a standard of competent representation guaranteed to criminal defendants under the Sixth Amendment. *Contrast Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052 (1984) (outlining the contours of the right to effective assistance of counsel

guaranteed to criminal defendants). Despite plaintiff's protestations regarding the adequacy of her aid, the record discloses that defendant Jones provided him with capable assistance in preparing for the hearing, and that she met with the plaintiff on three occasions, interviewed the witnesses which he designated, and obtained a significant amount of the materials requested by him. *See generally* Jones Decl. (Dkt. No. 50-14) ¶¶ 3-9. Having carefully reviewed the record, I find no basis to conclude that plaintiff was not afforded the meaningful assistance guaranteed under *Wolff.*

**\*13** Although plaintiff does not place significant emphasis on this element, the due process provision of the Fourteenth Amendment requires that a hearing officer's disciplinary determination be supported by "some evidence." *See Hill,* 472 U.S. at 447, 105 S.Ct. at 2770; *Morales v. Woods,* No. 9:06-CV-15, 2008 WL 686801, at *6 (N.D.N.Y. Mar. 10, 2008) (McAvoy, S.J.) (citations omitted). Based upon a careful review of the record developed during the course of plaintiff's disciplinary proceeding, I conclude that no reasonable factfinder could determine that the hearing officer's decision in this case was not supported by the requisite modicum of evidence.

A focal point of plaintiff's due process argument relates to alleged bias on the part of the hearing officer. The fact that the hearing officer appointed to address the charges against Tapp was a DOCS employee, as is normally the case, does not disqualify him from serving as a hearing officer or in and of itself provide reason to question his objectivity. Prison disciplinary hearing officers are not held to the same standard of neutrality as are adjudicators in other types of controversies. *See Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). Such a hearing officer must only be sufficiently impartial as to avoid "a hazard of arbitrary decision making," *Wolff,* 418 U.S. at 571, 94 S.Ct. at 2982, and is deserving of a presumption of honestly and integrity. *Winfrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464 (1985); *Rivera v. Senkowski,* 62 F.3d 80, 86 (2d Cir.1995). Based upon thorough review of the record associated with the disciplinary proceeding, I am unable to discern any basis from which a reasonable factfinder could conclude that CHO Harvey was biased or partial. Simply stated, plaintiff's bald allegation of bias, representing little more

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

than sheer speculation on his part, is insufficient to overcome the presumption of impartiality. *See Lebron v. Artus,* No. 06-CV-0532, 2008 WL 111194, at *15 (W.D.N.Y. Jan. 09, 2008).

In sum, because the record firmly discloses that plaintiff was afforded all of the process to which he was entitled prior to the imposition of disciplinary SHU confinement, I recommend dismissal of plaintiff's due process claim against defendants Harvey, Jones and Selsky.[FN15]

> FN15. In light of this determination, I find it unnecessary to address defendants' alternative argument, to the effect that plaintiff's section 1983 surrounding the disciplinary proceeding are precluded under *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364 (1994) and *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584 (1997). As was previous noted, however, plaintiff may not necessarily be precluded from pursuing section 1983 claims surrounding his disciplinary proceeding under *Edwards* and *Heck,* despite not having first secured reversal of that determination, provided that he agrees to forego any potential habeas corpus claim challenging the loss of good time credits which resulted from the recommendation made following that hearing. *See Peralta,* 467 F.3d at 104-05.

F. *Equal Protection*

In his amended complaint, plaintiff incants that he was denied equal protection by the defendants. Neither plaintiff's amended complaint nor his motion papers, however, articulates the basis for that claim.

The Equal Protection Clause directs state actors to treat similarly situated people alike. *See City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985). To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *See Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citing, *inter alia, McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767 (1987)). The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (quoting *Shaw v. Murphy,* 532 U.S. 223, 225, 121 S.Ct. 1475 (2001) (internal quotation marks omitted)).

***14** Because plaintiff has offered no proof that he was the subject of an improper classification, nor has he adduced any evidence of either invidious motivation for defendants' actions or discriminatory motivation, I recommend summary dismissal of plaintiff's equal protection claim.

G. *Conspiracy*

Also embedded within plaintiff's complaint, when liberally construed, is a claim that the defendants conspired to deprive him of his civil rights.

In a doctrine rooted in the conspiracy provision of section one of the Sherman Antitrust Act, 15 U.S.C. § 1, and which, although developed in the context of business entities, since inception has been expanded to apply to business corporations and public entities as well, the intra-corporate conspiracy doctrine provides that with exceptions not now presented, an entity cannot conspire with one or more of its employees, acting within the scope of employment, and thus a conspiracy claim conceptually will not lie in such circumstances. *See, e.g., Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 75-76 (E.D.N.Y.2002); *Griffin-Nolan v. Providence Washington Ins. Co.,* No. 5:05CV1453, 2005 WL 1460424, at *10-11 (N.D.N.Y. June 20, 2005) (Scullin, C.J.). In this instance plaintiff alleges that the various defendants named conspired to deprive him of his civil rights. Since those conspiracy claims are asserted against officers, agents or employees of the DOCS, each acting within the scope of his or her employment, they are precluded by virtue of the intracorporate conspiracy doctrine. *See Little v. City of New York,* 487 F.Supp.2d 426, 441-42 (S.D.N.Y.2007) (citations omitted); *Lewis v. Goord,* No. 9:06-CV-504, 2008 WL 902179, at *4 (N.D.N.Y. Mar. 31, 2008) (Scullin, S.J.).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)

(Cite as: 2008 WL 4371766 (N.D.N.Y.))

IV. *SUMMARY AND RECOMMENDATION*

    The plaintiff in this action has advanced an array of constitutional claims arising out of an incident occurring on June 24, 2005, alleging the use of excessive force by prison officials, the failure to adequately address the injuries resulting from the incident, and due process deprivations associated with the disciplinary proceedings which ensued. Having carefully reviewed plaintiff's amended complaint, I conclude that no reasonable factfinder could credit plaintiff's version of the incident, and determine that defendants did not violate his rights by exerting unnecessary force against him, in violation of the Eighth Amendment. Similarly, I find that plaintiff has not alleged or proven the existence of a serious medical need associated with injuries stemming from the incident, nor has he offered evidence tending to establish the defendants' subjective indifference to his medical needs, and therefore cannot support a medical indifference claim under the Eighth Amendment. Lastly, I find that while plaintiff was deprived of a liberty interest by virtue of the disciplinary proceedings against him, he received the requisite procedural due process guaranteed under the Fourteenth Amendment during the course of that deprivation. Accordingly, finding no other cognizable constitutional claim asserted in his amended complaint and supported by evidence in the record now before the court, I conclude that no reasonable factfinder could find liability on the part of one or more of the named defendants on any of plaintiff's claims, and therefore recommend dismissal of his complaint in its entirety as a matter of law.[FN16] Accordingly, it is hereby

    FN16. In light of this determination, I find it unnecessary to address the additional issue of qualified immunity, also raised by the defendants in support of their motion. *See Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S.Ct. 2151 (2001).

    **\*15** RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 50) be GRANTED, and plaintiff's complaint in this action be DISMISSED its entirety; and is further

    RECOMMENDED that in light of this determination, plaintiff's motion for summary judgment (Dkt. No. 56) be DENIED.

    NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

    It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2008.

Tapp v. Tougas
Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 4371762 (N.D.N.Y.)

(Cite as: 2008 WL 4371762 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Sean TAPP, Plaintiff,
v.
R. TOUGAS, C.O.; C.O. Wilson; M.E. B.
Santini-Correan; C.O. J. Rando; Sgt. Michael; C.O.
Sharrow; Mr. Harvey, Hearing Officer; Donald Selsky;
and Ms. Jones, Defendants.
No. 9:05-CV-1479.

Sept. 18, 2008.

Sean Tapp, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Steven H. Schwartz, Esq., Assistant Attorney
General, Albany, NY, for Defendants.

### MEMORANDUM-DECISION AND ORDER

Hon. NORMAN A. MORDUE, Chief Judge.

*1 Plaintiff, formerly an inmate in the custody of New
York State Department of Corrections, brings this civil
rights action pursuant to 42 U.S.C. § 1983, claiming in his
amended complaint (Dkt. No. 19) that he was assaulted by
corrections officers, denied adequate medical care for
injuries sustained during the course of the altercation, and
subjected to a lengthy period of disciplinary special
housing unit ("SHU") confinement as a result of the
incident without having been afforded procedural due
process.

Defendants move (Dkt. No. 50) for summary
judgment. Plaintiff cross-moves (Dkt. No. 56) for
summary judgment. The motions were referred to United
States Magistrate Judge David E. Peebles pursuant to 28
U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c). Magistrate
Judge Peebles has issued a thorough Report and
Recommendation recommending that this Court grant
defendants' motion, deny plaintiff's motion, and dismiss
the action.

Plaintiff interposes specific objections to numerous
aspects of Magistrate Judge Peebles' Report and
Recommendation. Pursuant to 28 U.S.C. § 636(b)(1)(C),
this Court reviews *de novo* those parts of a report and
recommendation to which a party specifically objects.
Where only general objections are filed, the Court reviews
for clear error. *See Brown v. Peters,* 1997 WL
599355,*2-* 3 (N.D.N.Y.), *af'd without op.,* 175 F.3d
1007 (2d Cir.1999). Failure to object to any portion of a
report and recommendation waives further judicial review
of the matters therein. *See Roldan v. Racette,* 984 F.2d 85,
89 (2d Cir.1993).

The Court adopts all factual and legal recitations in
the Report and Recommendation. The Court has
conducted *de novo* review of all issues to which plaintiff
interposes objections, and adopts Magistrate Judge
Peebles' analysis and recommendation with respect to all
issues except the recommendation that summary judgment
be granted dismissing the excessive force claim against
defendants Tougas, Wilson, Rando, Michael, and
Sharrow.

The Court adopts Magistrate Judge Peebles' recitation
of the law and facts with respect to the excessive force
claim. The Court agrees with his observation that the
question of whether to grant summary judgment to
defendants on this issue is a close one; however, in the
Court's view, plaintiff's testimony at his deposition and the
disciplinary hearing, and the supporting testimony of his
inmate witnesses at the disciplinary hearing, are sufficient
to raise questions of fact on this claim.[FN1]

FN1. Given his recommendation of dismissal,
Magistrate Judge Peebles did not address
whether plaintiff's excessive force claim might be
barred under the rule in *Edwards v. Balisok* that
a prisoner's section 1983 claim is not cognizable
where, if successful, it would necessarily
implicate the invalidity of a disciplinary
determination affecting the length of his
confinement. 520 U.S. 641, 645-48 (1997). It is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371762 (N.D.N.Y.)

(Cite as: 2008 WL 4371762 (N.D.N.Y.))

not clear on this record that the *Edwards* rule would preclude plaintiff in the instant case from proceeding on his section 1983 excessive force claim, because it is not clear that a jury determination that defendants used excessive force in subduing plaintiff would necessarily implicate the invalidity of the disciplinary determination that he was guilty of violent conduct, creating a disturbance, an assault on staff, refusing a direct order, and refusing a search and frisk. *See, e.g., Sales v. Barizone,* 2004 WL 2781752, *13-14 (S.D.N.Y. Dec. 2, 2004). Further, plaintiff's excessive force claim is based in part on events occurring after the events that were the subject of the disciplinary charge. Specifically, plaintiff and other inmates allege that the corrections officers continued to beat plaintiff after they had subdued him, even after they had placed him in handcuffs and leg irons. A finding in plaintiff's favor on these allegations would not affect the validity of the disciplinary determination. Moreover, the record does not clearly establish plaintiff's present custodial status on his New York sentence; if he has served his full sentence, *habeas corpus* is no longer an available remedy, and the *Edwards* rule would not bar the section 1983 claim. *See Huang v. Johnson,* 251 F.3d 65, 74-75 (2d Cir.2001). Accordingly, the *Edwards* rule does not warrant summary judgment in defendants' favor.

The Court also rules that the application of the doctrine of qualified immunity does not warrant dismissal of the excessive force claims against defendants Tougas, Wilson, Rando, Michael, and Sharrow. Accepting plaintiff's allegations as true for purposes of this motion, these defendants could not reasonably have believed their actions were consistent with plaintiff's Eighth Amendment rights. *See Anderson v. Creighton,* 483 U.S. 635, 639-40 (1987).

It is therefore

**\*2** ORDERED that defendants' motion (Dkt. No. 50) for summary judgment is denied with respect to plaintiff's

excessive force claim against defendants Tougas, Wilson, Rando, Michael, and Sharrow, and otherwise granted; and it is further

ORDERED that plaintiff's cross motion (Dkt. No. 56) for summary judgment is denied in its entirety; and it is further

ORDERED that the case will proceed to trial solely on the issue of excessive force; and it is further

ORDERED that the Report and Recommendation is rejected insofar as it recommends summary judgment dismissing plaintiff's claim of excessive force, and is otherwise accepted and adopted in all respects.

IT IS SO ORDERED.

N.D.N.Y.,2008.

Tapp v. Tougas
Not Reported in F.Supp.2d, 2008 WL 4371762 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

C

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Alvin PETERSON, Plaintiff,

v.

Sheryl MILLER, Nurse Practitioner; and Nurse Admin. Tousignant, Nurse Administrator, Defendants.

No. 9:04-CV-797.

July 13, 2007.

Alvin Peterson, East Elmhurst, NY, pro se.

Stephen M. Kerwin, Esq, Michael G. McCartin, Esq., Assts. Attorney General, of Counsel, Hon. Eliot Spitzer, Hon. Andrew M. Cuomo, Attorney General of the State of New York, Department of Law, Albany, NY, for Defendants.

***DECISION and ORDER***

DAVID N. HURD, United States District Judge.

***1** Plaintiff brought this civil rights action pursuant to 42 U.S.C. § 1983. By Report-Recommendation dated April 27, 2007, the Honorable David E. Peebles, United States Magistrate Judge, recommended that the defendants' motion for summary judgment be granted and that plaintiff's complaint be dismissed in all respects. No objections to the Report-Recommendation have been filed.

Based upon a careful review of the entire file and the recommendations of Magistrate Judge Treece, the Report-Recommendation is accepted and adopted in whole. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. The defendants' motion for summary judgment is GRANTED; and

2. Plaintiff's complaint is DISMISSED in all respects.

IT IS SO ORDERED.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, U.S. Magistrate Judge.

Plaintiff Alvin Peterson, a former New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 complaining of the deprivation of his constitutional rights. Plaintiff asserts that while incarcerated, he was denied adequate medical treatment by the defendants, both of whom were nurses at the facility in which he was confined at the relevant times, for kidney pain and a foot rash, and denied the migraine medication of his choice, in violation of his Eighth Amendment right to be free of cruel and unusual punishment.

Currently pending before the court is a motion by the defendants for summary judgment dismissing plaintiff's complaint, both on the merits and based upon qualified immunity. Having carefully considered the record in light of defendants' motion and finding that it presents no genuine issue of material fact for trial, I recommend that defendants' motion, which plaintiff has not opposed, be granted.

I. *BACKGROUND*[FN1]

FN1. In light of the procedural posture of this case, the following facts are presented in a light most favorable to the plaintiff, the non-moving party. *See Samuels v. Mockry,* 77 F.3d 34, 35 (2d Cir.1996). In this instance, the court's findings of fact are also informed by defendants' statement pursuant to Northern District of New York Local Rule 7.1(a)(3), the contents of which are assumed to be true as a result of plaintiff's failure to oppose defendants' motion. *See* pp. 9-11, *post.*

At the times relevant to his complaint, plaintiff was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"), and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)

(Cite as: 2007 WL 2071743 (N.D.N.Y.))

confined within the Clinton Correctional Facility ("Clinton"), located in Dannemora, New York. Plaintiff was released from DOCS custody on July 7, 2004.

While at Clinton, plaintiff was treated over time for a variety of medical ailments including, *inter alia,* complaints of pain in the area of his kidney, a foot rash condition which has on occasion been described as athlete's foot, and migraine headaches. Among the medical personnel at Clinton who have acted as plaintiff's care providers are defendants Sheryl Miller, a nurse practitioner, and Amy Tousignant, who at the relevant times served as a nurse administrator. FN2

> FN2. Defendant Tousignant, a registered nurse, is currently employed by the DOCS as Supervisor of Utilization Management and Quality Improvement. Tousignant Decl. (Dkt. No. 25) ¶ 1.

A. *Kidney Pain*

According to his medical records, plaintiff complained to prison medical personnel of pain, the origin of which is not disclosed, in his right flank or kidney area on eleven separate occasions between July 16, 2001 and October 28, 2003. Miller Decl. (Dkt. No. 25) ¶ 3. On November 30, 2001, plaintiff lodged his fourth such complaint, describing his symptoms as including a "dull pain." Miller Decl. (Dkt. No. 25) Exh. A at p. 128. Plaintiff was seen by a prison doctor several times for evaluation of his complaints of kidney pain, and was provided with Motrin to address his discomfort. *See, e.g., id.* at pp. 128, 133, 144, 171. X-rays taken in or about July of 2002 were reviewed by a consulting radiologist, Dr. M. Browman, M.D., D.A.B.R., who concluded that plaintiff had "no suspicious calcifications" and a normal bowel gas pattern. *Id.* at p. 92. Plaintiff's x-rays were characterized by Dr. Browman as "normal abdominal radiographs." *Id.*

B. *Foot Rash*

*2 The record, including plaintiff's complaint, reveals that Peterson suffered from a chronic foot rash condition over at least the last two and one-half years of his incarceration as a New York State inmate. *See, e.g.,* Complaint (Dkt. No. 1) ¶ 7. Early on, plaintiff's foot rash

condition was treated principally with Hydrocortisone cream, administered on a minimum of fifteen occasions between August 9, 2001 and January 30, 2004. Miller Decl. (Dkt. No. 25) ¶ 8 and Exh. A at pp. 138-40, 155, 158. Plaintiff was also provided with Vitamin E lotion for his condition at least eight times during 2003 and 2004. *See, e.g., id.,* Exh. A at pp. 160-62, 166.

In addition to these nonprescription remedies, plaintiff was prescribed at least four different types of medication to help combat his foot condition. Miller Decl. (Dkt. No. 25) ¶ 9. On July 5, 2002, defendant Miller initially prescribed Selenium Sulfide (2.5% strength), a prescription medication used to treat tinea versicolor, a type of fungal infection of the skin. *Id.* ¶ 9. Plaintiff reported on August 29, 2002 that the Selenium Sulfide had completely relieved his itch, although he continued to experience a rash on his feet. Miller Decl. (Dkt. No. 25) Exh. A at p. 144. Three other prescription medications were subsequently administered in an effort to control plaintiff's foot condition, including 1) Temovate, a medication designed to relieve skin itching and inflammation of moderate to severe degrees; 2) Itraconazole, a drug utilized to combat fungal infections including aspergillosis, blastomycosis, histoplasmosis, and fungal infection localized to the toenails and fingernails (onychomycosis); and 3) Lamisil, another anti-fungal prescription medication used to combat foot conditions. *Id.* ¶ 10 and Exh. A at pp. 186, 193.

C. *Migraine Headache Medication*

The third element of plaintiff's deliberate medical indifference claim relates to the discontinuance of Fioricet, described as a strong, non-narcotic pain reliever used for relief of tension headache symptoms caused by muscle contractions in the head, neck and shoulder area. Miller Decl. (Dkt. No. 25) ¶ 12. The drug Fioricet contains butalbital, a sedative barbiturate, and acetaminophen, a non-aspirin pain reliever, as well as caffeine. *Id.*

Prison officials, including defendant Miller, prescribed Fioricet to the plaintiff on several occasions prior to March 29, 2004. *See, e.g.,* Miller Decl. (Dkt. No. 25) Exh. A at pp. 146, 153, 186. After learning on March 29, 2004 that plaintiff had accumulated four tablets of Fioricet on his person, while asking medical personnel for yet another two tablets of the same medication, and, upon

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)

(Cite as: 2007 WL 2071743 (N.D.N.Y.))

further investigation, learning that another inmate locked in the same area as plaintiff had thirty Fioricet tablets stockpiled in his cell, security staff at Clinton requested that medical personnel discontinue providing the drug to the plaintiff. Miller Decl. (Dkt. No. 25) ¶ 13. Defendant Miller and other medical personnel complied, substituting instead a prescription for Motrin 600 mg, a pain reliever much more potent than the over-the-counter medication known by the same name, to address plaintiff's headaches. *Id.* ¶ 14 and Exh. A. at p. 191.

**\*3** A month later, on May 4, 2004, defendant Miller prescribed Naproxen, a non-steroidal anti-inflammatory drug utilized for the management of moderate pain, fever, and inflammation through reduction of levels of prostaglandins, for plaintiff's migraine headaches. Miller Decl. (Dkt. No. 25) ¶ 15. Following complaints by the plaintiff that the Naproxen was not working well to control his migraine headaches, defendant Miller replaced that drug with Inderal, a medication specifically designed for the treatment of migraine headaches, among other ailments. *Id.* ¶ 16 and Exh. A at p. 193. Plaintiff continued on the Inderal migraine medication until shortly before leaving DOCS custody. *Id.* at ¶ 16 and Exh. A at p. 197.

One of plaintiff's complaints concerns the failure of prison officials to resume his Fioricet as recommended by a cardiac consultant following its discontinuance. That portion of plaintiff's complaint relates to a consultation which occurred on June 2, 2004, at defendant Miller's recommendation, resulting in a report that the cardiologist "would [discontinue] Inderal & resume Norvasc 5 QD & Fioricet." [FN3] Miller Decl. (Dkt. No. 25) Exh. A at p. 87. That recommendation was not followed in light of the finding of security personnel at the facility regarding plaintiff's "saving" of Fioricet tablets for later use and suspected conveyance of Fioricet tablets to a fellow inmate. Miller Decl. (Dkt. No. 25) ¶ 18 and Exh. A at p. 187.

FN3. Norvasc is a medication used to treat high blood pressure and angina. Miller Decl. (Dkt. No. 25) ¶ 17.

II. *PROCEDURAL HISTORY*

After exhausting available administrative remedies, plaintiff commenced this action on July 8, 2004. Dkt. No. 1. Plaintiff's complaint asserts three separate causes of action, all of which relate to defendants' alleged failure to provide him with proper medical treatment for his various medical conditions. Named as defendants in the action are Nurse Practitioner Sheryl Miller, and Nurse Administrator Amy Tousignant. *Id.* ¶ 3. As relief, plaintiff seeks recovery of $750,000 in compensatory damages and $1,500,000 in punitive damages. *Id.*

On March 27, 2006, following the close of discovery, defendants moved seeking the entry of summary judgment dismissing plaintiff's complaint. Dkt. No. 25. In their motion, defendants argue that 1) plaintiff's deliberate indifference claim is legally deficient, based both on the lack of a showing that he suffered from a serious medical condition and his failure to establish that either of the defendants was deliberately indifferent to any such condition; 2) plaintiff has failed to demonstrate the personal involvement of defendant Tousignant in the matters complained of; and 3) in any event, both defendants are entitled to qualified immunity. *Id.* Defendants' motion, which plaintiff has not opposed, is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).[FN4]

FN4. A prior action brought by the plaintiff in this court pursuant to 42 U.S.C. § 1983 against various DOCS employees at Clinton, *Peterson v. Lacy, at al.,* 9:03-CV-1226 (DNH/RFT) (N.D.N.Y., filed 2003), was dismissed, on recommendation of United States Magistrate Judge Randolph F. Treece, on February 27, 2006, based upon plaintiff's failure to comply with the requirement that he notify the court of any change of address. 9:03-CV-1226, Dkt. Nos. 52, 54; *see also* Northern District of New York Local Rules 10.1(b)(2) and 41.2(b). In this case, plaintiff similarly has failed to notify the court of any change of address since his apparent release from DOCS custody. Based upon information received in connection with 9:03-CV-1226, the court has nonetheless adjusted its records to reflect a current address for the plaintiff in East

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)

(Cite as: 2007 WL 2071743 (N.D.N.Y.))

Elmhurst, New York. It appears from correspondence forwarded in the *Peterson v. Lacy* case to the plaintiff at that address but returned as undeliverable, *see* 9:03-CV-1226, Dkt. No. 63, however, that plaintiff may have again moved without notifying the court and defendants' counsel of his change of circumstances, thereby making it impossible for the court to communicate with him regarding his action and, if true, providing an independent basis for dismissal of his complaint. *See* Northern District of New York Local Rules 10.1(b)(2) and 41.2(b).

III. *DISCUSSION*

A. *Failure to Respond*

   **\*4** The first issue to be addressed is the legal significance, if any, of plaintiff's failure to oppose defendants' summary judgment motion, and specifically whether that failure automatically entitles defendants to dismissal based upon their motion.

   This court's rules provide that

   [w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown. N.D.N.Y.L.R. 7.1(b)(3).

   While recognizing that *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, *see Jemzura v. Public Serv. Comm'n, 961 F.Supp. 406, 415 (N.D.N .Y.1997)* (McAvoy, C.J.), courts in this district have found it appropriate to grant a dispositive motion pursuant to Local Rule 7.1(b)(3) based upon a pro se plaintiff's failure to respond. *Robinson v. Delgado,* No. 96-CV-169, 1998 WL 278264, at \*2 (N.D.N.Y. May 22, 1998) (Pooler, D.J. & Hurd, M.J.); *Cotto v. Senkowski,* No. 95-CV-1733, 1997 WL 665551, at \*1 (N.D.N.Y. Oct. 23, 1997) (Pooler, D.J. & Hurd,

M.J.); *Wilmer v. Torian, 980 F.Supp. 106, 106-07 (N.D.N.Y.1997)* (Pooler, D.J. & Hurd, M.J.). Before such an unopposed motion can be granted, however, the court must review the motion to determine whether it is facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231-32 (N.D.N.Y.2001) (Scullin, C.J.); *Leach v. Dufrain,* 103 F.Supp.2d 542, 545-46 (N.D.N.Y.2000) (Kahn, J.).

   While a party's failure to properly oppose an adversary's dispositive motion thus does not assure that the motion, however lacking in merit, will be granted, that failure is not without consequences. By opting not to submit papers in opposition to the motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statement unchallenged. Courts in this district have uniformly enforced Local Rule 7.1(a)(3) and its predecessor, Local Rule 7.1(f), by deeming facts set forth in a statement of material facts not in dispute to have been admitted based upon an opposing party's failure to properly respond to that statement.[FN5] *See, e.g., Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at \*1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). I recommend that the court follow this well-established practice and, notwithstanding plaintiff's *pro se* status, accept defendants' assertion of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, in light of plaintiff's failure to respond to that statement, when reviewing defendants' motion for facial sufficiency.

   FN5. Local Rule 7.1(a)(3) provides that "any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." *See* N.D.N.Y.L.R. 7.1(a)(3) (emphasis omitted).

B. *Summary Judgment Standard*

   **\*5** Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)

(Cite as: 2007 WL 2071743 (N.D.N.Y.))

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material," for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing Anderson). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (stating that summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

C. *Eighth Amendment Claims*

Plaintiff asserts three causes of action in his complaint. First, plaintiff avers that defendants violated his Eighth Amendment rights when "they failed to provide adequate medical attention and treatment for two and one half years for his complaints of pain in his left kidney area,

and rashes on his feet." Complaint (Dkt. No. 1) ¶ 7. Plaintiff next contends that defendants violated his Eighth Amendment rights by discontinuing the Fioricet migraine medication and failing to prescribe a beneficial medication. *Id.* Finally, the plaintiff claims that the defendants violated his Eighth Amendment rights by disregarding the order of the cardiologist to re-prescribe the Fioricet migraine medication. *Id.*

**\*6** Plaintiff's medical indifference claims are properly analyzed against the backdrop of a body of well-established Eighth Amendment jurisprudence. The Eighth Amendment prohibits the imposition of cruel and unusual punishments, including those that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102-03, 97 S.Ct. 285, 290-91 (1976) (quotations omitted). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison officials have violated the Eighth Amendment by their failure to provide adequate medical care must satisfy both an objective and a subjective requirement-the medical need must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at \*2 (N.D.N.Y. Oct. 1, 1998) (Kahn, D.J. and Homer, M.J.). Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713909, at \* 2 (same).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)

(Cite as: 2007 WL 2071743 (N.D.N.Y.))

1. *Serious Medical Need*

    To establish a constitutionally cognizable claim of deliberate medical indifference under the Eighth Amendment, a plaintiff must initially allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious.' " *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance* ). Relevant factors in making this determination include injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment,' " a condition that " 'significantly affects' a prisoner's daily activities, or causes " 'chronic and substantial pain.' " *Chance,* 143 F.3d at 701 (citations omitted); *LaFave v. Clinton County,* No. 00CV744, 2002 WL 31309244, at *2-3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.), *adopted,* No. 00-CV-744, Dkt. No. 27 (N.D.N.Y. June 20, 2002) (Hurd, D.J.).

a. *Kidney Pain*

    **\*7** According to his medical records, plaintiff complained to prison officials of pain in his kidney area over a period of two and one half years. Those records show that Peterson communicated those complaints to the medical staff, and as a result was seen on eleven occasions. Miller Decl. (Dkt. No. 25) ¶¶ 4, 6. Plaintiff described this pain as "dull pain." Miller Decl. (Dkt. No. 25) Exh. A at p. 128.

    Having carefully reviewed plaintiff's medical records, I find that no reasonable factfinder could conclude that his complaints of back or kidney pain arose to a level of constitutional significance, demonstrating the requisite level of "death, degeneration, or extreme pain."

*Hathaway,* 37 F.3d at 66; *see also Salaam v. Adams,* No. 03-CV-0517, 2006 WL 2827687, at * 10 (N.D.N.Y. Sept. 29, 2006) (Kahn, D.J. and Lowe, M.J.) (back pain that requires treatment with pain relievers and physical therapy was not a sufficiently serious medical need for purposes of the Eighth Amendment). Since at no time did plaintiff describe his pain in terms which would equate to "urgent," "debilitating," or "extreme", no reasonable factfinder could conclude that the condition constituted a sufficiently serious medical need to trigger the protections of the Eighth Amendment.

b. *Foot Rash*

    Plaintiff alleges, and his medical records bear out, that over a lengthy period of time he registered multiple complaints regarding a foot rash condition. Those records, however, fail to suggest that the rash increased in severity over time or that because of it, plaintiff suffered from a condition capable of producing "death, degeneration, or extreme pain." *Hathaway,* 37 F.3d at 66. Indeed, plaintiff's records reflect that while the rash persisted, the itch associated with it was relieved by medication provided to the plaintiff. Miller Decl. (Dkt. No. 25) ¶ 9 and Exh. A at p. 144. Under these circumstances, once again, no reasonable factfinder could conclude that during the relevant period, plaintiff's foot condition rose to a level of constitutional significance. *See Smith v. Nash,* No. 04-CV-0074, 2006 WL 2806464, at *4-5 (N.D.N.Y. Sept. 28, 2006) (Kahn, D.J. and Homer, M.J.) (arthritis pain for which plaintiff was being treated with medication, and of which plaintiff did not complain of any pain, was not a sufficiently serious medical need).

c. *Migraine Headaches*

    Plaintiff's complaint also claims a failure on the part of the defendants to properly medicate and otherwise treat his migraine headaches, causing him to needlessly suffer. Neither plaintiff's complaint nor his medical records are particularly informative as to the specifics regarding his migraine headaches, including their severity, duration, and degree. At most, plaintiff's medical records reveal that in March of 2004, plaintiff noted he "generally" suffered from headaches twice a week, and in April of 2004, his headaches were "bad" and generally started late at night. Miller Decl. (Dkt. No. 25) Exh. A at pp. 186, 189. While

Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)

(Cite as: 2007 WL 2071743 (N.D.N.Y.))

the court is therefore disadvantaged on this score, this particular issue is not appropriately resolved on summary judgment, since such a condition has, on occasion, been found by other courts to represent a sufficiently serious potential medical need as to survive a motion for summary judgment attacking the sufficiency of a plaintiff's showing in this regard. FN6 *See, e.g., Moriarity v. Neubould,* No. 02CV1662, 2004 WL 288807, at *2 n. 2 (D.Conn. Feb. 10, 2004) (suggesting that plaintiff's migraine headaches constituted a sufficiently serious condition to warrant Eighth Amendment protection since they can be "extremely painful and debilitating"); *O'Bryan v. Sedgwick County,* No. 98-3308, 2000 WL 882516, at *5 (D. Kan. June 12, 2000) (assuming plaintiff's migraine headaches, for which he was prescribed medication, comprised a sufficiently serious medical need under the Eighth Amendment); *Medcalf v. State of Kansas,* 626 F.Supp. 1179, 1183 (D.Kan.1986) (finding that deceased prisoner, who consistently complained of severe headaches, nausea and vomiting, exhibited sufficiently severe medical symptoms for the court to conclude that administrator of prisoner's estate had stated a claim for relief under section 1983 and the Eighth Amendment).

FN6. Defendants have not argued that plaintiff's migraine headaches do not constitute a sufficiently serious medical condition to warrant the Eighth Amendment protections, and I have therefore not assumed otherwise.

2. *Deliberate Indifference*

**\*8** Deliberate indifference, in a constitutional sense, exists if an official knows of and disregards an excessive risk to inmate health or safety; the official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

It is well-established that mere disagreement with a prescribed course of treatment, or even a claim that negligence or medical malpractice has occurred, does not provide a basis to find a violation of the Eighth Amendment. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 291-92; *Chance,* 143 F.3d at 703; *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), aff'd, 970 F.2d 896 (2d Cir.),

*cert. denied,* 506 U.S. 1040, 113 S.Ct. 828 (1992). The question of what diagnostic techniques and treatments should be administered to an inmate is a "classic example of a matter for medical judgment"; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703; *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998); *see also Perez v. Hawk,* 302 F.Supp.2d 9, 21 (E.D.N.Y.2004) (noting that "treatment of a prisoner's medication condition generally defeats a claim of deliberate indifference") (quotations omitted).

a. *Kidney Pain*

Plaintiff's medical records show that he complained of pain in the area of his kidney eleven times between July 16, 2001 and October 28, 2003. Miller Decl. (Dkt. No. 25) ¶ 3. Defendant was given Motrin to alleviate his discomfort, *see, e.g., id.,* Exh. A at pp. 128, 133, 144, 171, and was seen by a medical doctor on several of those occasions. Miller Decl. (Dkt. No. 25) ¶ 3 and Exh. A at pp. 133, 144, 171. As a general matter, the record fails to disclose any failure on the part of medical officials at Clinton to respond to his pain complaints.

Focusing on the involvement of defendant Miller, the record supports a finding that she was made aware of the plaintiff's kidney pain through plaintiff's complaints to her on July 5, 2002-a fact which she readily acknowledges. On that one and only occasion when defendant Miller saw the plaintiff regarding his pain complaints, she arranged for an outside radiologist to review x-rays of the plaintiff's back. Miller Decl. (Dkt. No. 25) ¶¶ 4, 5. Those x-rays were determined to be negative. *Id.* at ¶ 5. After the x-rays were taken, defendant Miller had no contact with the plaintiff regarding the condition. The record therefore fails to disclose any evidence from which a reasonable factfinder could conclude that defendant Miller was aware of but deliberately indifferent to plaintiff's kidney condition.

While the record discloses at least some minimal involvement on the part of defendant Miller in the treatment of plaintiff's kidney pain, there is no evidence from the record currently before the court of any involvement on the part of defendant Tousignant in

Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)

(Cite as: 2007 WL 2071743 (N.D.N.Y.))

connection with care or treatment for that complaint. Personal involvement of a defendant in an alleged constitutional deprivation is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

**\*9** Although plaintiff's complaint is silent on this issue, it may be that plaintiff asserts claims against defendant Tousignant in her administrative capacity as a nurse administrator. A supervisor, however, cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. A supervisory official can, however, be liable in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986). Even under this test the record fails to disclose any basis for finding defendant Tousignant liable with regard to plaintiff's kidney condition. Accordingly, I recommend that the portion of plaintiff's deliberate indifference claim against defendant Tousignant, related to the treatment of his kidney pain, be dismissed on this basis.

b. *Foot Rash*

The record reflects that both defendants were subjectively aware of plaintiff's foot rash. Plaintiff was seen on February 11, 2004 by defendant Tousignant, complaining of a rash on his feet. Tousignant Decl. (Dkt. No. 25) ¶ 4; Miller Decl. (Dkt. No. 25) Exh. A at p. 180. Defendant Tousignant reports that on that date she discussed with another nurse at the facility the care and treatment of plaintiff's foot condition, and was of the opinion that the treatment was appropriate. Tousignant Dec. (Dkt. No. 25) ¶ 4. While defendant Tousignant was aware of the plaintiff's foot rash condition, there was no evidence in the record demonstrating her deliberate indifference to that condition. I therefore recommend dismissal of plaintiff's foot rash indifference claim as against defendant Tousignant.

The record also reflects that defendant Miller was aware of, and indeed had a more active role in caring for, plaintiff's foot condition. The medical records associated with defendant Miller's care and treatment for that condition reflect significant efforts on her part, through administering of various prescription and non-prescription medications, to control plaintiff's condition and to relieve the itch associated with it. While plaintiff's quarrel appears to stem from his frustration over the inability to cure his rash condition, this without more fails to establish a constitutional violation. *See, e.g., Armour v. Herman,* No. 1:05CV295, 2005 WL 2977761, at \*3 (N.D.Ind. Nov. 4, 2005) ("The Eighth Amendment does not require medical success ...."); *Ramos v. Artuz,* No. 00 Civ. 0149, 2003 WL 342347, at \*9 (S.D.N.Y. Feb. 14, 2003) (indicating that an unsuccessful course of treatment does not support a finding of deliberate indifference); *see also Moolenaar v. Champagne,* No. 03-CV-1464, 2006 WL 2795339, at \*7 (N.D.N.Y. Sept. 26, 2006) (Kahn, D.J. and Peebles, M.J.) (plaintiff's complaints of pain resulting from degenerative disc disease, a chronic ailment sustained by many individuals and treated with exercise, pain medication, and physical therapy, with which plaintiff was treated, did not give rise to a valid deliberate indifference claim). Based upon my review of the records associated with that defendant Miller's treatment, I am unable to discern any basis upon which a reasonable factfinder could conclude that defendant Miller was inattentive and deliberately indifferent to plaintiff's foot rash condition.

c. *Migraine Headaches*

The treatment administered by medical personnel with

Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)

(Cite as: 2007 WL 2071743 (N.D.N.Y.))

respect to plaintiff's migraines similarly belies any claim of deliberate indifference to his medical needs. It is true that both defendants were aware of plaintiff's prescription of Fioricet and his desire to continue with that medication. *See, e.g.,* Miller Decl. (Dkt. No. 25) ¶ 13; Tousignant Decl. (Dkt. No. 25) ¶ 5. Plaintiff's complaint in this regard stems from the failure to continue prescribing his pain medication of choice; that decision, however, was not made by the defendants, who instead were merely following directives from security personnel at the facility to discontinue the prescription drug in light of plaintiff's stockpiling and at least the suspected potential for having sold or given the drugs to fellow inmates. Such legitimate security concerns can provide a basis for discontinuing or denying a treatment, especially when, as in this case, adequate alternative measures are taken. *See, e.g.,* Kosilek v. Maloney, 221 F.Supp.2d 156, 161 (D.Mass.2002) (stating that the duty of prison officials to protect the safety of both inmates and prison staff "is a factor that may properly be considered in prescribing medical care"); Hawley v. Evans, 716 F.Supp. 601, 604 (N.D.Ga.1989) (noting that as long as prison system abides by reasonable medical practices, whether to permit a prisoner to be treated with experimental drugs is within the discretion of the state officials, as "jail authorities have a legitimate security concern in limiting the exposure of inmates to drugs").

**\*10** In this instance, alternative efforts were taken by prison medical officials to address plaintiff's pain complaints. After termination of the Fioricet in or about late March, 2004, plaintiff was written a prescription for Motrin 600 mg, a strong pain reliever. Miller Decl. (Dkt. No. 25) ¶ 14 and Exh. A at p. 191. That was followed with a prescription on May 4, 2004 for Naproxen, another non-steroidal anti-inflammatory drug. Following a determination that the Naproxen was not working well enough to treat plaintiff's headaches, defendant Miller prescribed Inderal, a medication specifically designed for such purposes. Miller Decl. (Dkt. No. 25) ¶ 16 and Exh. A at p. 193.

In sum, plaintiff's medical records reflect that his migraine headaches were treated with three different prescription pain reliever medications. "[T]reatment of a prisoner's medical condition 'generally defeats a claim of deliberate indifference.' " Perez, 302 F.Supp.2d at 21

(quoting Wells v. Franzen, 777 F.2d 1258, 1264 (7th Cir.1985)). In this instance plaintiff's complaint represents nothing more than a disagreement with prison officials' choice of treatments, a matter which does not arise to a level of medical deliberate indifference. Estelle, 429 U.S. at 105-06, 97 S.Ct. at 291-92; *see also* Chance, 143 F.3d at 703. Accordingly, I find that plaintiff has not established medical deliberate indifference on the part of either of the defendants to his migraine medical condition.[FN7]

> **FN7.** The evidence reflects that defendant Tousignant did have at least minimal awareness of an involvement in the decision to discontinue his Fioricet medication and of plaintiff's quarrel with that determination. *See e.g.,* Tousignant Decl. (Dkt. No. 25) ¶ 5. I therefore recommend against dismissal of plaintiff's migraine headache claim as against defendant Tousignant on the independent basis of lack of personal involvement.

## IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's complaint claims deliberate indifference on the part of defendants to three separate conditions, including pain in the region of his kidney, a foot rash, and migraine headaches. Because the first two of those three conditions are insufficiently serious, either separately or in combination, to trigger the Eighth Amendment's cruel and unusual punishment protections, I recommend dismissal of those claims on this basis. Additionally, having carefully reviewed the available records associated with plaintiff's medical treatment while an inmate at Clinton, I find no evidence from which a reasonable factfinder could conclude that either of the defendants was deliberately indifferent to plaintiff's medical conditions even assuming, *arguendo,* that they were sufficiently serious to implicate the Eighth Amendment. Finally, in light of my recommendations on the merits, I find it unnecessary to address defendants' additional argument that they are entitled to qualified immunity.[FN8]

> **FN8.** The first step in the qualified immunity analysis requires a threshold determination of whether plaintiff has facially established a constitutional violation. Harhay v. Town of

Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)

(Cite as: 2007 WL 2071743 (N.D.N.Y.))

*Ellington Bd. of Educ.,* 323 F.3d 206, 211 (2d Cir.2003). Only if the answer to that inquiry is in the affirmative must the court then turn its focus to whether the right in issue was clearly established at the time of the alleged violation, and if so whether it was objectively reasonable for the defendant to believe that his or her actions did not violate any such clearly established right. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S.Ct. 2151, 2156 (2001)); *see also Poe v. Leonard,* 282 F.3d 123, 132-33 (2d Cir.2002).

Based upon the foregoing, it is hereby,

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 25) be GRANTED, and that plaintiff's complaint be DISMISSED in all respects.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

*11 It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with the court's local rules.

N.D.N.Y.,2007.

Peterson v. Miller
Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 196537 (S.D.N.Y.)

(Cite as: 2005 WL 196537 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Edward DAWKINS, Plaintiff,
v.
Lt. Larry JONES, et al., Defendants.
No. 03Civ.0068(DAB)(AJP).

Jan. 31, 2005.
*REPORT AND RECOMMENDATION*

PECK, Chief Magistrate J.
   **\*1** Pro se plaintiff Edward Dawkins, an **inmate** in the custody of the Department of Correctional Services, brings this action against ninety-three defendants alleging what appears to be various forms of retaliation for exercising his First Amendment rights, medical deliberate indifference, and other violations. (Dkt. No. 98: Second Am. Compl. [hereafter "Compl."].) The complaint, however, while factually quite lengthy, fails to identify what claims plaintiff is asserting. Presently before the Court is defendants' motion to dismiss and for summary judgment for failure to exhaust administrative remedies. (Dkt. No. 141; *see also* Dkt. Nos. 142-45, 150.) For the reasons stated below, the Court should grant defendants' motions and Dawkins' entire complaint should be dismissed (some aspects with and others without prejudice).

*FACTS*

   Dawkins' 104-page, 340-paragraph Second Amended Complaint (hereafter, "complaint") named ninety-three defendants. Of the original ninety-three defendants, Dawkins voluntarily dismissed eleven,[FN1] leaving eighty-two defendants. Another eight defendants, Goidel, Isiaddinso, Zwillinger, Schwartz, Wilkerson, Brizzel, Gatto and Lyons are named only in the Complaint's caption and are not mentioned in the body of the Complaint.[FN2] (*See* Defs. 56.1 Stmt. Ex. A: "Summary of Plaintiff's Allegations Against Each Defendant.") Of the

remaining seventy-four defendants, thirty-one were not named or identified in any grievance Dawkins filed.[FN3] (Dkt. No. 142: Defs. 56.1 Stmt. ¶ 3 & n.1; Dkt. No. 144: Small Aff. ¶ 6.) Of the sixty grievances that Dawkins claims he filed (Compl. at 1-2), only fifty-one represent grievances that Dawkins actually filed and that relate to his present allegations.[FN4] (Small Aff. ¶¶ 3-5 & nn.2-3.)

   FN1. Specifically, on December 16, 2003, the Court granted Dawkins' request to dismiss nine defendants: Bennis, Labogh, Laman, Peck, O'Neal, Conklin, Hollurans, Lacy, and Serens. (Dkt. No. 126: 12/16/03 Order; Dkt. No. 142: Defs. Br. at 2 n.1; Dkt. No. 144: Small Aff. ¶ 1 n.1; Dkt No. 150: Defs. Reply Br. at 1 n.1.) On May 13, 2004, the Court granted Dawkins' request to dismiss the case against Beatty and Hopkins. (Dkt. No. 148: 5/13/04 Order; Defs. Reply Br. at 1 n.1.)

   FN2. These eight defendants also were not named or identified in any grievance filed by Dawkins. (Defs. 56.1 Stmt. Ex. A n.1.)

   FN3. Specifically, Dawkins did not grieve his due process claims against Capt. Krom, Jones, or Lopiccolo (Defs. 56.1 Stmt. ¶ 4; Small Aff. ¶ 6), medical deliberate indifference claims against defendants Wright, Miraflor, Miller, or Dennis (Defs. 56.1 Stmt. ¶ 5; Small Aff. ¶ 6); retaliation claims as to Beatty, Jones, Szymanwiez, Krom, Lacy, or O'Neal (Defs. 56.1 Stmt. ¶ 6; Small Aff. ¶ 6); harassment, threat, and abuse claims against Delgado, Meyer, Leman, Lynch, or Serens (Defs. 56.1 Stmt. ¶ 7; Small Aff. ¶ 6); property claims against Olsen, Sullivan, Coster, Jackson, Degroat, Digirolamo or Duesler (Defs. 56.1 Stmt. ¶ 7; Small Aff. ¶ 6); cell search claims against Webbe, Dickerson, Hollurans, Peck, or Hopkins (Defs. 56.1 Stmt. ¶ 9; Small Aff. ¶ 6); transfer claim against Labogh (Defs. 56.1 Stmt. ¶ 10; Small Aff. ¶ 6).

   Defendants admit that Dawkins' claims against

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 196537 (S.D.N.Y.)

(Cite as: 2005 WL 196537 (S.D.N.Y.))

six of the defendants not named in any grievance-Selsky, Friedling, Garrett, Jones, Szymanwiez, and Meany-"concern dispositions or decisions made pursuant to disciplinary proceedings," and are therefore non-grievable. (Defs. 56.1 Stmt. ¶ 11; Small Aff. ¶ 7.)

FN4. Plaintiff did not appeal three grievances (Small Aff. ¶ 5, citing Small Aff. Exs. 4, 13, 26 & C), listed four grievances twice (Smalls Aff. ¶ 3 n.2), and did not file three that he listed in the Complaint (Small Aff. ¶ 3 n.2 & Ex. D: Stone Aff). In addition, Dawkins admits that another three are "typographical errors." (Small Aff. ¶ 3 n.2; Dawkins Motion to Dismiss Opp. Br. at 13.) (See Defs. 56.1 Stmt. ¶ 2.)

In addition to the defendants not named in any grievance, Dawkins initiated but did not complete the grievance procedure against eight defendants: Briggs, Zeeb, Hudson, Edwards, Woodward, Wendland, Cole, and Febrizio. (Defs. 56.1 Stmt. ¶ 12; Small Aff. ¶¶ 8-23.)

Defendants admit that Dawkins has fully exhausted his claims against thirty [FN5] defendants. (Defs. 56.1 Stmt. ¶ 13; Small Aff. ¶¶ 24-53.)

FN5. Defendants concede that Dawkins claims against these thirty defendants are exhausted: Basley, Gennorell, Beckwith, Graham, Stephens, Pecenso, Conklin, Roark, Schneeberger, Moricone, Venettozzi, Manning, Zaccagnino, Buonado, Stone, Supple, Ercole, Leclaire, Farao, Marshall, Collins, Pelc, Klysezjko, Schneider, Mazzucca, Cunningham, Dillard, Cocuzza, Swanson, and Larson. (Defs. 56.1 Stmt. ¶ 13; see Small Aff. ¶¶ 24-53.)

As to the thirty defendants against whom claims are exhausted, and the six additional defendants against whom claims are non-grievable (see n.3 above), Dawkins asserts specific factual allegations in his 340 paragraph complaint. (See generally Compl .) However, he has not specifically asserted any causes of action, and the Court therefore has had to deduce from the facts alleged what

claims Dawkins may be attempting to assert. Dawkins appears to allege that much of the events that occurred were due to retaliation against him for lodging other grievance complaints. Dawkins also appears to have medical indifference claims and a variety of uncategorizable "violations" that range from disagreements with disciplinary hearing results to name-calling to denial of access to a copy machine.

*Property Claims*

*Correctional Officers Jay Basley and R. Gennorell*

**\*2** Dawkins asserts that Corrections Officers Basley and Gennorell retaliated against him for a prior complaint against others by improperly packing his food, including discarding some of it, on March 10, 2003. (Com pl.¶¶ 291-93.)

*Captain Arlan Pelc*

Dawkins asserts that on September 18, 2001, Capt. Pelc ordered him to send home some of his property; that in March 2003, Capt. Pelc knew about his broken typewriter and told Dawkins that some of his other property was missing from storage; that it was partially Capt. Pelc's decision to keep him working in the laundry; and that Capt. Pelc lied about why Dawkins was reassigned from his cook position. (Compl.¶¶ 98, 298, 302, 320, 321.) Dawkins alleges that Capt. Pelc is retaliating against him for a January 2003 complaint. (Compl.¶ 302.)

*Lieutenant James Buonato*

Dawkins asserts that on July 9, 2002, Lt. Buonato ordered him to place his sleeping disorder machine "in his property" because electrical medical devices were not allowed in the "S.H.U." Dawkins may be asserting a medical indifference claim against Lt. Buonato. (Compl.¶ 205.) Dawkins alleges that Lt. Buonato is retaliating against him for a January 2003 complaint. (Compl.¶ 302.)

*Correctional Officer Kyle Collins*

Dawkins alleges that C.O. Collins threw Dawkins' property around his "cube" after Dawkins asked him to place it properly where it belonged. (Compl.¶ 215.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 196537 (S.D.N.Y.)

(Cite as: 2005 WL 196537 (S.D.N.Y.))

Dawkins alleges that C.O. Collins retaliated by telling Dawkins that he would be placed in the S.H.U. and also by writing a misbehavior report on October 7, 2002. (Compl.¶¶ 215, 228-29.) Dawkins further alleges that C.O. Collins called him names, threatened, and harassed him. (Compl.¶¶ 234-35.)

*Lieutenant Thomas R. Szymanwiez*

Dawkins alleges that Lt. Szymanwiez had some of Dawkins' personal property removed in retaliation for filing two 2001 complaints. (Compl.¶ 138.) Lt. Szymanwiez locked Dawkins in the S.H.U. for forty-five minutes on October 24, 2001 while another defendant searched his cube and threatened him with more S.H.U. time and keep lock sanctions in retaliation for filing an appeal. (Com pl.¶¶ 127-28, 131.)

*Medical Claims*

*Nurse Patricia Pecenco*

Dawkins alleges that Nurse Pecenco waited twelve hours before she examined him and that she refused to transfer him to the infirmary where he could use his C.P.A.P. (sleep apnea treatment) machine, and that when he complained to her of his injuries she replied that it was swelling and it would go down. (Compl.¶ 206, 212.)

*Dr. John M. Supple*

Dawkins disagreed with Dr. Supple's medical decisions: not to give him B-12 or iron and not to x-ray his wrists or his hand for arthritis in March, June and July 2002 (Compl.¶¶ 189-90, 201-02); not to order a new mask for his C.P.A.P. machine (Compl.¶ 202); improper treatment for his sleep disorder (Com pl.¶¶ 240-43); and his decision to disregard Dawkins' request for extra mattresses and large handcuff permits. (Compl.¶ 324.) Dawkins also asserts that Dr. Supple refused to see him a number of times or delayed his appointment. (Compl.¶¶ 237, 239.)

*Nurse Nancy Faoro*

**\*3** Dawkins' states that in November 2001 and February 2002, Nurse Faoro made notations that his C.P.A.P was not working properly and was in need of more repair. (Compl.¶ 247.) This appears to be beneficial

to Hawkins. Dawkins claims that in February 2003, when he was being admitted to the S.H.U., Nuse Faoro failed to write down his medical history and said she would do nothing about his sleep disorder. (Compl.¶¶ 271-72.)

*Dr. Richard Klyszejko*

Dawkins asserts that Dr. Klyszejko, who is acting indifferently to his medical needs, waited too long to take his vital signs (Compl.¶ 207), rescheduled his medical visit (Compl.¶ 239), and in response to his complaint about walking up and down stairs at Fishkill, responded that Fishkill is not an appropriate facility for Dawkins. (Compl.¶ 116.)

*Sergeant Larson*

Despite the fact that Sgt. Larson "knew [Dawkins'] physical therapy was more important than the IGRC hearing," he told Dawkins that he had to go to the IGRC office unless he had a no work permit from a doctor. (Compl.¶¶ 122-23.)

*Sergeant John H. Conklin*

In February, 2002, Sgt. Conklin notified another defendant about Dawkins' sleeping disorder. (Compl.¶ 106.) This appears to be of benefit to Dawkins.

*Disciplinary Hearing Claims and Claims against Prison Supervisors*

*Deputy Superintendent/Security Robert Ercole*

Dawkins alleges that when he spoke to Supt. Ercole about officers' retaliation against him in August 2001, Supt. Ercole told him that he was not going to protect Dawkins from the staff but that he would transfer him out of Fishkill if he was unhappy there; later in the month Dawkins decided that he did want to transfer and wrote to Supt. Ercole in October to ask for a transfer. (Compl.¶¶ 88, 130, 311.) Dawkins further asserts that in January 2002, Supt. Ercole affirmed a disciplinary decision of another defendant against him. (Compl.¶¶ 173-74.) Dawkins states that on July 19, 2002, his blood pressure was not taken and the only person he had spoken to about his sleep condition was Supt. Ercole, and further asserts that Supt. Ercole violated his rights by being in charge of security at the prison and denying him treatment for his sleep disorder. (Compl.¶¶ 208, 211.) Dawkins

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 196537 (S.D.N.Y.)

(Cite as: 2005 WL 196537 (S.D.N.Y.))

further asserts that on March 18, 2003, as per Supt. Ercole's orders, he was moved from his job in the A-21 mess hall, and that Supt. Ercole was retaliating against him for a January 23, 2003 complaint. (Compl.¶¶ 300, 302.)

*IGP Supervisor Michelle P. Stone*

Dawkins alleges that on January 30, 2002, Stone did not hold a fair and impartial hearing on one of his grievances, and that a week later Stone dismissed another grievance (the latter would appear to be of benefit to Dawkins). (Compl.¶ 185-86.)

*Deputy Commissioner Lucien J. Leclaire*

Dawkins asserts that on January 24, 2003, he wrote a letter to Commissioner Laclaire regarding "retaliatory motivated disciplinary ." (Compl.¶ 264.)

*Deputy Superintendent Raymond J. Cunningham*

*4 Dawkins alleges that on August 13, 2001 he wrote to Supt. Cunningham to ask for a transfer out of Fishkill, but that he never received a written response. (Compl.¶ 88.) Dawkins further asserts that Supt. Cunningham reviewed an appeal and found no reason for modification, and that in January 2002, Supt. Cunningham told him that he had too many bags to be transferred out of Fishkill. (Compl.¶¶ 130, 183.)

*Superintendent William Mazzuca*

Dawkins claims that Supt. Mazzuca did not respond to his appeal of an April 1997 hearing. (Compl.¶ 79.) Dawkins alleges that he wrote a letter to Supt. Mazzuca concerning sexual assault by a staff member and reading of legal documents in August 2001. (Compl. ¶ 93 .) Dawkins further asserts that he wrote several letters to Supt. Mazzuca about various complaints, and that he filed complaints with Supt. Mazzuca in September, October and November 2001. (Compl.¶¶ 99, 127, 131, 134, 307, 313.) Dawkins asserts that Supt. Mazzuca is "grossly negligent in supervising the area sergeant" who committed a "wrongful act." (Compl.¶ 258.)

*Director Donald Selsky*

Dawkins states that on July 11, 2000, Selsky reversed and dismissed one of his misbehavior reports. (Compl.¶ 57.) This appears to be another background fact, but of

conduct beneficial to Dawkins.
*Lieutenant Kendell W. Garrett*

Dawkins states that in October 2002, Lt. Garrett found him not guilty of charges brought against him. (Compl.¶ 230.) Again, a benefit not detriment to Dawkins.
*Lieutenant Lawrence Jones*

Dawkins claims that Lt. Jones found him guilty at a September 1999 disciplinary hearing concerning a misbehavior report. (Compl.¶ 10.) Dawkins also alleges that in May 2000, Lt. Jones deliberately taped over part of another hearing in retaliation for Dawkins complaining about the Woodburn Correctional Facility, and also retaliated against him by finding him guilty at that hearing. (Compl.¶¶ 49, 52-53.) Dawkins also asserts that Lt. Jones had an extra mattress and pillow confiscated from Dawkins' cell, and that in April 2000, Lt. Jones ordered Dawkins' cell searched in order to force Dawkins to give him information about another **inmate**. (Compl.¶¶ 54-55, 340.)

*Senior Counselor Warren Friedling*

Dawkins states that Friedling found him guilty of a drug-related charge at a September 1999 hearing, which he states was later reversed in response to his letter of reconsideration because he had already been charged for the same conduct in another hearing. (Compl.¶¶ 13, 15.)

*Sergeant Patrick J. Meaney*

Dawkins states that at an October 25, 2001 violation hearing, Sgt. Meaney imposed a "seven day work detail" and "13 days loss of recreation," and that on the same day Dawkins filed a complaint against Sgt. Meaney concerning work detail. (Compl.¶¶ 131, 312.)

*Captain Gwen Schneider*

Dawkins asserts that Capt. Schneider, in response to a complaint against Officer Hanna,[FN6] stated: " 'There is no evidence to support your allegation, therefore I consider this matter closed.' ' (Compl.¶ 125.) Dawkins further alleges that both on November 13, 2001 and during another episode, Capt. Schneider conducted an incomplete and one-sided investigation, the latter of which was for "her own personal reasons." (Compl.¶¶ 133, 256.) Dawkins also states that during her rounds on February 23,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 196537 (S.D.N.Y.)

(Cite as: 2005 WL 196537 (S.D.N.Y.))

2003, Capt. Schneider did not stop to talk to him. (Compl.¶ 286.)

FN6. Although Dawkins's asserts a claim of sexual assault by Hanna (Compl.¶¶ 93-94), the only non-time barred grievance relating to Hanna merely stated that Dawkins was "fearful" of him. (Small Aff. ¶ 6 n.6).

*Prison Administration Claims/Miscellaneous Claims*

*Correctional Officers Christopher Schneeberger and Chris Moricone*

**\*5** Dawkins claims that C.O. Schneeberger was not interviewed for a February 3, 2002 complaint, and that C.O. Moricone was present when C.O. Schneeberger called the grievance office in relation to the complaint. (Compl.¶ 124.)

*Correctional Officers Joseph M. Beckwith and Gordon Roark*

Dawkins alleges that on July 29, 2002, C.O. Beckwith did not allow him to shop in the commissary with other **prisoners** in retaliation for writing a grievance against two defendants who he believes are C.O. Beckwith's friends. (Compl.¶ ¶ 221-23.) Dawkins further asserts that C.O. Roark likewise stood in the way of his ability to shop by disposing of his commissary sheet, also in retaliation for filing a grievance. (Compl.¶ 224.)

*Correctional Officer Pamela Graham and Sergeant Gary Stephens*

Dawkins asserts that C.O. Graham denied him access to the law library after "star[ing] down" at him, and then proceeded to "write [Dawkins] up" at the direction of defendant Sgt. Stephens. (Compl.¶¶ 248-49.) Dawkins further alleges that Sgt. Stephens violated his First Amendment rights by blocking access to the law library, retaliating against him for a January 24, 2003 complaint against two other defendants, and that when Sgt. Stephens put him in keep lock, his address book and watch were removed from him during a search. (Compl.¶¶ 250-51, 297, 302.)

*Correctional Officer Joseph Marshall*

Dawkins asserts that upon arriving at a hearing, C.O. Marshall said to him "I am surprise[d] that you['re] still employed in the mess hall." (Compl.¶ 261.)

*Sergeant John V. Swanson*

Dawkins states that "[b]ecause of retaliation" he became fearful of Sgt. Swanson; Dawkins filed complaints against Sgt. Swanson on September 2, 2001 and October 29, 2001. (Compl. ¶ 95 n.14, ¶¶ 305, 313.) Dawkins further asserts that while he was cleaning the officers' bathroom, Sgt. Swanson and other officers laughed at him. (Compl.¶ 132.)

*Correctional Officers Robert Cocuzza and Zaccagnino*

Dawkins asserts that someone told him that C.O. Cocuzza called him the "grievance King." (Comp.¶ 259.) Dawkins further asserts that C.O. Cocuzza searched his bag, escorted him to a hearing fifteen minutes early, and conspired with C.O. Zaccagnino to make it seem that he had a bag of oatmeal in order to "lock [him] up." (Compl.¶¶ 260-63.) Dawkins also claims that C.O. Zaccagnino and C.O. Cucuzza conspired to "keep lock" him in retaliation for January 2003 complaints, and that in connection with the retaliation, C.O. Cocuzza is responsible for the loss of his mess hall cook position. (Compl.¶¶ 270, 300, 302, 321.) According to Dawkins, C.O. Zaccagnino said that he would find a way to put him in keep lock.

*Correctional Officer Richard Venettozzi*

Dawkins asserts that he and C.O. Venettozzi had an exchange about a complaint he was writing, and that because of retaliation, he became fearful of C.O. Venettozzi. (Compl. ¶ 95 n.14.) Dawkins further asserts that C.O. Venettozzi ordered him to throw away his clearly labeled legal mail. (Compl.¶ 326-27.)

*Senior Counselor Gilbert Dillard*

**\*6** Dawkins asserts that on March 24, 2003, Dillard informed him that the "main building mess hall" did not want him to work there, and Dillard also was responsible for the decision not to assign him to any food facility, and that Dillard is retaliating against him for his January 24, 2003 complaint. (Compl.¶ 299, 301-02.)

*Correctional Officer Colleen M. Manning*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 196537 (S.D.N.Y.)

(Cite as: 2005 WL 196537 (S.D.N.Y.))

Dawkins asserts that although C.O. Manning told him that she would have someone drop off his document request, no one did. (Compl.¶ 179.) Dawkins alleges that on July 31, 2002, C.O. Manning verbally assaulted, threatened and harassed him while he was making copies, and would not let him finish making copies. (Compl.¶ 226.) Dawkins states that C.O. Manning retaliated against his filing a grievance against her by barring his access to the library and subjecting him to pat frisks when he went to make copies of legal documents. (Compl.¶ 227.)

*Procedural History*

On October 15, 2003, Defendants moved to dismiss on several grounds, including failure to exhaust. (Dkt.Nos.91-92.) On March 22, 2004, this Court found that because failure to exhaust administrative remedies is an affirmative defense in the Second Circuit, " 'defendants bear the burden of showing non-exhaustion and the issue of exhaustion is generally not amenable to resolution by way of a motion to dismiss." ' *Dawkins v. Jones,* 03 Civ. 0068, 2004 WL 574726 at *1 (S.D.N.Y. Mar.22, 2004) (Peck, M.J.) (quoting *Foreman v. Goord,* 02 Civ. 7089, 2004 WL 385114 at *6 (S.D.N.Y. Mar.2, 2004) (internal quotations omitted)). Accordingly, the Court denied without prejudice defendants' motion to dismiss for lack of exhaustion, subject to renewal as a combined motion to dismiss and for summary judgment on the issue of exhaustion. *Dawkins v. Jones,* 2004 WL 574726 at *1. Defendants subsequently moved to dismiss Dawkins' second amended complaint and for summary judgement. (Dkt.Nos.141-45, 150.)

*ANALYSIS*

I. *DAWKINS' CLAIMS AGAINST FORTY-SEVEN OF THE DEFENDANTS* [FN7] *SHOULD BE DISMISSED DUE TO FAILURE TO EXHAUST PRISON GRIEVANCE REMEDIES*

FN7. Not including the defendants who Dawkins already dismissed (*see* page 2 n.1 above), there are forty-seven defendants who he did not grieve against (*see* page 2 n.3 above), eight he started but did not finish the grievance process (*see* page 3 above), and eight who are only mentioned in the complaint's caption but in any event were not grieved against (*see* page 2 n.2 above). The forty-seven defendants are: Tracy, Leclare,

Wright, Ronald Krom, Robert Krom, Dirie, Marshal, Hanna, Scott, Jackson, Lopiccolo, Wright, Miraflor, Miller, Dennis, Pacenco, Galloway, Melton, Delgado, Meyer, Lynch, Olsen, Sullivan, Coster, Jackson, Degroat, Digirolamo, Duesler, Webbe, Dickerson, Hopkins, Briggs, Zeeb, Hudson, Edwards, Woodward, Wendland, Cole, Febrizio, Goidel, Isiaddinso, Zwillinger, Schwartz, Wilkerson, Brizzel, Gatto and Lyons. (*See* page 2 & nn.1-3 above.) Although Dawkins did not grieve against Selsky, Jones, Garrett, Friedling, Szymanwiez, and Meaney, defendants admit that the claims relating to these defendants were non-grievable. (*See* page 2 n.3 above.)

A. *Exhaustion of Administrative Remedies* [FN8]

FN8. For an additional decision by this Judge about exhaustion of administrative remedies under the PLRA in language substantially similar to that in this entire section, *see Muhammad v. Pico,* 02 Civ. 1052, 2003 WL 21792158 at *7-8 (S.D.N.Y. Aug.5, 2003) (Peck, M.J.).

Under 42 U.S.C. § 1997e(a), as amended by the Prison Litigation Reform Act of 1996 ("PLRA"), a **prisoner** must exhaust administrative remedies before bringing suit in federal court under federal law:

No action shall be brought with respect to prison conditions under **section 1983** of this title, or any other Federal law, by a **prisoner** confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). This provision requires complete exhaustion in accordance with the administrative procedures within the New York State Department of Correctional Services ("DOCS"). Exhaustion is required even when a **prisoner** seeks a remedy that cannot be awarded by such administrative procedures. *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 988, 152 L.Ed.2d 12 (2002); *Booth v. Churner,* 532 U.S. 731, 741, 121 S.Ct. 1819, 1825, 149 L.Ed.2d 958 (2001).[FN9] The Supreme Court has made clear that there are no exceptions to the

Not Reported in F.Supp.2d, 2005 WL 196537 (S.D.N.Y.)

(Cite as: 2005 WL 196537 (S.D.N.Y.))

PLRA's exhaustion requirement:

FN9. *See also, e.g., Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004); *Richardson v. Goord,* 347 F.3d 431, 434 (2d Cir.2003); *Beharry v. Ashcroft,* 329 F.3d 51, 58 (2d Cir.2003); *Rivera v. Pataki,* 01 Civ. 5179, 2003 WL 21511939 at *4, 8 (S.D.N.Y. July 1, 2003); *Nelson v. Rodas,* 01 Civ. 7887, 2002 WL 31075804 at *2 (S.D.N.Y. Sept.17, 2002) (Peck, M.J.).

**\*7** [W]e hold that the PLRA's exhaustion requirement applies to all **inmate** suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.

*Porter v. Nussle,* 534 U.S. at 532, 122 S.Ct. at 992.[FN10]

FN10. *Accord, e.g., Feaster v. United States Bureau of Prisons,* No. 00-0118, 37 Fed. Appx. 15, 16, 2002 WL 970941 at *1 (2d Cir. May 10, 2002) (applying *Porter v. Nussle* holding to require exhaustion of **prisoner's** due process and retaliation claims); *Rodney v. Goord,* 00 Civ. 3724, 2003 WL 21108353 at *1, 3 (S.D.N.Y. May 15, 2003) (requiring exhaustion of claims of harassment, excessive force, and the filing of a false misbehavior report and subsequent disciplinary action); *Rivera v. Goord,* 253 F.Supp.2d 735, 745-46 (S.D.N.Y.2003); *Nelson v. Rodas,* 2002 WL 31075804 at *2.

"[A]lthough the exhaustion requirement of the PLRA is not jurisdictional, a **prisoner** must exhaust his or her administrative remedies prior to filing a claim under **§ 1983**." *Williams v. Cohen,* No. 01-0059, 101 Fed. Appx. 862, 864, 2004 WL 1462633 at *2 (2d Cir. June 30, 2004) (quoting *Richardson v. Goord,* 347 F.3d at 434).[FN11] A plaintiff must to administratively exhaust the claim against every defendant in that claim-that is, exhaustion as to one named defendant concerning a particular incident does not constitute exhaustion as to other defendants involved in that incident. *See, e.g., Venable v. Goord,* 03 Civ. 4434, 2004 WL 2033069 at *3-4 (S.D.N.Y. Sep.10, 2004); *Ellis v. Guarino,* 03 Civ. 6562, 2004 WL 1879834 at *7 (S.D.N.Y. Aug.24, 2004) (Batts, D.J.); *Lee v. Carson,* 310

F.Supp.2d 532, 536 (W.D.N.Y.2004); *Brewer v. Jones,* 02 Civ. 3570, 2004 WL 235269 at *3 (S.D.N.Y. Feb.5, 2004).

FN11. *Accord, e.g., Ziemba v. Wezner,* 366 F.3d at 163; *Timmons v. Pereiro,* No. 03-7190, 88 Fed. Appx. 447, 447, 2004 WL 322702 at *1 (2d Cir. Feb.18, 2004).

Dismissal of an action for failure to comply with the PLRA is without prejudice. *E.g., Morales v. Mackalm,* 278 F.3d 126, 128, 131 (2d Cir.2002) (per curiam) (Second Circuit "clarif[ies] that if a district court dismisses a **prisoner's** complaint for failure to exhaust administrative remedies, it should do so without prejudice.").[FN12]

FN12. *See also, e.g., Townsend v. Armstrong,* No. 02-0175, 2003 WL 21309185 at *1 (2d Cir. June 5, 2003); *De La Motte v. Menifee,* No. 01-0313, 40 Fed. Appx. 639, 639, 2002 WL 1635422 at *1 (2d Cir. July 23, 2002); *Stevens v. Goord,* 99 Civ. 11669, 2003 WL 21396665 at *4 (S.D.N.Y. June 16, 2003); *Nelson v. Rodas,* 2002 WL 31075804 at *2.

DOCS has a well-established **inmate** grievance procedure ("IGP"):

The regular DOCS grievance procedure consists of three tiers. First, the **inmate** files a level 1 grievance (either on an **Inmate** Grievance Complaint Form, or on plain paper if the form is not readily available) with the **Inmate** Grievance Resolution Committee ("IGRC"), which is composed of fellow **inmates** and prison officials. The IGRC must convene a hearing, if necessary, within seven working days, and issue a written decision within two days of the hearing. Next, the **inmate** has four days to appeal the IGRC decision to the superintendent of the facility, who must respond within ten days and must provide "simple directions" on how to appeal to the next level, the Central Office Review Committee ("CORC"). The **inmate's** final opportunity for resolution of his grievance is to appeal to the CORC within four working days of the superintendent's decision. The CORC then has 20 working days to render a decision. 7 N.Y.C.R.R. §

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 196537 (S.D.N.Y.)

(Cite as: 2005 WL 196537 (S.D.N.Y.))

701.7(c)(4).

   Hemphill v. New York, 380 F.3d 680, 682 (2d Cir.2004) (fns.omitted). [FN13]

      FN13. See also, e.g., Rivera v. Pataki, 2003 WL 21511939 at *3; Rodney v. Goord, 2003 WL 21108353 at *4 & n. 2; Nelson v. Rodas, 2002 WL 31075804 at *2; Perez v. Blot, 195 F.Supp.2d 539, 542-43 (S.D.N.Y.2002); Cruz v. Jordan, 80 F.Supp.2d 109, 117-18 (S.D.N.Y.1999); Vasquez v. Artuz, 97 Civ. 8427, 1999 WL 440631 at *5 (S.D.N.Y. June 28, 1999) (Peck, M.J.); N.Y. Correct. Law §§ 138-39; 7 N.Y.C.R.R. § 701.1, etseq.

   The Second Circuit has ruled that "total exhaustion," however, is not required, i.e., if some claims are exhausted and others are not, the unexhausted claims should be dismissed while the exhausted claims can go forward. See Ortiz v. McBride, 380 F.3d 649, 651, 655-63 (2d Cir.2004); see also, e.g., Madison v. Mazzuca, 02 Civ. 10299, 2004 WL 3037730 at *1 (S.D.N.Y. Dec.30, 2004) ("[T]he Second Circuit has held that the presence of unexhausted claims in an inmate's § 1983 complaint does not compel dismissal of the action in its entirety.") (citing Ortiz ); Degrafinreid v. Ricks, 03 Civ. 6645, 2004 WL 2793168 at *9 (S.D.N.Y. Dec.6, 2004) ("[T]he presence of unexhausted claims in an inmate's § 1983 complaint does not compel dismissal of the action in its entirety.") (citing Ortiz ); Scott v. Gardner, 344 F.Supp.2d 421, 425 (S.D.N.Y.2004) (same); Spitzley v. Sinha, No. 02-CV-0064, 2004 WL 2202653 at *3 n. 3 (W.D.N.Y. Sept. 28, 2004) ("[T]he presence of an unexhausted claim does not require dismissal of the action in its entirety."); Ellis v. Guarino, 03 Civ. 6562, 2004 WL 1879834 at *8 (S.D.N.Y. Aug.24, 2004) (Batts, D.J.) (Due to the recent Ortiz ruling, "[t]his Court shall not dismiss Plaintiff's entire lawsuit simply because he has failed to exhaust the administrative remedies for his denial of medical care claim" [against one defendant.] ); Foreman v. Goord, No. 02 Civ. 7089, 2004 WL 1886928 at *8-9 (S.D.N.Y. Aug.23, 2004); Pendergrass v. Sanney, No. 01-CV-243, 2004 WL 1946458 at *2 (W.D.N.Y. Aug. 18, 2004).

   *8 Therefore, Dawkins' claims against the forty-seven defendants either unnamed in any grievance or not fully grieved should be dismissed without prejudice, as unexhausted.

II. *DAWKINS' CLAIMS AGAINST DEFENDANTS MAZZUCA, JONES, AND FRIEDLING RELATING TO EVENTS PRIOR TO NOVEMBER, 18 1999 SHOULD BE DISMISSED WITH PREJUDICE AS TIME-BARRED*

   The statute of limitations for a § 1983 action is three years. See, e.g., Holiday v. Martinez, No. 02-7848, 2003 WL 21242641 at *2 (2d Cir. May 29, 2003) (three-year statute of limitations applies to § 1983 due process claim, which accrues when plaintiff knows or has reason to know of the injury which is the basis of his action); Warren v. Altieri, No. 02-69, 59 Fed. Appx. 426, 427, 2003 WL 1191173 at *1 (2d Cir. Mar.13, 2003) (plaintiff's " § 1983 action is governed by New York's three-year statute of limitations as set out in N.Y. C.P.L.R. § 214, the provision applicable to actions for personal injury."); Pearl v. City of Long Beach, 296 F.3d 76, 79 (2d Cir.2002), cert. denied, 538 U.S. 922, 123 S.Ct. 1574, 155 L.Ed.2d 313 (2003); Paige v. Police Dep't, 264 F.3d 197, 199 n. 2 (2d Cir.2001); Connolly v. McCall, 254 F.3d 36, 40-41 (2d Cir.2001); Muhammad v. Pico, 02 Civ. 1052, 2003 WL 21792158 at *18 (S.D.N.Y. Aug.5, 2003) (Peck, M.J.); Bristow v. Smith, 03 Civ. 2663, 2003 WL 21437005 at *1 (S.D.N.Y. June 18, 2003) (Peck, M.J.); cf. Noguera v. Hasty, 99 Civ. 8786, 2000 WL 1011563 at *12 (S.D.N.Y. July 21, 2000) (Peck, M.J.) report & rec. adopted in part, 2001 WL 243535 (S.D.N.Y. Mar.12, 2001) (Wood, D.J.). Dawkins' initial complaint in this action is dated November 8, 2002 and was received by this Court's Pro Se Office on November 18, 2002. (Dkt. No. 2: Orig. Compl. at cover & last page.) In his complaint, Dawkins' sets forth pre-November 8, 1999 claims against Mazzuca, Jones, and Friedling. (See pages 8-9 above.) Because some of the alleged acts of these individuals about which Dawkins complains took place prior to November 8, 1999, more than three years before he submitted his complaint to prison authorities on or about November 8, 2002 for submission to the Court, they are barred by the three-year limitations period. See, e.g., Rosario v. Bennett, 01 Civ. 7142, 2002 WL 31852827 at *14 (S.D.N.Y. Dec.20, 2002) (Peck, M.J.) (under the "federal ' prisoner mailbox rule," ' incarcerated pro se litigants are deemed to have

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 196537 (S.D.N.Y.)

(Cite as: 2005 WL 196537 (S.D.N.Y.))

filed their federal civil complaints and federal habeas petitions on the date the papers were handed to prison officials for mailing) (citing *Houston v. Lack,* 487 U.S. 266, 276, 108 S.Ct. 2379, 2385, 101 L.Ed.2d 245 (1988)); *see also, e.g., Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir.), *cert. denied,* 534 U.S. 886, 122 S.Ct. 197, 151 L.Ed.2d 139 (2001); *Coble v. Stinson,* No. 97-CV-0717, 2004 WL 1454392 at *1 n. 1 (W.D.N.Y. Jun. 23, 2004); *Moreno-Castillo v. United States,* 02 Civ. 2858, 2003 WL 23109747 at *1 n. 1 (S.D.N.Y. Dec.31, 2003).

**\*9** Accordingly, Dawkins' pre-November 8, 1999 claims should be dismissed with prejudice as time barred.

III. *SUMMARY JUDGMENT STANDARDS IN* **SECTION 1983** *CASES* <sup>FN14</sup>

> FN14. For additional decisions authored by this Judge discussing the summary judgment standards in **Section 1983** cases, in language substantially similar to that in this entire section of this Report and Recommendation, *see, e.g., Hall v. Perilli,* 03 Civ. 4635, 2004 WL 1068045 at *3 (S.D.N.Y. May 13, 2004) (Peck, M.J.); *Baker v. Welch,* 03 Civ. 2267, 2003 WL 22901051 at *4-6 (S.D.N.Y. Dec.10, 2003) (Peck, M.J.); *Muhammad v. Pico,* 02 Civ. 1052, 2003 WL 21792158 at *10-11 (S.D.N.Y. Aug.5, 2003) (Peck, M.J.); *Nelson v. Rodas,* 01 Civ. 7887, 2002 WL 31075804 at *9-10 (S.D.N.Y. Sept.17, 2002) (Peck, M.J.); *Walker v. Pataro,* 99 Civ. 4607, 2002 WL 664040 at *4-5 (S.D.N.Y. Apr.23, 2002) (Peck, M.J.); *Espinal v. Goord,* 00 Civ. 2242, 2001 WL 476070 at *5-7 (S.D.N.Y. May 7, 2001) (Peck, M.J.); *Fulmore v. Mamis,* 00 Civ. 2831, 2001 WL 417119 at *5 (S.D.N.Y. Apr.23, 2001) (Peck, M.J.); *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *4 (S.D.N.Y. Sept.29, 2000) (Peck, M.J.); *Culp v. Koenigsmann,* 99 Civ. 9557, 2000 WL 995495 at *4 (S.D.N.Y. July 19, 2000) (Peck, M.J.); *Carbonell v. Goord,* 99 Civ. 3208, 2000 WL 760751 at *4 (S.D.N.Y. June 13, 2000) (Peck, M.J.); *Greenfield v. City of New York,* 99 Civ. 2330, 2000 WL 124992 at *3 (S.D.N.Y. Feb.3, 2000) (Peck, M.J.); *Salahuddin v. Coughlin,* 999 F.Supp. 526, 534 (S.D.N.Y.1998) (Rakoff, D.J.

& Peck, M.J.); *Watson v. McGinnis,* 981 F.Supp. 815, 817 (S.D.N.Y.1997) (Kaplan, D.J. & Peck, M.J.).

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994); *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1223 (2d Cir.1994). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552-53.

To defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp. .,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *accord, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587, 106 S.Ct. at 1356.

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. at 2513;

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 196537 (S.D.N.Y.)

(Cite as: 2005 WL 196537 (S.D.N.Y.))

*see also, e.g., Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d at 36; *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d at 1223. The Court draws all inferences in favor of the nonmoving party only after determining that such inferences are reasonable, considering all the evidence presented. *See, e.g., Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 489 (1987). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d at 37.

**\*10** In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact. *See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987); *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510. While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,][f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. at 2510 (citations omitted); *see also, e.g., Knight v. United States Fire Ins. Co.,* 804 F.2d at 11-12.

"The Court recognizes that it must 'extend extra consideration' to pro se plaintiffs" such as Dawkins and that "pro se parties are to be given special latitude on summary judgment motions." *Salahuddin v. Coughlin,* 999 F.Supp. at 535 (citations & internal quotations omitted); *see, e.g., McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (a pro se party's pleadings should be read liberally and interpreted " 'to raise the strongest arguments that they suggest' ").[FN15] Moreover, the pro se party must be given express notice of the consequences of failing to respond appropriately to a motion for summary judgment. *See, e.g., Irby v. New York City Transit Auth.,* 262 F.3d 412, 413-14 (2d Cir.2001) ("[W]e remind the district courts of this circuit, as well as summary judgment

movants, of the necessity that pro se litigants have actual notice, provided in an accessible manner, of the consequences of the pro se litigant's failure to comply with the requirements of Rule 56.... [E]ither the district court or the moving party is to supply the pro se litigant with notice of the requirements of Rule 56.... In the absence of such notice or a clear understanding by the pro se litigant of the consequences of failing to comply with Rule 56, vacatur of the summary judgment is virtually automatic."); *McPherson v. Coombe,* 174 F.3d at 280-81 (" '[t]he failure of a district court to apprise pro se litigants of the consequences of failing to respond to a motion for summary judgment is ordinarily grounds for reversal." ') (citations omitted).[FN16] Defendants here served the appropriate notices on Dawkins. (Dkt. No. 145: Notice of Mot. for Summ. J.; Defs.' 56.2 Notice.)

FN15. *See also, e.g., Commer v. American Fed'n of State, County & Mun. Employees,* 02 Civ. 7930, 2003 WL 21698637 at \*1 (S.D.N.Y. July 17, 2003) ("[T]he Court is mindful that the plaintiff is proceeding pro se and that his submissions should be held to 'less stringent standards than formal pleadings drafted by lawyers....' "); *Douglas v. Portuondo,* 232 F.Supp.2d 106, 113 (S.D.N.Y.2002).

FN16. *See also, e.g., Trammell v. Coombe,* No. 97-2622, 201 F.3d 432 (table), 1999 WL 1295856 at \*2 (2d Cir. Dec.23, 1999); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999); *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *see generally* S.D.N.Y. Local Civil Rule 56.2 (requiring service of notice explaining the requirements of Rule 56 on litigant proceeding pro se).

"Nevertheless, proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* 93 Civ. 5981, 1999 WL 983876 at \*3 (S.D.N.Y. Oct.28, 1999) (citing cases); *see also, e.g., Viruet v. Citizen Advice Bureau,* 01 Civ. 4594, 2002 WL 1880731 at \*9 (S.D.N.Y. Aug 15, 2002) (Peck, M.J.); *Smith v. Planas,* 975 F.Supp.

Not Reported in F.Supp.2d, 2005 WL 196537 (S.D.N.Y.)

(Cite as: 2005 WL 196537 (S.D.N.Y.))

303, 305 n. 2 (S.D.N.Y.1997).

IV. *SUMMARY JUDGMENT SHOULD BE GRANTED TO DEFENDANTS SELSKY, STONE, LECLAIRE, CUNNINGHAM, MAZZUCA, AND ERCOLE DUE TO LACK OF PERSONAL INVOLVEMENT*[FN17]

> FN17. For additional cases authored by this Judge discussing the supervisory liability standard for **§ 1983** claims in language substantially similar to that in this entire section of this Report and Recommendation, *see Hall v. Perilli,* 03 Civ. 4635, 2004 WL 1068045 at *9 (S.D.N.Y. May 13, 2004) (Peck, M.J.); *Muhammad v. Pico,* 02 Civ. 1052, 2003 WL 21792158 at *16 (S.D.N.Y. Aug.5, 2003) (Peck, M.J.); *Walker v. Pataro,* 99 Civ. 4607, 2002 WL 664040 at *10 (S.D.N.Y. Apr.23, 2002) (Peck, M.J.); *Espinal v. Goord,* 00 Civ. 2242, 2001 WL 476070 at *10 (S.D.N.Y. May 7, 2001) (Peck, M.J.); *Fulmore v. Mamis,* 00 Civ. 2831, 2001 WL 417119 at *8 (S.D.N.Y. Apr.3, 2001) (Peck, M.J.) ( & cases cited therein); *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *7 (S.D.N.Y. Sept.29, 2000) (Peck, M.J.); *Djonbalic v. City of New York,* 99 Civ. 11398, 2000 WL 1146631 at *11 (S.D.N.Y., Aug 14, 2000) (Peck, M.J.); *Carbonell v. Goord,* 99 Civ. 3208, 2000 WL 760751 at *6 (S.D.N.Y. June 13, 2000) (Peck, M.J.); *Ali v. Szabo,* 81 F.Supp.2d 447, 462 (S.D.N.Y.2000) (Pauley, D.J. & Peck, M.J.).

**\*11** "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under **§ 1983**.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *accord, e.g., Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 122 (2d Cir.2004); *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003); *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999); *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Torres v. Mazzuca,* 246 F.Supp.2d 334, 338-39 (S.D.N.Y.2003); *Zamakshari v. Dvoskin,* 899 F.Supp. 1097, 1109 (S.D.N.Y.1995) (Sotomayor, D.J. & Peck, M.J.) ("In

order to maintain a cause of action [under **§ 1983**] against any official, a plaintiff must show that the defendant was personally involved in the alleged deprivation of his constitutional rights, since the doctrine of *respondeat superior* does not apply to **§ 1983** actions.").[FN18]

> FN18. *See also, e.g., Brown v. Peters,* No. 97-2725, 175 F.3d 1007 (table), 1999 WL 106214 at *1 (2d Cir.Feb.26, 1999).

"The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of **inmates** by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d at 873.[FN19]

> FN19. *Accord, e.g., Wright v. Smith,* 21 F.3d at 501; *Torres v. Mazzuca,* 246 F.Supp.2d at 339; *Zamakshari v. Dvoskin,* 899 F.Supp. at 1109; *see also, e.g., Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002).

Here, Dawkins fails to show that supervisory defendants Selsky, Stone, Leclaire, Cunningham, Mazzuca, and Ercole were personally involved in his exhausted claims denying him his constitutional rights. (*See* pages 7-9 above.) Any instance where these supervisory defendants are named is either in a supervisory capacity only or the allegation does not amount to a constitutional deprivation.[FN20] The claims against these defendants therefore should be dismissed with prejudice.

> FN20. For example: Dawkins claims that Ercole "is in charge of security at Fishkill correction facility he has violated the petitioner rights by depriving petitioner" of a "treatment to a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 196537 (S.D.N.Y.)

(Cite as: 2005 WL 196537 (S.D.N.Y.))

sleeping disorder condition." (Compl.¶ 211). Dawkins claims that Cunningham never responded to his letter that he felt that some officers had a "grudge" against him. (Compl.¶ 88). While some of these claims are simply precluded by a lack of personal involvement, others do not rise near any level of constitutional violation. *See, e.g., Kee v. Hasty,* 01 Civ. 2123, 2004 WL 807071 at *27 (S.D.N.Y. Apr.14, 2004) ("A prison officer's falsifying of a report regarding an alleged violation of an **inmate's** rights does not, in itself, rise to the level of a constitutional deprivation, absent a showing that the officer was personally involved in the underlying incident."); *Abdus-Samad v. Greiner,* 158 F.Supp.2d 307, 315 (S.D.N.Y.2001) (No constitutional violation where defendant "affirmed the decision of the grievance committee."); *Cancel v. Goord,* 00 Civ.2042, 2001 WL 303713 at *8-9 (S.D.N.Y. Mar.29, 2001) (Dismissing claims where "[p]laintiffs' sole claim against these three [supervisory] Defendants is that they were sent grievances and complaints by [plaintiff] which were ignored."); *Higgins v. Artuz,* 94 Civ. 4810, 1997 WL 466505 at *7 (S.D.N.Y. Aug.14, 1997) (Sotomayor, D.J.) (" '[I]t is well-established that an allegation that an official ignored a **prisoner's** letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.' "); *Neri v. Coughlin,* 92 Civ. 7890, 1993 WL 464687 at *6 (S.D.N.Y. Nov.9, 1993) (Sotomayor, D.J.) ("[A]ny administrative delays in responding to and deciding plaintiffs' challenges to the revocation [of prison visitation privileges] do not rise to the level of a due process violation because they do not implicate constitutional due process requirements.").

V. *DAWKINS HAS FAILED TO ALLEGE FACTS DEMONSTRATING RETALIATION UNDER* **SECTION 1983**, *DELIBERATE INDIFFERENCE TO HIS MEDICAL NEEDS, OR ANY DENIAL OF HIS CONSTITUTIONAL RIGHTS*

To prevail in a **§ 1983** action, a plaintiff must demonstrate that he has been denied a constitutional or federal statutory right and that the deprivation occurred under color of state law. *See* 42 U .S.C. **§ 1983**; *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 2254-55, 101 L.Ed.2d 40 (1988). "**Section 1983** itself," however, "creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citation omitted), *cert. denied,* 512 U.S. 1240, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994).

A. *Legal Standard Governing a* **§ 1983** *Retaliation Claim* [FN21]

FN21. For an additional decision authored by this Judge discussing the plaintiff's burden of proof for a **§ 1983** retaliation claim in language substantially similar to that in this entire section of this Report and Recommendation, *see Walker v. Pataro,* 99 Civ. 4607, 2002 WL 664040 at *8 (S.D.N.Y. Apr.23, 2002) (Peck, M.J.).

*12 The Second Circuit has clearly set forth a plaintiff's burden of proof in proving a **§ 1983** retaliation claim, as follows:

The plaintiff bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff. If the plaintiff carries that burden, the defendants must show by a preponderance of the evidence that they would have disciplined the plaintiff "even in the absence of the protected conduct." Thus, if taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone.

*Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted). [FN22]

FN22. *See, e.g., Bennett v. Goord,* 343 F.3d 133, 137 (2d. Cir.2003); *Ebron v. CTO Huria,* No. 99-0087, 205 F.3d 1322 (table), 2000 WL 241576 at *1 (2d Cir. Feb.1, 2000); *Davidson v. Chestnut,* 193 F.3d 144, 148-49 (2d Cir.1999); *Duamutef v. Hollins,* No. 97-2692, 159 F.3d 1346 (table), 1998 WL 537838 at *1 (2d Cir.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 196537 (S.D.N.Y.)

(Cite as: 2005 WL 196537 (S.D.N.Y.))

July 7, 1998); *Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246, 142 L.Ed.2d 202 (1998); *Davidson v. Kelly,* No. 96-2066, 131 F.3d 130 (table), 1997 WL 738109 at *3 (2d Cir. Nov.24, 1997); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994); *Sher v. Coughlin,* 739 F.2d 77, 82 (2d Cir.1984); *see also, e.g., Walker v. Keyser,* 98 Civ. 5217, 2001 WL 1160588 at *6 (S.D.N.Y. Oct.2, 2001); *Williams v. Muller,* 98 Civ. 5294, 2001 WL 936297 at *3 (S.D.N.Y. Aug.17, 2001); *Jackson v. Johnson,* 15 F.Supp.2d 341, 363-64 (S.D.N.Y.1998)) (Kaplan, D.J. & Peck, M.J.); *Campbell v. Kuhlmann,* 91 Civ. 6766, 1998 WL 249196 at *4 (S.D.N.Y. May 15, 1998).

A number of factors can be considered in determining whether a causal connection exists between the plaintiff's protected activity and the prison official's actions, including "any statements made by the defendant concerning his motivation" and "the temporal proximity between the protected activity and the defendant's adverse action." *Williams v. Muller,* 2001 WL 936297 at *3 (citing *Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995)); *see, e.g., Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002); *Gill v. Jones,* 95 Civ. 9031, 2001 WL 1346012 at *6 (S.D.N.Y. Nov.1, 2001); *Walker v. Keyser,* 2001 WL 1160588 at *6; *Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000).

"While ... the scope of conduct that can constitute actionable retaliation in the prison setting is broad, it is not true that every response to a **prisoner's** exercise of a constitutional right gives rise to a retaliation claim. Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation. Otherwise, the retaliatory act is simply *de minimis,* and therefore outside the ambit of constitutional protection." *Dawes v. Walker,* 239 F.3d 489, 492-93 (2d Cir.2001) (citations omitted); *accord, e.g ., Morales v. Mackalm,* 278 F.3d at 131; *Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir.1999); *Thaddeus-X v. Blatter,* 175 F.3d 378, 396-98 (6th Cir.1999) (to be actionable, retaliation against a **prisoner** must be likely to

"chill a person of ordinary firmness from continuing to engage" in activity protected by the First Amendment); *Crawford-El v. Britton,* 93 F.3d 813, 826 (D.C.Cir.1996) (en banc), *rev'd on other grounds,* 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998).[FN23]

> FN23. *See also, e.g., Walker v. Keyser,* 2001 WL 1160588 at *6; *Wagnoon v. Gatson,* 00 Civ. 3722 & 99 Civ. 5872, 2001 WL 709276 at *6 (S.D.N.Y. June 25, 2001); *Rivera v. Goord,* 119 F.Supp.2d at 340.

**Prisoners'** claims of retaliation, of course, must be examined with skepticism and particular care because they are " 'prone to abuse' since **prisoners** can claim retaliation for every decision they dislike." *Graham v. Henderson,* 89 F.3d at 79 (quoting *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)); *accord, e.g., Dawes v. Walker,* 239 F.3d at 491; *Colon v. Coughlin* 58 F.3d at 872; *Jackson v. Johnson,* 15 F.Supp.2d at 364 ( & cases cited therein).

*1. Application to Dawkins' Retaliation Allegations*

**\*13** Throughout Dawkins' amended complaint, he asserts that defendants retaliated against him after he filed grievances and wrote letters complaining about his confinement and treatment. (*See* Compl. ¶¶ 1, 22, 42, 47, 49, 65, 71, 76, 83, 91, 105, 126, 131, 181, 223, 224, 229, 230, 234, 251, 264, 281, 293, 303, 305, 313, 317, 332, 335, 340; *see also* pages 4-13 above.) However, with the exception of the medical related claims discussed below, Daskins has failed to allege any retaliatory acts sufficiently serious to rise to a constitutional violation, *i.e.,* acts that would deter a **prisoner** of ordinary firmness from exercising his constitutional rights. (Indeed, Dawkins obviously was not deterred-he was known as the "grievance King." (*See* page 12 above.) Dawkins' (non-medical) retaliation claims should be dismissed.
B. *Applicable Law Regarding Claims of Deliberate Indifference to Serious Medical Needs* [FN24]

> FN24. For additional cases authored by this Judge discussing the governing standard in medical indifference claims, in language substantially similar to that in this entire section

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 196537 (S.D.N.Y.)

(Cite as: 2005 WL 196537 (S.D.N.Y.))

of this Report and Recommendation, *see Hall v. Perilli,* 03 Civ. 4635, 2004 WL 1068045 at *4-7 (S.D.N.Y. May 13, 2004) (Peck, M.J.); *Nelson v. Rodas,* 01 Civ. 7887, 2002 WL 31075804 at *10-13 (S.D.N.Y. Sept.17, 2002)(Peck, M.J.); *Espinal v. Goord,* 00 Civ. 2242, 2001 WL 476070 at *7-10 (S.D.N.Y. May 7, 2001) (Peck, M.J.); *Fulmore v. Mamis,* 00 Civ. 2831, 2001 WL 417119 at *7-8 (S.D.N.Y. Apr.23, 2001) (Peck, M.J.); *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *5-6 (S.D.N.Y. Sept.29, 2000) (Peck, M.J.); *Culp v. Koenigsmann,* 99 Civ. 9557, 2000 WL 995495 at *6-7 (S.D.N.Y. July 19, 2000) (Peck, M.J.); *Carbonell v. Goord,* 99 Civ. 3208, 2000 WL 760751 at *5-6 (S.D.N.Y. June 13, 2000) (Peck, M.J.).

The Eighth Amendment protects **prisoners** from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials and conduct that offends "evolving standards of decency." *E.g., Hudson v. McMillan,* 503 U.S. 1, 5, 8, 112 S.Ct. 995, 998, 1000, 117 L.Ed.2d 156 (1992); *Wilson v. Seiter,* 501 U.S. 294, 297, 308, 111 S.Ct. 2321, 2323, 2329, 115 L.Ed.2d 271 (1991); *Estelle v. Gamble,* 429 U.S. 97, 102, 104-05, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976).

To establish an Eighth Amendment violation based on a claim that a prison official has placed an **inmate's** health in danger, the **inmate** must show that the prison official acted with "deliberate indifference" to the **inmate's** serious medical needs. *E.g., Helling v. McKinney,* 509 U.S. 25, 32, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22 (1993); *Estelle v. Gamble,* 429 U.S. at 104-05, 97 S.Ct. at 291.[FN25]

FN25. *See also, e.g., Smith v. Carpenter,* 316 F.3d 178, 183 (2d Cir.2003); *Selby v. Coombe,* No. 00-172, 17 Fed. Appx. 36 (table), 2001 WL 964195 at *1 (2d Cir. Aug.20, 2001) (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)); *Perkins v. Obey,* 00 Civ. 1691, 2004 WL 238036 at *8 (S.D.N.Y. Feb.10, 2004).

As the Second Circuit has explained, "the deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995).[FN26] "Objectively, the alleged deprivation must be 'sufficiently serious .' " *Hathaway v. Coughlin,* 99 F.3d at 553; *see also, e.g., Hudson v. McMillian,* 503 U.S. at 9, 112 S.Ct. at 1000 ("Because society does not expect that **prisoners** will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious' "); *Smith v. Carpenter,* 316 F.3d at 183-84 ("The objective 'medical need' element measures the severity of the alleged deprivation ..."); *Selby v. Coombe,* 2001 WL 964195 at *1; *Chance v. Armstrong,* 143 F.3d at 702; *Lumaj v. Williams,* 03 Civ. 1849, 2004 WL 1207894 at *4 (S.D.N.Y. June 2, 2004); *Torres v. Mazzuca,* 246 F.Supp.2d 334, 339 (S.D.N.Y.2003). " 'The Constitution does not command that **inmates** be given the kind of medical attention that judges would wish to have for themselves....' " *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (citation omitted); *see also, e.g., Dean v. Coughlin,* 804 F.2d at 215 (" '[T]he essential test is one of medical necessity and not one simply of desirability.' "). Thus, Eighth Amendment protection is limited to " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d at 702;[FN27] *accord, e.g., Morales v. Mackalm,* 278 F.3d 126, 132 (2d Cir.2002); *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) ("A serious medical condition exists where 'the failure to treat a **prisoner's** condition could result in further significant injury or the unnecessary and wanton infliction of pain.' ").

FN26. *Accord, e.g., Smith v. Carpenter,* 316 F.3d at 183; *Selby v. Coombe,* 2001 WL 964195 at *1; *Chance v. Armstrong,* 143 F.3d at 702.

FN27. The Second Circuit in *Chance v. Armstrong* identified several factors that are

Not Reported in F.Supp.2d, 2005 WL 196537 (S.D.N.Y.)

(Cite as: 2005 WL 196537 (S.D.N.Y.))

relevant in determining whether a serious medical condition exists, including " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." ' *143 F.3d at 702.*

**\*14** "Subjectively, the charged official must act with a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d at 553; *accord, e.g., Smith v. Carpenter,* 316 F.3d at 184 ("[T]he subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind."); *Selby v. Coombe,* 2001 WL 964195 at *1; *Chance v. Armstrong,* 143 F.3d at 702. "The required state of mind, equivalent to criminal recklessness, is that the official " 'knows of and disregards an excessive risk to **inmate** health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." " ' *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (quoting *Hathaway v. Coughlin,* 99 F.3d at 553 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994))).[FN28]

FN28. *See also, e.g., Smith v. Carpenter,* 316 F.3d at 184; *Selby v. Coombe,* 2001 WL 964195 at *1; *Chance v. Armstrong,* 143 F.3d at 702; *LaBounty v. Coughlin,* 137 F.3d 68, 72-73 (2d Cir.1998) ("To succeed in showing deliberate indifference, [plaintiff] must show that the acts of defendants involved more than lack of due care, but rather involved obduracy and wantonness in placing his health in danger."); *Lumaj v. Williams,* 2004 WL 1207894 at *5.

Deliberate indifference may be "manifested by prison doctors in their response to the **prisoner's** needs or by prison guards in intentionally denying or delaying access to medical care." *Estelle v. Gamble,* 429 U.S. at 104-05, 97 S.Ct. at 291 (fn.omitted); *accord, e.g., Kaminsky v. Rosenblum,* 929 F.2d 922, 926 (2d Cir.1991) ("Cruel and unusual punishment may consist of prison officials delaying an **inmate** access to needed medical care .").[FN29]

However, an "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle v. Gamble,* 429 U.S. at 105-06, 97 S.Ct. at 292; *accord, e.g., Burton v. New York State Dep't of Corrections,* 93 Civ. 6028, 1994 WL 97164 at *2 (S.D.N.Y. March 2, 1994) (Sotomayor, D.J.). "Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Estelle v. Gamble,* 429 U.S. at 106, 97 S.Ct. at 292.[FN30] As the Supreme Court has stated, "[m]edical malpractice does not become a constitutional violation merely because the victim is a **prisoner**." *Estelle v. Gamble,* 429 U.S. at 106, 97 S.Ct. at 292; *accord, e.g., Smith v. Carpenter,* 316 F.3d a 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."); *Hathaway v. Coughlin,* 99 F.3d at 553; *Burton v. New York State Dep't of Corrections,* 1994 WL 97164 at *2. An act of malpractice will amount to deliberate indifference only if "the malpractice involves culpable recklessness, *i.e.,* an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm." ' *Chance v. Armstrong,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d at 553); *Harrison v. Barkley,* 219 F.3d at 139 ("We agree that the mere malpractice of medicine in prison does not amount to an Eighth Amendment violation.... This principle may cover a delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs, or a mistaken decision not to treat based on an erroneous view that the condition is benign or trivial or hopeless, or that treatment is unreliable, or that the cure is as risky or painful or bad as the malady.... [But] [c]onsciously disregarding an **inmate's** legitimate medical needs is not 'mere medical malpractice." '); *Hathaway v. Coughlin,* 37 F.3d at 66 ("Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm.").

FN29. *See, e.g., Hathaway v. Coughlin,* 37 F.3d 63, 67 (2d Cir.1994) (delay for more than two years in removing broken pins from **prisoner's** hip despite nearly fifty complaints of pain), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130

Not Reported in F.Supp.2d, 2005 WL 196537 (S.D.N.Y.)

(Cite as: 2005 WL 196537 (S.D.N.Y.))

L.Ed.2d 1074 (1995); *Liscio v. Warren,* 901 F.2d 274, 277 (2d Cir.1990) (failure to provide medical attention to a delirious **inmate** for three days); *Archer v. Dutcher,* 733 F.2d 14, 15-17 (2d Cir.1984) (denying summary judgment where plaintiff "identifie[d] intentional efforts on the part of defendants to delay her access to medical care at a time [when] she was in extreme pain"); *Williams v. Vincent,* 508 F.2d 541, 544 (2d Cir.1974).

FN30. *Accord, e.g., Hathaway v. Coughlin,* 99 F.3d at 553; *Felipe v. New York State Dep't of Correctional Servs.,* No. 95-CV-1735, 1998 WL 178803 at *3 (N.D.N.Y. Apr.10, 1998) (Pooler, D .J.).

**\*15** "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a **prisoner** might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong,* 143 F.3d at 703; *accord, e.g., Hathaway v. Coughlin,* 37 F.3d at 70 (Jacobs, C.J., dissenting) (" 'We do not sit as a medical board of review. Where the dispute concerns not the absence of help, but the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, we will not second guess the doctors.' "); *Culp v. Koenigsmann,* 2000 WL 995495 at *7 ("Mere disagreements with the quality of medical care, however, do not state an Eighth Amendment claim."); *see also, e.g., Troy v. Kuhlmann,* 96 Civ. 7190, 1999 WL 825622 at *6 (S.D.N.Y. Oct.15, 1999) ("a **prisoner's** disagreement with the diagnostic techniques or forms of treatment employed by medical personnel does not itself give rise to an Eighth Amendment claim"); *Brown v. Selwin,* 98 Civ. 3008, 1999 WL 756404 at *6 (S.D.N.Y. Sept.24, 1999) (citing cases), *aff'd,* No. 01-0144, 29 Fed. Appx. 762, 2002 WL 355901 (2d Cir. Mar.6, 2002); *Negron v. Macomber,* 95 Civ. 4151, 1999 WL 608777 at *6 (S.D.N.Y. Aug.11, 1999); *Espinal v. Coughlin,* 98 Civ. 2579, 1999 WL 387435 at *3 (S.D.N.Y. June 14, 1999).[FN31]

FN31. Furthermore, a delay in medical treatment does not necessarily invoke the Eighth

Amendment:

Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, this Court has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a "life-threatening and fast-degenerating" condition for three days; or delayed major surgery for over two years. No such circumstances are present here. At no point was [plaintiff's] condition "fast-degenerating" or "life-threatening," and there is no indication that [defendant] delayed treatment in order to punish him. Moreover, any delay in treatment in this case does not rise to the egregious level identified in *Hathaway.* That [plaintiff] feels something more should have been done to treat his injuries is not a sufficient basis for a deliberate indifference claim.

*Demata v. New York State Correctional Dep't of Health Servs.,* No. 99-0066, 198 F.3d 233 (table), 1999 WL 753142 at *2 (2d Cir. Sept.17, 1999) (citations omitted) (summary judgment for defendants where plaintiff complained of knee injury in February 1994 and surgery not performed until March 1997); *accord, e.g., Smith v. Carpenter,* 316 F.3d at 185 ("When the basis for a **prisoner's** Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay or interruption* in treatment rather than the person's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim.") (emphasis in original); *Freeman v. Strack,* 2000 WL 1459782 at *9 (no Eighth Amendment claim against nurse who scheduled **inmate** with appendicitis requiring appendectomy for appointment two hours later rather than seeing **inmate** immediately where "[t]here was nothing in [the

Not Reported in F.Supp.2d, 2005 WL 196537 (S.D.N.Y.)

(Cite as: 2005 WL 196537 (S.D.N.Y.))

inmate]'s medical history which would have put [the nurse] on notice that [plaintiff] was suffering from the onset of appendicitis ... and there is no evidence that [the officer] gave [the nurse] any reason to believe that there was an emergency on hand"); *Culp v. Koenigsmann, 2000 WL 995495 at \*7-8* (rejecting claim based on fact that one doctor recommended arthroscopic surgery for knee injury in April 1999, while another doctor concluded that surgery was not warranted until more conservative measures like physical therapy had been tried and failed).

"Just as the relevant 'medical need' can only be identified in relation to the specific factual context of each case, the severity of the alleged denial of medical care should be analyzed with regard to all relevant facts and circumstances. The absence of adverse medical effects or demonstrable physical injury is one such factor that may be used to gauge the severity of the medical need at issue. Indeed, in most cases the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the **prisoner** to a significant risk of serious harm." *Smith v. Carpenter, 316 F.3d at 187* (citations omitted).

1. *Application of the Legal Standard to Dawkins' Various Medical Claims*

Dawkins asserts medical and quasi-medical related claims against six of the remaining defendants. (See pages 5-6 above.) None of these claims support a finding of deliberate medical indifference. Dawkins asserts that: (1) Nurse Pecenco waited too long before examining him; (2) Dawkins disagreed with Dr. Supple's medical decisions, and Dr. Supple delayed medical treatment or denied him medical treatment and ignored a request for extra mattresses and large handcuffs; (3) Nurse Faoro did not write down his full medical history upon admission to the S.H.U.; (4) Dr. Klyszejko waited too long to take his vital signs and rescheduled a medical visit; (5) Sgt. Larson, a non-medical staff member, made Dawkins go to a hearing instead of physical therapy; and (6) Sgt. Conklin, a non-medical staff member, notified another defendant

about Dawkin's sleep disorder.[FN32] (*See* page 7 above.)

FN32. The "claim" against Conklin is nothing more than a statement of fact and should be dismissed without further discussion. (It is not mentioned in a context indicating an invasion of an **inmate's** medical privacy, which would be another story.) The only reason it is listed among the other claims is because it is the only time that Conklin is mentioned outside the complaint caption. *See, e.g., McCoy v. Goord, 255 F.Supp.2d 233, 258 (S.D.N.Y. Mar.25, 2003)* ("It is well-settled that where the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted.") (quotation marks omitted).

**\*16** Dawkins has failed to make a showing of any deliberate indifference to his serious medical needs. In fact, the only potentially "serious" medical need he discussed was a sleep disorder,[FN33] for which he apparently had been given equipment and a sizeable amount of the prison's medical time and resources. Any any failure to act in a timely manner or manner of Dawkins' liking in regard to his sleep disorder is not disregarding a serious medical condition. Dawkins' other various medical claims do not rise to an Eighth Amendment violation. *See, e.g., Mowry v. Noone, 02-CV-6257, 2004 WL 2202645 at \*4 (W.D.N.Y. Sept.30, 2004)* ("[T]he denial of medical treatment must concern an objectively serious injury. A serious injury has been defined as one that may produce death, degeneration or extreme pain.") (citations & quotation marks omitted); *Davis v. Reilly, 324 F.Supp.2d 361, 368 (E.D.N.Y.2004)* ("The plaintiff's injuries, namely a sprained back and neck coupled with pain in the left testicle, do not constitute a serious medical condition."); *Rodriguez v. Mercado, 00 Civ. 8588, 2002 WL 1997885 at \*8-9 (S.D.N.Y. Aug.28, 2002)* (Plaintiff "has not adduced any evidence to suggest that any of his injuries ... were so urgent or life-threatening that they required immediate care. Courts in this circuit often have found no serious medical need in cases in which the injury of was similar to-or even more serious than-the injuries alleged by [plaintiff]....[Plaintiff] has not alleged that his injuries were 'life-threatening' or 'fast-degenerating,' or that he

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 196537 (S.D.N.Y.)

(Cite as: 2005 WL 196537 (S.D.N.Y.))

was experiencing extreme pain that more rapid treatment would have alleviated."); *Espinal v. Coughlin,* 98 Civ. 2579, 1999 WL 387435 at *5 (S.D.N.Y. June 14, 1999) (Correction officer carrying out an order to place **prisoner** in third floor cell when **prisoner** was afraid of walking up and down the stair due to a knee instability "fails to demonstrate intentional or reckless indifference to plaintiff's medical condition and does not constitute a violation of 42 U.S.C. § 1983.").

> FN33. Sleep apnea has been found by other courts to be a serious and potentially life threatening disorder. *See, e.g., Meloy v. Schuetzle,* No. 99-2122, 230 F.3d 1363 (table), 2000 WL 1160446 at *1 (8th Cir. Aug.17, 2000); *Silk v. City of Chicago,* 194 F.3d 788, 795 (7th Cir.1999); *Howard v. Goord,* No. 98-CV-7471, 2001 WL 739244 at *2 (E.D.N.Y. Jun.6, 2001).

Furthermore, Dawkins has not alleged that any medical personnel acted with a culpable state of mind. (*See* pages 5-6 above.) While deliberate indifference may be manifested by an intentional denial or delay in medical care (*see* pages 31-32 above), Dawkins has not alleged any such intentional denial or delay. *See, e.g., Baskerville v. Blot,* 224 F.Supp.2d 723, 735 (S.D.N.Y.2002) (Nurse did not act constitutionally indifferent to **prisoner's** medical needs when she waited several days to refill his high blood pressure medication because he "fail[ed] to allege facts sufficient to satisfy the subjective component; *i.e.,* that [the nurse] acted 'with the requisite culpable mental state.' ... Plaintiff's allegations fail to establish that she knowingly and intentionally provided inadequate medical treatment or that she knew of and disregarded a substantial risk of serious harm to him."); *Brown v. City of New York,* No. 98-CV-5354, 2001 WL 477279 at *8 (E.D.N.Y. Feb.15, 2001) (Although **prisoner** was "undeniably injured and bleeding from his forehead," he lacked evidence of deliberate indifference because he failed to show that his "condition was permitted to degenerate to a life threatening level. That [ **prisoner**] feels something more should have been done to treat his injuries is not a sufficient basis for a deliberate indifference claim."); *Espinal v. Coughlin,* 1999 WL 387435 at *4 (Doctor who diagnosed and treated

**prisoner's knee pain** as asserted in complaint did not act with deliberate indifference to his medical needs.); *Keyes v. Strack,* 95 Civ. 2367, 1997 WL 187368 at *4 (S.D.N.Y. Apr.16, 1997) ("The record shows that defendants were not deliberately indifferent to [plaintiff's] medical needs. The Fishkill medical staff made continual efforts to treat and care for plaintiff," with thirty visits to the facility's clinic over an eleven month period.); *Vondette v. McDonald,* 00 Civ. 6874, 2001 WL 1551152 at *5 (S.D.N.Y. Dec.5, 2001) (Defendants granted summary judgment in *Bivens;* "Plaintiff offers no evidence beyond his own conclusory allegations to show that defendants acted with deliberate indifference to his medical needs."). Finally, as discussed on page 33 above, mere disagreement over treatment does not create a constitutional claim. Because Dawkins has failed to adequately plead any constitutional deliberate indifference to his medical needs in any way, his **medical indifference** sounding claims should be dismissed.

C. *Analysis of Dawkins' Other* **Section 1983** *Claims*

**\*17** In addition to his claims discussed above, Dawkins makes other factual assertions against certain defendants: allegations that certain prison staff either improperly handled, destroyed, or retained Dawkins' property (*see* pages 4-5 above), and allegations that defendants found Dawkins guilty during disciplinary hearings (*see* pages 2-9 above).[FN34] None of these claims rise to a **Section 1983** violation.

> FN34. While Dawkins' amended complaint does not expressly reference the Due Process Clause, his allegations, construed liberally, claim a denial of due process in his disciplinary hearings. Before paragraph one of his amended complaint, Dawkins states that he lists violations of the First, Sixth, Eighth, and Fourteenth Amendments.

Dawkins' property claims are barred. "Deprivation of property by a state actor, whether intentional or negligent, does not give rise to a claim under § 1983 so long as the law of that state provides for an adequate post-deprivation remedy and the deprivation was the result of a 'random and unauthorized' act." *Dove v. City of New York,* 99 Civ. 3020, 2000 WL 342682 at *2 (S.D.N.Y. Mar.30, 2000)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 196537 (S.D.N.Y.)

(Cite as: 2005 WL 196537 (S.D.N.Y.))

(quoting *Butler v. Castro,* 896 F.2d 698, 700 (2d Cir.1990)); *see also, e.g., David v. N.Y.P.D. 42nd Precinct Warrant Squad,* 02 Civ. 2581, 2004 WL 1878777 at *5 (S.D.N.Y. Aug.23, 2004); *Aziz ZarifShabazz v. Pico,* 994 F.Supp. 460, 473-74 (S.D.N.Y.1998) (Sotomayor, D.J.); *Smith v. O'Connor,* 901 F.Supp. 644, 647-48 (S.D.N.Y.1995) (Sotomayor, D.J.). Dawkins' failure to file suit in a New York Court of Claims does not convert a personal property cause of action into a constitutional violation. *See Franco v. Kelly,* 854 F.2d 584, 588 (2d Cir.1988) ("As we noted in *Morello, Parratt* continues, even after *Daniels v. Williams,* to stand for the proposition that '**section 1983**[can]not be made a vehicle for transforming mere civil tort injuries into constitutional injuries.' ") (quoting *Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987)). Because Dawkins had an adequate state remedy to vindicate any alleged property loss, his property claims should be denied. *See, e.g., Dove v. City of New York,* 2000 WL 342682 at *3 ("Because New York provides an adequate post-deprivation remedy in the form of state law causes of action for negligence, replevin, or conversion, [ **inmate** plaintiff's] **§ 1983** claim for the loss of his property is dismissed.").

Most of the defendants against whom Dawkins asserts disciplinary due process claims are no longer in the case due to lack of personal involvement. (*See* Point IV above.) Even so, Dawkins has failed to assert any facts which would constitute a disciplinary due process claim under *Sandin v. Connor,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).[FN35] As such, his disciplinary claims should be dismissed.

> FN35. Dawkins' due process claims fall so far short of a constitutional violation that it is unnecessary to address them further. For an overview of *Sandin* as applied to **prisoner** disciplinary due process claims, *see Muhammad v. Pico,* 02 Civ. 1052, 2003 WL 21792158 at *13 (S.D.N.Y. Aug.5, 2003) (Peck, M.J.).

VI. *LEAVE TO REPLEAD IS GRANTED*

Despite the length of his complaint, Dawkins states only facts, not legal claims. That has made review of defendants' motion to dismiss more difficult. It is possible

that Dawkins can adequately re-plead claims against certain of the defendants against whom he has exhausted grievance remedies. Accordingly, the Court gives Dawkins thirty days from this Report and Recommendation to file a Third Amended Complaint, consistent with this Report and Recommendation, and only against defendants who this Report and Recommendation finds have been grieved against. Any such Third Amended Complaint must comply with Fed.R.Civ.P. 8, and must include "a short and plain statement of the claim showing that the pleader [*i.e.,* Dawkins] is entitled to relief." Fed.R.Civ.P. 8(a). It will not suffice for Dawkins merely to repeat the lengthy factual assertions in his present complaint, without identifying specific legal claims against each defendant, nor assert claims in purely conclusory language. *See, e.g., Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795-96 (2d Cir.1999) (" '[A] pro se complaint is to be read liberally. Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated.' ") (quoting *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991)); *Liner v. Keane,* 98 Civ. 1207, 1999 WL 182592 at *2 (S.D.N.Y. Mar.31, 1999) ("[B]ecause the chief problem with the complaint is a failure to provide factual details where only general allegations of wrongdoing have been alleged, it is appropriate, particularly because plaintiff proceeds pro se, to give plaintiff an opportunity to correct the deficiencies in his complaint.").

*CONCLUSION*

**\*18** For the reasons stated above, defendant's motion to dismiss and for summary judgment (Dkt. No. 141) should be *GRANTED.* Dawkins' complaint should be dismissed without prejudice as to defendants against whom he had not exhausted prison remedies, and dismissed without prejudice against the remaining defendants, *unless* Dawkins files a Third Amended Complaint, consistent with this Report and Recommendation, within thirty days hereof.

*FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 196537 (S.D.N.Y.)

(Cite as: 2005 WL 196537 (S.D.N.Y.))

objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Deborah A. Batts, 500 Pearl Street, Room 2510, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Batts. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57-59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

S.D.N.Y.,2005.

Dawkins v. Jones
Not Reported in F.Supp.2d, 2005 WL 196537 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1999 WL 387435 (S.D.N.Y.)

(Cite as: 1999 WL 387435 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Cesar A. ESPINAL, Plaintiff
v.
Thomas COUGHLIN III, et al., Defendants.
No. 98 Civ. 2579(RPP).

June 14, 1999.
OPINION AND ORDER

PATTERSON, J.

*1 Now pending before the Court are two motions. In the first, Defendants Dr. Hari P. Chakavorty, C.O. William E. Kelly, Christopher P. Artuz, Frederick M. Belanger, Dr. Harry Mamis, Nurse Betsy S. Healy, Jerry W. Surber, Dr. Jerome H. Fein, Sgt. Raymend J. Wilk, and Dr. Lester Silver, employees of the New York State Department of Correctional Services ("DOCS"), move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Amended Complaint of Cesar Espinal on the ground that it fails to state a claim upon which relief can be granted.FN1 In the second, Espinal moves for a preliminary injunction. For the reasons that follow, the motion to dismiss is granted in part and denied in part, and the motion for a preliminary injunction is denied.

> FN1. Espinal's original Complaint was dated January 16, 1998, received by the pro se office January 20, 1998, and docketed April 10, 1998. It named as defendants "Thomas Coughlin III, former Commissioner, et al., Phillip Coombe, Jr., Acting Commissioner et al ., Christopher Artuz, Superintendent of Green Haven C.F. et al., Larry Zwillinger, Regional Health Services Administrator for G.H. et al., and Dr. Manian, Facility Health Services Director of Green Haven C.F. et al." It included allegations against "L. Silver, Dr. Mamis, Dr. Chandler, and P.A. Zaken" and a corrections officer, Donald E. Hoffman.

The Amended Complaint was filed June 2, 1998. It named as defendants "Medical Provider Wright, Nurse Priscilla H. Watt, Dr. Lester Silver, Dr. Jerome H. Fein, Dr. Harry Mamis, Dr. Hari P. Chakrovorty, PA. Zaken, Dr. Laura L. Forese, Nurse Betsy S. Healy, Sgt. Raymend J. Wilk, Corr. Counselor Juan H. Hodelin, C.O. William E. Kelly, C.O. Jerry W. Surber, Supt. Christopher P. Artuz, Nurse Frederick M. Belanger, Dr. Kopelson, John Does numbered 1-33, the exact identities of whom are currently unknown to the plaintiff, in their official, personal, and individual capacity." The returns of service for the following defendants were twice returned unexecuted: Wright, Watt, Zaken, Forese, and Kopelson. (There are no returns of service, executed or unexecuted, for the defendants who were named in the original Complaint but dropped in the Amended Complaint, Coughlin, Coombe, Zwillinger, and Manian. There was an allegation against Chandler in the original Complaint but he was never served and not named in the caption of either version of the Complaint.)

The other defendants named in the Amended Complaint, with one exception, are the movants in the pending motion to dismiss. The one exception is Hodelin who, contrary to the belief of Assistant Attorney General Foo (Def. Mem. at 1 n. 1), did acknowledge service of process on September 15, 1998. (Doc. # 22.) Despite the fact that Mr. Hodelin has not formally joined in the present motion, he will be dismissed as a defendant pursuant to the statute of limitations as the only allegation against him is said to have occurred on February 5, 1995 (Am.Compl.¶ 38) and as the Amended Complaint does not relate back to the January 20, 1995 filing date of the original Complaint as to Hodelin. *See infra* at 5-6.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 387435 (S.D.N.Y.)

(Cite as: 1999 WL 387435 (S.D.N.Y.))

I. Defendants' Motion to Dismiss

A Court must deny a motion to dismiss a claim under Rule 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). For the purposes of this motion to dismiss, the allegations in the Complaint are assumed to be true. *Cruz v. Beto,* 405 U.S. 319, 322 (1972).

A. *The Amended Complaint*

The Amended Complaint seeks five million dollars in compensatory damages, five million dollars in punitive damages, and five million dollars for emotional stress and mental anguish, together with the costs and expenses of this action, plus 15% interest. (Am.Compl.¶ 65.) Espinal alleges he has sustained

severe and grievous injuries to his head, body and limbs, both internal and external, [and is] still sustaining severe pain, mental anguish, and physical and emotional disability and, further, said plaintiff has been caused to spend and become liable for, and upon information and belief, will in the future be caused to expend and become liable for great sums of money in an effect [sic] to cure himself of his injuries.

(*Id.* ¶ 64.)

The Amended Complaint states that on November 5, 1990, plaintiff was shot in his right leg which affected his right knee area (*id.* ¶ 1) and that on August 30, 1991, upon plaintiff's reception at DOCS' Downstate Correctional Facility, plaintiff informed John Doe 1 that he had pain in his right knee. (*Id.* ¶ 2.) Plaintiff continued to make sick call complaints of pain in his right knee and other parts of his body, and while at Downstate (*id .* ¶ 2), at Clinton Correction Facility (¶¶ 3, 4, 5, 6, 7, 8, 9) and at Greenhaven Correctional Facility (*id.* ¶¶ 10-61), plaintiff at various times was denied treatment; was given medication, therapy, or braces; underwent X-ray examination, CT scans and MRI examinations; and underwent corrective surgery. This was as a result of the actions of one or another of the movants, on one or more occasions, with the exception of Artuz, against whom there is only an allegation of failure to respond to a complaint. As a result of these defendants' acts, plaintiff

maintains he has suffered great physical pain and mental anguish and will be forced to undergo a second surgery to correct the bone deformity and tendon in his right knee. (*Id.* ¶¶ 63-64.)

B. *Statute of Limitations*

**\*2** As a threshold matter, the defendants argue that Espinal's claims are barred by the statute of limitations. Though the Amended Complaint does not state the legal basis for Espinal's claim, it is evident that the claim is brought pursuant to 42 U.S.C. § 1983 for alleged violations of Espinal's rights, guaranteed by the Eighth and Fourteenth Amendments, to adequate medical care while imprisoned.[FN2] *Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976). There is no statute of limitations in the text of § 1983, but the Supreme Court has held that courts should borrow the statute of limitations of the relevant state which governs personal injuries. *Owens v. Okure,* 488 U.S. 235 (1989). In New York there is thus a three year statute of limitations for § 1983 actions. *Id.* at 251; N.Y. C.P.L.R. § 214(5). To determine if the statute of limitations bars a particular claim, it is necessary to compare the date on which the complaint was filed to the date on which the claim accrued.

FN2. Espinal's original Complaint alleged

... defendants in disregard to policy and procedure, under their capacity, did violate and/or deprived Plaintiffs 8 [th] and 14 [th] amendment's. Plaintiff under the direction and control of defendants, failed to properly maintain a safe environment and properly failed to Supervise staff and other persons under their control with the failure to provide and appropriate medical care and treatment in a timely fashion, and by way of denying equal protection clause-discriminating on the basis of race, gender, in a deliberately manner, ect ...

(Compl. at p. 1 of attachment.). There are no allegations in the Amended Complaint, conclusory or otherwise, with respect to an equal protection violation.

An amended complaint that adds a new defendant and

Not Reported in F.Supp.2d, 1999 WL 387435 (S.D.N.Y.)

(Cite as: 1999 WL 387435 (S.D.N.Y.))

that would otherwise be barred by the statute of limitations will relate back to the date of the filing of the original complaint if the plaintiff made a mistake in the original complaint and if there is a lack of prejudice to the new defendant. Fed. R. Civ. Pro. 15(c)(3); *Soto v. Brooklyn Correctional Facility,* 80 F.3d 34, 35 (2d Cir.1996). In his original Complaint, Espinal named "Thomas Coughlin III, former Commissioner, et al., Phillip Coombe, Jr., Acting Commissioner et al ., Christopher Artuz, Superintendent of Green Haven C.F. et al., Larry Zwillinger, Regional Health Services Administrator for G.H. et al., and Dr. Manian, Facility Health Services Director of Green Haven C.F. et al." as defendants. However, the text of the Complaint contained no allegations against any of these individuals and instead contained allegations against "L. Silver, Dr. Mamis, Dr. Chandler, and P.A. Zaken" and a corrections officer, Donald E. Hoffman. The individuals named in the Complaint's caption are all relatively high officials in DOCS. The Court construes this as a mistake of law by Espinal. In *Soto,* the Second Circuit held that a § 1983 plaintiff's failure to sue individual defendants (he named the Brooklyn Correctional Facility as the defendant) was a "mistake as to the technicalities of constitutional tort law." 80 F.3d at 36. The fact that Espinal named high officials of DOCS in the caption but alleged facts against lower level employees with whom he actually had interactions suggests that, if Espinal were familiar with *Soto* at all, he misconstrued it to mean that he had to name individual DOCS officials as defendants but not the particular employees whom he alleges caused him injury.

As to prejudice, those individuals against whom Espinal made specific allegations in the original Complaint would not be prejudiced by having the Amended Complaint relate back to the date of the original Complaint; they were or should have been on notice of the nature of the allegations contained therein. Thus, the Amended Complaint is deemed to relate back to the date of the filing of the original Complaint for defendants Silver and Zaken, the only two defendants named in the caption of the Amended Complaint against whom allegations were made in the original Complaint.[FN3] The other defendants named in the Amended Complaint were not named in any allegations in the original Complaint and cannot have been on notice of plaintiff's claims at the time the original Complaint was filed.

> FN3. Of course. Zaken is not a moving defendant here, as she was never served with process. *See supra* note 1. She will be dismissed as a defendant subject to the condition contained in the Conclusion, *infra* at 17.

**\*3** A pro se action is deemed commenced when it is received by the court as opposed to when it is formally filed. *Toliver v. County of Sullivan,* 841 F.2d 41, 42 (2d Cir.1988). Thus, the original Complaint is deemed to have been filed on January 20, 1998, for the purposes of the statute of limitations, and any claims which accrued against Silver on or after January 20, 1995 will not be barred. Since the Amended Complaint does not relate back to January 20, 1995 for any of the other moving defendants, only those claims against them which accrued on or after June 2, 1995 satisfy the statute of limitations.

A § 1983 claim accrues when a plaintiff "knows or has reason to know of the injury which is the basis of his action." *Singleton v.. City of New York,* 632 F.2d 185, 191 (2d Cir.1980), *cert. denied,* 450 U.S. 920 (1981). The defendants argue that Espinal's claim accrued on August 30, 1991, when he first complained to a DOCS employee about the pain in his right knee and was told that he would be fine and that the pain would go away. Alternatively, they argue that his claim accrued in February, 1994, when he first told Green Haven employees of his knee pain. With both arguments defendants misconstrue the nature of plaintiff's complaint. He is not suing DOCS or Green Haven for a pattern of or ongoing indifference. He is suing individual employees for their individual deliberate indifference to his serious medical needs. Thus, a separate statute of limitations analysis is required with respect to each defendant.

The Amended Complaint alleges that Espinal first told Silver of his pain on March 15, 1994 (Am.Compl.¶ 11), which was obviously well before January 20, 1995. But the heart of his claim against Silver is Silver's alleged deliberate indifference beginning with Espinal's January 26, 1995 appointment. (*Id.* ¶ 33.) Those events occurred within the three year statute of limitations period of January 20, 1995 to January 20, 1998. As for the rest of

Not Reported in F.Supp.2d, 1999 WL 387435 (S.D.N.Y.)

(Cite as: 1999 WL 387435 (S.D.N.Y.))

the moving defendants, there are no allegations against them which occurred on or after June 2, 1995, which is the relevant accrual date for claims against them because the Amended Complaint, filed June 2, 1998, does not relate back to the original Complaint for those defendants.

Thus, with the exception of plaintiff's claims against Dr. Silver, his claims are barred by the statute of limitations.

C. *Failure to State a Claim*

To state a claim pursuant to § 1983 based on a violation of the Eighth Amendment, a complaint must allege that the defendant had direct or personal involvement in the alleged constitutional deprivation, *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994), or that the defendant had actual or constructive notice of the deprivation. *Al- Jundi v. Estate of Nelson Rockefeller,* 885 F.2d 1060, 1066 (2d Cir.1989). Liability for damages under § 1983 cannot be based on vicarious liability or respondeat superior. *Monell v. Department of Social Services,* 436 U.S. 658, 691 (1978). Furthermore, the facts alleged against each defendant must demonstrate that the intentional or reckless conduct of the defendant caused the plaintiff's injury, *Daniels v. Williams,* 474 U.S. 327, 328-31 (1986); *Davison v. Cannon,* 474 U.S. 344, 347-48 (1986), or show that the defendant was deliberately indifferent to plaintiff's medical condition in that he intentionally denied or delayed access to or interfered with prescribed treatment. *Gamble,* 429 U.S. at 104-06; *Gill v. Mooney,* 824 F.2d 192, 195-96 (2d Cir.1987). Mere differences of opinion as to medical opinion do not give rise to an Eighth Amendment claim. *Gamble,* 429 U.S. at 107. Even though the claims against the moving defendants are barred by the statute of limitations (with the exception of those against Dr. Silver), the defendants' motion to dismiss for failure to state a claim will be briefly reviewed with these principles in mind.

1. *Defendant Fein*

**\*4** The amended complaint alleges that at a sick call on July 11, 1994, plaintiff reported severe right knee pain that was keeping him up at nights and requested to see a doctor. (Am.Compl.¶ 13.) He attended an appointment with Dr. Fein on July 19, 1994, and Dr. Fein scheduled

plaintiff for X-rays and furnished him with medication and an elastic knee support. (*Id.* ¶ 14.) Dr. Fein also ordered a physiatrist examination which took place on August 9, 1994. (*Id.* ¶ 15.) These allegations do not support a claim of violation of the Eighth Amendment against Dr. Fein, as there are no allegations that Dr. Fein acted with deliberate indifference to a serious medical need.

2. *Defendant Mamis*

The amended complaint alleges that on August 10, 1994, after a soccer injury to plaintiff's leg,[FN4] defendant Dr. Mamis "injected plaintiff with 60 mg of toradol and gave him a used custom knee brace," and also ordered a CT scan and orthopedic exam, but ruled out an MRI. On August 16, 1994, Dr. Mamis noted plaintiff's condition as "no swelling, fully rom, however he still needs a knee brace" and despite plaintiff's complaints of severe pain and medical condition "noted that he go back to work." (Am.Compl.¶¶ 16, 17.) On August 22, 1994, Espinal reported to sick call, complaining of severe pain from his right knee to ankle, but Dr. Mamis did not examine him and "with an attitude, only ordered Plaintiff pain medication sending him on his way." (*Id.* ¶ 18.) On March 6, 1995, plaintiff complained to Dr. Mamis of chronic pain in his right knee and back and was referred by Dr. Mamis to the orthopedist who examined him on March 8, 1995 and ordered an MRI examination. (*Id.* ¶¶ 46, 47.)

> FN4. "On August 10, 1994, plaintiff was playing soccer-jumped-and when he came down landed on his feet but felt his right knee pop to one side." (Am.Compl.¶ 16.)

These allegations do not establish any denial of treatment or deliberate indifference to Espinal's medical condition but only a difference of opinion about the appropriateness of a certain course of treatment. Dr. Mamis gave Espinal pain medication and eventually referred him to an orthopedist. Accordingly, no violation of the Eighth Amendment is pleaded.

3. *Defendant Healy*

The Amended Complaint alleges that on August 22, 1994, when plaintiff reported to sick call, at which time he complained of severe pain from his right knee to his right ankle, Nurse Healy referred him to the facility clinic where

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 387435 (S.D.N.Y.)

(Cite as: 1999 WL 387435 (S.D.N.Y.))

he saw Dr. Mamis, who only prescribed pain medication. (Am.Compl.¶ 18). Espinal also reported to sick call on January 3, 1995 and told Nurse Healy of severe pain in his right knee; she examined it and noted it was "very puffy, popping when bending knee, can feel it if touc[h]ing knee." (*Id.* ¶ 29.) At sick call on March 29, 1995, Espinal complained of pain in his head and back, and Nurse Healy gave him an appointment to see Dr. Kopelson.

These acts of Nurse Healy do not amount to an Eighth Amendment violation as there are no allegations of deliberate indifference to a serious medical need, and the claims against her are dismissed.

4. *Defendant Chakavorty*

**\*5** The Amended Complaint alleges that on October 6, 1994, Espinal reported to sick call complaining of severe right knee pain. He was given an appointment with defendant Chakavorty, which occurred on October 24, 1994. Despite plaintiff's claim of a chronic medical disability, Chakavorty cleared him for work in the facility mess hall. (Am.Compl.¶ 25.) Plaintiff does not allege he was unable to work in the mess hall or that he suffered direct injury as a result of Dr. Chakavorty's clearance, though he does allege that on December 10, 1994 he was rushed from the mess hall to the facility clinic where he told Nurse Watt that he had severe pain and swelling in his right knee and that he was given an ace bandage and two days off work. (*Id.* ¶ 26.) The allegation that Chakavorty cleared plaintiff for work in the mess hall despite his complaints of chronic pain does not amount to an Eighth Amendment violation.

5. *Defendant Wilk*

The amended complaint alleges that on February 2, 1995 defendant Sgt. Wilk told plaintiff that because of the medical needs of other inmates, he was being moved from a cell on the second floor to a cell located on the third floor. (Am.Compl.¶ 37.) Espinal told Sgt. Wilk of his medical condition and of his fear of walking up and down stairs because of his knee's instability, but Sgt. Wilk told plaintiff "he still had no choice but to move as ordered." (*Id.* ¶ 37.) This conduct by a correction official carrying out an order to place plaintiff in a third floor cell based on the "medical needs of others" fails to demonstrate intentional or reckless indifference to plaintiff's medical

condition and does not constitute a violation of 42 U.S.C. § 1983. In any event, plaintiff does not contest Wilk's assertion of qualified immunity. (Pl. Mem. at 11.)

6. *Defendants Surber and Kelly*

The amended complaint alleges on February 3, 1995 these correction officer defendants, after being shown plaintiff's medical restriction slip, stated "We don't care about that! Now if you want your property you'll drag it," which caused him to drag his property approximately 80 yards after which a sergeant provided him with a cart. (*Id.* ¶ 40.) The plaintiff does not contest defendants' claim for qualified immunity for these acts. (Pl. Mem. at 11.) Accordingly, plaintiff's claims against these defendants are dismissed on that ground.

7. *Defendant Artuz*

Defendant Artuz was the superintendent of Green Haven Correctional Facility, where plaintiff has been confined since February 28, 1994. (Am.Compl.¶ 10.) The only charge against Artuz is that he refused to act on a complaint filed by plaintiff: "On February 8, 1995, plaintiff filed a complaint with Superintendent Christopher P. Artuz, that plaintiff has been subjected to since the accident on February 2, 1995, Mr. Artuz refused to act" [sic]. (*Id.* ¶ 43.) Evidently this is a reference to the treatment of plaintiff by corrections officers on February 2-3, 1995. (*Id.* ¶¶ 36-38.) The amended complaint does not explain why Artuz's failure to act constitutes a direct or personal involvement in any deprivation of plaintiff's constitutional rights. *Wright v. Smith,* 21 F.2d 496, 501 (2d Cir.1994); *Al- Jundi v. Estate of Nelson Rockefeller, 885 F.2d 1060, 1065-66 (2d Cir.1989).* The attachments to plaintiff's original complaint shows that Artuz responded on February 10, 1995 (Ex. 11), telling Espinal that his complaint was being forwarded to Deputy Superintendent Coefield for his action, and that Captain G. Schneider responded to plaintiff on February 28, 1995 (Ex. 8), having investigated the complaint and finding it without merit. Deputy Superintendent Coefield wrote to Espinal on April 26, 1995 that his grievance had already been investigated. (Ex. 11.) Construing plaintiff's allegations about the events of February 2 and 3, 1995 in the light most favorable to him, they do not rise to the level of a violation of his constitutional rights.

8. *Defendant Silver*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 387435 (S.D.N.Y.)

(Cite as: 1999 WL 387435 (S.D.N.Y.))

**\*6** The Amended Complaint alleges that on March 15, 1994, plaintiff informed Dr. Silver that he had severe pain and suffering in his right knee, as well as pain in his left thigh, arm, and back area. (Am.Compl.¶ 11.) Espinal told Silver that he had complained on numerous occasions of chronic pain in his right knee but had not yet received any medical care or treatment. (*Id.*) Dr. Silver then told Espinal that he was referring him to a foot doctor. (*Id.*) On January 26, 1995, Espinal expressed to Dr. Silver that he was not receiving appropriate medical care because he was suffering ongoing pain in his right knee, which was getting worse, and that he should be moved to "the flats" as had been previously ordered by P.A. Zaken. (Am.Compl.¶ 33.) [FN5] Dr. Silver then told plaintiff that his condition was not serious and that there was no reason for him to be moved to the flats. (*Id.*) Plaintiff saw Dr. Silver again on February 9, 1995, and complained about severe knee pain. "Dr. Silver told plaintiff that he is aware of his chronic condition, that to some degree his chronic pain may never go away, and that he is putting in a second order, ordering that plaintiff be moved to the flats." (*Id.* ¶ 44.)

> [FN5.] "The flats" refers to the first floor of the prison. (Am.Compl.¶ 31.)

The Amended Complaint goes on to allege that on March 2, 1995, Espinal again reported to sick call complaining of severe pain and that he was never moved to the flats. (*Id.* ¶ 45.) On March 6, 1995, Dr. Mamis referred him to an orthopedist, who recommended an MRI on March 8, 1995. (*Id.* ¶¶ 46-47.) Espinal complained of severe knee pain again on March 28 and 29 and April 9 and 12, 1995 (*id.* ¶¶ 49, 51-53) and finally had an MRI on May 11, 1995. (*Id.* ¶ 54.) The MRI showed a torn anterior cruciate ligament ("ACL") and a possible torn meniscus. (*Id.;* Orig. Compl. Ex. 5 .)

The Amended Complaint adequately states a claim that Dr. Silver was deliberately indifferent to Espinal's medical condition. Espinal alleges that Dr. Silver told him on January 26, 1995 that his condition was "not serious," despite the facts that (1) orthopedist and chief of surgical services Dr. Laura L. Forese had prescribed physical therapy on September 16, 1994 (Am. Compl. ¶ 21; Compl. Ex. 4); (2) that P.A. Zaken had told Espinal not to work or go to recreation because of his knee on December 12,

1994 (*id.* ¶ 27); (3) that John Doe # 17 had logged in his medical chart that Espinal needed an MRI on December 19, 1994 (*id.* ¶ 28); and (4) that P.A. Zaken had found Espinal's knee to be unstable on January 12, 1995 and had ordered him housed on the flats and again told him not to work. On February 9, 1995, Silver acknowledged that he was aware of Espinal's suffering. (*Id.* ¶ 44.) But even though Silver did re-order that Espinal be housed on the flats at that time, Silver told him that his pain may never go away. He apparently ignored the December 19, 1994 note in plaintiff's chart that he needed an MRI and said nothing about Espinal's continued need for physical therapy. In Dr. Forese's report of her September 16, 1994 exam of Espinal, she stated that she would see him again in about four months, but Dr. Silver apparently did not refer Espinal back to Dr. Forese when Dr. Silver saw Espinal in late January and early February of 1995, which was about the time Espinal should have gone back to Dr. Forese. [FN6] Moreover, even though Silver had told Espinal he would refer him to a foot doctor in March 1994, Espinal apparently never saw a foot doctor, and despite intervening accidents and continued pain, on January 26, 1995 Silver said that his condition was "nothing serious."

> [FN6.] The only indication of further contact with Dr. Forese is a memo signed by her dated March 12, 1995, referencing his March 8, 1995 orthopedist appointment in which it was concluded that he should have an MRI. (Orig.Compl.Ex. 12.)

**\*7** As the MRI later revealed, Espinal had a torn ACL, an extremely painful condition, for which he had surgery in August 1995. (Am.Compl.¶ 62.) Reading the Amended Complaint in the light most favorable to plaintiff, and making all reasonable inferences in his favor, it is possible that he was suffering from the torn ACL while he was in the care of Dr. Silver, that based on Espinal's medical history known to Silver the doctor should have ensured that Espinal had an MRI sooner than he did, or sent him back to Dr. Forese for follow-up in late January or early February, 1995, or ensured that Espinal saw a foot doctor, and at the very least followed up to ensure that Espinal was housed on the flats. From all these failures it is thus possible to infer that Silver was deliberately indifferent to Espinal's pain and serious

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 387435 (S.D.N.Y.)

(Cite as: 1999 WL 387435 (S.D.N.Y.))

medical condition, and the Amended Complaint cannot be dismissed as against him.

II. Plaintiff's Motion for Preliminary Injunction

By letter dated March 30, 1999, transmitted to the Court on April 14, 1999 by counsel for defendants, the plaintiff requested immediate help and a preliminary injunction due to denial of access to the law library, books and legal assistance, and due to harassment in retaliation for the plaintiff's commencement of this action. The letter contained no allegations of specific facts but attached an "unlawful retaliation complaint" addressed to defendant Artuz submitted on March 17, 1999 and resubmitted on March 24, 1999, asserting that in February plaintiff was moved to H-Block and was, thereafter, the subject of "humiliating harsh pat frisks and unnecessary cell searches, and has been found guilty of fabricated incidents, falsified misbehavior reports and placed in keep lock as a result of actions taken by officers Streetor and Ghostlaw in conjunction with other officers in H-Block, including defendants Kelly and Surber. Plaintiff also asserted that his grievances and appeals of these actions were being intercepted by the corrections officers of H-Block and requested the right to appeal de novo if his appeals had not been received by Commissioner Glen S. Goord.

Upon receipt of the March 30, 1999 letter, the Court ordered the defendants to show cause by April 20, 1999 why a preliminary injunction should not issue.

In response, defendants pointed out that plaintiff's papers show that his administrative appeals are still pending that he had not exhausted his administrative remedies as required under the Prisoner Litigation Reform Act, 42 U.S.C.A § 1997e(a); Def. Mem. at pp. 3-4. As for plaintiff's claim of denial of access to the courts, defendants pointed out that since, at the time of plaintiff's letter of March 30, 1999, a fully submitted motion was pending before this Court, plaintiff had not suffered irreparable injury in this matter by having limited access to the prison library and that no other injury is alleged and, thus, that plaintiff had not shown that his keep lock status had caused him irreparable injury.

*8 On May 3, 1999 the Court received a motion for

preliminary injunction from plaintiff which the Court will treat as reply papers. These papers allege that on May 18, 1998, plaintiff requested emergency sick call due to severe pain and suffering on the lower left side of his body; that Nurse Forgit, not a defendant, ordered him to provide a urine sample, and when he stated he was unable to urinate, accused him of using drugs or possessing drugs; that Forgit ordered him to drink an excess of water, and after harassing him denied him medical treatment and sent him back to H-Block where he was punched twice by Sgt. Toharz, also not a defendant; and that at 2:10 a.m., the same night after he was returned to the clinic and placed in a segregation room, another nurse obtained a urine sample from him which showed blood, as a result of which he was taken to St. Francis Hospital and had two kidney stones removed; that plaintiff filed a grievance based on this incident; and that an investigation was commenced and the grievance was denied on October 2, 1998. (Pl.P.I. Repl.Ex. H.) Plaintiff appealed the decision which was denied on November 18, 1998. (Id. Ex. L.) Plaintiff then alleges in conclusory terms that his ability to advance this litigation has been interfered with, that he has been denied access to the law library as a result of his keep lock status, and that the continuing violation of medical conditions of confinement. The allegations of what happened to Espinal on May 18, 1998 at the hands of DOCS employees, if true, are deeply disturbing. However, given the posture of this case, the Court is unable to provide plaintiff relief; his claims, though consistent with a pattern of alleged denial of medical care, are against individuals not named in the Amended Complaint.

As for the other allegations raised by plaintiff, this motion for a preliminary injunction is denied as not demonstrating that plaintiff will suffer irreparable injury if an injunction is not issued. Jackson Dairy v. A.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir.1979), supra, and because plaintiff has not shown a likelihood of success on the merits. Id.

Conclusion

For the foregoing reasons, motion to dismiss of Chakavorty, Kelly, Artuz, Belanger, Mamis, Healy, Surber, Fein, and Wilk is granted, and the motion to dismiss of Silver is denied. Hodelin will be dismissed as

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 387435 (S.D.N.Y.)

(Cite as: 1999 WL 387435 (S.D.N.Y.))

a defendant for the reasons stated in note 1. Furthermore, the claims in the Amended Complaint will be dismissed as against the remaining defendants for failure to serve process in a timely manner in compliance with Rule 4(m) of the Federal Rules of Civil Procedure unless plaintiff provides the Court with a satisfactory excuse for such failure by June 30, 1999.

For the reasons stated above, plaintiff's motion for a preliminary injunction is denied.

IT IS SO ORDERED.

S.D.N.Y.,1999.

Espinal v. Coughlin
Not Reported in F.Supp.2d, 1999 WL 387435 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 187368 (S.D.N.Y.)

(Cite as: 1997 WL 187368 (S.D.N.Y.))

**c**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
James KEYES, Plaintiff,

v.

Wayne STRACK, Superintendent of Fishkill
Correctional Facility and Dr. Ivan Mikler, Supervisor of
Fishkill Correctional Facility's Medical Department,
Defendants.
No. 95 Civ. 2367 (DC).

April 16, 1997.
James Keyes, Beacon, NY, Pro Se.

Dennis Vacco, Attorney General of the State of New York
by William Toran, Assistant Attorney General, New York
City.

*MEMORANDUM DECISION*

CHIN, *District Judge.*

   **\*1** *Pro se* plaintiff James Keyes ("Keyes") brings this
action under 42 U.S.C. § 1983 alleging that defendants
Wayne Strack ("Strack") and Dr. Ivan Mikler ("Mikler")
were deliberately indifferent to his serious medical needs
when they affirmed a decision made by the Fishkill
Correctional Facility's ("Fishkill" or the "Facility")
grievance committee dismissing Keyes's complaint against
Fishkill's medical staff. Keyes seeks monetary and
punitive damages in excess of $1,000,00. In addition,
Keyes seeks an order from the Court directing that he be
given continued medical treatment. Defendants now move
for summary judgment. For the following reasons,
defendants' motion is granted.

*BACKGROUND*

   On July 22, 1994, Keyes was working in Fishkill's
"industry" section as a grinder. At approximately 2:30
P.M., Keyes experienced "distortion and abnormal vision

in his left eye" as the result of exposure to a welding flash.
FN1 (Compl. at p. 1).FN2 Keyes informed an unidentified
corrections officer about his injury. The officer allegedly
refused to give Keyes permission to go to the emergency
clinic because there was "no apparent external damage" to
Keyes's eye. *Id.* The officer instead advised Keyes to sign
up for the next medical clinic.

   FN1. A welding flash, according to Keyes, is "a
   blind state that you get from any kind of
   welding." (Keyes Dep. at p. 10, 11. 19-20).

   FN2. References to (Compl. at p.-) refer to
   plaintiff's amended complaint dated April 11,
   1996.

   On July 27, 1994, Keyes saw the Facility's nurse.
After describing his symptoms to her, the nurse issued a
permit allowing Keyes to wear sunglasses until he was
seen by the Facility's eye doctor, Dr. Robert Frankel
("Frankel"). Two weeks later, Keyes was examined by
Frankel. During this examination, Frankel allegedly
disregarded Keyes's "disability and sensitivity to light." *Id.*
Frankel fitted Keyes for glasses and diagnosed the plaintiff
as having an "eye stigma." *Id.* Keyes disagreed with the
accuracy of this diagnosis. In fact, one week after his
initial examination, Keyes complained that the condition
of his left eye had worsened and requested a second
opinion. Based on this complaint, and several other visits
to the Facility's clinic at which similar complaints were
made, the request for a second opinion was granted. Keyes
was informed that a second visit with an ophthalmologist
would be scheduled as soon as an appointment became
available.

   Despite repeated assurances from the staff at the
Facility's clinic that an appointment would be made as
soon as possible, Keyes persisted in going to sick call at
the clinic to complain about his eye problems and inquire
about the date of his second visit to an ophthalmologist.
Keyes's visits were so persistent, that on December 15,
1994, a nurse at the clinic prohibited him from returning
to the clinic if he only wished to make further inquiries
into the date of his visit to an ophthalmologist.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 187368 (S.D.N.Y.)

(Cite as: 1997 WL 187368 (S.D.N.Y.))

Keyes immediately filed a grievance with the Facility's grievance committee. Keyes complained that the treatment he had received for his eye problem had been improper. In addition, he claimed that it was taking too long to schedule a second ophthalmology appointment. He sought an order from the grievance committee instructing the clinic and the Facility's medical staff to take certain steps in the treatment of his eye problems. The grievance committee denied his request. Keyes then appealed this denial to Strack who, after consulting with Mikler, affirmed the grievance committee's decision. It should be noted that neither Strack, the Superintendent of Fishkill Correctional Facility, nor Mikler, the supervisor of the Facility's medical department, were personally involved in the medical treatment received by Keyes. Their denial of his appeal was their only involvement with Keyes's medical treatment.

**\*2** Although the partial prohibition on Keyes's access to the clinic was upheld, Keyes continued to receive medical attention from the clinic when warranted. Furthermore, within a few months after his initial examination, Keyes was seen by an eye specialist. The specialist, finding "nothing wrong with plaintiff's left eye," referred him to a retina specialist. The retina specialist examined Keyes two months later. As a result of this examination, Keyes was scheduled for and had retina reattachment surgeries on March 15 and April 5, 1995. Keyes claims that despite the surgery, the vision in his left eye is still blurry due to "photophobia." *Id.* In addition, Keyes claims he "is once again seeing multi-colored and still is awaiting for proper fitting for glasses." *Id.* As of April 11, 1996, Keyes was still receiving therapy from Albany Medical Center.

Keyes now alleges that despite the operations that were performed on him, and despite the continuing medical attention he is receiving, the defendants' denial of his appeal of the grievance committee's decision amounted to deliberate indifference to his serious medical needs and violated his rights under the Eighth Amendment. Keyes seeks compensatory and punitive damages in excess of $1,000,000 as well as an order from the Court directing that he be given continued medical treatment.

*DISCUSSION*

A. *Claims Against Defendants in Their Official Capacities*

Defendants assert that claims against them in their official capacities are barred by the Eleventh Amendment. Defendants argue, therefore, that to the extent Keyes's claims are being asserted against them in their official capacities, those claims must be dismissed. I agree.

The Eleventh Amendment expressly limits the subject matter jurisdiction of the federal courts by, *inter alia*, barring a suit by a citizen of a state against that state, or one of its agencies, for monetary relief, absent the state's consent to such suit or an express statutory waiver of immunity. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98-99, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Eleventh Amendment immunity also extends to damage actions against state officials sued in their official capacities if the state is the real party in interest. *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Al- Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). Thus, because the State of New York has not consented to suit in federal court, *see Trotman v. Palisades Interstate Park Comm'n,* 557 F.2d 35, 38-40 (2d Cir.1977), the Eleventh Amendment bars suits, seeking monetary relief, against New York State or its officials acting in their official capacities. *See Pennhurst,* 465 U.S. at 100; *Cory v. White,* 457 U.S. 85, 91, 102 S.Ct. 2325, 72 L.Ed.2d 694 (1982). Accordingly, Keyes's claims are dismissed insofar as they seek monetary relief against defendants in their *official* capacities.

B. *Claims Against Defendants in their Individual Capacities*

1. *Personal Involvement*

**\*3** Section 1983 imposes liability on an individual for conduct that causes a person to be deprived of a constitutional right. *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986) (citing *Rizzo v. Goode,* 423 U.S. 362, 370-71, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976)). To succeed on a claim under § 1983 a plaintiff must allege personal involvement by each defendant in the alleged constitutional deprivation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 187368 (S.D.N.Y.)

(Cite as: 1997 WL 187368 (S.D.N.Y.))

98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). Thus, liability of supervisory officials under 42 U.S.C. § 1983 cannot be premised on the doctrine of respondeat superior. Consequently, defendants argue that Keyes's complaint is deficient because it fails to allege any personal involvement by them in the alleged deprivation of Keyes's constitutional rights. I agree.

In *Williams v. Smith,* the Second Circuit outlined four ways in which a supervisory official may be personally involved in a § 1983 violation. The official may have (1) directly participated in the infraction or ordered the action to be taken; (2) failed to remedy a wrong after learning of the violation; (3) created or allowed a policy to continue under which the violation occurred; or (4) been grossly negligent in managing their subordinates. 781 F.2d at 323-24. In addition, supervisory liability may be imposed where an official demonstrates "gross negligence" or "deliberate indifference" to the constitutional rights of inmates by failing to act on information indicating that unconstitutional practices are taking place. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994).

Keyes has failed to state a claim under any of these theories. Keyes does not allege that either defendant directly participated in the alleged violation. Furthermore, Keyes's assertion that defendants' affirmance of the Fishkill grievance committee's findings somehow proves that defendants "failed to remedy the alleged wrong after learning of it" is not sufficient to establish personal involvement.

It is well established that "supervisory officials are generally entitled to delegate medical responsibility to facility medical staffs and are entitled to rely on the opinions of medical staff concerning the proper course of treatment." *Lora v. Greifinger,* No. 96-0628, 1997 WL 102473, at *4 (S.D.N.Y. Feb.27, 1997) (citing *White v. Farrier,* 849 F.2d 322, 327 (8th Cir.1988); *Smiley v. Westby,* No. 87-6047, 1994 WL 519973, at *8 (S.D.N.Y. Sept. 22, 1994) ("[A] warden who receives assurances from his medical staff that an inmate is receiving appropriate care will ordinarily be insulated from section 1983 liability.")). Furthermore, the mere fact that defendants had supervisory authority over the medical staff is, by itself, insufficient to establish personal

involvement. *See Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996); *Lora,* 1997 WL 102473, at *4.

Defendants, in making their determinations, relied on the medical advice of the Fishkill staff. Mikler, in reviewing Keyes's medical records, noted that Keyes "has never been refused attention or treatment and that treatment has been timely, appropriate, sequential and thorough." (Mikler Aff. ¶ 4). Moreover, Mikler advised Strack of Keyes's treatment and Strack agreed with Mikler's conclusions. (Strack Aff. ¶¶ 3-5). Thus, according to well established Second Circuit case law, defendants acted properly in relying on this advice in denying Keyes's appeal. Moreover, no reasonable jury could conclude that defendants acted with gross negligence when they reviewed Keyes's records and determined that he had been properly denied unlimited access to the clinic. Accordingly, Keyes has failed to demonstrate the personal involvement of defendants in any alleged violation of his constitutional rights.

*2. Deliberate Indifference Standard*

**\*4** Moreover, even if Keyes could prove the "personal involvement" of the defendants, his claims nevertheless do not meet the necessary standard to find that defendants acted with "deliberate indifference" toward a serious medical need. In *Estelle v. Gamble,* the Supreme Court held that "deliberate indifference" to the serious medical need of a prisoner is demonstrated by proof that prison officials "intentionally den[ied] or delay[ed] access to medical care or intentionally interfer[ed] with the treatment once prescribed." 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1997).

An "inadvertent failure to provide adequate medical care," however, does not constitute "deliberate indifference." *Id.* at 105. Moreover, mere negligence in providing medical treatment, or differences of opinion as to matters of medical judgment, do not give rise to an Eighth Amendment claim. *Id.* at 106; *Brown v. Morton,* No. 95-2881, 1997 WL 37634, at *6 (E.D.N.Y. Jan. 27, 1997). Rather, the alleged conduct must be such that it is " 'repugnant to the conscience of mankind' " or "incompatible with the 'evolving standards of decency that mark the progress of a maturing society.' " *Estelle,* 429 U.S. at 102, 105 (citations omitted). Thus, a determination

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 187368 (S.D.N.Y.)

(Cite as: 1997 WL 187368 (S.D.N.Y.))

must be made as to whether each defendant acted with a sufficiently culpable state of mind. *Wilson,* 501 U.S. at 297-303; *see also Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). In the present case, Keyes's claim must be dismissed because, based on the evidence in the record, no reasonable jury could conclude that defendants acted with sufficient culpability.

The record shows that defendants were not deliberately indifferent to Keyes's medical needs. The Fishkill medical staff made continual efforts to treat and care for plaintiff. (*See* Mikler Aff. Ex. C) (detailing the examinations, diagnosis and treatment received by Keyes at approximately thirty visits to the Facility's clinic and other medical facilities over an eleven month period). Keyes, on the other hand, was not forthcoming with them. He failed to inform his treating physicians about the circumstances surrounding the infliction of his prior eye injuries. (Keyes Dep. at p. 31-33). Moreover, there is no evidence that defendants, in their supervisory capacities, purposefully prevented or delayed Keyes from getting the care he required. In fact, Keyes was able to receive medical care throughout the period in question and continues to receive therapy for his condition to date. Accordingly, based on the evidence in the record, I find that no reasonable jury could conclude that either of the defendants acted with "deliberate indifference" to Keyes's serious medical needs. Thus, summary judgment must be granted in their favor.

C. *Equitable Relief*

In his most recent complaint, Keyes asks for equitable relief in addition to his request for monetary relief. Specifically, Keyes seeks an order from the Court directing that he be given continued medical treatment. It should first be noted that the Eleventh Amendment is not a bar to suits in equity against state officials. *Dube v. State Univ. Of New York,* 900 F.2d 587, 595 (2d Cir.1990) ("A state official acting in his official capacity may be sued in a federal forum to enjoin conduct that violates the federal Constitution, notwithstanding the Eleventh Amendment bar."), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991). Thus, Keyes's request for equitable relief is not barred by the Eleventh Amendment.

Nevertheless, Keyes's request must be denied. Keyes seeks to have the Court direct defendants to provide him with continued medical treatment. Defendants, however, have neither stated nor demonstrated that Keyes will be denied medical treatment if it is deemed necessary. Furthermore, Keyes has offered no evidence from which I can conclude that medical treatment would be withheld. In fact, the record shows that Keyes has been receiving continued medical attention, and I am confident that Keyes will continue to receive reasonable, appropriate medical attention. Thus, Keyes's request for injunctive relief is denied.

*Conclusion*

**\*5** For the foregoing reasons, defendant's motion for summary judgment is granted. The complaint is hereby dismissed.

SO ORDERED.

S.D.N.Y.,1997.

Keyes V. Strack
Not Reported in F.Supp., 1997 WL 187368 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 3111711 (N.D.N.Y.)

(Cite as: 2009 WL 3111711 (N.D.N.Y.))

C

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
MORTIMER EXCELL, Plaintiff,
v.
Brian FISCHER, Commissioner, DOCS, et al.,[FN1]
Defendants.

FN1. It is noted that the plaintiff has named a total of forty-three (43) defendants in the eighty-eight (88) page complaint.

Civ. No. 9:08-CV-945 (DNH/RFT).

Sept. 24, 2009.
West KeySummary**Prisons 310** 126

310 Prisons

310II **Prisoners** and **Inmates**
310II(B) Care, Custody, Confinement, and Control
310k126 k. Protection from Violence, Assault, or Abuse. Most Cited Cases
**Sentencing and Punishment 350H** 1537

350H Sentencing and Punishment

350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1537 k. Protection from Violence. Most Cited Cases

**Inmate's** claim of failure to protect was facially adequate to sustain an action for violation of Eighth Amendment rights. **Inmate's** complaint alleged that he put prison officials on notice of a threat to his safety by sending three complaint letters days before he was allegedly assaulted. He also claimed that a prison nurse falsified his medical records so as to cover up the alleged assault, and another prison official participated in the conspiracy by instructing that no photographs be taken of **inmate's** injuries after the alleged assault. U.S.C.A.

Const.Amend. 8.
Mortimer Excell, Elmira, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Adam Silverman, Esq., David L. Cochran, Esq., Assts. Attorney General, of Counsel, Albany, NY, for State Defendants.

*DECISION and ORDER*

DAVID N. HURD, District Judge.
*16 Plaintiff, Mortimer Excell, brought this civil rights action pursuant to 42 U.S.C. § 1983. By Report-Recommendation dated August 25, 2009, the Honorable Randolph F. Treece, United States Magistrate Judge, specifically recommended that the defendants' motion to dismiss (Docket No. 59) be granted in part and denied in part; that the following defendants be dismissed: T. Ramsdell, C. Crossman, Fearchild, D. Uhler, M. Patnode, Lucien LeClaire, Jr., Vonda Johnson, Frenyea, R. Lawrence, S. Tyrell, Lt. Miller, Lashway, Benthley, Knapp, Lucia, Loomis, Ferguson, Poltlos, Brousseau, J.T. Rice, D. Waldron, Quinn, Travers, Pedro Diaz, Robert Woods, Richard Roy, Brian Bengmann, N. Bezio, Steven Racette, Sgt. Rokece, C.O. Green, Ortloff (spelled "Oltloff" on the docket), and Karen Bellamy; and that plaintiff's motion for a preliminary injunction (Docket No. 57) be denied. To clarify his recommendations, the Magistrate Judge specifically stated that his recommendations leave the following claims viable: (1) Excessive force and retaliation against defendants Tamer, M. Orzech, T. Carter, Moak, and Labetz; (2) conspiracy against defendant Tamer, M. Orzech, T. Carter, Moak, Labetz, R. Rock, and H. Warner; (3) violation of plaintiff's First Amendment right to practice religion against M. Orzech; and (4) supervisory liability against Dale Artus and Brian Fischer. The Magistrate Judge further stated that his recommendations leave defendants T. Carter, Tamer, Moak, M. Orzech, Labetz, R. Rock, H. Warner, Dale Artus, and Brian Fischer as remaining defendants should the Report-Recommendation be adopted. In a Clarification Order dated September 9, 2009, Magaistrate Judge Treece clarified that it is his recommendation that

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)

(Cite as: 2009 WL 3111711 (N.D.N.Y.))

all of plaintiff's claims against defendant Lester Wright, M.D., be dismissed. The plaintiff has timely filed objections to the Report-Recommendation.

**\*17** It is noted that the defendant "Labetz, Lt., Clinton Correctional Facility," has never been served. The Magistrate Judge ordered that said defendant not be dismissed from the action as the other unserved defendants will be. The Magistrate Judge directed the Clerk to issue a summons and forward it, along with a copy of the complaint, to the United States Marshal for service upon defendant Labetz within thirty days of the date of the Report-Recommendation. It appears that the summons and complaint were never issued for service. Therefore, the plaintiff will be granted thirty days from the date of this order within which to serve defendant Labetz. The plaintiff is again warned, that if this defendant is not served within thirty days, the claims against defendant Labetz will be dismissed without further order of this court.

Based upon a careful review of the entire file, including the recommendations of Magistrate Judge Treece, the Clarification Order, and the objections by plaintiff, the Report-Recommendation is accepted and adopted in all respects. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion to dismiss is GRANTED, in part, and DENIED, in part;

2. Defendants T. Ramsdell, C. Crossman, Fearchild, D. Uhler, M. Patnode, Lucien LeClaire, Jr., Vonda Johnson Fenyea, R. Lawrence, S. Tyrell, Lt. Miller, Lashway, Benthley, Paul Knapp, Lucia, Loomis, Ferguson, Poltlos, Brousseau, J.T. Rice, D. Waldron, Quinn, Travers, Pedro Diaz, Robert Woods, Richard Roy, Brian Bengmann, N. Bezio, Steven Racette, Sgt. Rokece, C.O. Green, Ortloff (spelled "Oltloff" on the docket), Karen Bellamy, and Lester Wright, M.D., are DISMISSED from this action;

3. Defendants T. Carter, Tamer, Moak, M. Orzech, Labetz, R. Rock, H. Warner, Dale Artus, and Brian

Fischer will remain as defendants;

4. Plaintiff's motion for a Preliminary Injunction is DENIED;

5. The following claims remain in this action:

a. Excessive force and retaliation against defendants Tamer, M. Orzech, T. Carter, Moak, and Labetz;

b. Conspiracy against defendant Tamer, M. Orzech, T. Carter, Moak, Labetz, R. Rock, and H. Warner;

c. Violation of plaintiff's First Amendment right to practice religion against M. Orzech; and

d. Supervisory liability against Dale Artus and Brian Fischer.

6. The defendant Labetz is not dismissed from this action at this time. The Clerk is directed to issue a summons and forward it, along with a copy of the complaint, to the United States Marshal for service upon defendant Labetz within thirty days of the date of this Order adopting the Report-Recommendation.

7. If defendant Labetz is not served within thirty days of the date of the order, he will then be DISMISSED without further order of the court.

8. The Clerk is directed to enter judgment against the dismissed defendants, and to make the necessary changes on the docket to reflect the remaining defendants; and

9. The above action is referred to the Honorable Victor Bianchini, Recalled United States Magistrate Judge, for the purposes of mediation. Any further proceedings are stayed pending the completion of mediation.

**\*18** IT IS SO ORDERED.

***REPORT-RECOMMENDATION and ORDER***

RANDOLPH F. TREECE, United States Magistrate Judge.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)

(Cite as: 2009 WL 3111711 (N.D.N.Y.))

**\*1** *Pro se* Plaintiff Mortimer Excell brings this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that he suffered the following constitutional violations: (1) conspiracy to violate his First, Eighth, and Fourteenth Amendment rights; (2) excessive force; (3) deliberate indifference to his serious medical needs; (4) retaliation; (5) due process violations stemming from both Disciplinary and Parole Board Hearings; (6) violation of his First Amendment rights of religious affiliation and expression; and (7) interference with his personal and legal mail.

Presently before the Court are Plaintiff's Motion for a Preliminary Injunction and Temporary Restraining Order and Defendants' Motion to Dismiss. Dkt. Nos. 57, 59, & 62.FN2 In support of his Opposition to Defendants' Motion, Plaintiff has submitted two Supplemental Briefs, both of which have Exhibits attached. Dkt. Nos. 79, 82, & 84. The Court has not considered these Exhibits in considering the instant Motion to Dismiss. For the reasons that follow, it is recommended that the Defendants' Motion to Dismiss be **GRANTED in part** and **DENIED in part,** and the Plaintiff's Motion for a Preliminary Injunction be **DENIED.**

> FN2. Defendants Tamer, Urzech, T. Carter, and Moak filed an Answer to the Complaint and do not join in the Motion to Dismiss. Dkt. No. 61, Ans.; Dkt. No. 62, Defs.' Mem. of Law at p. 1 n. 2. The causes of action asserted against these Defendants for excessive force, conspiracy, retaliation, and interference with his religious practices survive this Motion. Also, Defendants C.O. Green, Labetz, Oltloff, and Karen Bellamy have not been served with process. Dkt. Nos. 17, 54, & 66 (no summons has been returned for Defendant Bellamy).

**I. SUMMARY OF PLAINTIFF'S CLAIMS**

Plaintiff's Complaint is eighty-eight (88) pages in length and contains eighty-one (81) numbered paragraphs and five (5) "Causes of Action" which are in sum and substance summaries of the claims alleged in the preceding 81 paragraphs. *See generally* Dkt. No. 1, Compl. Given the length of the Complaint and the amount of claims stated therein, we shall provide in this section a summary of Plaintiff's claims and delve into the finer points of his allegations within our discussion of the Defendants' bases for dismissal. This summary is derived from the facts alleged in Plaintiff's Complaint, which must be accepted as true for the purposes of addressing Defendants' Motion to Dismiss brought pursuant to FED. R. CIV. P. 12(b)(6). *See infra* Part II.A.

From July through September 4, 2007, Plaintiff was incarcerated at Upstate Correctional Facility ("Upstate"), where he was allegedly denied medication for various physical ailments by Defendant Nurse Fearchild, denied recreation for a period of three days by Defendant N. Bezio, threatened and harassed by Defendant Brian Bengmann, and had his due process rights violated during a Disciplinary Hearing. Dkt. No. 1, Compl. at ¶¶ 1-7.FN3 In September 2007, Plaintiff was sent to Great Meadow Correctional Facility ("Great Meadow") in order to attend a medical appointment at Albany Medical Hospital. *Id.* at ¶ 7. During his stay at Great Meadow, Plaintiff was denied his "medical draft bag" and therefore forced to wear the same clothes from September 2-18, denied drinking water for one twenty-four (24) hour period, threatened, and issued a false misbehavior report by Defendant Correctional Officer ("C.O") Green. *Id.* at ¶¶ 7-10.

> FN3. All citations to the Plaintiff's Complaint refer to the paragraphs contained in the *"Statement of Facts"* section, starting on page twelve (12) of the Complaint.

Plaintiff alleges that on October 18, 2007, after his transfer back to Upstate, Defendant T. Ramsdell sexually assaulted him by grabbing and squeezing his penis during a body search and that Ramsdell and Defendant Rokece pushed his face against an iron rail, causing injuries to his face and forehead. *Id.* at ¶¶ 11-12 & 14. In the days that followed Plaintiff was threatened, harassed, issued a false Misbehavior Report accusing him of possessing contraband, and for a two-day period denied a bed pan and personal hygiene products. *Id.* at ¶¶ 13-19. In November 2007, Plaintiff was transferred to Clinton Correctional Facility ("Clinton"), where in December of that year, several Defendants, including S. Tyrell, R. Lawrence, Poltlos, and Frenyea, conspired to take his identification card, put him in keeplock, and improperly opened his legal mail. *Id.* at ¶¶ 22-27. During a Disciplinary Hearing held

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)

(Cite as: 2009 WL 3111711 (N.D.N.Y.))

on December 24, 2007, before Hearing Officer Defendant Lieutenant ("Lt.") Miller, Plaintiff was denied the opportunity to present evidence or testimony and was not given a written disposition of the proceeding. *Id.* at ¶ 32.

**\*2** On January 15, 2008, Plaintiff had a Parole Hearing before Defendants Loomis, Ferguson, and Ortloff,[FN4] during which Plaintiff articulated his complaints about the aforementioned alleged constitutional violations. These Defendants denied Plaintiff parole. *Id.* at ¶¶ 61-62.

> FN4. Defendant Ortloff's name is spelled "Oltloff" on the Docket Report. Because both parties refer to this Defendant as "Ortloff," we presume his name to be spelled as such.

On May 13, 1008, Defendant C.O. M. Orzech told Plaintiff to cut his beard by May 17th or he would issue Plaintiff a misbehavior report. *Id.* at ¶ 36. That same day, Plaintiff filed a request to Department of Correctional Services ("DOCS") officials for a beard permit based on his Rastafarian religious beliefs and, on May 14th, received a receipt for said request stating that Plaintiff did not have to cut his beard during the pendency of the decision on his request. *Id.* at ¶¶ 37-39. On May 15th, Plaintiff explained to Orzech that he had submitted a request for a beard exemption and could not be forced to cut his beard until that request was decided, however, on May 17th, Orzech denied Plaintiff recreation time and placed him in keeplock because he had not cut his beard. *Id.* at ¶¶ 3 6-43. Also, Plaintiff alleges that on May 17th, Orzech allegedly threatened to beat him up if he filed any more complaints to Defendants Commissioner Fischer and Superintendent Artus. *Id.* at ¶ 43.

On May 18, 2008, Plaintiff filed a medical services request to address his heart pain and weakness. *Id.* at ¶ 45. On May 19, 2008, Defendant C.O.'s T. Carter and Orzech arrived at Plaintiff's cell to take him to the medical unit and proceeded to cuff Plaintiff's hands behind his back, then pushed him to the floor as he was being escorted out of his cell block and punched, kicked, and beat him, as did Defendant C.O.'s Tamer and Moak. *Id.* at ¶¶ 46-47. Plaintiff was escorted to the hospital where he was punched by Moak and Defendant Lieutenant ("Lt.")

Labetz, and Defendant Nurse R. Rock allegedly refused to treat him for the injuries he sustained. *Id.* at ¶¶ 48 & 63(1).[FN5] Afterwards, Plaintiff was sent to the Special Housing Unit ("SHU"), where he was denied medical care, allegedly in order to prevent evidence of the incident in his medical records. *Id.* at ¶¶ 49-50.

> FN5. There are two consecutive paragraphs in the Complaint numbered 63. To avoid confusion, we will refer to them as paragraphs 63(1) and 63(2), respectively.

On May 20, 2008, Orzech and Carter issued Plaintiff Misbehavior Reports alleging that Plaintiff had attacked Orzech while being escorted to the medical unit; on May 27, 2008, a Disciplinary Hearing was convened on those charges before Hearing Officer Defendant Captain D. Uhler. At the Disciplinary Hearing, Plaintiff was denied the opportunity to call witnesses and present evidence, and was improperly removed from the proceedings; in addition the Hearing was allegedly improperly extended through June 19, 2008. *Id.* at ¶¶ 52-54, 58, & 63(2)-64.

From July 2005 through July 2008, Plaintiff did not receive any mail from family or friends, and his family members did not receive outgoing mail he sent. *Id.* at ¶¶ 63(1) & 65. In addition, letters of complaint Plaintiff sent to various New York State Officials and Officers were not received. Plaintiff alleges that his incoming and outgoing mail was stolen by Defendants J. Rice, Quinn, and D. Waldron, who are mail clerks at Auburn, Upstate, and Clinton Correctional Facilities, respectively. *Id.* at ¶¶ 65, & 75-80.

**\*3** Finally, on July 16, 2008, Plaintiff was transferred back to Upstate, where he was allegedly denied medical care from July 17 through August 14, 2008. *Id.* at ¶ 81.

## II. DISCUSSION

### A. Standard of Review

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). The trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)

(Cite as: 2009 WL 3111711 (N.D.N.Y.))

*Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at *2 (N.D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint'* may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991) (emphasis added).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL-CIO v. Schermerhorn,* 373 U.S. 746, 753 n. 6, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963); *see also Arar v. Ashcroft,* 532 F.3d 157, 168 (2d Cir.2008). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal,* --- U.S. ---- 129 S.Ct. at 1950 (citing *Twombly* ).[FN6] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* --- U.S. ---- 129 S.Ct. at 1949. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer

possibility that a defendant has acted unlawfully." *Id.* Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts which [he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* --- U.S. ---- 129 S.Ct. at 1950-51.

FN6. By its opinion in *Bell Atlantic Corp. v. Twombly* and then again in *Ashcroft v. Iqbal,* the Supreme Court abrogated the often-cited language of *Conley v. Gibson* "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 562-63 (2007) (quoting *Conley,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In so doing, the Court found that *Conley* "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Id.* at 563.

**B. Eighth Amendment Claims**

*1. Medical Treatment*

**\*4** The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment. Prohibited punishment includes that which "involve[s] the unnecessary and wanton infliction of pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a **prisoner** must prove deliberate indifference to [his] serious medical needs." *Smith v. Carpenter,* 316 F.3d 178, 183 (2d Cir.2003) (internal quotation marks and citations

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)

(Cite as: 2009 WL 3111711 (N.D.N.Y.))

omitted) (alteration in original). This standard contains both objective and subjective elements. *Id.* "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberative indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Id.* at 183-84 (citing *Chance v. Armstrong,* 143 F.3d at 702 & *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). The subjective element "entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Hathaway v. Coughlin,* 99 F.3d at 553 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

In this case, Plaintiff's medical indifference claims are as follows: (1) in mid-July 2007, he suffered from heart and chest pain for a period of five days, but received only non-aspirin medication and, on July 12, 2007, was denied a blood pressure test by Defendant Nurse Fearchild; (2) in November 2002, he was prescribed "Omeprazole 20 mg caps" for his "belly pains," but was denied refills of that medication by Defendant Nurses Travers and Fearchild at Upstate, and by Defendant Nurses Lashway, Rock, and Benthley at Clinton; and (3) Defendants Rock, Benthley, Lashway, Fearchild, and Travers failed to treat him for the injuries he sustained during the alleged use of excessive force against him on May 19, 2008, and falsified his medical records to cover-up the injuries he allegedly sustained on that date.[FN7] Compl. at ¶¶ 1, 48, 74 & 81.

> FN7. Plaintiff also alleges that at a Disciplinary Hearing held on June 16, 2008, he told the presiding hearing officer, Defendant Uhler, about his medical problems, and that Uhler denied his requests for medical care. Compl. at ¶ 60. To the extent Plaintiff intended to raise an Eighth Amendment claim against Uhler, that claim must fail because Uhler was not responsible for Plaintiff's medical treatment.

In Plaintiff's first and second **medical indifference** claims, there is no allegation that he suffered from a serious medical condition. Plaintiff claims that he suffered from heart and chest pains for a period of five (5) days, and that he was denied refills for medication used to treat

stomach pain. Compl. at ¶¶ 1 & 74. Such conclusory allegations of heart, chest, and stomach pain, without more, do not satisfy the objective prong of the Eighth Amendment test. *See Bell. Atl. Corp. v. Twombly,* 550 U.S. at 545 (stating that a valid claim must have enough factual allegations "to raise a right to relief above the speculative level"); *see also Hutchinson v. New York State Corr. Officers,* 2003 WL 22056997, at *5 (S.D.N.Y. Sept.4, 2003) (holding that a **general** allegation of chest **pain** is not sufficiently serious under the Eighth Amendment) (citations omitted); *Pender v. McClellan,* 1996 WL 343253, at *4 (W.D.N.Y. Feb.5, 1996) (dismissing plaintiff's Eighth Amendment claims based on stomach **pain** when there was no allegation that his condition was urgent or otherwise serious). Therefore, it is recommended that those claims be **dismissed.**

**\*5** Likewise, in his third **medical indifference** claim alleging Defendants Rock, Benthley, Lashway, Fearchild, and Travers failed to treat him for the injuries he sustained during the alleged use of excessive force against him on May 19, 2008, Plaintiff fails to allege that he suffered from a constitutionally significant injury or medical condition. Plaintiff merely alleges in **general** terms that his head and neck were hurt, he experienced head and heart **pain**, and that he requested x-rays for unspecified injuries to his head and body. Compl. at ¶¶ 48-49 & 81. These statements of **general pain** cannot sustain an Eighth Amendment claim because they do not allege that Plaintiff suffered from "a condition of urgency that may result in degeneration or extreme **pain**." *Chance v. Armstrong,* 143 F.3d at 702. Therefore, these claims should be **dismissed.**[FN8]

> FN8. Plaintiff's other claims surrounding the alleged excessive use of force on May 19th remain. *See infra* Parts II.F & IV.

### 2. *Conditions of Confinement*

In order to state a valid conditions of confinement claim under the Eighth Amendment, a plaintiff must allege: (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) the prison officials acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294,

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)

(Cite as: 2009 WL 3111711 (N.D.N.Y.))

297-99, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (citation omitted) (cited in *Branham v. Meachum,* 77 F.3d 626, 630-31 (2d Cir.1996)).

Plaintiff alleges the following conditions of confinement claims: (1) he was denied recreation on July 12, 13, and 15, 2007, Compl. at ¶ 2; (2) while on a multi-day visit to Albany Medical Hospital he was forced to wear the same clothes from September 2 through September 18, 2007, after being denied his "medical trip draft bag," Compl. at ¶¶ 7 & 10; (3) from September 12-13, 2007, he was forced to stay in a room without drinking water, Compl. at ¶ 8; and (4) he was denied all personal hygiene items from October 19-20, 2007, Compl. at ¶ 17.

With respect to Plaintiff's claim that he did not have drinking water in his cell for a 24-hour period from September 12-13, it unclear whether he is asserting that he did not have access to running water in his cell, or that he was completely denied water for a 24-hour period. Compl. at ¶ 8. To the extent Plaintiff intended to allege the former, a lack of access to running water, without more, does not constitute an Eighth Amendment violation, *James v. Monroe County Jail,* 2005 WL 2030730, at *3 (W.D.N.Y. Aug.23, 2005) (citation omitted); to extent Plaintiff intended to allege the latter, that claim is weakened by his statement that he was provided food on that date, but refused to eat it for fear that it was drugged, Compl. at ¶ 8. Thus, Plaintiff admits that he was not deprived of sustenance, even if he refused to accept it. Also, although Plaintiff alleges he was forced to wear the same clothes from September 2 through September 18, 2007, he does not allege that he was denied the opportunity to bathe or otherwise clean himself during that period.

**\*6** In sum, none of these deprivations are so serious as to constitute a denial of the "minimal civilized measure of life's necessities." *Wilson v. Seiter,* 501 U.S. at 297-99 (citation omitted). Plaintiff's claims amount to assertions that he was inconvenienced and perhaps discomforted for short periods of time, and are therefore *de minimis* and not cognizable under the Eighth Amendment, which only protects **inmates** from conditions that violate "contemporary standards of decency." *Hudson v. McMillan,* 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *see also, e.g., Hamilton v. Conway,* 2008 WL

234216, at *9 (W.D.N.Y. Jan.28, 2008) (stating that "briefly denying hygienic materials does not violate contemporary standards of decency"), *Ochoa v. Connell,* 2007 WL 3049889, at * 12 (N.D.N.Y. Oct.18, 2007) (citing cases for the proposition that the denial of recreation for a few days does not implicate the Eighth Amendment). Therefore, it is recommended that these claims be **dismissed.**

3. *Threats, Harassment, Excessive Force, and Sexual Abuse*

Plaintiff makes numerous allegations that various Defendants threatened, harassed, and subjected him to verbal abuse. Specifically, Plaintiff alleges that (1) on July 12, 2007, Fearchild threatened to issue a misbehavior report against him, Compl. at ¶ 1; (2) Defendant Bengmann threatened him on August 8, 2007, Compl. at ¶ 3; (3) on September 12, 2007, Defendant Green threatened to assault him, Compl. at ¶ 8; (4) on October 19, 2007, Defendant Crossman threatened to beat him up if he did not stop talking and then verbally abused Plaintiff with profane language and gestures, Compl. at ¶ 18; (6) on December 21, 2007, Defendants Tyrell, Lawrence, Poltlos, Frenyea, and other unnamed officers conspired to harass and provoke Plaintiff when they took his identification card, put him on keeplock, and improperly opened his legal mail, Compl. at ¶¶ 24-27; and (7) Defendant Poltlos threatened his life, pushed his face up against a wall, and made racial epithets against Plaintiff while escorting him to the mental health unit, Compl. at ¶¶ 28-29.

It is well settled law in this Circuit that "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003) (citing *Alnutt v. Cleary,* 913 F.Supp. 160, 165-66 (W.D.N.Y.1996)); *Petway v. City of New York,* 2005 WL 2137805, at *3 (E.D.N.Y. Sept.2, 2005); *Larocco v. N.Y. City Dep't of Corr.,* 2001 WL 1029044, at *5 (S.D.N.Y. Aug.31, 2001). Thus, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Moncrieffe v. Witbeck,* 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (quoting *Aziz*

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)

(Cite as: 2009 WL 3111711 (N.D.N.Y.))

*Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998)). Additionally, "threats do not amount to violations of constitutional rights." *Id.* (quoting *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995)). Therefore, the aforementioned claims of threats and harassment should be **dismissed.**

*7 To the extent Plaintiff intends to assert a claim of excessive force against Defendant Poltlos for allegedly pushing his face up against a wall, that action does not rise to the level of an Eighth Amendment violation, especially when, as here, Plaintiff has not alleged he was in any way injured by the Defendant's actions. *See Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a **prisoner's** constitutional rights.") (internal citations omitted); *see also Govan v. Campbell,* 289 F.Supp.2d 289, 300 (N.D.N.Y.2003) ( **prisoner's** claim that he was pushed up against a wall, even if true, did not amount to a constitutional violation).

Plaintiff has also brought claims of sexual and physical abuse against Defendants Ramsdell and Rokece. Compl. at ¶¶ 11-14. Specifically, Plaintiff alleges that during a search of his person for contraband, Defendant Ramsdell grabbed and squeezed his penis,[FN9] and that Rokece pushed his face up against an iron rail. *Id.* at ¶¶ 11-12 & 14. Like Plaintiff's claim against Poltlos, his claim that Rokece pushed him against a rail, even if true, is *de minimis* and therefore fails to state a claim. *See Govan v. Campbell,* 289 F.Supp.2d at 300. As per Plaintiff's claim against Ramsdell, in some cases, "[s]exual abuse may violate contemporary standards of decency" so as to implicate the Eighth Amendment. *Boddie v. Schnieder,* 105 F.3d 857, 861 (2d Cir.1997). However, the Second Circuit has made clear that allegations of minor, isolated incidents, even if inappropriate, will not normally state a valid cause of action under the Eighth Amendment. *Id.* In this case, Plaintiff has alleged a quick, isolated incident of inappropriate touching that occurred during a search of his person for contraband. Such an incident, even if true, does not constitute an Eighth Amendment violation. *Id.* ( **prisoner's** allegation that a corrections officer inappropriately touched his penis on one occasion did not state a valid claim), *see also Davis v. Castleberry,*

364 F.Supp.2d 319, 321 (W.D.N.Y.2005) ( **prisoner's** allegation that a corrections officer grabbed his penis during a pat frisk did not state a valid constitutional claim); *Montero v. Crusie,* 153 F.Supp.2d 368, 373 & 375 (S.D.N.Y.2001) (squeezing an **inmate's** genitalia on several occasions during pat frisks did not constitute an Eighth Amendment violation).

> FN9. Plaintiff does not allege that he was in any way injured when Ramsdell allegedly squeezed his penis.

Therefore, it is recommended that Plaintiff's allegations of sexual abuse, threats, excessive force, and harassment be **dismissed** for failure to state a claim.

### C. Due Process Claims

Plaintiff alleges that he suffered due process violations during a Parole Hearing held on January 15, 2008, and Disciplinary Hearings held in 2007 and 2008.

#### 1. *Parole Hearing*

Plaintiff alleges that on January 15, 2008, he had a Parole Hearing before Defendants Loomis, Ferguson, and Ortloff, all Commissioners of the New York State Division of Parole. Compl. at ¶ 61. Plaintiff states that he informed those Defendants about all of the constitutional violations he had suffered during his incarceration, but that Defendants Loomis and Ferguson prevented Plaintiff from pleading his side of the case and disregarded his suffering. *Id.* On January 16, 2008, Plaintiff was denied parole by Loomis, Ferguson, and Ortloff; Plaintiff alleges that but for such denial, he would not have been assaulted on May 19, 2008. *Id.* at ¶ 62.

*8 As Defendants point out, the Second Circuit has held that "parole board officials, like judges, are entitled to absolute immunity from suit for damages when they serve a quasi-adjudicative function in deciding whether to grant, deny or revoke parole." *Montero v. Travis,* 171 F.3d 757, 761 (2d Cir.1999) (citations omitted). Therefore, because Defendants Loomis, Ferguson, and Ortloff were acting as quasi-judicial officers when they allegedly improperly denied Plaintiff's parole, they are entitled to absolute immunity and the claims for damages[FN10] against them should be **dismissed** pursuant to 28 U.S.C. §

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)

(Cite as: 2009 WL 3111711 (N.D.N.Y.))

1915(e)(2)(B)(I), which gives the Court authority to dismiss a claim brought by a plaintiff proceeding *in forma pauperis* "at any time" if it determines such claim to be frivolous.

> FN10. Plaintiff does not ask for any other non-pecuniary form of relief against Defendants Loomis, Ferguson, and Ortloff. *See* Compl. at pp. 77-80.

### 2. *Disciplinary Hearings*

Plaintiff makes several due process claims concerning Disciplinary Hearings held on (1) November 21, 2007; (2) December 24, 2007; and (3) May 27 through June 19, 2008. Compl. at ¶¶ 21, 32, 58-60, 63(2), & 64. Plaintiff alleges that at the Disciplinary Hearing presided over by Defendant D. Kemp on November 21, 2007, Kemp prevented Plaintiff from presenting a defense by threatening him and stating that if Plaintiff did "it her way[,] she [would] not give [him] any time and [would] dismiss the charges against [him]." *Id.* at ¶ 21. Plaintiff alleges Kemp found him guilty of smuggling and issued him a sentence of "counsel and release." *Id.*

Plaintiff alleges that on December 24, 2007, Defendant Lieutenant Miller presided as Hearing Officer over a Disciplinary Hearing during which Plaintiff was denied the opportunity to present evidence and testimony and that he was not given a written disposition of the Hearing.[FN11] *Id.* at ¶ 32. Plaintiff alleges that he was found guilty at the Hearing and sentenced to thirty (30) days keeplock. Plaintiff states that he filed a complaint with Defendant Racette requesting a new hearing, which was denied. *Id.*

> FN11. Plaintiff also alleges that he did not receive a written disposition after a Disciplinary Hearing held in November 2007. Compl. at ¶ 20. However, that claim is alleged only against Superintendent Bukeco, who is not a named Defendant in this action, and therefore, should be **dismissed** as Plaintiff has alleged no personal involvement on the part of any Defendant.

Finally, Plaintiff alleges that on May 27, 2008, Defendant Uhler presided over a Disciplinary Hearing on charges brought by Defendants Orzech and T. Carter stemming from the May 19, 2008 incident, at which Plaintiff was denied the opportunity to present witnesses and other evidence. *Id.* at ¶ 54. Plaintiff also alleges that such Hearing was adjourned to June 3, 2008, and then again to June 9, 2008, but he did not receive a copy of an extension form in either instance and was made to wait in SHU during those adjournments. *Id.* Plaintiff alleges that the Hearing reconvened on June 16, 17, and 19, 2008 before Defendant Uhler, during which time Plaintiff was again precluded from presenting evidence and Uhler allegedly improperly led the witnesses. *Id.* at ¶¶ 58, 63(2), & 64. Plaintiff also avers that he was improperly removed from the proceedings on June 16, 2008. *Id.* at ¶ 63(2). Plaintiff does not state what the outcome of the May 27-June 19, 2008 Disciplinary Hearing was, nor if he received any form of punishment after its disposition. *Id.* at ¶¶ 54 & 58-60.

**\*9** In order to state a procedural due process claim pursuant to the Fourteenth Amendment, an **inmate** must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)). The Supreme Court held in *Sandin v. Conner* that state created liberty interests shall be limited to those deprivations which subject a **prisoner** to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

In this case, Plaintiff has alleged that he was sentenced to thirty (30) days keeplock after his conviction in the Disciplinary Hearing conducted on December 24, 2007. Courts in this Circuit have held that a 30 day period of keeplock, absent additional egregious circumstances, is not "atypical and significant" so as to create a liberty interest and thereby trigger the protections of the Due Process Clause. *See Rivera v. Goord,* 2008 WL 5378372, at *2-3 (N.D.N.Y. Dec.22, 2008)* (holding that 40 days of room restriction "did not constitute a constitutionally cognizable liberty deprivation"); *Uzzell v. Scully,* 893 F.Supp. 259, 263 (S.D.N.Y.1995) (45 days of keeplock is not atypical and significant; *Rivera v. Coughlin,* 1996 WL 22342, at *5 (S.D.N.Y. Jan.22, 1996)* (89 days in

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)

(Cite as: 2009 WL 3111711 (N.D.N.Y.))

keeplock does not create a liberty interest). Indeed, courts have roundly rejected the notion that such a short period of confinement, without additional hardships, creates a liberty interest even when that confinement is completely segregated, such as when an **inmate** is sent to the Special Housing Unit ("SHU"). *See Sealey v. Giltner,* 197 F.3d 578, 589-90 (2d Cir.1999) (101 days in normal SHU conditional was not atypical or significant) (cited in *Ochoa v. DeSimone,* 2008 WL 4517806, at *4 (N.D.N.Y. Sept.30, 2008)) (30 days in SHU, without more, did not create a liberty interest); *Thompson v. LaClair,* 2008 WL 191212, at *3 (N.D.N.Y. Jan.22, 2008)) (30 days in SHU does not create a liberty interest).

With respect to Plaintiff's allegations regarding the Disciplinary Hearings held on November 21, 2007 and from May 27, 2008, through June 19, 2008, Plaintiff does not allege that he suffered any atypical or significant hardship as a consequence of those alleged due process violations. To the extent Plaintiff intended to allege that his confinement in SHU during the pendency of his Hearing that went from May 27 through June 19, 2008, was a due process violation, such a short period of confinement is not atypical and significant for the reasons mentioned above. Therefore, it is recommended that his due process claims be **dismissed** because he had failed to implicate a liberty interest with respect to any of the due process violations alleged.

**D. First Amendment Claims**

*1. Interference with Personal Mail*

Plaintiff alleges that the Defendants interfered with his outgoing and incoming mail. Plaintiff states that his family members sent him numerous letters, but that he did not receive any mail from family or friends from September 2005 through July 2008. Compl. at ¶¶ 63(1) & 65. Plaintiff also states that on January 15, 2008, his mother informed Deacon Debiec [FN12] that he had not received any of Plaintiff's letters. *Id.* at ¶ 63(1). Plaintiff alleges that he sent his daughter and her mother a certified letter while in Auburn in 2005, but that he never received the return receipt; he called his daughter's mother who informed him that she never received the letter. *Id.* at ¶¶ 75-76. Plaintiff accuses the Senior Mail Clerk at Auburn, Defendant J. Rice, of stealing his mail. *Id.* Also in 2005,

Plaintiff allegedly sent complaint letters to the New York Department of State Ethics Commission and, having heard no response, sent another letter to the Ethics Commission asking if they received his complaints, to which they responded they had not. *Id.* at ¶ 77. Plaintiff accuses Defendant Rice of stealing those complaints. *Id.*

> FN12. Deacon Debiec is not a named Defendant in this action.

**\*10** Plaintiff alleges that from 2005 through March 24, 2007, he sent over two hundred (200) letters to his daughter and her mother, all of which were allegedly stolen by Defendant Quinn, a mail clerk at Upstate. *Id.* at ¶ 76. In addition, Plaintiff accuses Quinn of stealing letters he sent to DOCS' Rastafarian Priest Abuna A. Foxe in 2006, as well as a complaint of criminal misconduct sent to various government officers. *Id.* at ¶ 78.

In March 2008, Plaintiff spoke with his father who advised him that he had not received any correspondence from Plaintiff for over three years, though Plaintiff alleges he sent his parents over sixty (60) letters between 2005 and 2008. *Id.* at ¶ 79. Plaintiff accuses Defendants Rice, Quinn, and Defendant Waldron, who is a Senior Mail Supply Clerk at Clinton, of obstructing his written communications to his family. *Id.*

As Plaintiff correctly contends, the First Amendment protects an **inmate's** right to send and receive both legal and non-legal mail, though that right may be limited by restrictions that are " 'reasonably related to legitimate penological interests.' " *Thornburgh v. Abbott,* 490 U.S. 401, 409, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (quoting *Turner v. Safley,* 482 U.S. 78, 79, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). However, Plaintiff's sweeping accusations that his incoming and outgoing mail was obstructed for a period of over three years does not assert a plausible claim under § 1983. *See Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868. Plaintiff's conclusory accusations that Defendants Rice, Quinn, and Waldron stole his incoming and outgoing mail appears to be based on nothing more than the fact that those Defendants were DOCS employees who worked in the mailrooms at Auburn, Upstate, and Clinton, respectively. Indeed, beyond his own suspicions, Plaintiff offers no factual allegations that link these Defendants to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)

(Cite as: 2009 WL 3111711 (N.D.N.Y.))

the alleged obstruction of his mail from 2005 through 2008. Therefore, we recommend that these claims be **dismissed** as conclusory.

### 2. *False Misbehavior Reports*

Plaintiff alleges that several Defendants filed false misbehavior reports against him. Some of those allegations include the additional claim that the false reports were filed in retaliation for the exercise of his First Amendment rights, some do not. We address first the claims that do not have the retaliation rider attached.

Plaintiff alleges that on October 19, 2007, Defendant Ramsdell, in an effort to cover-up staff misconduct, issued him a false Misbehavior Report accusing Plaintiff of carrying contraband in his crotch. Compl. at ¶ 15. Plaintiff also alleges that on December 22, 2007, Defendant Tyrell filed a false Misbehavior Report accusing Plaintiff of threats in order to cover-up Tyrell's improper opening of Plaintiff's legal mail. *Id.* at ¶ 31. However, there is "no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d at 862 (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)); *see also Gill v. Riddick,* 2005 WL 755745, at *7 (N.D.N.Y. Mar.31, 2005). While an **inmate** may have a valid cause of action where a false misbehavior report is filed *in retaliation* for the exercise of a constitutional right, *see, e.g., Gill v. Riddick,* 2005 WL 755745 at *7, Plaintiff has not established that he was engaged in constitutionally protected conduct with respect to these claims. Therefore, it is recommended that these claims be **dismissed** for failure to state a claim and pursuant to 42 U.S.C. § 1915(g). *See supra* Part II.C.1.

**\*11** We now consider Plaintiff's claims that false misbehavior reports were filed against him with retaliatory animus. The Second Circuit has stated that courts must approach **prisoner** retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a **prisoner** by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) & *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988)), *overruled on other grounds by*

*Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

In order to prevail on a retaliation claim, a plaintiff bears the burden to prove that (1) he engaged in constitutionally protected conduct; (2) prison officials took an adverse action against him; and (3) a causal connection exists between the protected speech and the adverse action. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted); *see also Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

In this case, Plaintiff alleges that (1) at some point prior to August 8, 2007, Defendant Bezio submitted a letter of complaint Plaintiff had written to Defendant Bengmann of the DOCS Inspector General's Office in retaliation for a civil rights action Plaintiff had previously initiated against several DOCS officials, Compl. at ¶ 3; (2) on August 11, 2007, Defendant Bengmann issued Plaintiff a false Misbehavior Report in retaliation for complaints Plaintiff had filed against several DOCS and New York State officials, Compl. at ¶ 3; (3) on October 21, 2007, Defendant Crossman filed a false Misbehavior Report against Plaintiff in retaliation for his filing a civil lawsuit against numerous DOCS officials, Compl. at ¶ 19; and (4) on December 22, 2007, Defendant Lawrence filed a false Misbehavior Report against Plaintiff in retaliation and in order to cover-up staff misconduct, Compl. at ¶ 30.

With respect to the first two claims listed above, Plaintiff alleges that on August 8, 2007, he spoke with Defendant Brian Bengmann, who told Plaintiff that Bezio had forwarded him a letter written by Plaintiff that allegedly included threats against the Upstate staff. *Id.* at ¶ 3. Plaintiff states that Bengmann produced a letter of complaint Plaintiff wrote to Defendant Woods about his medical issues, assaults he had endured, and his allegedly improper SHU confinement. *Id.* Plaintiff alleges that he received a Misbehavior Report on May 21, 2008, for sending that letter to Woods, and was eventually assessed ninety (90) days in SHU on that charge. Plaintiff states that notwithstanding the punishment he had already been assessed, Defendant Bezio sent his letter to Defendant Bengmann on August 8, 2007, in retaliation for a civil rights action he filed in federal court that Plaintiff has identified as 9:07-CV-0305. [FN13] Plaintiff alleges that he

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)

(Cite as: 2009 WL 3111711 (N.D.N.Y.))

received a Misbehavior Report from Bengmann on August 21, 2007, in retaliation for a complaint Plaintiff filed against Defendant Richard Roy, former-Governor Eliot Spitzer, State Commission Chairman Daniel Stewart, DOCS Commissioner Defendant Brian Fischer, and Bezio. *Id.*

> FN13. The Court takes judicial notice that Plaintiff has currently pending in the Northern District of New York another § 1983 action, *Excell v. Woods et al.,* civil action number 9:07-CV-305(GTS/GHL), in which he has brought claims against many of the same Defendants listed in this action, including Bezio.

**\*12** With respect to Bengmann, Plaintiff's claim that he wrote a false Misbehavior Report against Plaintiff because of complaints and lawsuits Plaintiff filed against other individuals is conclusory because Plaintiff fails to allege a plausible causal connection between his protected conduct and Bengmann's allegedly false Misbehavior Report. Plaintiff himself alleges that Bengmann was acting on Plaintiff's letter of complaint that was forwarded to him by Bezio, a letter that was alleged to contain threats against DOCS officials. As per Bezio, the only retaliatory act Plaintiff has alleged is that he submitted Plaintiff's letter of complaint to Bengmann, who then authored a Misbehavior Report against Plaintiff. Thus, Plaintiff does not allege that Bezio took any adverse action directly against him. Therefore, it is recommended that these claims be **dismissed.**

Plaintiff's third and fourth retaliation claims listed above against Defendants Crossman and Lawrence, respectively, both suffer from the same deficiency: neither describes with any degree of specificity the constitutionally protected conduct that was the basis for the alleged retaliatory acts. *See id.* at ¶¶ 19 (alleging that Crossman filed a false Misbehavior Report against him "as retaliation against the Plaintiff for his **inmate** civil complaints against numerous fellow [DOCS] employees") & 30 (asserting no constitutionally protected conduct whatsoever). Therefore, it is recommended that these claims be **dismissed** as conclusory and pursuant to 42 U.S.C. § 1915(g).

### 3. *Access to the Courts*

In paragraph thirty-five (35) of his Complaint, Plaintiff appears to allege that he was denied access to the law library on May 8, 2008, but he does not state that any Defendant was personally involved in that alleged constitutional deprivation. *Id.* at ¶ 35. In paragraph sixty-six (66) of his Complaint, Plaintiff alleges in conclusory fashion that Brousseau destroyed several grievances he filed. Once again, this claim appears to be based on nothing more than Plaintiff's own supposition and speculation. Therefore, it is recommended that these claims be **dismissed.**

### E. Conspiracy Claims

Plaintiff brings several conspiracy claims that are difficult to decipher and to the extent they can be logically interpreted, are wholly conclusory. Plaintiff alleges that Defendant Bezio (and perhaps Uhler and Boyea as well) was involved in a conspiracy to send Plaintiff to Upstate and to have him placed in a cell next to an **inmate** with whom Plaintiff would likely have fights. Compl. at ¶ 22. In another conspiracy claim, Plaintiff states his belief that Bezio was the mastermind behind the alleged May 19, 2008, attack against him because Plaintiff knew Bezio from Upstate and Defendants Bezio and Uhler had a history of working together against Plaintiff. *Id.* at ¶ 5 8. Finally, Plaintiff alleges that Defendants Fischer, LeClaire, Bezio, Artus, and Uhler conspired to subject Plaintiff to "religious harassment and discrimination and physical assault and the prison disciplinary proceeding[s] and [to] transfer [him] back to upstate." *Id.* at ¶ 81.

**\*13** All of the aforementioned conspiracy claims appear to be based solely on Plaintiff's own beliefs and conjecture and, in the absence of factual allegations, should therefore be **dismissed** as frivolous pursuant to 42 U.S.C. § 1915(g).

### F. Personal Involvement

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to **section 1983**

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)

(Cite as: 2009 WL 3111711 (N.D.N.Y.))

actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept.15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. at 1948, 173 L.Ed.2d 868.

If a plaintiff seeks to bring a **§ 1983** action for supervisory liability, liability on the part of the supervisor may exist

in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d at 873) (further citations omitted).

Aside from naming them as Defendants, Plaintiff has failed to make any factual allegations whatsoever against Defendants Roy, Knapp, Lucia, and Diaz. Also, Plaintiff's only mention of Defendant LeClaire is the conclusory claim that LeClaire was somehow involved in his alleged First and Eighth Amendment violations. Compl. at ¶ 81. Therefore, it is recommended that the Complaint be **dismissed** as against those Defendants.

Furthermore, because we have recommended dismissal of Plaintiff's underlying constitutional claims concerning mail theft, retaliation, medical indifference, conditions of confinement, and due process, his claims of supervisory liability against Defendants Woods, Bezio, Racette, Uhler, Wright, Johnson, Brousseau, Patnode, and Bellamy, for failure to remedy those alleged violations should also be **dismissed.** *See* Compl. at ¶¶ 10, 21-22, 32-34, 51, 58-59, 66-67, 72-73, & 79.

Defendants have not moved to dismiss Plaintiff's claims stemming from the alleged events of May 19, 2008, however, they argue that Defendants Artus and Fischer should be dismissed for lack of personal involvement. Defs.' Mot. at pp. 16-17. Plaintiff has alleged that prior to the alleged use of excessive force that occurred on May 19, 2008, he sent complaints to Artus and Fischer about his problems with Orzech and Orzech's alleged threat to assault him, and that such complaints were either ignored or not responded to, and therefore, Artus and Fischer failed to protect him. Compl. at ¶¶ 41, 44, 57, & 68.

**\*14** In order to state a valid failure to protect claim, a **prisoner** must demonstrate that the prison officials "acted with deliberate indifference with respect to his safety or with an intent to cause harm to him." *Hendricks v. Coughlin,* 942 F.2d at 113. The key element of a failure to protect claim is the existence or potential existence of a substantial risk of serious harm and not the actual harm which may or may not ensue. *Farmer v. Brennan,* 511 U.S. 825, 836, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). To prove deliberate indifference, the plaintiff must show that the "official knew of and disregarded an excessive risk to the plaintiff's health or safety." *Id.* at 837 (cited in *Ramirez v. Mantello,* 1998 WL 146246, at *2 (N.D.N.Y. Mar.24, 1998).* "The official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists *and* he must also draw the inference." *Id.* at 836.

In this case, Plaintiff alleges that Artus and Fischer were put on notice of the threat to his safety by his letters of complaint dated May 15, 17, and 18, 2008. Based on these allegations, we find that Plaintiff has stated a facially adequate claim for failure to protect. Therefore, we recommend against dismissal of these claims against Artus and Fischer. Similarly, Plaintiff has alleged that Defendants Warner and Rock were involved in a conspiracy to cover-up the alleged May 19th assault. Although we recommended dismissal of Plaintiff's medical indifference claims against Rock in Part II.B.1, *supra,* Plaintiff also alleges that Rock falsified his medical records in furtherance of the alleged conspiracy to violate his Eighth Amendment rights. Compl. at ¶¶ 48 & 70. Warner is alleged to have participated in the conspiracy by

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)

(Cite as: 2009 WL 3111711 (N.D.N.Y.))

directing Defendant Tamer not to take any close-up pictures of Plaintiff's injuries after the assault. *Id.* at ¶ 48. Considering that Plaintiff's underlying excessive force claim has not been challenged, dismissal of his conjoining conspiracy claims would be premature at this stage. Therefore, it is recommended that these claims against Warner and Rock not be dismissed.

### G. Unserved Defendants

Under Federal Rule of Civil Procedure 4(c)(1), the plaintiff is responsible for service of the summons and complaint for each defendant within a specified time period. Specifically, the plaintiff must effectuate service of process within 120 days of the filing of the complaint. FED. R. CIV. P. 4(m). [FN14] Failure to properly serve any defendant in accordance with the Federal Rules will result in the court, upon motion or on its own initiative, to dismiss the case without prejudice as to that defendant. *Id.*

> FN14. Under the Local Rules for the Northern District of New York, a plaintiff must effectuate service within sixty (60) days. N.D.N.Y.L.R. 4.1(b).

In this case, there is no indication that the Defendants C.O. Green, Labetz, Ortloff, or Karen Bellamy have been served. *See* Dkt. Nos. 17, 54, & 66. Although courts must afford plaintiffs notice before they may dismiss a claim for failure to serve a defendant, FED. R. CIV. P. 4(m), in this case, because Plaintiff's claims against Defendants Green, Ortloff, and Bellamy lack merit, granting Plaintiff the opportunity to properly serve these unnamed Defendants would be futile. Thus, it is recommended that Plaintiff's claims against Green, Ortloff, and Karen Bellamy be **dismissed.** With respect to Labetz, Plaintiff has alleged that he used excessive force against Plaintiff during the May 19, 2008 incident. Compl. at ¶ 63(1). Because Defendants have not moved to dismiss Labetz for failure to state a claim, we will afford Plaintiff *one final opportunity to effectuate service of process on Defendant Labetz. Plaintiff is forewarned that a failure to do so will result in the Court's recommendation of dismissal of his claims against Labetz.* The Court will afford Plaintiff *thirty (30) days from the date this Report-Recommendation is issued* to effectuate service upon Labetz.

### III. Plaintiff's Motion for a Preliminary Injunction

**\*15** On February 23, 2009, Plaintiff submitted a Motion for a Preliminary Injunction and Temporary Restraining Order seeking an order enjoining the Defendants from: interfering with his Rastafarian religious practices, physically assaulting him, confining him in SHU under the pretext of false misbehavior reports, denying him medical care, stealing his mail, and denying him access to the law library. Dkt. No. 57 at pp. 1-6.

In the Second Circuit, the standard for granting a temporary restraining order and a preliminary injunction is the same. *See* FED. R. CIV. P. 65; *see also Local 1814 Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n Inc.,* 965 F.2d 1224, 1228 (2d Cir.1992).

In general, to secure a preliminary injunction, the moving party must demonstrate: (1) irreparable harm, and (2) either: (a) a likelihood of success on the merits of [the case], or (b) sufficiently serious questions going to the merits of the case to make it a fair ground for litigation, and a balance of hardships tipping decidedly in [favor of the moving party].

*D.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (internal quotation marks and citation omitted).

Irreparable harm "means an injury for which a monetary award cannot bring adequate compensation." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). The Second Circuit has held that the alleged violation of a constitutional right triggers a finding of irreparable injury. *See Jolly v. Coughlin,* 76 F.3d 468, 482 (2d Cir.1996). Therefore, in cases involving alleged constitutional violations, the issue of irreparable harm merges with the question of success on the merits. *See Metropolitan Council, Inc. v. Safir,* 99 F.Supp.2d 438, 443 (S.D.N.Y.2000) (citation omitted).

Finally, when the injunction sought "will alter, rather than maintain the *status quo,*" or will "provide the movant with ... relief [that] cannot be undone even if the defendant prevails at a trial on the merits," the moving party must show a "clear" or "substantial" likelihood of success. *Beal v. Stern,* 184 F.3d 117, 122-23 (2d Cir.1999) (citation

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)

(Cite as: 2009 WL 3111711 (N.D.N.Y.))

omitted).

In this case, Plaintiff has failed to demonstrate either irreparable harm or a likelihood of success on the merits of his claims. Indeed, we have already recommended for dismissal the majority of Plaintiff's claims. In addition, Plaintiff's Motion for Preliminary Injunction is presented in conclusory fashion and, for the most part, simply repeats the accusations brought in his Complaint. Therefore, it is recommended that Plaintiff's Motion be **denied.**

### IV. CONCLUSION

For the reasons stated above, it is recommended that the majority of the aforementioned claims be dismissed. To clarify, should the district court adopt this Report-Recommendation, the following claims will remain: (1) excessive force and retaliation against Defendants Tamer, Orzech, T. Carter, Moak, and Labetz; (2) conspiracy against Defendants Tamer, Orzech, T. Carter, Moak, Labetz, R. Rock, and Warner; (3) violation of Plaintiff's First Amendment right to practice religion against Orzech; and (4) supervisory liability against Artus and Fischer.

Therefore, it is hereby

**RECOMMENDED,** that the Defendants' Motion to Dismiss (Dkt. No. 59) be **GRANTED in part** and **DENIED in part** in accordance with the above opinion; and it is further

**RECOMMENDED,** that the following Defendants be **DISMISSED** from this action: T. Ramsdell, C. Crossman, Fearchild, D. Uhler, M. Patnode, Lucien LeClair, Jr., Vonda Johnson, Fenyea, R. Lawrence, S. Tyrell, Lt. Miller, Lashway, Benthley, Knapp, Lucia, Loomis, Ferguson, Poltlos, Brousseau, J.T. Rice, D. Waldron, Quinn, Travers, Pedro Diaz, Robert Woods, Richard Roy, Brian Bengmann, N. Bezio, Steven Racette, Sgt. Rokece, Green, Ortloff (spelled "Oltloff" on the Docket), Karen Bellamy; [FN15] and it is further

FN15. To clarify further, should the District Court adopt this Report-Recommendation, the following Defendants shall remain as parties in

this action: T. Carter, Tamer, Moak, M. Orzech, Labetz, R. Rock, H. Warner, Artus, and Fischer.

**RECOMMENDED,** that Plaintiff's Motion for a Preliminary Injunction (Dkt. No. 57) be **DENIED;** and it is further

**ORDERED,** that should the District Court adopt this Court's recommendation that Defendant Labetz not be dismissed from the action, the Clerk shall issue a Summons and forward it, along with a copy of the Complaint, to the United States Marshal for service upon Defendant Labetz. Plaintiff is warned that failure to effectuate service upon Labetz within **thirty (30) days of the date this Report-Recommendation is issued** will result in this Court recommending dismissal of his claims against Labetz; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2009.

Mortimer Excell v. Fischer
Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

C

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Henry BENITEZ, Plaintiff,
v.
HAM, et al., Defendant.
No. 9:04-CV-1159.

Oct. 21, 2009.
Henry Benitez, Malone, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy P. Mulvey, Esq., of Counsel, Syracuse, NY, for Defendants.

**ORDER**

NORMAN A. MORDUE, Chief Judge.

*1 The above matter comes to me following a Report-Recommendation by Magistrate Judge George H. Lowe, duly filed on the 30th day of September 2009. Following ten days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no objections submitted thereto, it is

ORDERED that:

1. The Report-Recommendation is hereby adopted in its entirety.

2. Defendants' motion for summary judgment (Dkt. No. 92) is GRANTED IN PART AND DENIED IN PART. The following claims are dismissed pursuant to Defendants' motion for summary judgment: (1) the Eighth Amendment claims against Defendants Weissman and Richards arising from their treatment of Plaintiff's severe body itch, left wrist, and right ankle; (2) the claims against

Defendant Ham; (3) the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham; (4) the retaliation claim against Defendants Nephew, Desotelle, and Snyder based on their filing of misbehavior reports against Plaintiff; (5) the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding their handling of Plaintiff's grievances regarding the events of January 2 and 3, 2003; (6) the claim against Defendant LaClair; (7) the claims against Defendant Bullis; and (8) the Eighth Amendment claim against Defendants Weissman and Girdich for approving the imposition of the loaf diet.

It is further ordered that the following claims are dismissed sua sponte pursuant to 28 U.S.C. § 1915(e)(2)(B): (1) Plaintiff's retaliation claim against Defendants Weissman and Richards; and (2) the claim against Defendant Selsky.

It is further ordered that the following claims survive summary judgment and sua sponte review and proceed to trial: (1) the conspiracy claim against Defendants Wright, Snyder, and Duprat; (2) the excessive force claim against Defendants Snyder, Duprat, Bogett, and Wright; (3) the retaliation claim against Defendants Snyder, Duprat, Bogett, and Wright arising from the use of excessive force; (4) the retaliation claim against Wright arising from his filing of a misbehavior report against Plaintiff; (5) the failure to intervene claims against Defendants Bezio and Duprat; (6) the retaliation claim against Defendant Bezio; and (7) the Eighth Amendment claims against Defendants Hensel, Goodwin, Kuhlman, and Costello.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

***REPORT-RECOMMENDATION AND ORDER***

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* **prisoner** civil rights action, commenced

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Henry Benitez alleges that 21 employees of the New York Department of Correctional Services ("DOCS") violated his constitutional rights by subjecting him to excessive force, denying him medical care, falsifying misbehavior reports, denying him assistance to prepare for a disciplinary hearing, and imposing a loaf diet on him as punishment. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 92.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

**I. FACTUAL AND PROCEDURAL SUMMARY**

*2 Unless otherwise noted, the facts in this summary are taken from Plaintiff's verified complaint.[FN1] Plaintiff, a New York state **prisoner**, was transferred to Upstate Correctional Facility on September 14, 2002. (Dkt. No. 1 ¶ 8.) Plaintiff alleges that he was suffering from "ongoing severe pain in his left hand wrist and right foot ankle due to nerve damage." (Dkt. No. 1 ¶ 9.) From the time he arrived at Upstate, he made "numerous requests" to Defendant Drs. Evelyn Weissman and Richards to receive a medication called Atarax that had been prescribed to him previously at Auburn Correctional Facility, an MRI of his left wrist and right ankle, and a referral to an orthopedist. (Dkt. No. 1 ¶ 12.) Plaintiff alleges that Defendants Weissman and Richards refused his requests for Atarax, the MRI, and the referral "in retaliation for his having filed numerous formal grievances against them [and other Upstate medical staff members] within a period of two years, and for the purpose of preventing [Plaintiff] from demonstrating in a civil rights action against prison officials the extent of the injuries of his left hand and right foot." (Dkt. No. 1 ¶ 12-13.) Plaintiff alleges that, as a result, he continues to experience severe pain in his left wrist and right ankle, numbness in different areas of his left hand and right foot, an inability to walk or stand for longer than ten minutes, and ongoing severe body itch. (Dkt. No. 1 ¶ 14.)

FN1. Only two of the named Defendants filed affidavits supporting Defendants' motion for summary judgment. Only one of those

affidavits-the affidavit of Defendant Dr. Evelyn Weissman-contradicts Plaintiff's version of events.

Regarding Plaintiff's requests for Atarax, Dr. Weissman declares that Atarax is

non-formulary, which means we do not regularly stock that medication, and special approval must be obtained to issue that medication. However, Vistaril and Hydroxyzine is the substitute we use for the same purpose as Atarax. Hydroxyzine is the generic form of Atarax. I prescribed Vistaril for [P]laintiff on October 2, 2002 ... Dr. Richards requested approval for Atarax in April 2004 and it was suggested that [P]laintiff try Claritin, which had become a formulary (regularly stocked) drug. Dr. Richards requested approval for Atarax again in June 2004, and the response was that if the generic (Hydroxyzine) had not worked, it was unclear that the branded drug Atarax would work ... Plaintiff's complaints of itching were not ignored, and he [was] constantly given medication for itching.

(Weissman Aff. ¶¶ 4-10.)

As to Plaintiff's other claims, Dr. Weissman declares:

Regarding [P]laintiff's claim that his request for an MRI was denied, Dr. Richards and I felt, in our medical judgment, an MRI was not warranted. However, because his pain and numbness was improving with time, Dr. Richards requested, and I approved, physical therapy for [P]laintiff beginning in January 2003. Regarding [P]laintiff's claim that his request for an orthopedic consult was denied, that is incorrect. Dr. Richards requested an orthopedic consult for [P]laintiff on August 19, 2003 and [P]laintiff saw an orthopedist on September 4, 2003. The orthopedist ... did not suggest an MRI and determined that [P]laintiff was improving and "... there is not much else that I can suggest for Henry to improve or accelerate his healing. For the time being, I am just going to suggest that he be patient."

*3 (Weissman Aff. ¶¶ 11-13.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Plaintiff was transferred to Elmira Correctional Facility Reception Center on November 7, 2002, for a court appearance. Upon arrival, Plaintiff informed Defendant Correction Officer Ham that he suffered "ongoing severe pain in his left hand wrist and right foot ankle due to nerve damage, and that the handcuffs and leg irons ... were too tight and causing him swelling and enormous pain." Ham observed that Plaintiff's hands were swollen. However, he refused to remove or loosen the restraints. Plaintiff remained in the restraints, suffering enormous pain and swelling, until he was transferred to Five Points Correctional Facility three hours later. (Dkt. No. 1 ¶ 9.)

Plaintiff was returned to the Elmira Correctional Facility Reception Center on November 14, 2002. At that time, Plaintiff again informed Defendant Ham that the restraints were too tight and were causing him swelling and extreme pain. Defendant Ham "again verbally acknowledged that [Plaintiff]'s hands were ... swollen" but refused to remove the restraints. Plaintiff remained in the restraints, suffering enormous pain and swelling, until he was transferred out of the facility three hours later. (Dkt. No. 1 ¶ 10.)

On January 2, 2003, Defendant Correction Officers Nephew and Desotelle strip-frisked Plaintiff [FN2] in preparation for transferring Plaintiff for a court appearance. Defendant Sgt. Snyder was also in the room. When they had completed the search, Defendant Nephew ordered Plaintiff to put on his coat. Plaintiff told Nephew that wearing the coat would "severely aggravate his continuing body itch stemming from his hepatitis virus." (Dkt. No. 1 ¶ 15.) Defendant Snyder called Plaintiff a "spick" and threatened to forcibly put the coat on Plaintiff. Plaintiff told Defendants Snyder, Nephew, and Desotelle that he would sue them if they used force. (Dkt. No. 1 ¶ 15.)

FN2. Plaintiff does not allege that the strip-frisk violated his constitutional rights. Even if he did, I would find that such a claim would not survive *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B). Strip searches conducted in a prison setting are constitutional if they are reasonably related to a legitimate penological

goal and are conducted in a reasonable manner. *Frazier v. Ward,* 528 F.Supp. 80, 81 (N.D.N.Y.1981). "However, a strip search is unconstitutional if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish. *See, e.g., Iqbal v. Hasty,* 490 F.3d 143, 172 (2d Cir.2007) (pretrial detainee alleged Fourth Amendment violation where he was subjected to repeated strip and body cavity searches that were not related to legitimate government purposes and designed to punish); *Covino,* 967 F.2d at 80 (strip search accompanied by physical and verbal abuse is unconstitutional); *Hodges v. Stanley,* 712 F.2d 34, 35-36 (2d Cir.1983) (second strip search performed soon after a first strip search served no legitimate interest when **prisoner** was under continuous escort); *Jean-Laurent v. Wilkerson,* 438 F.Supp.2d 318, 323 (S.D.N.Y.2006)." *Miller v. Bailey,* No. 05-CV-5493, 2008 U.S. Dist. LEXIS 31863, at *1, 2008 WL 1787692, at *9 (E.D.N.Y. Apr. 17, 2008). Plaintiff does not allege, and the evidence does not show, that Defendants conducted the strip-frisk with an intent to intimidate, harass, or punish Plaintiff.

Shortly thereafter, Defendant Lt. Wright approached Plaintiff and asked him if he had spit at staff. Before Plaintiff could respond, Defendant Wright ordered several guards to get a video camera and put a "spittle mask" on Plaintiff. After the guards did so, Defendant Wright escorted Plaintiff to his cell. He asked Plaintiff to explain what had happened in the frisk room. Plaintiff said that Defendant Wright would not believe his account of the incident, accused Defendant Wright of interfering with his court trip and unjustifiably putting a spittle mask on him, and said he would sue Defendants Wright and Snyder. Defendant Wright told Plaintiff that "transportation vans don't have cameras. You're going to learn not to spit ... [at] staff and ... threaten us with lawsuits." (Dkt. No. 1 ¶ 16.)

After Defendant Wright left Plaintiff's cell, Defendant Capt. Bezio approached and asked Plaintiff to explain what happened in the frisk room. Plaintiff told Defendant Bezio what had happened, denied that he had threatened to spit at a staff member, and asked Defendant Bezio to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

protect him while he was being transported to court. Defendant Bezio told Plaintiff to be "up and ready to go to court" and that "people don't like to get spat ... on." [FN3] (Dkt. No. 1 ¶ 19.)

> FN3. In their motion for summary judgment, Defendants argue that Plaintiff cannot maintain a claim against Defendant Bezio for these statements because (1) Plaintiff did not exhaust his administrative remedies regarding the statements; and (2) threats are not actionable constitutional violations. (Dkt. No. 92-10 at 35-36.) In his opposition to the motion, Plaintiff states that he did not intend to maintain a separate claim against Defendant Bezio based on the statements. Rather, he included this allegation in his complaint to provide relevant information for his failure to intervene claim. (Dkt. No. 109 at 48.) Therefore, I will not address Defendants' arguments regarding these statements.

*4 On January 3, 2003, Defendant Correction Officer Duprat escorted Plaintiff to the transportation van. Defendant Duprat told Plaintiff to "remember what we told you about the van." [FN4] As they were walking, Plaintiff saw Defendant Bezio and told him that Defendant Duprat had threatened to "employ physical abuse" against him in the van. Defendant Bezio shrugged his shoulders. (Dkt. No. 1 ¶ 20.) Defendant Duprat drove Plaintiff in a van to a different building, where he called Defendant Snyder "to arrange a beating" of Plaintiff. After the phone call, Defendant Duprat drove Plaintiff back to the first building. When they arrived, Defendant Snyder entered the rear section of the van and told Plaintiff that "you like ... suing us. Wright, my boss, doesn't like that and sent this as a reminder." Defendant Snyder then punched and slapped Plaintiff, who was in handcuffs and leg irons, in the face and the back of his head, knocking him unconscious. When Plaintiff revived, Defendants Duprat and Correction Officer Bogett entered the rear section of the van and punched and slapped Plaintiff several times in the head, chest, and right ear. When Plaintiff began to bleed from his right inner ear, Defendants Duprat and Bogett tied a spittle mask on Plaintiff's head. (Dkt. No. 1 ¶¶ 21-22.)

> FN4. In their motion for summary judgment, Defendants argue that Plaintiff cannot maintain a claim against Defendant Duprat for this statement because (1) Plaintiff did not exhaust his administrative remedies regarding the statement; and (2) threats are not actionable constitutional violations. (Dkt. No. 92-10 at 35-36.) In his opposition to the motion, Plaintiff states that he did not intend to maintain a separate claim against Defendant Duprat based on the statement. Rather, he included it in his complaint to provide relevant information for his excessive force claim. (Dkt. No. 109 at 48.) Therefore, I will not address Defendants' arguments regarding these statements.

When Plaintiff arrived at Five Points Correctional Facility later that day, he notified Defendant Nurse Hensel that he had been bleeding from his inner right ear due to a beating by Upstate officials, that he was suffering severe pain in his head and right ear, and that he wanted to be examined by a doctor. Defendant Hensel refused to examine Plaintiff, made no record of his complaints, and refused to schedule Plaintiff to see a doctor. [FN5] (Dkt. No. 1 ¶ 23.)

> FN5. The medical records produced by Defendants in support of their motion for summary judgment do not reflect that Plaintiff saw Nurse Hensel on January 3, 2003. However, as the Court has noted previously (Dkt. No. 99 at 3), a SHU log book entry for January 3, 2003, indicates that Plaintiff was "taken to strip frisk room for pictures and to be assessed by R/N Hensel." (Defs.' Resp. to P.'s 1st Req. for Prod. of Docs., Ex. E at 11.) This document corroborates Plaintiff's claim that he saw Defendant Hensel on January 3, 2003. I note, however, that none of the parties included the log book entry in their moving or opposing papers.

Plaintiff's medical record from Five Points indicates that on January 3, 2003, the day he arrived, Plaintiff was seen by Nurse Nancy O'Connor Ryerson. She noted that Plaintiff arrived via van with cuffs and chains and spit net,

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

and that he complained of pain and itching. "It was noted that he takes Naprosyn and Benadryl, and he was escorted to 12 Building. Apparently Naprosyn was not sent with him and it is a medication for which he would need a prescription from a doctor. Since this was not an emergency, the procedure is to place the **inmate** on the regular physician call-out list for an appointment. Nurse Ryerson also noted that he was Hepatitis C positive." (Bannister Aff. ¶ 5.)

On January 4, 2003, Plaintiff notified Defendant Nurse Goodwin [FN6] that he needed emergency medical treatment because of severe pain in his liver, left wrist, and right ear, and that he wanted medicine for his severe body itch. Defendant Goodwin refused to examine Plaintiff, made no record of his complaints, and did not provide any treatment to Plaintiff. (Dkt. No. 1 ¶ 24.)

> FN6. The complaint refers to this defendant as Nurse "Good." However, Defendants state that her name is actually Goodwin. (Dkt. No. 92-10 at 1 n. 1.) I will refer to her as Nurse Goodwin.

Plaintiff's medical records from Five Points indicate that on January 4, 2003, Plaintiff was seen by Nurse "Goon" at his cell after security staff told the nurse that Plaintiff stated his asthma was acting up. Nurse "Goon" 's note indicated that Plaintiff never acknowledged shortness of breath and that she checked Plaintiff's transfer form and the computer and found that he had no history of asthma. (Bannister Aff. ¶ 6.)

*5 On January 5, 2003, Plaintiff alleges that he informed Defendant Nurse Kuhlman [FN7] that he had been bleeding from his inner right ear and that he was suffering from an ongoing, extreme body itch due to his hepatitis C and B virus. Defendant Kuhlman told Plaintiff that she would review his medical chart and return to him. Defendant Kuhlman refused to examine Plaintiff, made no record of his medical complaints, and refused to provide treatment. (Dkt. No. 1 ¶ 25.)

> FN7. The complaint refers to this defendant as Nurse Coleman. As discussed further below, Plaintiff did not serve this defendant. In his opposition to the motion for summary judgment,

Plaintiff states that he ultimately learned through discovery that her name is actually Nurse Kuhlman. (Dkt. No. 109 at 6 n. 2.) I will refer to this defendant as Nurse Kuhlman.

Plaintiff's medical records from Five Points show that Defendant Kuhlman saw Plaintiff on January 5, 2003. Her note indicates that she went to his cell for his 4:00 p.m. medications and he complained about the way she distributed the medication [FN8]. He stated that the nurse would be getting a grievance. He was uncooperative and argumentative. (Bannister Aff. ¶ 7.)

> FN8. It is not clear what medications Nurse Kuhlman was distributing, since the Affidavit of Linda Bannister establishes that "nurses cannot give medications until they verify allergies and prescription orders" and that as of January 6, the day after Nurse Kuhlman saw Plaintiff, this verification had not been completed. (Bannister Aff. ¶ 8.)

On January 6, 2003, Plaintiff informed Defendant Nurse Costello that he needed treatment due to great pain in his right ear and his ongoing severe body itch. Defendant Costello refused to examine Plaintiff's right ear, made no record of his medical complaint, and refused to promptly provide medical treatment. (Dkt. No. 1 ¶ 26.)

Plaintiff's medical records from Five Points show that Defendant Costello saw him on January 6, 2003. She noted that he was complaining that he needed an emergency prescription for severe headache and severe itching. She noted that he requested a prompt examination by a physician. She instructed him that she would have to find the chart or the transfer paperwork because nurses cannot give medications until they verify allergies and prescription orders. (Bannister Aff. ¶ 8.)

Plaintiff's medical records from Five Points show that he was seen again the next day by Defendant Costello. Plaintiff's chart was still not available, and he again requested a prescription for itching, Hepatitis C, and a physical exam. Defendant Costello again noted that she would have to verify his requests and then possibly schedule an appointment. (Bannister Aff. ¶ 9.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Plaintiff's medical records from Five Points show that he was seen later that day by non-defendant Nurse Gardner at the request of security staff. Plaintiff stated "I was knocked out and beaten everywhere" and claimed that he had a lump on his head. Nurse Gardner examined him and noted no redness, bruising, or bump on head. (Bannister Aff. ¶ 10.)

Plaintiff alleges that Wright, Nephew, Desotelle, and Snyder retaliated against him for his threat to sue them by filing false misbehavior reports. (Dkt. No. 1 ¶¶ 17-18.) Defendant Correction Officer LaClair was assigned to assist Plaintiff with preparing for the subsequent disciplinary hearing. (Defs.' Ex. 14.)

According to a misbehavior report filed by Defendant LaClair, when he went to Plaintiff's cell to assist him, Plaintiff "stated ... that [LaClair] was to get him what he wanted." Defendant LaClair "informed him that what he needed had to be pertained (sic) to the misbehavior report. [Plaintiff] then stated "Get what I want or I'll fuck you up." Defendant La Clair "informed the interview was over and left the area." (Defs.' Ex. 15 at 2-3.) Plaintiff alleges that Defendant LaClair "falsified [the] misbehavior report against [Plaintiff] in order to refrain" from assisting Plaintiff. (Dkt. No. 1 ¶ 35.)

*6 On January 15, 2003, Defendant Bullis arrived at Plaintiff's cell and informed him that he would conduct the disciplinary hearing that day. He asked Plaintiff whether he wanted to attend the hearing. Plaintiff said that he did not because Defendant LaClair had not assisted him, but asked Defendant Bullis to interview Defendant LaClair and an **inmate** witness about the events leading to Defendant LaClair's refusal to provide assistance. Plaintiff asked Defendant Bullis not to impose a loaf diet as a punishment if he found Plaintiff guilty because the loaf diet caused Plaintiff severe abdominal pains and constipation due to his hepatitis. (Dkt. No. 1 ¶ 36.)

Defendant Bullis did not interview Defendant LaClair or the **inmate** witness. He found Plaintiff guilty and imposed a penalty of 21 days of the loaf diet. (Dkt. No. 1 ¶ 37.) Plaintiff alleges that Defendants Weissman and Girdich "maliciously" approved the penalty in "reckless

disregard" of the pain it would inflict on Plaintiff. (Dkt. No. 1 ¶ 38.) Plaintiff alleges that "[d]ue to the danger that the ... loaf diet posed" to his well-being, he refused to eat it. As a result, he lost 33 pounds and suffered severe abdominal pains and emotional distress that exacerbated his hepatitis. (Dkt. No. 1 ¶ 39.)

Plaintiff alleges that Defendants Brousseau, Donelli, Selsky, Girdich, and Eagen mishandled the grievances and appeals he filed or attempted to file regarding his claims. (Dkt. No. 1 ¶¶ 28-34, 40.)

Plaintiff filed this lawsuit on October 6, 2004. The parties proceeded to discovery, which proved contentious. Plaintiff successfully moved to compel responses to his discovery requests, and thereafter filed four motions for sanctions seeking Defendants' compliance with the order compelling discovery. (Dkt.Nos.56, 73, 94, 103.) I granted each of those motions in part. (Dkt. Nos.62, 79, 99, 107.) As is relevant here, I ruled that because not all of the pages of the Five Points Movement and Control Log Book for November 14, 2003, had been provided to Plaintiff before the original was destroyed, Plaintiff could ask the Court to draw factual inferences favorable to him. (Dkt. No. 99 at 2.) I ruled that because Defendants could not locate the SHU log book for January 2003, Plaintiff could "ask the Court to draw factual inferences favorable to him based upon the missing pages for January 14, 2003" in opposition to Defendants' motion for summary judgment. (Dkt. No. 99 at 1-2.) I noted that Defendants had told Plaintiff that photographs taken of him on January 10, 2003, would be produced but that, without explanation, Defendants could no longer find the photographs. Accordingly, I ruled that Plaintiff could ask the Court to draw factual inferences favorable to him based upon the missing photographs. (Dkt. No. 99 at 2-3.) I ordered that if photographs taken of Plaintiff on January 3, 2003, no longer existed, Plaintiff could similarly request favorable inferences. (Dkt. No. 99 at 3.)

*7 On March 16, 2009, Plaintiff again moved for sanctions. (Dkt. No. 103.) I noted that the photographs from January 3 and 10, 2003, were still missing. (Dkt. No. 107 at 1.) I reiterated that Plaintiff could ask the Court to draw factual inferences favorable to him based upon the missing photographs. (Dkt. No. 107 at 2.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 92.) Plaintiff has opposed the motion. (Dkt. No. 109.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Major League Baseball Properties, Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [FN9] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN10] In determining whether a genuine issue of material [FN11] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [FN12]

> FN9. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is properly made [by a defendant] and supported [as provided in this rule], the [plaintiff] may not rely merely on allegations ... of the [plaintiff's] pleading ....").

> FN10. *Ross v. McGinnis,* No. 00-CV-0275, 2004

U.S. Dist. LEXIS 9367, at * 20-21, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) (internal quotations omitted) (emphasis added).

> FN11. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN12. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

### B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) (citations omitted); *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Moreover, even where a defendant has not advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a *pro se* **prisoner** has failed to state a claim upon which relief may be granted. [FN13] For these reasons, it is appropriate to briefly summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

> FN13. The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B), which provides that "the court shall dismiss [a] case [brought by a **prisoner** proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [ **prisoner's** ] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

**\*8** Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2);[FN14] or (2) a challenge to the legal cognizability 14 of the claim.[FN15]

FN14. *See* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") (citations omitted); *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ( "The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

FN15. *See* *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they

state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") (citation omitted); *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") (citation omitted); *Util. Metal Research & Generac Power Sys., Inc.,* No. 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5, 2004 WL 2613993, at *1-2 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord,* *Straker v. Metro Trans. Auth.,* 333 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* No.01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12(b)(6) motion-one aimed at the sufficiency of the pleadings under Rule 8(a), and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) (emphasis added). By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [FN16] The

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

main purpose of this rule is to "facilitate a proper decision on the merits." [FN17] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN18]

> FN16. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) (citation omitted; emphasis added); *see also Swierkiewicz,* 534 U.S. at 512 (citation omitted); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (citation omitted).

> FN17. *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") (citation omitted); *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") (citations omitted).

> FN18. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord, Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* No. 98-CV-0293, 1998 U.S. Dist. LEXIS 8750, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J.). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,*

335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 (2d Cir.1996)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556-57, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but has not *shown*-that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 (emphasis added).

It should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [FN19] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*"[FN20] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

> FN19. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) (citation omitted); *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

> FN20. *Hernandez,* 18 F.3d at 136 (citation omitted); *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) (citations omitted); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) (citation omitted).

For example, the mandate to read the papers of *pro se*

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.[FN21] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [FN22] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [FN23] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint.[FN24] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it."[FN25]

FN21. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* No. 96-CV-7544, U.S. Dist. LEXIS 18131 1997 WL 714878, at * 1, n. 2, 1997 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) (citations omitted), *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. See *Washington v. James,* 782 F.2d 1134,

1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) (citations omitted).

FN22. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

FN23. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

FN24. *Yang v. New York City Trans. Auth.,* No. 01-CV-3933, 2002 U.S. Dist. LEXIS 20223, 2002 WL 31399119, at *2 (E.D.N.Y. Oct.24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

FN25. *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) (citation omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) (citation omitted); *see, e.g., See Rhodes v. Hoy,* No. 05-CV-0836, 2007 U.S. Dist. LEXIS 48370, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report-Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error in his complaint-the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process-was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* No. 07-CV-0166,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

2008 U.S. Dist. LEXIS 62919, 2008 WL 3582743, at *2 (D.Vt. Aug. 13, 2008) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the errors in his complaint-lack of subject-matter jurisdiction and lack of standing-were substantive and not formal in nature, rendering repleading futile) (citations omitted); *Hylton v. All Island Cab Co.,* No. 05-CV-2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint-which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence-were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba,* No. 00-CV-1309, 2001 U.S. Dist. LEXIS 737, 2001 WL 58834, at *11 (D.Conn. Jan.23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint-the fact that the defendants were protected from liability by Eleventh Amendment immunity-was substantive and not formal in nature, rendering repleading futile).

**\*9** However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has observed),[FN26] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12.[FN27] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[FN28] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended."[FN29]

FN26. *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 U.S.App. LEXIS 17113, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing

the form of pleadings.") [internal quotation marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") (citation omitted).

FN27. *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) (unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

FN28. *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by **prisoners** who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") (citation omitted); *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") (citation omitted); *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

FN29. *Stinson v. Sheriff's Dep't of Sullivan County.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

## III. ANALYSIS

### A. Weissman/Richards Health Care

Plaintiff alleges that Defendant Drs. Weissman and Richards violated his Eighth Amendment right to adequate medical care by prescribing an ineffective medication for his body itch, refusing to order an MRI of his left wrist and right ankle, and refusing to refer him to an orthopedist. (Dkt. No. 1 ¶ 12.) Defendants move for summary judgment of these claims, arguing that (1) Plaintiff did not suffer from a serious medical need; and (2) Defendants were not deliberately indifferent. (Dkt. No. 92-10 at 13-14.)

### 1. *Eighth Amendment Standard*

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102-03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for **prisoners**. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Thus, prison officials must "ensure that **inmates** receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the **inmates**.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To satisfy the objective component, "the deprivation alleged must be, objectively, 'sufficiently serious.' " *Id.* (quoting *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). Analyzing the objective element of an Eighth Amendment medical care claim requires two inquiries. "The first inquiry is whether the **prisoner** was actually deprived of adequate medical care." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide **inmates** with whatever care the **inmates** desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester County Dept. of Corr. Med. Dept.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008).

**\*10** The second inquiry is "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the **prisoner**." *Salahuddin,* 467 F.3d at 280. The focus of the second inquiry depends on whether the **prisoner** claims to have been completely deprived of treatment or whether he claims to have received treatment that was inadequate. *Id.* If "the unreasonable medical care is a failure to provide any treatment for an **inmate's** medical condition, courts examine whether the **inmate's** medical condition is sufficiently serious." *Id.* A "serious medical need" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702-03.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

If the claim is that treatment was provided that was inadequate, the second inquiry is narrower. *Salahuddin, 467 F.3d at 280.* For example, "[w]hen the basis for a **prisoner's** Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the **prisoner's** *underlying medical condition* alone in analyzing whether the alleged deprivation" is sufficiently serious. *Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir.2003).*

To satisfy the subjective component of an Eighth Amendment medical care claim, the defendant's behavior must be "wanton." What is considered "wanton" must be determined with "due regard for differences in the kind of conduct against which an Eighth Amendment objection is raised." *Whitley v. Albers, 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).* Where a **prisoner** claims that a defendant provided inadequate medical care, he must show that the defendant acted with "deliberate indifference." *Estelle, 429 U.S. at 105; Wilson v. Seiter, 501 U.S. 294, 302-03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).*

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Chance, 143 F.3d at 703* (quoting *Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir.1996)*). Thus, to establish deliberate indifference, an **inmate** must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the **inmate** had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer, 511 U.S. at 837; Chance, 143 F.3d at 702-703.* The **inmate** then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer, 511 U.S. at 835; Ross v. Giambruno, 112 F.3d 505, at \*2 (2d Cir.1997).* An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle, 429 U.S. at 105-06.* Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state

a valid claim ... under the Eighth Amendment." *Id.* Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a **prisoner**." *Id.; Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir.2003)* ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). However, malpractice that amounts to culpable recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance, 143 F.3d at 703* (citation omitted). Medical decisions that are contrary to accepted medical standards may constitute deliberate indifference if "the doctor has based his judgment on something other than sound medical judgment." *Stevens v. Goord, 535 F.Supp.2d 373, 385 (S.D.N.Y.2008)* (citation omitted). For instance, a doctor may be deliberately indifferent if he opts for an easier and less efficacious treatment plan "not on the basis of [his or her] medical views, but because of monetary incentives." *Chance, 143 F.3d at 704.*

### 2. *Atarax*

**\*11** Plaintiff claims that Defendants Weissman and Richards violated his Eighth Amendment rights by refusing to prescribe Atarax. (Dkt. No. 1 ¶¶ 1, 12.) Defendants move for summary judgment, arguing that Plaintiff's claim regarding the Atarax medication fulfills neither the objective nor the subjective prong of a viable Eighth Amendment claim. (Dkt. No. 92-10 at 13-14.)

Regarding the objective prong, the parties' briefs focus entirely on whether Plaintiff suffered from a serious medical need.[FN30] Applying the analytical framework described above, I must first address whether Plaintiff was actually deprived of adequate medical care. I find that there is a triable issue of fact that the refusal to prescribe Atarax constituted a denial of adequate or reasonable care. I base this finding on the fact that Defendant Dr. Richards twice requested approval to prescribe Atarax, noting that he had already tried treating Plaintiff with Hydroxyzine, Vistril, Allegra, and Zytrec "all of which worsened [Plaintiff's] condition." (Weissman Aff. Ex. A-9.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

FN30. Defendants argue that Plaintiff's severe body itch was not a serious medical need because it was not a "condition of urgency, one that may produce death, degeneration, or extreme pain". (Dkt. No. 92-10 at 13.) Plaintiff argues that severe body itch was a symptom of his Hepatitis C, which is a serious medical need. (Dkt. No. 109 at 28-30.)

Because Plaintiff alleges that he was provided with inadequate treatment, rather than completely deprived of treatment, the next inquiry is whether the *deprivation* was sufficiently serious. This requires an analysis of what harm, if any, the failure to prescribe Atarax caused or will cause Plaintiff. Here, there is simply no evidence before the Court that being deprived of Atarax harmed or threatened to harm Plaintiff. Rather, the evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation. Therefore, I find that Plaintiff has not raised a triable issue of fact regarding the objective prong of his Eighth Amendment claim regarding Defendant Weissman and Richards' failure to prescribe Atarax.

Having found that there is not a triable issue of fact as to the objective prong, it is not necessary to analyze the subjective prong. However, I will briefly address the parties' contentions for the sake of completeness. Defendants argue that the refusal by Defendants Weissman and Richards to prescribe Atarax was not deliberate indifference because the decision of "which medicine to prescribe for a particular condition amount[s] to nothing more than a disagreement with the course of treatment-not deliberate indifference." (Dkt. No. 92-10 at 13-14.) Defendants' argument regarding deliberate indifference is based entirely on the affidavit of Dr. Weissman. FN31 Interestingly, in contrast to her statements regarding Plaintiff's orthopedic care (discussed below), Dr. Weissman does *not* state that the decision not to prescribe Atarax was based on her medical judgment. Rather, she states that Atarax is a "non-formulary" medication and "special approval must be obtained to issue that medication." (Weissman Aff. ¶ 4.) Dr. Weissman does not say who was authorized to approve the use of non-formulary drugs. Dr. Richards twice requested

approval to prescribe Atarax to Plaintiff. (Weissman Aff. ¶¶ 7-8, Ex. A-9 and A-10.) In one of these requests, he stated that the other medications he had tried "worsened" Plaintiff's condition. (Weissman Aff. Ex. A-9.) His requests were denied. (Weissman Aff. ¶¶ 7-8, Ex. A-9 and A-10.) This sequence of events raises two interesting and related issues: does the acquiescence of Dr. Weissman and Dr. Richards to a course of treatment for Plaintiff with which they disagreed constitute deliberate indifference? FN32 Or does the fact that the decision not to prescribe Atarax was made by someone other than Dr. Weissman and Dr. Richards indicate that they were not personally involved with, and thus not liable for, the decision? *See* *Johnson v. Wright,* 412 F.3d 398 (2d Cir.2005) (claims against administrators who refused to approve treatment requested by treating physicians survived summary judgment; treating physicians were not named as defendants). The parties have not addressed these issues, and, due to my finding that there is no triable issue of fact as to the objective prong and in the absence of briefing, I decline to do so.

FN31. Dr. Richards did not file an affidavit supporting Defendants' motion for summary judgment.

FN32. *See* *Sulton v. Wright,* 265 F.Supp.2d 292 (S.D.N.Y.2003) (holding that a **prisoner** stated an Eighth Amendment claim against a doctor and physician's assistant who pursued less vigorous treatment than they had originally recommended when their request for approval of knee surgery was denied).

3. *MRI and Orthopedic Referral*

**\*12** Plaintiff claims that Defendants Weissman and Richards violated his Eighth Amendment rights by refusing to take MRIs of his left wrist and right ankle or to refer him to an orthopedist who could determine if medical footwear was necessary to correct his right foot problem. (Dkt. No. 1 ¶ 12.) Defendants argue that (1) any deprivation was not sufficiently serious to trigger Eighth Amendment scrutiny; and (2) they were not deliberately indifferent. (Dkt. No. 92-10 at 13-14.) Defendants are correct.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Even if one assumes that the deprivation was sufficiently serious to trigger Eighth Amendment scrutiny, the evidence does not raise a triable issue of fact that Defendants were deliberately indifferent. Regarding the MRIs, Dr. Weissman declares that "Dr. Richards and I felt, in our medical judgment, an MRI was not warranted." Because Plaintiff's "pain and numbness was improving with time, Dr. Richards requested, and I approved, physical therapy for [P]laintiff beginning in January 2003." (Weissman Aff. ¶ 11.) In September 2003, Dr. Richards referred Plaintiff to an orthopedist for treatment of his left wrist because, after completing physical therapy, Plaintiff was "still having [a] considerable amount of pain." (Weissman Aff. Ex. A-13.) The orthopedist examined Plaintiff and reported that Plaintiff "seems to be improving at this point and unfortunately, there is not much else I can suggest for Henry to improve or accelerate his healing." (Weissman Aff. Ex. A-14.)

Plaintiff filed a grievance a year after seeing the orthopedist complaining that Dr. Richards and Dr. Weissman "willfully refused to examine my injuries, to provide medical treatment for said injuries, and to order an MRI test of said injuries conducted ... in an attempt to prevent me from proving the precise nature and extent of my injuries in a court of law and, thus, to dissuade me from suing." (P.'s Decl. in Opp'n to Aff. of Evelyn Weissman, Ex. D.) Plaintiff argues that this grievance proves that he "continued to complain to these defendants about continuing severe pain in his left wrist and right ankle for more than one year after he had been evaluated by the orthopedist." (Dkt. No. 109 at 24-25.) The grievance Plaintiff cites does not mention any "continuing severe pain in his left wrist and right ankle." Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's Eighth Amendment claims against Defendants Weissman and Richards.[FN33]

> FN33. Plaintiff's complaint also asserts a **retaliation** claim against Defendants Weissman and Richards on these facts. (Dkt. No. 1 ¶ 12.) Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal pursuant to 28 U.S.C. § 1915(e) (2)(B) because the evidence does not establish that Defendants took

adverse action. While the denial of **medical** care may establish adverse action, *see e.g. Odom v. Poirier*, No. 99 Civ. 4933, 2004 WL 2884409, at * 4 (S.D.N.Y. Dec.10, 2004), I have found that Defendants Weissman and Richards did not **deny** Plaintiff **medical** care. Therefore, I recommend that the Court dismiss this claim.

**B. Ham/Grievances**

Plaintiff alleges that Defendant Ham violated his Eighth Amendment rights by refusing to loosen or remove his restraints on November 7 and 14, 2002. (Dkt. No 1 ¶¶ 9-10.) He further alleges that Defendants Brousseau and Donelli violated his constitutional rights by refusing to forward his grievance regarding Defendant Ham for an investigation. (Dkt. No. 1 ¶¶ 28-29.) Defendants argue that (1) Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendant Ham; (2) Plaintiff's allegations are not "sufficiently serious" to implicate the Eighth Amendment; and (3) Plaintiff's allegations regarding the handling of his grievance do not raise a constitutional claim. (Dkt. No. 92-10 at 21-23, 38.)

1. *Exhaustion of Administrative Remedies*

**\*13** Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendant Ham. (Dkt. No. 92-10 at 21-23.) I find that there is a triable issue of fact that Plaintiff's failure to receive a final decision on the merits of his grievance regarding Defendant Ham was justified.

The Prison Litigation Reform Act ("PLRA") requires that **prisoners** who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a **prisoner** confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." [FN34] "[T]he PLRA's exhaustion requirement applies to all **inmate** suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN35] The Department of Correctional Services ("DOCS") has available a well-established three-step **inmate** grievance program.[FN36]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

FN34. 42 U.S.C. § 1997e.

FN35. *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

FN36. 7 N.Y.C.R.R. § 701.7.

Generally, the DOCS **Inmate** Grievance Program ("IGP") involves the following procedure for the filing of grievances.[FN37] First, an **inmate** must file a complaint with the facility's IGP clerk within twenty-one (21) calendar days of the alleged occurrence. If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's **inmate** grievance resolution committee ("IGRC") has sixteen (16) calendar days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen (16) calendar days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven (7) calendar days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within twenty (20) calendar days of receipt of the grievant's appeal. Third, a grievant may appeal to the central office review committee ("CORC") within seven (7) working days of receipt of the superintendent's written decision. CORC is to render a written decision within thirty (30) calendar days of receipt of the appeal. It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process.[FN38] If a **prisoner** has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

FN37. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7; *see also White v. The State of New York,* No. 00-CV-3434, 2002 WL 31235713, at *2 (S.D.N.Y. Oct.3, 2002).

FN38. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g., Croswell v. McCoy,* 01-CV-0547, 2003 U.S. Dist. LEXIS 3442, at *12, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.).

Here, Plaintiff declares that on the day of the first incident with Defendant Ham, he asked a Five Points Correctional Facility officer for a grievance form. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy ¶ 17.) The officer did not give Plaintiff a form and told Plaintiff that he would need to file his grievance at Elmira Correctional Facility, where the incident had occurred. *Id.* Although an April 16, 2004, revision to the **inmate** grievance procedure specified that grievances "may only be filed at the facility where the **inmate** is housed even if it pertains to another facility," (*Id.,* at Ex. A), the procedures in effect at the time Plaintiff asked for a form to file a complaint against Defendant Ham were silent as to which facility should handle a particular grievance. Even if one assumes that the Five Points officer's advice was correct under DOCS practice at the time, it is difficult to see how Plaintiff could have filed a grievance at Elmira. Plaintiff was only at Elmira Correctional Facility for a few hours after receiving these instructions from the officer, during

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

which time he was handcuffed and shackled. (Dkt. No. 1 ¶ 10.)

**\*14** On December 8, 2002, Plaintiff filed a grievance at Upstate Correctional Facility regarding Defendant Ham's actions. (Dkt. No. 92-4, Ex. 4.) Defendant Brousseau, the IGP supervisor, returned the grievance to Plaintiff because Plaintiff failed to submit it within fourteen days of the incident.[FN39] *Id.*

> FN39. The **inmate** grievance procedures in place at the time of the incident required **inmates** to file grievances within 14, rather than 21, days.

On December 18, 2002, Plaintiff submitted a grievance complaining that Defendant Brousseau's refusal to accept the previous grievance violated his constitutional right of access to the courts because it prevented him from exhausting his claims against Defendant Ham. (Dkt. No. 92-4, Ex. 4.) The IGRC denied Plaintiff's grievance on December 26, 2002. *Id.* The IGRC stated that Defendant Brousseau's refusal was proper because Plaintiff "did not present any mitigating circumstances that would warrant accepting the [untimely] complaint ... [Plaintiff] had been back at the facility since 11/15/02 and had filed one grievance during this time period, this shows he had ample opportunity to file this complaint in a timely manner." *Id.* The grievance to which the IGRC's decision referred was a grievance regarding Defendant Richards' denial of Atarax. (Dkt. No. 92-4, Ex. 3.) Because that event occurred at Upstate Correctional Facility, there was no ambiguity about where Plaintiff's grievance should be filed.

Plaintiff appealed the IGRC's determination to the Superintendent. (Dkt. No. 92-4, Ex. 4.) Defendant Donelli affirmed the IGRC's determination on January 15, 2003. *Id.*

Defendants assert that Plaintiff "did not appeal [Defendant Donelli's decision] to the CORC." (Dkt. No. 92-3, Stmt. Pursuant to Rule 7.1(a)(3) ¶ 8.) For this proposition, they cite Exhibit 4 and to the Affidavit of Karen Bellamy. *Id.* Exhibit 4 shows that Plaintiff signed an "Appeal Statement" stating that he wished to appeal Defendant Donelli's decision to CORC. (Dkt. No. 92-4,

Ex. 4.) The Appeal Statement was signed by a grievance clerk. *Id.* That exhibit also shows that Defendant Brousseau responded to an inquiry regarding the status of the grievance by stating that the grievance had been received by CORC and was being processed. *Id.* However, the record before the Court does include any final disposition from CORC of Plaintiff's appeal. The appeal does not appear in a list provided in the Affidavit of Karen Bellamy of grievances on which Plaintiff received a final decision from CORC. (Bellamy Aff. Ex. B.) Thus, Plaintiff never received a decision from CORC and did not exhaust his administrative remedies. *See Mendez v. Artuz, No. 01 CIV. 4157, 2002 U.S. Dist. LEXIS 3263, at \* 4, 2002 WL 313796, at \* 2 (S.D.N.Y. Feb.27, 2002).* Even if CORC had acted on Plaintiff's appeal, I assume that CORC would have upheld the IGRC's finding and denied Plaintiff's grievance as untimely. In that event, I would find that Plaintiff had not exhausted his administrative remedies because "courts consistently have found that CORC's dismissal of a grievance appeal as untimely constitutes failure to exhaust available administrative remedies." *Soto v. Belcher,* 339 F.Supp.2d 592, 595 (S.D.N.Y.2004).

**\*15** Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a **prisoner** has failed to exhaust his administrative remedies.[FN40] First, "the court must ask whether [the] administrative remedies [not pursued by the **prisoner**] were in fact 'available' to the **prisoner**."[FN41] Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [ **prisoner's**] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense."[FN42] Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the **prisoner's** failure to comply with the administrative procedural requirements."[FN43] Justification "must be determined by looking at the circumstances which might understandably lead ... uncounselled **prisoners** to fail to

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

grieve in the normally required way." *Giano v. Good,* 380 F.3d 670, 678 (2d Cir.2004). Here, the silence of the regulations regarding which facility was the proper venue for Plaintiff's grievance, the bad advice that Plaintiff received from the officer at Five Points, and Plaintiff's inability to follow that advice because he was shackled during his entire tenure at Elmira create a triable issue of fact that Plaintiff's failure to file a timely grievance regarding Defendant Ham's actions was justified. I therefore find that summary judgment is not appropriate on the grounds that Plaintiff failed to exhaust his administrative remedies.

> FN40. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford. Chavis v. Goord,* No. 07-4787-pr, 2009 U.S.App. LEXIS 13681, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

> FN41. *Hemphill,* 380 F.3d at 686 (citation omitted).

> FN42. *Id.* (citations omitted).

> FN43. *Id.* (citations and internal quotations omitted).

2. *"Sufficiently Serious"*

Defendants argue that there is not a triable issue of material fact regarding Plaintiff's Eighth Amendment claim against Defendant Ham because "Plaintiff's alleged 'enormous pain' is nothing more than *de minimis* for Constitutional purposes." (Dkt. No. 92-10 at 22-23.)

Claims that prison officials applied restraints too tightly are analyzed under the Eighth Amendment as claims of excessive force. *See Davidson v. Flynn,* 32 F.3d 27 (2d Cir.1994). When prison officials are "accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The

extent of any injury suffered by the **inmate** "is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* at 7 (citation and quotation marks omitted).

**\*16** In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.

*Id.* (citation and quotation marks omitted). In other words, not "every malevolent touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of cruel and usual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* at 9 (officers who punched and kicked handcuffed and shackled **inmate** used unconstitutional force although **inmate** required no medical attention) (citations omitted); *Davidson,* 32 F.3d at 30 n. 1 (officers who placed handcuffs too tightly on **inmate** in retaliation for filing lawsuits used unconstitutional force where **inmate** suffered permanent scarring and numbness); *compare Warren v. Purcell,* No. 03 Civ. 8736, 2004 U.S. Dist. LEXIS 17792, at *24, 2004 WL 1970642 (S.D.N.Y. Sept.3, 2004) (officers who placed **prisoner** in tight restraints did not violate constitution where **prisoner** suffered temporary pain, numbness and swelling and no improper or wanton motive was suggested for the officers' actions).[FN44]

> FN44. Defendants served this unpublished case on Plaintiff with their moving papers as required by Local Rule 7.1(a)(1). (Dkt. No. 92-11.)

Plaintiff does not allege that he was permanently injured as a result of Defendant Ham's actions. Plaintiff

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

states that he suffered "enormous pain" and "severe swelling" as a result of being shackled so tightly. (Dkt. No. 109 at 38.) Although this would not end the Eighth Amendment inquiry if Defendant Ham's actions had been more egregious, there is simply no evidence in the record that Defendant Ham applied restraints to Plaintiff "maliciously and sadistically to cause harm" or in a way that was "repugnant to the conscience of mankind." Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's claims against Defendant Ham.

### 3. *Grievances*

Plaintiff alleges that Defendants Brousseau and Donelli "refused to forward" his complaint regarding Defendant Ham's actions "for an investigation" (Dkt. No. 1 ¶¶ 28-29), thus violating his First Amendment right to petition the government. (Dkt. No. 109 at 50-51.) Defendants argue that Plaintiff's allegation fails to state a constitutional violation. (Dkt. No. 92-10 at 38.) Defendants are correct.

The First Amendment protects a **prisoner's** right to meaningful access to the courts and to petition the government for the redress of grievances. *See Bill Johnson's Rest., Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). However, **inmate** grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable **§ 1983** claim. *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, *3 (S.D.N.Y. Mar. 29, 2001). If prison officials ignore a grievance that raises constitutional claims, an **inmate** can directly petition the government for redress of that claim. *See Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991). "Therefore, the refusal to process an **inmate's** grievance or failure to see to it that grievances are properly processed does not create a claim under **§ 1983**." *Cancel,* 2001 WL 303713, at *3; *see also Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003); *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 390 (W.D.N.Y.1998).

**\*17** *Shell v. Brzezniak,* 365 F.Supp.2d 362, 369-370 (W.D.N.Y.2005). Therefore, I recommend that the Court

grant Defendants' motion for summary judgment and dismiss the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham.

### C. Frisk Room Incident/Aftermath/Grievances

Plaintiff alleges that he threatened to sue Defendants Nephew, Desotelle, and Snyder if they used force to put on his coat. (Dkt. No. 1 ¶ 15.) Plaintiff alleges that, in retaliation for this threat, (1) Defendant Wright conspired with Defendant Snyder to subject Plaintiff to excessive force; (2) Defendants Duprat, Snyder, and Bogett used excessive force on Plaintiff; (3) Defendants Wright, Nephew, Desotelle, and Snyder falsified misbehavior reports against Plaintiff; and (4) Defendant Bezio failed to intervene to prevent the use of excessive force.[FN45] (Dkt. No. 1 ¶¶ 16-22.) He further alleges that Defendants Brousseau and Donelli would not allow Plaintiff to file a grievance regarding these events. (Dkt. No. 1 ¶¶ 30-31.) Finally, he alleges that Defendants Girdich and Eagen denied the grievance he filed regarding Defendant Brousseau and Donelli's refusal to process Plaintiff's grievance. (Dkt. No. 1 ¶¶ 32-34.)

> FN45. The complaint contains some language that could, very liberally construed, assert a claim against these Defendants for denial of Plaintiff's right of access to the courts on the theory that, at the time of these events, Plaintiff was being transported for a court appearance. Defendants addressed this possible claim in their motion for summary judgment. (Dkt. No. 92-10 at 40-42.) In his opposition to the motion, Plaintiff states that he did not intend to assert a claim for denial of access to the courts. (Dkt. No. 109 at 55.) I have therefore not addressed Defendants' arguments.

### 1. *Exhaustion of Administrative Remedies*

Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding any of these claims. (Dkt. No. 92-10 at 25-26, 31.) Plaintiff declares that on January 13, 2003, he attempted to submit a grievance to Defendant Brousseau regarding the claims. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy ¶ 26.) Plaintiff declares that Defendant Brousseau "refused to file and process the

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

grievance ... in order to prevent me from suing the officials named in the grievance." *Id.* ¶ 27.

On April 3, 2003, Plaintiff submitted a grievance complaining that Defendant Brousseau had refused to accept his January 13 grievance. (Dkt. No. 92-4, Ex. 8.) Plaintiff requested "[t]hat Ms. Brousseau submit the grievance complaint in question to the IGRC. Alternatively, that I be allowed to resubmit a copy of the grievance complaint in issue to the IGRC before moving for judicial intervention." *Id.* CORC denied the grievance on May 28, 2003, stating that it had "not been presented with sufficient evidence to substantiate any malfeasance" by Defendant Brousseau. *Id.*

As discussed above, Second Circuit precedent holds that a defendant may be equitably estopped from raising the exhaustion defense if he or she engaged in conduct that hindered the plaintiff's ability to pursue his or her administrative remedies. *Ziemba v. Wezner,* 366 F.3d 161, 163-64 (2d Cir.2004). A prison official's refusal to accept or forward a **prisoner's** grievance is conduct that hinders a plaintiff's ability to pursue administrative remedies. *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008). Thus, Plaintiff's declaration that Defendant Brousseau refused to accept his grievance raises a triable issue of fact that Defendants are estopped from asserting the exhaustion defense. Therefore, I recommend that the Court reject Defendants' argument that they are entitled to summary judgment as a result of Plaintiff's failure to exhaust his administrative remedies.

**2. Conspiracy**

**\*18** Defendants move for summary judgment of Plaintiff's conspiracy claim. [FN46] They argue that (a) Plaintiff has not shown that there was any meeting of the minds; and (b) the claim is barred by the intracorporate conspiracy doctrine.[FN47] (Dkt. No. 92-10 at 31-32.)

FN46. Defendants characterize Defendants Wright and Snyder as the only defendants to the conspiracy claim. Read broadly, the complaint also alleges that Defendant Duprat conspired with Defendants Wright and Snyder by calling Snyder "to arrange a beating" of Plaintiff. (Dkt. No. 1 ¶ 21.) I will include Defendant Duprat in my analysis of Plaintiff's conspiracy claim.

FN47. Defendants also argue that to the extent Plaintiff's conspiracy claim is brought under 42 U.S.C. § 1985, he has not shown that Defendants were motivated by any class-based animus. (Dkt. No. 92-10 at 31-32.) In his opposition to Defendants' motion, Plaintiff states that he did not intend to raise a claim under 42 U.S.C. § 1985. (Dkt. No. 109 at 44 n. 15.) Therefore, I have not addressed Defendants' argument regarding class-based animus.

a. *Meeting of the Minds*

Defendants argue that Plaintiff has not provided any factual basis for a finding that Defendants had a "meeting of the minds" as required for a conspiracy claim. (Dkt. No. 92-10 at 31-32.) I find that Plaintiff has raised a triable issue of fact.

"To prove a **§ 1983** conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999) (citations omitted).

Plaintiff has raised a genuine issue of material fact as to all of the elements of his **§ 1983** conspiracy claim. Plaintiff states in his verified complaint that Defendant Wright told him that " '[t]ransportation vans don't have cameras. You're going to learn not to spit ... [at] staff and not threaten us with lawsuits.' " (Dkt. No. 1 ¶ 16.) The next day, Defendant Duprat called Defendant Snyder "to arrange a beating" of Plaintiff. (Dkt. No. 1 ¶ 21.) Defendant Snyder entered the transportation van in which Plaintiff was sitting, said "Wright, my boss, doesn't like [you suing us] and sent this as a reminder," and then punched and slapped Plaintiff until Plaintiff lost consciousness. (Dkt. No. 1 ¶¶ 21-22.) A reasonable jury could, if it found Plaintiff's testimony credible, return a verdict for Plaintiff on his conspiracy claim based on this evidence.

b. *Intracorporate Conspiracy Doctrine*

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Defendants argue that Plaintiff's conspiracy claim is barred by the intracorporate conspiracy doctrine. (Dkt. No. 92-10 at 32.) Under that doctrine, employees of a single corporate entity are legally incapable of conspiring together. *Bond v. Board of Educ. of City of New York,* 97-cv-1337, 1999 U.S. Dist. LEXIS 3164, at *5, 1999 WL 151702, at *2 (W.D.N.Y. Mar.17, 1999). "This doctrine applies to public entities and their employees." *Lee v. City of Syracuse,* 603 F.Supp.2d 417, 442 (N.D.N.Y.2009) (citations omitted). Although the Second Circuit has recognized the doctrine in the context of 42 U.S.C. § 1985, *see Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978); *Girard v. 94th and Fifth Avenue Corp.,* 530 F.2d 66, 72 (2d Cir.1976), it has not extended its application of the doctrine to conspiracy claims under § 1983. Several district courts in the Second Circuit have, however, applied the doctrine to § 1983 cases.[FN48] The district court cases cited in the footnote applied the intracorporate conspiracy doctrine to § 1983 without discussing whether it was appropriate to do so. In *Anemone v. Metropolitan Transportation Authority,* 419 F.Supp.2d 602, 604 (S.D.N.Y.2006), the Southern District squarely held that the intracorporate conspiracy doctrine should be applied to § 1983 cases because "the doctrine's logic is sound" and not "a single case within the Second Circuit [has] held the doctrine inapplicable to **Section 1983** claims." I will assume that the doctrine applies in § 1983 cases.

> FN48. *See Green v. Greene,* No. 9:07-CV-0351 (GTS/DEP), 2009 U.S. Dist. LEXIS 68186, 2009 WL 2424353 (N.D.N.Y. Aug.5, 2009); *Sebast v. Mahan,* No. 09-cv-98 (GLS/RFT), 2009 U.S. Dist. LEXIS 64712, 2009 WL 2256949, at *3 (N.D.N.Y. July 28, 2009); *Lee v. City of Syracuse,* 603 F.Supp.2d 417 (N.D.N.Y.2009); *Lukowski v. County of Seneca,* No. 08-CV6098, 2009 U.S. Dist. LEXIS 14282, 2009 WL 467075 (W.D.N.Y. Feb.24, 2009); *Perrin v. Canandaigua City School Dist.,* No. 08-CV-61536, 2008 U.S. Dist. LEXIS 95280, 2008 WL 5054241 (W.D.N.Y. Nov.21, 2008); *Rodriguez v. City of New York,* --- F.Supp.2d ----, No. 05-CV-5117, 2008 U.S. Dist. LEXIS 9966, 2008 WL 420015 (E.D.N.Y. Feb.11, 2008); *Crews v. County of Nassau,* No. 06-CV-2610, 2009 U.S. Dist. LEXIS 38354,

2007 WL 4591325 (E.D.N.Y. Dec. 27, 2007); *Little v. City of New York,* 487 F.Supp.2d 426 (S.D.N.Y.2007); *Clark v. City of Oswego,* No. 5:03-CV-202 (NAM/DEP), 2006 U.S. Dist. LEXIS 95769, 2007 WL 925724 (N.D.N.Y. March 26, 2007); *Malone v. City of New York,* No. CV-05-2882, 2006 U.S. Dist. LEXIS 61866, 2006 WL 2524197 (E.D.N.Y. Aug. 30, 2006); *Caidor v. M & T Bank,* No. 5:05-CV-297 (FJS/GJD), 2006 U.S. Dist. LEXIS 22980, 2006 WL 839547 (N.D.N.Y. Mar.27, 2006).

**\*19** Even where the intracorporate conspiracy doctrine applies, there is an exception to the doctrine where "individuals pursue personal interests wholly separate and apart from the entity." *Orafan v. Goord,* 411 F.Supp.2d 153, 165 (N.D.N.Y.2006) (citation and quotation marks omitted), *vacated and remanded on other grounds, Orafan v. Rashid,* No. 06-2951, 249 Fed. Appx. 217 (2d Cir. Sept.28, 2007). I have previously found that a triable issue of fact exists regarding whether officers acted pursuant to their personal interests where a **prisoner** alleges that officers assaulted him in retaliation for participating in a federal lawsuit. *Medina v. Hunt,* No. 9:05-CV-1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept.25, 2008). Other courts have found that the personal interest exception applies, and thus allowed conspiracy claims to proceed, where it was alleged that officers conspired to cover up their use of excessive force. *Hill v. City of New York,* No.03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005). I find that the exception applies here because, as in *Medina,* Defendants allegedly conspired to retaliate against Plaintiff for his exercise of his right to access the courts. Therefore, I recommend that the Court deny Defendants' motion for summary judgment of the conspiracy claim against Defendants Wright, Snyder, and Duprat.

3. *Excessive Force*

Defendants move for summary judgment of Plaintiff's excessive force claims. They argue that there is no "objective evidence" that any excessive force was used. (Dkt. No. 92-10 at 33-35.) Specifically, Defendants argue that:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

[P]laintiff alleges that ... [D]efendants Snyder, Bogett, and Duprat punched him, slapped him, knocked him unconscious, and caused his ear to bleed. There is no objective evidence to support this conclusory allegation. An unusual incident report was generated because of [P]laintiff's behavior on January 3, 2003, but the report specifically states that no force was used on [P]laintiff. To the extent [P]laintiff is claiming the alleged force was used in the van, after the incidents described in the unusual incident report, there is no objective evidence to support this conclusion either. Plaintiff's medical records for January 3, 2003, upon arrival at Five Points C.F. indicate "arrived via van with cuffs & chains and spit net-complains of pain and itching," that [P]laintiff was escorted to 12 building, and that [P]laintiff was given Naprosyn and Benadryl. There is no indication of bleeding, or that [P]laintiff reported being assaulted in the January 3, 2003 entry, or the entries for January 4, 5, and 6, 2003. Plaintiff does report being "knocked-out and beaten everywhere" on January 7, 2003, while still at Five Points C.F., but without any record of reporting this type of conduct for the four (4) days prior to January 7, 2003, it is not credible that the incident to which [P]laintiff is referring occurred on January 3, 2003. Moreover, the January 7, 2003, entry does not indicate whether [P]laintiff was claiming to have been "knocked out and beaten everywhere" by staff or other **inmates**. Plaintiff has no objective evidence to support his claim of excessive force.

**\*20** (Id. at 34-35, citations omitted.)

Defendants refer to Plaintiff's allegations as "conclusory." "Conclusory" means to "express[ ] a factual inference without stating the underlying facts on which the inference is based." Black's Law Dictionary 284 (7th ed.1999). Plaintiff's allegations are not conclusory. Rather, Plaintiff describes the incident in detail. The ultimate determination of whether or not Defendants used excessive force, then, will rest largely on the finder of fact's judgment regarding Plaintiff's credibility.

Defendants, naturally, do not find Plaintiff credible. In general, of course, "[c]redibility determinations ... are jury functions, not those of a judge." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986). See also Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). Although Defendants do not explicitly say so, their argument that "Plaintiff has no *objective* evidence" is apparently an attempt to invoke a "narrow exception" to the general rule that credibility determinations are not to be made on summary judgment. Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir.2005); Blake v. Race, 487 F.Supp.2d 187, 202 (E.D.N.Y.2007). In *Jeffrys,* the Second Circuit held that in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," the court may appropriately conclude at the summary judgment stage that no reasonable jury would credit the plaintiff's testimony. Jeffreys, 426 F.3d at 554.

The narrow holding of *Jeffreys* is not applicable here for three reasons. First, in order for the *Jeffreys* exception to apply, the plaintiff must rely "almost exclusively on his own testimony." Jeffreys, 426 F.3d at 554. Here, Plaintiff is not relying "almost exclusively on his own testimony." Rather, because of Defendants' conduct during discovery, Plaintiff is relying on his own testimony plus adverse inferences drawn in his favor. As a consequence of Defendants' conduct during discovery, I ordered that Plaintiff could "ask the Court to draw factual inferences favorable to him based upon the missing photographs of January 3 and 10, 2003." (Dkt. No. 107 at 2.) Plaintiff requests that the Court draw the following inference in his favor: "That were the Defendants to provide the Court with the missing photographs taken of [Plaintiff] at Five Points C.F. on January 3, 2003, such photographs would reveal that [Plaintiff] had bruises and lacerations on his face, right ear, and chest." (Dkt. No. 109 at 46-47 n. 15.) The Court grants Plaintiff's request and draws the inference in his favor.

Second, in order for the *Jeffreys* exception to apply, Plaintiff's testimony must be "contradictory or incomplete." Jeffreys, 426 F.3d at 554. Here, Plaintiff's testimony is neither contradictory nor incomplete. In *Jeffreys,* the plaintiff, who alleged that police officers had beaten and defenestrated him, confessed on at least three

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

occasions that he had jumped out of a third-story window rather than having been thrown. *Id.* at 552. The plaintiff did not publicly state that he had been thrown out of a window by police officers until *nine months* after the incident. *Id.* The plaintiff could not identify any of the individuals whom he alleged participated in the attack or describe their ethnicities, physical features, facial hair, weight, or clothing on the night in question. *Id.* Here, in contrast, Plaintiff has never given a contradictory account of the events in the transportation van on January 3, 2003. Although Defendants stress that Plaintiff's medical records do not show that Plaintiff reported the incident upon arrival at Five Points, Plaintiff states in his verified complaint that he informed Defendant Hensel on the day of the incident that he had been beaten by Upstate guards. He further alleges that Defendant Hensel made no record of his complaint. (Dkt. No. 1 ¶ 23.) Plaintiff's claim regarding Nurse Hensel is corroborated by the log book entry that shows that he was taken to see Nurse Hensel on January 3, 2003, and the fact that Defendants did not provide the Court with a medical record of that visit with Plaintiff's other Five Points Medical Records. (Defs.' Resp. to P's 1st Req. for Produc. of Docs., Ex. E at 11; Bannister Aff.) As Defendants admit, Plaintiff's medical records show that within four days of the incident he reported that he had been "knocked-out and beaten everywhere." (Bannister Aff. ¶ 10.) In addition, unlike in *Jeffreys,* Plaintiff has specifically identified the officers whom he alleges beat him.

**\*21** Third, the *Jeffreys* exception is most applicable where the plaintiff's version of events is contradicted by defense testimony. In *Jeffreys,* for instance, one of the arresting officers declared that, contrary to the plaintiff's version of events, he was the only officer who entered the room where the plaintiff was allegedly beaten and that he saw the plaintiff jump out the open window. *Jeffreys, 426 F.3d at 551-52.* Here, Plaintiff's version of events has not been contradicted by an affidavit from any of the officers whom he alleges used excessive force because Defendants' motion for summary judgment is not supported by any affidavit from Defendants Snyder, Duprat, or Bogett. The only proof offered by Defendants that they did *not* use excessive force is a notation on a January 3, 2003, unusual incident report stating "Use of Force: No." (Dkt. No. 92-5, Ex. 16.)

Accordingly, I find that Plaintiff has presented sufficient "objective evidence" to raise a triable issue of fact that Defendants Snyder, Duprat, and Bogett subjected him to excessive force.[FN49] I therefore recommend that the Court deny Defendants' motion for summary judgment of this claim.

> FN49. Read broadly, the complaint also asserts an excessive force claim against Wright and retaliation claims against Defendants Snyder, Duprat, Bogett, and Wright. Defendants have not addressed these potential claims. I find that the claims are sufficient to withstand *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B).

4. *False Misbehavior Reports*

Plaintiff alleges that Defendants Nephew, Desotelle, Snyder, and Wright filed false misbehavior reports against him "in retaliation for his having threatened to sue them." (Dkt. No. 1 ¶¶ 17-18.) Defendants argue that (a) Plaintiff forfeited his claim by refusing to attend the disciplinary hearing on the charges; and (b) they would have issued the misbehavior reports regardless of any alleged retaliatory motive. (Dkt. No. 92-10 at 25-29.)
a. *Forfeiture*

Defendants argue that Plaintiff "cannot establish a prima facie case of retaliation, because although he claims the misbehavior report[s were] 'falsified,' he has forfeited his opportunity to present any evidence calling into question the truth of the misbehavior report[s] by refusing to attend the disciplinary hearing." (Dkt. No. 92-10 at 26.) Defendants cite *Brewer v. Kamas,* 533 F.Supp.2d 318 (W.D.N.Y.2008). In order to analyze *Brewer,* a review of Second Circuit precedent governing **prisoners'** allegations regarding false misbehavior reports is required.

A **prisoner's** claim that a correctional officer filed a false misbehavior report may implicate two separate constitutional provisions: (a) the Fourteenth Amendment right to procedural due process; or (b) the right not to be retaliated against for exercising First Amendment rights such as the right of access to the courts or the right to petition the government for redress of grievances.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

In the procedural due process context, the Second Circuit has held that while a **prisoner** "has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," he *does* have "the right not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). Where a **prisoner** is falsely accused of violating disciplinary rules, and a hearing is held on the allegedly false charges that comports with the procedural due process standards set forth by the Supreme Court in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and any resulting guilty finding is based on "some evidence," the correctional officer's filing of unfounded charges does not give rise to procedural due process liability. *Freeman,* 808 F.2d at 953-54.

**\*22** Two years after its *Freeman* opinion, the Second Circuit addressed the second variety of false misbehavior claim-a claim that an officer filed a false misbehavior report in retaliation for the exercise of constitutionally protected rights-in *Franco v. Kelly,* 854 F.2d 584 (2d Cir.1988). In *Franco,* a **prisoner** alleged that correction officers filed a false misbehavior report against him in retaliation for his cooperation with an investigation by the state Inspector General into incidents of **inmate** abuse at Attica Correctional Facility. *Franco,* 854 F.2d at 586. The defendants moved for summary judgment, arguing that Plaintiff could not state a claim because he had received a disciplinary hearing that complied with *Wolff v. McDonnell* and resulted in a guilty finding based on "some evidence." *Id.* The trial court granted the defendants' motion, relying on *Freeman. Id.* The trial court noted, however, "that under [t]his reading of *Freeman,* the mere provision of procedural due process could eliminate all liability in any case in which prison officials had intentionally filed false and unfounded charges." *Id.* The Second Circuit settled "the substantial and troublesome questions raised in th[e] case" by holding that "[a]lthough our decision in *Freeman* accords prison officials wide latitude in disciplining **inmates** as long as minimum constitutional procedures are employed, that latitude does not encompass conduct that infringes on an **inmate's** substantive constitutional rights" such as the **prisoner's** First Amendment rights of access to the courts and to petition for redress of grievances. *Id.* at 590

(citations omitted). Accordingly, the Second Circuit reversed the trial court's judgment and remanded the matter for further proceedings. *Id.* at 590-91.

In *Jones v. Coughlin,* 45 F.3d 677 (2d Cir.1995), the Second Circuit again clarified that the holding in *Freeman* is doctrinally different and distinct from the type of retaliation claim discussed in *Franco.* In *Jones,* a **prisoner** alleged that correction officers filed a false misbehavior report against him in retaliation for filing an administrative complaint against one of their colleagues. *Jones,* 45 F.3d at 678. At his disciplinary hearing, the **prisoner** was denied the opportunity to call witnesses. *Id.* He was found guilty and sentenced to serve 120 days in the SHU. *Id.* After he had served his SHU sentence, DOCS official Donald Selsky reversed the decision and expunged it from the **prisoner's** record. *Id.* at 679. The **prisoner** filed suit. *Id.* The trial court granted the prison officials' motion for summary judgment, finding that the **prisoner's** allegations against the corrections officers failed to state a claim under *Freeman* and that the **prisoner's** allegations against the hearing officer failed because any procedural due process defects in the hearing had been cured by Selsky's reversal of the decision. *Id.*

**\*23** On appeal, the Second Circuit stated that *Freeman* did not provide the "proper framework" for a decision in the case for both "factual and doctrinal reasons." *Jones,* 45 F.3d at 679. Factually, the case was distinguishable "if, as alleged, Jones was unfairly denied the right to call key witnesses in defense of the charges against him." *Id.* Doctrinally, the Second Circuit stated that "we have held that a **prisoner** has a substantive due process right not to be subjected to false misconduct charges as retaliation for his exercise of a constitutional right such as petitioning the government for redress of his grievances, and that this right is distinct from the procedural due process claim at issue in *Freeman.*" *Id.* at 679-80. The Second Circuit vacated the trial court's judgment and remanded for further proceedings. *Id.* at 680.

This brings us to *Brewer.* In *Brewer,* a **prisoner** alleged that correction officers filed false misbehavior reports against him in retaliation for filing grievances. *Brewer,* 533 F.Supp.2d at 323. The **prisoner** refused to

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

attend his disciplinary hearing and was found guilty. *Id.* He sued the officers in federal court. *Id.* at 324. The officers moved for summary judgment. *Id.* The court granted the motion, finding that the **prisoner** could not establish that the disciplinary charges were false because (1) he refused to attend his disciplinary hearing; (2) he offered no "explanation as to why he chose not to attend the hearing so as to rebut the charges, or why it was otherwise constitutionally deficient"; and (3) he did not "offer ..., in opposition to [d]efendants' motion, any evidence calling into question the truth of the ... charges." *Id.* at 330. (citation omitted). Based on these three factors, the court stated that the plaintiff "was provided with the requisite opportunity to rebut the alleged false disciplinary charges, as required by due process, and Plaintiff, by failing to do so, has waived his right to further challenge the validity" of the misbehavior report. *Id.* (citation omitted).

*Brewer* is not applicable here for three reasons. First, the case is factually distinguishable. In *Brewer,* the **prisoner** did not offer any explanation for his refusal to attend the hearing, did not explain why the hearing was constitutionally deficient, and did not offer any evidence calling into question the truth of the charges. *Brewer,* 533 F.Supp.2d at 330. Here, Plaintiff has explained that he did not attend the hearing because Defendant LaClair refused to assist him prepare a defense, has argued that the hearing was constitutionally deficient because Defendant Bullis did not call Defendant LaClair and an **inmate** as witnesses, and has offered his own testimony under penalty of perjury to rebut Defendants' version of the events leading to the misbehavior reports.

Second, Defendants overstate the holding of *Brewer.* The court did not hold that the **prisoner** had forfeited his opportunity to present evidence calling into question the truth of the misbehavior report simply by refusing to attend the disciplinary hearing. Rather, the court held that the **prisoner** had waived his right for three reasons, with the refusal to attend being only one of them. *Brewer,* 533 F.Supp.2d at 330.

**\*24** Third, because the **prisoner** in *Brewer* asserted a retaliation claim rather than a procedural due process claim, the precedent relied upon by the *Brewer* court is

puzzling. The portion of the decision cited at length by Defendants relies on (1) *Freeman,* which is a procedural due process case; (2) language from *Jones* that discusses the ways in which *Jones* was *factually* distinguishable from *Freeman,* rather than the language in *Jones* clarifying that a retaliation claim is *doctrinally* different from the type of procedural due process claim at issue in *Freeman;* and (3) quotes from *Franco* that summarize the procedural due process holding in *Freeman,* rather than quotes from *Franco* discussing the proper analysis of a retaliation claim. Thus, although the **prisoner** in *Brewer* raised a retaliation claim, the court analyzed it as a procedural due process claim.

Because I find that *Brewer* is factually distinguishable from Plaintiff's case, that the holding in *Brewer* is not as broad as Defendants suggest, and that *Brewer's* legal analysis rests on a line of cases to which the Second Circuit has referred as the improper framework for analyzing a retaliation claim, I recommend that the Court reject Defendants' argument that Plaintiff waived his claim regarding the allegedly false and retaliatory misbehavior reports by failing to appear at his disciplinary hearing.[FN50]

> [FN50]. I note that *Howard v. Wilkerson,* 768 F.Supp. 1002 (S.D.N.Y.1991) holds that "[a]n **inmate's** refusal to attend a disciplinary hearing waives his *due process objections* ... only when it occurs through no fault of prison officials." *Howard,* 768 F.Supp. at 1006 (citation and quotation marks omitted) (emphasis added). *Howard* is cited in *Nance v. Villafranca,* No. 91-CV-717, 1994 U.S. Dist. LEXIS 11114 (N.D.N.Y. June 20, 1994), which Defendants cite for a different proposition. (Dkt. No. 92-10 at 39.)

b. *Regardless of retaliatory motive*

Defendants argue that there is "ample evidence" that Defendants "would have issued the misbehavior report[s] regardless of whether [P]laintiff threatened to sue them." (Dkt. No. 92-10 at 28, 30.)

"An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right ... states a claim under §

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

1983. A plaintiff alleging retaliatory punishment bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff. The burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation. The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report." *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) (citations and quotation marks omitted).

Here, the misbehavior reports by Defendants Nephew, Desotelle, and Snyder charged Plaintiff with creating a disturbance, committing an unhygenic act, refusing a direct order, and making threats. (Dkt. No. 92-5, Ex. 11.) As the Second Circuit explained in *Hynes v. Squillace,* 143 F.3d 653 (2d Cir.1998), the "most serious charge" in a misbehavior report that includes charges of creating a disturbance, making threats, and refusing a direct order is the direct order charge. *Hynes,* 143 F.3d at 655, 657. Here, Plaintiff admits that he did not put on his coat when Defendant Nephew ordered him to do so. (Dkt. No. 1 ¶ 15.) Thus, Defendants have met their burden of showing that Plaintiff would have received the same punishment even absent the allegedly retaliatory motive by demonstrating that there is no dispute that Plaintiff committed the most serious of the prohibited conduct charged in the misbehavior report. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the retaliation claims against Defendants Nephew, Desotelle, and Snyder arising from the January 2, 2003, misbehavior reports.

**\*25** The misbehavior report by Defendant Wright charged Plaintiff with committing an unhygenic act, harassment, and threats.[FN51] (Dkt. No. 92-5, Ex. 11.) The most serious of these charges was the threat charge.

FN51. Although Defendants assert that Wright charged Plaintiff with disobeying a direct order, the evidence before the court does not support that assertion. (Dkt. No. 92-5, Exs.11-12.)

Plaintiff admits that when Defendant Wright asked him to explain what happened in the frisk room, Plaintiff "responded that Wright would not believe his account of the incident, that Wright had unjustifiably interfered with [his] court trip ... and that [Plaintiff] would sue Wright and Snyder for their unlawful acts and actions." (Dkt. No. 1 ¶ 16.) This is certainly an admission to the harassment charge. DOCS Rule 107.11 provides as follows: "An **inmate** shall not harass an employee or any other person verbally or in writing. Prohibited conduct includes, but is not limited to, using insolent, abusive, or obscene language or gestures." N.Y. Comp.Codes R. & Regs., tit. 7, § 270.2(B)(8)(ii). However, it is not an admission to the threat charge, which requires that "[ **i]nmate**[s] shall not ... make any threat, spoken, in writing, or by gesture." N.Y. Comp.Codes R. & Regs., tit. 7, § 270.2(B) (3)(I). Therefore, I recommend that the Court deny Defendants' motion for summary judgment regarding the retaliation claim against Defendant Wright.

### 5. *Failure to Intervene*

Plaintiff alleges that Defendant Bezio violated his constitutional rights by failing to intervene to protect Plaintiff from Defendants Duprat, Bogett, and Snyder. (Dkt. No. 1 ¶¶ 19-20.) Defendants move for summary judgment, arguing that there was no underlying constitutional violation with which to intervene. (Dkt. No. 92-10 at 36-37.)

Law enforcement officials can be held liable under § 1983 for not intervening in a situation where another officer is violating an **inmate's** constitutional rights. *Jean-Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citation omitted). A state actor may be held liable for failing to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.* (citation omitted); *see also Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 129 (2d Cir.1997) ("Failure to intercede to prevent an unlawful arrest can be grounds for § 1983 liability."). Whether an officer can be held liable on a failure to intervene theory is generally a question of fact for the jury to decide. *See Anderson v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Branen, 17 F.3d 552, 557 (2d Cir.1994) ("Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

Here, a jury could determine that Defendant Bezio failed to intervene to protect Plaintiff. Plaintiff's verified complaint states that on the day before the incident he asked Defendant Bezio to protect him while he was being transported to court. (Dkt. No. 1 ¶ 19.) Plaintiff alleges that Defendant Duprat made a threatening comment as he escorted Plaintiff to the transportation van and that Plaintiff informed Defendant Bezio of the threat before they reached the van. (Dkt. No. 1 ¶ 20.) Defendant Bezio merely shrugged his shoulders. Id. None of the defendants has filed an affidavit contradicting Plaintiff's version of events. As discussed above, there is a triable issue of fact that a constitutional violation occurred with which Defendant Bezio could have intervened. Therefore, I recommend that the Court deny Defendants' motion for summary judgment regarding the failure to intervene claim against Defendant Bezio.[FN52]

> FN52. Read broadly, the complaint asserts a retaliation claim against Defendant Bezio based on these same events and a failure to intervene claim against Defendant Duprat because he was present when Defendant Snyder initially beat Plaintiff. (Dkt. No. 1 ¶ 21.) Defendants have not moved for summary judgment of these claims. I find that these claims are sufficient to withstand *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B).

6. *Grievances*

*26 Plaintiff alleges that Defendants Brousseau, Donelli, Girdich, and Eagen violated his constitutional rights by refusing to allow him to file a grievance regarding the events of January 2 and 3, 2003. (Dkt. No. 1 ¶¶ 30-34.) Defendants move for summary judgment, arguing that Plaintiff has not stated a constitutional claim. (Dkt. No. 92-10 at 38.) As discussed above in Section III(B)(3), Defendants are correct. Therefore, I recommend

that the Court grant Defendants' motion and dismiss the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding the handling of Plaintiff's grievances.

**D. Disciplinary Hearing/Sentence**

Plaintiff raises several claims regarding the conduct of his disciplinary hearing, his disciplinary sentence, and his appeal of the sentence. Specifically, he claims that (1) Defendant LaClair violated his right to due process by falsifying a misbehavior report against Plaintiff to avoid serving as Plaintiff's pre-hearing assistant (Dkt. No. 1 ¶ 35); (2) Defendant Bullis violated his due process rights by failing to call an **inmate** and Defendant LaClair as witnesses (Dkt. No. 1 ¶¶ 36-37); (3) Defendant Bullis violated his Eighth Amendment rights by sentencing him to a 21-day loaf diet (Dkt. No. 1 ¶ 36-37) and Defendants Weissman and Girdich violated his Eighth Amendment rights by approving the loaf diet (Dkt. No. 1 ¶ 38); and (4) Defendant Selsky violated Plaintiff's right to due process by affirming Defendant Bullis' disposition (Dkt. No. 1 ¶ 40).

1. *LaClair*

Plaintiff alleges that Defendant LaClair falsified a misbehavior report against him in order to avoid serving as Plaintiff's pre-hearing assistant "and for the purpose of depriving Benitez of due process." [FN53] (Dkt. No. 1 ¶ 35.)

> FN53. The only version of the events between Defendant LaClair and Plaintiff in evidence before the Court is Defendant LaClair's misbehavior report. According to that report, when Defendant LaClair went to Plaintiff's cell to assist him, Plaintiff "stated ... that [LaClair] was to get [him] what he wanted." Defendant LaClair "informed him that what he needed had to be pertained (sic) to the misbehavior report. [Plaintiff] then stated "Get what I want or I'll fuck you up." Defendant LaClair "informed him the interview was over and left the area." (Dkt. No. 92-5, Ex. 15 at 2-3.) Although Plaintiff states in his verified complaint that Defendant LaClair "intentionally and maliciously falsified" the report, he does not offer any other version of what happened. (Dkt. No. 1 ¶ 35.) He alleges that he asked Defendant Bullis to "interview **inmate** Rolan and LaClair regarding the acts and actions

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

of LaClair that caused him not to provide Benitez pre-hearing assistance," but he does not provide any information about what those interviews might have revealed. (Dkt. No. 1 ¶ 36.) Due to Defendants' failure to provide Plaintiff with pages of the SHU log book for January 14, 2003, Plaintiff asks the Court to draw an adverse inference that "were Defendants to provide the Court with the missing pages of the ... log book ... such pages would not support any of the allegations of misconduct set out in the misbehavior report that LaClair filed against Benitez on that date." (Dkt. No. 109 at 41 n. 14.) Plaintiff does not explain, however, why such an inference is logical.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000).

Punishment implicates a protected liberty interest where (1) the state has granted its **inmates**, by regulation or statute, an interest in remaining free from that particular punishment; and (2) the punishment imposes "an atypical and significant hardship on the **inmate** in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Here, no liberty interest is implicated. As a result of being found guilty of the disciplinary charges, Plaintiff was sentenced to a loaf diet. The Second Circuit has held that the imposition of a loaf diet does not impose an atypical and significant hardship on **inmates**, even where the **inmate** alleges that the diet caused severe stomach pain and weight loss." *McEachin v. McGuinnis,* 357 F.3d 197 (2d Cir.2004). Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant LaClair.[FN54]

> FN54. Although Defendants argue, in regard to Plaintiff's other claims regarding his disciplinary hearing, that due process was not required

because no liberty interest was implicated by the imposition of the loaf diet, they did not assert that argument regarding the claim against Defendant LaClair. Rather, Defendants argue that Plaintiff waived Defendant LaClair's assistance by threatening him. (Dkt. No. 92-10 at 38-39.) Due process requires that prison officials provide pre-hearing assistance to a **prisoner** facing disciplinary charges who is confined to the SHU. *Eng v. Coughlin,* 858 F.2d 889 (2d Cir.1988). "An assistant's role is to act as merely a surrogate for the **inmate**, not a legal advisor or advocate. [A]n assistant's role is to perform tasks like interviewing witnesses that the **inmate** would perform himself if her were in the general population." *Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) (citations and punctuation omitted). The assistance "must be provided in good faith and in the best interests of the **inmate**." *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998) (citation omitted). An "assigned assistant who does nothing to assist a ... **prisoner** ... has failed to accord the **prisoner** his limited constitutional due process right of assistance." *Eng,* 858 F.2d at 898. Defendants cite several cases holding that an **inmate** may waive his right to assistance by remaining silent when assistance is offered or by refusing to sign a form requesting assistance. (Dkt. No. 92-10 at 39, citing *inter alia, Jackson,* 30 F.Supp.2d at 619.) However, Defendants have not cited any cases holding that an **inmate** waives his right to assistance by threatening his assistant. In light of my finding that Plaintiff was not deprived of a liberty interest, it is not necessary to reach this issue.

### 2. *Failure to Call Witnesses*

**\*27** Plaintiff alleges that Defendant Bullis violated his right to due process by failing to call the witnesses that Plaintiff requested. (Dkt. No. 1 ¶ 37.) Defendants move for summary judgment, arguing that Plaintiff cannot state a due process claim because he was not deprived of a liberty interest. (Dkt. No. 92-10 at 39-40.) As discussed above, Defendants are correct. *McEachin,* 357 F.2d at

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

200. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss this claim.

3. *Imposition of Loaf Diet*

Plaintiff alleges that Defendant Bullis violated his Eighth Amendment rights by imposing the loaf diet on him and that Defendants Weissman and Girdich violated his Eighth Amendment rights by approving the punishment. (Dkt. No. 1 ¶¶ 37-38.) Defendants move for summary judgment of the claim, arguing that (a) Plaintiff failed to exhaust his administrative remedies; and (b) Defendants were not deliberately indifferent. (Dkt. No. 92-10 at 14-20.)

a. *Exhaustion of Administrative Remedies*

Defendants argue that Plaintiff did not exhaust his administrative remedies regarding his Eighth Amendment claims against Defendant Bullis because he did not appeal the grievance he filed regarding Defendant Bullis' imposition of the loaf diet to the CORC. (Dkt. No. 92-10 at 14.) Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding his Eighth Amendment claim against Defendants Weissman and Girdich because he did not file a grievance at all. (*Id.* at 15.)

DOCS has a separate and distinct administrative process for **inmates** to appeal the result of disciplinary hearings, which is not referred to as a "grievance" process. N.Y. Comp.Codes R. & Regs. tit.7, § 701.3(e)(1)-(2). For Tier III superintendent hearings, such as Plaintiff's, the **inmate** must file an appeal with Donald Selsky, DOCS Director of Special Housing/ **Inmate** Disciplinary Program, pursuant to New York Compilation of Codes, Rules and Regulations, title 7, section 254.8. The appeal must be filed within 30 days of the **inmate's** receipt of the hearing officer's written disposition. N.Y. Comp.Codes R. & Regs. tit.7, § 254.8. Plaintiff raised the issue of the loaf diet in his appeal of the disciplinary sentence. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy, Ex. D.) Defendant Selsky denied the appeal. *Id.* at Ex. E. Therefore, Plaintiff exhausted his administrative remedies as to his claim against Defendant Bullis.

Plaintiff declares that on January 18, 2003, he submitted a grievance to Defendant Brousseau complaining about Defendant Bullis' imposition of, and

Defendants Weissman and Girdich's approval of, the loaf diet. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy, ¶ 26.) He declares that Defendant Brousseau "deliberately refused to file and process the grievance ... in order to prevent me from suing the officials named in the grievance." *Id.* ¶ 27. Therefore, as discussed above, there is a question of fact that Defendants are estopped from asserting the exhaustion defense.

b. *Deliberate Indifference*

**\*28** Defendants argue that Plaintiff has not raised a triable issue of fact that Defendants Bullis, Weissman, and Girdich acted with deliberate indifference when they ordered and approved that the loaf diet be imposed on Plaintiff. (Dkt. No. 92-10 at 15-20.) Defendants are correct.

Where a **prisoner** claims that punishment imposed following a disciplinary hearing violates his Eighth Amendment rights, the proper analysis of the subjective prong of the claim requires the court to "consider whether the [o]rder was reasonably calculated to restore prison discipline and security and, in that ... context, whether the officials were deliberately indifferent to [the **prisoner's**] health and safety." *Trammell v. Keane*, 338 F.3d 155, 163 (2d Cir.2003).

Here, the order imposing the loaf diet on Plaintiff was reasonably calculated to restore prison discipline and security. DOCS regulation allow the imposition of the loaf diet as punishment where, *inter alia*, the **inmate** is found guilty of committing unhygenic acts in the SHU or the **inmate** is a long-term SHU **inmate** who is disruptive and who has lost all other available privileges. (Dkt. No. 92-8, Bezio Aff., ¶ 5.) Here, Plaintiff was found guilty of committing unhygenic acts in the SHU. Moreover, Plaintiff is a long-term SHU **inmate** (he will remain in the SHU until June 3, 2021, and in keeplock until July 1, 2025) who has lost package, commissary, and phone privileges and has lost 11 years worth of good time credits. (Bezio Aff., ¶ 6.) Therefore, the imposition of the loaf diet was reasonably calculated to restore prison discipline.

There is no evidence that Defendants Bullis, Weissman, and Girdich acted with deliberate indifference

Case 9:09-cv-00515-GLS-DEP   Document 48   Filed 02/28/11   Page 287 of 379

Page 30

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

when they imposed and approved of the loaf diet. To establish deliberate indifference, an **inmate** must prove that (1) the defendant was aware of facts from which the inference could be drawn that the **inmate** had a serious medical need; and (2) the defendant actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702-703. Here, although Plaintiff told Defendant Bullis that the loaf diet would cause him severe abdominal pains and constipation due to his hepatitis (Dkt. No. 1 ¶ 36), his medical record did not support his assertion. Dr. Weissman declares that "there is nothing in his medical record that indicates that [Plaintiff] is medically unable to receive the restricted diet penalty ... [T]he fact that [P]laintiff is Hepatitis C positive does not mean he cannot receive the restricted diet because Hepatitis C is not a contraindication for the restricted diet." (Weissman Aff. ¶¶ 14-15.) Thus, there is no evidence in the record indicating that Defendants Bullis, Weissman, and Girdich were aware of facts from which the inference could be drawn that the loaf diet would harm Plaintiff or that they drew that inference. Moreover, Plaintiff admits that he refused to eat the loaf diet. (Dkt. No. 1 ¶ 39.) Accordingly, any weight loss and pain that he experienced could not have resulted from the loaf diet itself. Accordingly, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's Eighth Amendment claims against Defendants Bullis, Weissman, and Girdich.

**4.** *Selsky*

**\*29** Plaintiff alleges that Defendant Selsky affirmed Defendant Bullis' "disciplinary determination, even though he knew or should have known that Bullis violated [Plaintiff]'s clearly established due process rights." (Dkt. No. 1 ¶ 40.) Defendants' motion for summary judgment does not directly address this claim. However, I find that it is subject to *sua sponte* dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B) because, as discussed above, Defendant Bullis did not violate Plaintiff's due process rights. Therefore, I recommend that the Court dismiss the claim against Defendant Selsky.

**E. Five Points Health Care**

Plaintiff alleges that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment rights by failing to provide adequate medical care at Five

Points Correctional Facility following the alleged beating by Defendants Snyder, Duprat, and Bogett. (Dkt. No. 1 ¶¶ 23-26.) Defendants move for summary judgment, arguing that (1) Plaintiff failed to serve Defendant Kuhlman; and (2) Plaintiff cannot raise a triable issue of fact that these Defendants violated his Eighth Amendment rights because Plaintiff did not suffer from a serious medical need and Defendants were not deliberately indifferent. (Dkt. No. 92-10 at 6, 20.)

**1.** *Failure to Serve Defendant Kuhlman*

Defendants argue that the claim against Defendant Kuhlman must be dismissed because she was not served within 120 days of the filing of the amended complaint on October 6, 2004. (Dkt. No. 92-10 at 6.) Under the Federal Rules of Civil Procedure, a defendant must be served with the summons and complaint within 120 days FN55 after the filing of the complaint. Fed.R.Civ.P. 4(m). The court "must" extend the time for service for an appropriate period if the plaintiff shows good cause for the failure to serve. *Id.*

> FN55. This 120-day service period is shortened, or "expedited," by the Court's Local Rules of Practice (and the Court's General Order 25), which provide that all defendants must be served with the summons and complaint within sixty (60) days of the filing of the complaint. N.D.N.Y. L.R. 4.1(b) (emphasis added).

Here, on June 24, 2005, the summons was returned unexecuted as to Defendant "Coleman." (Dkt. No. 21.) On May 22, 2007, the Clerk's office sent Plaintiff a letter informing him that the Marshals Service had not been able to serve the defendant because there was no one by that name at Five Points Correctional Facility. The Clerk's office provided Plaintiff with another USM-285 form and asked for more information about the defendant. (Dkt. No. 54.) Plaintiff states that he was not able to ascertain Defendant Kuhlman's correct identity until after I issued orders on May 2, 2007, and October 3, 2007, compelling defendants to respond to discovery. (Dkt. No. 109 at 7-8.) The docket shows that on January 31, 2008, Plaintiff attempted to file an amended complaint "correctly identif[ying] defendant Kulhman by substituting the name 'Coleman' ... for 'Kuhlman.' " (Dkt. No. 74.) On February 4, 2008, I ordered Plaintiff's motion stricken from the

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

record because the deadline for filing motions to amend had expired on January 30, 2006. (Dkt. No. 75.) I find, therefore, that Plaintiff has demonstrated good cause for his failure to serve Nurse Kuhlman.

2. *Merits*

**\*30** Plaintiff claims that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment rights by refusing to treat him for head pain, pain in his liver, pain in his left wrist, and severe body itch. Plaintiff also alleges that he informed Defendant Hensel that "he had ... lost blood from within his right ear." (Dkt. No. 1 ¶¶ 23-26.) Defendants argue that Plaintiff has not raised a triable issue of fact as to either the objective or subjective prong of his Eighth Amendment medical care claim. (Dkt. No. 92-10 at 20.)

As discussed above, the objective prong of an Eighth Amendment medical claim requires the court to determine whether the **prisoner** was deprived of adequate medical care and, if so, whether the inadequacy was sufficiently serious. *Salahuddin, 467 F.3d at 279-80.* Where the **prisoner** alleges that he was completely deprived of treatment, the court must examine whether the **inmate's** medical condition is sufficiently serious. *Id.* at 280. Here, because Plaintiff alleges that he was totally deprived of medical care, I must consider whether the bleeding in his inner right ear, head pain, pain in his left wrist, and severe body itch are "serious medical conditions," in other words, whether they are conditions "of urgency that may produce death, degeneration, or extreme pain." *Id.; Nance v. Kelly, 912 F.2d 605, 607 (2d Cir.1990)* (Pratt, J. dissenting).

Defendants argue, without analysis, that none of Plaintiff's "conditions constitute a condition of urgency, one that may produce death, degeneration, or extreme pain." (Dkt. No. 92-10 at 20.) As discussed above in regard to Plaintiff's claims against Defendant Weissman and Richardson, I agree that Plaintiff's severe body itch is not a serious medical condition. However, Plaintiff's bleeding inner ear, head pain, and liver pain, as alleged, appear urgent and capable of producing extreme pain. *See Bjorkstrand v. DuBose, No. CIV. S-08-1531, 2008 WL 5386637, at \* 3 (E.D.Cal. Dec.24, 2008)* (finding that dried blood in ear was not a serious medical condition

because "there was no emergency problem with the left ear, such as active bleeding."). I therefore find that Defendants have not met their burden of showing that they are entitled to judgment as a matter of law on the issue of whether Plaintiff suffered from a serious medical condition.

Defendants argue that Plaintiff cannot raise a triable issue of material fact as to deliberate indifference because the issue of "[w]hether or not [P]laintiff needed treatment or to be seen by a physician amounts to nothing more than a disagreement with the course of treatment-not deliberate indifference." (Dkt. No. 92-10 at 20.) As Plaintiff notes (Dkt. No. 109 at 37), none of the named Five Points Defendants has filed an affidavit supporting Defendants' motion for summary judgment. They have therefore not established that their treatment of Plaintiff was based on their medical judgment. The evidence, when viewed in the light most favorable to Plaintiff, indicates that he arrived at Five Points on January 3 complaining of severe pain inflicted through excessive force and that he received absolutely no treatment for his injuries until Nurse Gardner examined him on January 7. Therefore, I find that Plaintiff has raised a triable issue of fact that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment right to adequate medical treatment.

**\*31 ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 92) be **GRANTED IN PART AND DENIED IN PART;** and it is further

**RECOMMENDED** that the following claims be dismissed pursuant to Defendants' motion for summary judgment: (1) the Eighth Amendment claims against Defendants Weissman and Richards arising from their treatment of Plaintiff's severe body itch, left wrist, and right ankle; (2) the claims against Defendant Ham; (3) the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham; (4) the retaliation claim against Defendants Nephew, Desotelle, and Snyder based on their filing of misbehavior reports against Plaintiff; (5) the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding their handling of Plaintiff's grievances regarding the events of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

January 2 and 3, 2003; (6) the claim against Defendant LaClair; (7) the claims against Defendant Bullis; and (8) the Eighth Amendment claim against Defendants Weissman and Girdich for approving the imposition of the loaf diet; and it is further

RECOMMENDED that the following claims be dismissed *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B): (1) Plaintiff's retaliation claim against Defendants Weissman and Richards; and (2) the claim against Defendant Selsky; and it is further

RECOMMENDED that the following claims survive summary judgment and *sua sponte* review and proceed to trial: (1) the conspiracy claim against Defendants Wright, Snyder, and Duprat; (2) the excessive force claim against Defendants Snyder, Duprat, Bogett, and Wright; (3) the retaliation claim against Defendants Snyder, Duprat, Bogett, and Wright arising from the use of excessive force; (4) the retaliation claim against Wright arising from his filing of a misbehavior report against Plaintiff; (5) the failure to intervene claims against Defendants Bezio and Duprat; (6) the retaliation claim against Defendant Bezio; and (7) the Eighth Amendment claims against Defendants Hensel, Goodwin, Kuhlman, and Costello; and it is further

ORDERED that the Clerk provide Plaintiff with Form USM 285 for service on Defendant Kuhlman; and it is further

ORDERED that the Clerk serve copies of *Miller v. Bailey,* No. 05-CV-5493, 2008 U.S. Dist. LEXIS 31863, 2008 WL 1787692 (E.D.N.Y. Apr. 17, 2008); *Odom v. Poirier,* No. 99 Civ. 4933, 2004 U.S. Dist. LEXIS 25059, 2004 WL 2884409 (S.D.N.Y. Dec.10, 2004); *Warren v. Purcell,* No. 03 Civ. 8736, 2004 U.S. Dist. LEXIS 17792, 2004 WL 1970642 (S.D.N.Y. Sept.3, 2004); *Bond v. Board of Educ. of City of New York,* 97-cv-1337, 1999 U.S. Dist. LEXIS 3164, 1999 WL 151702 (W.D.N.Y. Mar.17, 1999); *Medina v. Hunt,* No. 9:05-CV-1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept.25, 2008); *Hill v. City of New York,* No.03 Civ 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719 (E.D.N.Y. Dec. 30, 2005); and *Mendez v. Artuz,* No. 01 CIV. 4157, 2002 U.S. Dist. LEXIS 3263, 2002 WL 313796 (S.D.N.Y. Feb.27, 2002) on Plaintiff in

accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

*32 Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.* Roldan v. Racette, 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2009.

Benitez v. Ham
Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 2884409 (S.D.N.Y.)

(Cite as: 2004 WL 2884409 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Jonathan ODOM, Plaintiff,
v.
Curtis POIRIER et al., Defendants.
No. 99 Civ. 4933(GBD).

Dec. 10, 2004.
*OPINION*

DANIELS, J.

*\*1 Pro se* plaintiff brings suit alleging violations of his constitutional rights under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments. All defendants move to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons stated below, defendants' motion to dismiss is granted.

*BACKGROUND*

Plaintiff Jonathan Odom, currently an inmate at Attica Correctional Facility, brings this *pro se* action alleging violations of various constitutional rights against 80 defendants. Plaintiff commenced his initial action on July 9, 1999, amended that complaint on September 9, 1999 and submitted the current Second Amended Complaint ("Complaint") on May 22, 2000. The gravamen of plaintiff's complaint is that the defendants violated his constitutional rights in retaliation for having filed a federal civil rights action and grievances against the prison system, its officers, and its administrators. Plaintiff alleges that the defendants transferred him to numerous correctional facilities,[FN1] assaulted him, initiated unwarranted disciplinary proceedings against him; prevented him from presenting a defense during these proceedings; refused to review his appeals of the adverse determinations from these disciplinary hearings; obstructed his access to the court system and to his legal materials; and denied him medical care "in retaliation for ... having exercised his constitutional right to file federal

and state lawsuits and grievances against named defendants and/or unconstitutional prison conditions and treatment." *Id.* at 30, ¶ 92. Plaintiff further claims that an unofficial policy exists within the DOCS to improperly investigate harassment complaints. *Id.* at 15-16, ¶¶ 40-49. This policy was designed to "discredit all prisoners' claims of staff misconduct" and to "prepare all DOCS' reports in a manner which favorably establishes the credibility of the facility and department." *Id.* at 7, ¶ 19. Lastly, plaintiff challenges the DOCS grievance procedure, alleging that numerous defendants "were not providing sufficient office time for inmate grievance representatives/clerks to meaningfully and effectively perform their official responsibilities and duties." *Id.* at 16, ¶ 50. Plaintiff alleges that this practice deprived "inmates of a fair opportunity to have their grievances timely and impartially investigated, processed and heard at all stages." *Id.* at 32, ¶ 96. These actions allegedly infringed upon plaintiff's First, Sixth, Eighth, and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983 (" § 1983").[FN2]

> FN1. Plaintiff alleges that he has been an inmate at the following correctional facilities: Sing Sing; Clinton; Great Meadows; Attica; Five Points; and Southport. It is undisputed that plaintiff was transferred to various correctional institutions between July 9, 1999 and May 22, 2000.

> FN2. Although plaintiff's complaint also states a Fifth Amendment claim, plaintiff has not identified which of his many causes of action state a claim under the Fifth Amendment. Neither has plaintiff identified what conduct was committed by any of the defendants in violation of the Fifth Amendment. Plaintiff's complaint, outside of the first paragraph entitled "Jurisdictional Statement" does not again mention the Fifth Amendment and a review of plaintiff's complaint shows no cognizable Fifth Amendment claim. Accordingly, plaintiff's Fifth Amendment claim is dismissed.

In their motion to dismiss, defendants first argue that plaintiff's claims are barred by the statute of limitations;

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2884409 (S.D.N.Y.)

(Cite as: 2004 WL 2884409 (S.D.N.Y.))

[FN3] that plaintiff has failed to allege that he exhausted his administrative remedies; [FN4] and that plaintiff's claim for money damages is barred under the Prison Litigation Reform Act ("PLRA") for failure to allege physical injury.[FN5] Defendants also argue that plaintiff's complaint substantively fails to state a cognizable retaliation claim, a violation of due process claim, an excessive use of force claim, or a medical indifference claim. Defendants additionally argue that plaintiff does not demonstrate a claim for denial of access to the courts, nor does plaintiff allege the requisite personal involvement in the asserted constitutional violations.[FN6]

FN3. Plaintiff filed his original complaint on July 9, 1999. Defendants argue, therefore, that any cause of action which stems from any alleged occurrence prior to July 9, 1996 is time-barred. Although defendants are correct that the statute of limitations for § 1983 actions in New York is three years, see Harris v. City of New York, 186 F.3d 243, 247-48 (2d Cir.1999)(establishing that the statute of limitations for § 1983 claims under New York law is three years), defendants do not specify which of plaintiff's claims should be dismissed. A review of plaintiff's complaint, however, uncovers only one allegation of conduct occurring prior to July 9, 1996. Plaintiff alleges that "[o]n February 19, 1996, the defendant Keane sought to transfer plaintiff" to a different correctional facility in violation of his constitutional rights. Complaint at 8, ¶ 22-23. Defendants' motion to dismiss plaintiff's claim arising from this alleged transfer is therefore granted.

FN4. Defendants further assert that plaintiff's complaint must be dismissed because he fails to plead that he exhausted the administrative grievance process in pursuit of his claims. Defendants subsequently withdrew this argument as applied solely to plaintiff's claims of excessive force in a letter dated August 29, 2000. "In general, exhaustion of state remedies is not a prerequisite to an action under § 1983." Heck v. Humphrey, 512 U.S. 477, 480, 114 S.Ct. 2364, 2369, 129 L.Ed.2d 383 (1994). Pursuant to 42

U.S.C. § 1997e(a), however, Congress has required inmates seeking to maintain actions challenging prison conditions under Section 1983 to first exhaust all available administrative remedies. Enacted as part of the Prisoner Litigation Reform Act of 1996 ("PLRA"), exhaustion is a mandatory requirement. See Booth v. Churner, 532 U.S. 731, 739, 121 S.Ct. 1819, 1824, 149 L .Ed.2d 958 (2001). Plaintiff's complaint is devoid of any allegation that he exhausted the administrative grievance process in pursuit of his claims. Although the Court dismisses plaintiff's claims on other grounds, they are also dismissed for failing to allege that he sufficiently exhausted his administrative remedies.

FN5. Defendants additionally argue, in response to plaintiff's request for punitive damages, that the Prison Litigation Reform Act bars plaintiff from seeking monetary damages for alleged constitutional violations where the inmate-plaintiff does not suffer physical injury. As plaintiff's complaint is devoid of any allegation of physical injury, plaintiff's request for punitive damages is denied. See 42 U.S.C. § 1997e(e).

FN6. Defendants also argue that plaintiff has insufficiently pled a conspiracy claim under 42 U.S.C. § 1985. Plaintiff's complaint, even liberally construed, does not allege any conspiracy under 42 U.S.C. § 1985. If plaintiff intended to present a conspiracy claim under § 1985, his complaint insufficiently alleges a conspiracy and such a claim must be dismissed.

*ANALYSIS*

I. *Standard of Law Applied to Motions to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(6)*

**\*2** Federal Rule of Civil Procedure 12(b)(6) provides that in response to a claim for relief in a pleading, a party may make a motion to assert the defense of "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). In deciding a motion to dismiss, a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2884409 (S.D.N.Y.)

(Cite as: 2004 WL 2884409 (S.D.N.Y.))

court should liberally construe the complaint, " 'accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor ." ' *Kforce Inc. v. Alden Personnel, Inc.,* 288 F.Supp.2d 513, 515-16 (S.D.N.Y.2003)(quoting *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002). " 'The issue to consider is not whether the plaintiff will ultimately prevail but whether [he] is entitled to offer evidence to support the claims." ' *New v.. Ashcroft,* 293 F.Supp.2d 256, 257 (E.D.N.Y.2003)(quoting *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995)). The complaint may only be dismissed if plaintiff "can prove no set of facts in support of his claim which would entitle him to relief." *Id.* Moreover, where plaintiff is proceeding *pro se,* the Court should hold his submissions to a less stringent standard than had the pleadings been drafted by an attorney. *Id.*

II. *42 U.S.C. § 1983*

To maintain a cause of action under 42 U.S.C. § 1983, plaintiff must allege: (i) a violation of a federal statute or constitutional right and (ii) must show that the alleged deprivation was committed by a person "acting under the color of state law." *West v. Atkins,* 487 U.S. 42, 48 (1988), 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Plaintiff asserts the following claims under § 1983: violations of his First Amendment right to free speech in his first cause of action; violations of his constitutional rights caused by an unofficial DOCS policy in his second cause of action; violations of his due process rights and access to the courts under the Fourteenth Amendment in his first, third, fourth and sixth causes of action; and violations of his right to be free from cruel and unusual punishment under the Eighth Amendment in his fifth cause of action.[FN7]

FN7. Plaintiff also brings a claim for violation of his rights under the Sixth Amendment. Complaint at 2. However, given that plaintiff's complaint does not proffer any allegations that could support a cause of action under the Sixth Amendment, this claim must also be dismissed.

A. *Retaliation Claims*

Plaintiff's retaliation claim focuses on conduct which he alleges was performed by specific individuals "in retaliation for ... having exercised his constitutional right to file federal and state lawsuits and grievances against named defendants and/or unconstitutional prison conditions and treatment." *Id.* at 30, ¶ 92. At the center of plaintiff's retaliation claim are the numerous transfers he received to various correctional facilities. Plaintiff alleges that these transfers were initiated and illegally justified by numerous, unwarranted disciplinary actions. Specifically, plaintiff asserts that defendants relied on "dismissed or expunged misbehavior reports," false testimony, and documentary evidence which were "legally insufficient, incomplete and/or altered to sustain the charges against plaintiff as justification for transferring him. Complaint at 8, 10 ¶¶ 23, 29-30. During the disciplinary hearings to address these misbehavior reports, plaintiff alleges that he was prevented from presenting a defense and that the officers who conducted the various hearings relied on false and legally insufficient testimony and other evidence in sustaining the charges against him. Lastly, plaintiff claims that his administrative appeals of the adverse decisions that came from these proceedings were inadequately reviewed. Complaint at 8-11 ¶¶ 22-32.

**\*3** Plaintiff further alleges that he was twice assaulted by different officers in retaliation for his filing of lawsuits and grievances.[FN8] Plaintiff alleges that subsequent to the first assault by defendant Koupash, the defendant filed a false misbehavior report to justify his assault. At the hearing concerning this misbehavior report, plaintiff alleges that the officer provided false testimony and that evidence which could have exonerated him was destroyed. Plaintiff also claims that the defendant who conducted the hearing prevented plaintiff from presenting a defense and relied on legally insufficient, incomplete and altered evidence. Subsequent to the hearing, plaintiff alleges that defendants insufficiently reviewed his administrative appeals. Complaint at 11-13, ¶¶ 33-37.

FN8. Plaintiff alleges that on December 7, 1999, defendant Koupash assaulted him prior to transferring plaintiff from Great Meadow and that defendant Weaver assaulted him on December 18, 1997 following plaintiff's transfer from Clinton to Great Meadows. Complaint at 11, 22, ¶¶ 33, 68. Although plaintiff does not allege that these assaults violated his Eighth Amendment rights, such an alleged violation

Not Reported in F.Supp.2d, 2004 WL 2884409 (S.D.N.Y.)

(Cite as: 2004 WL 2884409 (S.D.N.Y.))

would also fail to state a claim. To prevail on an excessive force claim, a plaintiff first must show that the alleged use of force is "objectively actionable." *United States v. Walsh*, 194 F.3d 37, 50 (2d Cir.1999). A claim of excessive force may be established even if the victim does not suffer serious or significant injury if plaintiff can demonstrate that the amount of force used is more than *de minimus,* or otherwise involves force "repugnant to the conscience of mankind." *Id.* at 48. Plaintiff makes no such allegation. Second, a plaintiff alleging excessive force must also meet a subjective requirement; he must show that the defendant acted wantonly with a "sufficient culpable state of mind." *Id.* at 50. Where a state official is accused of using excessive force against an inmate, the inquiry turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 48-49. Plaintiff's complaint is also devoid of such an allegation.

Plaintiff makes similar allegations regarding another misbehavior report, dated March 1, 2000. Plaintiff asserts that the misbehavior report was unfounded, that the officer who issued it provided false testimony at his hearing, and that the official who conducted the hearing relied on legally insufficient evidence as well as false testimony and prevented plaintiff from presenting a defense. Complaint at 12-13, ¶¶ 37-39. Finally, plaintiff alleges that he was denied medical care and that the defendants obstructed his access to the court system and to his legal materials in retaliation for his lawsuits and grievances.

Defendants argue that plaintiff has offered nothing beyond "bald allegations of general misconduct." Defendants' Brief at 23. They assert that plaintiff has failed to ascribe specific conduct to specific defendants and that plaintiff's allegations that he was retaliated against are "wholly vague and conclusory." [FN8] Defendants' Brief at 23-24. Defendants further argue that plaintiff's claims regarding his inability to file grievances or lawsuits is belied by "plaintiff's admission in the complaint that, despite his troubles, he pursued numerous grievances and lawsuits." *Id.* at 24. Lastly, defendants stress that plaintiff's

allegations of retaliatory false misbehavior reports cannot sustain a claim of a constitutional violation as "a prison inmate has no constitutional right to be free from being falsely accused in a misbehavior report-there must be more, such as retaliation against the prisoner for exercising a constitutional right." *Id.*

FN9. Defendants do not address plaintiff's retaliation claim as a First Amendment claim, but rather as a general action under § 1983. Defendant's Brief at 22. However, because plaintiff specifically invokes the First Amendment in page two of the Complaint and then alleges that defendants have acted "in retaliation for plaintiff having exercised his constitutional right to file federal and state lawsuits and grievances against [them]," plaintiff's claim will be analyzed as a First Amendment retaliation claim. Complaint at 2; Complaint at 30, ¶ 92.

The First Amendment provides that Congress shall make no law "abridging the freedom of speech" or abridging the right "to petition the Government for a redress of grievances." U.S. CONST. amend. I. In order to establish that defendants have retaliated against plaintiff in violation of his First Amendment rights, plaintiff must demonstrate "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Scott v. Coughlin, et al.,* 344 F.3d 282, 287 (2d Cir.2003); *see also Nicholas v. Davis et al.,* 74 Fed.Appx. 131, 134 (2d Cir.2003). The allegations advanced must be non-conclusory. Due to the potential for fabrication of retaliation claims, courts have required a "higher level of detail in [the] pleading[s]." *Johnson v. Eggersdorf et al.,* 8 Fed.Appx. 140 (2d Cir.2001)(quoting *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987)); *see also Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). Furthermore, courts, recognizing that claims of retaliation by prisoners can be easily abused, have held that a retaliation claim that is wholly conclusory can be dismissed on the pleadings alone. *See Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

Not Reported in F.Supp.2d, 2004 WL 2884409 (S.D.N.Y.)

(Cite as: 2004 WL 2884409 (S.D.N.Y.))

**\*4** Plaintiff meets the first prong by alleging that the filing of grievances and lawsuits is constitutionally protected. The Second Circuit has held that "retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983." *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996)(citing *Franco v. Kelly,* 854 F.2d 584 (2d Cir.1988)). The right to petition the government for redress of grievances includes the right to file lawsuits as well as the right to pursue administrative grievances. *Franco,* 854 F.2d at 589. Indeed, the right to petition government for redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights." *United Mine Workers v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967). Plaintiff's claim, therefore, is clearly a protected right of redress under the First Amendment.

Plaintiff additionally satisfies the second prong by alleging adverse action by the defendants against him.[FN10] Specifically, plaintiff alleges that in retaliation for his filing of lawsuits and grievances, he was transferred from one correctional facility to another,[FN11] he was assaulted,[FN12] he was denied medical care, false charges and misbehavior reports were filed against him, at the hearing for those reports he was prevented from asserting a defense, subsequent to those hearings his appeals of adverse decisions were inadequately addressed, and finally, he was prevented from having access to the courts and to his legal materials.

FN10. Courts have found conduct to constitute adverse action when "it would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Baskerville v. Blot* 224 F.Supp.2d 723 (S.D.N.Y.2002).

FN11. Plaintiff alleges that he was transferred from Sing Sing ("Sing Sing") Correctional Facility to Clinton Correctional Facility ("Clinton"); from Clinton to Great Meadow Correctional Facility ("Great Meadow") and from Great Meadow to Attica Correctional Facility ("Attica"). Complaint at 9, ¶ 24.

Furthermore, although it is has been firmly established that an inmate has no right to be in a particular correctional facility, otherwise constitutional acts may be actionable if carried out in retaliation for plaintiff's exercise of First Amendment rights. *See Soto v. Iacavino,* 2004 WL 21281762 (S.D.N.Y.2003).

FN12. A claim of retaliatory assault sufficiently describes such adverse conduct that would deter a reasonable inmate from engaging in activity protected by the First Amendment. *Rivera v. Goord* 119 F.Supp.2d 327, 340 (S.D.N.Y.2000)(finding that defendants' alleged conduct, which included retaliatory assault, were "likely to 'chill a person of ordinary firmness from continuing to engage' in activity protected by the First Amendment). *Id.*

Plaintiff, however, fails to carry his burden for the third prong. In a retaliation claim, a plaintiff has the initial burden of showing that defendants' actions are based on an improper motive. *Scott,* 344 F.3d at 288. Moreover, because claims of retaliation may be easily fabricated, such claims by prisoners must be examined with "skepticism and particular care." *Johnson v. Eggersdorf,* 8 Fed.Appx. 140, 144 (2d Cir.2001)(finding that inmate failed to allege specific facts and direct evidence under heightened pleading requirements for prisoner retaliation claims). While defendants do not dispute that they indeed transferred plaintiff on multiple occasions and that they carried out disciplinary proceedings against him, plaintiff does not proffer any allegations to establish that these actions were taken because of an improper motive pertaining to the protected speech.

Factors that can lead to an inference of improper motive includes: 1) the temporal proximity of the filing of a grievance and the alleged retaliatory act; 2) the inmate's prior good disciplinary record; 3) vindication at a hearing on the matter; and 4) statements by the defendant regarding his motive for disciplining plaintiff. *Rivera v. Goord,* 253 F.Supp.2d 735, 749 (S.D.N.Y.2003).

In the instant case, plaintiff makes no allegations from which to infer an improper motive. Although these factors

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2884409 (S.D.N.Y.)

(Cite as: 2004 WL 2884409 (S.D.N.Y.))

may not be exclusive, plaintiff's complaint is devoid of any allegations from which the Court could infer improper motive. Similar to the inmate in *Johnson,* plaintiff in the instant case has "merely juxtaposed the grievances he filed against disciplinary charges filed against him." *Johnson,* 8 Fed.Appx. at 144. For example, plaintiff asserts that defendants transferred him on December 7, 1999 for retaliatory reasons, yet in sequential terms, this act occurred long after plaintiff filed his second amended complaint against defendants in October of 1996. If plaintiff is attempting to refer to retaliatory action taken more immediately in response to an unspecified grievance, even a liberal construction of the Complaint does not allow the Court to insert specific dates in order to interpret plaintiff's intended allegations. Given that plaintiff fails to allege facts supporting the finding of a nexus between his lawsuits and grievances and post-hearing transfers, his allegations lack the "higher level of detail" and "factual basis" upon which courts have required for pleadings. *Id.* (quoting *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987) and *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

**\*5** As plaintiff has alleged retaliation in wholly conclusory terms and provided insufficient factual allegations to support his retaliation claim, the defendants' motion to dismiss is granted and plaintiff's retaliation claim is dismissed. *Johnson,* 8 Fed.Appx. at 144 (finding that "a complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone"). *Id.*

B. *Fourteenth Amendment Due Process Claims*

Although plaintiff's due process claims and the facts in support of these claims are not clearly outlined in his complaint, a liberal reading of his complaint supports three due process claims centered on separate sets of allegations. The first set of allegations, as outlined in his first cause of action,[FN13] alleges a due process cause of action centered on plaintiff's transfers to other correctional facilities. Similar to his retaliation claims, plaintiff alleges that he was transferred to other correctional facilities; that numerous disciplinary actions, related proceedings and false misbehavior reports were filed to support these transfers; that at the disciplinary hearings for these misbehavior reports, he was not allowed to prepare a

defense, call witnesses, or "marshal documentary evidence;" that at these hearings, the named defendants improperly relied on dismissed or expunged misbehavior reports and false testimony; and that the defendants insufficiently reviewed his administrative appeals. Plaintiff alleges that these activities violate the Fourteenth Amendment's due process clause. Complaint at 30, 9-10, ¶¶ 91, 27-30.

> FN13. Each defendant specifically named by plaintiff is not alleged to have engaged in each activity described within this paragraph. Rather, plaintiff generally alleges that defendants contributed to the violation of his due process rights.

Plaintiff also alleges, in his fourth cause of action, that from May 21, 1997 to December 7, 1999, the defendants repeatedly impeded his access to the courts in violation of the Fourteenth Amendment, both as a retaliation measure and to prevent plaintiff from reporting on the allegedly unlawful practices occurring in the grievance programs at Great Meadow and Attica correctional facilities. Complaint at 32, ¶ 97-98. Plaintiff asserts that defendants screened his court petitions, stole and/or destroyed his legal documents, hampered his use of the law library, and harassed him. Complaint at 20-23, ¶¶ 62-73. Plaintiff claims that the loss of his legal materials "caused him irreparable harm to exercise his right of access to the courts." Complaint at 21, ¶ 66. Similarly, in his sixth cause of action, plaintiff alleges that the defendants destroyed plaintiff's law books, legal notes and research materials. Complaint at 22, ¶ 71. Plaintiff maintains that the defendants deliberately flooded his cell in order to ruin his legal materials, hampered his access to the law library to prevent him from carrying out research and meeting court deadlines, and took his writing supplies, stamps, notes, and rough draft worksheets during retaliatory cell searches in which they tossed his property all around. Complaint at 23, ¶ 72; *id.* at 21, ¶¶ 65-66. Plaintiff asserts that defendants' allegedly retaliatory actions obstructed his access to the courts and caused material prejudice to his ability to litigate pending lawsuits against state officials in violation of the Fourteenth Amendment. *Id.* at 23, ¶ 71; *id.* at 33-34, ¶ 102.

**\*6** Plaintiff's third cause of action asserts claims

Not Reported in F.Supp.2d, 2004 WL 2884409 (S.D.N.Y.)

(Cite as: 2004 WL 2884409 (S.D.N.Y.))

against the inmate grievance program. Essentially, plaintiff argues that the defendants' grievance program at Great Meadow Correctional Facility and Attica Correctional Facility insufficiently addresses his grievances and conducts the grievance program in a way that prevents a timely investigation and adjudication of any particular grievance. Plaintiff alleges that defendants operate the grievance program in such a way as to "make a mockery of the requirement of the exhaustion of administrative remedies." *Id.* at 58.

The defendants argue that "plaintiff makes no specific claim that he suffered any unduly harsh punishment as a result of the various disciplinary proceedings that he asserts were falsely brought." Defendants' Brief at 21. Defendants maintain that the absence of any allegation that plaintiff suffered any atypical or significant hardship is fatal to plaintiff's due process claim.

The Due Process Clause of the Fourteenth Amendment provides that no State "shall deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV. The Supreme Court has established a two-part test to determine whether a plaintiff has stated a due process claim under the Fourteenth Amendment. First, a plaintiff must allege that he or she possesses a constitutionally protected liberty or property interest that has been interfered with by the state. Second, the court examines what process the state provided and whether it was constitutionally adequate. *See Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990)(holding that what is unconstitutional in a procedural due process claim is the deprivation of a constitutionally protected interest in life, liberty, or property without due process of law).

*1. Disciplinary Hearings*

It is well settled that "a prisoner asserting a § 1983 claim for denial of due process at a disciplinary hearing must first identify a liberty interest protected by the Due Process Clause of which he was deprived." *Williams v. Goord,* 111 F.Supp.2d 280, 288 (S.D.N .Y.2000)(internal citations omitted). Once a prisoner identifies the state-created liberty interest allegedly deprived, he must then make a threshold showing that the deprivation of

which he complains imposed an "atypical and significant hardship in relation to the ordinary incidents of prison life." *Sims v. Artuz,* 230 F.3d 14, 22 (2d Cir.2000); *see Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). The prisoner must establish that "the state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). Once the prisoner meets these two elements, the Court then addresses "whether the deprivation of that liberty interest occurred without due process of law." *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997)(internal quotations and citations omitted).

*7 Although plaintiff alleges several incidents in his complaint of false misbehavior reports, improper conduct during disciplinary hearings, improper reliance on dismissed or expunged misbehavior reports and denial of his right to produce witnesses and generally present a defense, the Court is strained in trying to identify any liberty interest which plaintiff claims he was denied through these activities. Plaintiff doesn't claim, for example, that good time credits were taken away from him nor that he was subjected to time in a Special Housing Unit ("SHU") or segregated confinement as a result of these acts. [FN14]

> FN14. Although plaintiff titles Part 1 of his Statement of Facts within his complaint "Plaintiff's Retaliatory Transfers in Segregated Confinements for His Litigation Against DOCS" plaintiff makes mention of the SHU only twice in his complaint. The first instance arises in the context of plaintiff's access to the courts claim.
>
> Upon information and belief, defendant Ruff acting alone and/or in conjunction with another named defendant, intentionally and knowingly and willfully searched plaintiff's bags in his absence, and arbitrarily stole various items of his personal property, including his *pro se* legal materials, all of his notes, research materials, and rough draft worksheets on or about December 17, 1998 after plaintiff escorted to SHU by defendant Ryan."

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2884409 (S.D.N.Y.)

(Cite as: 2004 WL 2884409 (S.D.N.Y.))

Complaint at 21, ¶ 64. Plaintiff then alleges that defendants Carpenter, Burns and James "failed to act and credit the plaintiff with the illegal SHU time that all had been reversed towards the other SHU time when these reversals was [sic] received into the facility." Complaint at 26, ¶ 82. This allegation, without further supportive factual allegations, is insufficient to support a due process claim for transfer to segregated confinement. Plaintiff fails, for example, to allege specific facts detailing the nature and length of his confinement or when these segregated confinements occurred, referring to them only in passing in the context of other claims.

His complaint is devoid of any allegation that identifies what punishment he received as a result of these various disciplinary proceedings. Rather, plaintiff's complaint seems to imply that all of these activities were conducted to justify transferring him to different correctional facilities. Indeed, the allegations in plaintiff's complaint rely on an alleged deprivation of his right to not be transferred. This claim, however, must fail. It is well established that the transfer of a prisoner from one institution to another does not trigger the protection of the Due Process Clause. See *Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976); *see also Bell v. Artuz,* No. 98 Civ 4710 (MBM) 1999 WL 253607 *5 (S.D.N.Y.)(citing *Cf. Olim v. Wakinekona,* 461 U.S. 238, 245 (1983).* The Constitution does not guarantee that the convicted prisoner will be placed in any particular prison where "[t]he conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons," *Meachum v. Fano,* 427 U.S. at 225, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976)(emphasis in original). Prison officials have broad discretion to transfer prisoners to another facility. See *Montanye v. Haymes,* 427 U .S. 236, 243, 96 S.Ct. 2543, 2547-48, 49 L.Ed.2d 466 (1976). As plaintiff has not sufficiently alleged a liberty interest that is protected by the due process clause, his claims regarding his disciplinary hearings must be dismissed.

2. *Denial of Access to the Courts*

In his sixth cause of action, plaintiff alleges that the defendants acted to "harass, hamper, deter, prevent and obstruct [his] access to the courts in order to cause materially (sic) prejudice to his ability to litigate his pending lawsuits against state officials." Complaint at 33-34, ¶ 102. Specifically, plaintiff alleges that from May 21, 1997 to December 7, 1999 the defendants "did knowingly impede, obstruct and constantly interfered with plaintiff in gaining access to the Courts." *Id.* at 20, ¶ 62. Plaintiff further maintains that from June 28, 1997 to December 7, 1999, defendant Poirier "was screening all plaintiff's petitions sent to be typed before sending to the Federal Courts." *Id.* at 20, ¶ 63. Defendant Ruff allegedly "stole various items of his personal property, including his *pro se* legal materials, all of his notes, research materials, and rough draft worksheets." *Id.* at 20-21, ¶ 64. Plaintiff alleges that the defendants further hampered his ability to gain access to the law library to complete his research thereby preventing him from meeting mandatory court deadlines.[FN15] *Id.* at 21, ¶ 65. During a cell search, defendants Greene and Phillips allegedly tossed "his personal and legal property all around, before intentionally and selectively taking all his writing supplies, stamps, notes and rough draft worksheets from his cell" causing him "irreparable harm to exercise his rights to access to the courts." *Id.* at 21, ¶ 66. Defendant Sawyer allegedly "searched through plaintiff's draft bags on December 6, 1999" and "stole various items out of his personal property ... selectively taking all [of] plaintiff's *pro se* legal materials that he had prepared of all litigations against state officials." *Id.* at 22, ¶ 70. The documents that were left, including legal law books, notes, legal materials were "willfully ripped apart" by other defendants. Plaintiff further alleges that on March 1, 2000, defendant Spencer "flooded plaintiff's cell to ruin all of his legal materials and law books on his cell floor." *Id.* at 25, ¶ 72. Lastly, plaintiff asserts that certain Special Housing Unit surveillance videotapes were not preserved.

FN15. Plaintiff's allegations regarding his loss of access to the law library are also insufficient. Although reasonable access to a law library is guaranteed by the Constitution, *see Bounds v. Smith,* 430 U.S. at 821, 97 S.Ct. 1491, unlimited, unrestricted or unmanaged access at the demand of the prisoner is not required by the constitution. Prison officials may impose "reasonable

Not Reported in F.Supp.2d, 2004 WL 2884409 (S.D.N.Y.)

(Cite as: 2004 WL 2884409 (S.D.N.Y.))

restrictions" on use of prison law libraries. *See Morello v. James,* 810 F.2d 344, 346-47 (2d Cir.1987). Plaintiff, however, does not allege the extent of his loss of access to the law library and how that loss was unreasonable. Plaintiff's complaint, furthermore, is devoid of any allegations describing the actual injury he suffered as a result. *See Duff v. Coughlin,* 794 F.Supp. 521, 524 (S.D.N.Y.1992)(granting summary judgment against plaintiff where complaint did not identify prejudice suffered and no details were produced).

**\*8** Defendants argue that plaintiff's denial of access to the courts claim must be dismissed. Specifically, they contend that plaintiff cannot establish the requisite intent or injury required in a denial of access to courts claim. *See* Defendants' Brief at 26. Defendants further assert that plaintiff makes no clear statement alleging that defendants acted with the deliberate purpose of denying plaintiff access to the courts. *See id.* Defendants maintain that plaintiff's complaint is "couched in wholly conclusory terms of a general conspiracy by all DOCS employees to essentially do everything within their power to deny plaintiff access to the court system." *Id.* Additionally, defendants argue that plaintiff fails to allege that he suffered a fatal disposition as a result of any actions by defendants and that regardless, delays in working on one's legal action do not amount to constitutional violations. *Id.* at 27. Lastly, defendants assert that plaintiff seeks relief for mere "hypothetical prospective claims." *Id.*

It has long been established that inmates have a constitutional right to "adequate, effective, and meaningful access to the courts." *See Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). Moreover, the Second Circuit has held that prison officials may not place burdens on that constitutional right. *See Corby v. Conboy,* 457 F.2d 251, 253-54 (2d Cir.1972)(finding that plaintiff adequately stated a cause of action under § 1983 in alleging that prison officials hindered his ability to prepare legal papers by delaying his letters to courts, refusing him access to the prison typewriter and law library, and confiscating his law books); *see also Hampton v. Scully,* 1991 WL 18129 (S.D.N.Y.)(denying defendants' motion to dismiss with respect to plaintiff's claim of interference

with his right of access to the courts where defendants allegedly removed or destroyed his law books and other legal materials).

In order to establish a violation of a right of access to courts, a plaintiff must demonstrate that defendants " 'deliberately and maliciously interfered with his access to the courts, and that such conduct materially prejudiced a legal action he sought to pursue." ' *Higgins v. Coombe,* 1999 WL 760658, \*2 (S.D.N.Y.)(citing *Morello v. Smith,* 810 F.2d 344, 347 (2d Cir.1986). Plaintiff must show that defendant's efforts deliberately caused "actual injury." *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997)(quoting *Lewis v. Casey,* 518 U.S. 343, 348, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)). The actual injury requirement for a denial of access to the courts is "more than just any type of frustrated legal claim." *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 2181, 135 L.Ed.2d 606 (1996). The injury must go to plaintiff's ability to "attack their sentences, directly or collaterally, and in order to challenge the conditions of confinement." *Id.* A plaintiff must show how the destruction of documents could have impeded any suit that he had or could have brought. *Hikel v. King,* 659 F.Supp. 337, 340 (E.D.N.Y.1987). "A delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Herrera v. Scully,* 815 F.Supp 713, 725 (S.D.N.Y.1993)(citing *Jones v. Smith,* 784 F.2d 149, 151-52 (2d Cir.1986)).

**\*9** Construing plaintiff's complaint liberally and assuming the truth of plaintiff's allegations, a reasonable inference can be drawn that defendants acted intentionally and maliciously. Plaintiff alleges that defendants "knowingly and willfully" searched his belongings, "arbitrarily" stole or destroyed his legal documents, including his notes, research materials and rough draft work sheets, and in "bad faith," ripped apart his legal books. Complaint at 20-21, ¶¶ 64-65; Complaint at 23, ¶ 71. Further, plaintiff alleges that defendants "knowingly and willfully" selectively took his writing supplies and stamps, "tossed" his legal property around, and impeded his access to the law library. Complaint at 21, ¶¶ 65-66. Plaintiff asserts that defendants deliberately carried out these activities, either directly or as supervisors encouraging these activities, in retaliation for plaintiff's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2884409 (S.D.N.Y.)

(Cite as: 2004 WL 2884409 (S.D.N.Y.))

pending litigation against them and "with the belief and unlawful intention" of obstructing plaintiff's access to the courts. Complaint at 33, ¶¶ 101-02; Complaint at 21, ¶¶ 65-66; Complaint at 32, ¶ 98. Moreover, plaintiff alleges *multiple* incidents of defendants having allegedly "knowingly and willfully" interfered with his legal documents, rather than merely one incident. *See Ramirez v. Holmes,* 921 F.Supp. 204, 207 (S.D.N.Y.1996)(finding single incident of denial of use of prison law library did not violate constitutional rights).

Plaintiff does not, however, sufficiently allege how this conduct materially prejudiced any existing legal action. Plaintiff's complaint and his myriad of allegations simply do not state with any specificity the actual injury he suffered as a result of these activities. Plaintiff's conclusory allegations that the defendants' caused him "irreparable harm in his ability to litigate his state and federal claims against state officials" or that "the loss of these legal materials caused him irreparable harm to exercise his rights of access to the courts" are simply insufficient to state a claim. Complaint at 23, 21, ¶¶ 71, 66. Plaintiff does not allege, for example, what specific documents, including motions, pleadings, complaints, responsive papers, etc. he intended to file which he was subsequently prevented from filing. Furthermore, plaintiff does not allege that he would have brought a specific claim but for the actions and conduct of the defendants. Absent such allegations, defendants' motion to dismiss plaintiff's claim of denial of access to the courts is granted.

3. *Grievance Procedure Claim*

In his third cause of action, plaintiff alleges that the defendants' grievance program at Great Meadow Correctional Facility and Attica Correctional Facility "deprive[s] inmates of a fair opportunity to have their grievances timely and impartially investigated, processed, and heard." Complaint at 32, ¶ 96. Plaintiff asserts that the defendants FN16 "were not providing sufficient office time for inmate grievance representatives/clerks to meaningfully and effectively perform their official responsibilities and duties in violation of the Grievance Manual and Directive # 4040." *Id.* at 16, ¶ 50.FN17 Plaintiff alleges that the defendants circumvented the grievance process and denied inmates their right to a formal

grievance hearing by making recommendations based on incomplete or biased records and restricting grievance representatives' ability to interview inmates. Complaint at 17, ¶ 53; Complaint at 18, ¶ 56. He also maintains that the defendants denied his complaints either summarily on the grounds that his claims could not be substantiated by fact, without addressing them, or by conducting investigations in the best interest of DOCS employees. Complaint at 19, ¶¶ 59, 60.FN18 Plaintiff additionally asserts: that defendants obstruct grievance committee representatives' ability to interview inmates by restricting facility access; that grievances are summarily denied on grounds that inmate's claim cannot be substantiated by fact; and that complaints are either not addressed or investigations, or if conducted, are "one-sided" and in the "best interest of the employees." Complaint at 18-19, ¶ 56-61.

FN16. Plaintiff specifically identifies defendants Duncan, Stinson, Reams, A. Brown, Eagen, Herbert, Caryl, and Struebel.

FN17. Plaintiff specifically mentions the duty to respond to grievance investigation requests, hold hearings, hear appeals, and conduct interviews. Complaint at 16 ¶¶ 51, 53, 54, 56.

FN18. Although plaintiff does not allege what constitutional right was violated under this cause of action, plaintiff's claim discusses his inability to receive a fair opportunity to present and have heard his grievances. The Court, therefore, will construe this cause of action as a claim under the Fourteenth Amendment. *See Franco v. Kelly,* 854 F.2d 584, 589 (allegation that state prison officials retaliated against inmate in violation of § 1983 implicates the "right to petition the government for redress of grievances as guaranteed by the First and Fourteenth Amendments").

*10 The corrections officers' alleged failure to properly address plaintiff's grievances do not create a cause of action for denial of due process. Similar to plaintiff's previously addressed due process claims, plaintiff has failed to identify a liberty interest protected by the Due Process Clause. *See Williams v. Goord,* 111 F.Supp.2d 280, 288 (S.D.N.Y.2000). While the filing of

Not Reported in F.Supp.2d, 2004 WL 2884409 (S.D.N.Y.)

(Cite as: 2004 WL 2884409 (S.D.N.Y.))

grievances is constitutionally protected, the manner in which grievance investigations are conducted do not create a protected liberty interest. *See Torres v. Mazzuca, 246 F.Supp.2d 334, 342 (S.D.N.Y.2003)*(finding that because "[p]rison grievance procedures do not confer any substantive right upon an inmate requiring the procedural protections envisioned by the Fourteenth Amendment," claims that corrections officers failed to properly address plaintiff's grievances by conducting a thorough investigation to plaintiff's satisfaction must be dismissed); [FN19] *see also Mahotep v. DeLuca, 3 F.Supp.2d 385, 390 n. 3 (W.D.N.Y.1998)*(holding that because prison grievance procedures do not confer any substantive right upon an inmate, plaintiff's claims that defendants violated his Fourteenth Amendment rights by failing to conduct a fair and impartial investigation into plaintiff's grievances must be dismissed); *see also Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir.1993)*; *see also Adams v. Rice, 40 F.3d 72, 75 (4th Cir.1994)*. As plaintiff has failed to allege the violation of a liberty interest protected by the Fourteenth Amendment, his claim that the defendants violated his due process rights through their operation of the grievance program must also be dismissed.

> FN19. The Court further found that "the breadth of any investigation remains in the discretion of the offices conducting the investigation." *Torres, 246 F.Supp.2d at 342.* Furthermore, "[u]nder the applicable standard in *Sandin,* the failure to conduct an extensive investigation into [plaintiff's] charges does not impose an "atypical and significant hardship" upon [plaintiff] sufficient to create a protected liberty interest. *Id.*

C. *Medical Indifference Claim*

In his fifth cause of action, plaintiff alleges that over the course of his incarceration at Great Meadow, defendant Nesmith acted with deliberate indifference by failing to treat his medical needs in violation of his Eighth Amendment rights. Complaint at 24, ¶ 74. Plaintiff asserts that defendant Nesmith "knowingly and willfully acted with deliberate indifference to plaintiff's health ... after receiving 'actual knowledge' of plaintiff's injuries." Complaint at 24, ¶ 74. Defendants contend that plaintiff's claim for Eighth Amendment medical indifference must be

dismissed because "plaintiff fails to allege any medical condition from which he suffered that gave rise to a serious medical need towards which any defendants acted with deliberate indifference." Defendants' Brief at 29.

The Eighth Amendment bars the infliction of cruel and unusual punishment on inmates. U.S. CONST. amend. VIII To establish an Eighth Amendment claim, plaintiff must set forth facts supporting both objective and subjective components. The objective component requires plaintiff to allege that the deprivation of medical care was "sufficiently serious." *Johnson v. Newport et al.,* No. 01 Civ. 9587(SAS) 2003 WL 169797 *2 (S.D.N.Y.). "Only those deprivations denying 'the minimal civilized measure of life's necessities' 'constitute grounds for an Eighth Amendment violation. *Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)*(quoting *Rhodes v. Chapman, 452 U.S. 337, 347 (1981)*). To establish the subjective prong of the test, federal officials must have acted with culpability that rises to the level of deliberate indifference. *Johnson, 2003 WL 169797 at *3.* Accordingly, plaintiff must show that prison officials "intentionally denied, delayed access to, or intentionally interfered with prescribed treatment." *Id.*

**\*11** Plaintiff's complaint fails to allege any specific physical conditions that required medical attention. In the absence of an identified medical need, there is no basis from which to conclude that plaintiff was at risk of "serious" harm due to deprivation of medical care as required by the objective component of the medical indifference standard. Furthermore, plaintiff does not allege facts which might give rise to a reasonable inference that defendant Nesmith knew of any medical needs borne by plaintiff. Although plaintiff alleges that Nesmith had received " 'actual knowledge' of plaintiff's injuries" and that Nesmith "knew" plaintiff "faced a substantial risk of serious harm and totally disregarded that risk," plaintiff fails to proffer specific details concerning any medical condition or evidence to suggest that defendant Nesmith was indeed aware of it. Complaint at 24, ¶ 74. Moreover, plaintiff does not indicate in what manner defendant Nesmith demonstrated deliberate indifference to his medical needs.

Plaintiff has not alleged sufficient facts to substantiate a medical indifference claim. His Eighth Amendment

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2884409 (S.D.N.Y.)

(Cite as: 2004 WL 2884409 (S.D.N.Y.))

claim, therefore, is also dismissed. *See Delisser v. Goord, 2003 WL 133271 *5 (N.D.N.Y.)*(finding plaintiff failed to demonstrate deliberate indifference when nothing in the record showed that defendants knew of and disregarded an excessive risk to plaintiff's health or safety, and plaintiff failed to allege specific facts regarding his medical condition and the behavior constituting deliberately indifferent conduct).

D. *Monell Claim*

In his second cause of action, plaintiff alleges that defendants [FN20] have promulgated a policy or custom that encourages DOCS employees to conduct unlawful and unconstitutional investigations of harassment and discrimination in violation of 42 U .S.C. § 1983.[FN21] Complaint at 14, ¶ 42. Plaintiff alleges that this policy is designed to discredit all prisoners' claims of staff misconduct and allows defendants to

FN20. In this cause of action, plaintiff specifically names some defendants, but does not allege that each defendant engaged in each of the behaviors described within this paragraph. Plaintiff generally alleges that defendants promulgated an unofficial policy that constituted an obstruction of justice.

FN21. Defendants have briefed this cause of action as a conspiracy claim under 42 U.S.C. § 1985 or 1986. Defendants' Grief at 30. However, where plaintiff has clearly alleged a "policy or custom of encouraging unconstitutional DOCS' employees activities throughout Great Meadow and Attica Correctional Facilities," the Court will address this cause of action as a policy or custom claim under 42 U.S.C. § 1983. Complaint at 2.

(1) prepare a record which discredits inmates' complaints; (2) allows them to create records which look favorable (sic) upon the departments in anticipation of potential litigation; (3) prevents inmates from substantiating their complaints; (4) prevents inmate grievance representatives from performing their duties and responsibilities on an inmate's behalf; and (5) condones staff harassment, discrimination and misconduct.

Complaint at 31, ¶ 94. In support of his claim, plaintiff submits a Memorandum from Deputy Commissioner of DOCS Stephen Bernardi addressed to all superintendents. *See* Exhibit B of Plaintiff's Complaint. Plaintiff alleges that the Memorandum "directs that each superintendent inform all staff investigating harassment/unlawful discrimination grievances to prepare their reports in a manner which favorably establishes the credibility of the facility and department." Complaint at 14, ¶ 42. Plaintiff further alleges that the report "directs all superintendents to make sure 'under no circumstances should investigation reports be accessible to inmates,' to ensure their confidentiality; and that all investigation[s] of and response to these allegations is in the best interest of the employees involved and the good order of the facility." Complaint at 15, ¶ 44 (citing Exhibit B).

**\*12** Plaintiff also points to another memorandum titled "Misbehavior Report Alleging Lying by an Inmate," dated January 24, 1996. *Id.* at 15, ¶ 46. Plaintiff alleges that this memorandum permits correction employees to "issue a misbehavior report against the inmate, charging him with a violation of rule 107.20 which states that lying, incomplete, misleading and/or false statements or information by inmates is prohibited." Complaint at 15, ¶ 47. The memo allegedly "directs that there are a number of very strong policy reasons for carefully delineating the circumstances when a disciplinary procedure for lying may be authorized on the basis of an inmate complaint." Complaint at 16, ¶ 48. Plaintiff asserts that this unofficial policy precludes inmates from substantiating their claims. *Id.* at 15, ¶ 45.

Plaintiff essentially alleges that through the policies encouraged by the memoranda, DOCS employees "promulgated, employed and enforced" an "unofficial policy" to interfere with investigations of inmate reports of harassment and discrimination by preparing records which discredit inmates and are biased towards staff, preventing inmates from substantiating their complaints, preventing grievance representatives from assisting inmates, and condoning staff misconduct towards inmates. Complaint at 31, ¶ 94. Defendants only briefly refer to this claim, arguing that plaintiff fails to state a viable policy or custom because allegations are "unclear, general, vague and conclusory." Defendants' Brief at 35.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2884409 (S.D.N.Y.)

(Cite as: 2004 WL 2884409 (S.D.N.Y.))

In order to impose § 1983 liability against a municipal defendant, a plaintiff must set forth facts that demonstrate the alleged constitutional violation resulted from an official policy, custom or practice. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A plaintiff must show "a direct causal link between a municipal policy or custom, and the alleged constitutional deprivation." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The existence of a policy or custom can be inferred from "circumstantial proof, such as evidence that the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction." *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 123 (2d Cir.1991). However, inferences must be supported by "explicit factual allegations"; a mere assertion that a municipality has such a custom or policy is insufficient. *Fanelli v. Town of Harrison,* 46 F.Supp.2d 254, 258 (S.D.N.Y.1999)(citing *Dwares v. City of New York,* 985 F.2d 94 (2d Cir.1993)). "[T]here must be proof of such a custom or policy in order to permit recovery on claims against individual municipal employees in their official capacities, since such claims are tantamount to claims against the municipality itself." *Id.* (quoting *Dwares,* 985 F.2d at 100.).

*13 Although plaintiff offers the DOCS memorandum that details employee guidelines for the investigation of harassment and unlawful discrimination complaints, his allegations in support of his claim are insufficient to state a cause of action for DOCS liability.[FN22] Complaint, Exhibit B. By pulling phrases out of context, plaintiff attempts to provide an interpretation of the guidelines that is not supported by the language in the memorandum. For instance, plaintiff asserts that the memorandum *"directs* that each superintendent inform all staff ... to *prepare their reports in a manner which favorably 'establishes the credibility of the facility'* and department *since* such reports may be used 'as documentation for any further inquiries if litigation is pursued by the grievant.' ' Complaint at 14, ¶ 42 (emphasis added). In actuality, the lines which plaintiff refers to read in full:

> FN22. Determining the sufficiency of a plaintiff's claim for Rule 12(b)(6) purposes is limited to

consideration of the factual allegations of a plaintiff's complaint, which are accepted as true, documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which plaintiffs had knowledge and relied on in bringing suit. *See Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993). Plaintiff in the present case has submitted a photocopy of this memorandum as Exhibit B.

"Supervisors conducting such investigations should be made aware that their investigation is the basis for the superintendent's response to the harassment grievance and possibly, upon appeal, the basis for the CORC decision. It also establishes the credibility of the facility administration's and the Department's procedures for addressing such complaints. In all cases, the report of investigation which is submitted to the superintendent or designee becomes a matter of record that the superintendent may use as documentation for any further inquiries if litigation is pursued by the grievant."

Complaint, Exhibit B. By changing the language of the memorandum through use of terms such as "directs," "favorably," and "since," plaintiff attributes specific language to defendants not indicated on the face of the entire memorandum.

Furthermore, plaintiff's allegations regarding the second memorandum are insufficient to support a finding that DOCS has an unconstitutional policy or custom of issuing false misbehavior reports. As plaintiff has not offered any non-conclusory allegations, his claim is supported only by his mere assertion that an unconstitutional policy or custom exists. "Allegations which are nothing more than broad, simple, and conclusory statements are insufficient to state a claim under § 1983." *Knight v. Keane,* 247 F.Supp.2d 379, 394 (S.D.N.Y.2002)(quoting *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987)). As plaintiff offers no further factual allegations to support his claim of an unconstitutional DOCS policy or custom, it must also be dismissed.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2884409 (S.D.N.Y.)

(Cite as: 2004 WL 2884409 (S.D.N.Y.))

### *CONCLUSION*

For the reasons set forth above, defendants' motion to dismiss the Second Amended Complaint is granted. All of plaintiff's claims are dismissed.[FN23]

> [FN23.] Defendants also move to dismiss on the basis that plaintiff failed to allege the requisite personal involvement in each of the alleged constitutional violations. Although plaintiff attempts to allege personal involvement by particular defendants through their "supervisory capacity" in Part 6 of his complaint, defendants contend that the undisputed fact that the supervisory defendants had direct or indirect authority over the management of their employees does not suffice to hold them personally liable for damages for constitutional violations of which they had notice. Defendants' Brief at 34-35.

> Although the defendants are correct that there must be allegations that they were personally involved in an alleged constitutional deprivation in order to award damages under § 1983, *see Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986), they have not specified which defendants lacked personal involvement with a particular claim, arguing generally that "[m]any of the defendants are not alleged to have been personally involved at any level in the claimed constitutional violations." Defendants' Brief at 33. Regardless, the Court has dismissed all of plaintiff's claims on other grounds.

S.D.N.Y.,2004.

Odom v. Poirier
Not Reported in F.Supp.2d, 2004 WL 2884409 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Jesse L. STEWART, Jr., Plaintiff,

v.

Gary HOWARD, D. Monell, N. Marsh, D.
Spangenburg, D. Swarts, E. Hollenbeck, J. Edwards, D.
Russell, Defendants.

No. 9:09-CV-0069 (GLS/GHL).

April 26, 2010.

Jesse L. Stewart, Jr., Marienville, PA, pro se.

Office of Frank W. Miller, Frank W. Miller, Esq., Michael
J. Livolsi, Esq., of Counsel, East Syracuse, NY, for
Defendants.

### REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action,
commenced pursuant to 42 U.S.C. § 1983, has been
referred to me for Report and Recommendation by the
Honorable Gary L. Sharpe, United States District Judge,
pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).
Plaintiff Jesse L. Stewart alleges that Defendants, all
employees of the Tioga County Jail, violated his
constitutional rights by limiting his ability to send legal
mail, depriving him of his mattress and bedding during
daytime hours, subjecting him to excessive force, denying
him medical care after the alleged use of excessive force,
and conducting biased disciplinary hearings. Currently
pending before the Court is Defendants' motion for
summary judgment pursuant to Federal Rule of Civil
Procedure 56. (Dkt. No. 30.) Plaintiff has opposed the
motion. (Dkt. No. 32.) For the reasons that follow, I
recommend that Defendants' motion be granted.

### I. FACTUAL AND PROCEDURAL SUMMARY

This action involves Plaintiff's experiences at Tioga
County Jail, where he was incarcerated from August 19,
2008, to January 13, 2009. (Dkt. No. 30-4 at 14:2-11.)
The complaint consists almost entirely of copies of
grievances and letters that Plaintiff submitted to other
individuals and organizations. The "facts" section of the
civil complaint form merely directs the reader to "see
attached." As such, the precise contours of Plaintiff's
claims are difficult to discern. The documents attached to
the complaint show that:

On September 22, 2008, Plaintiff requested a
grievance form so that he could complain about the
facility's legal mail procedures. (Dkt. No. 1 at 41.) A
grievance form was issued. *Id.*

On October 27, 2008, Plaintiff requested a grievance
form so that he could complain about being denied access
to the courts. (Dkt. No. 1 at 44.) Sgt. William "spoke with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

[Plaintiff] but he refuses to sign off. He states he needs these letters to go out to these courts because he's fighting extradition." *Id.*

On October 30, 2008, Defendant Officer Earl Hollenbeck issued an Inmate Rule Infraction Notice to Plaintiff accusing him of sending mail using another inmate's account. (Dkt. No. 1 at 31.)

In a "notice of intention" dated November 30 2008, Plaintiff alleged that, pending disciplinary action against him, staff at the Tioga County Jail deprived him of his mattress, sheets, and blanket when temperatures were as low as fifteen degrees at night and forced him to sit directly on his steel bed for periods up to seventeen hours. (Dkt. No. 1 at 8.) In support of Defendants' summary judgment motion, Defendant Lt. David Monell declares that when inmates are accused of violating a disciplinary rule, they are placed in administrative segregation pending a hearing. During that time, the inmate's bedding is removed during the day. If this was not done, "inmates may intentionally violate rules in order to be assigned to administrative segregation so they could sleep in the cell all day instead of having to adhere to the normal inmate routine." (Dkt. No. 30-11 at 6 ¶ 12.) The parties agree that inmates' mattresses and bedding are returned at night. (Dkt. No. 1 at 10; Dkt. No. 30-11 at 6 ¶¶ 13-15.)

**\*2** In his "notice of intention," Plaintiff alleged that on November 3, 2008, he asked for a grievance form. (Dkt. No. 1 at 8.) Defendant Officer Douglas Swarts told him "if you don't shut the fuck up I'll have a few people shut you up." *Id.* Two or three minutes later, several other officers, including Defendant Sergeant Dennis Spangenburg, arrived and stood in front of Plaintiff's locked cell. *Id.* Plaintiff asked Defendant Spangenburg why he was denying Plaintiff the right to file a grievance. *Id.* at 8-9. Defendant Spangenburg replied "I can deny you anything I want." *Id.* at 9. Defendant Officers Jonathan Edwards and David Russell then entered Plaintiff's cell

and handcuffed Plaintiff so tightly that the handcuffs "stopp[ed] the flow of blood to [Plaintiff's] hands." *Id.* Defendants Edwards and Russell then escorted Plaintiff to the intake area of the facility. Along the way, they used Plaintiff's "head and body as a ram to open the electronically control[l]ed doors," which cut Plaintiff's lip and caused his nose to bleed. *Id.* Attached to Plaintiff's complaint are affidavits from inmates who state that they witnessed this incident. *Id.* at 14-15.

Plaintiff alleged in his "notice of intention" that upon arrival at the intake area, he was placed in a strip isolation cell. (Dkt. No. 1 at 9.) Several officers "entered in behind me, at what time I was hit with closed fist[s] and what felt like kicks from all directions to my head, back, ribs, and groin area several times." *Id.* Plaintiff was punched in the right eye. *Id.* After that, Plaintiff's handcuffs were removed and Defendant Sergeant Nathaniel Marsh entered the cell, grasped Plaintiff around the neck with one hand, held his mace an arm's length away from Plaintiff's face, and repeated "get the fuck up you little asshole" over and over. *Id.*

Defendants Marsh, Spangenburg, Swarts, Edwards, and Russell have submitted notarized affidavits in support of Defendants' motion for summary judgment stating that they did not assault Plaintiff. (Dkt. No. 30-11 at 10, 12, 18, 22, 24.)

At 10:50 a.m., Defendant Swarts issued two Inmate Rule Infraction Notices. The first stated that Plaintiff "refused to lock in his cell after numerous orders to do so. Duress alarm was activated." (Dkt. No. 1 at 32.) The second stated that Plaintiff "disrupted the pod by yelling threats to jail personnel." *Id.* at 33.

In his "notice of intention," Plaintiff alleged that he needed medical attention but was locked in the cell alone

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

without such attention for approximately fourteen hours. (Dkt. No. 1 at 9.) At 11:30 p.m., Plaintiff was escorted back to his usual cell. *Id.* All of his personal property had been removed and he was given only a mattress and a blanket. *Id.* The next morning, officers removed the mattress. *Id.* Plaintiff was told that he could only shower if he remained handcuffed and shackled. *Id.* He was given only two sheets of toilet paper. *Id.* at 9-10. This pattern of being given a mattress at night and having it removed in the morning continued for ten days. *Id.* at 10.

**\*3** On November 6, 2008, Plaintiff submitted an Inmate Request Form asking to "be released from ... restraint and receive my property back today." (Dkt. No. 1 at 45.) His request was denied. *Id.*

In his "notice of intention," Plaintiff alleged that when his property was finally returned to him, he "became submissive" and "did not file any more grievances as I was told not to or the next time it may be worse." *Id.* at 10.

In his "notice of intention," Plaintiff alleged that Defendant Marsh conducted a biased disciplinary hearing and found him guilty "on all of the infractions." (Dkt. No. 1 at 10.) Another attachment to the complaint shows that on November 12, 2008, Defendant Marsh found Plaintiff guilty and sentenced him to twenty-eight days of keeplock with no programs, no commissary, twenty minute hygiene, and legal phone calls only. *Id.* at 34.

In his "notice of intention," Plaintiff alleged that there is no "inhouse mail, or legal outgoing mail system" at Tioga County Jail and that Defendants refused to mail any item that would cost more than eighty-four cents. (Dkt. No. 1 at 10.)

On December 1, 2008, Officer Sean Shollenberger issued an Inmate Rule Infraction Notice stating that Plaintiff used stamps from another inmate to send personal mail. (Dkt. No. 1 at 35.) A hearing was scheduled for December 17, 2008. Plaintiff filed a written request stating that he had been informed of the hearing and requesting "that any decision to be determined may be done so without my participation or presence ... I do not wish to participate in such hearing." (Dkt. No. 1 at 36.) Plaintiff's request was approved. *Id.* At the hearing, Defendant Marsh found Plaintiff guilty and sentenced him to fourteen days of keeplock, no programs, no commissary, twenty minute hygiene, and legal calls only. *Id.* at 37. Defendant Marsh noted that "this is not the first infraction hearing due to [Plaintiff's] abusing the U.S. Postal Service." *Id.* On December 18, 2008, Plaintiff appealed the decision. *Id.* at 38. Plaintiff stated that he had refused to attend the hearing because of Defendant Marsh's previous use of force against him and because the hearing was not recorded. *Id.* at 39. The Chief Administrative Officer denied the appeal on December 23, 2008, because the "sanctions imposed are appropriate." *Id.* at 38.

On December 17, 2008, Plaintiff requested two grievance forms so that he could complain about the lack of bedding and facility disciplinary and hearing procedures. Grievance forms were issued. (Dkt. No. 1 at 46-47.)

On December 18, 2008, Plaintiff submitted a grievance complaining about the lack of bedding, visits, food, medical care, access to courts, and water. (Dkt. No. 1 at 20.) The grievance coordinator denied the grievance because "[d]iscipline is not grievable. There is an appeal process which the inmate can follow." *Id.* at 22. Plaintiff appealed to the Chief Administrative Officer. *Id.*

**\*4** On December 18, 2008, Plaintiff submitted a grievance complaining about Defendant Marsh's conduct during the disciplinary hearing [FN1] and requesting that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

disciplinary hearings be recorded or monitored by another hearing officer. (Dkt. No. 1 at 23-24.) The Grievance Coordinator denied the grievance because "NYS Minimum Standards requires that records be kept of infraction hearings. Records are kept of the infraction hearing. The TCJ does not have more than one officer available to do infraction hearings." *Id.* at 25. Plaintiff appealed to the Chief Administrative Officer. *Id* . On December 22, 2008, Defendant Marsh completed a Grievance Investigation Form stating that he interviewed Plaintiff. Defendant Marsh found that "this facility keeps all hearing records as well as provide a copy of the hearing record to the inmate. This facility has more than one hearing officer available." *Id.* at 26.

> FN1. Although it is not clear, Plaintiff was presumably referring to the November 12, 2008, hearing, which he attended, rather than the December 17, 2008, hearing that he refused to attend.

On December 18, 2008, Plaintiff submitted an Inmate Request Form asking to speak with the Undersheriff or Captain. (Dkt. No. 1 at 48 .)

On December 22, 2008, Plaintiff wrote a letter to the Chairman of the New York Commission of Corrections; the Hon. Thomas J. McAvoy, Senior United States District Judge, and the New York State Attorney General regarding conditions at Tioga County Jail. (Dkt. No. 1 at 16-17.) Specifically, Plaintiff complained about the bedding issue, the grievance and appeal system, and the legal mail system. *Id.*

On December 28, 2008, Plaintiff submitted a grievance complaining about the facility's legal mail procedure. (Dkt. No. 1 at 27.) The Grievance Coordinator denied the grievance because "[t]his facility is not denying

you access to the courts. Minimum standards ha[ve] been and will be controlled by the State of NY, therefore this issue is not grievable. NYSCOC was contacted regarding your reference to a 'new' state directive regarding legal mail. No such directive exists." *Id.* at 28. Plaintiff checked the box indicating that he wanted to appeal to the Chief Administrative Officer and wrote a note that he "was told that Lt. D. Monell is the Chief Officer and that I could not appeal this decision any higher." *Id.*

In his "notice of intention," Plaintiff alleged that on December 31, 2008, he was summoned to the front of the jail for an interview with Defendant Lt. D. Monell. (Dkt. No. 1 at 11.) Defendant Monell questioned Plaintiff about his December 22, 2008, letter to the Commission of Corrections. *Id.* Defendant Monell said that he did not give a damn about federal standards regarding bedding. *Id.* Defendant Monell told Plaintiff he should save his weekly postage allowance until he had enough to send a large document and did not respond when Plaintiff informed him that he was not allowed to do. *Id.* Regarding Plaintiff's complaint that he had received only two sheets of toilet paper, Defendant Monell replied that this was facility policy. (Dkt. No. 1 at 12.) Defendant Monell stated that he had reviewed the videotape of the alleged excessive force incident and did not see anything. *Id.* Defendant Monell asked "in a sarcastic manner" whether Plaintiff wanted protective custody because he felt threatened by the facility's officers. Plaintiff said no. *Id.*

**\*5** On January 1, 2009, Plaintiff filed an Inmate Request Form stating that he had not received responses to his appeals regarding disciplinary hearings. (Dkt. No. 1 at 49.) Defendant Russell responded that "Grievance # 36 was upheld so there is no appeal. Grievance # 35 was not a grievable issue because it regarded disciplinary sanctions." (Dkt. No. 1 at 50.)

On January 1, 2009, Plaintiff wrote to the Commission of Corrections informing them of his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

conversation with Defendant Monell and requesting an outside investigation. (Dkt. No. 1 at 18.)

On January 5, 2009, Plaintiff filed an Inmate Request Form asking for a grievance form. He stated that "the taking of bedding is not a disciplinary sanction but in fact an illegal practice." (Dkt. No. 1 at 42.) Defendant Monell replied that "removal of bedding is a disciplinary sanction and as such is not a grievable issue. Do not put in any more requests on this matter." *Id.*

On January 5, 2009, Plaintiff filed an Inmate Request Form stating that "the grievant has the right to appeal any decision by the grievance committee to the highest level for confirmation of such determination." (Dkt. No. 1 at 43.) Defendant Monell replied that Plaintiff should "read minimum standards-once the action requested has been met-there is no grounds for appeal. Request for grievance is denied. Do not put in any more requests on this matter ." *Id.*

On January 5, 2009, Plaintiff wrote to the Commission of Corrections again. He stated that he was being illegally denied the right to file grievances and that Defendant Monell "attempted to intimidate me." (Dkt. No. 1 at 19.) In a separate letter, he stated that his "grievance is not in regards to any disciplinary sanctions, but in fact an illegal local procedural practice at Tioga County Jail." (Dkt. No. 1 at 29.) He stated that he had been deprived of bedding, food, medical care, visits, and mail without due process. *Id.* at 29-30.

On January 8, 2009, Plaintiff filed an Inmate Request Form stating that he wanted to file a grievance about "the issue of periodicals and the donation/reading of them." (Dkt. No. 1 at 51.) A sergeant (signature illegible) responded that "this is not a grievable issue-this is a requestable issue which will be denied due to security

problems encountered in the D-pod housing unit involving the newspaper. Donations of books and magazines are allowed-you also are allowed to release property to persons outside of the jail." *Id.* at 52.

Plaintiff filed this action on January 21, 2009. (Dkt. No. 1.) Defendants now move for summary judgment. (Dkt. No. 30.) Plaintiff has opposed the motion. (Dkt. No. 32.) Defendants have filed a reply. (Dkt. No. 36.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

*Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

> FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

**\*6** To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted]; *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)) (emphasis added).

"Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

**III. ANALYSIS**

Defendants argue that they are entitled to summary judgment because (A) Plaintiff refused to cooperate with his deposition; (B) Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA") regarding the November 3 excessive force incident "and other claims such as lack of toilet paper"; (C) Plaintiff has failed to state an Eighth Amendment conditions of confinement claim; (D) Plaintiff's allegations regarding the lack of bedding do not state a due process claim; (E) Plaintiff has failed to state a claim that he was denied access to the courts; and (F) Plaintiff has not alleged that Defendants Howard or Hollenbeck were personally involved in any alleged constitutional violation.

**A. Deposition**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

**\*7** Defendants move, pursuant to Federal Rule of Civil Procedure 37, to dismiss this action because Plaintiff unilaterally ended his deposition before answering any substantive questions. (Dkt. No. 30-12 at 10-11.) In the alternative, Defendants request an order precluding Plaintiff from offering sworn testimony in opposition to any motion brought by Defendants or at trial. *Id.* at 11. I find that Defendants' motion is untimely.

This Court's Mandatory Pretrial Discovery and Scheduling Order, issued on March 31, 2009, granted Defendants permission to depose Plaintiff. The order stated that "[t]he failure of the plaintiff to attend, be sworn, and answer appropriate questions may result in sanctions, including dismissal of the action pursuant to [Rule] 37." (Dkt. No. 21 at 3 ¶ D.) The order also noted that "any motion to compel discovery in the case must be filed not later than ten (10) days after the deadline for completing discovery." FN3 *Id.* at 4 n. 5. The order set July 29, 2009, as the deadline for completing discovery. *Id.* at 4 ¶ A.

FN3. Effective January 1, 2010, the deadlines in the local rules were amended. The local rule now requires that discovery motions be filed no later than fourteen days after the discovery cut-off date. Local Rule 7.1(d)(8).

On July 2, 2009, Defendants requested permission to depose Plaintiff. (Dkt. No. 22.) The Court denied the motion as moot, noting that permission had already been granted. (Dkt. No. 23.) On July 31, 2009, Defendants requested an extension of the discovery cut-off date to allow them time to take Plaintiff's deposition. (Dkt. No. 24.) The Court granted Defendants' request and extended the discovery deadline to September 19, 2009. (Dkt. No. 27.)

On September 14, 2009, Defendants conducted Plaintiff's deposition. (Dkt. No. 30-4 at 9-17.) When defense counsel began asking Plaintiff about his criminal history, Plaintiff stated "[y]ou're browbeating me here, and I'll write to the judge and tell him why I didn't cooperate." *Id.* at 15:14-15. Plaintiff then ended the deposition. *Id.* at 15:20-22. No questions were asked or answered about the events at issue in this action.

Discovery in this case closed on September 19, 2009. Defendants did not file a motion to compel Plaintiff's deposition or for sanctions until they filed the pending motion on October 27, 2009. Because Defendants did not file their motion within ten days of the discovery cut-off date or request an extension of time in which to file a discovery motion, I recommend that their motion to dismiss the case as a sanction for Plaintiff's refusal to cooperate with his deposition be denied.

**B. Exhaustion of Administrative Remedies**

Defendants argue that Plaintiff's claims regarding the November 3, 2008, alleged use of excessive force and the alleged failure to provide medical care after the incident must be dismissed because Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 30-12 at 2-3.) Defendants are correct.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

institution to which they are confined. *Jones v. Bock,* 549 U.S. 199, 218 (2007).

**\*8** Tioga County Jail has an inmate grievance procedure. (Dkt. No. 30-10 at 8-11.) Under the procedure, the Corrections Officer assigned to the inmate's housing unit initially receives complaints either verbally or in writing and attempts to resolve the complaint informally. *Id.* at ¶ 1.2(A)(1-2). If the complaint cannot be resolved informally, the inmate files a written complaint form, which is forwarded to the Shift Supervisor. *Id.* at ¶ 1.2(A)(3-4). If the Shift Supervisor cannot resolve the complaint, the complaint is forwarded to the Grievance Coordinator, who provides the inmate with a grievance form. *Id.* at ¶ 1.2(A)(5-8). The Grievance Coordinator is responsible for investigating and making a determination on the grievance and must give a written copy of his or her decision to the inmate. *Id.* at ¶ 1.2(A)(9). This written decision must be issued within five business days of receipt of the grievance. *Id.* at 1.3(C). If the inmate does not accept the Grievance Coordinator's determination, "an appeal will be forwarded to the Jail Chief Administrative Officer." *Id.* at ¶ 1.2(A)(11). The inmate must appeal within two business days of receipt of the Grievance Coordinator's determination. *Id.* at ¶ 1.3(D). At the request of the inmate, a copy of the appeal will be mailed by the Jail Administrator to the Commission of Corrections. *Id.* at ¶ 1.2(A)(13). The Jail Administrator must make a determination within two working days. *Id.* at ¶ 1.3(E). The inmate may appeal within three business days of receipt of the decision to the Commission of Corrections. *Id.* at ¶ 1.3(F).

Here, Plaintiff did not file a grievance regarding the alleged use of excessive force on November 3, 2008. (Dkt. No. 30-11 ¶ 6.) Therefore, he did not exhaust his administrative remedies.

Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).[FN4]

> [FN4]. The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81 (2006), in which the Supreme Court held that each step of an available grievance procedure must be "properly" completed before a plaintiff may proceed in federal court. *Chavis v. Goord,* No. 07-4787-pr, 2009 U.S.App. LEXIS 13681, at \*4, 2009 WL 1803454, at \*1 (2d Cir. June 25, 2009).

First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

**\*9** Here, as discussed above, administrative remedies were available to Plaintiff. Defendants preserved the exhaustion defense by raising it in their answer. (Dkt. No. 19 at ¶¶ 8-10.) Plaintiff appears to argue that Defendants are estopped from asserting the defense or that special

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

circumstances exist justifying the failure to exhaust. Specifically, Plaintiff states that exhausting his administrative remedies would have been futile and "may have caused more harm to the plaintiff" because the officers who allegedly assaulted him "are the persons that operate and give the decisions" regarding grievances. (Dkt. No. 32 at 1.)

Plaintiff's explanation is belied by his actual conduct. Plaintiff alleges that Defendant Marsh was involved in the use of excessive force. (Dkt. No. 1 at 9.) Despite this fact, Plaintiff filed a grievance three weeks after the incident complaining about Defendant Marsh's conduct during a disciplinary hearing. (Dkt. No. 1 at 23-24.) This indicates that Plaintiff was not, in fact, afraid to file grievances against the Defendants who allegedly assaulted him and denied him medical care. Thus, Plaintiff has not plausibly alleged that special circumstances prevented him from exhausting his administrative remedies. Therefore, I find that Plaintiff failed to exhaust his administrative remedies regarding the alleged use of excessive force and I recommend that the Court dismiss that claim.

**C. Eighth Amendment Conditions of Confinement**

Plaintiff alleges that Defendants violated his Eighth Amendment rights by removing his personal property, taking away his bedding and mattress during the day, allowing him to shower only if he remained handcuffed and shackled, and providing him with only two sheets of toilet paper. (Dkt. No. 1 at 9-10.) Defendants move for summary judgment of this claim. (Dkt. No. 30-12 at 5.)

The Eighth Amendment to the United States Constitution imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson*

*v. Palmer,* 468 U.S. 517, 526-27 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To prove the objective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9 (1992). Specifically, an inmate must show that he was deprived of a "single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter,* 501 U.S. 294, 304 (1991). Here, Plaintiff does not allege that he was deprived of any human need. He was provided with a mattress and blankets at night, had the opportunity to shower, and received toilet paper. Although his conditions may not have been pleasant, the Eighth Amendment "does not mandate comfortable prisons." *Farmer,* 511 U.S. at 932 (citing *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)). Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's conditions of confinement claim.

**D. Due Process**

*1. Bedding*

**\*10** Defendants construe Plaintiff's complaint as asserting a claim that the removal of his bedding during the day violated his right to due process. Defendants argue that this claim should be dismissed. (Dkt. No. 30-12 at 5-6.) Defendants are correct.

An individual claiming that he was deprived of an

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

interest in property "must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). Plaintiff had not legitimate claim of entitlement to possessing bedding during the day. Therefore, I recommend that the Court dismiss this claim.

2. *Disciplinary Hearing*

Plaintiff appears to allege that Defendant Marsh deprived him of due process by conducting a biased disciplinary hearing. (Dkt. No. 1 at 10.) Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000).

An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Assuming *arguendo* that the state has granted inmates in county jails an interest in remaining free from keeplock confinement, the issue is whether Plaintiff's confinement imposed an "atypical and significant hardship" on him in relation to the ordinary incidents of prison life. Courts in the Second Circuit have routinely declined to find a liberty

interest where an inmate's keeplock confinement is an "exceedingly short" period, less than thirty days, and there is no indication that the inmate suffered any "unusual conditions" during the confinement. *Anderson v. Banks,* No. 06-Cv-0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) ("Confinements in ... keeplock of less than thirty days will not suffice to demonstrate a protected liberty interest absent other extraordinary circumstances of the confinement demonstrating that it was atypical or significant for other reasons.") (Sharpe, J.) (Homer, M.J.).[FN5]

FN5. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Here, Defendant Marsh sentenced Plaintiff to twenty-eight days of keeplock after the November 12, 2008, hearing that followed the alleged excessive force incident. (Dkt. No. 1 at 34.) Defendant Marsh sentenced Plaintiff to fourteen days of keeplock after the December 17, 2008, hearing regarding Plaintiff's alleged use of another inmate's stamps. (Dkt. No. 1 at 37.) There is no indication that Plaintiff suffered any unusual conditions during these keeplock confinements. Notably, Plaintiff's allegations regarding the removal of his bedding occurred not during these keeplock sentences, but rather during earlier administrative segregation periods in October and November. (Dkt. No. 1 at 8-10.) Thus, Plaintiff has not alleged facts plausibly suggesting, or raised a triable issue of fact, that he was deprived of a liberty interest. Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant Marsh *sua sponte.*

**E. Access to the Courts**

**\*11** Defendants argue that Plaintiff's claims regarding Tioga County Jail's legal mail procedures must be dismissed because (1) Plaintiff has not alleged the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

personal involvement of any Defendant; and (2) Plaintiff has not alleged any actual harm resulting from the procedures. (Dkt. No. 36-3 at 1.) Defendants did not raise this argument in their moving papers. Normally, due process would thus require that I disregard the argument or give Plaintiff an opportunity to file a sur-reply. Here, however, Plaintiff addressed this issue in his opposition despite Defendants' failure to raise it initially. (Dkt. No. 32 at 1.) Moreover, even if he had not, I would recommend that the Court dismiss the claim *sua sponte.*

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). "A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986) (citing *Bounds v. Smith,* 430 U.S. 817, 821-23 (1977)). This right of access, however, guarantees a prisoner "no more than reasonable access to the courts." *Herrera v. Scully,* 815 F.Supp. 713, 725 (S.D.N.Y.1993) (citing *Pickett v. Schaefer,* 503 F.Supp. 27, 28 (S.D.N.Y.1980)). A claim for reasonable access to the courts under § 1983 requires that an inmate demonstrate that the alleged act of deprivation "actually interfered with his access to the courts or prejudiced an existing action." *Id.* (citations omitted). Courts have not found an inmate's rights to be violated when the deprivation merely delays work on his legal action or communication with the court. *Id.* To state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury. *Lewis v. Casey,* 518 U.S. 343, 353 (1996); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

Here, Plaintiff has not raised a triable issue of fact that he suffered any actual injury. In his "notice of intention," he stated that the facility's mail policies "could cause a great effect" and *"could* cause irreparable harm" to two pending *habeas corpus* cases. (Dkt. No. 1 at 10, emphasis added.) In his opposition to the motion for summary judgment, Plaintiff states that he "suffered the loss of one of the court actions" because he could not mail a brief. (Dkt. No. 32 at 1.) However, I note that this statement is not "evidence" because Plaintiff's opposition was not signed under penalty of perjury and does not contain any other language bringing it into substantial compliance with 28 U.S.C. § 1746. *See, LeBoeuf, Lamb, Greene & MacCrae, L.L.P. v. Worsham,* 185 F.3d 61, 65-66 (2d Cir.1999). Therefore, I recommend that Plaintiff's claim regarding legal mail be dismissed.

**F. Personal Involvement**

**\*12** Defendants argue that Plaintiff has failed to allege personal involvement by Defendants Howard or Hollenbeck. (Dkt. No. 30-12 at 11-12.) Defendants are correct.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).[FN6] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant.[FN7] If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN8] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN9] Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). [FN10]

> FN6. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

> FN7. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

> FN8. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

> FN9. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

> FN10. The Supreme Court's decision in *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937 (2009) arguably casts in doubt the continued viability of some of the categories set forth in *Colon. See Sash v. United States,* --- F.Supp.2d ----, No. 08-CV-116580, 2009 U.S. Dist. LEXIS 116580, at *32-39, 2009 WL 4824669, at*10-11 (S.D.N.Y. Dec. 15, 2009). Here, the Court will assume *arguendo* that all of the *Colon* categories apply.

The only allegation in the complaint regarding Defendant Hollenbeck is that he issued an Inmate Rule Infraction Notice to Plaintiff on October 30, 2008. (Dkt. No. 1 at 31.) Plaintiff has not alleged any facts plausibly suggesting, or raised a triable issue of fact, that Defendant Hollenbeck's conduct violated Plaintiff's constitutional rights. Therefore, I recommend that any claims against Defendant Hollenbeck be dismissed.

The complaint's only reference to Defendant Howard is in the caption of the "notice of intention." (Dkt. No. 1 at 7.) Plaintiff could, perhaps, have argued that, as Sheriff, Defendant Howard was responsible for creating or allowing to continue unconstitutional policies. However, Plaintiff did not allege any facts plausibly suggesting, or raise a triable issue of fact, that Defendant Howard was responsible for the policies about which Plaintiff complains. Even if he had, as discussed above, Plaintiff has not provided sufficient evidence for any of his claims regarding those policies to survive summary judgment. Therefore, I recommend that any claims against Defendant Howard be dismissed.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 30) be *GRANTED;* and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Anderson v. Banks,* No. 06-Cv-0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**\*13** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.* *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2010.

Stewart v. Howard

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

▷

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Jerome BELLAMY, Plaintiff,

v.

MOUNT VERNON HOSPITAL, in its official and individual capacity, Dr. Marc Janis, in his official and individual capacity, New York State Department Of Correctional Services, Dr. Lester Wright, in his official and individual capacity, and Dr. J. Pereli, in his official and individual capacity, Defendants.

No. 07 Civ. 1801(SAS).

June 26, 2009.

West KeySummary **Civil Rights 78** 🔑 **1358**

78 Civil Rights

   78III Federal Remedies in General

      78k1353 Liability of Public Officials

         78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases

**Prisons 310** 🔑 **203**

310 Prisons

   310II Prisoners and Inmates

      310II(D) Health and Medical Care

         310k203 k. Reproductive issues. Most Cited
Cases

**Sentencing and Punishment 350H** 🔑 **1546**

350H Sentencing and Punishment

   350HVII Cruel and Unusual Punishment in General

      350HVII(H) Conditions of Confinement

         350Hk1546 k. Medical care and treatment. Most
Cited Cases

   A correctional services doctor was not deliberately indifferent to a prisoner's serious medical needs under the Eighth Amendment in connection with the alleged denial of testosterone treatments. The prisoner brought a § 1983 action which alleged that he was denied the treatments which he needed after he developed hypogonadism after an epididymectomy. The doctor not liable for the alleged harm because he was not involved with any denials of the prisoner's treatment and did not create a policy that contributed to the prisoner's alleged harm. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

Jerome Bellamy, Alden, NY, pro se.

Julinda Dawkins, Assistant Attorney General, New York, NY, for Defendants.

### OPINION AND ORDER

[SHIRA A. SCHEINDLIN](), District Judge.

## I. INTRODUCTION

   *1 Jerome Bellamy, presently incarcerated and proceeding pro se, alleges that the New York State Department of Correctional Services ("DOCS") and Dr. Lester Wright, the remaining defendants in this case [FN1], violated Bellamy's constitutional rights. His claims surround denials of requested testosterone treatment by Wright, a doctor and supervisory official for the DOCS. Wright and the DOCS now move for summary judgment. For the reasons stated below, their motion for summary judgment is granted in its entirety.

      [FN1.]() The original and amended complaints were also filed against Mount Vernon Hospital, Dr. Mark Janis, Dr. J. Pereli, in their individual and official capacities. The claims against Mount Vernon Hospital and Dr. Mark Janis were dismissed in *Bellamy I* and the claim against Dr. J. Pereli was dismissed in a subsequent order issued by this Court on January 15, 2009. Wright and the DOCS are the only remaining defendants.

## II. BACKGROUND[FN2]

      [FN2.]() For more detailed background, see *Bellamy v. Mount Vernon Hosp.*, No. 07 Civ. 1801, 2008

[WL 3152963 (S.D.N.Y. Aug. 5, 2008)]() (*"Bellamy I"*). Some of the facts recounted here are drawn from the prior opinion.

## A. Facts

### 1. Parties

   Bellamy is presently in the custody of the DOCS at the Wende Correctional Facility in Alden, New York.[FN3] The DOCS is a state agency responsible for the care, custody and control of inmates convicted of crimes under New York State laws.[FN4] Wright is both a New York-licensed medical doctor and the Deputy Commissioner and Chief Medical Officer ("CMO") of the DOCS.[FN5] As CMO, he is responsible for the development and operation of a system to provide necessary medical care for inmates in the custody of the DOCS.[FN6]

      [FN3.]() *See* Defendants' Rule 56.1 Statement of Facts ¶ 1.

      [FN4.]() *See id.* ¶ 2.

      [FN5.]() *See id.* ¶ 3.

      [FN6.]() *See id.*

### 2. Bellamy's Surgery

   In August 2004, while in DOCS custody at Sing Sing

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

Correctional Facility in Ossining, New York, Bellamy underwent an epididymectomy.[FN7] Bellamy was HIV positive at the time of his surgery.[FN8] Around that time, Bellamy developed hypogonadism (a deficiency in the hormone testosterone) as well as a deficiency in the hormone Cortisol.[FN9] As a result of these conditions, Bellamy was prescribed various medications, including a testosterone patch called "Androderm." [FN10] Bellamy contends that without testosterone treatment, he suffers from mood swings, fatigue, nausea, headaches, and lack of appetite.[FN11] However, he also experiences similar symptoms even with medication.[FN12]

FN7. See *Bellamy I, 2008 WL 3152963, at \*1.* An epididymectomy is defined as the surgical removal of the epididymis (the cord-like structure along the posterior border of the testicle). The epididymis is essential to the male reproductive system. See Dorland's Illustrated Medical Dictionary 639, 1342, 1770 (31st ed.2007).

FN8. See 3/6/08 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. I") at 139:15-17 (where Bellamy says that, prior to the surgery, he was on HIV medication).

FN9. See *Bellamy I, 2008 WL 3152963, at \*2.* These conditions had many side effects, including sexual maladies and dramatic weight loss. See id. While Bellamy contends that the surgery caused the hypogonadism, his treating doctor claims "with a reasonable degree of medical certainty" that the hypogonadism preceded the surgery. See 4/22/08 Affidavit of Dr. Harish Moorjani ("Moorjani Aff."), Ex. J to 6/5/09 Supplemental Declaration of Julinda Dawkins, counsel to defendants, ¶ 4.

FN10. See, e.g., Amended Complaint ("Am.Compl."), Statement of Facts ¶¶ 5, 7. Androgel is a similar medication. The Amended Complaint is divided into various parts with overlapping paragraph and page numbers. As a result, references to the Amended Complaint are made by noting first the relevant topic header and then the cited or quoted paragraph number.

FN11. See 1/12/09 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. II") at 35:23-24. Bellamy's hypogonadism may have been caused by his HIV. Bellamy complained of similar symptoms before the surgery and, therefore, before any alleged denial of Androgel or similar medications. See Moorjani Aff. ¶¶ 4-5.

FN12. See Bellamy Dep. II at 43:21-24 (where Bellamy admits that some of his symptoms resumed even after using the testosterone patch). See also Am. Compl., Statement of Facts ¶ 7 ("[T]his treatment [, Androderm,] still has not proven to be effective in keeping my hormone levels elevated, even after the dosages were increased, and my levels rise high at times then suddenly drops real low.").

**3. Bellamy's Letters to Wright**

Following the surgery, Bellamy wrote to Wright on three pertinent occasions. In the first letter, Bellamy provided background into his ailments and asked Wright to provide him with a hormone treatment (Androgel) which had been provided at a previous facility.[FN13] The second letter asked Wright to force Dr. Gennovese at the Shawangunk facility to provide him with Ensure-a nutritional supplement which had been provided at a previous facility. [FN14] Bellamy's third letter to Wright concerned several matters. [FN15] In particular, Bellamy claimed, *first,* that a female officer entered his cell and retrieved his HIV medication, *second,* that an officer

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

eavesdropped on a medical consultation with his doctor, and, *third,* that he went four days without HIV medication, five days without Cortisol treatment, and six days without testosterone treatment, all while undergoing a mental health evaluation.[FN16]

> FN13. *See* Defendants' Rule 56.1 Statement of Facts ¶ 9. *See also* 7/5/05 Grievance Letter from Bellamy to Wright, Ex. D to 3/30/09 Declaration of Julinda Dawkins, counsel to defendants ("Dawkins Decl.").

> FN14. *See* Defendants' Rule 56.1 Statement of Facts ¶ 10. *See also* 1/22/07 Grievance Letter from Bellamy to Wright, Ex. E to Dawkins Decl.

> FN15. *See* Defendants' Rule 56.1 Statement of Facts ¶ 11. *See also* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Deck

> FN16. *See* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Decl.

Wright's office routinely receives hundreds of letters each year, addressed to him personally from inmates throughout the DOCS system and from individuals writing on behalf of inmates.[FN17] These letters are screened by staff, who then forward them to the appropriate division or bureau within the DOCS with an instruction to respond or with a notation indicating the appropriate action.[FN18] Wright never sees the actual letters or their responses.[FN19] Inmate letters concerning medical care-such as Bellamy's-are forwarded to the Regional Health Services Administrator or the Regional Medical Director, as appropriate, that oversees the facility housing the inmate.[FN20] The concerns are then investigated and addressed by the regional staff.[FN21]

> FN17. *See* Defendants' Rule 56.1 Statement of Facts ¶ 12.

> FN18. *See id.*

> FN19. *See id.* ¶ 13.

> FN20. *See id.* ¶ 14.

> FN21. *See id.*

**\*2** All three of Bellamy's letters received responses. Holly A. Collet, the Facility Health Services Administrator at Elmira Correctional Facility, responded to Bellamy's July 5, 2005 letter.[FN22] Pedro Diaz, the Regional Health Services Administrator at Shawangunk Correctional Facility, responded to Bellamy's January 22, 2007 letter.[FN23] Pedro Diaz, also the Regional Health Services Administrator at Sing Sing Correctional Facility, responded to Bellamy's June 5, 2007 letter.[FN24] Wright and Bellamy have never met each other, nor have they had any other personal contact.[FN25] Bellamy admits that he has no evidence that Wright was involved in the responses to any of the three letters.[FN26]

> FN22. *See id.* ¶ 15.

> FN23. *See id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN24. *See id.*

FN25. *See id.* ¶ 16. *See also* 3/27/09 Affidavit of Dr. Lester N. Wright ("Wright Aff."), Ex. G to Dawkins Decl., ¶ 9; Bellamy Dep. II at 20:23-25.

FN26. *See* Bellamy Dep. II at 26:17-20.

**4. Bellamy's Claims**[FN27]

FN27. In addition to the claims listed here, Bellamy originally charged both the DOCS and Wright with violations of the Americans with Disabilities Act of 1990 (the "ADA") and the Rehabilitation Act of 1973 (the "RHA"). *See* Am. Compl., Legal Claims ¶ 15. However, Bellamy later conceded that "Plaintiff['s] Americans With Disabilities Act and Rehabilitation [Act] fails because those statutes are not applicable here at this junction." Plaintiff's Reply to Defendants' Summary Judgment ("Bellamy's Reply") at 7. This Court interprets Bellamy's Reply as a withdrawal of his ADA and RHA claims against the remaining defendants.

Bellamy admits that he has no evidence that Wright denied him testosterone replacement treatment.[FN28] Nonetheless, Bellamy claims that Wright "was responsible for denying plaintiff's testosterone treatment on different occasions" and "was also made aware of plaintiff's complaints, but failed to abate further injury to the plaintiff."[FN29] Bellamy charges the DOCS because he was in its custody when his claims arose.[FN30] Bellamy

specifically alleges that Wright-acting under color of state law-displayed "deliberate indifference to plaintiff's serious medical needs and violated plaintiff's rights and constituted cruel and unusual punishment under the Eight [h] Amendment of the United States Constitution."[FN31] A similar claim is lodged against the DOCS.[FN32] Bellamy also seeks a preliminary and permanent injunction against the DOCS to provide the medical treatment he requests and to comply with various New York State laws.[FN33] Finally, Bellamy seeks compensatory and punitive damages.[FN34]

FN28. *See* Bellamy Dep. II at 33:14 to 34:15 (Question: "Do you have any kind of evidence that Dr. Wright denied you testosterone treatment?" Answer: "Directly, no.").

FN29. *See* Am. Compl., Defendants ¶ 6.

FN30. *See id.* Many of the claims that allegedly occurred under DOCS supervision have since been dismissed.

FN31. *See id.,* Legal Claims ¶ 13. Bellamy brings his claims pursuant to section 1983 of Title 42 of the United States Code ("section 1983").

FN32. *See id.,* Legal Claims ¶ 14 (repeating the same claim but omitting the phrase that the DOCS "violate[d] plaintiff's rights").

FN33. *See id.,* Legal Claims ¶ 18. Bellamy's original Complaint only requested injunctive

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

relief against the DOCS. However, he later asked for injunctive relief against Wright. *See* Bellamy's Reply at 1. Because Bellamy is proceeding pro se, the *factual* allegations in his Reply Memoranda are treated as if they were raised in his Complaints. *See Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering a pro se plaintiff's affidavit in opposition to defendant's motion to dismiss in reviewing district court's dismissal of claim). However, it would be improper to allow a plaintiff, even one proceeding pro se, to add a defendant to a claim he had raised more than a year earlier. Thus, Bellamy's claim for injunctive relief against Wright is dismissed. *See Polanco v. City of New York Dep't of Corr.,* No. 01 Civ. 759, 2002 WL 272401, at *3 (S.D.N.Y. Feb. 26, 2002) ("It is well established that a plaintiff may not amend his pleading through papers offered in opposition to a motion to dismiss ... Plaintiff is bound by the allegations of his Amended Complaint.") (citations omitted).

FN34. *See* Am. Compl., Legal Claims ¶¶ 19-21.

**B. Procedural History**

Bellamy's first Complaint was filed on March 2, 2007, and an Amended Complaint followed on July 16, 2007. On August 5, 2008, this Court granted summary judgment to defendants Dr. Janis and Mount Vernon. The DOCS had not been properly served at that point, but it was subsequently served on August 7, 2008. Dr. J. Pereli was dismissed as a defendant on January 15, 2009, for lack of timely service of process.

**III. LEGAL STANDARD**

**A. Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." [FN35] An issue of fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " [FN36] A fact is material when it " 'might affect the outcome of the suit under the governing law.' " [FN37] "It is the movant's burden to show that no genuine factual dispute exists." [FN38]

FN35. Fed.R.Civ.P. 56(c).

FN36. *Roe v. City of Waterbury,* 542 F.3d 31, 34 (2d Cir.2008) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

FN37. *Ricci v. DeStefano,* 530 F.3d 88, 109 (2d Cir.2008) (quoting *Anderson,* 477 U.S. at 248).

FN38. *Vermont Teddy Bear Co. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. [FN39] "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

party's case, and on which that party will bear the burden of proof at trial.' " [FN40] To do so, the non-moving party must do more than show that there is " 'some metaphysical doubt as to the material facts,' " [FN41] and it " 'may not rely on conclusory allegations or unsubstantiated speculation.' " [FN42] However, " 'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.' " [FN43]

FN39. Fed.R.Civ.P. 56(c).

FN40. *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). *Accord In re September 11 Litig.,* No. 21 MC 97, 2007 WL 2332514, at *4 (S.D.N.Y. Aug.15, 2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case.") (quotation omitted).

FN41. *Higazy v. Templeton,* 505 F.3d 161, 169 (2d Cir.2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

FN42. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 428 (2d Cir.2001)).

FN43. *Kessler v. Westchester County Dep't of Soc. Servs.,* 461 F.3d 199, 206 (2d Cir.2006) (quoting *Anderson,* 477 U.S. at 248-49).

**\*3** In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[FN44] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.' " [FN45] Summary judgment is therefore "only appropriate when there is no genuine issue as to any material fact, making judgment appropriate as a matter of law." [FN46]

FN44. *See Mathirampuzha v. Potter,* 548 F.3d 70, 74 (2d Cir.2008) (quoting *Allianz Ins. Co. v. Lerner,* 416 F.3d 109, 113 (2d Cir.2005)).

FN45. *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (quoting *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997)). *Accord Anderson,* 477 U.S. at 249.

FN46. *Karpova v. Snow,* 497 F.3d 262, 270 (2d Cir.2007) (citing *Tocker v. Philip Morris Cos.,* 470 F.3d 481, 486-87 (2d Cir.2006)).

Further, where the plaintiff is proceeding pro se, his or her pleadings must be considered under a more lenient standard than that accorded to "formal pleadings drafted by lawyers," [FN47] and his or her pleadings must be "interpret[ed] ... to raise the strongest arguments they suggest." [FN48] However, a pro se plaintiff must still meet the usual requirements of summary judgment .[FN49] Thus, a

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

pro se plaintiff's "failure to allege either specific facts or particular laws that have been violated renders [his or her] attempt to oppose defendants' motion [for summary judgment] ineffectual." [FN50]

FN47. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam). *Accord* Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994) ("Because [plaintiff] is a pro se litigant, we read his supporting papers liberally.").

FN48. *Burgos,* 14 F.3d at 790.

FN49. *See Maalouf v. Salomon Smith Barney, Inc.,* No. 02 Civ. 4470, 2004 WL 2008848, at *4 (S.D.N.Y. Sept.8, 2004). (" 'Proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment.' ") (quoting *Cole v. Artuz,* No. 93 Civ. 5981, 1999 WL 983876, at *3 (S.D.N.Y. Oct.28, 1999)).

FN50. *Kadosh v. TRW,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994).

**B. Exhaustion of Administrative Remedies**

The Prison Litigation Reform Act (the "PLRA") mandates that a prisoner exhaust all administrative remedies before bringing an action regarding prison conditions. [FN51] Failure to exhaust is an absolute bar to an inmate's action in federal court: "[section] 1997e(a) requires exhaustion of available administrative remedies *before* inmate-plaintiffs may bring their federal claims to

court at all." [FN52] Because the plain language of section 1997e(a) states "no action shall be brought," an inmate must have exhausted his claims at the time of the initial filing, given that "[s]ubsequent exhaustion after suit is filed ... is insufficient." [FN53] Moreover, the exhaustion of administrative remedies must be proper-that is, in compliance with a prison grievance program's deadlines and other critical procedural rules-in order to suffice. [FN54] The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN55]

FN51. *See* 42 U.S.C. § 1997e(a) (providing that: "No action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.") ("section 1997"). *See also Porter v. Nussle,* 534 U.S. 516, 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); Booth v. Churner, 532 U.S. 732, 739 (2001).

FN52. *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) (quotation marks and citation omitted, emphasis in original).

FN53. *Id.*

FN54. *See Woodford v. Ngo,* 548 U.S. 81, 90-92, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

FN55. *Porter,* 534 U.S. at 532.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN58. *Id.* (quoting *Woodford,* 548 U.S. at 95).

While the Second Circuit has recognized that the PLRA's exhaustion requirement is mandatory, it has also recognized three exceptions to the exhaustion requirement:

when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion requirement. FN56

FN56. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006).

The Second Circuit has held that " '[a]lert[ing] the prison officials as to the nature of the wrong for which redress is sought,' ... does not constitute proper exhaustion." FN57 "[N]otice alone is insufficient because '[t]he benefits of exhaustion can be realized only if the prison grievance system is given fair opportunity to consider the grievance' and '[t]he ... system will not have such an opportunity unless the grievance complies with the system's critical procedural rules.' " FN58

FN57. *Marias v. Zenk,* 495 F.3d 37, 44 (2d Cir.2007) (quoting *Braham v. Clancy,* 425 F.3d 177, 184 (2d Cir.2005) and citing *Woodford,* 548 U.S. at 94-95) (finding plaintiff "cannot satisfy the PLRA's exhaustion requirement solely by filing two administrative tort claims, or by making informal complaints to the MDC's staff").

**C. Eleventh Amendment Immunity**

**\*4** The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State ..." FN59 "A state's Eleventh Amendment protection from suit extends to its agencies and departments." FN60 "This [Eleventh Amendment] bar remains in effect when State officials are sued for damages in their official capacity." FN61 To determine whether the action is an official or individual capacity suit, this Court must look behind the designation and determine whether "the State is the real, substantial party in interest." FN62 State agencies are not immune from suits asking for injunctive relief under the Eleventh Amendment. FN63

FN59. U.S. Const. amend. XI.

FN60. *Morningside Supermarket Corp. v. New York State Dep't of Health,* 432 F.Supp.2d 334, 338 (S.D.N.Y.2006) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). *Accord Bryant v. New York State Dep't of Corr. Servs. Albany,* 146 F.Supp.2d 422 (S.D.N.Y.2001) (affirming the dismissal of a section 1983 claim against the DOCS and a correctional facility because Eleventh Amendment immunity abrogated the court's subject matter jurisdiction to hear the claim).

FN61. *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN62. *Ford Motor Co. v. Department of Treasury of Ind.,* 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945), *overruled in part by Lapides v. Board of Regents of the Univ. Sys. of Ga.,* 535 U.S. 613, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002).

FN63. *See, e.g., Perez v. Westchester County Dep't of Corr.,* No. 05 Civ. 8120, 2007 WL 1288579, at *6-8 (S.D.N.Y. Apr. 30, 2007) (considering, but then denying, injunctive relief against a county's department of corrections).

**D. Section 1983**

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." [FN64] In order to state a claim under section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution. [FN65] "[N]either a State nor its officials acting in their official capacities are 'persons' under [section] 1983." [FN66] Thus, section 1983 "does not provide a federal forum for litigants who seek a remedy against a state for alleged deprivation of rights secured by the United States Constitution." [FN67]

FN64. *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.,* 423 F.3d 153, 159 (2d Cir.2005) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

FN65. *See Palmieri v. Lynch,* 392 F.3d 73, 78 (2d Cir.2004) (citation omitted).

FN66. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). *Accord Huminski v. Corsones,* 396 F.3d 53, 70 (2d Cir.2005).

FN67. *Bryant,* 146 F.Supp.2d at 425.

Furthermore, "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.' " [FN68] Thus, "[a] supervisory official cannot be liable solely on account of the acts or omissions of his or her subordinates." [FN69] In 1995, the Second Circuit held that a supervisory official is personally involved only when that official: (1) participates directly in the alleged constitutional violation; (2) fails to remedy the violation after being informed of the violation through a report or appeal; (3) creates or allows the continuation of a policy or custom under which unconstitutional practices occurred; (4) acts with gross negligence in supervising subordinates who commit the wrongful acts; or (5) exhibits deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. [FN70] However, in 2009, the Supreme Court held, "[b]ecause vicarious liability is inapplicable to ... [section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's *own individual actions,* has violated the Constitution." [FN71] The Supreme Court explicitly rejected the argument that, "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." [FN72] Thus, "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." [FN73] For example, "[t]he allegation that plaintiff sent defendant[ ] letters complaining of prison conditions is not enough to allege personal involvement." [FN74]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN68. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).

FN69. *Ford v. Conway,* No. 03 Civ. 0927S, 2004 WL 1071171, at *4 (W.D.N.Y. Mar.16, 2004).

FN70. See *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citation omitted).

FN71. *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009) (emphasis added).

FN72. *Id.* at 1949.

FN73. *Id.*

FN74. *Laureano v. Pataki,* No. 99 Civ. 10667, 2000 WL 1458807, at *4 (S.D.N.Y. Sept.29, 2000) (granting a motion to dismiss on similar facts). See also *Farid v. Goord,* 200 F.Supp.2d 220, 235 (W.D.N.Y.2002) (dismissing claims of personal involvement against supervisory official who merely sent grievances "down the chain of command for investigation").

**E. Eighth Amendment Right to be Free from Deliberate Indifference to Serious Medical Needs**

**\*5** The Eighth Amendment prohibits the infliction of cruel and unusual punishment on prisoners.[FN75] The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment." [FN76] Because the inadvertent or negligent failure to provide adequate medical care does not rise to the level of deliberate indifference, allegations of medical malpractice or negligent treatment are insufficient to state a claim under section 1983.[FN77] "Prison officials have a duty to provide prisoners with the 'reasonably necessary medical care which would be available to him or her ... if not incarcerated.' " [FN78] However, a prison cannot be required to meet the same standard of medical care found in outside hospitals.[FN79]

FN75. U.S. Const. amend. XIII.

FN76. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). *Accord Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind .... In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety ....") (quotations and citations omitted).

FN77. See *Estelle,* 429 U.S. at 105-06.

FN78. *Candeleria v. Coughlin,* No. 91 Civ. 2978, 1996 WL 88555, at *7 (S.D.N.Y. Mar.1, 1996) (quoting *Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir.1989)). *Accord Edmonds v. Greiner,* No. 99 Civ. 1681, 2002 WL 368446, at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

*8 (S.D.N.Y. Mar. 7, 2002) ("A person who is incarcerated is entitled to receive adequate medical care.").

FN79. *See Archer v. Dutcher,* 733 F.2d 14, 17 (2d Cir.1984) ("We have no doubt that the same standards of medical care cannot be imposed upon a prison as are presumed to be realized at a hospital.").

" 'The deliberate indifference standard embodies both an objective and a subjective prong.' " FN80 "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." FN81 "Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." FN82 "[W]hen a prisoner asserts that delay in his treatment constitutes deliberate indifference on the part of a healthcare provider, the Court looks to the severity of the consequences brought about by the alleged delay." FN83

FN80. *Morrison v. Mamis,* No. 08 Civ. 4302, 2008 WL 5451639, at *5 (S.D.N.Y. Dec.18, 2008) (quoting *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994)).

FN81. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003) (quoting *Estelle,* 429 U.S. at 104)).

FN82. *Id.* (citing *Estelle,* 429 U.S. 105-06).

FN83. *Pabon v. Goord,* No. 99 Civ. 5869, 2003 WL 1787268, at *11 (S.D.N.Y. Mar.28, 2003) (citation omitted).

**F. Preliminary and Permanent Injunction**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." FN84 "A preliminary injunction is an extraordinary remedy never awarded as of right." FN85 "When the movant seeks a 'mandatory' injunction-that is, as in this case, an injunction that will alter rather than maintain the status quo-[he or] she must meet the more rigorous standard of demonstrating a 'clear' or 'substantial' likelihood of success on the merits." FN86 The standard for a permanent injunction is essentially the same as for a preliminary injunction, except that a plaintiff seeking a permanent injunction must show actual success on the merits rather than a likelihood of success on the merits. FN87

FN84. *Winter v. Natural Res. Def. Council, Inc.,* --- U.S. ----, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008). *Accord Citigroup Global Markets Inc. v. VCG Special Opportunities Master Fund,* No. 08 Civ. 5520, 2009 WL 1528513, at *1-2 (S.D.N.Y. June 1, 2009) (discussing *Winter* approvingly). *But see Almontaser v. New York City Dep't of Educ.,* 5 19 F.3d 505, 508 (2d Cir.2008) ("A party seeking a preliminary injunction 'must show irreparable harm absent injunctive relief, and either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in plaintiff's favor.' ") (citation omitted).

FN85. *Winter,* 129 S.Ct. at 376 (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN86. *Mitchell v. New York State Dep't of Corr. Servs.,* No. 06 Civ. 6278, 2009 WL 185757, at *2 (W.D.N.Y. Jan. 26, 2009) (quoting *Doninger v. Niehoff,* 527 F.3d 41, 47 (2d Cir.2008)).

FN87. *See Winter,* 129 S.Ct. at 381.

## IV. DISCUSSION

Bellamy asserts an Eighth Amendment deliberate indifference claim against Wright and the DOCS. Defendants respond, first, by asserting Eleventh Amendment immunity with respect to all claims against the DOCS and any claims against Wright in his official capacity. As for the claim against Wright in his individual capacity, defendants argue that he was not personally involved in the alleged harm, nor did he create a policy that contributed to that harm. Bellamy also seeks a preliminary and permanent injunction against the DOCS to provide the medical treatment he requests and to comply with several New York State laws. Defendants argue that Bellamy will not win on the merits, nor will he suffer irreparable harm. Defendants urge this Court to decline to exercise supplemental jurisdiction over any remaining New York State law claims. Finally, Bellamy seeks compensatory and punitive damages.

### A. Exhaustion of Administrative Remedies

**\*6** This Court determined in a previous opinion that "Bellamy did not fail to exhaust his administrative remedies because he was justified in his belief that no administrative remedy was available to him." [FN88] Thus, Bellamy's claims are not barred by the PLRA.

FN88. *Bellamy I,* 2008 WL 3152963, at *5

(citing *Giano v. Goord,* 380 F.3d 670, 678 (2d Cir.2004)).

### B. Eleventh Amendment Immunity

The Eleventh Amendment immunizes state agencies and state officials acting in their official capacity from suit under section 1983. Accordingly, Bellamy's deliberate indifference claims against both the DOCS and Wright, in his official capacity, are dismissed.

### C. Section 1983 Claim of Deliberate Indifference Against Wright in His Individual Capacity

The Supreme Court's decision in *Iqbal v. Ashcroft* abrogates several of the categories of supervisory liability enumerated in *Colon v. Coughlin. Iqbal'* s "active conduct" standard only imposes liability on a supervisor through section 1983 if that supervisor actively had a hand in the alleged constitutional violation. Only the first and part of the third *Colon* categories pass *Iqbal'* s muster-a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred. The other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated-situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate.

Bellamy's remaining claim alleges that Wright, in his individual capacity, was deliberately indifferent to Bellamy's medical needs. However, Bellamy offers no evidence that any of Wright's actions fall into any of the remaining exceptions that would permit supervisory liability. *First,* Bellamy admits that Wright was not personally involved in the letter responses. Both parties agree that they have never had any form of contact. *Second,* Bellamy offers no evidence that Wright created or contributed to a policy or custom of unconstitutional practices. Bellamy also admitted that he can provide no

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

evidence that Wright was responsible for making any decisions regarding his testosterone medications.[FN89] Bellamy's conclusory allegations that Wright must have known about Bellamy's plight is not enough to impute section 1983 liability.[FN90]

FN89. *See, e.g.,* Bellamy Dep. II at 32:19-21 (Question: "Did Dr. Moorjani say anything that Dr. Wright was involved in the April of 2005 denial?" Answer: "No, he did not.")

FN90. *See Reid v. Artuz,* 984 F.Supp. 191, 195 (S.D.N.Y.1997) (dismissing an asthmatic prisoner's section 1983 claim against a supervisory official when the pleadings "fail[ed] to allege, let alone establish, any factual basis upon which a fact finder could reasonably conclude personal involvement by the supervisory official defendant ... that [defendant] created or continued a policy or custom which allowed the violation to occur, or that [defendant] was grossly negligent in managing the subordinates who caused the unlawful condition").

Finally, Bellamy offers no evidence that Wright demonstrated deliberate indifference to Bellamy's serious medical needs. Bellamy does not contend that Wright unnecessarily and wantonly inflicted any pain-indeed Bellamy conceded that Wright was not involved in the alleged denials of treatment. Accordingly, Bellamy's deliberate indifference claim against Wright in his individual capacity is dismissed.

**D. Preliminary and Permanent Injunction**

Bellamy asks this Court to order the DOCS-through an injunction-to provide him with adequate medical care and to comply with New York State laws. This request is

denied.

**\*7** *First,* Bellamy has not alleged that he is suffering irreparable harm. Instead, he has alleged a number of unrelated and sporadic problems that can be expected in the normal course of incarceration, especially when transferring from facility to facility. It cannot be inferred from his pleadings, his testimony or his letters to Wright that he has consistently been denied any form of treatment. Indeed, each of his three letters address completely different topics without re-addressing prior issues. Bellamy concedes that the disruption of his medication only occurred on a very limited or isolated basis.[FN91]

FN91. *See* Bellamy Dep. II at 56-57, 75-76 (demonstrating that, over the course of three-years, Bellamy was denied treatment for one three-week period, for one allegedly three-month period-while he was transferring facilities-and a few alleged short-term periods, although those dates are unspecified).

*Second,* Bellamy cannot show a clear or substantial likelihood of success on the merits. Bellamy does not offer evidence that either defendant was deliberately indifferent to his serious medical needs.[FN92] For the objective prong, Bellamy offers no evidence that any deprivation of medication was sufficiently serious. Headaches and fatigue do not rise to the level of seriousness necessary to warrant a preliminary injunction-especially when Bellamy admits that he still suffers similar side-effects while receiving the requested treatment.[FN93] For the subjective prong, Bellamy does not offer any evidence that any DOCS employee acted with the requisite state of mind to be deliberately indifferent to his serious medical needs.

FN92. While the DOCS itself is immune from section 1983 liability, the following analysis

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

surrounds the DOCS and its employees generally.

**FN93.** Further, the defendants' affidavits question many of Bellamy's medical propositions. *See, e.g.,* Moorjani Aff. ¶ 4 (claiming that Bellamy exhibited signs of hypogonadism and many of its symptoms, including weight loss, headaches, and fatigue, prior to the surgery).

This Court need not address the balance of equities nor the public interest factors because Bellamy has not shown irreparable harm or a substantial likelihood of success on the merits. Accordingly, Bellamy's request for both a preliminary and permanent injunction is denied.

**E. Supplemental Jurisdiction**

Bellamy asks this Court to compel the DOCS-through an injunction-to comply with New York State Public Health Laws.[FN94] To the extent that there are any remaining state law claims, this Court declines to exercise supplemental jurisdiction over those claims.[FN95]

**FN94.** *See* Am. Compl., Prayer for Relief ¶ 18.

**FN95.** *See Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims"). *See also Kshel Realty Corp. v. City of New York,* No. 01 Civ.

9039, 2006 WL 2506389, at *13 (S.D.N.Y. Aug.30 2006) ("[T]he Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of on 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.' ") (quoting *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 53 (2d Cir.1986)).

**V. CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is granted. The Clerk of the Court is directed to close this motion (Docket # 64) and this case.

SO ORDERED:

S.D.N.Y.,2009.

Bellamy v. Mount Vernon Hosp.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

**H**

United States District Court,

S.D. New York.

Matthew D'OLIMPIO and Michael Kaplan, Plaintiffs,

v.

Louis CRISAFI, in his individual capacity, Brendan
Vallely, in his individual capacity, Thomas
D'Amicantonio, in his individual capacity, James Giglio,
in his individual capacity, Michael Moffett, in his
individual capacity, Paul Nadel, in his individual
capacity, Jennifer Treacy, in her individual capacity,
Kenneth Post, in his individual capacity, and Timothy
Dewey, in his individual capacity, Defendants.

Louis Crisafi, Counterclaim-Plaintiff,

v.

Michael Kaplan, Counterclaim-Defendant.

Nos. 09 Civ. 7283(JSR), 09 Civ. 9952(JSR).

June 15, 2010.

**Background:** Arrestee and former narcotics enforcement
investigator brought action against another investigator
and other narcotics enforcement officials, alleging
malicious prosecution, false arrest, unlawful detention, and
other constitutional violations against arrestee, and First
Amendment retaliation against investigator. Defendant
investigator counterclaimed, alleging defamation by

plaintiff investigator. Defendants moved to dismiss for
failure to state a claim.

**Holdings:** The District Court, Jed S. Rakoff, J., held that:

(1) allegations were sufficient to state a claim of
supervisory liability against officials;

(2) law enforcement officers lacked even arguable
probable cause to make arrest;

(3) investigator's statements were not protected by First
Amendment; and

(4) plaintiff investigator was not liable for defamation.

Motions denied in part and granted in part.

West Headnotes

**[1] Civil Rights 78 ⟨key⟩ 1358**

78 Civil Rights

    78III Federal Remedies in General

        78k1353 Liability of Public Officials

            78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases

    Arrestee was not required to show discriminatory

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

purpose on the part of law enforcement officers in order to establish the personal involvement needed to support the officers' liability on his § 1983 claim alleging that his search, arrest, and prosecution violated the Fourth Amendment. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[2] Civil Rights 78 ⟲ 1395(6)**

78 Civil Rights

 78III Federal Remedies in General

  78k1392 Pleading

  78k1395 Particular Causes of Action

   78k1395(4) Criminal Law Enforcement; Police and Prosecutors

    78k1395(6) k. Arrest, search, and detention. Most Cited Cases

Allegations against law enforcement officials were sufficient to state a claim under § 1983 that officials failed to supervise narcotics enforcement investigators; complaint incorporated by reference an investigatory report that described various acts of misconduct by investigator that took place prior to arrestee's arrest, and concluded that there was a lack of appropriate supervision by officials, and arrestee alleged that another investigator complained to official in writing regarding investigator's misconduct prior to arrestee's arrest. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[3] Arrest 35 ⟲ 63.4(2)**

35 Arrest

35II On Criminal Charges

 35k63 Officers and Assistants, Arrest Without Warrant

  35k63.4 Probable or Reasonable Cause

   35k63.4(2) k. What constitutes such cause in general. Most Cited Cases

In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime. U.S.C.A. Const.Amend. 4.

**[4] Civil Rights 78 ⟲ 1376(6)**

78 Civil Rights

 78III Federal Remedies in General

  78k1372 Privilege or Immunity; Good Faith and Probable Cause

   78k1376 Government Agencies and Officers

    78k1376(6) k. Sheriffs, police, and other peace officers. Most Cited Cases

In the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show arguable probable cause. U.S.C.A. Const.Amend. 4.

**[5] Civil Rights 78 ⟲ 1358**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

[78](#) Civil Rights

    [78III](#) Federal Remedies in General

        [78k1353](#) Liability of Public Officials

           [78k1358](#) k. Criminal law enforcement; prisons. [Most Cited Cases](#)

Arrestee's allegations were sufficient to state a [§ 1983](#) supervisory liability claim against law enforcement officials, arising out of officials' creation of policy allowing narcotics enforcement investigators to initiate criminal charges based on a phone conversation or faxed affidavit, where arrestee alleged that his arrest for possession of a narcotic and criminal impersonation to obtain prescriptions was predicated on nothing more than his pharmacy's report that it had failed to receive a hard copy of a prescription within a week, which prompted a narcotics enforcement official to call arrestee's doctor's office and speak with an unknown person there, who either stated that he was not aware of any such prescription or effectuated the fax transmission of an affidavit bearing an unverified signature of arrestee's doctor. [U.S.C.A. Const.Amend. 4](#); [42 U.S.C.A. § 1983](#).

[[6]](#) **Arrest 35** ⚷    **63.4(8)**

[35](#) Arrest

    [35II](#) On Criminal Charges

        [35k63](#) Officers and Assistants, Arrest Without Warrant

           [35k63.4](#) Probable or Reasonable Cause

               [35k63.4(7)](#) Information from Others

                   [35k63.4(8)](#) k. Reliability of informer. [Most Cited Cases](#)

Law enforcement officers lacked even arguable probable cause to arrest arrestee for possession of a narcotic and impersonation of a physician based solely on unauthenticated report by physician's staff denying knowledge of arrestee's prescription. [U.S.C.A. Const.Amend. 4](#).

[[7]](#) **Constitutional Law 92** ⚷    **1941**

[92](#) Constitutional Law

    [92XVIII](#) Freedom of Speech, Expression, and Press

        [92XVIII(P)](#) Public Employees and Officials

           [92k1941](#) k. Discipline or reprimand. [Most Cited Cases](#)

A public employee's cause of action for his employer's discipline based on his speech can proceed only if the employee spoke as a citizen on a matter of public concern; otherwise, the employee's speech is outside the scope of the First Amendment. [U.S.C.A. Const.Amend. 1](#).

[[8]](#) **Constitutional Law 92** ⚷    **1955**

[92](#) Constitutional Law

    [92XVIII](#) Freedom of Speech, Expression, and Press

        [92XVIII(P)](#) Public Employees and Officials

           [92k1955](#) k. Police and other public safety officials. [Most Cited Cases](#)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

**Municipal Corporations 268** 🗝 **185(1)**

268 Municipal Corporations

    268V Officers, Agents, and Employees

        268V(B) Municipal Departments and Officers Thereof

            268k179 Police

                268k185 Suspension and Removal of Policemen

                      268k185(1) k. Grounds for removal or suspension. Most Cited Cases

    Law enforcement officer's complaints to supervisor about fellow officer's behavior, his workplace incident reports, and his complaint to the inspector general, was speech falling within officer's official duties, and thus was not protected under the First Amendment, as required to support employee's retaliation claim; statements were made privately though channels available through officer's employment and were made in a manner that would not be available to a non-public employee citizen, and subject of statements was that other officer was not performing his job properly. U.S.C.A. Const.Amend. 1.

**[9] Libel and Slander 237** 🗝 **28**

237 Libel and Slander

    237I Words and Acts Actionable, and Liability Therefor

        237k26 Repetition

            237k28 k. By others in general. Most Cited Cases

    It was simply implausible that narcotics investigator in any legally relevant sense caused the republication of his statements in an investigatory report or newspaper article regarding actions of a fellow investigator, as required to state a claim of defamation under New York law.

**[10] Libel and Slander 237** 🗝 **28**

237 Libel and Slander

    237I Words and Acts Actionable, and Liability Therefor

        237k26 Repetition

            237k28 k. By others in general. Most Cited Cases

    Under New York law, a plaintiff may not recover damages from the original author for slander arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication.

*342 James Brian Lebow, Sr., New York, NY, for Plaintiffs.

Christine Alexandria Rodriguez, Christine A. Rodriguez, Law Office, Ivan B. Rubin, Peter Sangjin Hyun, New York State Office of the Attorney General, New York, NY, for Defendants.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

*MEMORANDUM ORDER*

JED S. RAKOFF, District Judge.

On August 18, 2009, Plaintiff Matthew D'Olimpio brought this action (docket-numbered 09 Civ. 7283) against defendants Louis Crisafi, Brendan Vallely, Thomas D'Amicantonio, James Giglio, Michael Moffett, and Paul Nadel for malicious prosecution, false arrest, unlawful detention, and various other violations of the Constitution and 42 U.S.C. §§ 1983 and 1988. An amended complaint filed on October 29, 2009 joined Michael Kaplan as a plaintiff and added a claim against defendants Nadel, Jennifer Treacy, Kenneth Post, and Timothy Dewey for unconstitutionally retaliating against Kaplan based on his reports of misconduct committed by defendant Crisafi, a fellow investigator employed by the New York State Department of Health's Bureau of Narcotics Enforcement, Metropolitan Area Regional Office ("BNE-MARO"), in violation of the First and Fourteenth Amendments and § 1983.

On December 18, 2009, defendants Giglio, Moffett, and Nadel moved to dismiss all of D'Olimpio's claims against them, and defendants Crisafi, Vallely, and D'Amicantonio moved to dismiss D'Olimpio's malicious prosecution claim. That same day, defendants Nadel, Treacy, Post, and Dewey moved to dismiss Kaplan's claims against them. Meanwhile, on December 3, 2009, Crisafi had filed what was styled as a complaint against Kaplan (docket-numbered 09 Civ. 9952) alleging that Kaplan defamed him through publication of the reports of Crisafi's misconduct discussed in Kaplan's complaint. On the parties' consent, the Court converted Crisafi's complaint into a compulsory counterclaim in the action docket-numbered 09 Civ. 7283 and consolidated the two cases. *See* Transcript, 1/14/10, *Crisafi v. Kaplan,* No. 09 **\*343** Civ. 9952. On January 22, 2010, Kaplan moved to dismiss that counterclaim.

By Order dated March 1, 2010 (the "March 1 Order"), the Court granted the motion of Nadel, Treacy, Post, and Dewey to dismiss Kaplan's retaliation claim; granted Kaplan's motion to dismiss Crisafi's defamation counterclaim; and denied all other motions to dismiss.[FN1] The Order also promised that a Memorandum would issue in due course stating the reasons for these rulings. With apologies to counsel for the extended delay, the Court here provides that Memorandum.

> FN1. Although the Order did not explicitly so state, all the dismissals were with prejudice (which, as it happens, is also the default position when an order does not state whether a dismissal is or is not with prejudice).

The Court turns first to the motions of defendants Crisafi, Vallely, and D'Amicantonio to dismiss D'Olimpio's malicious prosecution claim, as set forth in the First Amended Complaint ("FAC") filed on October 29, 2009.[FN2] The relevant allegations are as follows:

> FN2. The first five causes of action in the FAC are D'Olimpio's claims. The sixth cause of action is Kaplan's claim.

Sometime before November 16, 2007, D'Olimpio, a resident of Brooklyn, was prescribed Vicodin by his doctor. FAC ¶ 17. He called that prescription into his pharmacy and obtained the Vicodin. *Id.* ¶ 18. D'Olimpio's pharmacy contacted the BNE-MARO after it had not received a hard copy of the prescription from D'Olimpio's doctor within seven days. *Id.* ¶ 19. A MARO official called D'Olimpio's doctor's office and spoke to an unknown individual there, who either stated by phone that he was not aware of D'Olimpio's Vicodin prescription or provided a faxed affidavit purportedly signed by the doctor to that effect. *Id.* ¶ 20. Based on these occurrences, and without any further investigation, MARO investigator Crisafi began planning Crisafi's arrest. *Id.* ¶ 21.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

On or about November 16, 2007, D'Olimpio was exiting his doctor's office in Brooklyn and walking toward his car when Crisafi and defendants Vallely and D'Amicantonio, also MARO investigators, showed D'Olimpio their badges and asked to speak with him. *Id.* ¶¶ 4, 27-28. They asked D'Olimpio his name, where he was coming from, what he was doing at the doctor's office, and whether the car was his. *Id.* ¶ 29. D'Olimpio replied it was his wife's car. *Id.* ¶ 30. Crisafi asked D'Olimpio if they could search him for weapons; D'Olimpio consented to be frisked, but not to a full search. *Id.* ¶¶ 31-32. Crisafi then frisked D'Olimpio, reached into his pockets, and took out his car keys. *Id.* ¶ 33. Crisafi asked D'Olimpio whether he would consent to a search of the car; D'Olimpio refused, but Crisafi nonetheless carried out the search. *Id.* ¶¶ 34-36. During the search, Crisafi found a bag containing a bottle marked Klonopin but containing both Vicodin and Klonopin pills, all of which were lawfully prescribed to Crisafi and which he carried in one bottle for convenience. *Id.* ¶¶ 37-38. Upon finding the bottle and discovering that there were two types of pills inside, Crisafi handcuffed D'Olimpio and moved him into the police car, without making any effort to find out whether the drugs were legally prescribed. *Id.* ¶¶ 39-40.

While D'Olimpio was being driven to the police precinct and again when he was being escorted to a bathroom prior to questioning, D'Olimpio requested an attorney, but these requests were denied. *Id.* ¶¶ 41-44. Before questioning began, D'Olimpio asked Crisafi to call an ambulance so that he could take the Klonopin that he needed; Crisafi told D'Olimpio to call his wife and ask her to come to the precinct with his medication. *Id.* ¶¶ 46-47. When **\*344** D'Olimpio's wife arrived, D'Olimpio was brought into a different room, and his wife was given his possessions. *Id.* ¶ 48. Crisafi then offered D'Olimpio a blue pill, which he took, but D'Olimpio now believes that pill was not a Klonopin pill, as he experienced side effects of confusion and drowsiness after taking it, which he had never felt previously when taking Klonopin. *Id.* ¶ 50. Crisafi began to interrogate D'Olimpio, and at one point

threatened to rescind his father's physician license. *Id.* ¶ 51. D'Olimpio at that point again requested an attorney, and Crisafi again denied his request. *Id.* ¶¶ 52-53.

During the interrogation, Crisafi asked D'Olimpio to confess to charges of criminal possession of a controlled substance for possessing the Vicodin and to charges of criminal impersonation for allegedly calling pharmacies and using false information to obtain prescriptions. D'Olimpio, under the influence of the pill, signed a one-page confession presented to him by Crisafi. *Id.* ¶ 54. At Crisafi's request, Vallely signed a form falsely indicating that he had seen Crisafi inform D'Olimpio of his *Miranda* rights. *Id.* ¶ 55. D'Olimpio's forged signature was also added to this "*Miranda* sheet." *Id.* ¶ 56. Crisafi, perhaps with the assistance of Vallely or D'Amicantonio, also wrote a four-page confession and forged D'Olimpio's signature and initials on it. *Id.* ¶ 57. Furthermore, Crisafi, possibly with the assistance of Vallely and D'Amicantonio, drafted an affidavit falsely attesting that D'Olimpio illegally possessed Vicodin and that he impersonated a doctor to obtain his prescriptions. *Id.* ¶ 58.

D'Olimpio was then taken to the Manhattan Detention Center, where he was held for 24 hours prior to being arraigned. *Id.* ¶¶ 59-60. Based on the four-page confession and the affidavit, he was arraigned on the criminal possession and impersonation charges and then released on his own recognizance. *Id.* ¶¶ 61-62. According to the Complaint, D'Olimpio appeared in court about seven times before the charges against him were finally dropped on September 4, 2008. *Id.* ¶ 76.

On the basis of these allegations, D'Olimpio's third cause of action claims that Crisafi, Vallely, and D'Amicantonio maliciously prosecuted D'Olimpio by initiating the criminal charges.[FN3] These defendants moved to dismiss this malicious prosecution claim, primarily on the basis that the charges against D'Olimpio remained pending against him as of the time of their motion, as

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

demonstrated by a Court Action Sheet of the Criminal Court, New York County. Decl. of Ivan Rubin, 12/22/09, Ex. 1. Because the favorable termination of the prosecution is a necessary element of a malicious prosecution claim under § 1983, *Green v. Mattingly,* 585 F.3d 97, 103 (2d Cir.2009), the pendency of criminal charges would be fatal to this cause of action.

> FN3. In the first, fourth, and fifth causes of action in the FAC, D'Olimpio respectively alleges that Crisafi, Vallely, and D'Amicantonio violated various constitutional rights, falsely arrested him, and unlawfully detained him. No motions to dismiss were filed with respect to these claims.

In his opposition to the motions to dismiss, D'Olimpio asserted that the Assistant District Attorney prosecuting D'Olimpio's criminal case had committed to move orally to dismiss that case at the next court hearing, which was scheduled for February 2, 2010. Based on that representation, this Court granted leave for D'Olimpio to file a Second Amended Complaint ("SAC") following that hearing. The Second Amended Complaint, filed on February 18, 2010, did indeed include the representation that the criminal charges were dismissed on February 2, 2010. SAC **345 ¶ 110. Since D'Olimpio had now sufficiently alleged the favorable termination of the criminal charges against him, the March 1 Order therefore denied the motions to dismiss D'Olimpio's malicious prosecution claim.[FN4]

> FN4. Defendants also asserted that the malicious prosecution claim should be dismissed because D'Olimpio's allegations failed to demonstrate the element of malice-*i.e.,* that there was "some deliberate act punctuated with awareness of 'conscious falsity' " with respect to the institution of criminal proceedings. *Bradley v. Vill. of Greenwood Lake,* 376 F.Supp.2d 528,

534-35 (S.D.N.Y.2005). But D'Olimpio's allegations regarding the false affidavits and confessions were clearly more than sufficient to plead malice.

Defendants Giglio, Moffett, and Nadel moved to dismiss D'Olimpio's second cause of action, which charged them with various constitutional violations based on their supervisory authority over Crisafi and their involvement with an alleged policy leading to D'Olimpio's false arrest. In this regard, the FAC contains the following allegations with respect to these defendants: At the time of the events alleged, James Giglio was the director of the BNE, and worked in the BNE's office in Troy, New York. *Id.* ¶ 5. Michael Moffett was the BNE's Section Chief with responsibility over BNE investigators, and also worked in the Troy office. *Id.* ¶ 6. Paul Nadel was the BNE's Program Director for the MARO, and worked in the same Manhattan office as Crisafi, Vallely, and D'Amicantonio. *Id.* ¶ 7. All three of these defendants had supervisory authority over Crisafi, Vallely, D'Amicantonio, and Kaplan. *Id.* ¶¶ 5-7.

The FAC further alleges that at the time of Crisafi's arrest, MARO followed the following protocol in order to determine whether a narcotics prescription was legitimate: First, when a patient called in a prescription to a pharmacy, the pharmacy would expect to receive a hard copy of the prescription from the patient's doctor within a week. Second, pharmacies were instructed to contact the MARO if they failed to receive a hard copy by the end of the seven-day period. Third, when the MARO was contacted by a pharmacy because the pharmacy did not receive a hard copy, a MARO officer would call the doctor's office and would either speak with the doctor to inquire whether the prescription was legitimate or would ask the doctor to fax an affidavit stating that the prescription was legitimate. *Id.* ¶ 11. With respect to this last step, MARO had a practice of confirming complaints from doctors by telephone and fax without taking any other steps to verify the doctors' identities. *Id.* ¶ 12.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

The FAC also includes the following allegations regarding the failure of Giglio, Moffett, and Nadel to supervise Crisafi: On March 22, 2007, the *New York Times* published an article detailing the abuse of parking placards by government officials. This article included a photograph of a car belonging to Crisafi. *Id.* ¶ 13. Shortly after the publication of that article, the New York State Inspector General's Office began an investigation of Crisafi, which unearthed evidence of other misconduct. *Id.* ¶ 14. Sometime before November 16, 2007, plaintiff Kaplan, a MARO investigator, sent Nadel a written complaint informing him that Crisafi was violating suspects' Fifth Amendment rights. *Id.* ¶ 15. Nadel took no action in response to this complaint. *Id.* ¶ 16. Kaplan followed up with a series of other complaints, including a report to the Inspector General, which are discussed more fully below in the context of Kaplan's retaliation claim. The Inspector General's investigation culminated in a report issued on December 8, 2008, written by Inspector General Joseph Fisch (the "Fisch Report"), which found that Crisafi committed numerous abuses, including many of those alleged by Kaplan, some of **\*346** which were assisted by Vallely and D'Amicantonio. The Fisch Report also found that Giglio and Moffett failed to supervise Crisafi and the MARO office, and noted the fact that Nadel, who was responsible for approving law enforcement operations, was a licensed pharmacist with no previous law enforcement experience. *Id.* ¶¶ 78-79.

Based on the above allegations, Crisafi in his second cause of action asserted § 1983 claims against Giglio, Moffett, and Nadel arising from (1) their creation of a policy allowing MARO personnel to initiate criminal charges based on a phone conversation or faxed affidavit without confirmation of the doctor's identity or that the alleged signature on the affidavit was authentic (the "Policy"); (2) their failure to supervise Crisafi and the MARO; (3) their allowing Nadel, a pharmacist with no prior law enforcement experience, to be the MARO Program Director; and (4) their deliberate indifference to D'Olimpio's rights. *Id.* ¶¶ 122-25.

Defendants attack these claims on several grounds. First, they assert that these claims are based on a broad theory of "supervisory liability" that has been discredited by the Supreme Court in *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Prior to *Iqbal,* well-established Second Circuit law provided five bases for showing that a supervisory defendant had sufficient personal involvement with the alleged violation to maintain a § 1983 claim. A plaintiff could plead personal involvement by showing any of the following:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Defendants argue that *Iqbal's* discussion of supervisory liability took a narrower approach than did *Colon,* therefore rendering D'Olimpio's reliance on some of the *Colon* categories unwarranted.

By way of background, the plaintiff in *Iqbal* brought a " *Bivens* " action against several high-ranking federal officials, including the Attorney General and the Director of the Federal Bureau of Investigation, based on allegations that following the September 11 attacks, the FBI "arrested and detained thousands of Arab and Muslim men" substantially on the basis of their race, religion, or national origin, and that as a result plaintiff was unlawfully

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

subjected to harsh confinement conditions substantially on these discriminatory bases. 129 S.Ct. at 1951. The Supreme Court, however, held, *inter alia,* that the complaint failed to state a claim for intentional discrimination with respect to the Attorney General or FBI Director, and, as part of that discussion, observed that neither *Bivens* itself (*i.e., Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)) nor § 1983 imposes supervisory liability simply on the basis of *respondeat superior;* rather, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 1948; *see also id.* at 1949 ("[T]he term 'supervisory liability' is a misnomer.... [E]ach Government official ... is only liable for his or her own misconduct."). The Court went on to note that the required showing of personal involvement "will vary with the **347** constitutional provision at issue"; as the plaintiff's claim in *Iqbal* was for "invidious discrimination" in violation of the First Amendment and Equal Protection Clause, "the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Id.* at 1948. Accordingly, the Court rejected the plaintiff's theory that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Id.* at 1949.

[1] The defendants here note that certain courts in this District have read these passages of *Iqbal* to mean that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster ... [t]he other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated." *Bellamy v. Mount Vernon Hosp.,* 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009); *see also Newton v. City of N.Y.,* 640 F.Supp.2d 426, 448 (S.D.N.Y.2009) ("[P]assive failure to train claims have not survived the Supreme Court's recent decision in *Ashcroft v. Iqbal.*"); *Joseph v. Fischer,* 2009 WL 3321011, at *15 (S.D.N.Y. Oct. 8, 2009) ("Plaintiff's claim, based on [defendant's] 'failure to take corrective measures,' is precisely the type of claim Iqbal eliminated."). This Court respectfully disagrees. As *Iqbal* noted, the degree of personal involvement varies depending on the

constitutional provision at issue; whereas invidious discrimination claims require a showing of discriminatory purpose, there is no analogous requirement applicable to D'Olimpio's allegations regarding his search, arrest, and prosecution. *See, e.g., Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). *Colon's* bases for liability are not founded on a theory of *respondeat superior,* but rather on a recognition that "personal involvement of defendants in alleged constitutional deprivations" can be shown by nonfeasance as well as misfeasance. 58 F.3d at 873 (internal quotation marks omitted). Thus, the five *Colon* categories for personal liability of supervisors may still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated. *See, e.g., Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) ("It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.' Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." (citation omitted)).

[2] Apart from this argument based on *Iqbal,* Giglio and Moffett assert that D'Olimpio's claims against them should be dismissed insofar as they allege a failure to supervise the MARO investigators. They maintain that D'Olimpio's allegations in this regard are too conclusory to state a claim. The Court disagrees. The FAC incorporates by reference the Fisch Report, which summarizes an investigation beginning in March 2007, describes various acts of misconduct by Crisafi that took place prior to D'Olimpio's arrest, contains a section headed "Lack of Supervision of Crisafi and MARO," and indeed concludes that there was a "lack of appropriate supervision by [Crisafi's] supervisors at MARO and at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

BNE's headquarters in Troy," where Giglio and Moffett were in charge. Fisch Report, 12/8/08, at 4, 16-17, *available at http:// www. ig. state. ny. us/ *348 pd fs/Investigationöf% 20Employee% 20Misconduct% 20at% 20the% 20DOH% 20Bureau% 20of% 20Narcotics% 20Enforcement.pdf* (cited in FAC ¶ 78). These findings by the Inspector General strongly suggest that defendants Giglio and Moffett "fail[ed] to act on information indicating unconstitutional acts were occurring," or were "gross[ly] negligen[t] in failing to supervise ... subordinates who commit ... wrongful acts," or were otherwise deliberately indifferent to suspects' rights, and also demonstrate "an affirmative causal link between the supervisor's inaction and [plaintiff's] injury." *Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002). For the foregoing reasons, the March 1 Order held that the claims against Giglio and Moffett in this respect cannot be dismissed.

Nadel also argued that the claims against him for his failure to supervise Crisafi must be dismissed because there were no specific allegations of Nadel's personal involvement. The FAC does allege, however, that Kaplan complained to Nadel in writing of Crisafi's misconduct prior to D'Olimpio's arrest. FAC ¶ 15. The Fisch Report, although it does not dwell on Nadel's actions, cites Nadel's lack of prior law enforcement experience and describes complaints by MARO investigators that the lack of a Program Director with law enforcement experience allowed Crisafi "to attain an inappropriate degree of power within the office." Fisch Report at 1, 16. Because the Court, in ruling on a motion to dismiss, must "take all facts and draw all inferences in the light most favorable" to the plaintiff, *Gross v. Rell,* 585 F.3d 72, 75 n. 1 (2d Cir.2009), and because, as noted, the FAC incorporates by reference the allegations of the Fisch Report, the Fisch Report's conclusion that there was a general failure to supervise Crisafi must be taken for these purposes to apply to Nadel, Crisafi's immediate supervisor.[FN5] Thus, the March 1 Order denied the motion to dismiss the claim alleging Nadel's failure to supervise.

FN5. Defendants' reply memorandum asserted that contrary to what was pleaded in the FAC, Crisafi was a Senior Investigator at the time of D'Olimpio's arrest and thus did not report to Nadel at that time. In support of this, it cited to the Fisch Report, which mentions that Crisafi was temporarily promoted between 2006 and March 2008. Fisch Report at 16. The Report does not, however, state that Crisafi ceased reporting to Nadel during this period. The FAC alleges that Nadel, as MARO Program Director, had supervisory authority over all MARO investigators. FAC ¶ 7. In light of the allegations in the FAC, and taking all inferences in favor of D'Olimpio, the Court cannot conclude that Nadel lacked supervisory authority over Crisafi during this period. In any event, it is undisputed that Nadel supervised Vallely and D'Amicantonio, who are also alleged to have violated D'Olimpio's constitutional rights.

With respect to those aspects of plaintiff D'Olimpio's second cause of action that relate to the alleged "Policy," that Policy allegedly permitted BNE investigators to rely on unverified telephone communications with, or faxed affidavits from, doctors' offices to satisfy the requirement of probable cause to arrest suspects or initiate criminal charges. While defendants appear to concede that Giglio, Moffett, and Nadel were sufficiently involved with the formation and operation of this Policy to satisfy the personal involvement requirement of § 1983, they argue that the alleged Policy is not unconstitutional, or at the very least, that the doctrine of qualified immunity should bar further proceedings with respect to these allegations.

[3][4] "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is **349 committing a crime." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). The probable cause determination is

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

based on the "totality of the circumstances," and does not readily lend itself to being reduced to a "neat set of legal rules." *Caldarola v. Calabrese,* 298 F.3d 156, 162 (2d Cir.2002) (internal quotation marks omitted). Furthermore, "in the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show 'arguable' probable cause." *Id.* (internal quotation mark omitted). The Supreme Court has held that tips from informants can provide probable cause to arrest, but only if either the informant or the information in his/her tips has been shown to be reliable or has been sufficiently corroborated. *See Illinois v. Gates,* 462 U.S. 213, 242, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("[E]ven in making a warrantless arrest[,] an officer 'may rely upon information received through an informant, rather than upon his direct observations, *so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.*'" (emphasis added)); *Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (anonymous call to police reporting that person was carrying a gun lacked indicia of reliability sufficient to satisfy "reasonable suspicion" standard with respect to a police officer's stop-and-frisk search, even though that standard requires a lesser showing than probable cause to arrest); *see also United States v. Elmore,* 482 F.3d 172, 179 (2d Cir.2007) ("Even a tip from a completely anonymous informant-though it will seldom demonstrate basis of knowledge and the veracity of an anonymous informant is largely unknowable-can form the basis of reasonable suspicion or probable cause *if it is sufficiently corroborated.*" (emphasis added) (citation omitted)); *Oliveira v. Mayer,* 23 F.3d 642, 647 (2d Cir.1994) ("Information about criminal activity provided by a single complainant can establish probable cause *when that information is sufficiently reliable and corroborated.*" (emphasis added)).

[5] Defendants argue that the Policy provides BNE officers with probable cause (either on the merits or sufficient to entitle them to qualified immunity) because the information provided by the doctors' offices is sufficiently reliable to support a reasonable belief that a crime has been committed. For this proposition, the defendants rely primarily on two out-of-circuit cases,

*United States v. Fooladi,* 703 F.2d 180 (5th Cir.1983), and *Edwards v. Cabrera,* 58 F.3d 290 (7th Cir.1995). While these cases do support the proposition that it may be error to discount information provided by disinterested informants absent reason to doubt these informants' veracity, even when their names are not known to the law enforcement officer, these cases do not stand for the proposition that such information alone suffices to establish probable cause. Rather, in *Fooladi,* the probable cause determination was not based solely on information provided by a representative of a glass manufacturer, which the Fifth Circuit held that the trial court had erroneously disregarded. Instead, the arrest was based not only on the employee's tip that the manufacturer had shipped glassware to a purported business address that was in fact the arrestee's personal address, but also on, among other things, the law enforcement agent's personal observation that the arrestee's residence emanated an odor characteristic of methamphetamine manufacturing and that the arrestee left the premises "holding his gloved hands away from his body as if a chemical were on them." 703 F.2d at 181-84. Similarly, in *Edwards,* the Seventh Circuit found that probable cause existed not just because of a tip from a bus **350** driver, relayed through a dispatcher, that the driver thought he saw several men participate in a drug transaction in a bus station, but also based on the police officer's own personal observations of several men, including the arrestee and his brother, who matched the driver's description standing together outside the bus station; the officer's personal observation that the arrestee's brother was so nervous that he appeared to have urinated on himself; and the officer's subsequent consent search of the brother's garment bag, which yielded a plastic bag appearing to contain marijuana. 58 F.3d at 292.

These cases are thus consistent with the law in this Circuit, as articulated in *Caldarola v. Calabrese,* 298 F.3d 156 (2d Cir.2002). The plaintiff in *Caldarola,* a New York corrections officer challenged his arrest on charges that he was unlawfully collecting job injury benefits even though he was no longer a New York resident and thus was not qualified to receive such benefits. The arresting officer determined there was probable cause to believe the plaintiff had moved from New York to Connecticut based

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

on an investigative file containing reports from two private investigation firms that had been hired by the officer's supervisors. The reports themselves contained, among other things, summaries of investigators' personal interviews with the plaintiff's New York neighbors, surveillance tapes showing the plaintiff emerging from a home in Connecticut and dropping his children off at school, a deed and mortgage for a Connecticut home in the plaintiff's name indicating that it was his primary residence, and work attendance records indicating that the plaintiff had a Connecticut telephone number. The Second Circuit held that it was reasonable for the arresting officer to conclude that these private investigative firms hired by his supervisors were reliable and that the investigators' reports provided information corroborating their conclusions. *Id.* at 163-68. Thus, accepting *arguendo* defendants' assertion that *Caldarola* stands for the proposition that information gathered by private investigators can support probable cause even in the absence of personal knowledge by the arresting officer, the decision certainly does not suggest that an unadorned, unverified phone call or fax can, by itself, without further meaningful corroboration, satisfy probable cause or support qualified immunity.

[6] Returning to the allegations in the FAC, D'Olimpio has asserted that, consistent with the Policy, his arrest was predicated on nothing more than his pharmacy's report that it had failed to receive a hard copy of the prescription within a week, which prompted a MARO official to call D'Olimpio's doctor's office and speak with an unknown person there, who either stated that he was not aware of any such prescription or effectuated the fax transmission of an affidavit bearing an unverified signature of the doctor. None of the above-cited cases suggests that this information originating from an unidentifiable person in a doctor's office can even come close to satisfying probable cause to arrest, absent corroboration or other indicia of reliability. Unlike *Caldarola,* here there is no underlying data providing support for the informant's conclusion. There is no indication that the identity of the informant here could ever be determined. *Cf. J.L.,* 529 U.S. at 270, 120 S.Ct. 1375 ("Unlike a tip from a known informant whose

reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.' " (citation omitted)). There is no suggestion that the MARO investigators had any reason to rely on this particular doctor's office; to the contrary, there are numerous **351 reasons why a doctor or her staff might inadvertently provide inaccurate information, especially given that the relevant information is not affirmatively provided by a tipper, but rather can be elicited by the investigator from whoever happens to pick up the phone in the doctor's office. Moreover, if the doctor herself were involved in wrongdoing with respect to the prescription of narcotics, she would have an incentive to affirmatively mislead the investigators. In sum, while a report from a doctor or her staff denying knowledge of the prescription might be a reasonable basis for further investigation, it is patently deficient as the sole ground for an arrest.

For the foregoing reasons, under the facts alleged and the clearly established law cited herein, defendants lacked even arguable probable cause to arrest D'Olimpio. Because the circumstances of this arrest were consistent with the Policy (as alleged), and because defendants do not dispute that Giglio, Moffett, and Nadel had personal involvement with the establishment and enforcement of this Policy, the March 1 Order declined to dismiss the second cause of action with respect to these allegations.

The Court turns next to those portions of the FAC that assert claims by plaintiff Kaplan, all of which the defendants moved to dismiss. Kaplan's claim of retaliation for expressing his First Amendment rights (the sixth cause of action in the FAC) is based on the following allegations: Kaplan (as noted) is a MARO investigator. FAC ¶ 3. During at least some of the times covered by the FAC, Crisafi was Kaplan's supervisor. *Id.* ¶ 64. As described above, Kaplan complained to Nadel about Crisafi prior to November 16, 2007, but Nadel took no action. *Id.* ¶¶ 15-16. On or about November 17, 2007, Kaplan again went to Nadel and raised concerns about

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

Crisafi: in particular, he stated that Crisafi took prescription narcotics while on duty; that Crisafi would experience facial tics and "zone out"; that Crisafi accidentally discharged his weapon while on duty; that Crisafi lied about his previous job experience; that Crisafi had investigators perform "ill-conceived" and dangerous arrests and searches; that Crisafi was violating suspects' *Miranda* rights; that Crisafi, without authorization, put sirens and lights on his car; and that Crisafi was working outside jobs during work hours. *Id.* ¶ 63. Despite the fact that Kaplan told Nadel that he was afraid of Crisafi and Nadel assured Kaplan that the conversation would be kept confidential, Nadel reported this conversation to Crisafi. *Id.* ¶¶ 63-64. Thereafter, on or about November 20, 2007, Crisafi threatened Kaplan by walking up behind him and saying, "Bang bang, you're dead." *Id.* ¶ 65. At around that same time, Kaplan filed a Workplace Incident Report with the Department of Health's Bureau of Employee Relations detailing these threats and reporting Crisafi's other misconduct, of which he had previously complained to Nadel. *Id.* ¶ 66. In response, Crisafi sabotaged Kaplan's work product on several occasions and began to spread rumors about him, including rumors that Kaplan appeared tired and slept while at the office. *Id.* ¶¶ 67-68. Kaplan then called the Inspector General to report these concerns about Crisafi, and the Inspector General then widened his ongoing investigation of Crisafi to address these issues. *Id.* ¶¶ 69-70. Because, however, the Inspector General's investigation led to interviews with all the MARO inspectors except for Kaplan, Crisafi and Nadel were able to infer that Kaplan was the whistleblower. *Id.* ¶ 71.

Kaplan, after spraining his ankle while on duty, went on workers' compensation leave on or about February 27, 2008. *Id.* ¶ 72. A bullet was shot at Kaplan's house on April 17, 2008, and on April 25, 2008, his house was vandalized. *Id.* ¶¶ 73-74. **352** On August 12, 2008, after Kaplan was notified that Employee Relations never received his first Workplace Incident Report, Kaplan resubmitted it. *Id.* ¶ 75.

After publication of the Fisch Report, Giglio resigned

as the director of the BNE. *Id.* ¶ 81. In December 2008, defendant Jennifer Treacy was appointed Deputy Director of the New York State Department of Health, with supervisory authority over the BNE and the MARO. *Id.* ¶ 82. The Inspector General attempted to persuade Kaplan to return to work, as Crisafi was on leave and would face discipline for his conduct. *Id.* ¶ 83. Kaplan agreed to return to work and received a physician's evaluation that he was fit to return. *Id.* ¶¶ 84-86. Nonetheless, Kaplan was required to undergo three additional physical examinations; after reviewing these, the relevant administrator concluded that Kaplan was fit to return, provided the he be closely monitored, specifically for falling asleep at work. *Id.* ¶¶ 87-90. He was scheduled to return to work on April 10, 2009. *Id.* ¶ 91. The FAC alleges that Treacy, who was romantically involved with Giglio, was upset about Giglio's resignation and blamed Kaplan for causing it; therefore, she ordered the acting director of the BNE not to allow Kaplan to return. *Id.* ¶¶ 92-93. On April 9, 2009, Kaplan was told not to return because of a lack of staff, and on April 23, the Department of Health sent him a letter informing him that he was terminated for failing to complete a study to confirm he did not have a sleep disorder. *Id.* ¶¶ 94-95. Kaplan filed a grievance and, after a hearing, was allowed to return to work. *Id.* ¶ 96.

In May 2009, defendant Kenneth Post was appointed as director of the BNE, and defendant Timothy Dewey was appointed as BNE Section Chief. *Id.* ¶¶ 97-98. In June 2009, Kaplan returned to work, and was informed that he would only be given a temporary assignment and would not perform fieldwork. *Id.* ¶ 99. After his reinstatement, Kaplan was denied access to a state car and was not given a badge, gun, or firearms training; he was confined to desk duties and menial document review. *Id.* ¶¶ 100-101. On July 14, 2009, Kaplan met with Dewey to complain about his treatment. *Id.* ¶ 102. D'Olimpio filed his original complaint in the instant action on August 18, 2009. In September 2009, Stephanie Jubic of Employee Relations confiscated the computers of Crisafi, Vallely, D'Amicantonio, and Kaplan-Kaplan believes Jubic downloaded his emails to find grounds to terminate him. *Id.* ¶ 105. On October 8, 2009, Kaplan was placed on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

administrative leave and told not to contact anyone at the BNE. *Id.* ¶ 108. On October 16, Jubic mailed Kaplan a letter stating that he would be interrogated on October 27 and would possibly face discipline. *Id.* ¶ 109. Also on October 16, Kaplan had a grievance hearing to discuss being denied his proper job responsibilities. At this hearing, Post stated that as BNE director, it was in his discretion to decide what duties Kaplan should have. *Id.* ¶ 110.

Based on these facts, Kaplan alleges in that defendants Treacy, Post, Dewey, and Nadel retaliated against him with respect to speech that was protected by the First Amendment. These defendants have moved to dismiss Kaplan's claim on several grounds, including that Kaplan's speech was made pursuant to his official duties and hence is not protected by the First Amendment.

[7] A public employee's cause of action for his employer's discipline based on his speech can proceed only if the employee "spoke as a citizen on a matter of public concern"; otherwise, the employee's speech is outside the scope of the First Amendment. *Sousa v. Roque,* 578 F.3d 164, 170 (2d Cir.2009) (internal quotation *353 mark omitted). In *Garcetti v. Ceballos,* 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421, 126 S.Ct. 1951. Though not without reluctance, the Court concludes that this "official duties" exception, as recently elaborated on by the Second Circuit in *Weintraub v. Board of Education,* 593 F.3d 196 (2d Cir.2010), is fatal to Kaplan's retaliation claim.

*Weintraub* made clear that for purposes of determining whether a public employee's speech is protected, a public employee's "official duties" are to be

construed broadly. The plaintiff in *Weintraub* was a public school teacher, and the allegedly protected speech consisted of a grievance he filed with his union challenging a school administrator's decision not to discipline a disruptive student. Quoting *Garcetti,* the Court of Appeals stated that the inquiry into whether a public employee speaks pursuant his official duties is "a practical one," and that the employee's duties should not be interpreted narrowly. 593 F.3d at 202 (internal quotation marks omitted). Thus, *Weintraub* held:

[U]nder the First Amendment, speech can be "pursuant to" a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer. In particular, we conclude that Weintraub's grievance was "pursuant to" his official duties because it was "part-and-parcel of his concerns" about his ability to "properly execute his duties," as a public school teacher-namely, to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning.... Weintraub's speech challenging the school administration's decision to not discipline a student in his class was a "means to fulfill," and "undertaken in the course of performing," his primary employment responsibility of teaching.

*Id.* at 203 (citations omitted). The court went on to note that its conclusion was supported "by the fact that [Weintraub's] speech ultimately took the form of an employee grievance, for which there is no relevant citizen analogue." *Id.* Whereas actions like writing a letter to a newspaper or informally discussing politics with co-workers are equally available to government employees and ordinary citizens, "[t]he lodging of a union grievance is not a form or channel of discourse available to non-employee citizens." *Id.* at 203-04.

[8] Here, the speech that Kaplan claims is protected falls within Kaplan's official duties as defined by

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

*Weintraub.* In the FAC, Kaplan alleges that the retaliation he allegedly suffered was in response to the following statements: (1) his complaints to Nadel about Crisafi's behavior; (2) his Workplace Incident Reports; and (3) his complaint to the Inspector General. With the possible exception of the latter, each of these statements, as Kaplan concedes, was "made privately though channels available through his employment," and was "made in a manner that would not be available to a non-public employee citizen." Kaplan Supp. Mem., 2/5/10, at 5. Moreover, the common theme of all these statements was that Crisafi was violating suspects' rights and was not performing his job properly, and by implication that Crisafi was interfering with Kaplan's ability to perform his own duties. It is clear that Kaplan's duties as a MARO officer included ensuring that investigations and arrests of narcotics abuses are lawfully conducted. *See, e.g.,* Fisch Report at 2-3 (describing policies and training manuals *354 applicable to BNE investigators). All of Kaplan's relevant speech was therefore, either directly or indirectly, " 'part-and-parcel of his concerns' about his ability to 'properly execute his duties' " as a BNE investigator. *Weintraub,* 593 F.3d at 203. Just as the speech in *Weintraub* was in furtherance of the teacher's duty to maintain classroom discipline, Kaplan's speech here, which related to ensuring the "safety of citizens" and the "constitutional rights of suspects," Kaplan Supp. Mem. at 5, was made in furtherance of his law enforcement duties as an investigator endowed with the power to arrest. *Cf. Carter v. Inc. Vill. of Ocean Beach,* 693 F.Supp.2d 203, 211 (E.D.N.Y.2010) ( "All of plaintiffs' complaints to their superiors ... related to their concerns about their ability to properly execute their duties as police officers, as they expressed concern [that various acts] affected their ability to perform their job assignments safely and that they were told not to issue summonses to certain individuals and businesses.... Plaintiffs' speech in challenging ... defendants' alleged cover-ups of officer misconduct ... was undertaken in the course of performing one of their core employment responsibilities of enforcing the law and, thus, was speech made pursuant to their official duties."). Accordingly, Kaplan's allegations cannot support a First Amendment retaliation claim.

In addition, the speech contained in Kaplan's Workplace Incident Reports and his complaint to the Inspector General were unprotected by the First Amendment because these statements were required by law. *See* N.Y. Labor Law § 27-b(6)(a) ("Any employee ... who believes that a serious violation of a workplace violence protection program exists or that an imminent danger exists shall bring such matter to the attention of a supervisor in the form of a written notice."); N.Y. Exec. Law § 55(1) ("Every state officer or employee in a covered agency shall report promptly to the state inspector general any information concerning corruption, fraud, criminal activity, conflicts of interest or abuse by another state officer or employee relating to his or her office or employment .... The knowing failure of any officer or employee to so report shall be cause for removal from office or employment or other appropriate penalty.").[FN6] Speech made pursuant to a public employee's legal obligations is not made "as a citizen."[FN7]

FN6. It is these statutory obligations, as well as *Weintraub's* broad definition of speech made in the course of official duties, that distinguish Kaplan's speech from that of the plaintiff in *Freitag v. Ayers,* 468 F.3d 528 (9th Cir.2006). The plaintiff in *Freitag,* a California correctional officer, claimed she was retaliated against after reporting to the California Inspector General that she and other prison guards were being sexually harassed. Although the Ninth Circuit held that the plaintiff "acted as a citizen" in complaining to the Inspector General and in writing letters to a state senator regarding this harassment, the court's holding was based on the fact that "[i]t was certainly not part of [plaintiff's] official tasks to complain to the Senator or the IG about the state's failure to perform its duties properly." *Id.* at 545. Under New York law, however, such complaints *are* within the official duties of BNE investigators.

FN7. Because Kaplan's speech was made

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

pursuant to his official duties and thus is not constitutionally protected, the Court need not reach other required elements of a First Amendment retaliation claim, including whether his speech addressed matters of "public concern," *see Sousa, 578 F.3d at 170,* and whether the complaint sufficiently alleges a causal connection between the protected speech and the retaliatory acts, *see Gorman-Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir.2001).*

For the foregoing reasons, the March 1 Order denied the sixth cause of action in the FAC, and, as the Court now clarifies, the dismissal was with prejudice because it rests on a legal ground that cannot be **\*355** cured by repleading. *Cf. Oliver Schs., Inc. v. Foley, 930 F.2d 248, 252-53 (2d Cir.1991).* The Court notes, however, that the dismissal of Kaplan's First Amendment claim brought pursuant to § 1983 does not alter Kaplan's opportunity under applicable New York law to seek protection from the retaliatory acts he alleges. *See* N.Y. Labor Law § 27-b(6)(e) (prohibiting retaliation based on an employee's filing of a report of workplace violence); N.Y. Exec. Law. § 55(1) (providing that employees who report "improper governmental action" to the Inspector General "shall not be subject to dismissal, discipline or other adverse personnel action").

[9] The Court comes finally to Crisafi's counterclaim for defamation, which insinuates that the aforementioned Workplace Incident Reports filed by Kaplan, Kaplan's complaint to the Inspector General, and even Kaplan's allegations in the FAC are defamatory. Crisafi subsequently conceded, however, that the only potentially actionable statements not protected by privilege or barred by the statute of limitations are those that were allegedly republished on December 8, 2008 by the Inspector General and the *New York Times.* Crisafi Mem. Opp. Kaplan's Mot. to Dismiss, 2/5/10, at 4-5. In this respect, the counterclaim, which was filed on December 3, 2009, alleges the following: Kaplan filed Workplace Incident Reports on or about November 20, 2007 and August 12,

2008 reporting various misconduct by Crisafi, and made a complaint to the Inspector General to the same effect on or about November 20, 2007. Crisafi Compl. ¶¶ 15, 17, 20, Exs. C-E. Crisafi alleges, based on information and belief, that Kaplan's report to the Inspector General "prompted an investigation" focused on Crisafi and relating to Kaplan's complaints. *Id.* ¶ 19. Also upon information and belief, Crisafi alleges that a copy of the Fisch Report was provided to Kaplan in advance of its public release. *Id.* ¶ 35. This report was also provided to the *New York Times,* which described this report in an article published on December 8, 2008. *Id.* ¶ 36 & Ex. F. Upon information and belief, Crisafi alleges that Kaplan gave the Fisch Report to the *New York Times. Id.* ¶ 37. The Fisch Report was published on the *New York Times's* and Inspector General's websites, where it remains accessible. *Id.* ¶¶ 39-40. Crisafi alleges that the contents of the *New York Times* article and the Fisch Report reflect false and defamatory statements made by Kaplan, and have caused Crisafi to be vilified and his reputation to suffer. *Id.* ¶¶ 16, 18, 21, 23-33, 41-43. Accordingly, Crisafi asserted two causes of action alleging that Kaplan defamed him. Kaplan then moved to dismiss these counterclaims on the basis that Kaplan is not responsible for the republication of his allegedly defamatory statements by the *New York Times* or the Inspector General.

[10] Under New York law, a plaintiff "may not recover damages from the original author for ... slander arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 59 (2d Cir.2002).* Crisafi argues that a more lenient standard applies, permitting liability based on Kaplan's mere knowledge or reasonable expectation that his allegedly defamatory statements would be republished. *See, e.g., Campo v. Paar, 18 A.D.2d 364, 368, 239 N.Y.S.2d 494 (1st Dept.1963).* The Court need not resolve which standard applies: Crisafi's counterclaim is deficient under either test because it fails to "state a claim to relief that is plausible on its face." *Iqbal, 129 S.Ct. at 1949* (internal quotation marks omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

Even accepting as true Crisafi's non-conclusory factual allegations, including **356** those made only on information and belief, it is simply implausible that Kaplan in any legally relevant sense caused the republication of his statements in the Fisch Report or *New York Times* article. Crisafi alleges that Kaplan's complaint prompted the Inspector General investigation, but this allegation is contradicted by the Fisch Report itself, which indicates that the investigation began after the *New York Times* published an article in March 22, 2007 describing abuses of government-issued parking placards. Fisch Report at 3-4. In any event, even if Kaplan's complaint served to expand the scope the investigation, and included allegations consistent with what the Fisch Report eventually concluded, the Report clearly did more than merely parrot Kaplan's charges. The Report, in a section headed "Methodology," states that the investigation was based on, among other things, interviews with Crisafi himself, other BNE employees, Giglio, and Moffett, as well as other police officers and district attorneys who had interacted with Crisafi. *Id.* at 4. Indeed, the Inspector General is required by statute to "investigate," not merely repeat, allegations of malfeasance. N.Y. Exec. Law § 53. And even if, as alleged, Kaplan acted to bring the Report to the attention of the *New York Times,* the *New York Times* article, which consists entirely of a summary of the Fisch Report, reflects Kaplan's allegations only to the extent that such charges were ratified by the Report itself. *See* Crisafi Compl., Ex. F.

For these reasons, the Court concluded that there is no basis for holding Kaplan liable for the republication of his allegedly defamatory statements, even if he intended that his allegations be republished in this manner and gave the *New York Times* a copy of the Fisch Report. "The rationale for making the originator of a defamatory statement liable for its foreseeable republication is the strong causal link between the actions of the originator and the damage caused by the republication." *Van-Go Transp. Co. v. N.Y. City Bd. of Educ.,* 971 F.Supp. 90, 102 (E.D.N.Y.1997) (internal quotation marks omitted). Here,

the duty of the Inspector General to investigate complaints prior to publishing a written report, the fact that the Fisch Report was based on numerous sources beyond Kaplan's allegations, and the fact that the *New York Times* article merely summarized the Fisch Report together sever any causal link that might exist between Kaplan's actions and the December 8, 2008 republications. Thus, the March 1 Order dismissed Crisafi's counterclaim with prejudice.[FN8]

FN8. This result is not inconsistent with *Campo v. Paar,* 18 A.D.2d 364, 368, 239 N.Y.S.2d 494 (1st Dept.1963), which declared that "[a]nyone giving a statement to a representative of a newspaper authorizing or intending its publication is responsible for any damage caused by the publication." This broad pronouncement was made in the context of a narrower holding that the defendant, Jack Paar, could be held responsible for the *New York Post's* publication of his statement, made by him to a reporter during an interview, that the plaintiff "lacked certain qualities which would fit him to be a performer desirable to [Paar's] program." *Id.* at 365, 239 N.Y.S.2d 494. The causal link between Kaplan's statements and the findings of the Fisch Report, which were subsequently summarized by the *New York Times,* is obviously much more attenuated than the relationship in *Campo* between Paar's statement to the newspaper reporter during an interview and the reporter's publication of that statement.

For the foregoing reasons, the Court hereby confirms its decisions to dismiss the sixth cause of action (*i.e.,* all of Kaplan's claims) and to dismiss both of Crisafi's counterclaims, all with prejudice, and to otherwise deny the motions to dismiss. The Clerk of the Court is directed to close **357** the entries numbered 33, 34, 35, 42, and 47 on the docket of case number 09 Civ. 7283 and to close case number 09 Civ. 9952.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)


S.D.N.Y.,2010.

D'Olimpio v. Crisafi

718 F.Supp.2d 340


END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

C

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Gultela QASEM, Plaintiff,

v.

Luis A. TORO; Superintendent of Taconic Correctional Facility Delores Thornton; Deputy Superintendent for Security William Rogers; John Does 1-10, Defendants.

No. 09 Civ. 8361(SHS).

Aug. 10, 2010.

**Background:** Inmate brought a § 1983 suit against corrections officials regarding injuries suffered by the inmate at the hands of a corrections officer alleged to have sexually assaulted the inmate. Superintendent and deputy superintendent for security moved to dismiss claims that they were deliberately indifferent to the inmate's personal safety.

**Holdings:** The District Court, Sidney H. Stein, J., held that:

(1) inmate stated a claim against the movants for Eighth and Fourteenth Amendment violations, and

(2) movants were not entitled to qualified immunity.

Motion denied.

West Headnotes

**[1] Civil Rights 78 ☞ 1358**

78 Civil Rights

   78III Federal Remedies in General

      78k1353 Liability of Public Officials

         78k1358 k. Criminal Law Enforcement; Prisons. Most Cited Cases

**Constitutional Law 92 ☞ 4825**

92 Constitutional Law

   92XXVII Due Process

      92XXVII(H) Criminal Law

         92XXVII(H)11 Imprisonment and Incidents Thereof

            92k4825 k. Use of Force; Protection from Violence. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))


**Prisons 310** ☞ **234**


310 Prisons

   310II Prisoners and Inmates

     310II(E) Place or Mode of Confinement

       310k234 k. Duty to Protect; Protective Confinement. Most Cited Cases


**Sentencing and Punishment 350H** ☞ **1537**


350H Sentencing and Punishment

   350HVII Cruel and Unusual Punishment in General

     350HVII(H) Conditions of Confinement

       350Hk1537 k. Protection from Violence. Most Cited Cases


Inmate's allegations against superintendent and deputy superintendent for security in a § 1983 suit, claiming that they were deliberately indifferent to her rights and were responsible for creating or maintaining policies or practices that failed to prevent her from being repeatedly raped and assaulted by a corrections officer, stated a claim for Eighth and Fourteenth Amendment violations; complaint alleged that the officials were responsible for determining where inmates were to be housed and the assignment of guards, and in conjunction with another official, the investigation and response to complaints of staff misconduct. U.S.C.A. Const.Amends. 8, 14; 42 U.S.C.A. § 1983.


**[2] Civil Rights 78** ☞ **1335**


78 Civil Rights

   78III Federal Remedies in General

     78k1334 Persons Liable in General

       78k1335 k. In General. Most Cited Cases


Degree of personal involvement required to overcome a motion to dismiss a § 1983 claim for failure to state a claim varies depending on the constitutional provision alleged to have been violated. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.


**[3] Civil Rights 78** ☞ **1355**


78 Civil Rights

   78III Federal Remedies in General

     78k1353 Liability of Public Officials

       78k1355 k. Vicarious Liability and Respondeat Superior in General; Supervisory Liability in General. Most Cited Cases


Categories set forth in case law as supporting personal liability of supervisors under § 1983 apply as long as they are consistent the requirements applicable to the particular constitutional provision alleged to have been violated. 42 U.S.C.A. § 1983.


**[4] Sentencing and Punishment 350H** ☞ **1532**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

350H Sentencing and Punishment

   350HVII Cruel and Unusual Punishment in General

     350HVII(H) Conditions of Confinement

       350Hk1532 k. In General. Most Cited Cases

Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. U.S.C.A. Const.Amend. 8.

**[5] Sentencing and Punishment 350H &#9758; 1533**

350H Sentencing and Punishment

   350HVII Cruel and Unusual Punishment in General

     350HVII(H) Conditions of Confinement

       350Hk1533 k. Deliberate Indifference in General. Most Cited Cases

Official acts with the requisite deliberate indifference for an Eighth Amendment violation when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. U.S.C.A. Const.Amend. 8.

**[6] Civil Rights 78 &#9758; 1376(7)**

78 Civil Rights

   78III Federal Remedies in General

     78k1372 Privilege or Immunity; Good Faith and Probable Cause

      78k1376 Government Agencies and Officers

       78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases

Superintendent and deputy superintendent for security were not entitled to qualified immunity in an inmate's § 1983 suit claiming that they were deliberately indifferent to her rights and were responsible for creating or maintaining policies or practices that failed to prevent her from being repeatedly raped and assaulted by a corrections officer, given the extent of the alleged sexual abuse, the numerous warning signs alleged, and the number of questionable, if not unintelligible, decisions made with respect to the inmate during the course of an investigation. 42 U.S.C.A. § 1983.

**[7] Civil Rights 78 &#9758; 1376(2)**

78 Civil Rights

   78III Federal Remedies in General

     78k1372 Privilege or Immunity; Good Faith and Probable Cause

      78k1376 Government Agencies and Officers

       78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

Individual defendants are shielded from liability for civil damages under § 1983 if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. 42 U.S.C.A. § 1983.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

Karen K. Won, Cooley Godward Kronish LLP, William O'Brien, Kronish, Lieb, Weiner & Hellman L.L.P., New York, NY, for Plaintiff.

Thomas Patrick McCloskey, Aliazzo, McCloskey & Gonzalez, LLP, Ozone Park, NY, Julia Hyun-Joo Lee, New York State Department of Law, New York, NY, for Defendants.

OPINION & ORDER

SIDNEY H. STEIN, District Judge.

*1 Plaintiff Gultela Qasem brings this action pursuant to 42 U.S.C. § 1983 against defendants Luis Toro, Delores Thornton, William Rogers, and John Does 1-10 in their individual capacities. The lawsuit arises from injuries allegedly suffered by Qasem at the hands of Corrections Officer Luis Toro while Qasem was an inmate under the custody of the New York State Department of Correctional Services ("DOCS") at Taconic Correctional Facility. The complaint alleges that defendants deprived Qasem of her constitutional rights through (1) direct and repeated acts of sexual assault by Toro; (2) Thornton and Rogers's deliberate indifference to her personal safety; and (3) Thornton and Rogers's maintenance of, or failure to remedy, policies and practices that created an unreasonable risk of sexual assault by Toro. Defendants Thornton and Rogers have now moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim for relief.

I. BACKGROUND

The following facts are taken from the complaint and presumed to be true for the purposes of this motion.

A. *Parties*

Plaintiff Gultela Qasem is currently an inmate at the Bedford Hills Correctional Facility. At the time of the acts alleged in the complaint, plaintiff was an inmate at the Taconic Correctional Facility. (Compl. ¶¶ 5, 21.) Defendant Toro-not a party to the present motion-is a DOCS Corrections Officer. At the time of the acts alleged in the complaint, defendant Delores Thornton was the Superintendent of Taconic and defendant Rogers was the Deputy Superintendent for Security of Taconic. (*Id.* ¶¶ 1, 8-9.)

B. *This Action*

Qasem alleges defendants violated her Eighth and Fourteenth Amendment rights under the United States Constitution as they arise out of a repeated pattern of sexual assault and rape committed against her by Toro.

While an inmate at Taconic, Qasem was assigned to work in Building 93 from approximately February 2007 to November 2007, and for most of that time, she also lived there. (*Id.* ¶¶ 21-22.) Qasem alleges that, on or around March 27, 2007, Toro entered her cell during the afternoon "count time" [FN1] and sexually assaulted her by fondling her breasts, vaginal area, and buttocks while also exposing his penis and forcing Qasem to perform oral sex on him. (*Id.* ¶ 23.) Plaintiff alleges that later that evening Toro ordered her to the officers' station where he raped her. (*Id.* ¶ 24.) Toro then told Qasem that he would write up a disciplinary action against her if she told anyone what he had done to her. (*Id.* ¶ 24.)

Qasem alleges that a pattern of sexual assault emerged over the next eight months. Toro allegedly assaulted and raped Qasem in her cell on numerous occasions during the night count time, in the officers' station, in the shower area, and in the recreation room. (*Id.* ¶¶ 25-26.) Throughout these eight months, Qasem alleges that Toro

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

repeatedly threatened to kill her and her family if she reported his actions. As a result, she did not report Toro's conduct. (*Id.* ¶ 27.) Plaintiff alleges, however, that other corrections staff facilitated Toro's repeated sexual abuse by condoning Toro or plaintiff being in unauthorized areas and allowing Toro into plaintiff's housing area when he was not assigned there. (*Id.* ¶ 28.)

**\*2** Although Qasem did not file a report against Toro based on his conduct, others did, and on July 2, 2007, the DOCS Officer of Inspector General ("IG") commenced an investigation into Toro's actions. (*Id.* ¶¶ 31-33.) When interviewed by an IG representative, Qasem denied the allegations because of the prior threats that Toro had made; despite her denials, plaintiff was reassigned to a different building the day after her interview. (*Id.* ¶¶ 33-34.) As the IG continued its investigation, in August 2007 Qasem was transferred back to building 93, which was the building where Toro worked at that time. Plaintiff contends that by causing her to be transferred back to Toro's building, defendants Thornton and Rogers were deliberately indifferent to her safety and allowed Toro to have continued unfettered access to her, which enabled him to continue raping and sexually abusing her. (*Id.* ¶ 38.) Plaintiff alleges that once she returned to building 93 in August 2007, Toro resumed his sexual assaults, including but not limited to raping her and sodomizing her. (*Id.* ¶ 40.)

During this same time period, plaintiff was transferred in and out of the "keeplock" area in building 93. (*Id.* ¶¶ 39-47.) While she was in keeplock, at least one corrections officer delivered a message from Toro to her, while other corrections staff condoned and disregarded the alleged continuing assaults by Toro. (*Id.* ¶¶ 47-48.) In addition to physical, mental, and emotional injuries she suffered from the repeated rapes and sexual abuse, Qasem alleges that in October 2007 she was diagnosed with genital herpes, a sexually transmitted disease, which she believes was transmitted to her by Toro. (*Id.* ¶¶ 61-63.)

Plaintiff alleges that sometime in November 2007, Toro became aware of the IG investigation and started harassing her by asking her what questions the IG representative had asked her and what her responses were. (*Id.* ¶ 45.) Qasem contends that on November 26, 2007, after she was once again raped by Toro, she told him that she was going to report his conduct, and Toro became violent with her-twisting her arm and wrist. (*Id.* ¶ 50.) The next day, plaintiff was transferred out of Taconic and into Bedford. (*Id.* ¶ 51.)

Plaintiff alleges that Thornton and Rogers were deliberately indifferent to her safety and well-being and that despite ample evidence of the assaults, they permitted Toro to have repeated access to her instead of removing either her or Toro from building 93. (*Id.* ¶¶ 55-60.) Plaintiff maintains that Thornton and Rogers were responsible for the inadequate polices and practices that allowed her to be repeatedly raped and assaulted over a number of months, despite the fact that other corrections officers were aware of Toro's misconduct. (*Id.*)

## II. DISCUSSION

A. *Rule 12(b)(6) Standard*

On a motion to dismiss a claim for relief pursuant to Rule 12(b)(6) a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 154 (2d Cir.2006). A complaint will be dismissed if it fails to set forth "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal, 129 S.Ct. at 1949* (quoting *Twombly, 550 U.S. at 556, 127 S.Ct. 1955).*

B. *Supervisory Liability Post-Iqbal*

**\*3** [1] The complaint alleges that defendants deprived Qasem of her constitutional rights through (1) the direct and repeated acts of sexual assault by Toro; (2) defendant Thornton and Rogers's deliberate indifference to her personal safety; and (3) Thornton and Rogers's maintenance of, or failure to remedy, policies and practices that created an unreasonable risk of sexual assault by Toro. Thornton and Rogers respond to the claims against them on several grounds.

First, they assert that Qasem's claims are based on a broad theory of "supervisory liability" that has been discredited by the U.S. Supreme Court in *Ashcroft v. Iqbal, --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).* Prior to *Iqbal,* well-established Second Circuit law provided five bases for alleging that a supervisory defendant had sufficient personal involvement with the alleged violation to maintain a section 1983 claim. A plaintiff could plead personal involvement by showing any of the following five courses of conduct:

(1) the defendant participated directly in the alleged constitutional violation, the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were

occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Sanders v. N.Y. City Dep't of Corr.,* 07 Civ. 3390, 2009 WL 222161, at \*5, 2009 U.S. Dist. LEXIS 7709, at \*17-18 (S.D.N.Y. Jan. 30, 2009). Defendants contend that *Iqbal's* discussion of supervisory liability took a narrower approach than did *Colon,* thereby rendering Qasem's reliance on *Colon* categories unwarranted.

The Second Circuit has not yet addressed how *Iqbal* affects the five categories of conduct that give rise to supervisory liability under *Colon.* As explained in detail in *D'Olimpio v. Crisafi,* No. 09 Civ. 7283, ---F.Supp.2d ----, ---- - ----, 2010 WL 2428128, at \*4-6, 2010 U.S. Dist. LEXIS 59563, at \*14-18 (S.D.N.Y. June 15, 2010), in the wake of *Iqbal,* certain courts in this district have found that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster," and that "[t]he other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated," because only the first and third categories allege personal involvement sufficiently to permit supervisory liability to be imposed after *Iqbal. Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801, 2009 WL 1835939, at \*1-2, 2009 U.S. Dist. LEXIS 54141, at \*6 (S.D.N.Y. June 26, 2009); *see also Newton v. City of N.Y.,* 640 F.Supp.2d 426, 448 (S.D.N.Y.2009) ("[P]assive failure to train claims pursuant to section 1983 have not survived the Supreme Court's recent decision in *Ashcroft v. Iqbal."); Joseph v. Fischer,* No. 08 Civ. 2824, 2009 WL 3321011, at \*15, 2009 U.S. Dist. LEXIS 96952, at \*42-43 (S.D.N.Y. Oct. 8, 2009) ("Plaintiff's claim, based on [defendant's] 'failure to take corrective measures,' is precisely the type of claim *Iqbal* eliminated."). This Court, as did the Court in *D'Olimpio,* disagrees with this narrow interpretation of *Iqbal.*

**\*4** [2] As *Iqbal* noted, the degree of personal involvement required to overcome a Rule 12(b)(6) motion varies depending on the constitutional provision alleged to

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

have been violated. Invidious discrimination claims require a showing of discriminatory purpose, but there is no analogous requirement applicable to Qasem's allegations of repeated sexual assaults. *See Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) (citing *Chao v. Ballista,* 630 F.Supp.2d 170, 178 n. 2 (D.Mass.2009)); *see also D'Olimpio,* --- F.Supp.2d at ----, 2010 WL 2428128, at *5, 2010 U.S. Dist. LEXIS 59563, at *16. *Colon's* bases for liability are not founded on a theory of respondeat superior, but rather on a recognition that "personal involvement of defendants in alleged constitutional deprivations" can be shown by nonfeasance as well as misfeasance. *Id.* at ----, at *5, 2010 U.S. Dist. LEXIS 59563 at *17 (quoting *Colon,* 58 F.3d at 873).

[3] Thus, the five *Colon* categories supporting personal liability of supervisors still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated. *Id.*; *see also Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) ("It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.' Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." (citation omitted)).

Plaintiff's allegations and inferences, if proven, would entitle her to relief under the Fourteenth Amendment and Eighth Amendments. *See Breithaupt v. Abram,* 352 U.S. 432, 435, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957) (sustaining substantive due process claims where state action shocks the conscience); *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the

Eighth Amendment.") (quoting *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)).

C. *Colon Categories*

Second and apart from their argument based on *Iqbal,* Thornton and Rogers assert that plaintiff has adequately alleged neither (1) that they were deliberately indifferent to her rights by failing to act on information that unconstitutional acts were occurring nor (2) that they were responsible for creating or maintaining policies or practices that failed to prevent Qasem from being repeatedly raped and assaulted.

[4][5] The Court finds that plaintiff has alleged sufficient facts that Thornton-the Superintendent of the DOCS facility where plaintiff resided-and Rogers-the Deputy Superintendent for Security at that same facility-were deliberately indifferent to her health and safety and that they were responsible for creating or maintaining policies and practices that failed to prevent plaintiff from being raped and assaulted. The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 620 (2d Cir.1996). "An official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

**\*5** Specifically, the complaint alleges that defendants were responsible for determining where inmates were to be housed and the assignment of guards, and in conjunction with the IG, the investigation and response to complaints of staff misconduct. Despite an investigation and what plaintiff alleges as substantial evidence of Toro's misconduct known to a variety of individuals (*id.* ¶ 56),

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

defendants Thornton and Rogers allowed plaintiff to be housed in the building where Toro worked (*id.* ¶ 58); they failed to remove him from guarding Qasem (*id.* ¶ 57); they failed to reassign Qasem to another building (*id.*); they allowed Qasem to be transferred back to the building where Toro worked (*id.* ¶ 58); and they did not increase supervision of Toro despite their knowledge of allegations of Toro's assaults and the IG's investigation of him (*id.* ¶ 59). The complaint also alleges that a number of acts occurred under defendants' supervision that were violations of DOCS rules and regulations (*id.* ¶¶ 28, 47), and that defendants Thornton and Rogers allowed those practices to take place.

Although discovery may ultimately reveal that defendants Thornton and Rogers made every reasonable effort to prevent the alleged sexual abuse, Qasem has alleged sufficient facts to allow the Court "to draw the reasonable inference" that the defendants "are liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949.

D. *Qualified Immunity*

[6] Third, Thornton and Rogers claim that qualified immunity requires dismissal of this litigation as to them. So far as the Court can ascertain, defendants contend that they are entitled to immunity principally because Qasem herself initially denied the sexual relationship when asked about it by prison security officers. In their view, her denials by themselves operate as a "reasonable" basis for the decision to place plaintiff back into the building where Toro had unfettered access to her.

[7] Individual defendants are " 'shielded from liability for civil damages' " under 42 U.S.C. § 1983 if " 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d

396 (1982)); *accord Gilles v. Repicky,* 511 F.3d 239, 243 (2d Cir.2007). "A right is clearly established if (1) the law is defined with Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.' " *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003) (quoting *Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998)).

This Court cannot find the defendants immune from suit on this record. It is well established that the sexual exploitation of prisoners by prison guards amounts to a constitutional violation. *See Schwenk v. Hartford,* 204 F.3d 1187, 1197 (9th Cir.2000) ("In the simplest and most absolute terms, the Eighth Amendment right of prisoners to be free from sexual abuse was unquestionably clearly established ... and no reasonable prison guard could possibly have believed otherwise."); *Daskalea v. District of Columbia,* 227 F.3d 433, 440, 343 U.S.App.D.C. 261 (D.C.Cir.2000) (affirming prisoner's Eighth Amendment claim after prison guards sexually assaulted her); *Berryhill v. Schriro,* 137 F.3d 1073, 1076 (8th Cir.1998); *Barney v. Pulsipher,* 143 F.3d 1299, 1310 (10th Cir.1998) ("Clearly plaintiffs' deprivations resulting from the sexual assaults are sufficiently serious to constitute a violation under the Eighth Amendment."). *Cf. Farmer v. Brennan,* 511 U.S. 825, 833-34, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.' ") (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Given the extent of the alleged sexual abuse, the numerous warning signs alleged, and the number of questionable-if not unintelligible-decisions made with respect to plaintiff during the course of the IG's investigation, the Court cannot say at this stage of the litigation that Thornton and Rogers are entitled to qualified immunity for their alleged actions.

III. CONCLUSION

*6 Because plaintiff has alleged enough facts to raise

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

a plausible claim to relief against the supervisory officials Thornton and Rogers and they are not entitled to qualified immunity on the basis of the record at this stage of the litigation, the motion by Thornton and Rogers to dismiss the complaint is denied.

> FN1. Count time is time during which all activity stops and essentially all inmates are locked into their cells, and corrections staff verify that no inmates are missing. (Compl. ¶ 23 n. 1.)

S.D.N.Y.,2010.

Qasem v. Toro

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

C

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Faris ABDUL-MATIYN, Plaintiff,
v.
Governor George PATAKI, Governor; Allen,
Correction Officer; Rowe, Correction Officer;
Valezquez, Correction Officer; Benbow, Correction
Officer; Johnson, Sullivan Correctional Facility Senior
Parole Officer; John Doe, 1, Sullivan Correctional
Facility Audiologist; John Doe 2, Sullivan Correctional
Facility Counselor; Walsh, Sullivan Correctional
Facility Superintendent; John Doe 3, Sullivan
Correctional Facility Psychiatrist; John Doe # 4, Cnypc
Psychiatrist; Elizabeth Farnum, Doctor; Debroize,
Doctor; Forshee, Doctor; Pete Hanmer, Cnypc Primary
Therapist; Tom Murphy; Jeff Nowicki; Sharon Barboza,
Director Cnypc Sotp Program; Sawyer, Director, Cnypc;
Cnypc Medical Staff; Michelle Payne, Former Cnypc
Program Rehabilitation Counselor; Steve Capolo; and
Linda Becker, Defendants.
No. 9:06-CV-1503 (DNH)(DRH).

April 8, 2008.

Faris Abdul-Matiyn, Brooklyn, NY, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General
State of New York, Gerald J. Rock, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants Johnson, Walsh, Farnum, Debroize, Forshee,
Hanmer, Murphy, Nowicki, Barboza, Sawyer, CNYPC
Medical Staff, Capolo, and Becker.

Kloss, Stenger, Kroll & Lotempio, David W. Kloss, Esq.,
of Counsel, Buffalo, NY, for Defendants Allen, Rowe,
Valezquez, and Benbrow.

*DECISION and ORDER*

DAVID N. HURD, District Judge.

**\*1** Plaintiff, Faris Abdul-Matiyn, brought this civil rights
action pursuant to 42 U.S.C. § 1983. By a voluminous
Report-Recommendation dated February 19, 2008, the
Honorable David R. Homer, United States Magistrate
Judge, addressed the numerous issues in this matter with
the recommendations that:

1. The motion of Walsh and Johnson to sever be denied;

2. The motion of Walsh and Johnson to dismiss be granted
as to plaintiff's conspiracy claim against defendant
Johnson for failure to intervene, and denied in all other
respect;

3. The state defendants' motion to dismiss be granted in all
respects as to defendant Sawyer; granted in all respects as
to plaintiff's claim for denial of access to the courts, and
denied in all other respects;

4. The City defendants' motion to dismiss be denied in all
respects;

5. The motion of defendant CNYPC Medical Staff to
dismiss be granted; and

6. The complaint be dismissed without prejudice as to
defendants George Pataki, Michelle Payne, and John Does
I-IV.

No objections to the Report-Recommendation have been
filed.

Based upon a careful review of the entire file and the
recommendations of Magistrate Judge Homer, the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

Report-Recommendation is accepted and adopted in its entirety. *See* 28 U.S.C. 636(b) (1).

Accordingly, it is

ORDERED that:

1. Defendant Walsh and Johnson's motion to sever is DENIED;

2. Defendant Walsh and Johnson's motion to dismiss is GRANTED with regard to plaintiff's conspiracy claim against defendant Johnson for failure to intervene, and DENIED in all other respects;

3. The state defendants' motion to dismiss is GRANTED in all respects with regard to defendant Sawyer, GRANTED in all respects with regard to plaintiff's claim for denial of access to the courts, and DENIED in all other respects;

4. The City defendants' motion to dismiss is DENIED in all respects;

5. The motion of defendant CNYPC Medical Staff to dismiss is GRANTED; and

6. The complaint is DISMISSED without prejudice with regard to defendants George Pataki, Michelle Payne, and John Does I-IV.

7. The Clerk is directed to enter judgment accordingly, and the remaining defendants are instructed to file and serve answers with regard to the remaining claims on or before April 29, 2008.

IT IS SO ORDERED.

**REPORT-RECOMMENDATION AND ORDER**[FN1]

FN1. This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se Faris Abdul-Matiyn ("Abdul-Matiyn"), formerly an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants,[FN2] twelve DOCS employees[FN3] ("State defendants"), four New York City Corrections Officers ("City defendants"), and the Central New York Psychiatric Center ("CNYPC") Medical Staff ("CNYPC defendants"), violated his constitutional rights under the First, Fourth, Eighth, and Fourteenth Amendments. Compl. (Docket No. 1). Presently pending are a motion to sever defendants Walsh and Johnson pursuant to Fed.R.Civ.P. 21 or, in the alternative, to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) (Docket No. 17) and motions to dismiss from the State defendants (Docket Nos. 44, 47),[FN4] the City defendants (Docket No. 46), and defendant CNYPC Medical Staff defendants (Docket No. 55) pursuant to Fed.R.Civ.P. 12(b)(6). Abdul-Matiyn opposes all motions. Docket Nos. 45, 48, 62. For the following reasons, it is recommended that (1) the motion of Walsh and Johnson to sever be denied and their motion to dismiss be granted in part and denied in part, (2) the State defendants' motion be granted in part and denied in part, (3) the City defendants' motion be denied, and (4) the motion of the CNYPC Medical Staff be granted.

FN2. Abdul-Matiyn initially named twenty-six defendants. Compl. By an order entered January 26, 2007, the Court *sua sponte* dismissed three of the defendants. Docket No. 8. Defendants Pataki and Payne have not been served or otherwise appeared in this action. Likewise, defendants John Does I-IV have neither been served nor further identified. More than 120 days have elapsed since the complaint was filed. Accordingly, it is recommended that the complaint be dismissed without prejudice as to these six defendants pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

FN3. Two of the State defendants, Walsh and Johnson, are employed by Sullivan Correctional Facility and, while represented by the same attorney as the other State defendants, have filed separate motions.

FN4. The State defendants initially moved to dismiss which was later discovered to contain an error in the electronic scanning of the documents. Docket No. 47. By an order dated May 29, 2007 (Docket No. 44, Pt. 1), that motion was stricken from the record and replaced by Docket No. 47. Docket No. 49.

## I. Background

**\*2** The facts are presented in the light most favorable to Abdul-Matiyn as the non-moving party. *See Ertman v. United States,* 165 F.3d 204, 206 (2d Cir.1999).

Abdul-Matiyn "was released from Woodburn [Correctional Facility], after ... serv[ing] sixteen years and eight months ...." Compl. at 13. Abdul-Matiyn thereafter "attended [and completed] sex therapy, alternative[s] to violence, [and] psychological programs ...." *Id.* However, on May 5, 2005, Abdul-Matiyn was arrested and detained at Rikers Island due to a parole violation. *Id.*

Upon his arrival at Rikers Island, Abdul-Matiyn complained of "arthritis, back problems (pains), a history of heart problems, a history of blackouts ...," and kidney and bladder stones. *Id* . On July 6, 2005, Abdul-Matiyn requested a sick call because he was "having severe back pains, that were making it almost impossible for him to walk ... [and] a tightness in his chest and strong chest pains." *Id.* at 7. Abdul-Matiyn alleges that he was sent back to his cell, and despite his continued complaints, crippling pain, and pleas to go to the hospital, defendants Allen and Benbow ignored his requests. *Id.* at 7-8. Defendant Valezquez replaced Allen and "[Abdul-Matiyn] and the inmates informed [her] that [AbdulMatiyn] was having chest and back pains ... [so she] called the hospital and she was told to send [him] right down." *Id.* at 8. Benbow approached Valezquez to inquire where AbdulMatiyn was going and when Valezquez informed

her that he was going to the hospital, Benbow allegedly referred to Abdul-Matiyn by a racial epithet and called the hospital, instructing them to put Abdul-Matiyn "on the burn". *Id.*

Defendant Rowe met Abdul-Matiyn upon his arrival at the hospital. *Id.* She informed him that he was "on the burn" and "[d]espite [Abdul-Matiyn's] persistent complaints of chest and back pains ..," Rowe did not let him see a doctor until over three and one-half hours later. *Id.* at 9. Abdul-Matiyn's chest pains had subsided, but he was still suffering from back pain and was prescribed methocarbamol. *Id.* Abdul-Matiyn contends that the physician informed him that due to the hospital's faulty equipment, the methocarbarnol was the only treatment available and that any persisting pain would have to be managed with Abdul-Matiyn's ability to use his mind to control the discomfort. *Id.*

Additionally, Abdul-Matiyn alleges that on another occasion where he was rushed to the clinic "due to severe pains [in his] chest, back and belly ..,", he encountered Rowe, who stated that "they had something special in store for [Abdul-Matiyn]" and refused to provide Abdul-Matiyn with immediate medical treatment. *Id.* at 12. Abdul-Matiyn also contends that some of Rowe's saliva landed on his face and in his mouth while Rowe was speaking to him and attributed this exchange of bodily fluids to his contraction of Hepatitis B. *Id.* at 15.

**\*3** Abdul-Matiyn was supposed to be released from Rikers Island on May 5, 2006. *Id.* at 14. However, at the beginning of April, Abdul-Matiyn was summoned to meetings with the Sullivan Correctional Facility's mental health department. *Id.* at 16.[FN5] The mental health workers "stated that Albany told them to interview [Abdul-Matiyn] and to send Albany an evaluation;" however, despite Abdul-Matiyn's repeated requests, they would not tell him why Albany required an evaluation. *Id.* During the interview, Abdul-Matiyn was asked questions concerning his religion and alleged involvement with terrorists and terrorist organizations. *Id.* Additionally, Abdul-Matiyn contends that the mental health department was misconstruing prior conversations he had with them [FN6] about his religious beliefs, "distort[ing] and misinterpret[ing his statements] to have it appear that [he] was seeing and hearing things that were not there." *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

FN5.   At some point Abdul-Matiyn was transferred to Sullivan Correctional Facility for housing, but the exact date is not reflected in the record.

FN6.   Abdul-Matiyn states that he sporadically suffered from depression which caused trouble sleeping. Compl. at 16. When this occurred, he would "go to mental health and speak with someone and [ ] get something to help him sleep." *Id.*

After the evaluation interview, Abdul-Matiyn was seen by defendant Johnson. *Id.* at 17. Johnson asked Abdul-Matiyn to complete additional paperwork, allegedly because AbdulMatiyn's initial paperwork had been "messed up." *Id.* Abdul-Matiyn "asked if anything came up that would interfere with his release ...." and Johnson responded "no unless something else comes up unexpectedly ...." *Id.* Abdul-Matiyn continually asked correctional facility staff if there were new developments occurring in his case that would preclude his release; however, "[e]ach defendant expressed ... that they had no knowledge of anything that would prevent [him] from going home." *Id.*

On May 5, 2005, Abdul-Matiyn was met by Johnson and informed that he was "suppose[d] to have been examined by mental health the last two weeks before he was to be released [and] ... he had to be transferred to Marcy Psychiatric [Correctional Facility] to be evaluated." *Id.* at 18. Abdul-Matiyn alleges that he was told that his evaluation would be "three days to a week and no more than two weeks ...." *Id.* Abdul-Matiyn was then strip-searched, shackled, and transported to CNYPC. *Id.* Abdul-Matiyn later alleged that Walsh authored and signed an application for involuntary commitment and that this information was readily known by other defendants. Docket No. 45 at ¶¶ 6-7; Docket No. 48 at ¶¶ 11, 13-14.

Upon arrival at CNYPC, defendant Murphy allegedly told Abdul-Matiyn that he would "be [t]here a lot longer than [two weeks because he was] one of the filthy animals [defendants] have to clean off our streets." Compl. at 19. "All of [Abdul-Matiyn's] property was taken from him,"

including religious texts and other items. *Id.* Additionally, Murphy informed Abdul-Matiyn that he would "be [t]here for the rest of [his] life." *Id.* Abdul-Matiyn continually asked what authority granted defendants the ability to keep him confined against his will, but defendants did not give him an answer. *Id.*

*4 Additionally, Abdul-Matiyn underwent a psychological evaluation upon arrival. *Id.* According to the psychologist, "she didn't see anything mentally wrong with [Abdul-Matiyn] ... and that she could not give [him] any answers to his legal questions except that Governor Pataki instructed them to lock up everyone convicted of a sexual offense by any means possible, and keep them locked up forever." *Id.*

While Abdul-Matiyn resided at CNYPC, the CNYPC defendants, "especially ... Hanmer, .. Murphy, .. Nowicki and ... Payne told [him] he had no constitutional rights ... to be allowed to practice his religion, have access to the courts or be told why he was [t]here at CNYPC." *Id.* at 20. Additionally, defendant Capolo allegedly refused Abdul-Matiyn's requests to pray, "tell[ing Abdul-Matiyn] that he was too busy to allow [Abdul-Matiyn] the opportunity to pray and [that he] would have to find another time after Capolo got off work to pray." *Id.* at 27. Abdul-Matiyn also contends that Payne "would taunt [him] everyday by making sarcastic statements about [Abdul-Matiyn] and his religion to groups of people whenever he was present." *Id.* Furthermore, although CNYPC provided kosher meals to Jewish residents and defendant Becker "told [Abdul-Matiyn] that they would consider obtaining a contract for halal meals [FN7] ...," none were purchased and Abdul-Matiyn was denied his special religious diet. *Id.* at 20.

FN7.   "Halal" foods are those prepared in accordance with Islamic religious law. *See, e.g.,* Cyril Glasse, *The Concise Encyclopedia of Islam* 133, 144, 148 (1989).

Abdul-Matiyn also contends that while he was at CNYPC, he was "forcefully strip searched, on a few occasions and threatened with the threat of being injected with drugs if he refused to be striped [sic] searched or ... participate in the programs [t]here at CNYPC, even if his refusal [wa]s

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

due to his religion or if he w[as] physically ill." *Id.* at 23. AbdulMatiyn also alleges that Payne threatened him with the punishment of the "side room", where patients were allegedly "unmercifully beat, kick[ed] and stomp[ed] ...." *Id.* at 28. Moreover, Abdul-Matiyn contends that his "room ha[d] not been clean in over six months and the times [he] ha[d] tried to clean his room with a wet towel; he was threatened with punishment ...." *Id.* at 23. Abdul-Matiyn also complains that his confinement was discriminatory because "defendants ... came to the determination that they would imprison males convicted of sexual offenses ... [since] defendants are targeting only males convicted of sexual offenses and not females who commit the same or similar offenses." *Id.* at 25. This action followed.

## II. Discussion

In his complaint, Abdul-Matiyn alleges that his First Amendment rights were violated because the CNYPC defendants failed to provide him with halal meals, did not allow him to pray, and impeded his access to the courts. Abdul-Matiyn also claims that he was unlawfully strip-searched and shackled on multiple occasions. Additionally, Abdul-Matiyn asserts Eighth Amendment violations for deliberate indifference to a serious medical need [FN8] and, liberally construing Abdul-Matiyn's complaint, failure to protect. Moreover, AbdulMatiyn contends that his due process rights were violated by his civil confinement and the conspiracy between Walsh and Johnson to have him civilly confined, as well as claiming that his equal protection rights were violated by CNYPC's discriminatory procedures confining only male sex offenders. Walsh and Johnson move to sever and, in the alternative, dismiss based upon the failure to (1) abide by the pleading requirements, (2) allege the personal involvement of Walsh, and (3) state a claim with respect to Johnson. The State defendants move to dismiss based upon (1) Abdul-Matiyn's failure to comply with pleading requirements, (2) failure to allege the personal involvement of Sawyer, (3) the submission of a conclusory complaint with respect to the First and Fourteenth Amendment claims, and (4) the fact that verbal harassment alleged on the part of Capolo is not actionable under § 1983. The City defendants move to dismiss based upon the failure to (1) comply with pleading requirements, (2) allege personal involvement, (3) exhaust administrative remedies,[FN9] and (4) allege a serious medical need. The

CNYPC defendants move to dismiss based upon Eleventh Amendment immunity.

FN8. Abdul-Matiyn asserts multiple claims of serious medical conditions including *inter alia* back and chest pain, hearing loss, bladder and kidney stones, Hepatitis B, and arthritis. Compl. at 5,11, 12-13, 14. Because only the City defendants asserted an argument controverting Abdul-Matiyn's serious medical need, only the ailments directly pertaining to their involvement with his treatment will be discussed. Docket No. 46. These claims primarily concern the complaints of Abdul-Matiyn's chest and back pain. Compl. at 7-9.

FN9. "[F]ailure to exhaust is an affirmative defense ...." *Jones v. Block,* 127 S.Ct. 910, 921 (2007); *see also Paese v. Hartford Life Accident Ins. Co.,* 449 F.3d 435, 445 (2d Cir.2006). Thus, the City defendants' assertion of this affirmative defense in a motion to dismiss is premature but may be revisited at the summary judgment stage. *See Jones,* 127 S.Ct. at 921-22 (holding that an inmate is not required to plead exhaustion in the complaint). Accordingly, the City defendants' motion on this ground should be denied.

## A. Legal Standard

**\*5** Fed.R.Civ.P. 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the nonmovant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, "a 'complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *Gilfus v. Adessa,* No. 5:04-CV-1368 (HGM/DEP), 2006 WL 2827132, at \*3 (N.D.N.Y.2006) (citing *De Jesus v. Sears, Roebuck & Co.* 87 F.3d 65, 70 (2d Cir.1996) (internal quotations omitted)). Thus, dismissal is only warranted if it appears, beyond a reasonable doubt, that the non-moving party cannot prove a set of facts which would support his or her claim or entitle him or her to relief. *See Hishon v. King &*

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

*Spalding,* 467 U.S. 69, 73 (1984); *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999).

When, as here, a party seeks dismissal against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they 'suggest..... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations,.. or arguments that the submissions themselves do not "suggest, ..." that we should not "excuse frivolous or vexatious filings by *pro se* litigants" ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law ...."

*Id.* (citations and footnote omitted).

### B. Failure to Comply with Pleading Requirements

"Under the Federal Rules, a 'short and plain' complaint is sufficient as long as it puts the defendant on notice of the claims against it." *Phillips v. Girdich,* 408 F.3d 124, 127 (2d Cir.2005) (*quoting* Fed.R.Civ.P. 8(a)). Additionally, the Federal Rules state that "[a]ll averments of claim ... shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances...." Fed.R.Civ.P. 10(b). However, "[a]t base, the Rules command us never to exalt form over substance." *Phillips,* 408 F.3d at 128 (*citing* Fed.R.Civ.P. 8(f)).

The majority of defendants cite Abdul-Matiyn's failure to number his complaint in paragraphs as a basis for dismissal. However, the Court has been "willing to overlook harmless violations of Rule 10(b) ..." where the spirit of the rule, "to facilitate [ ] the clear presentations of

the matters set forth, so that allegations might easily be referenced in subsequent pleadings," is not offended. *Id.* (citations and internal quotations omitted). Thus, "where the absence of numbering or succinct paragraphs does not interfere with one's ability to understand the claims or otherwise prejudice the adverse party, the pleading should be accepted." *Id.* (citations omitted).

*6 In this case, it is clear that all defendants were able to reference easily the allegations in the complaint as each set forth multiple reasons to dismiss the complaint other than the failure to comply with Rule 10(b). Moreover, defendants were not clearly prejudiced as each motion and memorandum of law is extensively researched, cogently written, and, when viewed together, refute most of the bases upon which Abdul-Matiyn asserts constitutional violations.

Therefore, the motions of Walsh and Johnson, the State defendants, and the City defendants on this ground should be denied.

### C. Personal Involvement

Certain defendants contend that Abdul-Matiyn has failed to establish their personal involvement. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

> (1)[T]he defendant participated directly in the alleged constitutional violation, the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

### 1. Walsh

Walsh contends that "[o]ther than being named in the caption and identified as a party, [he] is never referred to in the complaint." Docket No. 17, Pt. 2 at 4. However, construing all of Abdul-Matiyn's submissions liberally, he alleges that "Walsh ... without any medical support, wrote out an application, stating that [Abdul-Matiyn] was in need of involuntary commitment .... " Docket No. 48 at ¶ 11. As discussed *infra* in subsection II(E)(2)(I), Abdul-Matiyn's involuntary civil confinement may constitute a due process violation. Thus, Walsh's alleged actions of authoring and signing the allegedly false report which served as the basis of Abdul-Matiyn's confinement may constitute direct participation in an alleged constitutional violation.

Accordingly, Walsh's motion to dismiss on this ground should be denied.

### 2. Benbow, Allen, Rowe, and Valezquez

The City defendants contend that there are no allegations that they were personally involved in the alleged deliberate indifference to Abdul-Matiyn's medical treatment because they were not personally involved with providing his medical care. However, defendants need not physically administer the care to be subject to Eighth Amendment liability.

*7 As discussed *infra* in subsection II(E)(1), construing all facts in the light most favorable to Abdul-Matiyn, the City defendants exhibited deliberate indifference to his medical treatment. Although the City defendants were not responsible for the actual medical care, they were

responsible for seeing that Abdul-Matiyn received adequate treatment once they were aware of his serious medical need. Crediting Abdul-Matiyn's allegations, each City defendant ignored this responsibility by denying Abdul-Matiyn with medical treatment or severely delaying it. Therefore, the complaint suffices to allege that each was directly involved in the alleged deliberate indifference.

Thus, City the City defendants' motion on this ground should be denied.

### 3. Sawyer

The State defendants argue that "[o]ther than being named in the caption and identified as a party, Sawyer is never referred to in the complaint." Docket No. 47, Pt. 2 at 4. Reading all of Abdul-Matiyn's submissions together, he alleges that "superiors [are] liable for their [employees'] actions ... and Sawyer is responsible for the training for those employed at CNYPC and liable for their actions and inactions." Docket No. 48 at ¶ 22. Abdul-Matiyn continues by alleging negligent hiring and retention and vicarious liability. *Id.* at ¶¶ 23-26.

Sawyer cannot be held liable solely because he held a supervisory position over other defendants. Abdul-Matiyn does not specifically contend that Sawyer was directly involved or had knowledge of the alleged constitutional violations; however, even when reading the complaint in the light most favorable to Abdul-Matiyn, any liberally construed allegations of direct involvement and knowledge would still lack any factual basis. Additionally, although Abdul-Matiyn contends that there was negligent supervision, there is no fact asserted beyond his conclusory allegations that Sawyer created a hiring or retention policy which allowed constitutional violations to continue or was grossly negligent in managing the other named defendants.

Therefore, the State defendants' motion to dismiss on this ground should be granted.

### D. Severance

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

In the event of misjoinder of parties, "[a]ny claim against a party may be severed and proceed separately." Fed.R.Civ.P. 21. "While the decision whether to grant a severance motion is committed to the sound discretion of the trial court, the federal courts view severance as a procedural device to be employed only in exceptional circumstances." *Baergas v. City of New York,* No. 04-CV-2944 (BSJ/HBP), 2005 WL 2105550 at *3 (S.D.N.Y. Sept. 01, 2005) (citations and internal quotations omitted). The factors considered "when determining whether severance is appropriate [are]:

> (1) whether the claims arise out of the same transaction or occurrence, whether the claims present common questions of fact or law, (3) whether severance would serve judicial economy, (4) prejudice to the parties caused by severance, and (5) whether the claims involve different witnesses and evidence."

**\*8** *Id.* at \*3-4 (citations omitted).

In this case, it is clear that severance is not warranted. The actions of Walsh and Johnson are the basis of Abdul-Matiyn's due process claim. Liberally reading all submissions, Abdul-Matiyn alleges that Walsh, "without any medical support, wrote out an application, stating that [Abdul-Matiyn] was in need of involuntary commitment" and signed it, leading to Abdul-Matiyn's involuntary civil confinement, potentially in violation of the Fourteenth Amendment. Docket No. 45 at ¶¶ 6-7; Docket No. 48 at ¶ 11. Additionally, Abdul-Matiyn contends that Johnson participated in the conspiracy to involuntarily confine him "by concealing what was taking place, and giving [him] misleading information concerning the situation." *Id.* at ¶ 13. Thus, the subsequent claims of involuntary confinement asserted against the CNYPC defendants directly relate to, and intertwine with, the allegations against Walsh and Johnson. Additionally, the same set of facts relating to who signed the papers and ordered that he be confined would be determined in both cases. Among other things, this would result in defendants calling duplicate witnesses. Thus, severing the litigation would not serve the interests of judicial economy and may lead to inconsistent findings in liability and damages which

would prejudice all defendants.

Therefore, Walsh and Johnson's motion to sever should be denied.

**E. Failure to State a Claim**

An action commenced pursuant to 42 U.S.C. § 1983 requires proof of the "deprivation of any right[ ], privilege[ ], or immunit[y] secured by the Constitution" or laws of the federal government. 42 U.S.C. § 1983. Thus, no action lies under § 1983 unless a plaintiff has asserted the violation of a federal right. *See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n,* 453 U.S. 1, 19 (1981).

**1. Eighth Amendment**

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII. This includes the provision of medical care and punishments involving "the unnecessary and wanton infliction of pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citations omitted). A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Hathaway,* 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844 (1994).

**\*9** " 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1,9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, 16 and (3) the existence of chronic and substantial pain ." *Brock v. Wright,* 315 F.3d 158, 162-63 (2d Cir.2003) (citing *Chance,* 143 F.3d at 702). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, (1976). "Mere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate. *Id* . at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a § 1983 claim." *Magee v. Childs,* No. 04-CV1089 (GLS/RFT), 2006 WL 681223, at *4 (N.D.N.Y. Feb. 27, 2006). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Courts have held that "[s]evere back pain, especially if lasting an extended period of time, can amount to a 'serious medical need' under the Eighth Amendment." *Nelson v. Rodas,* No. 01-CV-7887 (RCC/AJP), 2002 WL 31075804, at *14 (S.D.N.Y. Sept. 17, 2002). Courts have also failed to recognize chest pains as a serious medical condition. *See McCoy v. Goord,* 255 F.Supp.2d 233, 260 (S.D.N.Y.2003) (holding that keeping plaintiff "waiting for twenty-five minutes and then sen[ding] him back to his cell without treating his chest pains does not amount to a constitutional deprivation.").

However, considering Abdul-Matiyn's claims together and reading all allegations in a light most favorable to him, it appears that he has alleged a serious medical condition. Abdul-Matiyn contends he had a history of back pain and that the back pain he was experiencing on July 6, 2005 was so severe that it was "making it almost impossible to walk ...." Compl. at 7. This pain began at 11:30 a.m. and was not addressed until after 3 p.m. *Id.* at 7-9. Additionally, the back pain was accompanied by severe chest pain. *Id.* at 7. This pain lasted far longer than that addressed in *McCoy.* Additionally, the combination "had [Abdul-Matiyn] twisted over in a bending position ... [causing him to] cry[ ]." *Id.* Crediting Abdul-Matiun's allegations, this combination of factors present a condition which a reasonable person or physician would deem worthy of treatment. Additionally, the pain appears to have been of sufficient severity. Thus, Abdul-Matiyn's chest and back pain constituted a serious medical condition.

**10** Construing the allegations in the light most favorable to Abdul-Matiyn also leads to the conclusion that the City defendants were deliberately indifferent to his need for medical treatment. Abdul-Matiyn alleges that Allen and Benbow refused to respond to his repeated requests to go to the clinic for his severe and crippling chest pains. Compl. at 7. Additionally, even though Valezquez called the clinic on Abdul-Matiyn's behalf, it is alleged that Valezquez stood idly by while Benbow told the clinic that Abdul-Matiyn was to be placed "on the burn." *Id.* at 8. Additionally, upon arrival at the clinic, Rowe refused to let Abdul-Matiyn see a physician for an extended period of time. Compl. at 9. If proven, these actions could constituted intentional delay and denial of medical services during a serious medical need.

Therefore, the City defendants' motion to dismiss on this ground should be denied.

### 2. Fourteenth Amendment

### I. Due Process

Abdul-Matiyn contends that the State defendants violated his due process rights when he was involuntarily, civilly

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

confined at CNYPC without being given any justification from the State defendants. The State defendants contend that Abdul-Matiyn's claims are conclusory.

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. *See Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). "Prisoners enjoy the right not to be deprived of life, liberty or property without due process of law, but their rights are to be balanced with, and often tempered by, the needs of their special institutional setting." *Malik v. Tanner,* 697 F. Supp 1294, 1301 (S.D.N.Y.1988) (citing *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974)). "Involuntary confinement, including civil commitment, constitutes a significant deprivation of liberty requiring due process." *Fisk v. Letterman,* 401 F.Supp.2d 362, 374 (S.D.N.Y.2005) (citing *Addington v. Texas,* 441 U.S. 418, 425 (1979)). However, the Supreme Court has "permit[ted] involuntary confinement based upon a determination that the person currently both suffers from a 'mental abnormality' or 'personality disorder' and is likely to pose a future danger to the community." *Kansas v. Hendricks,* 521 U.S. 346, 371 (1997). "In the case of civil confinement, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for ... commit[ment] ... [and is in]tolera [nt of] the involuntary confinement of a nondangerous individual." *Mental Hygiene Legal Serv. v. Spitzer,* No. 07-CV-2935 (GEL), 2007 WL 4115936, at *6 (S.D.N.Y. Nov. 16, 2007) (citations and internal quotations omitted).

In this case, viewing all facts in the light most favorable to Abdul-Matiyn, it appears that his due process rights were violated. Abdul-Matiyn continually inquired why he was being interviewed, if the results of those discussions would interfere with his release date, and, upon his arrival at CNYPC, under what authority and with what proof he was being detained. All of these unanswered inquiries directly reflect upon the due process, or lack thereof, afforded to Abdul-Matiyn.

**\*11** Additionally, construing the allegations in the light most favorable to Abdul-Matiyn, he was not a danger to the community as he had undergone multiple courses during his release and devoted his time and energy to his religion and assisting those less fortunate in the community. Compl. at 13-14. Moreover, Abdul-Matiyn had no suicidal ideations or mental illness but was merely a devout and spiritual Muslim. *Id.* at 16. Therefore, AbdulMatiyn has alleged adequate facts to present a basis for recovery.

Thus, the State defendants' motion to dismiss on this ground should be denied.

### ii. Equal Protection[FN10]

> **FN10.** Liberally construing Abdul-Matiyn's complaint, there is a second allegation of discrimination. Abdul-Matiyn claims that defendants did not target those convicted of homicide, a crime specifically mentioned in the Mental Hygiene laws, for confinement while they did target sex offenders, a crime allegedly "never considered by the framers ... as a mental illness ...." Compl. at 25. However, Abdul-Matiyn's conclusory allegations do not compare similarly situated individuals; thus, any such contention does not implicate Fourteenth Amendment protection.

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). "In order to establish an equal protection violation, the plaintiffs must show that they were treated differently than other people in similar circumstances and must establish that such unequal treatment was the result of intentional and purposeful discrimination." *Myers v. Barrett,* No. 95-CV-1534, 1997 WL 151770, at *3 (N.D.N.Y. Mar. 28, 1997) (Pooler, J.). "To withstand constitutional challenge, previous cases establish that classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren,* 429 U.S. 190, 197 (1976).

In this case, Abdul-Matiyn alleges that male sex offenders were civilly confined in CNYPC while similarly situated female sex offenders were not. Compl. at 25. Construing

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

all allegations in the light most favorable to Abdul-Matiyn, it appears that he has asserted a sex-based, discriminatory policy. The State defendants merely claim that Abdul-Matiyn has stated a conclusory allegation; however, at this stage these facts, without any proffer of substantial relation to an important government objective, are suffice to allege a potential basis for relief.

Therefore, the State defendants' motion to dismiss on this ground should be denied.

### 3. First Amendment

### I. Free Exercise of Religion

Abdul-Matiyn alleges that his First Amendment rights were violated when the State defendants failed to provide him with his religious meals and refused to let him pray. The State defendants contend that Abdul-Matiyn's claims are conclusory.

"The First Amendment ... guarantees the right to the free exercise of religion." *Johnson v. Guiffere,* No. 04-CV-57 (DNH), 2007 WL 3046703, at *4 (N.D.N.Y. Oct. 17, 2007) (citing *Cutter v. Wilkinson,* 544 U.S. 709, 719 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). This right "is not absolute or unbridled, and is subject to valid penological concerns ...." *Johnson,* 2007 WL 3046703, at * 4.

### a. Failure to Provide Halal Meals

**\*12** The Free Exercise Clause extends "into other aspects of prison life including, pertinently, that of an inmate's diet ...." *Id.* The Second Circuit has held that it is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples ...." *Ford,* 352 F.3d at 597 (citations omitted). Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith ... unconstitutionally burden [s] their free exercise

rights." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004).

> A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes on his or her sincerely held religious beliefs.... [T]he burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision ... [and i]n the event such a[n] interest is articulated, its reasonableness is then subject to analysis under ... *Turner* ....

*Johnson,* 2007 WL 3046703 at * 4-5 (citations omitted).

In this case, Abdul-Matiyn has articulated a First Amendment violation as the State defendants did not provide him with his halal meals during his confinement in CNYPC. There is no dispute at this stage that Abdul-Matiyn held genuine religious beliefs. The State defendants at this stage assert only that Abdul-Matiyn's claim was conclusory. Therefore, the State defendants' motion must be denied because the allegations of the complaint suffice to state a claim.

Therefore, the State defendants' motion on this ground should be denied.

### b. Refusal to Allow Prayer

"A determination of whether the refusal to permit attendance at a religious service [vioolates the First Amendment] hinges upon the balancing of an inmate's First Amendment free exercise right[ ] against institutional needs of ... operating prison facilities ...." *Johnson,* 2007 WL 3046703, at *4. "The governing standard is one of reasonableness, taking into account whether the particular regulation affecting some constitutional right asserted by a prisoner is reasonably related to legitimate penological interests." *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (citations omitted).

In this case, Abdul-Matiyn appears to have asserted a First Amendment violation when the State defendants removed

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

his religious texts and refused to permit him to pray. Compl. at 19. Abdul-Matiyn specifically references defendant Capolo, alleging that "he refuse[d] to allow [Abdul-Matiyn] to go and perform his prayers ...." *Id.* at 27. The State defendants contend that Capolo's oral refusals constituted nothing more than verbal harassment, which "alone, unaccompanied by an injury no natter how inappropriate, unprofessional, or reprehensible .., does not constitute the violation of any federally protected right and therefore is not actionable under 42 U. S.C. § 1983." *Murray,* 2007 WL 956941, at *8.

However, the State defendants are incorrect in asserting that Capolo's alleged oral denials amounted only to verbal harassment and were insufficient to state a First Amendment violation. Capolo's alleged continuous refusals to provide Abdul-Matiyn with his religious texts or permit him time and space to pray were at least arguably unreasonable in light of the fact that at this stage, the State defendants have not proffered a legitimate penological interest which justified denial of the provision of a book and time for prayer. Thus, Abdul-Matiyn has alleged here a violation with a potential basis for relief.

*13 Therefore, the State defendants motion on this ground should be denied.

### ii. Access to Courts

Abdul-Matiyn contends that while confined, he was denied access to a law library and was thus denied his First Amendment right of access to the courts. The State defendants assert that Abdul-Matiyn alleges only a conclusory claim here.

The Supreme Court has held "that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries ...." *Bounds v. Smith,* 430 U.S. 817, 828 (1977); *see also Lewis v. Casey,* 518 U.S. 343, 351 (1996). This right is not unlimited and "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis,* 518 U.S. at 531.

"[I]n order to fulfill the actual injury requirement ... on a law library claim where there is a lack of access to the courts, the inmate must be pursuing [*inter alia* ] ... a civil rights claim pursuant to § 1983 to vindicate basic constitutional rights." *Linares v. Mahunik,* No. 05-CV-625 (GLS/RFT), 2006 WL 2595200, at *7 (N.D.N.Y. Sept. 11, 2006) (citations and internal quotations omitted). Thus, "to prove an actual injury, a plaintiff must show that a non-frivolous legal claim was frustrated or impeded due to the actions of prison officials." *Id.* (citations omitted).

In this case, Abdul-Matiyn enjoyed the right to a law library. Construing his allegations in the light most favorable to Abdul-Matiyn, this right was violated when the State defendants denied him access to one. Compl. at 20. However, Abdul-Matiyn does not allege that he suffered any injury due to this alleged deprivation. even when viewing all of Abdul-Matiyn's submissions together, he makes only that his lack of access to a law library precluded him from "drafting papers for court." Docket No. 48 at § 47. Additionally, Abdul-Matiyn claims that this preclusion from drafting papers provided defendants with their grounds for dismissal based on non-compliance with pleading requirements. *Id.*

However, this conclusory allegation is insufficient to provide a basis for relief. AbdulMatiyn alleges no case then pending which was adversely affected in any way. In this case, defendants' motions to dismiss based on the failure to comply with the pleading requirements were rejected. Moreover, Abdul-Matiyn gives no other indication of what drafts he intended to submit to the Court.

Therefore, the State defendants' motion to dismiss on this ground should be granted.

### 4. Conspiracy

Johnson assert that Abdul-Matiyn has failed to state a cause of action against him. Abdul-Matiyn contends that Johnson participated in the conspiracy to have him civilly detained and that he has a right "to be free from conspiracies to deprive him of his constitutional rights."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

Docket No. 48 at ¶¶ 13-14.

**\*14** "Section 1985 prohibits conspiracies to interfere with civil rights." *Davila v. Secure Pharmacy Plus,* 329 F.Supp.2d 311, 316 (D.Conn.2004). To state a claim for relief under § 1985(3), a plaintiff must show:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

*United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott,* 463 U.S. 825, 828-29 (1983); *see also Iqbal v. Hasty,* 490 F.3d 143, 176 (2d Cir.2007). "In addition, the conspiracy must be motivated by some class-based animus." *Iqbal,* 490 F.3d at 176 (citations omitted).

Here, Abdul-Matiyn alleges that Johnson joined with others to deprive Abdul-Matiyn of his rights. Liberally construing those allegations, the concert of actions by Johnson and others could support a claim of agreement among Johnson and other defendants and acts in furtherance of the conspiracy. This suffices to support a claim for conspiracy against Johnson and Johnson's motion on this ground should be denied.

However, liberally construing Abdul-Matiyn's claims, he has asserted an action for negligent failure to prevent the deprivation of his rights. If Johnson "ha[d] knowledge that any of the wrongs ... mentioned in section 1985 ... [we]re about to be committed, and ha[d] power to prevent or aid in preventing the commission of the same, [and] neglect[ed] or refuse[d] so to do ... [he] shall be liable to the party injured." 42 U.S.C. § 1986. However, "[a] claim under section 1986 ... lies only if there is a viable conspiracy claim under section 1985." *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 194 (2d Cir.1994).

Therefore, Johnson's motion to dismiss on this ground

should be granted in part and denied in part.

### F. Eleventh Amendment

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State ." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100.

"[T]he Central New York Psychiatric Center[,] ... [as an institution, is an] arm[ ] of the state for Eleventh Amendment purposes and ... therefore, [is] absolutely immune from [P]laintiff's claims for monetary damages in this lawsuit." *Murray v. Pataki,* No. 03-CV-1263 (LEK/RFT), 2007 WL 956941, at \*12 (N.D.N.Y. Mar. 29, 2007) (citations omitted). Therefore, the motion of defendant CNYPC Medical Staff on this ground should be granted.

### III. Conclusion

**\*15** For the reasons stated above, it is hereby **RECOMMENDED** that:

A. The motion of Walsh and Johnson to sever (Docket No. 17) be **DENIED**;

B. The motion of Walsh and Johnson to dismiss (Docket No. 17) be:

1. **GRANTED** as to Abdul-Matiyan's conspiracy claim

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

against defendant Johnson for failure to intervene; and

2. **DENIED** in all other respects;

C. The State defendants' motion to dismiss (Docket Nos. 44, 47) be:

1. **GRANTED** in all respects as to defendant Sawyer;

2. **GRANTED** in all respects as to Abdul-Matiyan's claim for denial of access to the courts; and

3. **DENIED** in all other respects;

D. The City defendants motion to dismiss (Docket No. 46) be **DENIED** in all respects;

E. The motion of defendant CNYPC Medical Staff to dismiss (Docket No. 55) be **GRANTED;** and

F. The complaint be **DISMISSED** without prejudice as to defendants George Pataki, Michelle Payne, and John Does I-IV.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2008.
Abdul-Matiyn v. Pataki
Slip Copy, 2008 WL 974409 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 1065548 (S.D.N.Y.)

(Cite as: 2004 WL 1065548 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Theophelus HILL, Plaintiff,
v.
PHILIP MORRIS USA, The Promotion Network, and
Mark Sanna, Chief of Security, Philip Morris, USA,
Defendants.
No. 03 Civ. 6922(GEL).

May 11, 2004.

Marcia Goffin, Gould Fishbein Reimer & Gottfried, LLP,
New York, NY, for Plaintiff.

Ina B. Scher, Davis & Gilbert LLP, New York, N.Y.
(Howard J. Rubin, on the brief), for Defendant The
Promotion Network.

Eric B. Post, Kelly Drye & Warren LLP, New York, N.Y.
(Robert E. Crotty, on the brief), for Defendants Philip
Morris USA, Inc. and Mark Sanna.

OPINION AND ORDER

LYNCH, J.

*1 Theophelus Hill brought this action against his
former employer, The Promotion Network ("TPN"),
TPN's client, Philip Morris USA ("PMUSA"), and Mark
Sanna, a security employee of PMUSA, alleging various
federal civil rights violations and pendent intentional-tort
claims under New York law. Defendants move to dismiss
pursuant to Fed.R.Civ.P. 12(b)(6).FN1 On April 2, 2004,
the Court held oral argument and thereafter invited limited
additional briefing. For the reasons that follow,
defendants' motions will be granted.

FN1. PMUSA and Sanna, on the one hand, and
TPN, on the other, bring separate motions to
dismiss. They will be considered together.

BACKGROUND

The facts set forth below are drawn from the
complaint and must be accepted as true for purposes of
this motion to dismiss. See Bolt Elec., Inc. v. City of New
York, 53 F.3d 465, 469 (2d Cir.1995). TPN, which
provides advertising and promotional services, employed
Hill, an African-American male, from 1998 until April 30,
2001. (Compl.¶¶ 3, 9, 16, 26.) In September 1999, Hill
relocated to TPN's New York office, located at 120 Park
Avenue in Manhattan, to work on various matters for
TPN's client PMUSA, which has an office in the same
building. (Id. ¶¶ 9-10.)

On August 30, 2000, Sven Bergman, an employee of
PMUSA, reported his wallet stolen. (Id. ¶ 11.) Later that
morning, someone made purchases at various retail
establishments near 120 Park Avenue using both personal
and PMUSA business credit cards from Bergman's wallet.
(Id. ¶¶ 11-13.) Sanna, on behalf of PMUSA, filed a
complaint report with the New York City Police
Department ("NYPD"), and thereafter, PMUSA security
personnel, "acting in cooperation with and at the direction
of the [NYPD]," investigated the theft and subsequent use
of the credit cards. (Id. ¶ 14.) Based on security
videotapes recorded at two of the retail establishments
where cards from Bergman's wallet were used, PMUSA
identified the perpetrator of the theft as a black male with
a shaved or bald head, a description that fits Hill. (Id. ¶¶
15-16.) According to Hill, "Philip Morris security
personnel conducted their investigation under the
supervision and at the direction of [the NYPD]." (Id. ¶
35.)

PMUSA security personnel showed Hill's photograph,
and only that photograph, to clerks at two of the retail
establishments, and the clerks identified Hill as the
suspect. (Id. ¶¶ 17-19.) On September 6, 2000, Sanna and
other PMUSA employees told TPN officials that they
thought Hill stole Bergman's wallet, and the TPN officials,
allegedly "acting at the direction of Philip Morris
security," subsequently informed Hill that he was
considered a suspect. (Id. ¶¶ 20-21.) The next day, again
acting "at the direction of PMUSA," TPN placed Hill on
paid leave and ordered him to stay away from its office

Not Reported in F.Supp.2d, 2004 WL 1065548 (S.D.N.Y.)

(Cite as: 2004 WL 1065548 (S.D.N.Y.))

and not contact anyone at PMUSA or TPN. (*Id.* ¶ 22.)

On September 13, 2000, NYPD Detective Anthony Castiglia arrested Hill, charged him with forgery, larceny, and criminal possession of stolen property, and took him into custody. (*Id.* ¶ 23.) Hill posted bail and was released after two and one-half days. (*Id.* ¶ 24.) On October 17, 2000, Hill learned that a New York grand jury had indicted, him, but on April 5, 2001, a judge dismissed the indictment because Hill had not been afforded the opportunity to testify before the grand jury. (*Id.* ¶ 25.) On April 17, 2001, TPN told Hill that it would terminate his paid leave and discharge him as of April 30, 2001. (*Id.* ¶ 26.) On July 9, a new grand jury indicted Hill for burglary, grand and petit larceny, criminal possession of stolen property, and attempt. (*Id.* ¶ 28.) On January 9, 2002, a judge dismissed the attempt and petit larceny charges, and on October 22, after receiving exculpatory evidence from Hill's counsel, the New York County District Attorney notified Hill that it would move to dismiss the other charges. On November 12, all remaining charges were dismissed, and on December 12, the records of the proceedings against him sealed. (*Id.* ¶¶ 29-32 .)

DISCUSSION

I. *Standard on a Motion to Dismiss*

**\*2** On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court must accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the plaintiff, drawing all reasonable inferences in his favor. *Leeds v.. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The Court will not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). But "[w]hile the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice ." *Leeds,* 85 F.3d at 53; *see also De Jesus v. Sears, Roebuck & Co.,* 87 F.3d 65, 70 (2d Cir.1996) ("A complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6).") (internal quotation marks omitted.)

II. *42 U.S.C. § 1983*

Hill brings three claims against PMUSA under 42 U.S.C. § 1983, which provides a right of action to persons deprived of constitutional rights under color of state law. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48 (1988). Hill alleges that by conducting only a cursory investigation of the theft of Bergman's wallet, and by showing only his picture during that investigation, PMUSA, "acting under the direction of the [NYPD]," caused him to be arrested falsely and prosecuted maliciously, on the basis of his race, in violation of the Fourth, Fifth, and Fourteenth Amendments to the Constitution. (Compl.¶¶ 36-41.)

Hill's § 1983 claims fail because the complaint does not adequately allege state action. It contains no allegations showing concerted action by PMUSA and the NYPD. In *Ciambriello v. County of Nassau,* 292 F.3d 307 (2d Cir.2002), the Second Circuit emphasized that "[a] merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity." *Id.* at 324. Here, except for the oft-repeated, but entirely conclusory, allegation that PMUSA's security personnel acted at or under "the direction of" the NYPD (Compl.¶¶ 14, 35, 37, 39, 41), the complaint is completely devoid of allegations suggesting PMUSA's complicity "in joint activity with the State or its agents" to violate Hill's rights. *Spear v. Town of West Hartford,* 954 F.2d 63, 68 (2d Cir.1992) (internal quotation marks omitted).[FN2] Hill alleges no concrete act or statement whatsoever of any NYPD member or anyone else that permits a factual inference that a state officer directed either employment decisions relative to Hill or the investigation undertaken by PMUSA's security employees.

FN2. Nor does Hill allege that Sanna or another PMUSA security guard had been deputized with state authority. *See, e.g., Rojas v. Alexander's Dep't Store, Inc.,* 924 F.2d 406, 408 & n. 1 (2d Cir.1990) (defendant department store employed a security guard deputized pursuant to N.Y. Admin. Code § 434a-7.0 to arrest shoplifters). Even if Hill had so alleged, PMUSA would not be "liable under § 1983 for the constitutional

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1065548 (S.D.N.Y.)

(Cite as: 2004 WL 1065548 (S.D.N.Y.))

torts of [its] employees" unless he also alleged that PMUSA had a policy or practice of some kind that led its employees to violate his rights. *Id.* at 408. The complaint does not allege that PMUSA had any official policy - for example, that PMUSA directed its security guards to engage in racial profiling - that caused its employees to violate Hill's rights.

**\*3** Hill's citation to this Court's decision in *Lucas v. Novogratz,* No. 01 Civ. 5445, 2002 WL 31844913 (S.D.N.Y. Dec. 18, 2002), is unavailing. (P. Br.7.) In *Lucas,* the plaintiff "presented supporting operative facts tending to show agreement and concerted action between the private party and the state actors." *Id.* at \* 4 (internal quotation marks and alterations omitted). Indeed, the plaintiff in *Lucas* alleged six specific statements or acts of the defendants that, "if proved, might support an inference of joint action or agreement between [the private defendants] and [a defendant police officer]." *Id.* at \*5.[FN3] Here, none of the factual averments in Hill's complaint (as opposed to the wholly conclusory claim that PMUSA's security personnel worked at or under "the direction of" the NYPD), even if proved, would permit an inference of joint action between PMUSA and the NYPD.

FN3. In particular, the plaintiff in *Lucas* alleged:

(a) Mr. Novogratz stated to Lucas on December 21, 1998, that he "had all his ducks in the water, and had a friend in the detective division at the First Precinct whom he was going to see"; (b) sometime in January 1999 defendant Druin caused a clerk at the First Precinct to "abruptly terminate [ ] the taking" of a complaint from Lucas concerning the removal of equipment from the site; (c) Druin on a later occasion informed Lucas that "plaintiff would never have a complaint involving the Novogratzes accepted at his precinct, or at any other"; (d) Druin again intervened on or about January 27, 1999, when Lucas attempted to file a criminal complaint at the First Precinct relating to city permits that allegedly had been fraudulently obtained under plaintiff's name, allegedly telling Lucas "that

he would not allow any criminal complaints to be made that would implicate the Novogratzes"; (e) at the February 18, 1999, ECB hearing (which apparently took place in the Seventeenth Precinct), Ms. Novogratz telephoned Druin to report that Lucas was in the courtroom, and, as a result of Druin's intervention, the hearing was adjourned; and (f) the following week, Druin sent Detective Matuzak to arrest Lucas while he was hospitalized in the St. Vincent's Hospital Coronary Care Unit, notwithstanding that detectives had earlier agreed to permit Lucas to surrender voluntarily at the precinct after his discharge from the hospital.

*Lucas,* 2002 WL 31844913, at \*4 (internal citations to complaint omitted).

At oral argument, the Court invited Hill to submit authority for the proposition that for a § 1983 plaintiff to plead state action, it suffices for him to allege, without any supporting factual averments, that the defendants "worked with the cops." (Tr. 9.) In *Niemann v. Whalen,* 911 F.Supp. 656 (S.D.N.Y.1996), the sole case cited by Hill in response to this request, the court held that the plaintiff introduced sufficient circumstantial evidence of a conspiracy between a police officer and a bank security employee, both of whom she named as defendants, to survive summary judgment. *Id.* at 664-65. The plaintiff introduced evidence that, if credited, would have amply supported an inference that the bank's security officer had conspired with the investigating police officer to interrogate her in a manner that violated her constitutional rights. *See id.* at 662. To the extent that *Niemann,* a summary judgment decision, provides guidance here, it does not support Hill's position. Unlike Niemann, Hill has not named any state official as a defendant and alleges no facts that, if proved, would support an inference that Sanna or another PMUSA employee conspired with the NYPD to violate his rights. Accordingly, Hill's complaint fails to state a claim under 42 U.S.C. § 1983. *See Studifin v. N.Y. City Police Dep't,* 728 F.Supp. 990, 993 (S.D.N . Y.1990) ("Even a *pro se* plaintiff must allege some factual basis to substantiate his conclusion that defendants [a private party and a police officer] conspired together," and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1065548 (S.D.N.Y.)

(Cite as: 2004 WL 1065548 (S.D.N.Y.))

thus, "[p]laintiff's one-sentence allegation of conspiracy, without supporting facts or specification of time, place, persons, and dates pertaining to the alleged conspiracy, fails to charge a conspiracy with sufficient particularity to make out a section 1983 claim against th[e] private party.") (footnote omitted); *see also Johnson ex rel. Johnson v. Columbia Univ.,* No. 99 Civ. 3415, 2003 WL 22743675, at *4 (S.D.N.Y. Nov. 19, 2003).

III. *42 U.S.C. §§ 1981 and 1985(3)*

Hill also alleges violations of 42 U.S.C. §§ 1981 and 1985(3), which do not require state action. His fourth and fifth claims allege that by "causing [Hill] to be falsely arrested and maliciously prosecuted based on a cursory investigation and on the basis of race," PMUSA and TPN denied him the rights to make and enforce contracts and to the "equal benefit of law and proceedings for security of persons and property." (*Id.* ¶¶ 43, 45.) His eleventh claim alleges that "[PMUSA] and TPN intentionally conspired to deprive plaintiff of equal protection of laws by terminating his employment, based on his race, in violation of 42 U.S.C. § 1985(3)." (*Id.* ¶ 57.) These claims fail for lack of factual allegations sufficient to give rise to an inference of discriminatory intent.

**\*4** To state a claim under § 1981, the plaintiff must allege: "(1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.)." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993). To state a claim under § 1985(3), the plaintiff "must allege, *inter alia,* that the defendants who allegedly conspired sought, *with discriminatory intent,* to deprive the plaintiff of a right covered by the Constitution or other laws." *Spencer v. Casavilla,* 903 F.2d 171, 174 (2d Cir.1990) (emphasis added); *see also Mian,* 7 F.3d at 1087.

Hill must therefore allege facts from which discriminatory intent can be inferred. *Albert v. Carovano,* 851 F.2d 561, 571-72 (2d Cir.1988) ("Essential to an action under Section 1981 are allegations that the defendants' acts were purposefully discriminatory."); *Jenkins v. Arcade Bldg. Maint.,* 44 F.Supp.2d 524, 528

(S.D.N.Y.1999) (emphasizing that for a § 1981 complaint "to survive a motion to dismiss, the events of the intentional and purposeful discrimination, as well as the racial animus constituting the motivating factor for the defendant's actions must be specifically pleaded") (internal quotation marks omitted); *see also Martin v. N.Y. State Dep't of Mental Hygiene,* 588 F.2d 371, 372 (2d Cir.1978) (conclusory allegations fail to state a claim under the Civil Rights Acts). While racial bias, both intentional and subconscious, doubtless continues to affect many areas of life in the United States, §§ 1981 and 1985(3) make actionable only *purposeful* discrimination. *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania,* 458 U.S. 375, 390 (1982); *Griffin v. Breckenridge,* 403 U.S. 88, 102 (1971); *see also Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 268-69 (1993); *De Jesus-Keolamphu v. Vill. of Pelham Manor,* 999 F.Supp. 556, 564-65 (S.D.N.Y.1998); *Bailey v. City of New York,* No. 98 Civ. 1812, 2003 WL 21031972, at *7 (S.D.N.Y. May 2, 2003). Mere "intent as volition or intent as awareness of consequences" does not establish a discriminatory purpose; the actor must have "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 279 (1979).

Hill's complaint does not plead purposeful racial discrimination. That PMUSA security officers showed only Hill's picture to the store clerks who identified him as the suspect does not give rise to an inference of racial animus on the part of PMUSA. Hill does not allege that PMUSA security officers engaged in racial profiling or assumed that the perpetrator of the theft must be black. Rather, by Hill's own allegations, he was identified as the suspect because the store videotapes showed an African-American man with a shaved or bald head using Bergman's purloined credit cards. That is how Hill describes himself, and he worked in the same building as Bergman. It hardly seems surprising that PMUSA's suspicions focused on Hill, and he alleges only in conclusory terms, devoid of any factual allegations, that "had the alleged perpetrator been Caucasian, Philip Morris security personnel would have shown an array of photographs to the salesclerks, not only one." (*Id.* ¶ 34.) The complaint provides no factual allegations to support

Not Reported in F.Supp.2d, 2004 WL 1065548 (S.D.N.Y.)

(Cite as: 2004 WL 1065548 (S.D.N.Y.))

that assertion. It does not allege, for example, that in cases involving Caucasians suspected of theft, PMUSA's security personnel have proceeded differently.

**\*5** The Court recognizes that standard and proper police practice would have been to show Hill's photograph as part of an array of photographs of men who similarly fit the description of the thief. By failing to follow that procedure, PMUSA's security employees gave the witnesses no alternatives to consider, implicitly suggested that they already knew the thief's identity, and thereby increased the risk of an incorrect identification. Still, PMUSA's employees violated no law by performing a sloppy investigation of the incident, and their failure to exercise due care does not, without more, give rise to an inference of racial animus. The complaint simply fails to allege any facts supporting the claim that PMUSA would have behaved more professionally had a white employee been similarly identified as the suspect.

In _Boomer v. Bruno,_ 134 F.Supp.2d 262 (N.D.N.Y.2001), the court dismissed a § 1981 complaint based on factual allegations strikingly similar to those presented here. The plaintiff in _Boomer_ alleged that the defendant police officers caused his arrest and indictment based on a single still photograph taken during an undercover narcotics investigation, even though one of the defendants, before testifying to the grand jury, became "aware of the possible existence of a photograph ... on file which could be used either to confirm that Plaintiff was the suspect or to exonerate him." _Id._ at 265. Based on that defendant's testimony, a grand jury voted to indict, and as the plaintiff could not afford bail, he remained in jail for six weeks. _Id._ Subsequently, as here (Compl. ¶¶ 30-31; Tr. 5), a more careful analysis and comparison of the photograph with the plaintiff made it "obvious that the 'wrong person' was in custody." _Id._ After being exonerated, the plaintiff brought suit, claiming, _inter alia,_ a violation of § 1981, based on the allegation "that the proper identification procedures were not followed 'because both the suspect and plaintiff were African-American males.' " _Id._ at 269 (quoting the complaint).

The court found the plaintiff's allegation insufficient to sustain a § 1981 claim because he did not plead specific

facts permitting an inference of discriminatory intent, "[i]n particular, ... that any similarly situated non-African Americans were treated differently by Defendants." _Id._ Furthermore, the court specifically found unavailing the plaintiff's argument, identical to the one Hill urges here, "that a reasonable inference should be drawn ... that, if a young white male had been indicted and incarcerated under similar circumstances, Defendants would have made additional efforts to verify his identity." _Id._ Finally, even if that inference could be drawn, the court made clear that to state a claim, the plaintiff would be required to plead "that similarly situated individuals _have_ been treated differently, not that they would be treated differently." _Id._ (emphasis added).

**\*6** The reasoning in _Boomer_ applies equally to Hill's complaint. Its sole specific factual allegation - that PMUSA conducted a sloppy investigation by showing only Hill's photograph to the store witnesses - does not permit an inference of purposeful discriminatory intent in the absence of an allegation that PMUSA has treated similarly-situated Caucasians differently. _See id._ (emphasizing that "[c]omplaints must 'specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of racially discriminatory intent' "), quoting _Yusuf v. Vassar College,_ 35 F .3d 709, 713 (2d Cir.1994); _see also Albert,_ 851 F.2d at 572 (finding the allegation that a college selectively enforced its rules against the plaintiffs on the basis of their race "too conclusory to survive a motion to dismiss"); _Davidson v. Citycorp/Citibank, N.A.,_ No. 90 Civ. 941, 1990 WL 96991, at \*4 (S.D.N.Y. July 2, 1990) (allegation that defendant bank denied plaintiff's application for credit despite "plaintiffs' superior credentials and assets, which equal or exceed the majority of white applicants," held insufficient to establish discriminatory intent absent allegation that bank granted the applications for credit of such white applicants).[FN4]

> FN4. _Phillip v. University of Rochester,_ 316 F.3d 291 (2d Cir.2001), is not to the contrary. In _Phillip,_ the Second Circuit, relying on the Supreme Court's recent decision in _Swierkiewicz v. Sorema,_ 534 U.S. 506 (2002), sustained a § 1981 claim based on a somewhat skeletal

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1065548 (S.D.N.Y.)

(Cite as: 2004 WL 1065548 (S.D.N.Y.))

complaint, which coupled factual allegations about what defendants' did with an allegation of discriminatory intent, "that defendants selected [plaintiffs] for maltreatment solely because of their color." *Id.* at 298 (internal quotation marks omitted). Plaintiffs alleged, *inter alia,* that defendants "attempted to trigger a legal proceeding against plaintiffs but would not have taken the same action" against similarly situated white people. *Id.* at 298. Unlike in this case, however, the *Phillip* plaintiffs both "describe[d] in great detail what the defendants [university security officers] actually did - actions that included confiscating without cause one plaintiff's identification, refusing to allow the plaintiffs to leave an area where they were peaceably assembled, and calling law enforcement officers without any misconduct on the students part," and "allege[d] that the plaintiffs were singled out of a group that apparently also contained non-minority students." *Id.* at 298-99. Hill's complaint both lacks comparable factual detail and contains no comparable allegation that could give rise to an inference of purposeful discriminatory intent.

Finally, even assuming the truth of Hill's allegation that PMUSA would have investigated a suspected Caucasian thief more carefully - by showing an array of photographs of similarly-featured Caucasians rather than only the photograph of the suspect - Hill would still be unable to state a claim under §§ 1981 or 1985(3). The factual allegations must permit an inference that PMUSA treated Hill differently not only "in spite of" the potential for such treatment adversely to affect African-Americans, but "at least in part 'because of' ' that effect. *See Feeney, 442 U.S. at 279; see also Eagleston v. Guido,* 41 F.3d 865, 878 (2d Cir.1994). None of Hill's allegations supports that inference. To the contrary, under the very circumstances pled by Hill, the natural inference is that PMUSA suspected Hill because his description matched that provided by the store videotape recordings and because he worked in the same building as Bergman.

The Court is not unsympathetic to Hill's situation. Assuming the truth of the allegations, Hill, through no fault of his own, lost his job and suffered severe damage to his reputation as a consequence of what appears to have been a case of mistaken identity. But the law does not and cannot provide redress for every wrong. Given the sad history of race in this country, it may well be inevitable that a person of color in Hill's position would believe that he has been a victim of discrimination. Indeed, given that history, it is certainly possible that white investigators might have been more solicitous of a white suspect. But as a matter of law, a legal remedy only exists for intentional racial discrimination. This is not a case in which the investigators chose a suspect in a way that could have been influenced by racial bias. Hill does not allege that he became a suspect because of racial prejudice. Rather, he alleges that, having become a suspect for logical, objectively appropriate reasons, he fell victim to a sloppy investigation, conducted with negligent techniques and a lack of due care. But carelessness knows no color and does not, without more, evince racial animus. Absent an allegation of a track record of better performance with white suspects, intentional discrimination cannot be inferred simply from the race of a victim of less than optimal investigative procedures.

**\*7** Accordingly, Hill's §§ 1981 and 1985(3) claims are dismissed for lack of an adequate allegation of purposeful discriminatory animus.

IV. *Pendent Claims*

Hill seeks to bring pendent claims under New York State law for false arrest, malicious prosecution, tortious interference with contract, intentional infliction of emotional distress, wrongful termination, and violations of the New York State Human Rights Law and the New York City Human Rights Law. Because no federal claims remain, however, the Court declines to exercise supplemental jurisdiction over these state-law claims. *See Giordano v. City of New York,* 274 F.3d 740, 754 (2d Cir.2001) (noting that, as a general matter, where all federal claims have been dismissed before trial, pendent state claims should be dismissed without prejudice and left for resolution to the state courts; collecting cases).

V. *Leave to Replead*

Finally, Hill seeks leave to replead should the Court

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1065548 (S.D.N.Y.)

(Cite as: 2004 WL 1065548 (S.D.N.Y.))

grant defendants' motions. (P. Br.1, 15.) In general, leave to replead should be "freely given when justice so requires." Fed.R.Civ.P. 15(a). But leave to replead may be denied if repleading would be futile. *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 55 (2d Cir.1995). Hill's complaint sets forth the narrative basis for his claims. He explains how PMUSA, TPN, and indeed the New York State authorities, came to suspect him of the theft of Bergman's wallet, and the consequences of that suspicion: his arrest and prosecution, and his ultimate discharge by TPN. But for the reasons set forth above, none of the factual allegations give rise to an inference of state action or purposeful racial discrimination, prerequisites to the various claims made. To give Hill leave to replead would be to invite him to offer a new narrative, not to furnish details that could salvage the original one, for such details, if they exist, would have been included in the first instance. Hill filed this complaint on September 9, 2003, about eighteen months after the last allegedly unlawful act by the defendants, TPN's discharge of Hill on April 30, 2001. It strains credulity that Hill, represented by counsel, failed to include factual details that could further buttress the causes of action asserted on the basis of the narrative described in the complaint.

Indeed, Hill does not offer any additional facts that he could or would add to an amended complaint. He admits that he would only be able to allege facts explaining how TPN, PMUSA, and the NYPD cooperated with one another, as well as "when or where such cooperation took place," after discovery. (P. Br.8.) But

it is not sufficient to say that appropriate allegations to plead a sufficient cause of action will be made after pre-trial discovery. *Conley v. Gibson* [355 U.S. 41, 45-46 (1957) ], ... does not authorize parties to use an insufficient complaint with a conclusory allegation as a hunting license to discover whether in fact a viable claim may be alleged. The discovery rules are designed to support a properly pleaded cause of action and to prepare defenses to charges made[,] not to discover whether a claim exists.

**\*8** *Am. Communications Ass'n. Local 10, I.B.T. v. Ret. Plan for Employees of RCA Corp. and Subsidiary Cos.,* 488 F.Supp. 479, 484 (S.D.N.Y.1980) (Weinfeld, J.); *see also* *Lucente v. Int'l Bus. Mach. Corp.,* 310 F.3d

243, 258 (2d Cir.2002) ("Where it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend.") (internal quotation marks omitted). Accordingly, leave to replead will be denied.

CONCLUSION

For the reasons stated, defendants' motions are granted, and this action is dismissed.

SO ORDERED.

S.D.N.Y.,2004.

Hill v. Philip Morris USA
Not Reported in F.Supp.2d, 2004 WL 1065548 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.